**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| IN RE: | Chapter 11 (Subchapter V) |
|---|---|
| ALECTO HEALTHCARE SERVICES LLC,[1] | Case No. 23-10787 (__) |
| Debtor. | |

**DECLARATION OF MICHAEL SARRAO, EXECUTIVE VICE PRESIDENT,
GENERAL COUNSEL, AND SECRETARY OF ALECTO HEALTHCARE SERVICES
LLC, IN SUPPORT OF FIRST DAY MOTIONS**

I, Michael Sarrao, declare and state as follows:

1.     I am the Executive Vice President, General Counsel, and Secretary for Alecto Healthcare Services LLC, a Delaware limited liability company (the "Debtor") that has filed a voluntary petition (the "Chapter 11 Petition") under Chapter 11, Subchapter V of title 11 of the United States Code (the "Bankruptcy Code"), commencing this Chapter 11 case (the "Case").

2.     To minimize the adverse effects of filing the Chapter 11 Petition while at the same time maximizing value for the benefit of stakeholders, the Debtor has filed a number of pleadings requesting various kinds of "first day" relief (collectively, the "First Day Pleadings").  I submit this Declaration in support of the Chapter 11 Petition and the First Day Pleadings.  I am familiar with the contents of each First Day Pleading (including the exhibits and other attachments to such motions) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Pleading: (a) is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption; (b) is critical to the Debtor's efforts to preserve value and maximize recoveries; and (c) best serves the Debtor's estate and creditors' interests.  Further, it is my belief that the relief sought in the First Day Pleadings is narrowly tailored and necessary to achieve the goals of this Chapter 11 Case.

---

[1]  The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

3.      I have served as the Debtor's Executive Vice President, General Counsel, and Secretary since January 1, 2013.  Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.  If called upon to testify, I could and would testify to the facts set forth in this Declaration.  The Debtor has authorized me to submit this Declaration.

4.      I am also personally familiar with the Debtor's records submitted in support of the First Day Pleadings.  The Debtor's records are made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record.  In general, the Debtor retains its files electronically in its computer system which is backed up regularly.

5.      This Declaration is divided into three parts.  Part I provides an overview of the Debtor's business, its corporate structure, its recent financial performance and its prepetition indebtedness.  Part II discusses the circumstances surrounding the commencement of this Chapter 11 case and what the Debtor views as the path forward.  Finally, Part III sets forth relevant facts in support of the First Day Pleadings.

## I.      OVERVIEW OF THE DEBTOR'S BUSINESS

### A.      Organizational Structure

6.      The Debtor is a Delaware limited liability company with its headquarters in Glendale, California.

7.      The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
|---|---|
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |

| The Hayes Irrevocable Trust | 3.80% |
|---|---|
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

**B.    The Debtor's Business Operations**

Historical Overview

8.    The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

9.    Since its inception, the Debtor has formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

10.    The following is a list of entities for which the Debtor holds a direct ownership interest:

| Name of Entity | % of Ownership | Current Value of Debtor's Interest |
|---|---|---|
| Alecto Healthcare Services Hayward LLC | 100% | $100,000.00 |
| United Medical Management, LLC | 100% | $0.00 |
| Alecto Healthcare Services Sherman LLC | 80% | $0.00 |
| Alecto Healthcare Services Los Angeles LLC | 100% | $0.00 |
| Alecto Healthcare Services Ohio Valley, LLC | 100% | $0.00 |
| Alecto Healthcare Services Real Estate Holdings LLC | 100% | $0.00 |
| Sunrise MOB Holdings LLC | 100% | $10,000.00 |
| Alecto Healthcare Services Fairmont LLC | 100% | $10,000.00 |
| Acceleron Services LLC | 100% | $0.00 |

| M/C Healthcare LLC | 100% | $0.00 |
|---|---|---|

### Current Business Operations

11.     In the ordinary course of business, the Debtor's employees (the "Employees") provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries.  The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of the litigation matters outlined below.

12.     The Debtor has thirteen (13) Employees. The table below summarizes how this population is distributed across the Debtor's operations:

| *Role* | *Approx. Number of Employees* |
|---|---|
| CEO | 1 |
| CFO | 1 |
| VP of Clinical Operations & Nursing | 1 |
| VP of Laboratory Services | 1 |
| Accounting Manager | 1 |
| Records Clerks | 2 |
| Accounts Payable | 3 |
| IT | 1 |
| HR Manager (Per Diem) | 1 |
| Finance (Per Diem) | 1 |
| **TOTAL:** | **13** |

13.     As of the Petition Date, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Healthcare Services Hayward LLC ("Alecto Hayward").  Alecto Hayward is a party to an amended management services agreement with Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "Management Services Fee"). Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.

14.     To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

15.     The Debtor also generates a de minimis amount of income from collecting fees for producing medical records and other similar items.

**C.      Recent Financial Performance**

16.     In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

17.     In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

**D.      The Debtor's Prepetition Indebtedness**

<u>Secured Debt</u>

18.     The Debtor has a secured debt obligation to Cardinal Health 110, LLC, as the agent on account of agreements with Cardinal Health 100, LLC and Cardinal Health 200, LLC (collectively, "<u>Cardinal Health</u>") related to the provision of pharmaceuticals and other supplies provided to hospitals operated by the Debtor's subsidiaries.  Cardinal Health claims it is owed approximately $366,547 for pharmaceuticals and supplies provided to the Debtor's subsidiaries. The debt owed to Cardinal Health is secured by the pharmaceuticals and supplies provided to the Debtor's subsidiaries.

19.     When the Debtor's subsidiaries acquired acute care hospitals across the country, the Debtor's subsidiaries entered into mortgage loans or sale/leaseback transactions with affiliates of Medical Properties Trust, a publicly traded real estate investment trust ("<u>MPT</u>").  Except for

one acquisition, all of the transactions with MPT were sale/leaseback transaction whereby the Debtor's subsidiaries sold certain real estate and improvements to affiliates of MPT and subsequently leased them back from affiliates of MPT such that the affiliates of MPT served as the landlord for the Debtor's subsidiaries.  The Debtor guaranteed certain obligations of its subsidiaries to MPT and its affiliates including: (a) a mortgage loan from MPT of Los Angeles, L.P., secured by the real estate and improvements associated with an acute care hospital in Los Angeles, California which has been paid in full, (b) a lease agreement with MPT of Fairmont-Alecto Hospital, LLC related to an acute care hospital located in Fairmont, West Virginia which has been terminated, (c) a lease agreement with MPT of Wheeling-Alecto Hospital, LLC and MPT of Martins Ferry-Alecto Hospital, LLC, related to acute care hospitals in Wheeling, West Virginia and Martins Ferry, Ohio which has been terminated; and (d) a lease agreement with MPT of Sherman-Alecto related to an acute care hospital in Sherman, Texas currently operated by one of Debtor's subsidiaries.   The Debtor's obligations to the MPT Entities are secured by the fees, if any, paid by the Debtor's subsidiaries to the Debtor under management services agreements between the Debtor and the Debtor's subsidiaries.

20.    No fees were ever paid to the Debtor on account of the foregoing agreements between the Debtor and its subsidiaries and none of the Debtor's cash was generated by such agreements. Accordingly, the Debtor has no cash collateral issues.

<u>Unsecured Debt</u>

21.    The Debtor has approximately 30 unsecured creditors totaling approximately $85,937,786.72 of which approximately $ $3,916,390.65 is liquidated, non-contingent and undisputed.

22.    The total of the claims of the twenty largest unsecured claims is approximately $16,000,000 including disputed, contingent, and unliquidated claims that are subject to defenses and counterclaims of and by the estate.

23.    There are currently six (6)  formal legal actions pending as of the Petition Date: (1) *Hall v. Olympia Medical Center, et al,*. in Los Angeles Superior Court, Case No. 21STCV31953;

(2) *Booe v. Alecto Healthcare Services*, in United States District Court for Eastern District of Texas, Sherman Division. Civil Action No. 4:22-CV-00110-ALM; (3) *Cardinal Health 110, LLC, et. al. v. Alecto Healthcare Services LLC*, in Franklin County (Ohio) Court of Common Pleas Civil Division, Case No. 22-CV-000272; (4) *Snyder Brothers, Inc., v. Alecto Healthcare Services LLC*, in United States District Court for Western District of Pennsylvania, Civil Action No. 2:20-00-1974; (5) *Health Carousel Travel Network, LLC v. Alecto Healthcare Services Wheeling LLC, et. al.*, in Court of Common Please Hamilton County Ohio, Case No. A1903955; and (6) *United States of America v. Olympia Health Care, LLC, Alecto Healthcare Services, LLC et. al.*, in United States District Court for Central District of California, Case No. 2:23-cv-01783.

## II.  EVENTS LEADING TO THE CHAPTER 11 CASE AND PATH FORWARD

24.     At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and  one of the Debtor's subsidiaries provided management services to an acute care hospital owned by a unrelated third-party.

25.     The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals.  Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

26.     After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

27.     The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the

operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts of its subsidiaries.

28.     As of the Petition Date, the Debtor's subsidiaries continue to operate only one hospital. However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially.  In an effort to ensure that this hospital could meet the healthcare needs of the community and attempt a financial recovery, the Debtor has provided advances to this subsidiary during the past two (2) years which has placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

29.     The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

30.     While the Debtor has been able to maintain the business operations outlined above and is actively seeking to dispose of the remaining hospital operated by its subsidiary, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 plus interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

31.     Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate.

32.     Consequently, the Debtor filed for bankruptcy relief to stay enforcement of the Reed Judgment and all outstanding litigation in order to propose a path forward that will enable the Debtor to continue operating while providing for fair and equitable treatment of all parties in interest.

### III.    FIRST DAY PLEADINGS

33.    In addition to this Declaration , the Debtor filed the First Day Pleadings seeking relief related to the administration of this Case, the Debtor's operations, and the Debtor's creditors. Below is a list of the First Day Pleadings:

a.    Motion for an Order Authorizing (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code (the "Cash Management Motion");

b.    Motion for Order Authorizing Payment of Prepetition Employee Wages, Benefits and Associated Expenses and Granting Related Relief (the "Wage Motion");

c.    Motion for Order Under Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or discriminating against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance (the "Utilities Motion"); and

d.    Motion for an Order Under Sections 105(a), 363(b), 363(c) and 503(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Assume Existing Insurance Policies; and (b) Pay All Obligations in Respect Thereof (the "Insurance Motion").

34.    The Debtor has narrowly tailored the First Day Pleadings to meet its goals of: (a) continuing its operations in Chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of its key constituencies during the bankruptcy process; and (c) establishing procedures for the efficient administration of this Case.

35.    I have reviewed each of the First Day Pleadings (including the exhibits thereto) and I believe the facts stated therein to be true and correct to the best of my knowledge with appropriate

reliance on the Debtor's employees and advisors.  I incorporate by reference the factual statements set forth in each of the First Day Pleadings as though set forth herein.

36.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the successful implementation of the Debtor's efforts to maximize the recovery to its creditors.

37.     The success of this Case depends upon the Debtor's ability to maintain its operations to the extent necessary to effectuate and confirm the Plan.  The relief requested in the First Day Pleadings is a critical component of maintaining the confidence of key constituencies necessary to implement this strategy.

38.     Accordingly, I respectfully request that all of the relief requested in the First Day Pleadings, and such other and further relief as may be just and proper, be granted based upon the following:

### The Cash Management Motion

39.     Pursuant to 11 U.S.C. §§ 105(a), 345(b), and 363(c), the Debtor seeks authorization to maintain its existing Cash Management System (as defined in the Cash Management Motion).

40.     The Debtor maintains the following three Bank Accounts at the Bank: (1) a depository account (ending in 6065) ("Depository Account"); (2) a payroll account (ending in 6508) ("Disbursement Account"); and (3) a checking account which is no longer active (ending in 3784) ("Inactive Account"). The Inactive Account has no balance and will be closed as soon as possible.

41.     The Cash Management System was implemented to facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's day-to-day business operations. The Cash Management System facilitates reporting, monitors collection and disbursement of funds, reduces administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information, and administers the Depository Account and Disbursement Account to effectuate the collection, disbursement, and movement of cash. Because of the nature of the Debtor's business and the disruption that would result if it was forced to close its existing Bank Accounts and establish a

new cash management system, it is critical that the existing Cash Management System remain in place.

42.    The Cash Management System preserves the orderly flow of cash and also permits the Debtor to accurately track deposits and disbursements. The Cash Management System facilitates the Debtor's cash monitoring, forecasting, accounting and reporting, and enables the Debtor to maintain control over the administration of its Bank Accounts. The Bank Accounts are already set up to receive funds electronically and pay bills electronically. Therefore, if the Bank Accounts had to be closed and new ones re-opened, the Debtor's business operations would be disrupted and the Debtor and its estate would incur a significant increase of administrative expenses.

43.    In addition, closing the Bank Accounts would cause a severe adverse impact in the Debtor's cash flow.  All payments made to the Debtor are paid to the Depository Account. Closing the Depository Account would require responsible parties to reset to a new bank account and would harm the Debtor's ability to collect cash in a timely and complete manner. The funds within the Depository Account are then transferred to the Disbursement Account to meet critical expenses. The Debtor clearly relies on the Bank Accounts for its operations and closing the Bank Accounts would result in irreparable harm and decline to the liquidity to the Debtor.

44.    To protect against the unauthorized payment of prepetition obligations, the Debtor represents that, if it is authorized to continue to use the Bank Accounts, it will not pay, and the Bank will be directed not to pay, any debts incurred before the Petition Date, other than as authorized by this Court.

45.    Requiring the Debtor to close the Bank Accounts and to open new accounts will disrupt the Debtor's operations and materially distract the Debtor's management. It will disrupt the Debtor's operations because (a) any changes to the Depository Account will slow down payment of amounts due to the Debtor, (b) any changes to the Disbursement Account will slow down the payment to crucial vendors as many are paid through electronic fund transfers and would disrupt and delay payment for payroll, administrative fees, and related taxes; (c) any changes to

the Depository Account could inhibit the Debtor's ability to receive amounts owed to it by one or more of its subsidiaries; (d) it would increase the work of the Debtor's accounting personnel, who are already dealing with the many complex and varied issues related to this Case; and (e) it would needlessly cost the Debtor time and money and would result in no discernable benefit to the Debtor's bankruptcy estate or its creditors and other parties in interest.

46.     In addition, the Debtor requests that the Bank be permitted to debit the Debtor's accounts in the ordinary course of business without the need for further order of this Court for all checks drawn on the Bank Accounts which are cashed at the Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Petition Date. The Debtor further requests that the Bank be restrained from honoring any check, draft, wire, or electronic funds transfer presented, issued, or drawn on the Bank Accounts on account of a prepetition claim unless: (a) authorized in an order of this Court, as represented to the Bank by the Debtor as set forth below; (b) not otherwise prohibited by a "stop payment" request received by the Bank from the Debtor; and (c) supported by sufficient funds in the Bank Account in question.

47.     In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor has and will continue to incur fees and other charges (collectively, all such fees and charges, the "Cash Management Claims") in connection with (i) Bank services (the "Service Charges"), (ii) checks deposited with the Bank which have been dishonored or returned for insufficient funds in the applicable amount, and (iii) any reimbursement or other payment obligations, such as overdrafts, arising under agreements governing the Bank Accounts, including, without limitation, any prepetition cash management agreements or treasury services agreements. The Debtor incurs an average of approximately $500.00 per month in fees owed related to Service Charges.  The Debtor seeks authority, in its sole discretion, to pay: (i) all undisputed prepetition Cash Management Claims; and (ii) any such routine Cash Management Claims that accrue to the Bank post-petition, in a monthly aggregate amount not to exceed $600.00. As with the Cash Management System, payment of the Cash Management Claims will minimize disruption to the Debtor's operations and is therefore in the best interest of the estate.

48.     In the ordinary course of business, the Debtor uses business letterhead, invoices, envelopes, promotional materials, and a number of other business forms and correspondence (collectively, the "Existing Forms").  Because the Existing Forms were used prepetition, they do not reference the Debtor's current status as a debtor in possession. The Debtor is seeking authorization to continue using all Existing Forms in the forms existing immediately prior to the Petition Date.

49.     I believe that most parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the notice of the commencement of the Case being given to creditors and other parties-in-interest. Changing the Debtor's Existing Forms would be expensive, unnecessary, and burdensome to the Debtor's estate. Further, such changes would be disruptive to the Debtor's business operations and would not confer any benefit upon those dealing with the Debtor.

50.     In sum, the Bank Accounts and Cash Management System facilitate the timely and efficient collection, management, and disbursement of funds used in the Debtor's business. Because of the disruption to the business that would result if the Debtor were forced to close these Bank Accounts, I believe it is critical that the Debtor maintain its Cash Management System and the Bank Accounts.

**The Wage Motion**

51.     The Debtor filed the Wage Motion seeking the entry of an interim and final order, authorizing but not directing, the Debtor, in its discretion, to pay, continue, or otherwise honor various prepetition employee-related obligations (collectively, the "Prepetition Obligations") to or for the benefit of their current employees (individually, an "Employee"  or collectively,  the "Employees") for wages, compensation, benefits, and expense reimbursements under all plans, programs, and policies maintained or contributed to, and agreements entered into, by the Debtor prior to the Petition Date (as described below, individually, "Employee Program" or collectively, "Employee Programs") and have applicable banks and other financial institutions receive, process, honor, and pay certain checks presented for payment and honor certain fund transfer requests.

52.      I discussed and summarized above the Debtor's Employees. I believe that it is absolutely critical that the Debtor be able to assure the Employees that their wages, compensation and salaries ("Wages") and the Employee Programs will continue unaffected by their chapter 11 filings in order to effectuate a successful outcome in the Case. Moreover, if the Debtor fails to pay the Prepetition Obligations and fails to continue the Employee Programs in the ordinary course, the Employees will suffer extreme personal hardship. Such a result would have a highly negative impact on workforce morale and would likely result in unmanageable turnover, resulting in immediate and irreparable harm to the Debtor and its estate.

53.      As set forth above, the Employees are all very important to the success of the Debtor's business, including the Debtor's ability to maximize the value of the Debtor's estate. The primary source of the Debtor's revenue comes from the provision of hospital management services by one of the Debtor's subsidiaries to Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose"). The Debtor provides the services of its Employees to deliver such management services to St. Rose in exchange for payments from its subsidiary.  Without the availability of the Employees, the Debtor's subsidiary could not provide the management services and the primary source of the Debtor's revenue would be eliminated.  Therefore, if the Employees were to leave the Debtor's employment, the Debtor would lose the valuable revenue generated through these  Employees.

54.      The Debtor paid payroll to the Employees on June 16, 2023 for the two (2) week period ending June 10, 2023.  The Employees will accrue wages and other Pre-Petition Obligations for the periods of June 11, 2023 through the Petition Date for which the Debtor seeks authority to pay post-petition in the ordinary course on  June 30, 2023.  None of the Employees will receive more than the maximum amount provided for in § 507(a)(4).

55.      The Prepetition Payroll Obligations owed by the Debtor are summarized below[2]:

| Category | Amount Owed Prepetition |
|---|---|
|  |  |

---

[2] The amounts included are approximate amounts, and may fluctuate. In addition, for certain of the categories, the Debtor does not believe they owe any amounts prepetition. However, the Debtor includes these categories to the extent it is discovered that amounts are, in fact, due prepetition.

| | |
|---|---|
| Employee Wages (accrued but unpaid) | $ 17,000 |
| Employee Medical Insurance | $ 400 |
| Employee Vision Insurance | $ 10 |
| Employee Dental Insurance | $ 160 |
| Life, Accidental Death and Dismemberment | $ 500 |
| PTO, Vacation, Sick Time | $ 2,500 |
| 401k – Employee Contribution | $ 2,500 |
| Federal Tax – Employee Contribution | $ 5,500 |
| CA State and SDI Tax – Employee Contribution | $ 2,200 |
| FICA Tax – Employee Contribution | $ 1,800 |
| FICA Tax- Employer Contribution | $ 1,400 |
| Expense Reimbursement | $ 18,300 |
| Miscellaneous Expenses | $ 5,000 |
| Total Employee Compensation Owed | $ 57,270 |

56.     The Debtor expects that there will be  outstanding checks for Pre-Petition Obligations for Wages that have not yet cleared the Debtor's bank accounts. Consequently, the Debtor seeks authority through this Motion for any checks for Pre-Petition Obligations that have not yet cleared the Debtor's bank accounts to be honored post-petition.  In the event there are any outstanding checks, the Debtor estimates the amount of such checks will total less than $42,000.

57.     The Employees are paid bi-weekly, each approximately one week in arrears. Bi-weekly payroll averages between $70,000 and $80,000.  The Debtor funds and disburses payroll payments internally.

58.     As of the Petition Date, the Debtor made deductions from the Employees' paychecks for payments on behalf of the Employees for various federal, state, and local income, FICA, and other taxes, as well as for garnishments, support payments and tax levies, savings programs, benefit plans, flexible savings accounts, insurance programs, credit unions, and other similar programs on account of which the Debtor deducts a sum of money from an Employee's paycheck and pay that amount to a third party (collectively, the "Deductions").

59.     By virtue of the timing of the filing of the Case, the Employees have not been paid all their compensation earned through the Petition Date.  The Debtor estimates that as of the Petition Date, accrued but unpaid wages for the Employees is approximately $17,000.  In addition, the applicable Deductions may not have yet been taken. To the extent Deductions have been taken,

however, the Debtor may not yet have forwarded to the various third parties noted above the payments that are attributable to the Deductions. The Debtor estimates that, as of the Petition Date, they are holding Deductions already taken aggregating approximately $16,970 which the Debtor seeks to pay to third parties in accordance with their prepetition practice.

60.    The Debtor estimates that, as of the Petition Date, accrued but unpaid compensation, including the Deductions, totals approximately $57,270. The Debtor seeks authority to pay, continue, or otherwise honor their Prepetition Obligations in the ordinary course of their businesses. None of the amounts to be paid to the Employees for pre-petition wages will exceed the $15,150.00 cap set forth in Bankruptcy Code § 507(a)(4).  The Debtor believes that the costs associated with paying such amounts are relatively minimal compared with the damage to the Debtor's estate that would follow if employee morale and patient care were harmed by the Debtor's failure to meet its payroll  obligations.

61.    The Debtor, in the ordinary course of its business, reimburses the Employees for certain business related expenses that the Employees incur.  These include expenses for travel, supplies and other incidental expenses.  The monthly reimbursable expense is fairly small but it is essential to the continued operation of the Debtor's business that the Debtor be permitted to continue reimbursing the Employees for such business expenses.

62.    The Debtor requires that, to be reimbursed for business expenses, an Employee must submit expense reports, together with appropriate supporting documentation. The Debtor expects that the total amount of unreimbursed business expenses as of the Petition Date will be $16,300 , but certainly will not exceed $18,300.

63.    As part of their overall compensation, Employees are entitled to receive a certain number of days of paid time off ("PTO").  PTO starts to accrue immediately upon employment.

64.    The Debtor estimates that, as of the Petition Date, total accrued but unpaid PTO is approximately $105,000.00. By this Motion, the Debtor is not seeking to pay such sums to the Employees but does seek authority for the Employees to use their accrued PTO in the ordinary

course of business pursuant to the Debtor's policies and procedures regardless of the maximum amount provided for in §507(a)(4).

65.      The Debtor offers health benefits through two plan options offered by Anthem Blue Cross ("Blue Cross") for medical insurance ("Medical Plan").    As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in one of the medical insurance plans.  The Debtor pays approximately 80% of the premiums for those Employees.  The cost per month to the Debtor for the Medical Plan is approximately $9,800.

66.      The Debtor offers dental insurance through Met Life ("Dental Plan").  The Debtor pays 20% of the premiums for those Employees and the 1 non-employee officer.  As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in the Dental Plan.   The cost per month to the Debtor for the Dental Plan is approximately $211.

67.      The Debtor offers vision insurance through Met Life (the "Vision Plan" and collectively with the Medical Plan and the Dental Plan, the "Health Benefits").  The Debtor pays 80% of the premiums for those Employees.  As of the Petition Date, approximately 7 Employees and 1 non-employee officer were participating in the Vision Plan.  The cost per month to the Debtor for the Vision Plan is approximately $124.

68.      The Debtor provides Employees with a policy for life insurance and accidental death and dismemberment through Unum (the "Life Plan") with an option for the Employee to purchase an additional amount.  The cost per month for the Life Plan is $350.

69.      As required by statute, the Debtor provides the Employees a workers' compensation benefit program for income protection, medical services, and rehabilitation services to employees with job-related injuries and illnesses (the "WC Insurance").  The WC Insurance is provided through StarNet Insurance Company. The annual cost of the WC Insurance is approximately $16,025.00.

70.      The Debtor offers voluntary short-term, long-term, critical illness, and accident insurance through Mutual of Omaha. These programs are 100% Employee funded.

71.     Employees may also participate in a 401(k) plan. The Debtor does not match any contributions.

72.     The Debtor seeks to honor and continue all of the Employee Programs described above.

73.     The Debtor also requests confirmation of its right to continue to perform its obligations with respect to these Employee Programs on a postpetition basis. The Employee Programs are an important component of the total compensation offered to the Employees, and are essential to the Debtor's efforts to maintain Employee morale and minimize operation disruption. I believe that the expenses associated with the Employee Programs are reasonable and cost-efficient in light of the potential attrition, loss of morale, and loss of productivity that would occur if the Employee Programs were discontinued.

74.     Prior to the Petition Date, the Debtor paid certain of its Prepetition Obligations with checks that had not been presented for payment as of the Petition Date. In order to ensure the orderly payment of the Prepetition Obligations, the Debtor requests that the Court enter an order requiring the Debtor's banks to honor any such checks which are drawn on the Debtor's accounts, and authorizing the banks to rely on the representations of the Debtor as to which checks are subject to the Motion. To the extent that any such checks are refused payment, the Debtor additionally requests authority to issue replacement checks and to reimburse the Employees for any loss resulting from the dishonoring.

75.     The Debtor represents that: (a) it will not distribute any amounts over $15,150.00 directly to any individual Employee on account of the sum of unpaid: (i) prepetition Wages or (ii) any other compensation due to an Employee; (b) will not make contributions to any employee benefit plan on account of unpaid prepetition amounts in excess of (i) the number of Employees covered by such plan multiplied by $15,150.00, less (ii) the aggregate amount of prepetition Wages and ordinary course bonus payments, plus the aggregate amount paid by the Debtor on behalf of such Employees to any other employee benefit plan, as provided under § 507(a)(5) of the Bankruptcy Code; and (c) it will not pay any amounts in excess of the estimated outstanding

prepetition cap amounts for each category of prepetition claims identified in the chart above and in the proposed interim order without further order from this Court, except to the extent required under state law.

76.     The Debtor's Employees may rely exclusively on receiving their full compensation and/or reimbursement of their expenses in order to continue to pay their daily living expenses. These Employees may be exposed to significant financial and healthcare related problems if the Debtor is not permitted to pay and/or honor the Wages and Employee Programs, and the expenses associated therewith, in the ordinary course of the Debtor's business. Moreover, I believe that if it is unable to honor accrued Wages and the Employee Programs described above, Employee morale and loyalty will be jeopardized at a time when Employee support is critical. I believe that any uncertainty with regard to continuation of Wages and the Employee Programs will cause significant disruption and will harm the Debtor's ability to successfully navigate the Case and reorganize. As stated above, the Employees are composed of revenue-generating Employees (whom would be difficult, if not impossible, to replace) and staff that ensure that the Debtor is able to operate and provide such management services. If the Employees were to leave the Debtor's employment, the Debtor could be unable to provide management services and lose the valuable revenue generated by those services.  Consequently, it is absolutely imperative that the Debtor's Employees remain satisfied with their employment, which means their Wages and Employment Programs must be maintained.

77.     Additionally, the Debtor submits that the Deductions do not constitute property of the Debtor's estate and principally represent Employee earnings that governments (in the case of taxes), employees (in the case of voluntary Deductions), and judicial authorities (in the case of involuntary Deductions), have designated for deduction from employee paychecks.

78.     The failure to transfer these withheld funds could result in hardship to certain Employees.  Moreover, if the Debtor cannot remit these amounts, the Employees may face legal action due to the Debtor's failure to submit these payments.

79.     The Debtor's failure to pay employee-related taxes could have a material adverse financial impact on their Employees and thus, on the Debtor's ability to operate in the ordinary course of business and continue to generate revenue.  The Employees must continue to provide services in order to ensure the Debtor continues to generate revenue to fund a plan.

80.     Finally, the Employees are absolutely necessary to the Debtor's continued operations.  The loss of both the revenue-generating Employees and the Debtor's support staff would adversely impact the Debtor and its ability to successfully reorganize and emerge from Chapter 11. Consequently, I believe that satisfaction of the Wages and Employee Programs, as described herein, is necessary to ensure continued, efficient operation and  to maximize value for all creditors.

**The Utilities Motion**

81.     In the normal course of its business, the Debtor obtains Utility Services provided by  a number of entities  (each  a  "Utility  Company"  and  collectively,  the  "Utility Companies"). The Debtor pays the Utility Companies, on average, approximately $1,115 per month for services rendered.  To the best of my knowledge, prior to the commencement of this case, the Debtor was current with respect to undisputed invoices for Utility Services.  Moreover, I expect that on the Petition Date, there will be no outstanding balances owed to the Utility Companies.

82.     Based upon cash flow from operations, the Debtor expects to have ample liquidity to pay timely all postpetition obligations owed to the Utility Companies.

83.     However, to provide adequate assurance to the Utility Companies as required under section 366(c) of the Bankruptcy Code, the Debtor proposes to deposit on account of each Utility Company listed on the Utilities List (as may be amended) an amount equal to the value of two (2) weeks of Utility Services provided by the Utility Company, based upon the Debtor's estimated average monthly bill as set forth in more detail in the Utilities Motion.

84.     If the Motion is not approved, the Debtor could be forced to address requests by its Utility Companies in a disorganized manner during the critical first weeks of this case. Moreover,

the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of Utility Services could potentially shut down operations, and any significant disruption of operations could put this chapter 11 case in jeopardy.

**Insurance Motion**

85.     In the ordinary course of the Debtor's business, the Debtor maintains numerous insurance policies providing coverage for, *inter alia*: general liability, property, auto, cyber, environmental pollution, umbrella, workers compensation, management liability including directors and officers liability (the "D&O Policies") and medical malpractices liability set forth in Exhibit A to the Insurance Motion (collectively, the "Insurance Policies").

86.     By the Insurance Motion, the Debtor seeks explicit authority to maintain its insurance policies with National Union Fire Insurance Company (Directors & Officers and Employment Practices), RSUI Indemnity Company (Directors & Officers and Employment Practices), StarNet Insurance Company (Workers Compensation), Coalition Insurance Services (Cyber Liability), Vanetpro Specialty Insurance Company (Auto), Magmutual Professional Security Insurance Company (Professional and General Liability), and Endurance American Specialty Insurance Company (Professional and General Liability) (the "Insurance Carriers").

87.     The Insurance Policies protect the Debtor from various losses incurred in the ordinary course of business. For example, the D&O Policies protect the Debtor's directors and officers and are essential in order to retain the Debtors' qualified and dedicated senior management.  All of the Insurance Policies are held in the name of the Debtor, including policies that solely cover certain of the Debtor's subsidiaries.

88.     The Debtor pays total annual Insurance Premiums of approximately $1,300,000 with the majority of such amounts being premium financed and paid in monthly installments.

89.     The nature of the Debtor's business and the extent of its operations make it essential for the Debtor to maintain its Insurance Policies on an ongoing and uninterrupted basis. The

nonpayment of any Insurance Premiums or related fees under the Insurance Policies could result in the Insurance Carrier terminating the existing policies, declining to renew their Insurance Policies, or refusing to enter into new insurance agreements with the Debtor in the future.

90.     I believe that the continuation and renewal of the Insurance Policies, on an uninterrupted basis, and the payment of all prepetition and postpetition Insurance Obligations arising under the Insurance Policies, is essential to preserve the Debtor's business and the value of the Debtor's estate for all creditors.

91.     If the Debtor is unable to enter into new arrangements to pay the premiums under any renewed Insurance Policies, the Debtor would be required to pay lump- sum premiums for the Insurance Policies in advance, thus negatively affecting the Debtor's cash flow in the infancy of this chapter 11 case.  In view of the importance of maintaining insurance coverage with respect to its business activities and the preservation of the Debtor's estate by financing the Insurance Premiums, I believe it is in the best interests of its estate to authorize the Debtor to enter into new insurance premium financing arrangements in the ordinary course of business.

92.     The Debtor submits that payment of obligations due or arising under or related to the Insurance Policies will be paid in the ordinary course of business and in accordance with the terms of the Insurance Policies and in a manner consistent with prepetition practices.

**F.     CONCLUSION**

93.     For all of the reasons set forth herein and in the First Day Pleadings, I respectfully request that the Court grant the relief requested in each of the First Day Pleadings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated:  6/16/2023

_____
Michael Sarrao
Executive Vice President, General Counsel,
and Secretary