## **EXHIBIT 1**

Blackline

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN.  ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC., | Case No. 23-10787 (JKS) |
| Debtor.[1] | |

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION
PROPOSED BY THE DEBTOR**

You are encouraged to carefully review the full text of this document, including all exhibits and attachments, before deciding how to vote on the Plan. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**IN ADDITION TO CASTING YOUR VOTE TO ACCEPT OR REJECT THE PLAN, YOU MAY OBJECT TO CONFIRMATION OF THE PLAN. IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY [OBJECTION DATE/TIME], 2023 ("Plan Objection Deadline").**

**YOUR BALLOT STATING HOW YOU ARE VOTING ON THE PLAN MUST BE RETURNED BY [DEADLINE], 2023. THE BALLOT MUST BE MAILED TO THE FOLLOWING ADDRESS:**

<div align="center">

~~[BALLOTING AGENT]~~

**Alecto Ballot Processing
c/o Stretto
410 Exchange, Suite 100
Irvine, CA 92602**

</div>

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR NOVEMBER 15, 2023 AT 11:00 A.M. IN COURTROOM NO. 6 AT THE U.S.**

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

**BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

**YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

Dated: ~~September 14~~October 9, 2023

**MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

## TABLE OF CONTENTS

<div align="right">Page</div>

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION**............................................1

**ARTICLE I - DEFINITIONS** ........................................................................................1

**ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS** ...~~6~~5

**ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR** ........~~7~~6

   1.  Nature of the Debtor's Business.........................................................................~~7~~6

   2.  History of Business Operations of the Debtor.....................................................7

   3.  Filing of the Debtor's Chapter 11 Case. ............................................................8

   4.  Legal Structure and Ownership. .....................................................................~~9~~8

   5.  Events Leading to the Filing of the Bankruptcy Case. ......................................~~9~~8

   6.  The Debtor's Assets and Liabilities................................................................~~10~~9

   7.  Current and Historical Financial Conditions. ..............................................~~12~~11

   8.  Significant Events During the Bankruptcy Case. ..........................................~~12~~11

   9.  Projected Recovery of Avoidable Transfers Against Insiders..........................~~16~~15

**ARTICLE IV - THE PLAN** .....................................................................................~~18~~17

   1.  Unclassified Claims........................................................................................~~18~~17

       a.  Administrative Expenses .....................................................................18

       b.  Post-Confirmation Professional Fee Claims ......................................~~20~~19

       c.  Priority Tax Claims..............................................................................~~20~~19

   2.  Classes of Claims and Equity Interests...........................................................~~21~~20

       ~~b~~a.  ...................................................................Classes of Other Priority Claims     20

       b.  Class of Priority Non-Tax Claims.............................................................20

       c.  Class of Secured Claims. ........................................................................21

       ~~c~~d.  ....................................................~~Classes~~ Class of General Unsecured Claims.   ~~25~~22

       d~~e~~.  ......................................................................Class of Equity Interest Holders.  ~~26~~22

   3.  Treatment of Claims and Claims Objections. ..............................................~~26~~22

       a.  Allowance of Claims .........................................................................~~26~~23

       b.  Claims Administration Responsibilities ............................................~~26~~23

       c.  Estimation of Claims.........................................................................~~27~~23

       d.  Adjustment to Claims .......................................................................~~27~~24

       e.  Disallowance of Claims .....................................................................~~27~~24

16291449/3
16291449/3

f.  Amendments to Claims..................................................................2824

g.  De Minimis Distributions ...........................................................2824

h.  No Distributions Pending Allowance...........................................2824

i.  Duplicative Claims ......................................................................2825

4.  Treatment of Executory Contracts and Unexpired Leases. .................2825

5.  Means for Implementation and Funding of the Plan...........................3026

a.  Funding the Plan .............................................................................30

6.  Payments. .............................................................................................3027

a.  Responsibility for Making Payments...........................................3027

b.  Disputed Claims...........................................................................3127

c.  Unclaimed Payments....................................................................3127

d.  Payment Date Dates and Location Locations..............................3128

e.  Undeliverable Distribution Reserve.............................................3228

f.  Tax Requirements. ........................................................................3229

7.  Post-Confirmation Management and Insiders Retained by the Debtor.........................3229

8.  Preservation of Causes of Action. .......................................................3329

9.  Tax Consequences of the Plan..............................................................3330

**ARTICLE V - FEASIBILITY OF PLAN** ....................................................**3430**

1.  Ability to Initially Fund Plan...............................................................3430

2.  Ability to Make Plan Payments And Operate Without Further Reorganization. ...........3431

**ARTICLE VI  - LIQUIDATION ANALYSIS**.................................................**3431**

**ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS** ................**3531**

1.  Discharge...............................................................................................3531

2.  Debtor Releases. ..................................................................................32

23. Exculpation and Limitation of Liability...............................................3532

34. Injunction..............................................................................................3632

45. Remedies Upon Default. ......................................................................3633

**ARTICLE VIII - GENERAL PROVISIONS**.................................................**3633**

1.  Title to Assets.......................................................................................3633

2.  Binding Effect.......................................................................................3734

3.  Severability............................................................................................3734

4.  Retention of Jurisdiction by the Bankruptcy Court. ............................3734

5.  Headings................................................................................................3835

16291449/3
16291449/3

6.  Successors and Assigns. ...................................................................................38 35

7.  No Fourteen Day Stay. ....................................................................................38 35

8.  Incorporation of Agreements Entered Into by the Debtor. ............................38 35

9.  Modification of Plan. ......................................................................................38 35

10. Reservation of Rights. .....................................................................................39 35

11. Filing of Notice of Substantial Consummation ..............................................39 36

12. Post-Effective Date Service List .....................................................................39 36

13. Changes in Rates Not Subject to Regulatory Commission Approval. ............39 36

14. Final Decree. ....................................................................................................39 36

**ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE.........40 36**

1.  Conditions Precedent to Confirmation. ..........................................................40 36

2.  Conditions Precedent to the Effective Date. ...................................................40 36

3.  Waiver of Conditions. ......................................................................................40 37

4.  Effect of Failure of Conditions. ......................................................................40 37

5.  Filing of Notice of the Effective Date. ............................................................41 37

**ARTICLE X - EXHIBITS .....................................................................................38**

1.  Rules of Interpretation. ....................................................................................41 38

2.  Computation of Time. ......................................................................................42 39

3.  Governing Law. ................................................................................................42 39

4.  Reference to Monetary Figures. ......................................................................43 39

5.  Controlling Document. .....................................................................................43 40

16291449/3
16291449/3

## ARTICLE I - DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in the Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

1. **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent owed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

2. **Administrative Tax Claim**: Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

3. **Allowed:** With respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a proof of claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Equity Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. "Allow" and "Allowing" shall have correlative meanings.

4. **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has

1

become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the Confirmation Date.

5.      **Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowedas secured claims under § 506 of the Code.

6.      **Avoidance Actions**: Any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

7.      **Ballot:** The form approved by the Bankruptcy Court and distributed to each Holder of an impaired Claim or Equity Interest that is entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

8.      **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amendedand codified as Title 11 of the United States Code.

9.      **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

10.     **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

11.     **Bar Date:** August 15, 2023-, the date by which Proofs of Claim are required to be filed by Creditors.

12.     **Business Day**: Any day of the year, other than a Saturday or Sunday, on which national banking institutions in Wilmington, Delaware are open to the public for conducting business and are not required or authorized by Law to close.

13.     **Cash**: Cash, cash equivalents and other readily marketable securities or instruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issued by banks and commercial paper of any entity, including interest accrued or earned thereon.

14.     **Causes of Action**: All Claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate that are or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any entity, based in law or

2

equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date with respect to matters arising on or before the Effective Date.  For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (d) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

15. **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Alecto Healthcare Services LLC is the debtor in possession, Case No. 23-10787.

16. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

17. **Claims Objection Bar Date:** The last day for objecting to a Claim, which shall be the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed or extended by the Court, the Debtor or the Reorganized Debtor, or by an order of the Bankruptcy Court for objecting to Claims.

18. **Claims Register**: The register of Claims maintained by the Bankruptcy Court.

19. **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

20. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

21. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be theentry of the Final Order vacating such stay or the date on which such stay expires and is nolonger in effect.

22. **Confirmation Hearing**: The hearing to be held on November 15, 2023 at 11:00 a.m. (ET) to consider confirmation of the Plan.

23. **Confirmation Order**: An order of the Bankruptcy Court or any amendmentthereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

24. **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

25. **Debtor** and **Debtor-in-Possession**: Alecto Healthcare Services LLC, the debtor in possession in this Chapter 11 Case.

26. **Disputed Claim:** Any claim against the Debtor pursuant to § 502 of the BankruptcyCode that is not yet Allowed.

27. **Distribution**: The property required by the Plan to be distributed to the holders of Allowed Claims.

28. **Effective Date**: The first Business Day following the date upon which (a) the Confirmation Date has occurred, or (b) the Confirmation Order is a Final Order, unless, at the Debtor's option, the Debtor desires the Plan go effective regardless of any pending appeal, so long as no stay pending appeal has been granted.

29. **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

30. **Equity Interest**: An ownership interest in the Debtor.

31. **Estate:** The estate of the Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

32. **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

33. **File, Filed** or **Filing**: File, filed, or filing in the Chapter 11 Case with the Bankruptcy Court, including with respect to the filing of a Proof of Claim or proof of Equity Interest.

34. **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no noticeof appeal has been filed.

35. **General Unsecured Claim:** any Claim other than: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Equity Interest.

36. **Governmental Unit**: As defined by 11 U.S.C. § 101(27), the term "governmental unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

4

37.    **Holder**: an Entity holding a Claim or Equity Interest, as applicable.

38.    **Other Priority Claim:** Any Claim entitled to priority in payment under Sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code.

39.    **Petition Date**: June 16, 2023, the date the chapter 11 petition for relief was filed.

40.    **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

41.    **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

42.    **Professional**: A person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

43.    **Professional Fee Claims**: A Claim of a Professional for professional services rendered or costs incurred on or after the Petition Date through the Effective Date.

44.    **Proof of Claim**: A proof of Claim Filed in the Chapter 11 Case.

45.    **Released Parties:** All of the following, and in each case in its capacity as such: (a) the ~~Debtor and the Reorganized Debtor, (b) the~~ officers and managers of the Debtor ~~or Reorganized Debtor; (c;~~ (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date.

46.    **Reorganized Debtor**: The Debtor after the Effective Date.

47.    **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets [Docket Nos. 48 and 49].

48.    **Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

49.    **Subchapter v Trustee**: Jami Nimeroff, the Subchapter V trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

50.    **United States Trustee Fees**: All fees due under 28 U.S.C. § 1930.

16291449/3
16291449/3

## ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Plan is a reorganization Plan. The Plan will be funded with available Cash on hand on the Effective Date and the Debtor's projected disposable income generated by the ongoing operations of the Debtor. For a period of three (3) years, the Debtor will contribute (i) its entire projected disposable income, in an aggregate amount of no less than $635,549, (ii) any residual value received by the Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement proceeds received on account of such claims. Such amounts will be used to fund Distributions provided under the Plan on an annual basis.

The chart below reflects the proposed treatment of Allowed Claims and Equity Interests under the Plan:

- o Allowed Administrative Claims will be paid on a monthly pro rata basis, until such claims are paid in full or, alternatively, upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

- o Allowed Priority Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Tax Claims owed.

- o Allowed Priority Non-Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Non-Tax Claims owed.

- o Allowed Secured Claims, if any, will be paid in accordance with the existing loan documents or other agreements with the Debtor that existed prior to the Petition Date which govern the payment of Debtor's obligations to the holder of the Allowed Secured Claim. Each holder of an Allowed Secured Claim shall retain its lien on its collateral in the same validity and priority as it held prior to the Petition Date until the Allowed Secured Claim amount has been paid. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, withouts penalty or premium.

- o Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis, after payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, if any, Allowed Priority Non-Tax Claims, if any, and Allowed Secured Claims. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

- o Upon entry of the Confirmation Order, all existing Equity Interests in the Debtor shall be retained.

## ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.   Nature of the Debtor's Business.

The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

In the ordinary course of business, the Debtor's employees provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries.  The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of certain litigation matters.  An organizational chart of the Debtor and its subsidiaries is attached hereto as **Exhibit A**.

2.    <u>**History of Business Operations of the Debtor.**</u>

Historically, the Debtor formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and  one of the Debtor's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party.

As of the Petition Date, the Debtor had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("<u>Sherman/Grayson</u>") and Alecto Healthcare Services Hayward LLC ("<u>Alecto Hayward</u>")

As of the Petition Date, however, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Hayward.  Alecto Hayward is a party to an Amended Management Services Agreement with Hayward Sisters Hospital dba St. Rose Hospital ("<u>St. Rose</u>") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "<u>Management Services Fee</u>").  Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  Alecto Hayward's contract with St. Rose currently runs through May 2025, subject to renewal for an additional period of 2 years. The contract can be terminated without cause on 365 days advance written notice.

To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose.  In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

Sherman/Grayson is the operator of Wilson N. Jones Regional Medical Center ("<u>WNJ</u>"), a 207-bed acute care hospital located in Sherman, Texas. Sherman has a population of around 45,000 people and is located within Grayson County, Texas which is approximately 75 miles

7

from Dallas, Texas. Among other things, WNJ contains an emergency department, medical surgical units, an intensive care unit, and a behavioral health unit. As discussed below, Sherman/Grayson filed for Chapter 11 relief in Case No. 23-10810 and the Sherman Sale Order (defined below) provides for the sale of substantially all of Sherman/Grayson's assets.

Sherman/Grayson has faced significant financial challenges both during and after the COVID-19 pandemic. As a result of such challenges, during the year prior to filing, Sherman/Grayson was operating at a loss of over $1 million per month.

### 3.    Filing of the Debtor's Chapter 11 Case.

On June 16, 2023, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case. On the Petition Date, the Debtor filed the Declaration of Michael Sarrao, Executive Vice President General Counsel, and Secretary of the Debtor, in Support of First Day Motions [Docket No. 3] (the "Sarrao Declaration"). A copy of the Sarrao Declaration is incorporated as if fully set forth herein.[2]

On June 20, 2023, the Jami Nimeroff was appointed as the Subchapter v Trustee in the Chapter 11 Case.

### 4.    Legal Structure and Ownership.

The Debtor is a Delaware limited liability company.

The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
|---|---|
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |
| The Hayes Irrevocable Trust | 3.80% |
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

### 5.    Events Leading to the Filing of the Bankruptcy Case.

---

[2]    A copy of all pleadings in the Chapter 11 Case are available for a fee on the Bankruptcy Court's website, https://ecf.deb.uscourts.gov/.

16291449/3
16291449/3

The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals.  Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts of its subsidiaries.

As of the Petition Date, the Debtor's subsidiaries continued to operate only one  hospital, which has subsequently filed for bankruptcy.  However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially.  In the two years immediately prior to the Petition Date, the Debtor made significant investments in the form of advances to and the payment of expenses on behalf of Sherman/Grayson  in an effort to ensure that this hospital could continue operating as a going concern thereby maximizing the value of the subsidiary while meeting the healthcare needs of the community and avoiding additional costs and expense to Debtor if the hospital was to close. Additionally, the Debtor was a guarantor on Sherman/Grayson's lease with MPT of Sherman-Alecto, LLC, which required that (a) Sherman/Grayson  maintain its insurance, and in the event that Sherman/Grayson's  insurance lapsed, such lapse would be an event of default for which the Debtor would be liable for under the guaranty as obligations under the lease, and (b) that Sherman/Grayson indemnify MPT of Sherman-Alecto, LLC was required to purchase an office building for more than $10 Million pursuant to the terms of a ground lease which may require MPT of Sherman-Alecto, LLC as the ground lessor, to purchase the office building if a healthcare facility is not operated at the location of Wilson N. Jones Regional Medical Center for twelve (12) consecutive months and Sherman/Grayson's failure to perform would constitute an event of default for which the Debtor would be liable for under the guaranty-.  Accordingly, the Debtor provided significant advances to Sherman/Grayson's during the two (2) years immediately prior to the Petition Date which placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

While the Debtor has been able to maintain the business operations outlined above, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 in plus

interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs (the "Reed Creditors") in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate

### 6.    The Debtor's Assets and Liabilities.

The Debtor's assets and liabilities are detailed in the Schedules filed on June 30, 2022 [Docket Nos. 48 and 49] (the "Schedules").

By operation of General Order of the Delaware Bankruptcy Court dated September 14, 2020, the deadline for all parties other than governmental entities to the file a proof of claims was August 15, 2023, and the deadline for governmental entities to the file a proof of claims was set for December 13, 2013.  A copy of the claims register maintained by the Bankruptcy Court and the Schedules  are attached hereto as **Exhibit B.**

Additionally, on March 9, 2023, the United States commenced a civil suit against the Debtor, seven of its direct or indirect subsidiaries and three individuals to recover approximately $14,211,115 in alleged overpayments made to Defendant Olympia Health Care, LLC by the Centers for Medicare and Medicaid Services, part of the Department of Health and Human Services, in 2005 (Civil Action No. 2:23-cv-01783).  The Debtor was named as a defendant because it allegedly controlled Olympia during the relevant period.  The Debtor does not believe that it (or any of the defendants) has any liability to the United States for the alleged overpayments.

On the Petition Date, the Debtor had two operating subsidiaries:  (i) Sherman/Grayson which, as discussed below, filed its own voluntary Chapter 11 bankruptcy during which its assets were sold and the Debtor may realize some value on account of its claim, and (ii) Alecto Hayward.   The projected income and expenses of the Debtor for the next three years is attached hereto as **Exhibit C**.

The Debtor also some miscellaneous assets, including a vehicle and office furniture and equipment.  The Debtor does not expect that, if the Chapter 11 case were to convert to Chapter 7 that these miscellaneous assets would generate much money, if any.

In addition to those two entities, the Debtor may realize some value from other direct and indirect subsidiaries but which may have some remnant value.

Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), may have residual income due from West Virginia Medicaid of as much as $3 million[3] and from Medicare of as

---

[3]    This money due to Alecto Fairmount has been outstanding for more than two years and it is unclear how much or when such amounts will be paid.

much as $2.8 Million if Alecto Fairmont's appeals related to Medicare's denial of Alecto Fairmont's requests for a Volume Decrease Adjustment of $1,406,332 for 2016 and $1,408,524 for 2017 are successful.  The Debtor cannot predict the likelihood or timing for recovery related to these appeals.  Before the any payment can be upstreamed to the Debtor, Alecto Fairmount will need to pay all of the liabilities to its own creditors, which include certain outstanding trade claims, payroll taxes, and the payment of certain liabilities related to Alecto Fairmont's withdrawal from a multi-employer pension plan sponsored by the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds, which may be as much as $20 million and Alecto Fairmont's contingent liability as a member of the control group with respect to a defined benefit pension plan sponsored by Alecto Healthcare Services Ohio Valley LLC (the "Alecto Ohio Valley Pension Plan").  The Debtor anticipates that that the liabilities of Alecto Fairmount will significantly exceed any of its residual assets.

Alecto Healthcare Services Wheeling, LLC, an indirect subsidiary of the Debtor, ~~is owed approximately $900,000~~ may have some residual income due from West Virginia Medicaid of as much as $900,000, but it also has significant liabilities, including the Reed Creditor's judgment and other judgments entered against it.  Those liabilities include payroll taxes, judgments, and contingent liabilities associated with the Alecto Ohio Valley Pension Plan . The Debtor anticipates that that the liabilities of Alecto Wheeling will significant exceed any of its residual assets.

Sunrise MOB Holdings, LLC ("Sunrise MOB"), a direct subsidiary, is also an indirect parent of Plaza Medical Office Building, LLC ("Plaza").  Plaza recently received $3 million from an indemnity reserve from a sale of certain of its real estate assets.  Even though Plaza received these funds, it ~~is still~~ has contingent liabilities as a member of the control group with respect to the withdrawal liability of Alecto Fairmont, which may be as much as $20 million, and as a member of the control group with respect to the Alecto Ohio Valley Pension Plan. Accordingly, the Debtor does not anticipate that its interest in either Sunrise MOB or Plaza will have any value for the benefit of the Debtor's creditors

### 7.     Current and Historical Financial Conditions.

In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

Since the Petition Date, the Debtor has filed monthly operating reports reflecting the Debtor's ongoing finances [Docket Nos 83 and 122].

### 8.     Significant Events During the Bankruptcy Case.

A.     First Day Motions and Orders

On or about the Petition Date, the Debtor filed certain motions and applications seeking

relief from the Bankruptcy Court designed to minimize the potential disruption of the Chapter 11 filing on the Debtor's business affairs and facilitate the orderly administration of the Chapter 11 Case.  On, or shortly after the Petition Date, the Bankruptcy Court entered various orders.  The final hearing on the below motions is set for July 14, 2023. These include:

(a)     Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments [Docket No. 4].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 26].

(b)     Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance [Docket No. 5].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 27].

(c)     Debtor's Motion for Interim and Final Orders Authorizing: (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code [Docket No. 6].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 28].

(d)     Motion of the Debtor for an Order Under Sections §§105(a), 363(b), 363(c), and 503(b) of the Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Maintain Existing Insurance Policies; and (B) Pay All Obligations in Respect Thereof [Docket No. 7].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 29].

B.     Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court entered various orders authorizing the employment of various professionals to assist with the conduct and administration of the Chapter 11 Case and reorganization efforts, including but not limited to the following:

a.     On July 7, 2023, the Debtor filed (i) an application for entry of an order authorizing the retention and employment of Shulman Bastian Friedman & Bui LLP as bankruptcy counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 67], and (ii) an Application for Entry of an Order Authorizing the Retention and Employment of The Rosner Law Group LLC as Delaware counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 68] (collectively, the "Shulman/Rosner Applications").  On August 7, 2023, the United

States Trustee filed an objection to the Shulman/Rosner Applications [Docket No. 89] (the "UST Objection"), and based upon the UST Objection as well as comments made by the Court at the July 13, 2023 hearing to consider the Shulman/Rosner Applications, the Debtor and Sherman/Grayson elected to have substitute counsel for the Debtor.

On August 16, 2023, the Court held a hearing on the Application at which the Court requested additional evidentiary support.  On August 23, 2023, the Debtor filed the First Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No. 133], and on August 24, 2023, the Debtor filed the Second Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No. 136]. On August 28, 2023, the Court held a hearing on the Application.. Based on the record at the Hearing, the Court approved the Application subject to certain revisions, and on August 31, 2023, this Court entered an Orders approving the Shulman/Rosner Applications *nunc pro tunc* to the Petition Date through and including August 2, 2023 [Docket Nos.  146 and 147].

b.      Due to the possibility of a perceived conflict due to potential claims against the Debtors' insiders, on August 9, 2023, the Debtor filed an application to employ Steven Balasiano as independent director/manager to the Debtor *nunc pro tunc*, to August 4, 2023 [Docket No. 93] (the "Balasiano Application").  The purpose of Mr. Balasiano's retention was to make decisions on behalf of the Debtor related to: (i) the Claim of Alecto against Sherman/Grayson arising from intercompany advances made by the Debtor to Sherman/Grayson and certain expenses paid by the Debtor on behalf of Sherman/Grayson, including any settlement of the Alecto Claim; and (ii) potential estate claims against the Debtor's insiders, and (iii) any other conflict that may arise as and between the Debtor and Sherman/Grayson/ On August 16, 2023, the Bankruptcy Court entered an Order approving the Balasiano Application [Docket No. 118].

c.      On August 16, 2023, the Debtor filed an Application to Employ Morris James as counsel to the Debtor *nunc pro tunc*, to August 11, 2023  [Docket No. 115] (the "Morris James Application").  On September 1, 2023, the Bankruptcy Court entered an Order approving the Morris James Application [Docket No. 149].

d.      On August 27, 2023, the Debtor filed an Application to Employ Gould Consulting Services as Forensic Investigation Consultant to the Debtor, *nunc pro tunc*, to August 25, 2023 [Docket No. 138].

C.      Filing of the Sherman/Grayson Bankruptcy Case

On June 23, 2023, Sherman/Grayson, one of the Debtor's remaining two operating subsidiaries, filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Delaware at Case No. 23-10810 (the "Sherman Bankruptcy Case").  When Sherman/Grayson filed its bankruptcy petition, the Debtor was the largest creditor of Sherman/Grayson, with a general claim of approximately $60.1 million.

On July 5, 2023, Sherman/Grayson filed a Motion for Entry of an Order (I) Authorizing the Private Sale of Substantially All Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment Of Executory Contracts

and Unexpired Leases, and (III) Granting Other Related Relief [Docket No. 60] (the "Sherman Sale Motion").    By and through the Sherman Sale Motion, the Debtor sought to sell its substantially all of its assets to AHS Sherman, LLC (the "Purchaser") for $100,000 in cash, plus the assumption of certain liabilities.  Significantly, the Purchaser also agreed to fund all of the Debtor's operations and other administrative obligations of the hospital and its bankruptcy case, including estate professional fees irrespective of whether the closing is ultimately consummated. Prior to the hearing to consider the Sherman Sale Motion, the Official Committee of Unsecured Creditors of Sherman/Grayson (the "Sherman Committee") entered into a term sheet with the Purchaser by and through which the Purchaser agreed to fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors (the "Sherman GUC Fund").  Additionally, the term sheet between the Purchaser and the Sherman Committee provided that the Debtor would release all claims against the Sherman/Grayson estate and the Debtor would not participate in any distribution from the Sherman GUC Fund.  On August 15, 2023, the Debtor filed a limited objection and reservation of rights with respect to the Sale Motion to address the Debtor's right to participate in the Sherman GUC Fund.  At the hearing to consider the Sherman Sale Motion, the Debtor again expressly reserved its rights with respect to the proceeds of the sale and the waiver of any right of the Debtor.  The Sherman Committee announced that it would file a motion under Bankruptcy Rule 9019 for approval of the term sheet, including the waiver of the Debtor's right to a distribution from the Sherman GUC Fund. The Committee has not yet filed the motion for approval of the settlement.  On August 31, 2023, the Bankruptcy Court entered an Order approving the Sale Motion [Docket No. 167] (the "Sherman Sale Order").  The sale has not closed as Sherman/Grayson and the Purchaser attempt to address the regulatory issues.

Significantly, the Debtor has been paying certain expenses of Sherman/Grayson, including its insurance.  By virtue of the Sherman Sale Order, the Debtor has received repayment on account of the costs of insurance on behalf of Sherman/Grayson for the prorated month of June and for July that were paid by the Debtor.  The Debtor expects that the Purchaser will continue to provide funds to Sherman/Grayson so that it will continue to remit payment to the Debtor until the sale closes.

Additionally, at a hearing on August 16, 2023, the Bankruptcy Court orally granted a request by Sherman/Grayson to remit payment to the Debtor on account of certain insurance obligations for the benefit of Sherman/Grayson under the doctrine of necessity.  An Order granting the request has not yet been entered.

As set forth above, as part of the sale to the Purchaser, the Sherman Committee negotiated to provide that the Purchaser would fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors.  Based solely upon the schedules filed by Sherman/Grayson, the Debtor's unsecured claim is approximately 75% of all unsecured claims.  Notably, the Sherman Committee has asserted that the Debtor has liability to Sherman/Grayson on account of avoidable transfers in an amount up to $150,000, and therefore the Debtor is not entitled to a distribution by operation of 11 U.S.C. § 502(d).  The Debtor does not agree with the Sherman Committee's analysis, and barring settlement, the Debtor will likely object to any motion filed by Sherman/Grayson or the Sherman Committee which would deny the Debtor's right to any distribution from the Sherman GUC Fund..

14

D.      Motion for Appointment of an Official Committee of Unsecured Creditors

On August 11, 2023, the Reed Creditors filed a motion to Appoint Creditors' Committee [Docket No. 100] (the "Committee Appointment Motion").  Another creditor, Snyder Brothers, Inc., filed a joinder to the Committee Appointment Motion [Docket No. 111].  On August 22, 2023, the Debtor filed an objection to the Committee Appointment Motion [Docket No. 127], and the United States Trustee filed a statement in response to the Committee Appointment Motion [Docket No. 128].

On August 28, 2023, the Court conducted an evidentiary hearing to consider the Committee Appointment Motion and objection thereto. At the conclusion of the hearing, the Court denied the Committee Appointment Motion, and ruled that the Debtor did not have to provide work product to creditors or the Subchapter v Trustee. On September 11, 2023, the Court entered an Order denying the Committee Appointment Motion [Docket No. 152].

9.      **Projected Recovery of Avoidable Transfers Against Insiders**

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[4]   The Debtor has requested that Gould Consulting Services ("GCS") conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any.  Since its retention on August 25, 2023, Gould Consulting Services has GCS received more than 330 approximately 1,950 documents and it during the course of our examination has performed the following

---

[4]      Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

15

analyses:[5]

1.　　Reviewed certain filings with the Bankruptcy Court.

2.　　Conducted interviews with Michael Sarrao, Alecto's Executive Vice President, General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.

3.　　Analyzed cash sources and uses based on the analysis, categorization, and summarization of ~~116,759~~ 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

　　　a.　　Bank statements were received for the Examination Period for the following entities: [6]

　　　　　i.　　Alecto Healthcare Services LLC (3 accounts)

　　　　　ii.　　Alecto Healthcare Services Hayward LLC (1 account) [7]

---

[5] ~~Due to the abbreviated time frame from its retention~~ The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the ~~filing of the Plan~~ source of such deposits unless discussed herein, ~~Gould Consulting Services' review and~~ c) analysis ~~is ongoing. The Debtor intends to supplement the Plan~~ of vendor invoices and related payments, ~~once this~~ d) analysis ~~is complete~~ of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

[6] ~~Bank statements were requested for Alecto Healthcare Services Fairmont, LLC, FRMC Physicians, Inc., a subsidiary of Alecto Fairmont, Alecto Healthcare Services Wheeling, Alecto Healthcare Services Martin's Ferry, however, these statements were not received by the date of this summary.~~

~~It is also the understanding of Gould Consulting Services that the following entities did not have bank accounts: Sherman/Grayson Sponsor LLC (subsidiary of Alecto Sherman), Horizon Real Estate Holdings LLC, Sunrise Real Estate Holdings LLC, Olympia Plaza Management, Inc.~~

16291449/3
16291449/3

      iii.     Sherman/Grayson Hospital LLC (7 accounts)

      iv.    Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

      v.    Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

      vi.    Olympia Health Care LLC (6 accounts)

      vii.    Plaza Medical Office Building LLC (2 accounts)

b.    Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

c.    Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

~~c.Tracing cash flows to/from CNH Finance Fund I, LP via~~ d.    Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers ~~between Alecto and Affiliates to Alecto's general ledger and other documentation related to intercompany transactions.~~from Alecto's account *3874 to bank accounts held by Affiliates.

e.    Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

f.    Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

~~d.Analysis of~~g.    Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4.~~Examination of~~    Examined Alecto's general ledger, including ~~1,322~~ 1,208 separate disbursements by check, ACH~~,~~. or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

5.    Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

---

[7]    ~~Under a springing lockbox agreement with CNH Finance Fund I, LP, the AR Lender for the Debtor and its direct and indirect subsidiaries.~~

6.      Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

7.      Examined supporting documentation for interest payments related to the Plaza MOB Loan.

5.Analysis of 8.      Analyzed cash flows and certain closing documents, including funds flow and settlement and funds flow statements, related to the June 20, 2019, refinance of Plaza MOB and the 2021 asset sales to The Regents of the University of California for the benefit of UCLA Health. Plaza MOB Refinance and the 2021 UCLA Asset Sale.

After conducting its forensic analysis, GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. A copy of GCS report is attached hereto as **Exhibit D**. At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers.

Gould Consulting Services is continuing its investigation and analysis, which it anticipates will be completed by September 30, 2023. At the conclusion of its investigation and analysis, it will prepare a letter report of its findings on completion of work to the Independent Director for his consideration as to the merit and value of such claims, if any, including such other factors as the costs of litigation and collectability on account of such claims.

Once the Independent Director has finalized his conclusions, the Debtor will supplement the Plan to include a synopsis of the merits and anticipated value of such potential estate claims. All of the underlying documents relied upon by Gould Consulting Services and the Independent Director will be made available upon written request by Holders of Claims and the subchapter v Trustee, other than personally identifiable information and subject to an executed confidentiality agreement.

Any conclusions of fact or law, including the merits and anticipated value of potential estate claims shall be without prejudice to any third party.

## ARTICLE IV - THE PLAN

The Plan must describe how Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment. For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired. A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Creditors are otherwise entitled. If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Only Creditors in classes that are impaired may vote on whether to accept or reject the Plan, and only Creditors holding Allowed Claims may vote. A class accepts the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the Allowed Claims that actually vote, vote in favor of the Plan. Also, a class of Equity Interest holders accepts the Plan when at least two-thirds (2/3) in amount of the allowed Equity Interest holders that actually vote, vote in favor of the Plan. A class that is not impaired is deemed to accept the Plan.

Pursuant to section 1191(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even if no impaired Class of Claims votes to accept the Plan. Specifically, section 1191(b) of the Bankruptcy Code provides that the Plan may be confirmed if the applicable requirements of section 1129(a) are satisfied, other than sections 1129(a)(8), (10), and (15), if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. Thus, even if no impaired Class votes to accept the Plan, the Debtor reserves the right to assert that the Plan satisfies these requirements and can nevertheless be confirmed.

## 1.    <u>Unclassified Claims.</u>

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code. For example, Administrative Expenses and Priority Tax Claims are not classified. They are not considered impaired, and holders of such Claims do not vote on the Plan. They may, however, object if, in their view, their treatment under the Plan does not comply with that required by the Bankruptcy Code. As such, the Plan does not place the following Claims in any class:

### a.    <u>Administrative Expenses</u>

The Debtor must pay all Administrative Expenses in full. If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense. Any Administrative Expense that is undisputed and is due and owing on the Effective Date will be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Creditor or Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

- If the Debtor continues to operate in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided. This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

- Administrative Expenses also include any post-petition fees and

19

expenses allowed to Professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case. These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, and their proposed treatment under the Plan:

| Type | Estimated Amount Owed | Proposed Treatment |
|------|------------------------|--------------------|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 (All amounts paid on ongoing basis) | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Administrative Tax Claims | $0.00 | The Debtor does not expect any but if there are any Administrative Tax Claims, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| United States Trustee fees | $2,500 | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Professional Fee Claims, including the fees of the Independent Director as approved by the Bankruptcy Court | ~~$400,000~~ $500,000 | After Bankruptcy Court approval, Payment through the Plan as follows: Payment in full. |
| Subchapter V Trustee | $50,000 | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: Payment in full. |
| **TOTAL** | ~~**$452,500**~~**$552,500** | |

**b.**     **Post-Confirmation Professional Fee Claims**

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**c.**     **Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agrees to a less favorable treatment, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

The Debtor anticipates that there will be no Priority Tax Claims.

**2.**     **Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

**a.**     Classes of Other Priority Claims.

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes.  The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim.  However, a class of holders of such Claims may vote to accept different treatment.

It is anticipated that there will be no Other Priority Claims owed. In the event that there are Other Priority Claims owed, such claims will be paid in full on the Effective Date.

**b.**     **Class of Priority Non-Tax Claims**

| Class | Plan Treatment | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| 1 | Priority Non-Tax Claims.  Each Holder of an Allowed Priority Non-Tax Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Reorganized Debtor and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0<br><br>Recovery: 100% |

### b.c.    Classes Class of Secured Claims.

Allowed Secured Claims are Claims secured by property of the Estate (or that are subject to setoff) to the extent allowed as secured Claims under § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

The following chart lists all classes containing the Debtor's secured prepetition Claims and their proposed treatment under the Plan:

22

| Class No. | Description | Insider? (Yes or No) | Impairment (Yes or No) | Treatment |
|---|---|---|---|---|
| 2A | *Secured claim of*: <br><br> Name: Cardinal Health 110, LLC <br><br> Collateral description: Pharmaceuticals and supplies <br><br> Allowed Secured Amount: $0.00 <br><br> Priority of lien: First <br><br> Principal owed: $366,547 <br><br> Pre-petition arrearage: $0.00 <br><br> Total claim: $366,547 | No. | No. Cardinal Health 110, LLC is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. | Cardinal Health 110, LLC shall retain its lien on its collateral and shall be paid in accordance with existing loan or other agreements that existed prior to the Petition Date in the same validity and priority as it held prior to the Petition Date. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, without penalty or premium. |
| 2B | *Secured claim of*: <br><br> Name: MPT of Sherman-Alecto Hospital LLC <br><br> Collateral description: All fees, accounts receivable, and amounts due or to become due to Debtor arising out of that certain Management Services Agreement between Debtor and Sherman/Grayson Hospital, LLC <br><br> Allowed Secured Amount: $427,617.00 <br><br> Priority of lien: First <br><br> Principal owed: $427,617.00 <br><br> Pre-petition arrearage: $0.00 <br><br> Total claim: $427,617.00 | No. | No. MPT of Sherman-Alecto Hospital LLC is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. | MPT of Sherman-Alecto Hospital LLC shall retain its lien on its collateral and shall be paid in accordance with existing loan or other agreements that existed prior to the Petition Date in the same validity and priority as it held prior to the Petition Date. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, without penalty or premium. |

23

| Class No. | Description | Insider? (Yes or No) | Impairment (Yes or No) | Treatment |
|---|---|---|---|---|
| 2C | *Secured claim of:* <br><br> Name: MPT of Wheeling-Alecto Hospital LLC <br><br> Collateral description: All fees, accounts receivable, and amounts due or to become due to Debtor arising out of that certain Management Services Agreement by and among Debtor, Alecto Healthcare Services Wheeling LLC, and Alecto Healthcare Services Martin's Ferry LLC <br><br> Allowed Secured Amount: $0 <br><br> Priority of lien: First <br><br> Principal owed: $0.00 <br><br> Pre-petition arrearage: $0.00 <br><br> Total claim: $0.00 | No. | No. MPT of Wheeling-Alecto Hospital LLC is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. | MPT of Wheeling-Alecto Hospital LLC shall retain its lien on its collateral and shall be paid in accordance with existing loan or other agreements that existed prior to the Petition Date in the same validity and priority as it held prior to the Petition Date. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, without penalty or premium. |
| 2D | *Secured claim of:* <br><br> Name: MPT of Fairmont-Alecto Hospital LLC <br><br> Collateral description: All fees, accounts receivable, and amounts due or to become due to Debtor arising out of that certain Management Services Agreement between Debtor and Alecto Healthcare Services Fairmont LLC <br><br> Allowed Secured Amount: $0 <br><br> Priority of lien: First <br><br> Principal owed: $0.00 <br><br> Pre-petition arrearage: $0.00 <br><br> Total claim: $0.00 | No. | No. MPT of Fairmont-Alecto Hospital LLC is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. | MPT of Fairmont-Alecto Hospital LLC shall retain its lien on its collateral and shall be paid in accordance with existing loan or other agreements that existed prior to the Petition Date in the same validity and priority as it held prior to the Petition Date. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, without penalty or premium. |

16291449/3
16291449/3

| Class No. | Description | Insider? (Yes or No) | Impairment (Yes or No) | Treatment |
|---|---|---|---|---|
| 2E | *Secured claim of:* Name: MPT of Los Angeles LP Collateral description:  All fees, accounts receivable, and amounts due or to become due to Debtor arising out of that certain Management Services Agreement between Debtor and Olympia Health Care, LLC Allowed Secured Amount: $0 Priority of lien: First Principal owed: $0.00 Pre-petition arrearage: $0.00 Total claim: $0.00 | No. | No. MPT of Los Angeles LP is conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan. | MPT of Los Angeles LP shall retain its lien on its collateral and shall be paid in accordance with existing loan or other agreements that existed prior to the Petition Date in the same validity and priority as it held prior to the Petition Date. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, without penalty or premium. |

The Debtor does not believe that there are any secured Claims as the Debtor does not have any assets that are currently encumbered by security interests, and any party that previously had a security interest in the Debtor's assets is entitled to a general Unsecured Claim due have unsecured deficiency Claim, however in the event that a Holder of an Allowed secured Claim has a valid security interest such Holder of an Allowed secured Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing.

| Class | Plan Treatment | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| | | | |

25

| Class | Plan Treatment | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| 2 | Secured Claims.  Each Holder of an Allowed secured Claim, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing. | Unimpaired; **Not entitled to vote** (deemed to accept Plan) | Approx. $0  Recovery: 100% |

26

16291449/3
16291449/3

### c.d.    Classes Class of General Unsecured Claims.

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

The following chart identifies the Plan's proposed treatment of Class 3 which contains General Unsecured Claims against the Debtor:

| Class No. Class | Description | Impairment (Yes or No) | Plan Treatment | Voting Status | Estimated Claim Pool /Projected Recovery |
|---|---|---|---|---|---|
| 3 | Allowed General Unsecured Claims | Yes. Holders of Allowed Class 3 Claims are impaired and entitled to vote to accept or reject the Plan. | After payment in full of all Secured Claims, all Allowed Administrative Claims, and all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date. | Yes. Holders of Allowed Class 3 Claims are impaired and entitled to vote to accept or reject the Plan | Approx. $11,000,000

Recovery: 2.5% - 4% |

### e.    d.Class of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest)in the Debtor.  The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

27

| Class~~No.~~ | ~~Description~~Plan Treatment | ~~Impairment (Yes or No)~~ Voting Status | ~~Treatment~~Estimated Claim Pool /Projected Recovery |
|---|---|---|---|
| 4 | Equity Interest Holders in Class 4 will retain their equity ownership interest in the Debtor. | Holders of Class 4 Equity Interests are unimpaired and not entitled to vote to accept or reject the Plan. Holders of Class 4 Claims are deemed to have accepted the Plan | ~~Equity Interest Holders in Class 4 will retain their equity ownership interest in the Debtor.~~Unimpaired |

**3.**    **Treatment of Claims and Claims Objections.**

The Debtor or the Reorganized Debtor, as applicable, and the Subchapter v Trustee may object to the amount or validity of any Claim by the Claims Objection Bar Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan. If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan. Nothing in this Section shall in any way limit the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

**a.**    **Allowance of Claims**

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date. Further, the Reorganized Debtor shall succeed to the right to any objection to a Claim pending on the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.

**b.**    **Claims Administration Responsibilities**

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtor shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; and (2) from and after the Effective Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any

28

such objection, or the Debtor and the Creditor elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.  For the avoidance of doubt, nothing set forth herein shall limit in any way the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### c.    Estimation of Claims

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been disallowed, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor, or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim, unless otherwise ordered by the Bankruptcy Court.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d.    Adjustment to Claims

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register after the Debtor or the Reorganized Debtor, as applicable, files a notice of satisfaction with the Bankruptcy Court and serves such notice of satisfaction on the affected Claimant on ten (10) days' negative notice if no objection having been filed.  If an objection is filed to the notice of satisfaction, an evidentiary hearing will be scheduled before the Bankruptcy Court.

### e.    Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor.  All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the

29

Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

**f.**     **Amendments to Claims**

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor.  Unless such prior authorization is granted, any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

**g.**     **De Minimis Distributions**

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may withhold such distribution until a final distribution is made to such Holder.  If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may cancel such distribution.  Any unclaimed Distributions pursuant to this Section shall be treated as unclaimed property under Article IV(6)(f) of the Plan.

**h.**     **No Distributions Pending Allowance**

If an objection to a Claim or portion thereof is Filed, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtor. Any distribution to be made on account of such Claim shall be reserved by the Reorganized Debtor, pending Allowance or Disallowance of the Claim that is the subject of an objection.  In the event that a Claim is Disallowed in whole or in part, the Debtor will make Distributions to the Holder of the Claim on account of the Allowed portion of the Claim, and the balance will be distributed on a pro rata basis to Holders of Allowed Claims

**i.**     **Duplicative Claims**

If a Class 3 Creditor filed duplicate Proofs of Claim, the earlier filed Proof of Claim will be deemed Disallowed without the need for any further motion, objection or Bankruptcy Court order, such that the Class 3 Creditor receives only one payment under the Plan based on the later filed Proof of Claim.

**4.**     **Treatment of Executory Contracts and Unexpired Leases.**

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract.  The Debtor has the right to reject, assume (i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

16291449/3
16291449/3

Check all that apply:

☒ Assumption of Executory Contracts.

The Executory Contracts shown on **Exhibit ~~D~~ E** shall be assumed by the Debtor. Assumption means that the Debtor has elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.

The Debtor shall give any party to an Executory Contract that the Debtor seeks to assume fourteen (14) days' notice of the Debtor's intent to assume such Executory Contract along with a proposed cure of any defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and Executory Contracts related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

☒ Rejection of Executory Contracts.

The Executory Contracts shown on **Exhibit ~~E~~ F** shall be rejected by the Debtor.

Except for the Executory Contracts and Unexpired Leases being assumed in Exhibit ~~D~~E, the Debtor rejects the remaining Executory Contracts and Unexpired Leases listed in the Debtor's Schedule G on file with the Court, including but not limited to those listed in Exhibit ~~E~~F.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as a General Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

Neither the exclusion nor inclusion of any Executory Contract on Exhibits ~~D or E~~E or F, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or Reorganized Debtor has any liability thereunder.

31

16291449/3
16291449/3

Further, it is important to note that contracts between the Debtor and non-debtor parties that are included on Exhibits E or F may not be executory.  The inclusion of contracts is premised upon the inclusion of those contracts in the Debtor's Schedules.  **In the event, and to the extent, that any party objects to the inclusion and proposed treatment of a contract as proposed herein, the party must timely file an objection to such treatment.  Absent such any objection, all contracts listed on Exhibits E and F will be treated as set forth herein.**

5.    **Means for Implementation and Funding of the Plan.**

a.    **Funding the Plan**

The Plan will be funded by: (1) cash on hand on the Effective Date; and (2) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties.  The Debtor expects to have approximately $50,000 in 170,000 in combined cash on hand on the Effective Date and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1.  The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

On the Effective Date of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Reorganized Debtor and all funds not expressly provided for in Plan will remain property of the Estate.  The Debtor expects to have sufficient Cash on hand to make the payments required on the Effective Date.

6.    **Payments.**

a.    **Responsibility for Making Payments.**

Prior to the Effective date, the Debtor shall remit all payments due for United States Trustee Fees.  Upon the Effective Date, the Reorganized Debtor shall make all Plan Distributions to Creditors in accordance with the terms of the Plan.

The Reorganized Debtor shall only be required to act and make Distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Reorganized Debtor shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtor on any date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

Any required payments to the Holders of Allowed Claims or Equity Interests shall be

32

made by the Reorganized Debtor: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtor), or (b) by wire transfer from a domestic bank.

### b.    Disputed Claims.

Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Reorganized Debtor, no Distribution shall be made to any Entity that holds both an Allowed Claim and a Disputed Claim until such Entity's Disputed Claims have been resolved by settlement or Final Order.

### c.    Unclaimed Payments.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 180 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets.  In such cases, any Cash or other property held by the Reorganized Debtor in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Reorganized Debtor to be distributed according to the priority set forth in the Plan without any further action or order of the Bankruptcy Court.

### d.    Payment ~~Date~~ Dates and ~~Location~~ Locations.

Distributions shall be made by the Reorganized Debtor twice a year, and such Distributions shall be on a pro rata basis to Holders of Allowed Claims based upon their priority. Accordingly, the first Distributions shall be remitted on a pro rata basis to Holders of Allowed Administrative Expenses (including United States Trustee Fees) until all Allowed Administrative Expenses are paid in full. Once Allowed Administrative Expenses have been paid in full, the Reorganized Debtor shall remit payments on a pro rata basis to Holders of Allowed Priority Claims until all Allowed Priority Claims are paid in full, including interest to the extent applicable.  Once Allowed Priority Expenses have been paid in full, the Reorganized Debtor shall remit payment on a pro rata basis to Holders of general unsecured claims.  After each Distribution, the Reorganized Debtor shall provide the Subchapter v Trustee a list of parties to whom payments were remitted.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative

identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor and Reorganized Debtor have not received a written notice of a change of address prior to the Effective Date.

The Reorganized Debtor shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein. The Reorganized Debtor, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions. Any Distributions returned to the Reorganized Debtor as undeliverable or otherwise shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Reorganized Debtor of its then current address.

Nothing contained in this Plan shall constitute a waiver or release by the Reorganized Debtor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

       **e.**      **Undeliverable Distribution Reserve.**

If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable or is claimed or is deemed to have been forfeited.

       **f.**      **Tax Requirements.**

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Reorganized Debtor reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

       **7.**      **Post-Confirmation Management and Insiders Retained by the Debtor.**

The managers and officers of the Debtor immediately prior to the Effective Date shall serve as the initial managers and officers of the Debtor on and after the Effective Date. Each off the managers and officers being retained are insiders of the Debtor. The post-confirmation officers and managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| **Laxman Reddy** | **President & CEO** | **$750,000** |
| **Matt Williams** | **CFO** | **$300,000** |
| **Michael Sarrao** | **EVP & General Counsel** | **$0**[86] |

## 8.    Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, including the Claims and Causes of Action specifically discussed in Article 5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion.  No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it.  The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

## 9.    Tax Consequences of the Plan.

---

[86] Mr. Sarrao is not paid compensation other than: (1) medical, dental and vision insurance (approximate value of $33,000); and (2) certain expense reimbursements.

16291449/3
16291449/3

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.***

There may be a number of material income tax considerations, risks and uncertainties associated with the implementation of the Plan. The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OR OTHER PLAN RECIPIENTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE V - FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

1.    **Ability to Initially Fund Plan.**

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

36

2.      **Ability to Make Plan Payments And Operate Without Further Reorganization.**

For a period of three (3) years, the Debtor will contribute its entire projected disposable income, in an aggregate amount of $635,549, plus (ii) any residual value received by the Reorganized Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement of such claims, to fund distributions under the Plan on an annual basis. Once a year, the Debtor shall file a certified statement about money received by the Debtor on account of its interest from direct and indirect affiliates.[97] Further, to the extent that the Independent Director determines that there are any valid Causes of Action, the Debtor may create a liquidating trust with an independent third party to pursue such claims with all costs of pursuing such claim(s) coming from the Debtor's projected disposable income that would otherwise be distributions on account of Allowed Claims.

The Debtor will have sufficient operating income to make such payments as indicated in the projections attached hereto as **Exhibit A.**

## ARTICLE VI - LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit FG.**

## ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS

1.      **Discharge.**

Assuming the Plan is consensual, pursuant to section 1191(a) of the Bankruptcy Code, on the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under the Bankruptcy Code, the Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of the Bankruptcy Code, and all other debt allowed under section 503

---

[97]      In accordance with applicable non-bankruptcy law, any amounts received by the Debtor's direct or indirect subsidiaries must first be paid to those subsidiaries' creditors and Debtor's direct and indirect subsidiaries must maintain adequate reserves to address contingent liabilities before such money can be transferred to the Debtor as a distribution on account of the Debtor's equity interest.

16291449/3
16291449/3

of the Bankruptcy Code and provided for in this Plan, except any debt – (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court; or (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

**2.      Debtor Releases.**

Subject to the occurrence of the Effective Date, and in consideration of the services provided and a total of $25,000 to be remitted by certain of the Debtor's insiders, on the Effective Date, the Debtor and its Estate shall release, waive, and discharge unconditionally the Released Parties from any and all claims, causes of action, and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: in connection with or arising from the Debtor's Chapter 11 Case, the pursuit of confirmation of the Plan, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action resulting from the willful misconduct, actual fraud, or gross negligence

**3.      2.Exculpation and Limitation of Liability.**

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from any Cause of Action arising between the Petition Date and the Effective Date related to any act or omission in connection with, relating to, or arising out of: (i) the Chapter 11 Case, (ii) the Plan, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, (iii) the pursuit of Confirmation, (iv) the administration and implementation of the Plan, or (v) the distribution of property under the Plan or any other related agreement.  The Released Parties have, and upon closing of the Chapter 11 Case or the Effective Date shall be deemed to have, with respect to all actions arising on or after the Petition Date, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that in no event shall anything in this Article **5.2** 5.3 be construed as a release of any person's gross negligence, fraud, or willful misconduct, each as determined by a Final Order.

**4.      3.Injunction.**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated

38

pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

### 5. ~~4.~~Remedies Upon Default.

The Debtor expects to be able to make all payments under the Plan.  In the event of a default, however, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default. If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Bankruptcy Court and request a hearing to consider appropriate remedies.

### ARTICLE VIII - GENERAL PROVISIONS

### 1.    Title to Assets~~.~~

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the  Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

 If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor

acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the Estate.

**2.**      **Binding Effect.**

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**3.**      **Severability.**

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**4.**      **Retention of Jurisdiction by the Bankruptcy Court.**

The Bankruptcy Court shall retain jurisdiction of this case with regard to all matters to the fullest extent allowed pursuant to applicable law, including the following: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan and to remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest; (v) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan; (vi) to determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract; (vii) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any entity's obligations in connection with the Plan, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor and the Estate; (ix) to decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending on the Effective Date or that may be brought by the Debtor or the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing; (x) to decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation of the Plan, including but not limited to the issuance of Form 1099s (or similar forms); (xi) to interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; (xii) to enforce the release, exculpation and injunction provisions contained in Article

40

5 herein; and (xiii) to enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

**5.**    **Headings.**

The headings contained in this Plan are for convenience of reference only and  do not affect the meaning or interpretation of this Plan.

**6.**    **Successors and Assigns.**

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

**7.**    **No Fourteen Day Stay.**

Notwithstanding the requirements set forth by Federal Rules of Bankruptcy Procedure, Rules 3020(e), 6004(h), and 6006(d), the Debtor has the right to elect for the Plan to go effective upon entry of the Confirmation Order so long as no stay is in place.

**8.**    **Incorporation of Agreements Entered Into by the Debtor.**

The Debtor may enter into certain agreements or stipulations with certain Creditors regarding the treatment of their Claim so long as such agreements or stipulations do not violate the Bankruptcy Code. The Plan may be amended to reflect such agreements or stipulations. Such amendments shall not reopen any notice or objection periods regarding the Plan.

**9.**    **Modification  of  Plan.**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a). However, the Bankruptcy Court may require additional items including revoting on the Plan.

If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the  Plan  at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Effective Date, or such longer time not to exceed 5 years as fixed by the Bankruptcy Court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

**10.**    **Reservation of Rights.**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.   Neither the filing of the Plan, any

41

statement or provision contained herein, nor the taking of any action by Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

11. **Filing of Notice of Substantial Consummation**

Not later than fourteen (14) days after the Plan of is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve upon the Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

12. **Post-Effective Date Service List**

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors, Cerberus, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date. Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order.  **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list.**

13. **Changes in Rates Not Subject to Regulatory Commission Approval.**

The Debtor is not subject to governmental regulatory approval of rate. The Debtor is not regulated by a governmental commission.

14. **Final Decree.**

Unless otherwise ordered by the Bankruptcy Court, once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor or other party in interest shall file a motion with the Bankruptcy Court to obtain a final decree to close the case.

## ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

1. **Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a) The Plan and the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

**2.     Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

(b)     The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtor confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

(c)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)     No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Debtors.

**3.     Waiver of Conditions.**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article 7 may be waived at any time by the Debtor.

**4.     Effect of Failure of Conditions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor or any of the Released Parties; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Equity Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Creditors  or Equity Interest Holders or any other entity in any respect.  In addition, the Debtor and all Holders of Claims against or Equity Interests in the Debtor shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

**5.     Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

16291449/3
16291449/3

16291449/3
16291449/3

## ARTICLE X - EXHIBITS

The following documents accompany the Plan:

| Attached | Description | Exhibit |
|----------|-------------|---------|
| X | Organizational Chart | A |
| X | Claims Register and Schedules | B |
| X | Projected Income and Expenses | C |
| X | Report of Gould Consulting Services | D |
| X | Executory Contracts and Unexpired Leases to be Assumed | ~~D~~E |
| X | Executory Contracts and Unexpired Leases to be Rejected | ~~E~~F |
| X | Liquidation Analysis | ~~F~~G |

## ARTICLE XI - RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

1.    **Rules of Interpretation.**

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the

45

docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtor, the Reorganized Debtor, or the Trustee in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

2.      **Computation of Time.**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

3.      **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtor or the Reorganized Debtor, as applicable, shall be governed by the laws of the state of incorporation or formation of the Debtor or Reorganized Debtor, as applicable.

4.      **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

16291449/3
16291449/3

5.      **Controlling Document.**

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Dated: ~~September 14~~October 9, 2023                    **MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

# **EXHIBIT D**

Report of Gould Consulting Services

**GOULD** Consulting Services
**LISTEN | EVALUATE | OPINE**
P.O. Box 888021
Atlanta, Georgia 30356
770.315.9627
Leanne@GouldForensics.com

September 28, 2023

Steven Balasiano, Independent Director
Alecto Healthcare Services, LLC
c/o Jeffrey Waxman, Esq.
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, Delaware 19801-1494

**In Re: Alecto Healthcare Services, LLC (Case No. 23-10787 (JKS))**
**Forensic Investigation Consulting**

Dear Mr. Balasiano,

You asked me to prepare this letter report to describe our findings, procedures employed, and data and transactions analyzed in the forensic investigation of transactions by and between Alecto Healthcare Services, LLC ("Alecto" or "Debtor") and its Affiliates[1] and/or any current or former officers, directors, or equity holders ("Insiders")[2] performed by Gould Consulting Services ("GCS").

The forensic investigation covered the four (4) year period June 17, 2019, through June 16, 2023, the date Alecto filed for bankruptcy protection under chapter 11, subchapter V (the "Examination Period").

Section I of this letter report sets forth our observations based on work performed during our retention. Specifically, this letter report will discuss the following transactions:



---

[1] Alecto Healthcare Services Sherman LLC ("Alecto Sherman") and its subsidiary, Sherman/Grayson Hospital, LLC, d/b/a Wilson N. Jones Regional Medical Center ("Sherman/Grayson"), Alecto Healthcare Services Hayward, LLC ("Alecto Hayward"), Alecto Healthcare Services Los Angeles LLC ("Alecto LA") and its subsidiary, Olympia Health Care d/b/a Olympia Medical Center ("Olympia HC" or "OMC"), Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), Alecto Healthcare Services Ohio Valley, LLC ("Alecto Ohio Valley"), Alecto Sunrise MOB Holdings LLC ("Sunrise MOB"), its subsidiaries Sunrise Real Estate Holdings LLC (Sunrise REH") and Plaza Medical Office Building LLC ("Plaza MOB"), and Alecto Healthcare Services Real Estate Holdings LLC ("Alecto REH"), (collectively, and including unnamed subsidiary entities, the "Affiliates"). See GCS Diagram 1 – Organization Chart.
[2] Alecto's officers and directors are Lex Reddy, Michael Sarrao. The Alecto equity holders are Lex Reddy, Richard Hayes, The Reddy Investment Trust, Roger Krissman, The Krissman Family Trust, Michael Sarrao, The Sarrao Family Trust, Panch Jeyakumar, M.D., The Jeyakumar Inter-Vivos Trust, Martha Hayes, the Hayes Irrevocable Trust, Matthew C. Hayes, Comstock Investment Trust, Steven Kay, Matthew Williams, Aman Dhuper, (collectively, the "Alecto Members") (Alecto Healthcare Services LLC 2022 Partnership Tax Return).

*Providing counsel and their clients with forensic accounting, business valuation, financial advisory and expert services in commercial and bankruptcy disputes.*

September 28, 2023
In Re: Alecto Healthcare Services, LLC

GCS understands that as of the date of this letter report the statute of limitations for avoidance actions under U.S. Bankruptcy Code §548 and the Uniform Voidable Transactions Act ("UVTA") has passed with respect to the June 19, 2019 Transfer except for the Debtor's ability to bring such actions.  This letter report is provided to you with respect to potential avoidance actions that may be pursued by the Debtor.

Section II outlines the scope of our work and analysis performed under the limitations listed in Section III.

## I.    FINDINGS AND OBSERVATIONS

GCS examined documents and data produced by Alecto to identify potentially voidable transfers during the Examination Period.  Our examination was focused in the following areas:

- Transactions involving the transfer of 1) Sunrise REH, and effectively, Plaza MOB, by Alecto in 2019 to Sunrise MOB, an organization formed by the Alecto Members, and 2) the transfer of Sunrise MOB, and effectively Plaza MOB, to Alecto in 2021.

   **Findings:**  Although the June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million), the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million.  No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million. (*See Sections A and C of the Summary of Observations and discussion below*).

- Inter-company transfers and allocation of advances by Alecto.

   **Findings:** Generally, and in aggregate, lockbox deposits exceeded advances allocated to the Affiliates.  The excess deposits to advances were either retained by Alecto for payroll, expenses, additional transfers to Affiliates, or used to reduce Alecto's revolving credit facility with its lender.  GCS identified other inter-company transfers between Affiliates and/or Alecto.  In the instances where funds were transferred from an Affiliate to Alecto, these funds were subsequently transferred to another Affiliate or used by Alecto for payroll and other expenses.  Essentially, Alecto acted as a conduit for funding to Affiliates.  *(See Section E of the Summary of Observations and discussion below.)*

- Transfers to/from Insiders including transfers to/from Plaza MOB, 1) in the gap period between the 2019 transfer of Sunrise REH and Plaza MOB by Alecto to Sunrise MOB, and the 2021 transfer by assignment of Sunrise MOB, and Plaza MOB back to Alecto,[3] and 2) after the January 2021 assignment of Sunrise MOB and Plaza MOB.

   **Findings:**  Transfers to Alecto and Affiliates from Plaza MOB exceeded transfers to Plaza MOB in the "Plaza MOB Gap Period" and post-assignment. *(See Sections B and D of the Summary of Observations and discussion below).*

   Specifically, regarding direct payments to Insiders, based on our analysis of the data and supporting documentation produced, payments to Insiders were reimbursements of business-

---

[3] The "Plaza MOB Gap Period" is the period from June 19, 2019, through December 31, 2020.

2

September 28, 2023
In Re: Alecto Healthcare Services, LLC

related expenses and advances for the benefit of Alecto and/or payroll and benefits provided as compensation for services to Alecto and/or Affiliates. *(See Section F and G of the Summary of Observations and discussion below.)*

## Summary of Observations

A. June 19, 2019 Transfer of Sunrise REH to Sunrise MOB and the Alecto Members

- Plaza MOB appraised market value at June 1, 2019: $50,700,000
- New loan amount: $30,000,000
- Net proceeds of refinance to Plaza MOB: $9,185,830 ($8,565,154 plus $620,676)
- Payoff amount: $19,472,350 (Wells Fargo and Berkadia Commercial Mortgage)
- Capital contribution to Alecto per general ledger: $8,944,477
- Total payoff and capital contribution to Alecto: $28,416,827

The transfer of Sunrise REH to Sunrise MOB was for less than reasonably equivalent value as the appraised value of the assets exceeded the loan payoff and capital contribution received by Alecto.

B. Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"[4]

- Net transfers of $2,749,226 to Alecto and/or Affiliates
- $3,789,966 to "REAM, as Trustee for Various Investors" for Plaza MOB Loan interest

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

C. January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

- Asset sale price at August 31, 2021 (agreed to January 1, 2021): $58,500,000
- No consideration paid by Alecto to the Alecto Members on January 2, 2021
- Net proceeds of sale to Plaza MOB on August 31, 2021: $15,769,770
- Payoff amount $42,087,433 (Wells Fargo and MPT Operating Partnership)[5]

Alecto received more than reasonably equivalent value in the exchange as no consideration was paid to Sunrise MOB or the Alecto Members for the Sunrise MOB assets.

D. Post-Assignment Transfers to/from Plaza MOB

- $30,559,770 to, or for the benefit of, Alecto and/or Affiliates
  - Transfers to Alecto: $13,917,603
  - Transfer to Alecto of $15,770,214 proceeds from the UCLA Asset Sales (Plaza MOB) equals total transfers to Alecto: $29,687,817
  - Transfers to Olympia HC/OMC: $871,953
- $3,807,251 to, of for the benefit of Plaza MOB
  - $2,709,449 from Alecto
  - $1,097,803 from OMC

Alecto and/or Affiliates received more cash from Plaza MOB than transferred to Plaza MOB.

---

[4] Payees of Plaza MOB payments by check could not be determined based on information produced to GCS.
[5] Alecto was a borrower on the MPT Operating Partnership Loan.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

E. Inter-company Transfers and the CNH Revolving Facility

- Advances from the CNH Revolving Facility and Affiliate allocations tracked by Alecto Management in an Excel spreadsheet tie, for the most part, to wire transfers into/out of Alecto's disbursements account *3784.
- In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances. As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.
- In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits. It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Based on our analysis, Alecto acted as a conduit for funding Affiliates and any excess funds from the Affiliates or its credit facility was used to fund Alecto's payroll, expenses, or additional Affiliate funding.

F. Transfers to Insiders of $10,000 or more

- GCS extracted payments by check or "Bill Payment"/ACH Transfer from Alecto's general ledger and identified payments to Insiders of $10,000; a threshold amount agreed to by you and GCS as sufficient for our examination.
- GCS examined 40 payments of $10,000 or more totaling $1,416,763; 92% of identified payments to Insiders.
- Approximately 59% or $835,320 in payments, were supported as business expenses paid by M. Sarrao and/or his law firm for the benefit of Alecto and/or its Affiliates. The remaining payments to A. Dhuper, R. Krissman, S. Kay and American Express were also supported as business expenses.
- A $77,000 and a $30,000 payment to L. Reddy and R. Krissman, respectively, were identified as the reimbursement of advances to Alecto. Additional payments to L. Reddy of $50,000 and $380,000 were identified by GCS' examination of journal entries in Alecto's general ledger and were verified as reimbursement of advances as well.
- Payments to the Cooperative of American Physicians, Inc., for the benefit of Dr. P. Jeyakumar, were verified as professional dues and insurance.
- L. Reddy, A. Dhuper, Dr. P. Jeyakumar, and M. Sarrao received compensation and benefits as employees.

The transfers examined were reimbursements of Alecto business expenses, advances, payroll, and professional dues and insurance and were determined to be appropriately supported.

G. Transactions Related to the 2018 Promissory Note

- Payments by, or for the benefit of, Alecto and advances to Alecto through a Wells Fargo line of credit under the 2018 Promissory Note were verified through an examination of bank statements, loan statements, and the Alecto general ledger.
- Plaza MOB paid off the loan, on behalf of Alecto, on January 6, 2022.

The payoff of the Wells Fargo line of credit by Plaza MOB increased the inter-company amounts due Plaza MOB. Reconciliation of inter-company accounts by Alecto resulting in the

September 28, 2023
In Re: Alecto Healthcare Services, LLC

reclassification of Plaza MOB's inter-company account balance to a loan payable (due to Plaza MOB) in Alecto's general ledger.

H. Transfers to Holders of Previously Unidentified Accounts

- 113 transfers from Alecto totaling, in aggregate, less than $214,000
- 76 of those transfers were for less than $1,000

Transfers to unidentified accounts were below the agreed to research threshold of $10,000. Based on Alecto's general ledger, the majority of transfers were to OMC HSA Account *3709.

---

## Discussion

### A. June 19, 2019 Transfer of Sunrise REH to the Alecto Members

On June 19, 2019, Alecto transferred Sunrise REH to the Alecto Members (the "Sunrise REH Transfer") in order to enable the refinancing of Plaza MOB (the "Plaza MOB Refinancing"), a subsidiary of Sunrise REH, to "take advantage of interest rate opportunities and cash out the equity that had been developed."[6] It is our understanding that the proposed lender, Wells Fargo Bank, N.A., ("Wells Fargo") required Sunrise REH not be owned by Alecto in order to complete the refinancing.[7]

Prior to the Sunrise REH Transfer, on June 12, 2019, the Alecto Members formed Sunrise MOB[8] to facilitate the refinancing of Plaza MOB and a subsequent loan from Alecto to Olympia HC, Alecto LA's hospital operating company.

The following transactions (as shown in GCS Diagram 2) were effectuated to comply with Wells Fargo's refinancing conditions:

1. 6/12/2019: Formation of Sunrise MOB by the Alecto Members; cash contributions to capital were not identified in the Sunrise MOB Operating Agreement;[9]

2. 6/19/2019: Alecto transferred Sunrise REH, and effectively its subsidiaries, Plaza MOB and Olympia Plaza Management, Inc. ("OPM") to the Alecto Members; the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[10]

3. 6/19/2019: The Alecto Members transferred Sunrise REH to Sunrise MOB; the second amendment to the Sunrise REH amended operating agreement memorializing the transfer does not identify any consideration in return for the transfer;[11]

---

[6] Plaza MOB Summary prepared by Alecto Management ("Plaza MOB Summary), ¶2 [GCS Exhibit 1]. With reference to this letter report and analysis, Alecto Management is represented by M. Sarrao and M. Williams.
[7] Plaza MOB Summary, ¶3.
[8] Plaza MOB Summary, ¶4.
[9] Sunrise MOB Holdings LLC Operating Agreement [Plaza MOB Summary, Exhibit A].
[10] First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit B].
[11] Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC [Plaza MOB Summary, Exhibit C].

5

September 28, 2023
In Re: Alecto Healthcare Services, LLC

4. 6/20/2019: Plaza MOB was refinanced for $30,000,000[12] (the "Plaza MOB Loan") resulting in net proceeds before loan payoff of $28,235,111.[13] After loan payoff, Net Proceeds deposited in Plaza MOB's bank account totaled $8,565,153.79.[14]

    a. The Funds Flow Agreement directed the Net Proceeds of the Plaza MOB Loan to be transferred to the Richard A. Hayes, Inc. Client Trust Account ("Hayes Trust Account")[15] and distributed to Sunrise REH in two (2) distributions; the $8,444,477.81 "Plaza MOB Distribution" and the $120,235.98 "Plaza MOB Second Distribution."[16]

    b. The Funds Flow Agreement also contemplated distributions to the Alecto Members of "up to $500,000 from the Additional Insurance Reserve Funds and up to $355,002 from the Rent Concession Reserve Funds (the "Reserve Funds Distributions");[17] the Plaza MOB Second Distribution and Reserve Funds Distributions were to be deposited in the Hayes Trust Account.[18]

5. 6/20/2019: Plaza MOB transferred $8,444,477.81 to the Hayes Trust Account.[19]

6. 6/20/2019: According to the Funds Flow Agreement, the $8,444,477.81 was to be "transferred" to the Alecto Members through a series of "paper distributions" consummating in a capital contribution by the Alecto Members to Alecto and the disbursement of the $8,444,477.81 from the Hayes Trust Account directly to Alecto. The "paper distributions" are described as follows:

    a. Plaza MOB distributed $8,444,477.81 to Sunrise REH.[20]

    b. Sunrise REH distributed $8,444,477.81 to Sunrise MOB.[21]

    c. Sunrise MOB distributed $8,444,477.81 to the Alecto Members;[22]

7. 6/20/2019: The Alecto Members directed the disbursement of the $8,444,477.81 from the Hayes Trust Account to Alecto as a capital contribution (the "Plaza MOB Distribution").[23] The Plaza

---

[12] The property owned by Plaza MOB, Olympia Medical Plaza, held a Market Value As-Is (Stabilized) of $50,700,000 as of June 1, 2019, per an appraisal by Cushman & Wakefield Western, Inc.

[13] "Funds Flow Agreement" dated June 20, 2019, by and between Plaza MOB, Sunrise REH, Sunrise MOB, Alecto and the Alecto Members [Plaza MOB Summary, Exhibit D], Recital E. See also Promissory Note dated June 20, 2019, Borrower's Estimated Settlement Statement, and Lender Closing Statement

[14] Funds Flow Agreement, Recital E. Net Proceeds included the $8,444,477.81, the "Plaza MOB Distribution" and a remaining balance of $120,235.98, the "Plaza MOB Second Distribution." Per the Borrower's Estimated Settlement Statement, estimated cash to Plaza MOB was $8,446,479.89. The difference from the $8,565,153.79 deposit amount and the estimate is primarily the $120,235.98 estimated future payment to Berkadia Commercial Mortgage LLC due July 6, 2019.

[15] Funds Flow Agreement, Recital J.

[16] Funds Flow Agreement, Recitals F and K.

[17] Funds Flow Agreement, Recital L.

[18] Funds Flow Agreement, Recital M.

[19] Plaza MOB Account *2120, June 2019.

[20] Funds Flow Agreement, Recital F.

[21] Funds Flow Agreement, ¶2.

[22] Funds Flow Agreement, ¶3.

[23] Funds Flow Agreement, ¶4.

6

September 28, 2023
In Re: Alecto Healthcare Services, LLC

MOB Distribution was received into Alecto's operating account *6065 [24] and recorded in Alecto's general ledger as a capital contribution.[25]

8. 6/20/2019: Alecto loaned $8,444,477.81 to Olympia HC, a subsidiary of Alecto LA (the "2019 Olympia HC Loan").[26] The loan was received into Olympia HC's Cash Management Account (CMA) *7573 [27] and recorded as "Loan to Olympia" in Alecto's general ledger.[28]

9. 7/31/2019: Plaza MOB transferred $620,675.98 to the Hayes Trust Account (the "July 2019 Plaza MOB Distribution").[29]

    a. The 7/31/2019 deposit included the "Plaza MOB Second Distribution" of $120,235.98,[30] $440 from First American Title Insurance Company, and $500,000 from Wells Fargo; amounts received by Plaza MOB on 6/21/2019 and 7/17/2019, respectively.[31]

10. 7/31/2019: The $620,675.98 July 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred to Olympia HC's account *7573 on the same day (the "July 2019 Olympia Transfer").[32]

    a. The Funds Flow Agreement directed additional deposits from the Hayes Trust Account be contributed to the capital of Alecto by the Alecto Members through the same series of distributions as the $8,444,477.81 Plaza MOB Distribution.[33]

    b. The Second Capital Contribution was not recorded in Alecto's general ledger as a capital contribution.

    c. The July 2019 Olympia Transfer was not recorded as a "Loan to Olympia" in Alecto's general ledger.

11. 9/26/2019: Plaza MOB transferred $500,000 to the Hayes Trust Account (the "September 2019 Plaza MOB Distribution"). This transfer, and a Plaza MOB Loan interest payment of $152,680 to "Ream, as Trustee for Various Invest," reduced the balance in Plaza MOB's operating account to $2,377.98.[34]

    a. The $500,000 September 2019 Plaza MOB Distribution was disbursed from the Hayes Trust Account into Alecto's operating account *6065 and transferred that same day to Alecto's Acct *3784, an account used to receive advances from a revolving credit facility

---

[24] Alecto Account *6065, June 2019.

[25] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |

[26] Olympia Promissory Note. The Olympia Promissory Note was entered into subject to a consent agreement dated June 19, 2019, by and among MPT of Los Angeles, L.P, MPT of Olympia, LLC, Alecto, Alecto LA, Olympia HC, Horizon Real Estate Holdings LLC, Sunrise REH, Sunrise MOB and Plaza MOB.

[27] Olympia HC Account *7573, June 2019.

[28] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |

[29] Plaza MOB Account *2120, July 2019.

[30] Funds Flow Agreement, Recital K.

[31] Plaza MOB Account *2120, July 2019. GCS assumes the $500,000 from Wells Fargo were the Additional Reserve Funds, a "Reserve Funds Distribution." Two (2) $500,000 distributions were deposited into the Hayes Trust Account by Plaza MOB: $500,000 on 7/31/2019 and $500,000 on 9/26/2019 (Plaza MOB Account *2120, September 2019).

[32] Alecto Account *6065, July 2019 and Olympia HC Account *7573, July 2019. The Amended and Restated Promissory Note dated September 26, 2019.

[33] Funds Flow Agreement, ¶5.

[34] Plaza MOB Account *2120, September 2019.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

      with CNH Finance Fund I, L.P. ("CNH Finance") and utilized to allocate and distribute funds to Affiliates.[35]

    b.   The $500,000 transfer was recorded in Alecto's general ledger as a capital contribution.[36]

    c.   On 9/26/2019, a total of $935,000 was transferred from Alecto's Account *3784 to Olympia HC's account *7573 (the "September 2019 Olympia Transfer").[37] However, only $500,000 was recorded as a "Loan to Olympia" in Alecto's general ledger.[38]

12.  The July 2019 Olympia Transfer and $500,000 of the $935,000 September 2019 Olympia Transfer were documented in an Amended and Restated Promissory Note dated September 26, 2019, as additional advances on the 2019 Olympia HC Loan such that the principal amount on the Olympia HC Loan was $9,565,153.79 at that date.[39]

    a.   However, Alecto's general ledger reflects a "Loan to Olympia" of $8,944,477.81; the total of the $8,444,477.81 Plaza MOB Distribution and $500,000 of the September 2019 Olympia Transfer.[40] No additional advances were recorded after September 30, 2019.

    b.   Alecto's general ledger reflects a total $8,944,477.81 in "Paid-in-capital or Surplus."[41] No additional capital contributions were recorded after September 30, 2019.

## B.  Transfers to/from Plaza MOB in the "Plaza MOB Gap Period"

From June 19, 2019, through December 31, 2020 (the "Plaza MOB Gap Period"), Sunrise REH and its subsidiaries, Plaza MOB, and Olympia Plaza Management, Inc. were owned by Sunrise MOB (the Alecto Members) not Alecto. According to Plaza MOB's bank statements, during the Plaza MOB Gap Period, the following cash transfers were made between Alecto and Plaza MOB, resulting in a net amount transferred to Alecto of $2,624,225.[42]

1.  Plaza MOB transferred $3,011,226 to Alecto's operating account[43]

    a.   $2,751,226 on 7/10/2019 originating from an "over counter deposit" of the same amount into Plaza MOB's Acct *2120 on 7/8/2019. Also on 7/10/2019, Alecto transferred the same amount to Olympia HC Acct *7573;[44]

---

[35] Alecto Account *6065, September 2019 and Alecto Account *3784, September 2019.

[36] Alecto general ledger:

| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
|---|---|---|---|---|

[37] Alecto Account *3784, September 2019 and Olympia HC Account *7573, September 2019.

[38] Alecto general ledger:

| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
|---|---|---|---|---|

[39] Amended and Restated Promissory Note dated September 26, 2019 by an between Alecto and Olympia HC.

[40] Alecto general ledger:

| Loan to Olympia | | | | |
|---|---|---|---|---|
| Loan to Olympia | Journal Entry | 9/30/2019 | wire received on 06/19/19 - receivable from OMC | 8,444,477.81 |
| Loan to Olympia | Journal Entry | 9/30/2019 | To record Loan receivable from OMC - Sun Rise MOB LLC contribution | 500,000.00 |
| Total for Loan to Olympia | | | | 8,944,477.81 |

[41] Alecto general ledger:

| Paid-In Capital or Surplus | | | | |
|---|---|---|---|---|
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | Wire received on 09/26/19 from Richard Hayes Attorney Client trust account | 500,000.00 |
| Paid-In Capital or Surplus | Journal Entry | 9/30/2019 | wire received on 06/19/19 now accounted as paid in capital surplus set up in COA | 8,444,477.81 |
| Total for Paid-In Capital or Surplus | | | | 8,944,477.81 |

[42] Bank transaction summary for Plaza MOB's Account *2120 (GCS Schedule A.7.3.1).

[43] Plaza MOB Account *2120, July 2019, December 2019, January 2020.

[44] Olympia HC Account *7573, July 2019.

8

September 28, 2023
In Re: Alecto Healthcare Services, LLC

      b.  $160,000 on 12/13/2019; $160,000 was subsequently transferred to Plaza MOB from Alecto on 12/30/2019; and

      c.  $280,000 on 1/14/2020; this transfer was received by Alecto and originally recorded as an intercompany liability due to Olympia HC by Alecto. However, a cash transfer from Alecto to Olympia HC was not identified in either entity's bank statements. The transaction was reclassified in Alecto's general ledger on June 30, 2020, as an intercompany liability due to Plaza MOB.[45]

2.  In February 2020, Alecto transferred $277,000 from Alecto Account *3784 to Alecto Account *6065 and then via wire to Plaza MOB; $97,000 on 2/5/2020 and $130,000 on 2/10/2020.[46] These transfers were originally recorded as an offset to intercompany amounts due to Olympia HC by Alecto. These transactions were reclassified in Alecto's general ledger on June 30, 2020, as an offset to intercompany amounts due to Plaza MOB by Alecto with the journal entry description "refer JE 1061 02/28/2018 Re-class to PMOB."[47]

In addition to the cash transfers, transactions for the benefit of Plaza MOB and/or Sunrise REH were recorded as follows:

1.  On June 30, 2020, Alecto recorded a journal entry reclassifying $150,000 recorded as an intercompany amount due to Olympia HC by Alecto to and intercompany amount due to Plaza MOB with the journal entry description "refer JE 795 09/28/2018 Re-class to PMOB."[48]

2.  During the Plaza MOB Gap Period, Alecto made payments for lien searches and taxes totaling $7,670 to, or for the benefit of, Plaza MOB and/or its parent company Sunrise REH.[49]

Alecto's 2020 general ledger reflects an intercompany liability due to Plaza MOB of $224,353.97.[50]

---

[45] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | -280,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | 280,000.00 |

[46] Alecto Account *3784, February 2020, Alecto Account *6065, February 2020 and Plaza MOB Account *2120, February 2020. See also GCS Schedules A.0.1, A.0.3 and A.7.3.1.

[47] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 130,000.00 |
| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | 97,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -130,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to | -97,000.00 |

[48] Alecto general ledger:

| Inter-Co - Olympia | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | -150,000.00 |
| Inter-Co - Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | 150,000.00 |

[49] Ibid. June 1, 2020 tax expenses (transaction numbers PMOB 2020, SREH 2020 TX) and a July 31, 2020 lien search expense (transaction number July 2020) paid by M. Sarrao in July and August 2020 and reimbursed to M. Sarrao on September 4, 2020.

| Inter-Co – Plaza MOB | Bill | 7/31/2020 | July 2020 | Michael J. Sarrao | Paracorp Inc UCC Lien | -70.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 Estimated Tax | -6,000.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | PMOB 2020 | Franchise Tax Board | PMOB 2020 TX | -800.00 |
| Inter-Co – Plaza MOB | Bill | 6/1/2020 | SREH 2020 TX | Franchise Tax Board | SREH 2020 TX | -800.00 |

[50] Alecto general ledger:

September 28, 2023
In Re: Alecto Healthcare Services, LLC

Also, during the Plaza MOB Gap Period, Plaza MOB transferred $3,789,966 in monthly payments to "REAM, Trustee for Various Invest." These monthly payments were verified as interest payments on the Plaza MOB Loan.[51]

## C.  The January 1, 2021 Sunrise MOB Assignment to Alecto and the UCLA Asset Sale

Olympia HC owned and operated Olympia Medical Center (the "Hospital" or "OMC") on land (the "Hospital Real Property") owned by Horizon Real Estate Holdings LLC ("Horizon"), a subsidiary of Alecto LA.  Plaza MOB owned property adjacent to the Hospital including a medical office building and parking structure (the "Plaza Real Property").[52]  UCLA entered into an agreement with Olympia HC, Horizon and Plaza MOB to purchase the Hospital assets, Hospital Real Property, Plaza Real Property, and certain other assets in a two (2) phase asset sale (the "UCLA Asset Sale) for an aggregate purchase price of $128,500,000.[53]

On January 1, 2021, the Initial Closing Date, UCLA acquired the Hospital assets and Hospital Real Estate for $75,850,000.[54] Proceeds from the sale were used by Olympia and Horizon to pay obligations to lenders resulting in net proceeds of $23,506,100[55] which were deposited into Alecto's operating account *6065 on January 4, 2021, via wire transfer.[56] On January 19, 2021, Alecto transferred the net proceeds to Alecto Account *3784 and used the cash, in part, to fund its operating expenses and Affiliates through May 2022.[57]

On the same day, January 1, 2021 (the "Assignment Date"), the members of Sunrise MOB assigned their interest in Sunrise MOB, and therefore Plaza MOB, to Alecto.[58]  No consideration was given by Alecto for the transfer.

On August 31, 2021, the Final Closing Date, the Plaza Real Property was sold to UCLA for $58,500,000.[59] Proceeds from the sale were used to pay Plaza MOB's mortgage with Wells Fargo, N.A., and the loan

| | | | | |
|---|---|---|---|---|
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | 27,021.89 |
| Inter-Co – Plaza MOB | Journal Entry | 1/31/2020 | Re class Escrow refunds on Sunrise Holdings -MOB & PL for Ex. liab policy | 2,002.08 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | -130,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 1061 02/28/2018-Re-class to PMOB | -97,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer JE 795 09/28/2018-Re-class to PMOB | 150,000.00 |
| Inter-Co – Plaza MOB | Journal Entry | 6/30/2020 | refer 1047 01/31/2020-Re-class to PMOB | 280,000.00 |
| Inter-Co – Plaza MOB | | | | |
| Total for Inter-Co – | | | | 224,353.97 |

[51] Wells Fargo Payment Coupon/Billing Statements for the period July 2019 – August 2021. (GCS Schedule A.7.3.1)
[52] Plaza MOB Summary.
[53] Asset Purchase Agreement dated December 4, 2020, among Olympia Health Care, LLC, Horizon Real Estate Holdings, LLC, Plaza Medical Office Building, LLC and The Regents of the University of California, on behalf of UCLA Health (the "UCLA APA"). The UCLA APA contemplated the closing of the purchase of assets from Plaza MOB to occur on March 31, 2021 (the "Initial Outside Closing Date"). The Regents of the University of California together with UCLA Health are referred to herein as "UCLA." See also Plaza MOB Summary, ¶15.
[54] The Initial Closing Purchase Price of $70 million less a $3 million Indemnity Holdback Amount, or $67 million was delivered to First American Title Insurance Company.
[55] Seller's Final Settlement Statement listed "Cash to Seller" of $23,507,202 (includes credit for Independent Consideration of $100).
[56] Alecto Account *6065, January 2021. GCS noted the net proceeds were not deposited into Olympia HC's bank accounts. GCS did not receive Horizon's bank statements and therefore, the original recipient of the net proceeds, if not Alecto, is unknown.
[57] Alecto Account *3784, January 2021.
[58] Plaza MOB Summary, Exhibit E, Assignment of Membership Interests. See also GCS – Diagram 3 – Plaza MOB Assignment and UCLA Asset Sale (Plaza MOB).
[59] Seller's Estimated Settlement Statement.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

obligations of Alecto and certain Affiliates to MPT Operating Partnership, LP.[60] Net proceeds of $15,769,770.21 were deposited into Plaza MOB's bank account *2120.[61]

## D.  Post-Assignment Transfers to/from Plaza MOB

Between the Assignment Date, January 1, 2021, and the Final Closing Date on August 31, 2021, Plaza MOB made payments by check of $874,797[62] and transferred a total of $1,278,196 to a) third-parties ($41,076), OMC ($8,517), and "REAM, Trustee for Various Invest" for Plaza MOB Loan interest ($1,222,447).[63]

From August 31, 2021, through June 30, 2023, $2,709,449 was transferred by Plaza MOB to Alecto and $1,097,803 was transferred to Olympia HC.[64]

From August 31, 2021, through June 30, 2023, Plaza MOB transferred $13,917,603 to Alecto and $871,953 to Olympia HC.  Including the proceeds from the sale of Plaza MOB's assets to UCLA, $29,687,817 was deposited into Alecto's bank accounts through June 30, 2023.[65] As of June 30, 2023, Plaza MOB had approximately $22,000 in its bank account.[66]

On January 6, 2022, Plaza MOB wired $3,892,489.92 to First Clearing for payment to The Reddy Investment Trust.[67]  At that time, The Reddy Investment Trust held a $4,039,463.75 unsecured Promissory Note issued by Alecto in October of 2018 (the "2018 Promissory Note").[68]  Alecto Management represented that this payment was made by Plaza MOB as a condition to The Reddy Investment Trust consenting to sale of Plaza MOB's assets to UCLA.[69]

---

[60] Seller's Estimated Settlement Statement.  The Seller's Escrow Instructions include a payoff letter from MPT of Los Angeles, L.P. related to a Secured Promissory Note issued on January 1, 2021, by Sunrise REH, Plaza MOB, Alecto LA, Olympia HC, Horizon and Alecto. The $8,004,800 loan and subsequent payoff was and recorded in Alecto's general ledger as a Loan Payable to Plaza MOB:

| Inter-Co - WNJ | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | -8,004,800.00 |
| Loans Payable Account | Journal Entry | 8/31/2021 | UCLA Transaction # 2 - PMOB - MPT | 8,004,800.00 |
| Total for Loans Payable Account | | | | 8,004,800.00 |

See also Plaza MOB Summary, ¶15.

[61] Plaza MOB Account *2120, August 2021.

[62] Payees of payments by check and preauthorized debits could not be determined based on information produced to GCS.

[63] GCS Schedule A.7.3.1. Alecto Management represented, and GCS verified, monthly payments to "REAM, Trustee for Various Investors" were for interest payments on the Plaza MOB Loan. Monthly payments to "REAM, Trustee for Various Investors" were made from Plaza MOB's bank account beginning in August 2019 through August 2021.

[64] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[65] GCS Schedule A.7.3.1., Schedule A.0.1., Schedule A.0.3., Schedule A.3.1.1. and Schedule A.3.1.2.

[66] Plaza MOB Account *2120, June 2023.

[67] Plaza MOB Account *2021, January 2022. GCS Schedule A.7.3.1. See also Summary of Loans prepared by Alecto Management.

[68] Promissory Note dated October 9, 2018, by and between Alecto Healthcare Services, LLC and The Reddy Investment Trust matured October 31, 2021.   GCS has not received any documentation that the 2018 Promissory Note was amended or restated. It is our understanding, per a discussion with Alecto Management, that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan, and the 2018 Promissory Note was entered into.  See Section G.

[69] Summary of Loans (a)(2). The UCLA APA Schedule 4.4(f)(ix) Consents to Final Closing to the sale of the Plaza Real Property does not specifically list The Reddy Investment Trust or Alecto.  However, the schedule does refer to "Consent of the Members of Sunrise MOB Holdings LLC pursuant to the Sunrise Holdings LLC Agreement."  As of the Final Closing Date, August 31, 2021, Sunrise MOB Holdings was owned by Alecto.  The 2018 Promissory Note was not listed on the UCLA APA Schedule 5.6 Transactions with Affiliates although the Olympia HC Loan resulting from the Plaza MOB Refinancing in 2019 was listed.  GCS notes that Alecto Management represented that the lender,

September 28, 2023
In Re: Alecto Healthcare Services, LLC

## E.  Inter-company Transfers and the CNH Revolving Facility[70]

On July 8, 2019, CNH Finance refinanced Alecto's revolving credit facility with White Oaks Healthcare Finance, LLC after numerous events of default.[71]  The CNH Revolving Facility was secured by accounts receivable and initially capped at $30 million.[72]  The CNH Revolving Facility was entered into between CNH Finance, Alecto, and the following Affiliates:[73]

–   Alecto Hayward
–   Alecto Sherman
–   Sherman/Grayson Sponsor
–   Sherman/Grayson Hospital
–   Sherman/Grayson Health Services
–   Sherman MD Provider
–   Sherman Anesthesia
–   Alecto Fairmont
–   FRMC Physicians
–   Alecto Ohio Valley
–   Alecto Wheeling
–   Alecto Martin's Ferry
–   Alecto East Ohio Physicians (listed as inactive)
–   Alecto Los Angeles
–   Olympia Health Care
–   Horizon Real Estate Holdings

Controlled deposit accounts of the borrower Affiliates were swept on a daily basis to offset Alecto's obligations under the facility.[74]  Advances were funded under the CNH Revolving Facility and deposited into Alecto's Account *3784.  Funds were then allocated and transferred to borrower Affiliates or utilized by Alecto to fund payroll and other expenses.[75]

On March 2, 2021, Alecto requested the cap on the CNH Revolving Facility be reduced to $12 million.  In addition, changes to certain covenants were instituted, retroactive as of December 1, 2020, recognizing Alecto's failure to maintain the required minimum Current Ratio and Minimum EBITDAR in 2020.[76]

---

Wells Fargo, was not notified of the transfer of Sunrise MOB Holdings to Alecto as the lender was to be paid in full from proceeds of the Plaza MOB asset sale.  GCS has not seen documentation to verify whether or not notice of the transfer and Alecto's consent was given to UCLA prior to, or on, the Final Closing Date.  GCS notes that UCLA APA Schedule 4.4(e)(vii) Consents to Initial Closing includes the consent of Alecto and Alecto's members to the sale of the Hospital assets and the Hospital Real Property.

[70] Amended and Restated Credit and Security Agreement between Alecto Healthcare Services LLC, and those entities listed on Schedule 1 hereto and CNH Finance Fund I, L.P. dated July 8, 2019 (the "CNH Revolving Facility")

[71] CNH Revolving Facility, Schedule 8.1 White Oak Loan Defaults.  Defaults under the White Oak Loan Agreement, the MPT Lease Agreements, and the MPT Debt Agreements, generally included breach of financial covenants, failure to make base rent payments, failure to make reserve deposits, failure to make principal and interest payments, failure to deliver required financial statements, failure to make timely payments of payroll taxes and sales and use taxes, and other items.

[72] CNH Revolving Facility. See "Facility Cap" definition.

[73] CNH Revolving Facility, Schedule 1 – List of Borrowers.

[74] CNH Revolving Facility, Schedule 2 – Borrowers' Deposit Accounts.  See also GCS Exhibit 2 – List of Accts.

[75] Certain advanced funds were transferred to Alecto's Payroll Account *6508 or Operating Account *6065.

[76] First Amendment to Amended and Restated Credit and Security Agreement and Waiver dated March 1, 2021.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

On November 1, 2021, Alecto requested and were granted a further reduction of the Facility Cap to $6 million.[77]

On August 1, 2022, Alecto requested the term of the CNH Revolving Facility be extended to December 31, 2022, and the Alecto account *3784 was converted to a springing deposit account.[78]  The CNH Revolving Facility was terminated and activity ceased by September 30, 2022.[79]

During the term of the CNH Revolving Facility, Alecto tracked deposits or "sweeps" from the Affiliates, advances, and allocations to Affiliates and reconciled these transactions to downloaded electronic statements and tracked fees, interest payments and availability under the CNH Revolving Facility.[80]

GCS compared the recorded "sweeps" and advances against wire transfers into and out of Alecto's Account *3784 and found advances recorded in the LOC Reconciliations matched wire transfers into Account *3784.[81] As shown on GCS Exhibit 3 – Allocation Summary, GCS found, for the most part, wire transfers out of Alecto's Account *3784 matched the recorded allocation of advances to Affiliates.[82]

In any month, an Affiliate may have been under or over funded, meaning deposit sweeps from an Affiliate's lockbox may be more or less than allocated advances.  As such, funds deposited by one Affiliate may have been allocated to another Affiliate or Alecto itself.

In 2020, advances allocated to Affiliates were less than the Affiliates' lockbox deposits.  It appears Alecto retained funds through the 2020 COVID crisis maintaining an average bank balance of $20 million through the end of 2020.

Although Alecto had entered into management services agreements with the Affiliate hospitals,[83] it is our understanding that Alecto did not collect any management fees from the Affiliate hospitals.[84]

## F.  Transfers to Insiders of $10,000 or more

GCS identified 1,208 payments by check, ACH and wire transfer from Alecto's bank accounts in the Examination Period.[85]  These payments were aggregated and grouped by payee. GCS identified 40

---

[77] Second Amendment to Amended and Restated Credit and Security Agreement dated November 1, 2021. At December 31, 2021, Alecto's bank balances totaled $11,438,741 and the availability on the CNH Revolving Facility was $2,696,427.
[78] Third Amendment to Amended and Restated Credit and Security Agreement dated August 1, 2022.  The principal balance at July 28, 2022 was $4,342,720.03.
[79] GCS Exhibit 3 – Allocation Summary.  See also Summary of Loans prepared by Alecto Management. At September 30, 2022, Alecto's bank balances totaled $120,096.27.
[80] GCS Exhibit 4 – Allocations by Entity prepared, in part, based on Alecto Management produced Excel spreadsheets: "2019 LOC of AHS with CNH," "2020 LOC of AHS with CNH," "Year 2021 LOC of AHS with CNHF" and "Year 2022 LOC of AHS with CNH" (the "LOC Reconciliations").
[81] GCS Exhibit 3 – Allocation Summary.
[82] GCS reconciled differences as noted on GCS Exhibit 3 – Allocation Summary.
[83] Alecto Fairmont, Alecto Healthcare Services Wheeling, LLC ("Alecto Wheeling," a subsidiary of Alecto Ohio Valley), Alecto Healthcare Martin's Ferry LLC ("Alecto Martin's Ferry," a subsidiary of Alecto Ohio Valley), Olympia HC, and Sherman/Grayson (collectively, the "Management Agreements"). The Management Services Agreement with Sherman/Grayson included specified insurance conditions.  Under the various Management Agreements, Alecto was to receive monthly management fees equal to 4% of monthly "Collected Net Revenues," as defined in the Management Agreements, unless such fees were deferred, discounted, or waived by Alecto.  In addition, Alecto was entitled to reimbursement of actual out-of-pocket costs incurred in providing such services.
[84] Summary of Management Services Agreement prepared by Alecto Management.
[85] GCS Exhibit 5 – Payment Analysis. Examined 1,322 payments including those dated January 1, 2019 – June 16, 2019.

13

September 28, 2023
In Re: Alecto Healthcare Services, LLC

individual cash transfers of $10,000 or more to Insiders (32), entities owned by Insiders (1) and American Express (7).[86]   GCS reviewed documentation supporting the transfers.   The transfers appeared to be reimbursement of Alecto business-related expenses and the reimbursement of a $77,000 advance of funds by Lex Reddy in October 2019 applied as a payment on the 2018 Promissory Note held by The Reddy Investment Trust (see Section G below).

GCS also identified a $380,000 payment to Lex Reddy recorded as a reimbursement of advances to Alecto on Alecto's general ledger.   The advances occurred on December 19, 2018 ($300,000) and January 25, 2019 ($80,000) with deposits into Alecto's Account *6065 and were reimbursed to Lex Reddy on July 27, 2020, from Alecto Account *6508.[87]

Three (3) transfers totaling $48,345 to Cooperative of American Physicians, Inc. in January 2021, January 2022, and January 2023, were made for the benefit of Dr. P. Jeyakumar for professional dues and insurance.

| 1/4/2021 | 3322 | Cooperative of American Phys Inc. | -15,602.00 |
| 1/3/2022 | 3429 | Cooperative of American Phys Inc. | -16,058.00 |
| 1/5/2023 | 3466 | Cooperative of American Phys Inc. | -16,685.00 |

In addition to cash transfers, GCS examined Alecto's year end payroll reports for the years 2020 – 2022 and the period beginning January 1, 2023, through June 16, 2023.[88]  The following Insiders received payroll during this period:

| | A. Dhuper | | | | | | | L. Reddy | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Regular | Regular Hrs | Bonus | PTO | PTO Hrs | | | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
| 2020 | 284,998.48 | 1,976 | 20,000.00 | 14,999.92 | 104.00 | | Q4 2020 | 750,000.16 | 2,080 | | | |
| 2021 | 284,998.48 | 1,976 | 25,000.00 | 26,538.32 | 184.00 | | 2021 | 778,846.32 | 2,160 | | | |
| Q1 2022 | 28,846.00 | 200 | | 34,734.91 | 240.83 | | Q3 Q4 2022 | 750,000.16 | 2,080 | (1,520 Hrs Q3, 560 Hrs Q4) | | |
| 6 mos 2023 | | | | | | | 6 mos 2023 | 346,153.92 | 960.00 | | | |
| Total | $598,842.96 | | $45,000.00 | $76,273.15 | | | Total | $2,625,000.56 | | $   - | $   - | |

| | P. Jeyakumar | | | | | | | M. Sarrao | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Regular | Regular Hrs | Bonus | PTO | PTO Hrs | | | Regular | Regular Hrs | Bonus | PTO | PTO Hrs |
| 2020 | 178,853.76 | 1,952 | | 18,750.24 | 128.00 | | 2020 | | | | | |
| Q1-Q3 2021 | 80,774.40 | 1,120 | | 21,786.23 | 135.24 | | Q3 2021 | 1,218.00 | 87 | | | |
| 2022 | | | | | | | 2022 | | | | | |
| 6 mos 2023 | | | | | | | 6 mos 2023 | | | | | |
| Total | $259,628.16 | | $   - | $40,536.47 | | | Total | $   1,218.00 | | $   - | $   - | |

As a result of our analysis of Alecto's general ledger, GCS also identified a payroll payment to Lex Reddy of $16,851.85 from Alecto Hayward on June 16, 2023 which was cashed on June 20, 2023.

## G.  Transactions related to the 2018 Promissory Note (GCS Exhibit 6.1)

As discussed in Section D above, Alecto entered into the 2018 Promissory Note in the amount of $4,039,463.75 with The Reddy Investment Trust in order to satisfy a loan with Wells Fargo.[89]

---

[86] Total payments to Insiders, entities owned by Insiders, and to American Express are shown in GCS Exhibit 5 – Payment Analysis.  GCS Exhibit 6 – Insider Payments lists payments of $10,000 or more reviewed.
[87] Excerpt of the Alecto transfers in reimbursement of the $380,000 in advances.

| 07/27/2020 | Account Transfer Dr. TO ACC | 6065 | | 380,000.00 | | (380,000.00) | | 3784 | TRANSFER TO | | 6065 |
| 07/27/2020 | Account Transfer Dr. TO ACC | 6508 | | 380,000.00 | | (380,000.00) | | 6065 | TRANSFER TO | | 6508 |
| 07/27/2020 | Preauthorized Debit 76508 ALECTO HEA PAYMENTS ACH OFFSET ALECTO CCD | | | 380,000.00 | | (380,000.00) | | 6508 | ACH | ALECTO HEA OFFSET ALECTO CCD | |

[88] Processed through Olympia Medical Center; Olympia Medical Center YTD Payroll Registers.
[89] As mentioned previously, the Plaza MOB Summary prepared by Alecto Management states that in October 2018, "Alecto had a direct loan with Wells Fargo which Wells Fargo was ready to call" and Lex Reddy personally paid the loan as shown on his October 2019 Wells Fargo Priority Credit Line Statement. GCS verified transactions related to the 2018 Promissory Note through examination of Reddy Credit Line statements, Alecto's general ledger and Alecto's bank statements.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

Funds provided to Alecto under the 2018 Promissory Note originated from a margin account credit line held by Lex Reddy ("Reddy Credit Line"). The 2018 Promissory Note was dated October 9, 2018, with a maturity date of October 31, 2021. Although GCS has not received any documentation that the 2018 Promissory Note was amended or restated, additional advances totaling $960,000 were issued to Alecto in the period January 17, 2019, through January 22, 2020. During that period, two (2) payments totaling $107,000 were made such that the outstanding balance at January 30, 2020, was $5,084,973.33.[90]

Soon thereafter, the stock market plummeted as a result of the COVID crisis, margin calls were made on the "Reddy Credit Line." A total of $459,404 was transferred by Alecto to the Reddy Credit Line to cover the margin calls. These transfers were booked as loan payments against the balance on the 2018 Promissory Note. Subsequent payments on the 2018 Promissory Note were made on April 13, 2021 ($792,683.49), and nine (9) months of interest payments beginning April 30, 2021, through January 2, 2022. On January 31, 2022, the 2018 Promissory Note was paid in full by Plaza MOB through First Clearing.[91]

GCS verified that all advances from the Reddy Credit Line under the 2018 Promissory Note were received by Alecto and all payments from, or on behalf of Alecto, were applied to reduce the balance of the Reddy Credit Facility or pay interest and fees.

### H. Transfers to Accounts of Previously Unidentified Holders

Our review of the bank statements produced identified four (4) accounts of previously unidentified holders receiving transfers from Alecto and/or its Affiliates. The 113 transfers from Alecto to these accounts totaled less than $214,000[92] and 76 of those transfers were for less than $1,000. Transfers to previously unidentified accounts were below the agreed to research threshold of $10,000. However, based on Alecto's general ledger, the majority of the transfers were to OMC HSA Account *3709, the remaining transfers related to entities previously owned or operated by Alecto; M/C Healthcare and Chesterfield.

## II.    SCOPE AND ANALYSIS

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[93]   In this case, the investigation performed by GCS focused on cash transactions into and out of Alecto's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any. GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:

1. Reviewed certain filings with the Bankruptcy Court.
2. Conducted interviews with Michael Sarrao, Alecto's Executive Vice President, General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.
3. Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and

---

[90] Payments included a payment of $30,000 on May 16, 2019, and payment of $77,000 on October 2, 2019, originating from the aforementioned advance from Lex Reddy.
[91] Plaza MOB Account *2120, January 2022.
[92] See GCS Exhibit 7 – Bank Account Summary Schedules.
[93] Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

    a. Bank statements were received for the Examination Period for the following entities:[94]

        i. Alecto Healthcare Services LLC (3 accounts)

        ii. Alecto Healthcare Services Hayward LLC (1 account)[95]

        iii. Sherman/Grayson Hospital LLC (7 accounts)

        iv. Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

        v. Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

        vi. Olympia Health Care LLC (6 accounts)

        vii. Plaza Medical Office Building LLC (2 accounts)

    b. Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

    c. Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

    d. Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

    e. Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

    f. Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

    g. Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4. Examined Alecto's general ledger, including 1,208 separate disbursements by check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

5. Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

6. Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

7. Examined supporting documentation for interest payments related to the Plaza MOB Loan.

8. Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

---

[94] Bank statements were requested for Alecto Fairmont, LLC, FRMC Physicians, Inc., a subsidiary of Alecto Fairmont, Alecto Wheeling, Alecto Martin's Ferry, however, these statements were not received by the date of this summary. It is our understanding that Alecto Fairmont ceased operations in March 2020.  It is also our understanding that Alecto Wheeling and Alecto Martin's Ferry ceased operations in October 2019.

    It is also our understanding that the following entities did not have bank accounts: Sherman/Grayson Sponsor LLC (subsidiary of Alecto Sherman), Horizon Real Estate Holdings LLC, Sunrise Real Estate Holdings LLC, Olympia Plaza Management, Inc.

[95] Under a springing lockbox agreement with CNH Finance.

September 28, 2023
In Re: Alecto Healthcare Services, LLC

## III.    LIMITATIONS

The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

The procedures were performed solely for use in this bankruptcy matter and the use of this letter report and supporting schedules is restricted to Mr. Balasiano, as Independent Director of Alecto Healthcare Services LLC, Debtor's counsel and the Bankruptcy Court.  This letter and supporting exhibits are not to be reproduced, distributed, disclosed, or used for any other purpose without prior written consent of Gould Consulting Services.  This letter is not intended for general circulation or publication other than as required by the Bankruptcy Court.

Leanne Gould, CPA/ABV/CFF, ASA
GOULD Consulting Services

GCS Diagram 1
Organizational Chart

**Alecto Healthcare Services, LLC**
**Organizational Chart**



GCS Diagram 2
Plaza MOB Refinancing
2019 Sunrise MOB Transaction

**Alecto Healthcare Services, LLC**
**2019 Sunrise MOB Transaction**
*Refer to Plaza MOB Summary for paragraph references [#] below*



GCS Diagram 3

Horizon

UCLA Asset Sale

Alecto Partners

**Alecto Healthcare Services LLC**



<u>January 1, 2021</u>

Alecto Healthcare Services
Los Angeles LLC

Sold - wind down, No patients
since 3/31/2021

<u>*100% owner of:*</u>

[3.1]
Olympia Health Care, LLC
**2. Olympia Medical Center**
Hospital Operations

[3.2]
Horizon Real Estate
Holdings, LLC

Hospital Real Estate
Sold to UCLA Health 1/1/2021
Leased back for 90 days until
closure

<u>January 20, 2021</u>

**$23,506,100**
Assumed net proceeds
of Horizon Asset Sale to
UCLA transferred to
Alecto Operating
Account *6065

$7,534,858.10
Payment to Holtz Slavett
& Drabkin
"Bsuite Wire Out-Dom"

+$12 service charge = $7,534,870.10

Net proceeds transferred
to Alecto CNH Finance
Disbursement Account
*3784

**$7,534,870.10**

Balance of Net Proceeds:    **$15,971,229.90**

$5,000,000    Pay off of Note to MPT of Fairmont-Alecto Hospital LLC,
Borrower Alecto Fairmont, Guarantor, Alecto

GCS Diagram 4

Plaza MOB Assignment

And UCLA Asset Sale

**Alecto Healthcare Services, LLC**

**2021 Sunrise MOB Transaction**

*Refer to Plaza MOB Summary for paragraph references [#] below*

$7,500,000 of proceeds from Plaza MOB asset sale used to pay off of Note to MPT of Sherman-Alecto Hospital LLC, Borrower Sherman Grayson Hospital and Sherman/Grayson Health Services, Guarantor, Alecto

# Exhibits

# Exhibit 1
# Plaza MOB Summary

**Prepared by Alecto Management**

## Plaza Medical Office Building

(1)     Plaza Medical Office Building, LLC ("Plaza MOB") is a California limited liability company which owned and operated a medical office building and parking garage located at 5901 W. Olympic Boulevard, Los Angeles, California 90036, and 5975 W. Olympic Boulevard, Los Angeles, California 90036.  Plaza MOB owners were and are: (a) Sunrise Real Estate Holdings, LLC (99.5%) and Olympia Plaza Management, Inc. ("OPM").  Prior to June 19, 2019, Alecto Healthcare Services LLC owned 100% of Sunrise Real Estate Holdings, LLC.

(2)     In the late spring of 2019, Plaza MOB sought to refinance its existing mortgage to take advantage of interest rate opportunities and cash out the equity that had been developed. Except for the mortgage, Plaza MOB had no creditors.

(3)     Wells Fargo Bank, N.A., the proposed lender for the refinance required that Sunrise Real Estate Holdings, LLC not be owned by Alecto Healthcare Services LLC in order to complete the refinancing.

(4)     On June 12, 2019, Sunrise MOB Holdings, LLC, a Delaware limited liability company was formed.  As of June 12, 2019, Sunrise MOB Holdings, LLC members were as follows:

| Members | Units |
|---|---|
| Class A Members | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| Class A Totals | 49,000 |
| | |
| Class B Members | |
| The Reddy Investment Trust | 51,000 |
| Class B Totals | 51,000 |
| | |
| Total Units | 100,000 |

Attached hereto as **Exhibit A** is the Operating Agreement for Sunrise MOB Holdings LLC.

(5)    On June 19, 2019, Alecto Healthcare Services LLC transferred 100% of the membership interests in Sunrise Real Estate Holdings to the following persons:

| Members | % Ownership |
|---------|-------------|
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

Attached hereto as **Exhibit B** is the First Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(6)    On June 19, 2019, the Members of Sunrise Real Estate Holdings, LLC transferred their interests in Sunrise Real estate Holdings, LLC to Sunrise MOB Holdings LLC.  Attached hereto as **Exhibit C** is the Second Amendment to the Amended and Restated Operating Agreement of Sunrise Real Estate Holdings, LLC.

(7)    On June 20, 2019, Plaza MOB completed the refinancing and received net proceeds of $8,444,477.81.

(8)    On June 20, 2019, Plaza MOB made a distribution of $8,444,477.81 to Sunrise Real Estate Holdings LLC.  Attached hereto as **Exhibit D** is the Funds Flow Agreement.

(9)    On June 20, 2019, Sunrise Real Estate Holdings LLC made a distribution to Sunrise MOB Holdings LLC.

(10)    On June 20, 2019, Sunrise MOB Holdings LLC made a distribution of $8,444,477.81 to the Sunrise MOB Members as follows:

| Members | % | Amount of Distribution |
|---------|-----|------------------------|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

(11)    On June 20, 2019, each of the Sunrise MOB Members made a capital contribution to Alecto Healthcare Services LLC in the following amounts:

| Members | % | Amount of Capital Contribution |
|---|---|---|
| The Reddy Investment Trust | 56% | $4,728,904.21 |
| The Krissman Family Trust | 10% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7% | $591,113.03 |
| The Sarrao Family Trust | 7% | $591,113.03 |
| The Hayes Irrevocable Trust | 5% | $422,223.59 |
| Steven Kay | 5% | $422,223.59 |
| Matthew Williams | 5% | $422,223.59 |
| Aman Dhuper | 5% | $422,223.59 |

(12)    On June 20, 2019, Alecto Healthcare Services LLC made a loan equal to $8,444,477.81 to Olympia Health Care, LLC.

(13)    On December 31, 2019, Aman Dhuper transferred his membership in Sunrise MOB Holdings LLC to The Reddy Investment Trust and The Jeyakumar Inter-Vivos Trust transferred its membership interests in Sunrise MOB Holdings LLC to The Reddy Investment Trust.

(14)    On January 1, 2021, each of the members of Sunrise MOB Holdings LLC transferred their interests in Sunrise MOB Holdings LLC to Alecto Healthcare Services LLC. Attached hereto as **Exhibit E** is the Assignment of Membership Interests.

(15)    Effective August 31, 2021, Plaza MOB sold the medical office building and parking garage to The Regents of the University of California for the benefit of UCLA Health. Except for obligations to Wells Fargo Bank, N.A., MPT of Olympia, L.P., and obligations as the lessor under office leases, including security deposits, Plaza MOB has no creditors or liabilities as of August 31, 2021. Wells Fargo Bank, N.A. and MPT of Olympia, L.P., were paid in full through escrow on August 31, 2021 and The Regents of the University of California assumed the leases and obligations thereunder effective August 31, 2019. Plaza MOB has had no creditors since August 31, 2021.

EXHIBIT A

# SUNRISE MOB HOLDINGS LLC

**A Delaware Limited Liability Company**

# OPERATING AGREEMENT

## SUNRISE MOB HOLDINGS LLC

## OPERATING AGREEMENT

This Operating Agreement (this "Agreement") is entered into and effective as of June 14, 2019, by and among the Persons identified as Members (each a "Member" and collectively the "Members") in **Exhibit A** which is incorporated herein by reference.  Except as otherwise provided, the capitalized terms used in this Agreement shall have the meanings set forth in Article I hereof.

**WHEREAS**, Sunrise MOB Holdings LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on June 12, 2019 (the "Effective Date"); and

**WHEREAS**, the Company was formed to own one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC; and

**WHEREAS**, the Members desire to enter into this Agreement to create two classes of Membership, to provide for their respective rights, obligations and duties, and to set forth the provisions for the management and governance of the Company; and

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" shall mean the Delaware Limited Liability Company Act, in effect at the time of the initial filing of the Articles, and as thereafter amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's aggregate Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)      Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)      Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

1

"Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Affiliated Person" or "Affiliate" shall mean, with reference to a specified Person, (a) any member of such Person's Immediate Family, (b) any Person who owns directly or indirectly ten percent (10%) or more of the beneficial ownership in such Person, (c) any one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clauses (a) or (b); and (d) any entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (a), (b) or (c) owns directly or indirectly ten percent (10%) or more of the beneficial ownership.

"Agreement" shall mean this Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" shall mean the Applicable Federal Rate as that term is defined in Code Section 1274(d)(1), whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury.

"Approval of the Board" or "Board Acting by Approval" and any grammatical variation thereof, shall mean consent, approval or vote of a majority of the Managers then in office.

"Articles" shall mean the Certificate of Formation creating the Company, and as may, from time to time, be amended in accordance with the Act.

"Bankruptcy" shall mean any of the following:

(a)     If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her interest in the Company (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree);

(b)     If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her interest in the Company shall be

2

appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

        (c)     If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Board" or "Board of Managers" shall refer collectively to the Persons named to be the Managers in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity on the Board of Managers of the Company.

"Book Value" shall mean, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except that:

        (a)     The initial Book Value of any asset contributed by a Member of the Company shall be the gross fair market value of such asset (reduced for any liabilities to which it is subject or which the Company assumes), as such value is determined by Approval of the Board, and for which credit is given to the contributing Member under this Agreement;

        (b)     The Book Values of all assets of the Company shall be adjusted to equal their respective gross fair market values, as determined by Approval of the Board, at and as of the following times:

        (i)     The acquisition of an additional or new interest in the Company by a new or existing Member in exchange for other than a de minimis Capital Contribution by such Member, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

        (ii)     The distribution by the Company to a Member of more than a de minimis amount of any asset of the Company (including cash or cash equivalents) as consideration for all or any portion of an interest in the Company, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and

        (iii)     The liquidation of the Company within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g).

        (c)     The Book Value of the assets of the Company shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704 1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (c) to the extent that the Managers, acting by Approval, determines that an adjustment pursuant to the immediately preceding clause (b) is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (c).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (a), (b) or (c), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Section 704(b) and (c) of the Code. The Capital Account of each Member shall be:

        (a)      Credited with all payments made to the Company by such Member on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Member, the agreed (as indicated by the Approval of the Board) fair market value of such property, net of liabilities secured by such property and assumed by the Company or subject to which such contributed property is taken) and by such Member's allocable share of Profits and items in the nature of income and gain of the Company;

        (b)      Charged with the amount of any distributions to such Member (and as to any distributions of property other than cash or a promissory note of a Member or the Company, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Member or subject to which such distributed property is taken), and by such Member's allocable share of Losses and items in the nature of Losses and deductions of the Company;

        (c)      Adjusted simultaneously with the making of any adjustment to the Book Value of the Company's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the Company recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

        (d)      Otherwise appropriately adjusted to reflect transactions of the Company and the Members.

"Capital Contribution" shall mean the amount of cash and the value of any other property contributed to the Company by a Member.

"Class A Member" shall mean any Member holding Class A Units in the Company, in each such Member's capacity as a holder of Class A Units.

"Class B Member" shall mean initially Lex Reddy, and shall include any Member subsequently holding Class B Units in the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent of the Class B Members" shall mean the written consent or approval of the Class B Members.

"Depreciation" shall mean, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an

asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by Approval of the Board, but not less than depreciation allowable for tax purposes for such year.

"Immediate Family" with respect to any individual, shall mean his or her ancestors, spouse, issue, spouses of issue, any trust principally for the benefit of any one or more of such individuals, his or her estate, and any entity beneficially owned by such individuals or trusts for their principal benefit.

"Legal Representative" shall mean, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, trustee, personal representative or other legal representative appointed as a result of the death, minority or incompetency of such individual.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Manager" shall refer to each Person named as a Manager by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company. "Managers" or "Board" shall refer collectively to the Persons named as Managers by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company.

"Member" shall mean any Person named as a Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the Company.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as that term is defined in Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" or "partner nonrecourse liability" as those terms are defined in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as that term is defined in Regulations Section 1.704 2(i)(1).

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Non-Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Person" or "Party" shall mean any natural person, partnership (whether general or limited), limited liability company, trust, estate, association or corporation.

"Profits and Losses" shall mean, for each year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

      (a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

      (b)    Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or added to such loss;

      (c)    Gain or loss from a disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

      (d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

      (e)    Any items which are separately allocated pursuant to Sections 6.5 and/or 6.6 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the Company's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profits for such year; and if negative, such amount shall be the Company's Losses for such year.

"Reasonable Reserves" shall mean such amount as the Board acting by Approval, shall deem reasonably necessary to meet the foreseeable liabilities or obligations of the Company taking into consideration historic costs as well as reasonably projected cash flow, and including, but not limited to, (i) the normal expenses of the operation and management of its activities, as such liabilities and obligations become due and payable, and (ii) the expenses of any redemptions pursuant to the provisions of this Agreement.

"Redemption Price" shall mean the fair market value of the Company taken as a whole taking into account the Company's book value, the value of any real property and improvements owned by the Company's subsidiaries, and the amount of any debt secured by such real property and improvements, and not taking into account the value of goodwill, trade names, or other intangible assets.

"Regulations" shall mean the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Supermajority Approval" shall mean the written consent or approval of the Members holding a majority of the Class A Units then issued and outstanding and the Consent of the Class B Members.

"Terminating Capital Transaction" shall mean a sale or other disposition of all or substantially all of the assets of the Company.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any interest of a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Unit" shall mean a unit or share of interest in the Company. The interest of each Unit in the Company shall be equal to one (1) divided by the total number of Units then authorized and outstanding (including, but not limited to, Class A Units and Class B Units).

"Unit Proportion" shall mean the number of Units held by a Member divided by all Units then issued and outstanding.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

## ARTICLE II
## Organizational Powers and Membership

2.1    Organization.  The Board of Managers shall file such articles, certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the Company shall conduct business and shall continue to do so as long as the Company conducts business therein. By Approval of the Board, the Company may establish places of business within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 2.2 hereof, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

2.2    Purposes and Powers of the Company.  The Company is organized for the general purposes of (i) owning one hundred percent (100%) of the membership interests of Sunrise Real Estate Holdings, LLC, a Delaware limited liability company, (ii) engaging in other activities in connection therewith which are necessary or beneficial to the Business, and (iii) engaging in any other lawful business activity permitted under the Act consistent with the foregoing.  To that end, the Company, subject to the terms of this Agreement, may enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company, so long as said activities and contracts may

be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware.

2.3    <u>Regulatory Regulations</u>.  The Members understand that the Company's and the Business operations may subject to various state and federal laws regulating permissible relationships with entities such as the Company.  It is the intent of the parties that the Company operate in a manner consistent with all applicable laws.  Accordingly, each Member represents and warrants and covenants as of the date hereof and while the Member is a Member, that such Member has not been barred or suspended from participation in any state or federal governmental healthcare program, including, but not limited to, the Medicare or Medicaid programs.

2.4    <u>Membership</u>.

(a)    There shall be two (2) authorized classes of Members of the Company: Class A Members and Class B Members.  All Members shall have (based on Units held) the same economic rights.  The Members, acting as Members, shall have no right to act for or bind the Company.  The initial Class A Members and the initial Class B Member are identified in Exhibit A hereto.

2.5    <u>Investment Through Asset Protection Vehicle</u>.  Notwithstanding anything herein to the contrary, a Member ("Entity Owner") may invest through a pension plan, trust, limited liability company or other similar entity ("Entity Investor") as long as the following conditions are met: (i) the Entity Investor is owned by a Member and/or his or her Immediate Family; (ii) any breach of this Agreement by the Entity Investor or the Entity Owner, or the occurrence of a Terminating Event related to the Entity Owner or the Entity Investor, shall be treated as a Terminating Event under this Agreement; (iii) if a Terminating Event occurs with respect to the Entity Owner, the Entity Investor's Units will be redeemed in accordance with Section 4.3 of this Agreement; (iv) the Entity Owner agrees to be bound by each of the covenants contained in this Agreement, including, without limitation, all confidentiality and non-competition covenants, and agrees to abide by the requirements of aMember in this Section 2.3 hereof, as if such Entity Owner were a direct owner of the Company; and (v) the Entity Owner agrees to sign a counterpart signature page to this Agreement, as such other documents as the Company may reasonably require.

## ARTICLE III
### Capital Contributions and Liability of Members

3.1    <u>Capital Accounts</u>.  A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the Company.

3.2    <u>Capital Contributions</u>.

(a)    <u>Capital Contributions</u>.  The Members have made or shall make the Capital Contributions in the amounts set forth in Exhibit A.  The Class A Members shall initially own forty nine thousand (49,000) Units and shall collectively at all times hold forty nine percent (49%) interest in the Company, and the Class B Members shall initially own fifty one thousand Units and shall collectively at all times hold fifty one percent (51%) interest in the Company.  Additional issuances of Units shall be solely of Class A Units, with the resulting dilution of their percentage interests in the Company, it being expressly understood that no additional Class B Units are to be

issued without the approval of all Class B Members.  No Member shall have preemptive rights to acquire any Units to be issued by the Company after the date of this Agreement.

(b)　　　Loans.  Except as set forth in this Article III, and except with Supermajority Approval pursuant to Section 7.4 hereof, no Member or Manager shall be entitled, obligated or required to make any loan to or guarantee a loan for the Company or make any Capital Contribution to the Company in addition to such Member's Capital Contribution made pursuant to Section 3.2(a) hereof.  No loan made to the Company by any Member or Manager shall constitute a Capital Contribution to the Company for any purpose.

(c)　　　Additional Capital Contributions.  Additional Capital Contributions may be required only with the Supermajority Approval pursuant to Section 7.4 hereof and otherwise in accordance with Article V below.

3.3　　　No Withdrawal of or Interest on Capital.  Except as otherwise provided in this Agreement, (i) no Member shall have any right to demand and receive property of the Company in exchange for all or any portion of such Member's Capital Contribution or Capital Account, and (ii) no interest or preferred return shall accrue or be paid on any Capital Contribution or Capital Account.

3.4　　　Liability of Members.  No Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance of such Member's Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the Company, or to restore any amounts distributed from the Company, except as may be required specifically under this Agreement, the Act or other applicable law.  Except to the extent otherwise provided in this Agreement or otherwise agreed to, or as required by law, in no event shall any Member, in such Member's capacity as a Member, be personally liable for any liabilities or obligations of the Company or any of its Members.

3.5　　　Managers as Members.  No Manager is required to hold any Units in the Company in order to serve as a Manager.

3.6　　　Additional Members.  Additional Members may be admitted to the Company only upon Supermajority Approval, including the terms of admission, and the Approval of the Board of Managers in accordance with the terms of Article VII hereof and upon execution and delivery by the new Member of a counterpart of this Agreement, delivery of the required Capital Contribution (as determined by the Board of Managers) and execution and delivery of such other documents, instruments and items as the Managers may require. Issuance of Units to new Members shall be subject to compliance with Section 3.2 hereof.  All such issuances shall be structured such that the amount paid for Units is not less than fair market value, payments are made in cash or such other consideration as is approved by the Board of Managers.

## ARTICLE IV
## Members And Units

4.1 <u>Classification of Members</u>. There shall be two (2) classes of Members of the Company: a Class A Member Class and Class B Member Class. All Members shall have (based on Units held) the same economic rights.

4.2 <u>Withdrawal of a Class A Member</u>. No Class A Member has the right to withdraw or resign from the Company at any time, except upon Supermajority Approval. If a Class A Member withdraws or resigns as a Member in violation of this Section 4.2, or through such Member's action causes such Member to fail to satisfy the conditions of Membership, such Member hereby agrees that such withdrawal, resignation or action will constitute a breach of this Agreement. The Company may offset any damages due to such a breach against any amounts otherwise distributable to such Member. In the event that the Act or a final court ruling entitles the Class A Member to receive a distribution upon withdrawal in violation of this Section 4.2, such distribution shall be equal to the Member's Capital Account. The foregoing represents the parties' reasonable best efforts to determine the damages that would stem from a Class A Member's breach of this Section 4.2.

4.3 <u>Redemption of a Member</u>.

(a) Terminating Events are categorized as either Adverse Terminating Events or Non-Adverse Terminating Events for purposes of differentiating the Company's redemption obligations to the Member to whom or which an event occurs.

(b) For purposes of this Section, an "Adverse Terminating Event" means:

(i) with respect to any Member:

A. the improper Transfer (or attempt to Transfer) of Units;

B. the conviction of any felony;

C. any uncured material breach of a provision of this Agreement;

D. any event of Bankruptcy; or

E. the failure to make guaranties or any capital contribution required pursuant to Section 5.1.

(c) For purposes of this Section, a "Non-Adverse Terminating Event" means any event not specified in Section 4.3(b) including a request by a Member's heirs, after a Member's death, that the Company purchase the deceased Member's interest in the Company from his estate or heirs.

(d)     Each Terminating Event, if subject to cure within thirty (30) days, shall trigger termination only after written notice is provided and if a cure has not been made of the Terminating Event within such thirty (30) day period.

(e)     If a Terminating Event (whether Adverse or Non-Adverse) shall occur with respect to any Member, the Company may elect, at the Company's sole option and upon written notice to such Member within six (6) months after the Company has received actual knowledge of the Terminating Event (meaning knowledge of a majority of the Board of Managers without knowledge being imputed from one Manager to another), to purchase the Member's Units and the Member must sell such Units to the Company at a price as determined as follows:

(i)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of an Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price determined as of the date of the Terminating Event multiplied by the Member's Unit Proportion, discounted by twenty percent (20%) (the "Adverse Purchase Price").

(ii)     Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of a Non-Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Redemption Price multiplied by the Member's Unit Proportion (the "Non-Adverse Purchase Price"). The "Adverse Purchase Price," and the "Non-Adverse Purchase Price" may be referred to collectively as the "Valuation Price."

(f)     For purposes of this Section 4.3, the Redemption Price  (as defined in Article I) is intended as a means of approximating fair market value while minimizing disputes and appraisal-related costs and expenses regarding valuation of Units for purposes of redemption.

(i)     All calculations used to determine the Redemption Price shall be performed by the Company's regularly retained accountants and such calculations shall be final and binding upon all parties to this Agreement. All Members acknowledge and agree that the Redemption Price may be an inexact approximation of fair market value, and all Members waive any and all rights to contest the use of the Redemoption Price for any and all purposes in lieu of an appraisal or other method.

Payments for Units hereunder shall be made as follows: twenty percent (20%) on the initial payment date, which shall be within ninety (90) days after the determination of the Valuation Price (the "Purchase Date") (which in no event shall be more than six (6) months after the Terminating Event, and twenty percent (20%) of the Valuation Price on each of the anniversaries of the Purchase Date with interest on the outstanding principal balance accruing at the Prime Rate shown in the Money Rates Section of the Wall Street Journal on the Purchase Date until the principal is paid in full.  Notwithstanding any delay in the payment of amounts due, a Member's rights as a Member shall cease on the Purchase Date. Aggregate payments to be made in connection with all redemptions shall not exceed seven and one-half percent (7.5%) of the Company's collected revenues in any year. If payments are so restricted, payments shall be made in proportion to amounts owed to all Members being redeemed.  In sum, notwithstanding the provisions of this Article, the Company shall not be required to make payments to former Members pursuant to this

Section 4.3 which, in the aggregate, would exceed seven and one-half percent (7.5%) of the aggregate collections of the Company for any such period. If the aggregate amount of payments otherwise due to former Members pursuant to this Section would reasonably be expected to exceed this limitation in any calendar year or portion thereof, the Company, with the Approval of the Board, shall pay such former Members, on a pro rata basis, based on the amount still owed such Members, quarterly payments totaling seven and one-half percent (7.5%) of the Company's anticipated aggregate collections for such period, and the balance of that period's payment obligations to such former Members shall be deferred to the following calendar year or years, until such amounts can be paid without violating such limitation with respect to any such year or years. Within sixty (60) days following the end of each calendar year, the Company shall make a pro rata adjusted payment to the former Members if and to the extent that actual aggregate collections during the prior year (or relevant portion thereof) have exceeded the anticipated amount.

### ARTICLE V
### Additional Capital

5.1    Funding Capital Requirements.

(a)    In the event that the Company requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the Company may borrow funds from such lender(s), including Members and Managers, on such terms and conditions as are Approved by the Board of Managers, all on such terms as reflect fair market value. It is specifically provided that (except as set forth in Section 3.2 and 5.1(c)) no such terms or conditions shall impose any personal liability on any Member without the prior written consent of such Member.

(b)    No Member or Manager shall be obligated to make any Capital Contributions or loans to the Company (except as provided in Sections 3.2 and 7.4 of this Agreement), or otherwise supply or make available any funds to the Company, even if the failure to do so would result in a default of any of the Company's obligations or the loss or termination of all or any part of the Company's assets or business.

(c)    The Company may require that additional Capital Contributions be made by the Members upon Supermajority Approval pursuant to Section 7.4 hereof. If a Member fails to deliver to the Company such an additional requested Capital Contribution within ten (10) business days of a request by the Board to do so, the Company, after giving thirty (30) days notice of such failure, may elect (i) to subordinate such Member's Unit Proportion to that of all non-defaulting Members for the amount of the additional Capital Contribution, plus interest of 12% per annum, compounded annually, or, if lower, the highest rate allowed by law (the "Applicable Interest Rate"); (ii) to borrow on behalf of such Member that amount necessary to meet such Member's commitment and the charging of interest thereon of up to the Applicable Interest Rate, with repayments of such indebtedness made from the first distributions related to such Member's Membership interest; (iii) allow the remaining Members to make contributions in excess of their proportionate shares, on a pro rata basis, to the extent such Members desire to make such contributions, with a corresponding adjustment to such contributing Members' Unit Proportion in the Company to reflect their relative Capital Contributions; or (iv) dilute such Member's Unit Proportion by issuing to those Members that have made the required additional Capital Contribution a number of Units equal to the Diluted Issuance Amount. The "*Diluted Issuance Amount*" for each

contributing Member shall mean a number of Units equal to: (1) the total amount of the additional Capital Contribution made by the particular Member with respect to the specific additional Capital Contribution required, *divided by* (2) the Deemed Unit Value. The "*Deemed Unit Value*" shall mean an amount equal to: (I) the Formula Amount as of the time of the additional Capital Contribution *divided by* (II) the total number of Units outstanding in the Company prior to the additional Capital Contribution, then discounted by forty percent (40%). Any Member who fails to make the required additional Capital Contribution shall not be issued any additional Units under this subsection 5.1(c)(iv).

5.2     Third Party Liabilities.  The provisions of this Article and of Section 3.2 hereof are not intended to be for the benefit of any creditor or other Person (other than a Member in his, her or its capacity as a Member) to whom any debts, liabilities or obligations are owed by (or who otherwise has any claim against) the Company or any of the Members.  Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member.

### ARTICLE VI
### Distributions; Profits and Losses

6.1     Distribution of Company Funds - In General.  Except as necessary to comply with the Sections of this Article VI, distribution of Company funds to the Members shall be subject to Approval of the Board, taking into account future cash needs of the Conpany, Reasonable Reserves and such other factors as are considered by the Board of Managers, within their sole and absolute discretion.  All distributions approved by the Board of Managers shall be distributed among the Members on a pro rata basis based on each Member's Unit Proportion.

6.2     Distribution Upon Dissolution.  Proceeds from a Terminating Capital Transaction and/or other amounts or assets available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the Company, shall be distributed and applied in the following priority:

(a)     First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by Approval of the Board, provided that, upon the expiration of such period of time as the Board, acting by Approval, shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section; and

(b)     Second, to the Members, an amount sufficient to reduce the Members' Capital Accounts to zero, in proportion to the positive balances in such Capital Accounts after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other Company transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss) and (ii) such Terminating Capital Transaction; and

(c)     Finally, to the extent funds remain, to the Members of the Company on a pro rata basis based on each Member's Unit Proportion.

6.3     Distribution of Assets in Kind.  No Member shall have the right to require any distribution of any assets of the Company in kind.  If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their respective fair market values as determined by the Approval of the Board.  Any Member entitled to any interest in such assets shall, unless otherwise determined by the Approval of the Board, receive separate assets of the Company and not an interest as tenant-in-common, with other Members so entitled, in each asset being distributed.

6.4     Allocation of Profits and Losses.  After giving effect to the allocations set forth in Sections 6.5 and 6.6 which affect the Members' distributive shares, Profits and Losses shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.

6.5     Required Regulatory Allocations.

(a)     Limitation on and Reallocation of Losses.  At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any fiscal year.  To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 6.5(a).

(b)     Minimum Gain Chargeback.  If there is a net decrease in the Minimum Gain of the Company during any fiscal year, then items of income or gain of the Company for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Member in an amount equal to such Member's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d)(1).  A Member's share of the net decrease in the Minimum Gain of the Company shall be determined in accordance with Regulations Section 1.704-2(g).  The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(2)(i).

(c)     Nonrecourse Deductions.  Nonrecourse Deductions for any fiscal year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 6.5(d)) shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.752-3(a)(3), the Company Profits shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.  The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4), to which such Member Nonrecourse Deductions are attributable in

accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(b) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e) <u>Member Minimum Gain Chargeback</u>. Notwithstanding any contrary provisions of this Article VI, other than Section 6.5(b) above, if there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during any fiscal year, then each Member who has a share of such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the Company, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Member's share of the net decrease in such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(3) and 2(i)(5).

(f) <u>Qualified Income Offset</u>. If any Member unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Member in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 6.5(f) shall only be made if and to the extent that such Member would have an Adjusted Capital Account Deficit after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(f).

(g) <u>Basis Adjustment</u>. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to either of Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to said Section of the Regulations.

(h) <u>Gross Income Allocation</u>. If at the end of any Company fiscal year any Member has a Capital Account deficit which is in excess of the sum of the items to be credited to a Member's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Member shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 6.5(h) shall only be made if and to the extent that such Member would have a Capital Account deficit in excess of such sum after accounting for all other allocations provided for in this Article VI other than described in this Section 6.5(h). As among Members having such excess, if there are not sufficient items of income and gain to eliminate all such excess, such allocations shall be made in proportion to the amount of each Member's respective excess.

(i) <u>Curative Allocations</u>. The allocations set forth in this Section 6.5 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Members intend to divide Company distributions and to make Profit and Loss

allocations.  Accordingly, by the Approval of the Board, after effecting the allocations required pursuant to this Section 6.5, other allocations of Profits, Losses and items thereof shall be divided among the Members so as to prevent the allocations in this Section 6.5 from distorting the manner in which Company distributions will be divided among the Members pursuant to Sections 6.1 and 6.2 hereof.  In general, the Members anticipate that this will be accomplished by specifically allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that the net amount of allocations under this Section 6.5 and allocations under this Section 6.6 to each such Member is zero.  However, the Board shall have discretion to accomplish this result in any reasonable manner.

6.6     Tax Allocations and Book Allocations.

(a)     Except as otherwise provided in this Section 6.6, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article VI.

(b)     In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value, such allocation to be made by the Approval of the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

(c)     In the event the Book Value of any property of the Company is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its respective Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

(d)     Allocations pursuant to this Section 6.6 are solely for federal, state, and local income tax purposes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

6.7     General Allocation and Distribution Rules.

(a)     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Approval of the Board of Managers using any permissible method under Code Section 706 and the Regulations thereunder.  Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocated among the Members in the same proportions as the allocations of Profits or Losses for the fiscal year in which such items are to be allocated.

16

(b)     Upon the admission of a new Member or the Transfer of an interest, the new and old Members or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or transferred Company interest was held by the new and old Members, or the transferor and transferee, respectively.  For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the Company shall close its books on an interim basis on the last day of the previous calendar month.

6.8    Tax Withholding.  If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member.  Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Board, acting by Approval of the Board of Managers, give notice to such Member making demand therefore.  Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date.  The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

6.9    Tax Matters Partner.  The Class B Member, and if more than one Class B Member the one holding the largest number of Unit, shall be the "Tax Matters Partner" (as defined in Code Section 6231) of the Company.  The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings (collectively, "Audits"), and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.  The Company shall indemnify and hold harmless the Tax Matters Partner and if applicable the Tax Matters Partner's directors, officers, employees and agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of his, hers or its activities on behalf of the Company as Tax Matters Partner absent the gross negligence of the Tax Matter Partner.  The Members specifically acknowledge that the Tax Matters Partner shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member with respect to any action taken by the Tax Matters Partner with respect to an Audit absent the gross negligence of the Tax Matter Partner.  The Tax Matters Partner shall take such action as may be necessary to cause each Member to be entitled to notice as set forth in Code Section 6223.  The Tax Matters Partner shall not take any action contemplated by Code Section 6224 through 6230 without the prior authorization of the Members.

# ARTICLE VII
## Management

7.1     <u>Management of the Company</u>.  The overall management and control of the business and affairs of the Company shall be vested in the Board of Managers, acting by Approval of the Board of Managers, but subject to the Member protections as set forth in Section 7.4 hereof or as otherwise provided in this Agreement.  All management and other responsibilities not specifically reserved to the Members in this Agreement, or specifically requiring Class A Member and/or Class B Member Consent, shall be vested in the Board of Managers, and the Members shall have no voting rights except as specifically provided in this Agreement.  Each Manager shall devote such time to the affairs of the Company as is reasonably necessary for performance by such Manager of his, her or its duties, provided such Manager shall not be required to devote full time to such affairs.  Moreover, each Manager shall act in good faith with the care an ordinary, prudent person in a like position would exercise under similar circumstances and in the best interest of the Company.

7.2     <u>Board of Managers</u>.  The business and affairs of the Company shall be managed by the Board of Managers.

(a)     <u>Number, Term, Election, and Qualifications</u>.  The Company shall have a panel of three (3) Managers, comprised initially of the following: Lex Reddy, Roger A. Krissman and Michael J. Sarrao.  The number of Managers comprising the panel of Managers of the Company may be changed from time to time by the Supermajority Approval, provided that in no instance shall there be less than three (3) Managers.  The Managers shall be elected and hold office until such time as a new slate of Managers are elected at a meeting of the Members held pursuant to a written request for such meeting by Members holding a majority of the Units then outstanding.  At the meeting for the election of Managers "cumulative voting" shall apply.  Cumulative voting shall permit each Member to cast a number of votes for Managers equal to such Member's number of Units multiplied by the number of Managers to be elected at such time.  Each Member shall be entitled to cast one or more and up to all of such Member's votes for one candidate for Manager, or may allocate votes among the various candidates for Manager in whatever manner the Member so chooses.  For example, if three Managers are to be elected, and if a Member has 10,000 Units, the Member shall be entitled to vote 30,000 votes (10,000, which is the number of votes respecting the election of a single Manager, times 3, which is the number of Managers to be elected), and may allocate his, her or its 30,000 votes to one Manager candidate or allocate such votes equally or unequally among all the Manager candidates, as the Member so chooses.  A Manager need not be a Member, an individual, a resident of any particular State, or a citizen of the United States.  The powers of the Board shall be exercised subject to the Member protections set forth in Section 7.4 hereof.

(b)     Meetings of the Board of Managers and the Members may be called and scheduled by the President of the Company, the Class B Member and/or by two (2) Managers.  At least four (4) days prior written notice of the time, place and purpose of the Board of Manager meetings shall be provided to all Managers, and at least ten (10) days prior written notice of the time, place and purpose of the Member meetings shall be provided to all Members.

(c)       Special meetings of the Members also may be called at the written request of any two (2) Members delivered to the President.  Upon receipt of such written request the President shall schedule a meeting of the Members within no later than thirty (30) days, and shall send advance written notice to the Members at least ten (10) days prior to the date of the meeting. The time, place and purpose or purposes for such special meeting shall be stated in the notice of such meeting.

(d)       Managers representing a majority of Units shall constitute a quorum at any meeting of the Board of Managers.  Members representing a majority of Units shall constitute a quorum at any meeting of the Members.

(e)       Regarding Board meetings, Managers may provide a proxy to attend a Board meeting who shall have powers to vote as a Manager.  For Class A Members, such proxy to attend a meeting of the Members must be a Member.  Members and Managers may also attend their respective Member and Board meetings by phone or video conference.

(f)       Any action required or permitted to be taken by the Managers may be taken by unanimous consent without a meeting.  Any writing executed by all of the Managers shall be conclusive evidence of such action and consent.

(g)       A Manager may resign from, retire from, abandon or otherwise terminate his, her or its status as a Manager upon ten (10) days prior written notice to the Board, unless the Board otherwise consents in writing.

7.3       Manner of Exercise of Board's Authority.  All responsibilities granted to the Board under this Agreement shall be exercised by the Board as a body, and no Manager, acting alone and without prior Approval of the Board, shall have the authority to act on behalf of the Board.  Unless otherwise expressly provided in this Agreement, all actions of the Board of Managers shall act by Approval of the Board.  None of the following actions shall be taken by the Company except upon Approval of the Board of Managers, subject to the requirements of Section 7.4 hereof:

(a)       Borrow money and otherwise obtain credit and other financial accommodations in the ordinary course of the business of the Company;

(b)       Enter into management agreements, leases, asset purchase agreements, financing agreements and loans in any amounts, and any other agreements wherein the financial obligations of the Company exceed on an annual basis the sum of One Hundred Thousand Dollars ($100,000.00);

(c)       Employ, engage, retain or deal with any Persons to act as agents, brokers, accountants or lawyers or outside professionals in such other capacity as may be necessary or desirable;

(d)       Appoint individuals to act as officers of the Company and delegate to such individuals such authority to act on behalf of the Company and such duties and functions as would normally be delegated to officers of a corporation holding similar offices;

19

(e)        Adjust, compromise, settle or refer to arbitration any claim in favor of or against the Company or any of its assets;

(f)        Make elections in connection with the preparation of any federal, state and local tax returns of the Company and to institute, prosecute, and defend any legal action or any arbitration proceeding;

(g)        Acquire and enter into any contract of insurance necessary or proper for the protection of the Company and/or any Member and/or any Manager, including without limitation to provide the indemnity described in Section 7.8 or any portion thereof;

(h)        Approve technical amendments to this Agreement or the Articles;

(i)        Approve the Transfer of Class A Units to another Class A Member;

(j)        Establish a record date for any distribution to be made under Article VI;

(k)        Enter into, renew, amend or terminate any arrangement or agreement with any Company executive or employee who is also a Manager or Member; and

(l)        Perform any other act which the Managers may deem necessary or desirable for the Company as well as the Business.

7.4      Restrictions.  Notwithstanding any other provision in this Agreement to the contrary, the Company shall not take any of the following actions without Supermajority Approval:

(a)        Authorize, create, designate, determine or issue any new class of Units or issue new Units, or securities convertible into Units or issue options or warrants to purchase Units or authorize the merger, consolidation or similar combination with any other entity, or authorize the sale of all or substantially all the assets of the Company or the dissolution or liquidation of the Company;

(b)        Except as contemplated by Article IV hereof, authorize, or set aside any sums for, the purchase, repurchase, redemption or other acquisition by the Company of any Member's Units of any class or make loans or distributions to Members;

(c)        Effect any Bankruptcy event with regard to the Company;

(d)        Require a Member to make an additional Capital Contribution or guarantee an obligation of the Company; provided, the aggregate debt to which such personal liabilities relate may not exceed One Million Five Hundred Thousand Dollars ($1,500,000);

(e)        Approve any decision to not enforce the Company's rights set forth in Article X; and

(f)        Except for technical amendments, amend this Agreement or the Articles.

7.5     <u>Binding the Company</u>.  Subject to the provisions of Sections 7.3 and 7.4 hereof, any action taken by a Manager, with Approval of the Board or, where so required, with Supermajority Approval, shall bind the Company and any other Managers and shall be deemed to be the action of the Company.

7.6     <u>Compensation of Managers and Members</u>.  No direct or indirect payment shall be made by the Company to any Manager, Member, or officer of the Company or to any Affiliate of any Manager, Member, or officer of the Company, for such Manager's, Member's, or officer's services as a Manager, Member, or officer, except by Approval of the Board.  Each Manager and officer shall be entitled to reimbursement from the Company for all reasonable expenses incurred by such Manager or officer in managing and conducting the business and affairs of the Company.

7.7     <u>Contracts with Affiliated Persons</u>.  Subject to Section 7.4 hereof, the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.

7.8     <u>Indemnification</u>.

(a)     Notwithstanding any provision of this Agreement, common law or the Act, no member of the Board, principal officer of the Company or the Tax Matters Member (the "Covered Persons") shall be liable to the Members or to the Company for any loss suffered which arises out of an act or omission of such person, if, in good faith, it was determined by such persons that such act or omission was in the best interests of the Company and such act or omission did not constitute gross negligence or fraud. The Covered Persons shall be indemnified by the Company against any and all claims, demands and losses whatsoever if: (i) the indemnitee conducted himself in good faith; (ii) the indemnitee was not grossly negligent and the loss was not caused by the indemnitee's willful misconduct; (iii) reasonably believed (x) in the case of conduct in his, her or its official capacity with the Company, that the conduct was in its best interests and (y) in all other cases, that the conduct was at least not opposed to its best interests; and (iv) in the case of any criminal proceeding, the Covered Person had no reasonable cause to believe the conduct was unlawful. The payment of any amounts for indemnification shall be made before any distribution are made by the Company.  No Member shall have any obligation to provide funds for any indemnification obligation hereunder.

(b)     The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles, provision of this Agreement, vote of Members or otherwise.

(c)     The Company may maintain insurance, at its expense, to protect itself and any Member, the Board, Board committees, officer, employee or agent of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(d)      Any amendment, repeal or modification of any provision of this Section 7.8 shall not adversely affect any right or protection of a Member, the Board, Board committee, officer, employee or agent of the Company existing at the time of such amendment, repeal or modification.

7.9      Other Activities.  Subject to any other restrictions set forth in this Agreement, the Members, Managers and any Affiliates of any of them may engage in and possess interests in other investment opportunities of every kind and description other than those that are similar to the Business of the Company, independently or with others as long as they do not violate Article X hereof.

7.10      Financial Statements.   The Board shall authorize and cause to be prepared reviewed, but not audited, financial statements on an annual basis within ninety (90) days after the end of each fiscal year of the Company.

## ARTICLE VIII
## Officers

8.1      Number; Election; Resignation.  The Company shall have a President (who may also be referred to as the CEO), a Chief Financial Officer, a Secretary, and such other officers as the Board may in its discretion create.  All officers shall be elected by the Board, acting by Approval, at any duly convened meeting of the Board or by written consent in lieu of a meeting. In selecting officers, the Board shall consider the skill, qualifications, dedication, and loyalty of officer candidates, and with respect to such officers, the Board shall select only those individuals who, in the Board's sole opinion, shall best promote and advance the interests of the Company. Each officer shall hold office until his or her successor is chosen and qualified, unless terminated earlier and except as otherwise provided at the meetings respectively at which he or she is elected or appointed.  Any officer may resign by delivering written resignation to the Company at its office, or to the Board, and such resignation shall be effective upon receipt, unless it is specified to be effective at some other time or upon the happening of some other event.

8.2      Same Person Holding Two or More Offices.  To the extent permitted by the Act, any two or more of the offices referred to in this Section may be filled by the same person.

8.3      Officers Need Not Be Members or Managers.  Except as otherwise provided by the Act, any person shall be eligible for election to be an officer of the Company without the necessity of being a Member or Manager.

8.4      Removal of Officers.  Any officer may be removed by the Board, acting by Approval, with or without cause.

8.5      Vacancies.  In case a vacancy in any office shall occur due to any cause, the Board of Managers, acting by Approval, may elect a person to fill such vacancy who shall hold office until the date on which the office would ordinarily be filled, and until a successor is chosen and qualified.

8.6      President.  The President shall be the chief executive officer of the Company and shall, subject to the provisions set forth hereinafter, have the authority to oversee such administrative activities and to take such administrative actions as shall be customary for a chief

22

executive officer.  The President shall perform such additional duties as may be delegated to the President by the Board or as may be imposed by law.  It shall be the duty of the President, and the President shall have the power to see to it, that all orders and resolutions of the Board are carried into effect.  The President shall, from time to time, report to the Board all matters within his or her knowledge which the interests of the Company may require to be brought to its notice.

8.7    Chief Financial Officer.  The Chief Financial Officer shall, subject to the supervision and control of the Board, have custody of the funds and of all the valuable papers of the Company.  The Chief Financial Officer shall keep the accounts of the Company in a clear manner, and shall, at all times, when requested by the Board, exhibit a true statement of the affairs of the Company.  The Chief Financial Officer shall, if required by the Board, give a bond for the faithful discharge of his or her duties, at the expense of the Company, with satisfactory sureties in such penal sum as the Board may determine, if so required by the Board.  Except as the Board may otherwise order, the Chief Financial Officer shall sign and/or endorse all promissory notes, bills, checks, drafts, trade acceptances, and bankers' acceptances, and may execute all deeds, mortgages, reports, contracts, agreements, and other legal documents of the Company, but the Board may authorize any other officer or officers, or agent or agents, to sign any obligations, instruments, or papers on behalf of the Company, and/or may limit the authority of the Chief Financial Officer in any of said matters.  The Chief Financial Officer shall perform such other duties as may be delegated to him or her by the Board or as may be imposed by law.

When the Chief Financial Officer shall be absent or for any other reason unable to perform his or her duties, the Chief Financial Officer may appoint any other officer of the Company to act as Treasurer, and said Treasurer shall have all the duties herein delegated to the Chief Financial Officer during the term of his or her appointment.

8.8    Secretary.  The Secretary shall keep the records of the Company, of its Members, and of the Board, and shall perform such duties and have such powers additional to the foregoing as the Board shall designate.

### ARTICLE IX
### Fiscal Matters

9.1    Books and Records.  The Chief Financial Officer shall oversee the day to day bookkeeping for the Company and all of its operations and  facilities and shall keep complete and accurate records of the same.  The Company shall keep reviewed, but not audited financial statements that are prepared on an annual basis.  Upon Approval of the Board, the Company may engage the services of a certified public accounting firm ("Accounting Firm") to audit the Company's books and records using the same methods of accounting which are used in preparing the federal income tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied.  The Company's books and records shall be maintained and updated monthly, and shall be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the Company or the Accounting Firm (as applicable) for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such books, records, documents and information shall be sent by the Company to any Member, or the Member's duly authorized representative,

upon reasonable request therefore and at the expense of such Member. The Company shall keep at its principal office all items required pursuant to the Act. Within ninety (90) days after the end of each fiscal year of the Company, each Member shall be furnished with financial statements which shall contain a balance sheet as of the end of the fiscal year and statements of income and cash flows for such fiscal year. Any Member may, at any time, at the Member's own expense, cause an audit or review of the Company books to be made by a certified public accountant of the Member's own selection.

9.2     Bank Accounts.  Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by Approval of the Board, and withdrawals shall be made and other activity conducted on such signature or signatures as determined by Approval of the Board. Any and all records with respect to such bank accounts and/or other accounts, including, but not limited to, copies of any checks written on such account or records or other withdrawal activity, shall be available at an office of the Company or the Accounting Firm for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such records shall be sent by the Company to any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member.

9.3     Fiscal Year.  The fiscal year of the Company shall end on December 31 of each year, unless otherwise Approved by the Board.

## ARTICLE X
## Transfer of Interests and Admission of Transferees

10.1    Restriction on Transfers.

(a)     Except as indicated below, no Class A Member may sell, Transfer, pledge, hypothecate, gift or otherwise dispose of or encumber all or any portion of his, her or its Units without Approval of the Board.  Any Transfer in violation hereof shall be treated as an Adverse Terminating Event.  The Units of a Member and any interest of such Member's spouse in such Units, shall remain subject to this Agreement regardless of the termination, for any reason, of the marital relationship of any Member and the Member's spouse.  During the marriage of the Member and such Member's spouse, such Member's obligations to sell or offer to sell Units pursuant to this Agreement shall include any interest of such Member's spouse in the Units.  Any Units transferred in contravention of this Section shall be void of all voting, inspection and other rights with respect to the pledgee/transferee and any such transfer shall be null and void ab initio and shall be subject to purchase by the Company as an Adverse Terminating Event. Each spouse of a Member shall sign a Consent of Spouse form, substantially in the form of Exhibit B, agreeing to be bound by the terms hereof including, without limitation, the term providing that ownership by a spouse is not permitted.  Any transferee must sign a counterpart to this Agreement agreeing to be bound by all terms hereof prior to such Transfer being deemed effective.

(b)     Notwithstanding anything else to the contrary in this Agreement, a Class B Member may Transfer his, her or its Units to an Affiliate or to such other Person as is approved

24

by the affirmative vote of the holders of a majority of the outstanding Class B Units, so long as the transferor and the transferee agree to remain bound by all of the terms hereof.

(c)    No Member may pledge his, her or its Units to a bank, financial institution, creditor or other lender.

(d)    Notwithstanding the foregoing, a Member may transfer his or her interest to an Entity Investor in accordance with Section 2.5 hereof.

(e)    Notwithstanding the foregoing, a Member may transfer his or her interest by will, by laws if descent or distribution, and *inter vivos*, in each case to the Member's heirs.

10.2    <u>Irreparable Harm</u>.  Each Member specifically acknowledges that a breach of Section 10.1 would cause the Company and the Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money.  In the event of a breach or threatened breach by a Member of the provisions of Section 10.1, the Company or other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond or prove damages.  Nothing herein shall be construed to prevent the Company or other Members from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages, reasonable attorneys' fees and expenses.

10.3    <u>Assignee of a Member's Units</u>.  If, notwithstanding the prohibitions in Section 10.1, a Member Transfers all or any portion of his, her or its Units and a Person acquires such Units, (but is not admitted as a substituted Member pursuant to the terms of this Agreement) such Person shall:

(a)    be treated as an assignee of a Member's Units, as provided in the Act, and not as a Member of the Company;

(b)    have no right to participate in the business and affairs of the Company or to exercise any rights of a Member under this Agreement or the Act;

(c)    share in distributions from the Company with respect to the transferred Units on the same basis as the transferring Member previously had; and

(d)    be required to transfer the Units to the Company in accordance with the redemption provisions hereof relating to Adverse Terminating Events.

10.4    <u>Obligations of Permitted Transferees</u>.  In the case of any approved Transfer or disposition of Units, the transferee shall execute and deliver an appropriate instrument agreeing to be bound by this Agreement as a Member and such additional agreements or instruments as the Board may require. Any permitted transferee of Units shall receive and hold such Units subject to this Agreement and all of the restrictions, obligations and rights created hereunder, and the Members and each transferee shall be bound by their obligations under this Agreement with respect to each subsequent transferee.

10.5    <u>Preemptive Rights</u>.  No Member shall have any preemptive rights to purchase or otherwise acquire New Units proposed to be issued by the Company, it being expressly understood

that additional Units are contemplated to be issued to Eligible Employees hired by the Company after the date of this Agreement, the terms and conditions of such subsequent issuances being subject to Approval of the Board.  For purposes of applying this Section, "New Units" shall mean any Units (irrespective of class) which the Company proposes to issue on or after the date hereof, any rights or options which the Company proposes to grant for the purchase of any Units (irrespective of class), any bonds, securities or obligations of the Company which are convertible into or exchangeable for, or which carry any rights, to acquire Units (irrespective of class), whether now or hereafter authorized or created, whether issued or unissued, and whether the proposed issue, transfer or grant is for cash, property, services or any other lawful consideration, and including any issuance otherwise provided for in this Agreement.

     10.6   <u>Noncompetition</u>.  During the term of a Member's membership in the Company, and for a period of five (5) years thereafter, other than through the Company, no Member, nor any of their Affiliates, except as provided below, shall, without the prior written Approval of the Board and the Class B Members, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a business that is similar to or competitive with the Business of the Company, whether or not the Company is then doing business in the same State. The preceding sentence shall not be construed to prevent a Member or any of their Affiliates from owning stock of one percent (1%) or less of any publicly traded company that engages in any of the restricted activities set forth herein so long as the Member does not activitely participate in any aspect of the operations and business of such publicly traded company.

     Each party understands and acknowledges that the provisions of this Section 10.6 are designed to preserve the goodwill of the parties and that the Multiple used in the Formula Amount set forth in Section 4.3 takes into consideration some allocation of such goodwill.  Accordingly, each party hereby acknowledges and agrees that any breach or threatened breach of the provisions of this Section 10.6 hereof binding on a party will result in irreparable harm and injury to the other party and that monetary damages will not provide an adequate remedy to a party.  Accordingly, each Member hereby agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the non-breaching party shall be entitled to:  (a) a temporary restraining order, preliminary injunction and permanent injunction to enjoin such breach or threatened breach without the requirement of the posting of a bond; (b) an accounting for any and all monies, earnings, profits and other benefits that the breaching party has derived or received, directly or indirectly, as a result of such breach or threatened breach; (c) recover from the breaching party the reasonable attorneys' fees and costs incurred by the non-breaching party in enforcing the provisions of this Section 10.6; and (d) all deferred payments due to the Member shall be suspended until final resolution of the dispute. The breaching party further agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the restrictions set forth in this Section 10.6 shall be extended during the period of any breach or threatened breach by the breaching party.  The rights and remedies set forth herein are cumulative and shall be in addition to any other rights or remedies to which a party may be entitled.

     Each party hereby acknowledges that the restrictions set forth in this Section 10.6 are minimal, reasonable in scope and duration and are necessary to protect the legitimate interests of the parties and that any breach or threatened breach of these restrictions will result in irreparable

harm to the non-breaching party. In the event that any of the restrictions are found by a court of competent jurisdiction to be too broad to permit enforcement to its full extent, then such restrictions shall be enforced to the maximum extent allowable by law and the parties hereby consent to and authorize the court to modify the restrictions in a manner to permit their enforcement. Notwithstanding any other provision of this Agreement, the Class B Members shall have the right to enforce, on behalf of the Company and at the Company's expense, the provisions of this Section 10.6 against any Member without relying on the Approval of the Board therefore.

      10.7   <u>Confidential Information</u>. Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as he, she or it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section 10.7, he, she or it shall:

      (a)   treat the Confidential Information as secret and confidential;

      (b)   not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third Party except with the prior written consent of Company;

      (c)   not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement;

      (d)   recognize and acknowledge that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for its own personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except: (i) with the prior written consent of all the other Members; (ii) in the course of the proper performance of the Member's duties hereunder; or (iii) as required by applicable law or legal process. Each Member confirms that all such information constitutes the exclusive property of the Company.

      (e)   Given the secretive and competitive environment in which the Company does business and the fiduciary relationship that the Members have with the Company, each Member agrees to promptly deliver to the Company, at any time when the Company so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company. Notwithstanding the foregoing paragraph or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member, and limit the dissemination of and access to the

Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents, attorneys, consultants, professional advisors or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section.

(f)     "Confidential Information" means any and all policies, procedures, quality assurance techniques, plans, projections, pro formas, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information.  Confidential Information does not include information which:

(i)     was lawfully made available to or known by third person on a non-confidential basis prior to disclosure by a Member;

(ii)     is or becomes publicly known through no wrongful act of a Member; or

(iii)     is received by a Member from a third party other than in breach of confidence.

10.8    Additional Covenants.

(a)     If a court of competent jurisdiction should declare this Article X, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

(b)     Each Member specifically acknowledges that a breach of this Article X would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of any of the provisions of this Article X, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorneys' fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

(c)     Each Member warrants and represents that he, she or it:

(i)     Is familiar with the confidentiality and non competition agreements contained herein.

(ii)     Is acquiring such Units solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose his, her or its entire investment and

has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Units in the Company are to be held by the Members solely for investment and on each of the representations made hereby.

(iii)     Has concluded that his, her or its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable.

(iv)     Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Article.

(v)     Acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty.

(vi)     Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no obligation or current intention to register such Units under the Federal Securities Act 1933 ("33 Act").

(vii)     Acknowledges that the Units have not been registered under the 33 Act because the Company is issuing such Units in the belief that such Units are being issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(viii)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

(ix)     Acknowledges that this Agreement does not conflict with or violate any other agreement to which the Member is party.

(x)     Agrees to be substantially involved in the operation of the Company and does not expect a return on his, her or its investment due to the efforts of others.

(xi)     Is aware that there are numerous risk factors associated with the holding of the Units, all of which each Member is aware exists and has expressly agreed to assume.

## ARTICLE XI
## Dissolution and Termination

11.1    Events Causing Dissolution.  The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and, by Approval of the Board, a determination is made not to distribute any such non-cash items to the Members;

(b)    The election for any reason to dissolve the Company made by Supermajority Approval;

(c)    When there are no remaining Members, unless the holders of all of the financial rights in the Company agree in writing, within ninety (90) days after the cessation of membership of the last Member, to continue the legal existence and business of the Company and to appoint one or more new Members;

(d)    Any consolidation or merger of the Company with or into any entity unless the Company is the resulting or surviving entity; or

(e)    Entry of a decree of judicial dissolution.

11.2    Procedures on Dissolution.  Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles shall be canceled in the manner set forth in the Act.  Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business and the affairs of the Company shall be conducted so as to maintain the continuous operation of the Company pursuant to the terms of this Agreement.  Upon dissolution of the Company and subject to the Supermajority Approval required by Section 7.4 hereof, the Board, acting by Approval, or, if none, a liquidator elected by Supermajority Approval, shall liquidate the assets of the Company, apply and distribute the proceeds thereof under Article VI, and cause the termination of this Agreement.

## ARTICLE XII
## General Provisions

12.1    Notices.  Any and all notices under this Agreement shall be effective (a) on the fifth (5th) business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery.  All such notices in order to be effective shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified.  A Member may change its address for purposes of this Agreement by giving the Board notice of such change in the manner heretofore provided for the giving of notices.

30

12.2    Word Meanings.  The words "herein," "hereinafter," "hereinbefore," "hereof" and "hereunder" as used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  All section references, except as otherwise provided herein, are to sections of this Agreement.

12.3    Binding Provisions.  Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

12.4    Applicable Law.  This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary.

12.5    Counterparts.  This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

12.6    Separability of Provisions.  Each provision of this Agreement shall be considered separable.  If for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and if for any reason any provision or provisions herein would cause the Members to be liable for or bound by the obligations of the Company, such provision or provisions shall be deemed void and of no effect.

12.7    Section Titles.  Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8    Amendments.  This Agreement may be amended or modified only in accordance with Sections 7.3 and 7.4 hereof.

12.9    Entire Agreement.   This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12.10    Waiver of Partition.  Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company.  Accordingly, each Member agrees that he or she shall not, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his or her successors and assigns) accepts the provisions of this Agreement as his or her sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale or other liquidation with respect to his or her interest, in or with respect to, any assets or properties of the Company.  Each Member further agrees that he or she or it will not petition a court for the dissolution, termination or liquidation of the Company.

12.11  <u>Survival of Certain Provisions</u>.  The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including, but without limitation, the provisions of Sections 10.6 and 10.7.  The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company so as to effectuate the intended purposes and agreements of the Members hereunder shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the Company or the execution of any document terminating this Agreement, unless such document specifically provides for nonsurvival by reference to this Section 12.11 and to the specific provisions hereof which are intended not to survive.

12.12  <u>No Impairment</u>.  Except as expressly contemplated by this Agreement, the Company shall not amend, modify or repeal any provision of the Articles or this Agreement in any manner which would alter or change the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Members, without the express prior written consent of the holders of a majority of the Units of the class so impacted in each and every such instance; nor shall the Company, through any reorganization, transfer of assets, merger, dissolution, issue, sale or distribution of Units or any other voluntary action, avoid or seek to avoid the observance or performance of any terms of this Agreement for the benefit of the Members, without the express prior written consent of the majority of the holders of the majority of the Class so impacted in each and every such instance, as limited by Section 7.4.  The Company shall in good faith take any and all actions which are necessary or appropriate in order to protect the rights of the Members.

12.13  <u>Specific Performance or Injunctive Relief</u>.  The Members and the Company hereby declare that it is impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform any of its obligations hereunder. Therefore, if any Party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has or may have an adequate remedy at law and agrees not to urge in any such action or proceeding that such a remedy exists. Furthermore, any Party seeking to enforce the provisions of this Agreement shall have the right to specific performance, injunctive or other equitable relief without the requirement to post bond.

12.14  <u>Dispute Resolution; Limited Renegotiation; Arbitration</u>. Except for disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief and the Arbitrator (as defined below) does not have authority to grant preliminary, temporary and/or permanent injunctive relief, all disputes shall be resolved under the following provisions of this Agreement.

This Agreement shall be construed to be in accordance with any and all federal and state statutes, rules, regulations, principles and interpretations applicable to the Company and the Members, and the relationships among them.  It is the intent of this Section to set forth a procedure so that if certain legal developments occur, a dispute arises, or certain circumstances arise in which the Board of Managers should become internally deadlocked (provided, however, that a deadlock shall not be deemed to occur due to the withholding of Supermajority Approval), a procedure will be in place that will bring the terms of this Agreement back into legal compliance and/or resolve

a Board deadlock while preserving, to the extent possible, the economic and governance relationships set forth here.

In the event there is any dispute among the parties or there is any legal development, including without limitation, a change in (or the interpretation of) federal or state statutes, rules, regulations, principles or interpretations, that renders any of the material terms of this Agreement unlawful or unenforceable (including any services rendered or compensation to be paid hereunder), or a definitive judicial or State of Delaware interpretation of Delaware law that substantially affects the business, governance, or economics of the Company in an adverse manner (collectively a "Negative Legal Development"), or any circumstance in which the Board itself is deadlocked in its decision making hereunder and cannot take action (a "Deadlock Event"), any Member affected by such Negative Legal Development or such Deadlock Event shall have the immediate right upon notice to the other Members (the "Notice") to initiate the renegotiation of the affected term or terms of this Agreement, so as to remedy the impacts of the Negative Legal Development or to seek resolution of the Deadlock Event, each in a manner that substantially maintains the then existing economic and governance relationships of the Members, if it is legal to accomplish the change while maintaining substantially such economic and governance relationship.

If the Parties are not able to renegotiate the affected terms of the Agreement or resolve the Deadlock Event or dispute on a mutually satisfactory basis within forty-five (45) days after the Notice, the Parties must submit the issues (the "Dispute") to mediation and arbitration pursuant to the procedure set forth below. The arbitrator selected in accordance with the provisions set forth below (the "Arbitrator") will be asked to determine whether there is a bona fide Negative Legal Development or Deadlock Event, and if so, the Arbitrator will decide the matter as set forth in Section 12.14 C. of this Agreement.

A.    Right to Mediate or Arbitrate.  Any dispute between the Parties relating to this Agreement must first be submitted to non-binding mediation in accordance with procedures agreed upon by the Parties.  If the dispute is not resolved through mediation within forty-five (45) days of the initial request for mediation or within a time frame mutually agreed upon by the Parties, the dispute must then be submitted for binding arbitration in accordance with procedures set forth by the American Health Lawyers Association.

B.    Pre-Arbitration Procedure.

1.    Any dispute shall be submitted to arbitration by notifying the other Party or Parties, as the case may be, hereto in writing of the submission of such dispute to arbitration (the "Arbitration Notice"). The Party delivering the Arbitration Notice shall specify therein, to the fullest extent then possible, its version of the facts surrounding the dispute and the amount of any damages and/or the nature of any injunctive or other relief such Party claims.

2.    The Party (or Parties, as the case may be) receiving such Arbitration Notice shall respond within sixty (60) days after receipt thereof in writing (the "Arbitration Response"), stating its version of the facts to the fullest extent then possible and, if applicable, its position as to damages or other relief sought by the Party initiating arbitration.

3.      The Parties shall then endeavor, in good faith, to resolve the dispute outlined in the Arbitration Notice and Arbitration Response. In the event the Parties are unable to resolve such dispute within sixty (60) days after receipt of the Arbitration Response, the Parties shall initiate the arbitration procedure outlined below.

C.      Arbitration Procedure.

1.      If the Parties hereto are unable to resolve the dispute within sixty (60) days after receipt of the Arbitration Response as set forth above, then the Parties must submit the dispute to binding arbitration in accordance with the American Health Lawyers arbitration program. If the Parties are unable to agree on an arbitrator within sixty (60) days after receipt of the Arbitration Response, each of the Parties shall, within sixty (60) days after receipt of the Arbitration Response, choose an arbitrator selector ("Selector"). The Selectors shall then have forty (40) days to select an arbitrator who shall serve as the final arbitrator for the dispute. (The arbitrator chosen by the Parties hereto or by the Selectors, as the case may be, shall hereinafter be as the "Arbitrator"). The Arbitrator shall not be an Affiliate of any of the Parties hereto.

2.      The arbitration shall be held in Los Angeles County, California. The Parties shall submit to the Arbitrator the Arbitration Notice and the Arbitration Response and any other facts regarding the dispute of which any Party desires.

3.      The Arbitrator shall apply the arbitration rules set forth below in making his or her decision. After the Arbitrator has heard the case of each Party in accordance with Section 12.14 D., the Arbitrator shall request that each Party submit an Order to resolve all matters in dispute. The Arbitrator shall then execute one of the Orders submitted by the Parties. The Arbitrator shall not be allowed to modify or amend any Orders submitted by the Parties. The decision of the Arbitrator shall be rendered within sixty (60) days of the close of the hearing record.

D.      Arbitration Rules.

1.      The Arbitrator shall allow reasonable discovery, which he determines is necessary for determination of the issues presented.

2.      The Arbitrator shall be guided by, and shall substantially comply with, the then applicable Federal Rules of Evidence.

3.      Should any Party refuse or neglect to appear or participate in the arbitration proceedings, including the procedures relating to the selection of an Arbitrator, the participating Party may select the Arbitrator and the Arbitrator is empowered to decide the controversy in accordance with whatever evidence is presented.

E.      Arbitrator's Award. The award of the Arbitrator shall be binding on the Parties and may be entered as a final judgment in a court of competent jurisdiction.

F.      Other Disputes. All disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief shall be resolved by a court of law with the site of venue in Los Angeles County, California if the Arbitrator does not have authority to grant preliminary, temporary and/or permanent injunctive relief.

34

12.15  <u>Waiver of Trial by Jury</u>.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN CONNECTION WITH ANY ACTION OR PROCEEDING INSTITUTED UNDER OR RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO, OR IN CONNECTION WITH ANY COUNTERCLAIM RESULTING FROM ANY SUCH ACTION OR PROCEEDING.

12.16  <u>Counsel to the Company</u>.  Each of the Members acknowledges that Michael J. Sarrao has prepared this Agreement as attorney for the Company and not as attorney for any Member.  The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests, and (iii) they are aware that Michael J. Sarrao is a trustee and beneficiary of The Sarrao Family Trust.  Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Agreement and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

<p align="center">[<em>Signatures Appear on Next Page</em>]</p>

35

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

36

**IN WITNESS WHEREOF,** the the undersigned have executed this Agreement as of the day and year first above written.

<div align="center">CLASS A MEMBERS:</div>

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger M. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

<div align="center">36</div>

**IN WITNESS WHEREOF,** the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST                THE KRISSMAN FAMILY TRUST

By: _____              By: _____
      Lex Reddy, Trustee                       Roger A. Krissman, Trustee

By: _____
      Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST          THE SARRAO FAMILY TRUST

By: _____              By: _____
      Panch Jeyakumar, Trustee                 Michael J. Sarrao, Trustee

                                         _____
                                         Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
      Martha M. Hayes, Trustee           _____
                                         Steven Kay

                                         _____
                                         Aman Dhuper

36

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

CLASS A MEMBERS:

THE REDDY INVESTMENT TRUST

By:
   Lex Reddy, Trustee

By:
   Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By:
   Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By:
   Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By:
   Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By:
   Michael J. Sarrao, Trustee

Matthew Williams

Steven Kay
Steven Kay

Aman Dhuper

36

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

**IN WITNESS WHEREOF**, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

THE REDDY INVESTMENT TRUST                THE KRISSMAN FAMILY TRUST

By: _____            By: _____
    Lex Reddy, Trustee                        Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST           THE SARRAO FAMILY TRUST

By: _____            By: _____
    Panch Jeyakumar, Trustee                  Michael J. Sarrao, Trustee

                                                    _____
THE HAYES IRREVOCABLE TRUST               Matthew Williams

By: _____            _____
    Martha M. Hayes, Trustee              Steven Kay

                                                    _____
                                                    Aman Dhuper

36

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee


By: _____
    Richard A. Hayes, Trustee


THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

CLASS B MEMBER:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By _____
    Richard A. Hayes, Trustee

THE COMPANY:

SUNRISE MOB HOLDINGS LLC

By: _____
    Lex Reddy, CEO

**EXHIBIT A**

**MEMBERS, CAPTIAL CONTRIBUTIONS AND UNITS**

| NAMES OF MEMBERS | TOTAL UNITS |
|---|---|
| CLASS A MEMBERS: | |
| | |
| | |
| The Krissman Family Trust | 10,000 |
| The Reddy Investment Trust | 5,000 |
| The Jeyakumar Inter-Vivos Trust | 7,000 |
| The Sarrao Family Trust | 7,000 |
| The Hayes Irrevocable Trust | 5,000 |
| Steven Kay | 5,000 |
| Matthew Williams | 5,000 |
| Aman Dhuper | 5,000 |
| | |
| CLASS A TOTALS | 49,000 |
| CLASS B MEMBER: | |
| | |
| The Reddy Investment Trust | 51,000 |
| | |
| CLASS B TOTALS | 51,000 |
| | |
| TOTALS | 100,000 |

## EXHIBIT B

### CONSENT OF SPOUSE

      I acknowledge that I have read the foregoing Agreement and that I understand its contents.  I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Sunrise MOB Holdings LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

      I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _____, 2019.

Name of Member: _____

Name of Spouse: _____

Signature of Spouse: _____

EXHIBIT B

<u>SUNRISE REAL ESTATE HOLDINGS, LLC</u>

A Delaware Limited Liability Company

<u>FIRST AMENDMENT TO</u>

<u>AMENDED AND RESTATED</u>

<u>OPERATING AGREEMENT</u>

SUNRISE REAL ESTATE HOLDINGS, LLC
FIRST AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This First Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability companu ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto owned one hundred percent of the Company's membership interests (the "Interests")

WHEREAS, Alecto desires to transfer and assign all of its right, title, and interest in and to the Interests to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the "New Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to the New Members (the "New Members Transfer") subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.    Approval of Transfer and Admission of New Members.  Upon full execution of this Amendment by the New Members and the Company, (i) the transfer by the Alecto of all of its interest in the Company to the New Members is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) the New Members are confirmed as Members of the Company under the Operating Agreement. The New Members acknowledge having received a copy of the Operating Agreement and hereby agree to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating

Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

      2.    <u>Representations of New Member</u>.  Each New Member warrants and represents that it:

      (a)    Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising.  The Company has relied upon the fact that the Interests in the Company are to be held by each New Member solely for investment and on each of the representations made hereby.

      (b)    Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

      (c)    Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

      (d)    Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

      (e)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

      (f)    Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

      (g)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

      (h)    Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

      (i)    Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

      3.    <u>Exhibit A</u>.  Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

4.    <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document.  In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

5.    <u>Counsel to the Company</u>.  Each of the Members acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members.  The Members acknowledge that (i) they have each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing each such Member, and (ii) they have been informed that Michael J. Sarrao has performed legal services for certain Members and other entities in which the Members have differing interests.  Each Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

6.    <u>Remaining Restated Agreement Terms</u>.  In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____

      Lex Reddy, Trustee

By: _____

      Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____

      Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____

      Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____

      Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____

      Michael J. Sarrao, Trustee

_____

Matthew Williams

_____

Steven Kay

_____

Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
Lex Reddy, Trustee


By: _____
Richard A. Hayes, Trustee


THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
Panch Jeyakumar, Trustee


THE HAYES IRREVOCABLE TRUST

By: _____
Martha M. Hayes, Trustee


THE KRISSMAN FAMILY TRUST

By: _____
Roger A. Krissman, Trustee


THE SARRAO FAMILY TRUST

By: _____
Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
      Lex Reddy, Trustee

By: _____
      Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
      Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
      Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
      Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
      Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

MEMBERS:

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST

By: _____
    Lex Reddy, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
    Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
    Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
    Michael J. Sarrao, Trustee

THE HAYES IRREVOCABLE TRUST

By: _____
    Martha M. Hayes, Trustee

_____
Matthew Williams

_____
Steven Kay

_____
Aman Dhuper

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBERS:**

THE REDDY INVESTMENT TRUST     THE KRISSMAN FAMILY TRUST

By: _____    By: _____
    Lex Reddy, Trustee             Roger A. Krissman, Trustee

By: _____
    Richard A. Hayes, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST    THE SARRAO FAMILY TRUST

By: _____    By: _____
    Panch Jeyakumar, Trustee        Michael J. Sarrao, Trustee

                                  _____
THE HAYES IRREVOCABLE TRUST    Matthew Williams

By: _____    _____
    Martha M. Hayes, Trustee       Steven Kay

                                    _____
                                    Aman Dhuper

**THE COMPANY**:

Sunrise Real Estate Holdings, LLC, a
Delaware limited liability company

By: _____

     Lex Reddy
     President & CEO

2

EXHIBIT A

MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
|---|---|
| The Reddy Investment Trust | 56% |
| The Krissman Family Trust | 10% |
| The Jeyakumar Inter-Vivos Trust | 7% |
| The Sarrao Family Trust | 7% |
| The Hayes Irrevocable Trust | 5% |
| Steven Kay | 5% |
| Matthew Williams | 5% |
| Aman Dhuper | 5% |

EXHIBIT C

SUNRISE REAL ESTATE HOLDINGS, LLC

A Delaware Limited Liability Company

SECOND AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

SUNRISE REAL ESTATE HOLDINGS, LLC
SECOND AMENDMENT TO
AMENDED AND RESTATED
OPERATING AGREEMENT

This Second Amendment to Amended and Restated Operating Agreement (this "Amendment") is entered into and effective as of June 19, 2019 by and among the Persons who execute this Amendment (each a "Member" and collectively the "Members"). Except as otherwise provided, the capitalized terms used in this Amendment shall have the meanings set forth in Article I of the Restated Agreement (as hereinafter defined).

WHEREAS, Sunrise Real Estate Holdings, LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on March 5, 2014 (the "Effective Date"); and

WHEREAS, Alecto Healthcare Services LLC, a Delaware limited liability companu ("Alecto"), as the Company's sole member, entered into an Amended and Restated Operating Agreement dated March 5, 2014 (the "Operating Agreement") providing for the organization and operation of the Company; and

WHEREAS, immediately prior to the effectiveness of this Amendment, Alecto transferred one hundred percent of the Company's membership interests (the "Interests") to The Reddy Investment Trust (56%), The Krissman Family Trust (10%), The Jeyakumar Inter-Vivos Trust (7%), The Sarrao Family Trust (7%), The Hayes Irrevocable Trust (5%), Steven Kay (5%), Matthew Williams (5%), and Aman Dhuper (5%) (collectively, the Trust/Individual Members") in proportion to the percenatages in the parenthetical immediately following each entity or person; and

WHEREAS, the Trust/Individual Members desire to transfer and assign all of their right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC, a Delaware limited liability company; and

WHEREAS, the Company desires to evidence their approval of the transfer of all of Alecto's right, title, and interest in and to the Interests to Sunrise MOB Holdings LLC subject to the execution of this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

1.      Approval of Transfer and Admission of New Member.  Upon full execution of this Amendment by Sunrise MOB Holdings LLC and the Company, (i) the transfer by the Trust/Individual Members of all of their interests in the Company to Sunrise MOB Holdings LLC is hereby approved, (ii) this Amendment shall be deemed to amend the Operating Agreement and shall become valid and binding on all Members of the Company, and (iii) Sunrise MOB Holdings LLC is confirmed as a Member of the Company under the Operating Agreement. Sunrise MOB Holdings LLC acknowledges having received a copy of the Operating

Agreement and hereby agrees to be bound by all of the representations, warranties, restrictions, agreements, terms and conditions as are set forth in the Operating Agreement and this Amendment, as the Operating Agreement may be further amended from time to time, and as otherwise applicable under Delaware law governing limited liability companies.

2.    <u>Representations of Sunrise MOB Holdings LLC</u>.  Sunrise MOB Holdings LLC warrants and represents that it:

(a)    Is acquiring the Interests solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose its entire investment and has not learned of this investment through any general solicitation or advertising.  The Company has relied upon the fact that the Interests in the Company are to be held by Sunrise MOB Holsdings solely for investment and on each of the representations made hereby.

(b)    Has concluded that its obligations and the Company's rights and remedies described in the Operating Agreement are reasonable.

(c)    Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon it by the Operating Agreement.

(d)    Acknowledges that the restrictive covenants contained in the Operating Agreement are fair, reasonable and just, under the circumstances, and are not a penalty.

(e)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to the Interests, and the Company has no obligation or current intention to register the Interests under the Federal Securities Act 1933 (the "33 Act").

(f)    Acknowledges that the Interests have not been registered under the 33 Act because the Company issued the Interests in the belief that the Interests were issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(g)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Interests were acquired by a Member with a view to distribution.

(h)    Acknowledges that the Operating Agreement does not conflict with or violate any other agreement to which it is party.

(i)    Is aware that there are numerous risk factors associated with the holding of the Interests, all of which it is aware exists and has expressly agreed to assume.

3.    <u>Exhibit A</u>.  Exhibit A attached hereto sets forth all of the Members of the Company and their respective interest in the Company after giving effect to the transfer approved in this Amendment.

2

4.    <u>Counterparts</u>.  This Amendment may be executed in one or more counterparts, each of which will be deemed to be an original but all of which together will constitute one and the same document.  In addition, the signatures to this Amendment may be exchanged by fax and/or email transmission, and any such transmitted signature may be attached to this Amendment as if it was an original.

5.    <u>Counsel to the Company</u>.  The Member acknowledges that Michael J. Sarrao has prepared this Amendment as attorney for the Company and not as attorney for any Members. The Member acknowledges that it has each been advised to seek review of this Amendment and all of the other documents pertaining to the formation of the Company, and advice concerning same, from an attorney independently and separately representing the Member.  The Member hereby waives any conflict that may exist in Michael J. Sarrao preparing this Amendment and all other Company documents previously prepared and as may be prepared in the future, and consents to his representation of the Company.

6.    <u>Remaining Restated Agreement Terms</u>.  In all other respects, the terms and conditions of the Restated Agreement shall remain in full force and effect.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the the undersigned have executed this Amendment as of the day and year first above written.

**MEMBER**:

SUNRISE MOB HOLDINGS LLC

By: _____

     Lex Reddy
     President & CEO

**COMPANY**:

SUNRISE REAL ESTATE HOLDINGS LLC

By: Sunrise MOB Holdings LLC
Its: Sole Member

By: _____

     Lex Reddy
     President & CEO

EXHIBIT A

MEMBERSHIP INTERESTS

| Name of Member | Percentage Interest |
|---|---|
| Sunrise MOB Holdings LLC | 100% |

EXHIBIT D

**FUNDS FLOW AGREEMENT**

This Funds Flow Agreement (this "Agreement") is made and entered into as of June 20, 2019 by and among, Plaza Medical Office Building, LLC, a California limited liability company ("Plaza MOB"), Sunrise Real Estate Holdings, LLC, a Delaware limited liability company ("Sunrise Real Estate"), Sunrise MOB Holdings LLC, a Delaware limited liability company ("Sunrise MOB"), Alecto Healthcare Services LLC, a Delaware limited liability company ("Alecto"), The Reddy Investment Trust ("Reddy Trust"), The Krissman Family Trust ("Krissman Trust"), The Jeyakumar Inter-Vivos Trust ("Jeyakumar Trust"), The Sarrao Family Trust ("Sarrao Trust"), The Hayes Irrevocable Trust ("Hayes Trust"), Matthew Williams ("Williams"), Steven Kay ("Kay"), and Aman Dhuper ("Dhuper") . Plaza MOB, Sunrise Real Estate, Sunrise MOB, Alecto, Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are sometimes referred to herein individually as a "Party" and collectively as the "Parties." The Reddy Trust, Krissman Trust, Jeyakumar Trust, Sarrao Trust, Hayes Trust, Williams, Kay, and Dhuper are collectively referred to herein as the "Members".

**RECITALS:**

A.      Plaza MOB owns and operates a medical office building and parking garage located at 5901 and 5975 W. Olympic Boulevard, Los Angeles, California 90036 (the "Property").

B.      Sunrise Real Estate is a member of Plaza MOB.

C.      Sunrise MOB is the sole member of Sunrise Real Estate.

D.      The Members are the members of Sunrise MOB.

E.      Effective June 20, 2019, Plaza MOB entered into a Loan Agreement with Wells Fargo Bank, National Association, pursuant to which Plaza MOB borrowed Thirty Million Dollars ($30,000,000.00) from Wells Fargo Bank (the "Loan Proceeds"). After setting aside funds for reserves and closing costs, Wells Fargo Bank deposited $28,235,111.00 into escrow with First American Title Company ("Escrow"). After deducting its costs and fees and subtracting such funds as were necessary to defease the existing loan on the Property, Escrow transferred $8,565,153.79 (the "Net Proceeds") to Plaza MOB on June 20, 2019.

F.      On June 20, 2019, Plaza MOB's members elected to distribute $8,444,477.81 to Sunrise Real Estate (the "Plaza MOB Distribution").

G.      On June 20, 2019, Sunrise Real Estate's member elected to distribute an amount equal to the Plaza MOB Distribution to Sunrise MOB ("Sunrise Real Estate Distribution").

H.      On June 20, 2019, Sunrise MOB's members elected to distribute an amount equal to the Sunrise Real Estate Distributions to the Members in proportion to their percentage ownership interest in Sunrise MOB (the "Member Distribution").

I.      On June 20, 2019, each of the Members elected to contribute capital to Alecto in an amount equal to their respective percentage of the Member Distribution (the "Alecto Capital Contribution").

1

J.      In order to facilitate the flow of funds described in Recitals G to I, Sunrise Real Estate, Sunrise MOB, and the Members have directed Plaza MOB to cause the Net Proceeds to be deposited in the Richard A. Hayes, Inc. Client Trust Account ("**Hayes Client Trust Account**") and have requested that Richard A. Hayes, Inc., distribute the Net Proceeds in accordance with the terms of this Agreement.

K.      In addition to the Plaza MOB Distribution, it is anticipated that there will be an additional $120,675.98 distribution from the Net Proceeds from Plaza MOB to Sunrise Real Estate and then to the Members ("the Plaza MOB Second Distribution").

L.      In addition to the Plaza MOB Distribution and the Plaza MOB Second Distribution, it is anticipated that there will be additional funds received by Plaza MOB from the Loan Proceeds attributable to distributions of up to $500,000.00 from the Additional Insurance Reserve Funds  (as defined in the Loan Agreement with Wells Fargo Bank) and up to $355,002.00 from the Rent Concession Reserve Funds (as defined in the Loan Agreement with Wells Fargo Bank) (collectively the "Reserve Funds Distributions").

M.      In order to facilitate the flow of funds described in Recitals K and L, Sunrise Real Estate, Sunrise MOB, and the Members desire to direct Plaza MOB to cause the Plaza MOB Second Distribution and the Reserve Funds Distributions funds to be deposited in the Hayes Client Trust Account as such funds are received from time to time, and direct that Richard A. Hayes, Inc., distribute such funds in accordance with the terms of this Agreement.

N.      The Parties seek to enter into this Agreement to document the terms and conditions under which the Net Proceeds were distributed and transferred.

**NOW, THEREFORE,** for and in consideration of the recitals and the covenants contained herein, the Parties agree as follows:

**AGREEMENT:**

1.      **PLAZA MOB DISTRIBUTION**.  The Parties acknowledge and agree that the members of Plaza MOB elected to distribute 8,444,477.81 to Sunrise Real Estate on June 20, 2019, that Plaza MOB transferred $8,441,477.81 to the Hayes Client Trust Account on June 20, 2019, and that the transfer of the $8,444,477.81 constitutes the Plaza MOB Distribution.  Sunrise Real Estate acknowledges receipt of the Plaza MOB Distribution in the amount of $8,441,471.81.

2.      **SUNRISE REAL ESTATE DISTRIBUTION**.  The Parties acknowledge and agree that the members of Sunrise Real Estate elected to distribute $8,444,477.81 to Sunrise MOB on June 20, 2019, that Sunrise MOB received a distribution equal to $8,444,477.81 on June 20, 2019, and that Sunrise MOB directed Richard A. Hayes to not make a disbursement from the Hayes Client Trust Account in an amount equal to $8,444,477.81 but instead directed Richard A. Hayes to retain the $8,444,477.81 to facilitate a distribution to the members of Sunrise MOB.

3.      **DISTRIBUTION TO MEMBERS**.  The Parties acknowledge and agree that the members of Sunrise MOB elected to distribute $8,444,477.81 to the Members on June 20, 2019 in proportion to their percentage interests in Sunrise MOB, that the Members received a distribution equal to $8,444,477.81, and that the Members directed Richard A. Hayes to not make a

2

disbursement from the Hayes Client Trust Account to the Members but instead to retain the $8,444,477.81 to facilitate a capital contribution from the Members to Alecto.

4.      **CAPITAL CONTRIBUTION TO ALECTO**.   The Parties acknowledge and agree that each Member elected to make a capital contribution to Alecto in an amount equal to the amount their respective percentage of the Member Distribution on June 20, 2019, that the Members directed Richard A. Hayes to disburse $8,444,477.81 from the Hayes Client Trust Account to make the Alecto Capital Contributions, that Alecto received $8,444,477.81 on June 20, 2019, and that the amount of the capital contributions made by each Member is set forth on **Exhibit A**.

5.      **ADDITIONAL DISTRIBUTIONS**.   The Parties acknowledge and agree that (i) the Plaza MOB Second Distribution, and (ii) the Reserve Funds Distributions as received from time to time, shall be deposited in the Hayes Client Trust Account and contributed to the capital of Alecto through distributions to Sunrise Real Estate and Sunrise MOB consistent with and under the same terms and conditions as the Plaza MOB Distribution.

6.      **CONFIDENTIALITY**.   Except for disclosure to their legal counsel, accountant or financial advisors, the Parties shall not disclose the terms of this Agreement to any person who is not a party or signatory to this Agreement, unless disclosure thereof is required by law or otherwise authorized by this Agreement or consented to by the parties.   Unauthorized disclosure of the terms of this Agreement shall be a material breach of this Agreement.

7.      **ARBITRATION**.   Any dispute or controversy arising under, out of or in connection with, or in relation to this Agreement, or any amendment hereof, or the breach hereof shall be determined and settled by arbitration in the County of Los Angeles, State of California before a mutually agreed upon arbitrator in accordance the commercial rules of Judicial Arbitration and Mediation Services (JAMS) and applying the laws of the State of California.   In the event the Parties cannot agree on the selection of an arbitrator, an arbitrator will be appointed in accordance with JAMS' rules.   The arbitrator shall have no authority to award special, indirect, consequential or punitive damages and the Parties expressly waive any right to recover any special, indirect, consequential or punitive damages.   Any award rendered by the arbitrator shall be final and binding upon each of the Parties, and judgment thereon may be entered in any court having jurisdiction thereof.   The costs shall be borne equally by both parties.   The provisions of this Section 8 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE, THEN EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER MATTER INVOLVING THE PARTIES HERETO.

8.      **ENTIRE AGREEMENT; MODIFICATION**.   This Agreement contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, and all other communications between the Parties relating to such subject matter.   This Agreement may not be amended or modified except by mutual written

3

agreement.  Any reference to this Agreement shall include each and every exhibit, each of which is fully incorporated into this Agreement where referenced.

9.      **GOVERNING LAW**.  This Agreement shall be construed in accordance with the laws of the State of California.  The provisions of this Section 9 shall survive expiration or termination of this Agreement regardless of the cause of such termination.

10.     **COUNTERPARTS**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Signatures of the Parties on this Agreement or any document delivered pursuant to this Agreement may be transmitted by facsimile (or other electronic transmission including email of a PDF signature) shall be deemed to be original signatures for all purposes. At the request of a Party, the Parties will confirm facsimile transmitted (or other electronic transmission including email of a PDF signature) signatures by signing an original document.

11.     **WAIVER**.  A waiver by either Party of a breach or failure to perform hereunder shall not constitute a waiver of any subsequent breach or failure.

12.     **CAPTIONS**.  The captions contained herein are used solely for convenience and shall not be deemed to define or limit the provisions of this Agreement.

13.     **ASSIGNMENT; BINDING EFFECT**.  No Party shall assign or transfer this Agreement in whole or in part, or assign or delegate any of its rights, duties or obligations under this Agreement, in each case without the prior written consent of the other party, and any assignment, transfer or delegation without such consent shall be null and void.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, representatives, successors and permitted assigns.

14.     **WAIVER OF CONFLICTS OF INTEREST**.  Each Party acknowledges that Richard A. Hayes agreed to facilitate the disbursement of funds through the Hayes Client Trust Account to allow the efficient transfer of funds and not as an attorney for any Party.  Each Party hereby waives any conflict that may exist with respect to Richard A. Hayes facilitating the transfer of funds, Richard A. Hayes serving as a Co-Trustee of The Reddy Investment Trust, and Richard A. Hayes being a beneficiary of The Hayes Irrevocable Trust.

*[Signatures Appear in Next Page]*

**THE PARTIES HERETO** have executed this Agreement as of the day and year first above written.

THE REDDY INVESTMENT TRUST

By: _____
Lex Reddy, Trustee

By: _____
Richard A. Hayes, Trustee

THE KRISSMAN FAMILY TRUST

By: _____
Roger A. Krissman, Trustee

THE JEYAKUMAR INTER-VIVOS TRUST

By: _____
Panch Jeyakumar, Trustee

THE SARRAO FAMILY TRUST

By: _____
Michael J. Sarrao, Trustee

_____
Matthew Williams

THE HAYES IRREVOCABLE TRUST

By: _____
Martha M. Hayes, Trustee

_____
Steven Kay

_____
Aman Dhuper

5

## EXHIBIT A
### CAPITAL CONTRIBUTIONS TO ALECTO

| Member | % Interest | Capital Contribution |
| --- | --- | --- |
| The Reddy Investment Trust | 56.00% | $4,728,904.21 |
| The Krissman Family Trust | 10.00% | $844,447.18 |
| The Jeyakumar Inter-Vivos Trust | 7.00% | $591,113.03 |
| The Sarrao Family Trust | 7.00% | $591,113.03 |
| The Hayes Irrevocable Trust | 5.00% | $422,223.59 |
| Matthew Williams | 5.00% | $422,223.59 |
| Steven Kay | 5.00% | $422,223.59 |
| Aman Dhuper | 5.00% | $422,223.59 |
|  | 100.00% | $8,444,471.81 |

EXHIBIT E

## ASSIGNMENT OF MEMBERSHIP INTERESTS
## OF
## SUNRISE MOB HOLDINGS LLC

This Assignment of Membership Interests (this "**Assignment**") is executed and effective as of the opening of business on January 1, 2021 (the "**Effective Date**"), by and between The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams (each a "**Transferor**" and collectively, the "**Transferors**") and Alecto Healthcare Services LLC, a Delaware limited liability company ("**Transferee**").

### RECITALS

A.      The Reddy Investment Trust is a Class A Member of Sunrise MOB Holdings LLC, a Delaware limited liability company (the "**Company**") and owns Seventeen Thousand (17,000) Class A Membership Units of the Company and a Class B Member of the Company and owns Fifty One Thousand (51,000) Class B Units of the Company; The Krissman Family Trust is a Class A Member of the Company and owns Ten Thousand (10,000) Class A Units of the Company, The Sarrao Family Trust is a Class A Member of the Company and owns Seven Thousand (7,000) Class A Units of the Company, The Hayes Irrevocable Trust is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, Steven Kay is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company, and Matthew Williams is a Class A Member of the Company and owns Five Thousand (5,000) Class A Units of the Company. The Class A and Class B Membership Interests owned by The Reddy Investment Trust, The Krissman Family Trust, The Sarrao Family Trust, The Hayes Irrevocable Trust, Steven Kay, and Matthew Williams constitute one hundred percent (100%) of the outstanding and issued Membership Units of the Company and hereinafter shall be referred to herein as the "**Transferred Interests**"

B.      Transferors have agreed to transfer, convey, assign and deliver to Transferee, and Transferee has agreed to accept, the Transferred Interests.

NOW, THEREFORE, in consideration of the mutual agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

### ASSIGNMENT

1.      **Assignment**. Transferors hereby irrevocably transfer, convey, assign and deliver to Transferee the Transferred Interests, together with all of Transferors' right, title, interest and benefit in and to the properties (real and personal), capital, cash flow, distributions, dividends, profits and losses, and all other economic benefits of the Transferred Interests accruing to or distributable with respect to the Transferred Interest and the interests in the Company represented thereby or associated therewith from and after opening of business on January 1, 2021 (the "**Effective Time**").

2.      **Acceptance, Assumption and Acknowledgment**.   Transferee hereby accepts Transferors' assignment of the Transferred Interests pursuant to Section 1 and acknowledges and agrees that it shall continue to be bound by all of the terms and conditions of the Amended and Restated Operating Agreement of the Company, as amended from time to time (the **"Operating Agreement"**).

3.      **Effect of Assignment**.   As of the Effective Time, (a) Transferee shall be the owner of the Transferred Interests in accordance with this Assignment, (b) Transferee shall succeed to the rights and obligations of Transferors in respect of the Transferred Interests and such transfer shall be included in the books and records of the Company to reflect such transfer, and (c) Transferors hereby resign as members of the Company, and shall have no further rights, powers or obligations with respect to the Transferred Interests or otherwise under the Operating Agreement.

4.      **Survival of Indemnification Provisions**.   Notwithstanding the transfer, Transferors' resignation as a member of the Company, or any other provision of this Agreement, the indemnification provisions set forth in Section 7.8 of the Operating Agreement for the benefit of Transferors and other indemnified persons described therein shall survive the transfer of the Transferred Interests.

5.      **Binding Effect**.   This Assignment is binding on and shall inure to the benefit of the signatories hereto and their respective successors and assigns.

6.      **Counterparts**.   This Assignment may be executed (including by facsimile or electronic transmission) in multiple counterparts, each of which shall be deemed an original and all of which taken together shall constitute one instrument binding on all the parties hereto, notwithstanding that all the parties hereto are not signatories to the original or the same counterpart.

[Remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the Effective Date.

**TRANSFERORS**:

**THE REDDY INVESTMENT TRUST**

By: _____
Lex Reddy, Trustee

By: _____
Richard A. Hayes, Trustee

**THE KRISSMAN FAMILY TRUST**

By: _____
Roger Krissman
Trustee

**THE SARRAO FAMILY TRUST**

By: _____
Michael Sarrao, Trustee

**THE HAYES IRREVOCABLE TRUST**

By: _____
Martha M. Hayes, Trustee

**STEVEN KAY**

By: _____
Steven Kay

**MATTHEW WILLIAMS**

By: _____
Matthew Williams

[Signature Page to Assignment of Membership Interests]

**TRANSFEREE**:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____
         Lex Reddy
         President & CEO

# Exhibit 2
# List of Bank Accounts

**Alecto Healthcare Services LLC**

**Lockbox Accounts - Daily Sweeps to CNH Finance**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Deposit Account |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Non-Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0262 | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Government Receivables |

**Alecto Healthcare Services LLC**
**Disbursement Accounts - Receipt of Advances from CNH Finance**
CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Acct | Entity Abrev. | Description of Account |
|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | | 3784 | Alecto | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | | 6065 | Alecto | Operating Acct |
| | | | 6508 | | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | 9152 | WNJ | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | | WNJ MD | |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | | n/a | |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | 7573 | OMC | CMA |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | 2115 | FRMC | |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | | FRMC PHY | |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | 0194 | OVMC | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | | EORH | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | |

**Alecto Healthcare Services LLC**

**Lockbox Accounts - Account # Order**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | n/a | 0262 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7329 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | n/a | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | n/a | 9584 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | | | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | | |

# Alecto Healthcare Services LLC

**Lockbox Accounts - Entity Order**

CNH Cash Flows.xlsx

| Name of Borrower | Bank Name | Entity Ref. | Entity Abrev. | Acct | Acct Type | Description of Account |
|---|---|---|---|---|---|---|
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 3784 | Disbursement | Primary Disbursement Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6065 | Disbursement | Operating Acct |
| Alecto Healthcare Services LLC | City National Bank | 0.0 | Alecto | 6508 | Disbursement | Payroll Acct |
| Alecto Healthcare Services Hayward | City National Bank | 1.0 | Alecto | 7509 | Lockbox | Deposit Account |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 1646 | Other | Payroll Acct |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 4404 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | | 2.1 | WNJ | 4799 | Other | Non-Govt A/P |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 5572 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8191 | Lockbox | Government Receivables |
| Sherman/Grayson Hospital, LLC | Capital One | 2.1 | WNJ | 8205 | Lockbox | Non-Government Receivables |
| Sherman/Grayson Hospital, LLC | Bank of America | 2.1 | WNJ | 9152 | Disbursement | A/P Acct |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 3717 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Bank of America | 2.3 | WNJ MD | 7324 | Lockbox | Non-Government Receivables |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7392 | Other | A/P Acct |
| Sherman MD Provider, Inc. | | 2.3 | WNJ MD | 7343 | Other | Payroll Acct |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8248 | Lockbox | Government Receivables |
| Sherman MD Provider, Inc. | Capital One | 2.3 | WNJ MD | 8264 | Lockbox | Non-Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9202 | Lockbox | Government Receivables |
| Sherman Anesthesia, Inc. | Capital One | 2.4 | n/a | 9210 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 2995 | Lockbox | Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 4538 | Other | Care Credit Acct |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7573 | Disbursement | CMA |
| Olympia Health Care, LLC | Wells Fargo Bank, NA | 3.1 | OMC | 7780 | Lockbox | Non-Government Receivables |
| Olympia Health Care, LLC | | 3.1 | OMC | 7798 | Other | Payroll Acct |
| Olympia Health Care, LLC | | 3.1 | OMC | 9017 | Other | Disbursement A/P Acct |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 2115 | Disbursement | |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4948 | Lockbox | Government Receivables |
| Alecto Healthcare Services Fairmont LLC | Huntington Bank | 5.0 | FRMC | 4951 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5057 | Lockbox | Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | 5073 | Lockbox | Non-Government Receivables |
| FRMC Physicians, Inc. | Huntington Bank | 5.1 | FRMC PHY | | Disbursement | |
| Plaza MOB | | 7.3 | n/a | 2120 | Other | Operating |
| Plaza MOB | | 7.3 | n/a | 2210 | Other | Depository |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0152 | Lockbox | Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0165 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Wheeling LLC | Huntington National Bank | 8.1 | OVMC | 0194 | Disbursement | |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0204 | Lockbox | Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | 0217 | Lockbox | Non-Government Receivables |
| Alecto Healthcare Services Martin's Ferry LLC | Huntington National Bank | 8.2 | EORH | | Disbursement | |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0259 | Lockbox | Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | 0262 | Lockbox | Non-Government Receivables |
| Alecto East Ohio Physicians, Inc. | Huntington National Bank | 8.3 | | | Disbursement | |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | 9280 | Lockbox | Non-Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank., Inc. | 8.4 | | 9584 | Lockbox | Government Receivables |
| Ohio Valley Health Services and Education Corporation | Wesbanco Bank, Inc. | 8.4 | | | Disbursement | |

# Exhibit 3
# Allocation Summary

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784**

### 2019

| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | | Wire In (CNH) (per Bank Stmnts) *less wires <7/8* | Wire Out (per Bank Stmnts) *less wires <7/8* | Net Advances per Bank Statement to Alecto | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Jul | 19,363,308.50 | (18,334,880.31) | | 18,334,880.31 | 17,593,000.00 | 741,880.31 | | | | |
| Aug | 22,723,750.18 | (28,281,600.00) | | 28,281,600.00 | 27,151,000.00 | 1,130,600.00 | | *Alecto Advance vs. Net Advances per Bank Statement* | | |
| Sep | 21,590,109.79 | (17,472,000.00) | | 17,472,000.00 | 18,957,000.00 | (1,485,000.00) | | 945,000.00 | (540,000.00) | |
| Oct | 18,317,818.60 | (16,193,100.00) | | 16,193,100.00 | 15,839,000.00 | 354,100.00 | | OMC | 500,000.00 | 9/26/2019 |
| Nov | 15,074,972.12 | (13,921,500.00) | | 13,921,500.00 | 12,769,000.00 | 1,152,500.00 | | EORH | 40,000.00 | 9/4/2019 |
| Dec | 16,650,340.82 | (16,653,900.00) | | 16,653,900.00 | 15,740,500.00 | 913,400.00 | | | | |
| **Grand Total** | **113,720,300.01** | **(110,856,980.31)** | | **$110,856,980.31** | **$108,049,500.00** | **$2,807,480.31** | | | | |

Lockbox Deposits in Excess of Affiliate Advances:    -    $5,670,800.01

(2,492,901.81) Less Net Transfers To *6065/*6508
$314,578.50 Advances retained by Alecto

### 2020

| Months (Mo) | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | | Wire In (CNH) (per Bank Stmnts) | Wire Out/Bsuite Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto |
|---|---|---|---|---|---|---|
| Jan | 13,294,989.39 | (13,987,400.00) | | 13,987,400.00 | (13,889,262.18) | 98,137.82 |
| Feb | 12,264,749.43 | (10,993,900.00) | | 10,993,900.00 | (9,929,700.00) | 1,064,200.00 |
| Mar | 16,029,431.59 | (14,249,880.00) | | 14,249,880.00 | (11,752,100.00) | 2,497,780.00 |
| Apr | 44,750,504.64 | (30,711,100.00) | | 30,711,100.00 | (16,583,000.00) | 14,128,100.00 |
| May | 7,726,047.19 | (10,507,400.00) | | 10,507,400.00 | (10,393,200.00) | 114,200.00 |
| Jun | 23,550,415.01 | (33,095,551.00) | | 33,095,551.00 | (26,022,901.00) | 7,072,650.00 |
| Jul | 30,619,036.72 | (18,016,600.00) | | 18,016,600.00 | (15,054,500.00) | 2,962,100.00 |
| Aug | 8,251,126.20 | (13,168,000.00) | | 13,168,000.00 | (12,150,000.00) | 1,018,000.00 |
| Sep | 8,335,576.17 | (8,452,300.00) | | 8,452,300.00 | (8,295,000.00) | 157,300.00 |
| Oct | 13,301,780.05 | (11,583,800.00) | | 11,583,800.00 | (10,275,000.00) | 1,308,800.00 |
| Nov | 10,639,712.03 | (14,482,500.00) | | 14,482,500.00 | (11,352,000.00) | 3,130,500.00 |
| Dec | 12,040,041.51 | (10,639,400.00) | | 10,639,400.00 | (17,286,000.00) | (6,646,600.00) |
| **Grand Total** | **200,803,409.93** | **(189,887,831.00)** | | **$189,887,831.00** | **-$162,982,663.18** | **$26,905,167.82** |

Lockbox Deposits in Excess of Affiliate Advances:    -    $37,820,746.75

(13,870,734.38) Less Net Transfers To *6065/*6508
$13,034,433.44 Advances retained by Alecto
(to maintain avg  bank balance at ~$20MM)

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Advances from CNH to Alecto *3784**

### 2021

| Months (Mo) | Values | | Alecto *3784 | | |
| --- | --- | --- | --- | --- | --- |
| | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto |
| Jan | 10,368,948.45 | (10,026,500.00) | 10,026,500.00 | (10,330,500.00) | (304,000.00) |
| Feb | 9,694,104.65 | (7,383,900.00) | 7,383,900.00 | (9,655,000.00) | (2,271,100.00) |
| Mar | 8,939,904.71 | (11,130,900.00) | 11,130,900.00 | (9,925,000.00) | 1,205,900.00 |
| Apr | 5,696,386.02 | (3,254,900.00) | 3,254,900.00 | (4,622,000.00) | (1,367,100.00) |
| May | 4,411,225.44 | (4,003,600.00) | 4,003,600.00 | (4,092,000.00) | (88,400.00) |
| Jun | 4,907,861.76 | (5,091,400.00) | 5,091,400.00 | (4,549,900.00) | 541,500.00 |
| Jul | 4,044,677.94 | (4,086,800.00) | 4,086,800.00 | (3,758,500.00) | 328,300.00 |
| Aug | 3,974,868.59 | (3,867,300.00) | 3,867,300.00 | (7,179,700.00) | (3,312,400.00) |
| Sep | 5,453,242.00 | (5,283,500.00) | 5,283,500.00 | (5,529,100.00) | (245,600.00) |
| Oct | 4,390,949.45 | (3,801,500.00) | 3,801,500.00 | (6,397,000.00) | (2,595,500.00) |
| Nov | 4,341,372.77 | (5,248,800.00) | 5,248,800.00 | (6,134,000.00) | (885,200.00) |
| Dec | 4,136,252.07 | (3,740,300.00) | 3,740,300.00 | (5,562,000.00) | (1,821,700.00) |
| **Grand Total** | **70,359,793.85** | **(66,919,400.00)** | **$66,919,400.00** | **-$77,734,700.00** | **-$10,815,300.00** |

*Alecto Advance vs. Net Advances per Bank Statement*
254,200.00   (631,000.00)
OMC   231,000.00   11/18/2021
OVMC   400,000.00   11/29/2021

Advances in Excess of Affiliate Lockbox Deposits:   -   ($7,374,906.15)

8,114,913.38  Less Net Transfers From *6065/*6508   (1)
($2,700,386.62)  Advances used by Alecto for expenses/Affiliates

(1)  1/1/2021 UCLA Asset Sale proceeds of $23,506,100 deposited in Alecto *6065 and transferred to Alecto *3784

### 2022

| Months (Mo) | Values | | Alecto *3784 | | |
| --- | --- | --- | --- | --- | --- |
| | Affiliate Lockbox Deposits | Advances from CNH to Alecto *3784 | Wire In (CNH) (per Bank Stmnts) | Wire Out (per Bank Stmnts) | Net Advances per Bank Statement to Alecto |
| Jan | 3,648,832.46 | (4,053,000.00) | 4,053,000.00 | (8,305,374.00) | (4,252,374.00) |
| Feb | 4,083,099.59 | (3,804,800.00) | 3,804,800.00 | (6,367,000.00) | (2,562,200.00) |
| Mar | 4,443,269.65 | (3,525,600.00) | 3,525,600.00 | (4,100,000.00) | (574,400.00) |
| Apr | 3,342,283.08 | (4,478,600.00) | 4,478,600.00 | (5,853,000.00) | (1,374,400.00) |
| May | 3,586,838.94 | (4,030,000.00) | 3,465,500.00 | (3,465,000.00) | 500.00 |
| Jun | 4,602,345.47 | (4,189,500.00) | 4,754,200.00 | (4,851,500.00) | (97,300.00) |
| Jul | 3,258,787.49 | (3,542,900.00) | 3,542,900.00 | (4,740,600.00) | (1,197,700.00) |
| Aug | 9,451,140.27 | (5,234,394.11) | 5,107,641.83 | (4,683,150.00) | 424,491.83 |
| Sep | 1,653,063.06 | (1,526,126.78) | 1,653,063.06 | (2,233,902.86) | (580,839.80) |
| **Grand Total** | **38,069,660.01** | **(34,385,120.89)** | **$34,385,304.89** | **-$44,599,526.86** | **-$10,214,221.97** |

*Alecto Advance vs. Net Advances per Bank Statement*
581,023.80   184.00

Advances in Excess of Affiliate Lockbox Deposits:   184.00   -$6,529,866.85
OVERDRAW FOR WNJ   72.00   9/21/2022
OVERDRAFT CLOSE ACCT   112.00   9/30/2022

3,508,678.74  Less Net Transfers From *6065/*6508
($6,705,543.23)  Advances used by Alecto for expenses/Affiliates

# Exhibit 4
# Allocations by Entity

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto \*378**4

### 2019 Lockbox Deposit Sweeps

| Months (Mo) | Values | | | | | Total |
| | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Deposits |
|---|---|---|---|---|---|---|
| Jul | 4,309,043.52 | 7,433,896.73 | 4,487,463.83 | 3,132,754.42 | 150.00 | 19,363,308.50 |
| Aug | 5,124,775.10 | 7,856,299.90 | 4,983,138.17 | 4,438,452.44 | 321,084.57 | 22,723,750.18 |
| Sep | 6,608,391.69 | 7,018,583.11 | 4,458,294.87 | 3,267,731.03 | 237,109.09 | 21,590,109.79 |
| Oct | 4,882,037.95 | 2,774,247.18 | 5,435,350.73 | 4,983,656.25 | 242,526.49 | 18,317,818.60 |
| Nov | 5,140,091.21 | 798,722.81 | 4,599,025.16 | 4,216,639.53 | 320,493.41 | 15,074,972.12 |
| Dec | 5,291,428.49 | 495,337.83 | 5,188,552.07 | 5,395,135.71 | 279,886.72 | 16,650,340.82 |
| **Grand Total** | **31,355,767.96** | **26,377,087.56** | **29,151,824.83** | **25,434,369.38** | **1,401,250.28** | **113,720,300.01** |

### 2019 Advances

| Months (Mo) | Values | | | | | Total |
| | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Advances |
|---|---|---|---|---|---|---|
| Jul | (5,663,000.00) | (5,295,000.00) | (2,395,000.00) | (4,240,000.00) | (741,880.31) | (18,334,880.31) |
| Aug | (8,183,000.00) | (9,110,000.00) | (5,160,000.00) | (4,698,000.00) | (1,130,600.00) | (28,281,600.00) |
| Sep | (6,041,000.00) | (5,746,000.00) | (2,615,000.00) | (4,015,000.00) | 945,000.00 | (17,472,000.00) |
| Oct | (5,022,000.00) | (3,487,000.00) | (3,355,000.00) | (3,975,000.00) | (354,100.00) | (16,193,100.00) |
| Nov | (4,654,000.00) | (1,075,000.00) | (3,395,000.00) | (3,645,000.00) | (1,152,500.00) | (13,921,500.00) |
| Dec | (5,964,000.00) | (474,500.00) | (4,076,000.00) | (5,226,000.00) | (913,400.00) | (16,653,900.00) |
| **Grand Total** | **(35,527,000.00)** | **(25,187,500.00)** | **(20,996,000.00)** | **(25,799,000.00)** | **(3,347,480.31)** | **(110,856,980.31)** |

### 2019 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jul | (1,353,956.48) | 2,138,896.73 | 2,092,463.83 | (1,107,245.58) | | 1,770,158.50 |
| Aug | (3,058,224.90) | (1,253,700.10) | (176,861.83) | (259,547.56) | | (4,748,334.39) |
| Sep | 567,391.69 | 1,272,583.11 | 1,843,294.87 | (747,268.97) | | 2,936,000.70 |
| Oct | (139,962.05) | (712,752.82) | 2,080,350.73 | 1,008,656.25 | | 2,236,292.11 |
| Nov | 486,091.21 | (276,277.19) | 1,204,025.16 | 571,639.53 | | 1,985,478.71 |
| Dec | (672,571.51) | 20,837.83 | 1,112,552.07 | 169,135.71 | | 629,954.10 |
| **Grand Total** | **(4,171,232.04)** | **1,189,587.56** | **8,155,824.83** | **(364,630.62)** | **-** | **4,809,549.73** |

**Alecto Healthcare Services LLC**

**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto *378**4

### 2020 Lockbox Deposit Sweeps

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 5,166,146.93 | 300,221.43 | 4,438,520.13 | 3,134,963.35 | 255,137.55 | 13,294,989.39 |
| Feb | 4,090,888.47 | 189,748.53 | 4,568,259.33 | 3,116,625.04 | 299,228.06 | 12,264,749.43 |
| Mar | 4,962,445.42 | 84,845.34 | 7,281,072.46 | 3,478,068.25 | 223,000.12 | 16,029,431.59 |
| Apr | 17,046,716.00 | 1,245,454.17 | 21,492,726.90 | 4,532,034.55 | 433,573.02 | 44,750,504.64 |
| May | 1,680,218.48 | 251,874.65 | 4,380,980.44 | 416,566.66 | 996,406.96 | 7,726,047.19 |
| Jun | 12,622,210.49 | 115,175.72 | 4,653,709.57 | 5,766,251.01 | 393,068.22 | 23,550,415.01 |
| Jul | 4,576,052.63 | 86,357.53 | 25,413,062.92 | 217,047.56 | 326,516.08 | 30,619,036.72 |
| Aug | 3,151,092.19 | 154,931.50 | 4,632,064.78 | 31,545.16 | 281,492.57 | 8,251,126.20 |
| Sep | 3,638,002.43 | 159,428.62 | 4,231,011.73 | 118,631.96 | 188,501.43 | 8,335,576.17 |
| Oct | 8,313,560.13 | 32,640.62 | 4,698,904.30 | 37,784.18 | 218,890.82 | 13,301,780.05 |
| Nov | 5,825,935.54 | 15,826.13 | 4,495,833.31 | 38,888.29 | 263,228.76 | 10,639,712.03 |
| Dec | 5,711,982.05 | 26,560.82 | 5,340,656.44 | 636,118.39 | 324,723.81 | 12,040,041.51 |
| **Grand Total** | **76,785,250.76** | **2,663,065.06** | **95,626,802.31** | **21,524,524.40** | **4,203,767.40** | **200,803,409.93** |

### 2020 Advances

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (5,744,227.18) | (405,035.00) | (4,510,000.00) | (3,230,000.00) | (98,137.82) | (13,987,400.00) |
| Feb | (3,570,000.00) | (58,700.00) | (3,411,000.00) | (2,890,000.00) | (1,064,200.00) | (10,993,900.00) |
| Mar | (5,021,000.00) | (25,100.00) | (4,170,000.00) | (2,536,000.00) | (2,497,780.00) | (14,249,880.00) |
| Apr | (7,361,000.00) | (5,000.00) | (5,217,000.00) | (4,000,000.00) | (14,128,100.00) | (30,711,100.00) |
| May | (4,880,000.00) | (11,200.00) | (4,257,000.00) | (1,245,000.00) | (114,200.00) | (10,507,400.00) |
| Jun | (6,616,000.00) | (6,250.00) | (17,531,251.00) | (1,869,400.00) | (7,072,650.00) | (33,095,551.00) |
| Jul | (8,950,000.00) | (6,500.00) | (5,953,000.00) | (145,000.00) | (2,962,100.00) | (18,016,600.00) |
| Aug | (5,500,000.00) | - | (6,450,000.00) | (200,000.00) | (1,018,000.00) | (13,168,000.00) |
| Sep | (4,650,000.00) | - | (3,600,000.00) | (45,000.00) | (157,300.00) | (8,452,300.00) |
| Oct | (5,020,000.00) | - | (4,950,000.00) | (305,000.00) | (1,308,800.00) | (11,583,800.00) |
| Nov | (5,171,000.00) | (4,000.00) | (6,000,000.00) | (177,000.00) | (3,130,500.00) | (14,482,500.00) |
| Dec | (5,778,000.00) | (5,000.00) | (11,230,000.00) | (273,000.00) | 6,646,600.00 | (10,639,400.00) |
| **Grand Total** | **(68,261,227.18)** | **(526,785.00)** | **(77,279,251.00)** | **(16,915,400.00)** | **(26,905,167.82)** | **(189,887,831.00)** |

### 2020 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (578,080.25) | (104,813.57) | (71,479.87) | (95,036.65) | | (849,410.34) |
| Feb | 520,888.47 | 131,048.53 | 1,157,259.33 | 226,625.04 | | 2,035,821.37 |
| Mar | (58,554.58) | 59,745.34 | 3,111,072.46 | 942,068.25 | | 4,054,331.47 |
| Apr | 9,685,716.00 | 1,240,454.17 | 16,275,726.90 | 532,034.55 | | 27,733,931.62 |
| May | (3,199,781.52) | 240,674.65 | 123,980.44 | (828,433.34) | | (3,663,559.77) |
| Jun | 6,006,210.49 | 108,925.72 | (12,877,541.43) | 3,896,851.01 | | (2,865,554.21) |
| Jul | (4,373,947.37) | 79,857.53 | 19,460,062.92 | 72,047.56 | | 15,238,020.64 |
| Aug | (2,348,907.81) | 154,931.50 | (1,817,935.22) | (168,454.84) | | (4,180,366.37) |
| Sep | (1,011,997.57) | 159,428.62 | 631,011.73 | 73,631.96 | | (147,925.26) |
| Oct | 3,293,560.13 | 32,640.62 | (251,095.70) | (267,215.82) | | 2,807,889.23 |
| Nov | 654,935.54 | 11,826.13 | (1,504,166.69) | (138,111.71) | | (975,516.73) |
| Dec | (66,017.95) | 21,560.82 | (5,889,343.56) | 363,118.39 | | (5,570,682.30) |
| **Grand Total** | **8,524,023.58** | **2,136,280.06** | **18,347,551.31** | **4,609,124.40** | **-** | **33,616,979.35** |

**Alecto Healthcare Services LLC**

**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto \*3784**

**2021  Lockbox Deposit Sweeps**

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 4,767,903.28 | 19,207.59 | 5,154,121.98 | 36,521.53 | 391,194.07 | 10,368,948.45 |
| Feb | 4,434,551.72 | 26,118.81 | 4,946,294.79 | 26,496.04 | 260,643.29 | 9,694,104.65 |
| Mar | 5,257,109.18 | 17,796.00 | 3,055,330.03 | 332,774.29 | 276,895.21 | 8,939,904.71 |
| Apr | 3,810,031.18 | 15,660.77 | 1,473,382.79 | 18,446.18 | 378,865.10 | 5,696,386.02 |
| May | 3,186,709.34 | 18,587.17 | 841,357.77 | 32,824.86 | 331,746.30 | 4,411,225.44 |
| Jun | 3,467,902.13 | 28,787.49 | 1,196,297.86 | 12,883.14 | 201,991.14 | 4,907,861.76 |
| Jul | 3,327,232.72 | 15,935.01 | 378,473.19 | 46,637.73 | 276,399.29 | 4,044,677.94 |
| Aug | 3,376,505.07 | 17,976.59 | 375,982.36 | 20,713.47 | 183,691.10 | 3,974,868.59 |
| Sep | 3,335,395.23 | 14,412.33 | 203,693.95 | 1,668,959.73 | 230,780.76 | 5,453,242.00 |
| Oct | 3,586,247.64 | 13,291.74 | 610,997.33 | 12,184.40 | 168,228.34 | 4,390,949.45 |
| Nov | 3,846,521.08 | 10,595.84 | 176,178.62 | 3,238.93 | 304,838.30 | 4,341,372.77 |
| Dec | 3,764,875.80 | 6,205.41 | 104,690.94 | 19,364.89 | 241,115.03 | 4,136,252.07 |
| **Grand Total** | **46,160,984.37** | **204,574.75** | **18,516,801.61** | **2,231,045.19** | **3,246,387.93** | **70,359,793.85** |

**2021  Advances**

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (5,200,000.00) | (5,500.00) | (4,850,000.00) | (275,000.00) | 304,000.00 | (10,026,500.00) |
| Feb | (4,345,000.00) | (5,000.00) | (5,100,000.00) | (205,000.00) | 2,271,100.00 | (7,383,900.00) |
| Mar | (5,025,000.00) | (59,000.00) | (4,750,000.00) | (91,000.00) | (1,205,900.00) | (11,130,900.00) |
| Apr | (2,525,000.00) | (12,000.00) | (2,000,000.00) | (85,000.00) | 1,367,100.00 | (3,254,900.00) |
| May | (3,586,000.00) | (5,000.00) | (475,000.00) | (26,000.00) | 88,400.00 | (4,003,600.00) |
| Jun | (4,113,000.00) | (4,900.00) | (350,000.00) | (82,000.00) | (541,500.00) | (5,091,400.00) |
| Jul | (3,040,000.00) | (6,500.00) | (650,000.00) | (62,000.00) | (328,300.00) | (4,086,800.00) |
| Aug | (6,575,000.00) | (8,700.00) | (495,000.00) | (101,000.00) | 3,312,400.00 | (3,867,300.00) |
| Sep | (5,050,000.00) | (53,100.00) | (290,000.00) | (136,000.00) | 245,600.00 | (5,283,500.00) |
| Oct | (5,250,000.00) | (5,000.00) | (601,000.00) | (541,000.00) | 2,595,500.00 | (3,801,500.00) |
| Nov | (5,350,000.00) | (5,000.00) | (100,000.00) | (48,000.00) | 254,200.00 | (5,248,800.00) |
| Dec | (5,150,000.00) | (6,000.00) | (330,000.00) | (76,000.00) | 1,821,700.00 | (3,740,300.00) |
| **Grand Total** | **(55,209,000.00)** | **(175,700.00)** | **(19,991,000.00)** | **(1,728,000.00)** | **10,184,300.00** | **(66,919,400.00)** |

**2021  Total Advance (Over)/Under**

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (432,096.72) | 13,707.59 | 304,121.98 | (238,478.47) | | (352,745.62) |
| Feb | 89,551.72 | 21,118.81 | (153,705.21) | (178,503.96) | | (221,538.64) |
| Mar | 232,109.18 | (41,204.00) | (1,694,669.97) | 241,774.29 | | (1,261,990.50) |
| Apr | 1,285,031.18 | 3,660.77 | (526,617.21) | (66,553.82) | | 695,520.92 |
| May | (399,290.66) | 13,587.17 | 366,357.77 | 6,824.86 | | (12,520.86) |
| Jun | (645,097.87) | 23,887.49 | 846,297.86 | (69,116.86) | | 155,970.62 |
| Jul | 287,232.72 | 9,435.01 | (271,526.81) | (15,362.27) | | 9,778.65 |
| Aug | (3,198,494.93) | 9,276.59 | (119,017.64) | (80,286.53) | | (3,388,522.51) |
| Sep | (1,714,604.77) | (38,687.67) | (86,306.05) | 1,532,959.73 | | (306,638.76) |
| Oct | (1,663,752.36) | 8,291.74 | 9,997.33 | (528,815.60) | | (2,174,278.89) |
| Nov | (1,503,478.92) | 5,595.84 | 76,178.62 | (44,761.07) | | (1,466,465.53) |
| Dec | (1,385,124.20) | 205.41 | (225,309.06) | (56,635.11) | | (1,666,862.96) |
| **Grand Total** | **(9,048,015.63)** | **28,874.75** | **(1,474,198.39)** | **503,045.19** | **-** | **(9,990,294.08)** |

**Alecto Healthcare Services LLC**
**Examination of Lockbox Deposits and Related Allocations from CNH through Alecto \*3784**

### 2022 Lockbox Deposit Sweeps

| Months (Mo) | Sum of WNJ | Sum of OV-EO | Sum of OMC | Sum of FRMC | Sum of AHS | Total Deposits |
|---|---|---|---|---|---|---|
| Jan | 3,165,457.59 | 5,622.07 | 156,450.13 | 3,880.57 | 317,422.10 | 3,648,832.46 |
| Feb | 3,308,890.58 | 5,147.32 | 487,321.75 | 8,276.74 | 273,463.20 | 4,083,099.59 |
| Mar | 4,029,192.13 | 6,706.20 | 37,299.90 | 13,769.47 | 356,301.95 | 4,443,269.65 |
| Apr | 2,763,385.40 | 5,566.61 | 297,102.78 | 8,516.59 | 267,711.70 | 3,342,283.08 |
| May | 3,233,785.82 | 7,131.05 | 12,020.71 | 4,696.01 | 329,205.35 | 3,586,838.94 |
| Jun | 4,031,234.46 | 4,265.31 | 13,257.03 | 11,427.84 | 542,160.77 | 4,602,345.47 |
| Jul | 3,054,433.24 | 10,211.29 | 5,261.20 | 4,072.04 | 184,809.72 | 3,258,787.49 |
| Aug | 9,213,788.56 | 5,508.73 | 7,026.14 | - | 224,816.84 | 9,451,140.27 |
| Sep | 1,650,660.17 | 2,402.89 | - | - | - | 1,653,063.06 |
| **Grand Total** | **34,450,827.95** | **52,561.53** | **1,015,739.64** | **54,639.26** | **2,495,891.63** | **38,069,660.01** |

### 2022 Advances

| Months (Mo) | Sum of WNJ2 | Sum of OV-EO2 | Sum of OMC2 | Sum of FRMC2 | Sum of AHS2 | Total Advances |
|---|---|---|---|---|---|---|
| Jan | (8,056,374.00) | (8,000.00) | (200,000.00) | (41,000.00) | 4,252,374.00 | (4,053,000.00) |
| Feb | (6,230,000.00) | (5,000.00) | (120,000.00) | (12,000.00) | 2,562,200.00 | (3,804,800.00) |
| Mar | (3,997,000.00) | (6,000.00) | (85,000.00) | (12,000.00) | 574,400.00 | (3,525,600.00) |
| Apr | (5,645,000.00) | (5,000.00) | (115,000.00) | (88,000.00) | 1,374,400.00 | (4,478,600.00) |
| May | (3,332,000.00) | (5,000.00) | (85,000.00) | (43,000.00) | (565,200.00) | (4,030,200.00) |
| Jun | (4,820,000.00) | (3,500.00) | (10,000.00) | (18,000.00) | 662,000.00 | (4,189,500.00) |
| Jul | (4,592,000.00) | (2,600.00) | (73,000.00) | (73,000.00) | 1,197,700.00 | (3,542,900.00) |
| Aug | (4,562,500.00) | (5,650.00) | (108,000.00) | (7,000.00) | (551,244.11) | (5,234,394.11) |
| Sep | (2,200,902.86) | - | (30,000.00) | (3,000.00) | 707,776.08 | (1,526,126.78) |
| **Grand Total** | **(43,435,776.86)** | **(40,750.00)** | **(826,000.00)** | **(297,000.00)** | **10,214,405.97** | **(34,385,120.89)** |

### 2022 Total Advance (Over)/Under

| Months (Mo) | WNJ | OV-EO | OMC | FRMC | AHS | Total Advance (Over)/Under |
|---|---|---|---|---|---|---|
| Jan | (4,890,916.41) | (2,377.93) | (43,549.87) | (37,119.43) | | (4,973,963.64) |
| Feb | (2,921,109.42) | 147.32 | 367,321.75 | (3,723.26) | | (2,557,363.61) |
| Mar | 32,192.13 | 706.20 | (47,700.10) | 1,769.47 | | (13,032.30) |
| Apr | (2,881,614.60) | 566.61 | 182,102.78 | (79,483.41) | | (2,778,428.62) |
| May | (98,214.18) | 2,131.05 | (72,979.29) | (38,303.99) | | (207,366.41) |
| Jun | (788,765.54) | 765.37 | 3,257.03 | (6,572.16) | | (791,315.30) |
| Jul | (1,537,566.76) | 7,611.29 | (67,738.80) | (68,927.96) | | (1,666,622.23) |
| Aug | 4,651,288.56 | (141.27) | (100,973.86) | (7,000.00) | | 4,543,173.43 |
| Sep | (550,242.69) | 2,402.89 | (30,000.00) | (3,000.00) | | (580,839.80) |
| **Grand Total** | **(8,984,948.91)** | **11,811.53** | **189,739.64** | **(242,360.74)** | **-** | **(9,025,758.48)** |

# Exhibit 5
# Payment Analysis

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

I. Checks

| Name | Values Count of | Sum of Original |
|---|---|---|
| American Express | 43 | (124,463.54) x |
| Anthem Blue Cross | 10 | (140,695.70) |
| Arent Fox LLP | 1 | (750.00) |
| Arnett Carbis Toothman LLP | 3 | (31,110.20) |
| Bandwidth Simplified | 1 | (125.00) |
| Bank Direct | 4 | (1,226,270.13) |
| BCal 101 North Brand Property, LLC | 1 | (150.52) |
| Berkley Net Underwriters | 4 | (103,073.00) |
| | 4 | (148.98) |
| Brighthouse Life Insurance Company | 4 | (11,376.00) |
| Clark Hill P.L.C. | 2 | (4,042.68) |
| Cogency Global | 2 | (940.00) |
| Cooperative of American Phys Inc. | 7 | (60,915.00) |
| Corporation Service Company | 2 | (2,335.00) |
| Cox Communications | 31 | (43,440.18) |
| CT Corporation | 2 | (1,427.36) |
| Datarooms.com, LLC | 1 | (4,207.50) |
| Delaware Secretary of State | 2 | (9,300.00) |
| Department of Treasury | 8 | (7,711.51) |
| | 2 | (79.18) |
| | 1 | (3,006.57) |
| Fifth Third Bank | 1 | (200.82) |
| Flaherty Sensabaugh Bonasso PLLC | 1 | (83,348.88) |
| Fontis | 2 | (392.84) |
| Franchise Tax Board | 20 | (77,673.77) |
| | 1 | (287.74) |
| Hallett & Perrin P.C. | 1 | (60,341.06) |
| Haubert For Supervisor | 1 | (1,000.00) |
| Holtz Slavett & Drabkin | 3 | (32,405.70) |
| Intralinks, Inc. | 1 | (14,666.68) |
| Iron Mountain | 34 | (4,394.03) |
| Iyer Demirovic Chinchoy LLP | 1 | (4,600.00) |
| Jatheon | 1 | (3,690.00) |
| | 1 | (200.97) |
| | 1 | (1,089.38) |
| Kieckhafer Schiffer LLP | 1 | (9,000.00) |
| King & Spalding | 1 | (5,248.50) |
| Koenig Jacobsen LLP | 13 | (71,568.25) |
| Konica Minolta Premier Finance | 19 | (10,481.90) |
| Kutak Rock LLP | 1 | (1,400.50) |
| Los Angeles County Tax Collector | 1 | (470.42) |
| | 2 | (2,545.66) |
| | 1 | (463.26) |
| Medhost of Tennessee | 1 | (41,481.99) |
| MetLife Ins | 2 | - |
| Michael J. Sarrao | 1 | (22,895.97) x |
| Michael K. Nunley & Associates, Inc. | 1 | (15,100.05) |
| Modern Parking, Inc. | 1 | - |
| | 1 | (549.75) |
| | 1 | (164.07) |
| North American Speciality | 1 | (863.00) |
| NTT America, Inc. | 2 | (86,775.00) |
| Ohio Dept. Of Taxation | 2 | (45,818.17) |
| Ohio Valley Medical | 8 | (6,941.98) |
| Olshan Frome Wolosky | 1 | (52,673.52) |
| One Time Vendor | 8 | (65,940.57) |
| Pacific Global Investment Management Company | 1 | (18,316.80) |
| PaperlessPay, Corp | 1 | (535.00) |
| | 2 | (842.77) |
| Protective Life Insurance Company | 7 | (86,999.38) |
| Roger Krissman | 1 | (27,102.79) x |
| Ruthrauff Service LLC. | 1 | (45,000.00) |
| Shulman Bastian Friedman & Bui LLP | 5 | (38,216.95) |

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

| | | |
|---|---|---|
| Singer Associates Inc. | 1 | (630.00) |
| St. Rose Medical Staff Hosp | 1 | (150.00) |
| ▋ | 1 | (749.51) |
| Steven Kay Esq | 1 | (10,300.00) x |
| ▋ | 2 | (2,038.10) |
| The Kullman Firm | 1 | (1,053.00) |
| U.S. Department of Homeland Security | 4 | (4,210.00) |
| U.S. Department of Labor | 1 | (49,116.76) |
| United States Postal Service | 1 | (681.00) |
| Unlimited Services Bldg Maint | 29 | (8,625.08) |
| ▋ | 1 | (5,000.00) |
| VerityStream | 1 | (25,805.25) |
| ▋ | 1 | (1,029.99) |
| Woodruff-Sawyer & Co. | 3 | (65,553.11) |
| Zurich Services Corporation | 3 | (10,458.00) |
| **Grand Total** | **342** | **(2,902,655.97)** |

**II. Bill Payments/ACH Transfers**

| | Values | |
|---|---|---|
| **Name** | **Count of** | **Sum of Original** |
| AIG Claims Inc | 13 | (1,057,527.04) |
| Aman Dhuper | 10 | (107,272.04) x |
| American Express | 7 | (337,326.03) x |
| Anthem Blue Cross | 19 | (271,375.70) |
| AT&T | 23 | (1,832.40) |
| Bank Direct | 57 | (8,700,227.68) |
| BCal 101 North Brand Property, LLC | 7 | (45,909.42) |
| ▋ | 18 | (5,171.36) |
| ▋ | 5 | (47,536.84) |
| City National Bank | 46 | (200,858.54) |
| Clampett Industries LLC dba EMG | 1 | (14,850.00) |
| Cogency Global | 2 | (2,632.00) |
| Cooperative of American Phys Inc. | 1 | (3,417.00) |
| Corporation Service Company | 4 | (13,456.50) |
| Department of Treasury | 3 | (46,726.78) |
| Dexter Hofing LLC | 1 | (7,000.00) |
| Economists Incorporated | 1 | (9,026.00) |
| Evangeline Douglass | 47 | (168,312.31) |
| Exclusive Modular Installation Inc. | 1 | (14,200.00) |
| First Insurance Funding | 4 | (304,549.44) |
| Franchise Tax Board | 48 | (78,891.10) |
| ▋ | 2 | (660.04) |
| ▋ | 3 | (130,000.00) |
| Gordon & Rees | 1 | (8,535.00) |
| GRM Information Management Services of San Francisco, LLC | 1 | (14,900.69) |
| Hemanth P Mohanadas | 17 | (108,173.78) |
| ▋ | 10 | (31,307.05) |
| Holtz Slavett & Drabkin | 15 | (8,889,593.54) |
| ▋ | 2 | (431.21) |
| ▋ | 41 | (58,549.98) |
| King & Spalding | 1 | (6,935.00) |
| Koenig Jacobsen LLP | 7 | (44,482.18) |
| Konica Minolta Premier Finance | 43 | (22,675.39) |
| Kutak Rock LLP | 1 | (5,545.95) |
| Lex Reddy | 5 | (88,360.74) x |
| ▋ | 2 | (1,131.88) |
| Medhost of Tennessee | 3 | (128,012.39) |
| MedPro | 9 | (818,799.93) |
| Merrill Lynch, Pierce, Fenner & Smith, Inc. | 2 | (105,000.00) |
| MetLife Ins | 27 | (41,302.08) |
| Michael J. Sarrao | 53 | (960,052.31) x |
| Michael K. Nunley & Associates, Inc. | 12 | (71,245.02) |
| Modern Parking, Inc. | 27 | (31,290.00) |
| Moss Adams LLP | 41 | (747,474.76) |
| ▋ | 6 | (2,000.65) |
| Navex Global, Inc. | 3 | (18,085.28) |

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

| | | |
|---|---|---|
| New Horizon Communications | 20 | (19,051.70) |
| ███████████████ | 1 | (1,448.76) |
| NTT America, Inc. | 20 | (289,250.00) |
| Olshan Frome Wolosky | 15 | (803,967.47) |
| Pacific Global Investment Management Company | 1 | (5,724.00) |
| Panch Jeyakumar M.D. | 3 | (3,139.00) |
| ███████████ | 3 | (3,383.86) |
| Protective Life Insurance Company | 2 | (25,916.53) |
| Quadax, Inc. | 1 | (2,200.00) |
| Roger Krissman | 1 | (30,000.00) x |
| ██████████ | 3 | (3,726.10) |
| | 4 | (4,155.51) |
| Shulman Bastian Friedman & Bui LLP | 1 | (15,388.95) |
| Snell & Wilmer | 1 | (13,630.10) |
| Spilman Thomas & Battle | 18 | (1,096,421.19) |
| St. Rose Hospital 1 | 1 | (5,868.95) |
| █████████ | 39 | (95,046.37) |
| Symphony Risk Solutions, LLC | 22 | (1,301,740.67) |
| Tech Guys | 1 | (3,300.00) |
| Unum Life Insurance Company of America | 30 | (108,490.76) |
| VerityStream | 2 | (51,610.51) |
| ████████ | 6 | (15,070.00) |
| Woodruff-Sawyer & Co. | 19 | (1,305,415.48) |
| **Grand Total** | **866** | **(28,976,589.24)** |
| | | |
| **Grand Total Check and Bill Payments (ACH Transfer)** | **1208** | **(31,879,245.21)** |

**Alecto Healthcare Services, LLC**
**Payments by Check/ACH Transfer**

**III. GCS Examination**

**III.A. Checks**

| Name | Values Count | Amount | | GCS Examination Count | Amount |
|------|-------|--------|---|-------|--------|
| American Express | 43 | (124,463.54) | x | 1 | (12,763.60) |
| Michael J. Sarrao | 1 | (22,895.97) | x | 1 | (22,895.97) |
| ███████████ | 1 | (549.75) | | | |
| Roger Krissman | 1 | (27,102.79) | x | 1 | (27,102.79) |
| Steven Kay Esq | 1 | (10,300.00) | x | 1 | (10,300.00) |
| **Grand Total** | **47** | **(185,312.05)** | | **4** | **(73,062.36)** |

**III.B. Bill Payments/ACH Transfers**

| Name | Values Count | Amount | | GCS Review Count | Amount |
|------|-------|--------|---|-------|--------|
| Aman Dhuper | 10 | (107,272.04) | x | 6 | (88,429.47) |
| American Express | 7 | (337,326.03) | x | 6 | (335,846.67) |
| Lex Reddy | 5 | (88,360.74) | x | 1 | (77,000.00) |
| Michael J. Sarrao | 53 | (960,052.31) | x | 22 | (812,424.52) |
| ███████████ | 6 | (2,000.65) | | | |
| Panch Jeyakumar M.D. | 3 | (3,139.00) | | | |
| Roger Krissman | 1 | (30,000.00) | x | 1 | (30,000.00) |
| **Grand Total** | **85** | **(1,528,150.77)** | | **36** | **(1,343,700.66)** |

| Grand Total Check and Bill Payments (ACH/Wire) | 132 | (1,713,462.82) | | 40 | (1,416,763.02) |
|---|---|---|---|---|---|
| | | | | | 83% |

# Exhibit 6
# Insider Payments

**Alecto Healthcare Services, LLC**
**Transfers to Insiders of $10,000 or more (excl. 2018 Promissory Note)**

| Type | Date | Num | Name | Memo | Amount | Count |
|---|---|---|---|---|---|---|
| Bill Payment | 4/11/2023 | ACH PMT | Michael J. Sarrao | Pmt of Forvis Invoice - FRMC Volume Decrease Adjustment preparation & OOS | -41,250.00 | 20 |
| Bill Payment | 1/12/2023 | ACH PMT | Michael J. Sarrao | Dec 2022 - MJS expense reimbursement | -13,826.13 | 19 |
| Bill Payment | 10/5/2022 | ACH PMT | Michael J. Sarrao | OVMC & EORH - Forvis invoices 07/28/2022 FRMC Settlement - Moran v. FRMC | -110,000.00 | 18 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - ST Of WV - Dept. of H&HR letter 07/05/22 | -149,743.00 | 17 |
| Bill Payment | 8/3/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG ▮ 8062 04/21/2022 | -10,000.00 | 16 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | OVMC - DHG ▮ 9695 05/06/22 EORH - DHG ▮ 9698 05/06/22 | -20,000.00 | 15 |
| Bill Payment | 6/9/2022 | ACH PMT | Michael J. Sarrao | May 2022 - MJS expense reimbursement | -12,110.31 | 14 |
| Bill Payment | 12/29/2021 | ACH PMT | Michael J. Sarrao | Flaherty Legal - Christensen v. OVMC - Septic shock | -27,472.14 | 21 |
| Bill Payment | 12/17/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser FS, Moore & Biser 1358, Moore & Biser 1388;  Wright, James R v. OVMC | -35,000.00 | 12 |
| Bill Payment | 12/13/2021 | ACH PMT | Michael J. Sarrao | Moore & Biser - Wright, James R v. OVMC | -91,632.34 | 11 |
| Bill Payment | 10/29/2021 | ACH PMT | Michael J. Sarrao | Kieckhafer Schiffer - OVMC Pension Plan - Inv 624348 10/18/21 | -17,110.01 | 22 |
| Bill Payment | 10/20/2021 | ACH PMT | Michael J. Sarrao | | -11,567.50 | 23 |
| Bill Payment | 10/1/2021 | ACH PMT | Michael J. Sarrao | | -55,736.10 | 10 |
| Bill Payment | 7/22/2021 | ACH PMT | Michael J. Sarrao | Flaherty Sensabaugh Inv 220132 04/19 - OVMC Christensen v. OVMC | -26,458.70 | 13 |
| Bill Payment | 7/1/2021 | ACH PMT | Michael J. Sarrao | | -15,500.00 | 9 |
| Bill Payment | 5/11/2021 | ACH PMT | Michael J. Sarrao | | -13,690.76 | 8 |
| Bill Payment | 1/20/2021 | ACH PMT | Michael J. Sarrao | | -24,608.17 | 7 |
| Bill Payment | 1/6/2021 | ACH PMT | Michael J. Sarrao | | -17,156.78 | 6 |
| Bill Payment | 11/24/2020 | ACH PMT | Michael J. Sarrao | | -17,130.45 | 5 |
| Bill Payment | 11/5/2020 | ACH PMT | Michael J. Sarrao | | -17,016.95 | 4 |
| Bill Payment | 4/14/2020 | ACH PMT | Michael J. Sarrao | | -70,790.89 | 3 |
| Bill Payment | 2/7/2020 | ACH PMT | Michael J. Sarrao | | -14,624.29 | 2 |
| Check | 8/30/2019 | 3163 | Michael J. Sarrao | | -22,895.97 | 1 |
| | | | Michael J. Sarrao | | -835,320.49 | |
| Bill Payment | 1/20/2021 | ACH PMT | Lex Reddy | WF Margin call money advanced, now refunded | -77,000.00 | 1 |
| | | | Lex Reddy See [1] | | -77,000.00 | |
| Bill Payment | 3/31/2022 | ACH PMT | Aman Dhuper | 2021 Year Final bill | -12,388.61 | 1 |
| Bill Payment | 1/19/2022 | ACH PMT | Aman Dhuper | 2020-2021 SRH expense | -11,139.77 | 2 |
| Bill Payment | 6/8/2021 | ACH PMT | Aman Dhuper | Dec 20-Feb 2021, Mar 21 - Apr 2021 | -11,532.01 | 3 |
| Bill Payment | 12/1/2020 | ACH PMT | Aman Dhuper | June - Sept 2020 | -14,717.63 | 4 |
| Bill Payment | 8/5/2020 | ACH PMT | Aman Dhuper | Jan - May 2020, OV-EO & FRMC | -20,318.66 | 5 |
| Bill Payment | 6/17/2020 | ACH PMT | Aman Dhuper | March thru May 2020 | -18,332.79 | 6 |
| | | | Aman Dhuper | | -88,429.47 | |
| Bill Payment | 4/13/2020 | WIRE PMT | American Express | | -150,000.00 | 1 |
| Bill Payment | 3/20/2020 | WIRE PMT | American Express | | -60,000.00 | 2 |
| Bill Payment | 2/10/2020 | WIRE | American Express | | -40,000.00 | 3 |
| Bill Payment | 4/24/2020 | WIRE PMT | American Express | | -35,345.68 | 4 |
| Bill Payment | 6/15/2020 | WIRE PMT | American Express | | -25,500.99 | 5 |
| Bill Payment | 5/13/2020 | WIRE PMT | American Express | | -25,000.00 | 6 |
| Check | 11/2/2021 | 3417 | American Express | | -12,763.60 | 8 |
| | | | American Express | | -348,610.27 | |
| Check | 4/14/2020 | 3235 | Roger Krissman | | -27,102.79 | 1 |
| Bill Payment | 12/22/2020 | ACH PMT | Roger Krissman | | -30,000.00 | 2 |
| | | | Roger Krissman | | -57,102.79 | |
| Check | 4/24/2020 | 3240 | Steven Kay Esq | | -10,300.00 | 1 |
| | | | Steven Kay Esq | | -10,300.00 | |
| | | | | Payments Examined: | -1,416,763.02 | 40 |

[1] See Ex. 6.1 for analysis of payments related to the 2018 Promissory Note.

**Exhibit 7**
**Bank Account**
**Summary Schedules**

# Schedules A.0 – A.3, A.7

**Schedules A.0.1 – A.0.4**
**Alecto Bank Account Summaries**

**Schedule A.0.1 – Account *3784 Disbursement**
**Schedule A.0.2 – Account *3784 (2019 monthly)**
**Schedule A.0.3 – Account *6065 Operating**
**Schedule A.0.4 – Account *6508 Payroll**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 2019 - December 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**I.  Deposits: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| Transaction Type | 7 | 8 | 9 | 10 | 11 | 12 | |
| BANK FEE | | | | | $280 | | $280 |
| TRANSFER FROM | | $900,000 | $715,600 | $252,000 | $418,000 | $185,000 | $2,470,600 |
| WIRE IN | $23,574,880 | $28,281,600 | $17,472,000 | $16,193,100 | $13,921,500 | $16,653,900 | $116,096,980 |
| Grand Total | $23,574,880 | $29,181,600 | $18,187,600 | $16,445,100 | $14,339,780 | $16,838,900 | $118,567,860 |

**I.A.  Transfers received into Acct *3784: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | |
|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| Transaction Type | Acct | 8 | 9 | 10 | 11 | 12 | |
| TRANSFER FROM | 3709 | | $9,400 | $6,000 | | | $15,400 |
| TRANSFER FROM | 6065 | $900,000 | $704,200 | $246,000 | $416,000 | $185,000 | $2,451,200 |
| TRANSFER FROM | 6508 | | $2,000 | | $2,000 | | $4,000 |
| Grand Total | | $900,000 | $715,600 | $252,000 | $418,000 | $185,000 | $2,470,600 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 2019 - December 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**II.  Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **7** | **8** | **9** | **10** | **11** | **12** | |
| ACH FEE | | | | | -$20 | -$20 | -$40 |
| BANK FEE | | | | | -$140 | | -$140 |
| TRANSFER TO | -$879,930 | -$785,962 | -$424,300 | -$657,122 | -$1,275,024 | -$1,090,000 | -$5,112,338 |
| WIRE FEE | -$1,149 | -$1,242 | -$996 | -$1,038 | -$813 | -$1,047 | -$6,285 |
| WIRE OUT | -$22,758,000 | -$27,151,000 | -$18,957,000 | -$15,839,000 | -$12,769,000 | -$15,740,500 | -$113,214,500 |
| **Grand Total** | **-$23,639,079** | **-$27,938,204** | **-$19,382,296** | **-$16,497,160** | **-$14,044,997** | **-$16,831,567** | **-$118,333,303** |

**II.A.  Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| **Transaction Type** | **Acct** | **7** | **8** | **9** | **10** | **11** | **12** | |
| **TRANSFER TO** | 3709 | | | -$9,000 | -$6,000 | | | -$15,000 |
| **TRANSFER TO** | 6065 | -$556,730 | -$401,000 | -$264,000 | -$491,000 | -$943,857 | -$805,000 | -$3,461,587 |
| **TRANSFER TO** | 6508 | -$322,900 | -$384,315 | -$151,300 | -$160,000 | -$331,000 | -$285,000 | -$1,634,515 |
| **TRANSFER TO** | 7067 | -$200 | | | | | | -$200 |
| **TRANSFER TO** | 7509 | -$100 | -$647 | | -$122 | -$167 | | -$1,036 |
| **Grand Total** | | **-$879,930** | **-$785,962** | **-$424,300** | **-$657,122** | **-$1,275,024** | **-$1,090,000** | **-$5,112,338** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis - July 8, 2019 - July 31, 2019**
**Analysis of Transfers under the CNH Revolving Facility**
**Alecto Disbursements Acct *3784**

**II.B. 2019 Transfers under the CNH Revolving Facility (beginning 7/8/2019)**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

2019 Transfers to Alecto *6065/*6508 after 2019 Plaza MOB Refinance  -$4,947,802
2019 Wire Transfers to Affiliates after 2019 Plaza MOB Refinance:  -$108,049,500
**Total Transfers in 2019 "Plaza MOB Gap Period":  -$113,013,538**

| Sum of Amount | | | Yr |
|---|---|---|---|
| | | | **2019** |
| **Transaction Ty** **Acct Transfer To / I** **Date** | | | **7** |
| **TRANSFER T(** | **6065** | 7/12/2019 | -$320,000 |
| **TRANSFER T(** | **6065** | 7/15/2019 | -$56,000 |
| **TRANSFER T(** | **6065** | 7/16/2019 | -$2,000 |
| **TRANSFER T(** | **6065** | 7/19/2019 | -$43,100 |
| **TRANSFER T(** | **6065** | 7/23/2019 | -$5,000 |
| **TRANSFER T(** | **6065** | 7/25/2019 | -$50,000 |
| **TRANSFER T(** | **6065** | 7/26/2019 | -$13,630 |
| **TRANSFER T(** | **6065** | 7/31/2019 | -$6,000 |
| **TRANSFER TO  6065 Total** | | | **-$495,730** |
| **TRANSFER T(** | **6508** | 7/10/2019 | -$85,000 |
| **TRANSFER T(** | **6508** | 7/15/2019 | -$16,900 |
| **TRANSFER T(** | **6508** | 7/18/2019 | -$134,000 |
| **TRANSFER TO  6508 Total** | | | **-$235,900** |
| **TRANSFER TO Total** | | | **-$731,630** |
| **WIRE OUT** | **(blank)** | 7/8/2019 | -$1,050,000 |
| **WIRE OUT** | **(blank)** | 7/9/2019 | -$100,000 |
| **WIRE OUT** | **(blank)** | 7/10/2019 | -$1,985,000 |
| **WIRE OUT** | **(blank)** | 7/11/2019 | -$200,000 |
| **WIRE OUT** | **(blank)** | 7/12/2019 | -$1,450,000 |
| **WIRE OUT** | **(blank)** | 7/15/2019 | -$700,000 |
| **WIRE OUT** | **(blank)** | 7/16/2019 | -$928,000 |
| **WIRE OUT** | **(blank)** | 7/17/2019 | -$335,000 |
| **WIRE OUT** | **(blank)** | 7/18/2019 | -$2,695,000 |
| **WIRE OUT** | **(blank)** | 7/19/2019 | -$1,050,000 |
| **WIRE OUT** | **(blank)** | 7/22/2019 | -$960,000 |
| **WIRE OUT** | **(blank)** | 7/23/2019 | -$510,000 |
| **WIRE OUT** | **(blank)** | 7/24/2019 | -$1,585,000 |
| **WIRE OUT** | **(blank)** | 7/25/2019 | -$705,000 |
| **WIRE OUT** | **(blank)** | 7/26/2019 | -$990,000 |
| **WIRE OUT** | **(blank)** | 7/29/2019 | -$750,000 |
| **WIRE OUT** | **(blank)** | 7/30/2019 | -$1,105,000 |
| **WIRE OUT** | **(blank)** | 7/31/2019 | -$495,000 |
| **WIRE OUT** | **(blank) Total** | | **-$17,593,000** |
| **WIRE OUT Total** | | | **-$17,593,000** |
| **Grand Total** | | | **-$18,324,630** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis: January 2019 - June 2023**
**Alecto Disbursements Acct *3784**

Significant transfers greater than $2.5 million:

| | | | | | |
|---|---|---|---|---|---|
| (1) | 01/19/2021 | $23,506,100 | Account Transfer Cr. FR ACC ███ 6065 | | Proceeds of the UCLA Asset Sale (OMC/Horizon) |
| (2) | 01/20/2021 | ($7,534,870) | Account Transfer Dr. TO ACC ███ 6065 | | Internal Payroll Tax payment |
| (3) | 08/06/2020 | ($2,500,000) | Account Transfer Dr. TO ACC ███ 6065 | | Internal Payroll transfer |

### I.  Deposits: STMNT Processed_3784

| GCS Acct | (Multiple Items) |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | $280 | | | | | $280 |
| DEPOSIT | | | $16,503 | | | $16,503 |
| (1) TRANSFER FROM | $6,748,300 | $836,518 | $23,506,100 | $8,880,111 | $3,562,594 | $43,533,623 |
| WIRE IN | $275,632,620 | $189,887,831 | $66,919,400 | $34,391,109 | | $566,830,960 |
| **Grand Total** | **$282,381,200** | **$190,724,349** | **$90,442,003** | **$43,271,219** | **$3,562,594** | **$610,381,366** |

Wire transfers into account from CNH Revolving Facility greater than $5 million:

| | | | | | |
|---|---|---|---|---|---|
| 04/16/2020 | Incoming Wire-Dom | $13,474,200 various --> | (a) | $13,469,200 | AHS |
| 06/15/2020 | Incoming Wire-Dom | $13,500,000 various --> | (b) | $9,536,600 | AHS |
| 06/25/2020 | Incoming Wire-Dom | $11,579,251 OMC | | | |
| 07/21/2020 | Incoming Wire-Dom | $6,504,300 AHS | (c) | | |

### I.A.  Transfers received into Acct *3784: STMNT Processed_3784

| GCS Acct | 3784 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3709 | | $55,400 | | | | | $55,400 |
| (1) TRANSFER FROM | 6065 | 2018 LOAN | $740,000 | $170,000 | | | | $910,000 |
| TRANSFER FROM | 6065 | | $5,948,900 | $643,018 | $23,506,100 | $8,880,079 | $3,562,572 | $42,540,669 |
| TRANSFER FROM | 6508 | | | $4,000 | $19,100 | | | $23,100 |
| TRANSFER FROM | 7067 | | | $4,400 | | | | $4,400 |
| TRANSFER FROM | 7509 | | | | | $32 | $22 | $54 |
| **Grand Total** | | | **$6,748,300** | **$836,518** | **$23,506,100** | **$8,880,111** | **$3,562,594** | **$43,533,623** |

Note:

(a)  Advance by Alecto to increase bank balance from $670,000 to an average of $14 million through mid-June 2020 during COVID crisis.

(b)  Advance by Alecto to increase bank balance to approximately $20 million through end of 2020 during COVID crisis.

(c)  Balance dropped to $15 million, advance increased average balance to $20 million.

**Alecto Healthcare Services LLC**

**Bank Statement Analysis: January 2019 - June 2023**

**Alecto Disbursements Acct *3784**

**II.  Withdrawals: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH OFFSET W/O | | | | -$1,521,467 | | -$1,521,467 |
| ACH FEE | -$40 | | | | | -$40 |
| BANK FEE | -$140 | -$948 | -$1,967 | -$1,374 | -$218 | -$4,647 |
| (2)(3) TRANSFER TO | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 | -$45,641,061 |
| WIRE FEE | -$13,512 | -$5,121 | -$780 | -$1,035 | | -$20,448 |
| (d) WIRE OUT | -$272,006,065 | -$103,624,663 | -$4,000 | | | -$375,634,728 |
| (d) WIRE OUT BSUITE | | -$59,358,000 | -$77,730,700 | -$47,002,027 | -$3,562,384 | -$187,653,111 |
| Grand Total | -$282,164,359 | -$177,722,585 | -$93,128,634 | -$53,897,303 | -$3,562,622 | -$610,475,501 |

Wire transfers out of account to Affiliates greater than $5 million:

| 06/25/2020 | Tnet Wire Out- | ($11,579,251) OMC |
|---|---|---|

Wire transfers related to the 2019 Olympia Loan:

| 09/26/2019 | Account Transfer Cr. FR ACC ███████6065 | $500,000 |
|---|---|---|
| 09/26/2019 | Tnet Wire Out- *(Incl. in $935,000 transfer w/ $435,000 Advance funding)* | ($500,000) |

**II.A.  Transfers out of Account: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER TO** | 3709 | | -$71,000 | -$25,759 | | | | -$96,759 |
| (2) **TRANSFER TO** | 6065 | 2018 LOAN - $792K COVER | | | -$1,000,000 | | | -$1,000,000 |
| (3) **TRANSFER TO** | 6065 | 2018 LOAN - CALL | | -$336,132 | | | | -$336,132 |
| **TRANSFER TO** | 6065 | | -$7,034,292 | -$13,527,589 | -$13,981,187 | -$4,803,800 | -$20 | -$39,346,887 |
| **TRANSFER TO** | 6508 | | -$3,036,824 | -$839,131 | -$410,000 | -$567,600 | | -$4,853,556 |
| **TRANSFER TO** | 7067 | | -$900 | -$5,016 | | | | -$5,916 |
| **TRANSFER TO** | 7509 | | -$1,586 | -$225 | | | | -$1,811 |
| Grand Total | | | -$10,144,602 | -$14,733,853 | -$15,391,187 | -$5,371,400 | -$20 | -$45,641,061 |

Note:

(d)  Change in transaction description on bank statement, confirmed to be transfers to Affiliates.  See Sections I.B. and I.C.

**Alecto Healthcare Services LLC**
**Bank Statement Analysis: January 2019 - June 2023**
Alecto Disbursements Acct *3784

**I.B.  Monthly Advances from CNH Revolving Facility: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | WIRE IN |
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | |
|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 Grand Total |
| | 1 | $27,836,000 | $13,987,400 | $10,026,500 | $4,053,000 | $55,902,900 |
| | 2 | $24,871,000 | $10,993,900 | $7,383,900 | $3,804,800 | $47,053,600 |
| | 3 | $28,287,000 | $14,249,880 | $11,130,900 | $3,525,600 | $57,193,380 |
| | 4 | $28,965,640 | $30,711,100 | $3,254,900 | $4,478,600 | $67,410,240 |
| | 5 | $26,625,000 | $10,507,400 | $4,003,600 | $3,465,500 | $44,601,500 |
| | 6 | $22,951,000 | $33,095,551 | $5,091,400 | $4,754,200 | $65,892,151 |
| | 7 | $23,574,880 | $18,016,600 | $4,086,800 | $3,542,900 | $49,221,180 |
| | 8 | $28,281,600 | $13,168,000 | $3,867,300 | $5,107,642 | $50,424,542 |
| | 9 | $17,472,000 | $8,452,300 | $5,283,500 | $1,653,063 | $32,860,863 |
| | 10 | $16,193,100 | $11,583,800 | $3,801,500 | $2,745 | $31,581,145 |
| | 11 | $13,921,500 | $14,482,500 | $5,248,800 | $3,059 | $33,655,859 |
| | 12 | $16,653,900 | $10,639,400 | $3,740,300 | | $31,033,600 |
| **Grand Total** | | **$275,632,620** | **$189,887,831** | **$66,919,400** | **$34,391,109** | **$566,830,960** |

**I.C.  Monthly Wire Transfers to Affiliates: STMNT Processed_3784**

| GCS Acct | 3784 |
|---|---|
| Transaction Type | (Multiple Items) |
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Mo | | 2019 | 2020 | 2021 | 2022 | 2023 Grand Total |
| | 1 | -$29,157,500 | -$13,889,262 | -$10,330,500 | -$8,305,374 | -$1,611,734 | -$63,294,370 |
| | 2 | -$23,201,000 | -$9,929,700 | -$9,655,000 | -$6,367,000 | -$485,650 | -$49,638,350 |
| | 3 | -$29,454,427 | -$11,752,100 | -$9,925,000 | -$4,100,000 | -$1,100,000 | -$56,331,527 |
| | 4 | -$28,374,637 | -$16,583,000 | -$4,622,000 | -$5,853,000 | -$290,000 | -$55,722,637 |
| | 5 | -$26,511,000 | -$10,393,200 | -$4,092,000 | -$3,465,000 | -$75,000 | -$44,536,200 |
| | 6 | -$22,093,000 | -$26,022,901 | -$4,549,900 | -$4,851,500 | | -$57,517,301 |
| | 7 | -$22,758,000 | -$15,054,500 | -$3,758,500 | -$4,740,600 | | -$46,311,600 |
| | 8 | -$27,151,000 | -$12,150,000 | -$7,179,700 | -$4,683,150 | | -$51,163,850 |
| | 9 | -$18,957,000 | -$8,295,000 | -$5,529,100 | -$2,233,903 | | -$35,015,003 |
| | 10 | -$15,839,000 | -$10,275,000 | -$6,397,000 | -$794,500 | | -$33,305,500 |
| | 11 | -$12,769,000 | -$11,352,000 | -$6,134,000 | -$433,000 | | -$30,688,000 |
| | 12 | -$15,740,500 | -$17,286,000 | -$5,562,000 | -$1,175,000 | | -$39,763,500 |
| **Grand Total** | | **-$272,006,065** | **-$162,982,663** | **-$77,734,700** | **-$47,002,027** | **-$3,562,384** | **-$563,287,839** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

Significant transfers greater than $2.5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 6/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 6/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| (3) | 1/4/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |
| (4) | 1/19/2021 | ($23,506,100) | Account Transfer Dr. TO ACC ███ 3784 | to Alecto Disbursements Account |
| (5) | 1/20/2021 | $7,534,870 | Account Transfer Cr. FR ACC ███ 3784 | from Alecto Disbursements Account |
| (6) | 1/20/2021 | ($7,534,870) | Bsuite Wire Out-Dom | Payroll Tax payment through Holtz Slavett & Drabkin |

**I. Deposits: STMNT Processed_6065**

| | |
|---|---|
| GCS Acct | 6065 |
| Credit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | | $5 | | | $5 |
| CREDIT MEMO | $80,000 | $74 | | $2,522 | | $82,596 |
| DEPOSIT | $2,422,568 | $277,004 | $2,550,116 | $1,038,848 | $3,319,299 | $9,607,835 |
| FILE INPUT CREDIT | | | | $140 | | $140 |
| INTERCO TRNX IN | $38,963 | $55,624 | | | | $94,587 |
| ST. ROSE INTERCO ALLOC | $293,890 | $505,058 | $124,508 | $244,558 | $251,799 | $1,419,813 |
| TRANSFER FROM | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |
| WIRE IN | $16,546,448 | $1,986,251 | $24,041,002 | $10,766,656 | $4,502,048 | $57,842,405 |
| Grand Total | $27,089,503 | $16,692,732 | $41,326,820 | $17,926,951 | $9,691,052 | $112,727,057 |

(1) (3) — WIRE IN row markers

Wire transfers into account greater than $5 million:

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (3) | 01/04/2021 | $23,506,100 | Incoming Wire-Dom | UCLA Asset Sale Proceeds (OMC/Horizon) |

Transfers into/out of account related to the Plaza MOB Refinancing and 2019 Olympia HC Loan

| | | | | |
|---|---|---|---|---|
| (1) | 06/20/2019 | $8,444,478 | Incoming Wire-Dom | Contribution from Alecto Members (Plaza MOB Refinancing) |
| (2) | 06/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | 2019 Olympia HC Loan |
| | 07/31/2019 | $620,576 | Incoming Wire-Dom | Additional distributions from Plaza MOB Refinancing |
| | 07/31/2019 | ($620,576) | Tnet Wire Out-Dom | Transfer to OMC |
| | 09/26/2019 | ($500,000) | Account Transfer Dr. TO ACC ███ 3784 | To Alecto *3784 then to OMC for 2019 Olympia Loan |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct \*6065**

I.A.  **Transfers received into Acct \*6065: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Credit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3709 | | $6,000 | | | $6 | | $6,006 |
| TRANSFER FROM | 3762 | | | | $30 | | | $30 |
| (5)  TRANSFER FROM | 3784 | 2018 LOAN - $792K COVER | | | $1,000,000 | | | $1,000,000 |
| TRANSFER FROM | 3784 | 2018 LOAN - CALL | | $336,132 | | | | $336,132 |
| TRANSFER FROM | 3784 | | $7,034,292 | $13,527,589 | $13,601,137 | $4,803,800 | $20 | $38,966,837 |
| TRANSFER FROM | 6508 | | | $5,000 | $10,000 | $26,000 | $19,092 | $60,092 |
| TRANSFER FROM | 7509 | | $667,343 | | $22 | $1,044,422 | $1,598,793 | $3,310,580 |
| Grand Total | | | $7,707,634 | $13,868,721 | $14,611,189 | $5,874,228 | $1,617,905 | $43,679,677 |

Direct transfers out of account greater than $5 million:

(5)        01/20/2021    $7,534,870   Account Transfer Cr. FR ACC ▉▉▉ 3784        from Alecto Disbursements Account

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

**II.  Withdrawals: STMNT Processed_6065**

| GCS Acct | 6065 |
| Debit | (Multiple Items) |
| Description | (All) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH | -$52,230 | -$21,771 | | | | -$74,001 |
| ACH FEE | -$1,347 | -$2,841 | -$3,222 | -$2,820 | -$1,604 | -$11,835 |
| BANK FEE | -$1,828 | -$1,491 | -$1,281 | -$1,208 | -$510 | -$6,318 |
| CC PYMNT | | | -$5,000 | | | -$5,000 |
| CHECK | -$4,069,955 | -$551,473 | -$534,767 | -$189,708 | -$121,980 | -$5,467,883 |
| CNB CC PYMNT 71026418 | | -$22,085 | -$118,819 | -$11,562 | -$3,520 | -$155,986 |
| DEBIT MEMO | | | -$62,250 | | | -$62,250 |
| DEPOSIT RETURN ITEM FEE | | -$12 | -$36 | | | -$48 |
| FRANCH TAX | | | -$32,606 | -$38,185 | -$8,100 | -$78,891 |
| IRS TAX OLYMPIA PLAZA MGT | -$2,000 | -$2,000 | | -$36,777 | | -$40,777 |
| RETURN ITEM | | -$5,000 | -$90 | | | -$5,090 |
| (4) TRANSFER TO | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |
| WIRE FEE | | -$834 | -$780 | -$105 | -$315 | -$225 | -$2,259 |
| (2) WIRE OUT | -$15,695,254 | -$5,732,322 | | | | -$21,427,576 |
| (6) WIRE OUT BSUITE | | -$4,669,805 | -$12,047,312 | -$4,445,895 | -$2,130,382 | -$23,293,394 |
| WITHDRAWAL | | -$245,441 | -$516 | -$146,299 | -$482 | -$392,737 |
| Grand Total | -$27,104,381 | -$16,681,985 | -$41,748,786 | -$18,701,073 | -$9,720,048 | -$113,956,274 |

Wire transfers out of account greater than $5 million:

| (2) | 06/20/2019 | ($8,444,478) | Tnet Wire Out-Dom | |
| (6) | 01/20/2021 | ($7,534,858) | Bsuite Wire Out-Dom | Holtz Slavett & Drabkin |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Operating Acct *6065**

**II.A.  Transfers out of Acct *6065: STMNT Processed_6065**

| GCS Acct | 6065 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3709 | | -$29,466 | -$34,672 | -$40,654 | -$488 | | -$105,280 |
| TRANSFER TO | 3762 | | | | -$60 | | | -$60 |
| (4) TRANSFER TO | 3784 | | -$5,948,900 | -$643,018 | -$23,506,100 | -$8,880,079 | -$3,562,572 | -$42,540,669 |
| TRANSFER TO | 3784 | 2018 LOAN | -$740,000 | -$170,000 | | | | -$910,000 |
| TRANSFER TO | 6508 | | -$559,839 | -$4,577,166 | -$5,393,986 | -$4,946,290 | -$3,850,869 | -$19,328,151 |
| TRANSFER TO | 7067 | | -$1,500 | -$329 | -$196 | -$242 | -$66 | -$2,333 |
| TRANSFER TO | 7423 | | | | -$22 | | | -$22 |
| TRANSFER TO | 7509 | | -$1,227 | -$1,779 | -$1,764 | -$1,206 | -$39,738 | -$45,714 |
| Grand Total | | | -$7,280,932 | -$5,426,964 | -$28,942,782 | -$13,828,305 | -$7,453,246 | -$62,932,229 |

Direct transfers out of account greater than $5 million:

(4)         01/19/2021   ($23,506,100)  Account Transfer Dr. TO ACC ▮▮▮▮ 3784   UCLA Asset Sale (OMC/Horizon)

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Payroll Acct *6508**

**I.  Deposits: STMNT Processed_6508**

| GCS Acct | 6508 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| RETURN ITEM | | $51,882 | $4,711 | | | $56,593 |
| TRANSFER FROM | $3,596,663 | $5,416,297 | $5,567,986 | $5,513,890 | $3,876,712 | $23,971,549 |
| **Grand Total** | **$3,596,663** | **$5,468,179** | **$5,572,697** | **$5,513,890** | **$3,876,712** | **$24,028,141** |

**I.A.  Transfers received into Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER FROM | 3784 | $3,036,824 | $839,131 | $310,000 | $567,600 | | $4,753,556 |
| TRANSFER FROM | 6065 | $559,839 | $4,577,166 | $5,257,986 | $4,946,290 | $3,850,869 | $19,192,151 |
| TRANSFER FROM | 7509 | | | | | $25,842 | $25,842 |
| **Grand Total** | | **$3,596,663** | **$5,416,297** | **$5,567,986** | **$5,513,890** | **$3,876,712** | **$23,971,549** |

**II.  Withdrawals: STMNT Processed_6508**

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| (1) 2018 LOAN | -$30,000 | | | | | -$30,000 |
| 2018 LOAN INT | | | -$96,947 | -$12,118 | | -$109,066 |
| ACH | -$186,209 | -$2,563,734 | -$2,695,342 | -$2,883,803 | -$2,755,429 | -$11,084,516 |
| ACH FEE | -$40 | -$24 | -$12 | | | -$76 |
| BANK FEE | | -$185 | | | | -$185 |
| IRS TAX ALECTO | | -$7,950 | | | | -$7,950 |
| P/R RETIREMNT PLN | -$146,700 | -$125,790 | -$84,325 | | | -$356,815 |
| P/R TAX | -$886,745 | -$949,386 | -$896,928 | -$928,859 | -$367,123 | -$4,029,041 |
| PAYROLL | -$2,089,147 | -$1,689,129 | -$1,499,701 | -$1,505,846 | -$637,489 | -$7,421,311 |
| TAX CAL | -$249,973 | -$80,534 | | | | -$330,507 |
| TRANSFER TO | -$4,000 | -$25,700 | -$10,000 | -$26,000 | -$19,092 | -$84,792 |
| WITHDRAWAL | | -$10,364 | -$52,759 | -$157,987 | -$92,003 | -$313,113 |
| **Grand Total** | **-$3,592,814** | **-$5,452,797** | **-$5,336,013** | **-$5,514,613** | **-$3,871,135** | **-$23,767,372** |

(1)  2019: $30,000 loan payment on 2018 Promissory Note to The Reddy Investment Trust
2021-2022: Nine (9) nterest payments of $12,118.

**II.A.  Transfers out of Acct *6508: STMNT Processed_6508**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3709 | | -$1,600 | | | | -$1,600 |
| TRANSFER TO | 3784 | -$4,000 | -$19,100 | | | | -$23,100 |
| TRANSFER TO | 6065 | | -$5,000 | -$10,000 | -$26,000 | -$19,092 | -$60,092 |
| **Grand Total** | | **-$4,000** | **-$25,700** | **-$10,000** | **-$26,000** | **-$19,092** | **-$84,792** |

# Schedule A.1
# Alecto Hayward Bank Account Summary

## Schedule A.1 – Account *7509

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Alecto Hayward Acct *7509**

**I. Deposits: STMNT Processed_7509**

| GCS Acct | 7509 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK FEE | | $25 | | $30 | | $55 |
| ST. ROSE MGMT FEE | $3,213,798 | $3,980,667 | $3,005,273 | $3,540,401 | $1,602,494 | $15,342,633 |
| TRANSFER FROM | $2,813 | $2,004 | $1,764 | $1,206 | $39,738 | $47,525 |
| WIRE IN | $719,737 | $222,937 | | | $450,743 | $1,393,417 |
| Grand Total | $3,936,348 | $4,205,633 | $3,007,037 | $3,541,637 | $2,092,975 | $16,783,631 |

**II. Withdrawals: STMNT Processed_7509**

| GCS Acct | 7509 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH FEE | -$40 | | | | | -$40 |
| BANK FEE | -$1,795 | -$1,751 | -$1,698 | -$1,188 | -$128 | -$6,560 |
| CHECK | | | | | -$47,280 | -$47,280 |
| TRANSFER TO | -$667,343 | | -$22 | -$1,044,476 | -$1,624,702 | -$3,336,542 |
| WIRE FEE | -$30 | -$15 | | | -$30 | -$75 |
| WIRE OUT | | | | | -$411,426 | -$411,426 |
| WIRE OUT REPET | -$3,267,640 | -$4,203,767 | -$3,005,273 | -$2,495,892 | | -$12,972,572 |
| WITHDRAWAL | | | | | -$9,198 | -$9,198 |
| Grand Total | -$3,936,848 | -$4,205,533 | -$3,006,993 | -$3,541,556 | -$2,092,765 | -$16,783,695 |

Note: No single wire transfer transaction greater than $600,000.

**II.A.  Transfers out of account: STMNT Processed_7509**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER TO | 3784 | | | -$32 | -$22 | -$54 |
| TRANSFER TO | 6065 | -$667,343 | -$22 | -$1,044,422 | -$1,598,793 | -$3,310,580 |
| TRANSFER TO | 6508 | | | | -$25,842 | -$25,842 |
| TRANSFER TO | 7067 | | | -$22 | -$44 | -$66 |
| Grand Total | | -$667,343 | -$22 | -$1,044,476 | -$1,624,702 | -$3,336,542 |

Note: No single direct transfer transaction greater than $600,000.

# Schedules A.2.1.1 – A.2.1.5
# Sherman/Grayson Hospital Bank Account Summaries

**Schedule A.2.1.1 – Account *5772**
**Schedule A.2.1.2 – Account *8191**
**Schedule A.2.1.3 – Account *8205**
**Schedule A.2.1.4 – Account *9152**
**Schedule A.2.1.5 – Account *1646**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I.  Deposits: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK ADJ | | $749 | | | | $749 |
| CLAIM DEPOSIT | $1,186,627 | $1,031,913 | $924,280 | $1,727,503 | $532,802 | $5,403,124 |
| COLLECTIONS | $324,119 | $172,525 | $138,342 | | | $634,987 |
| DEPOSIT | $1,203,904 | $731,567 | $527,696 | $4,886,880 | $1,315,625 | $8,665,673 |
| GOVT INS DEPOSIT | $4,841,555 | $2,595,173 | $2,507,420 | $1,559,408 | $878,378 | $12,381,933 |
| LOCKBOX IN | $8,116,149 | $7,846,703 | $6,086,137 | $3,117,211 | $866,286 | $26,032,487 |
| PMT WILSON | $1,050,104 | $11,292,351 | $1,868,226 | $1,006,313 | $433,659 | $15,650,654 |
| SQUARE DEP | $34 | | | | | $34 |
| (1) TRANSFER IN | | | | $5,353,551 | | $5,353,551 |
| UMR | $11,834 | $18,037 | | | | $29,871 |
| WIRE IN | | | | | $450,213 | $450,213 |
| **Grand Total** | **$16,734,327** | **$23,689,018** | **$12,052,102** | **$17,650,866** | **$4,476,963** | **$74,603,275** |

(1)        08/05/2022 ACCOUNT TRANSFER TRSF FROM ██████9152        5,353,551  Acct *9152

**I.A.  Wire transfers into account: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | $7,081 | $7,081 |
| **WIRE IN** | SHERMAN GRAYSON | $412,390 | $412,390 |
| **WIRE IN** | SHERMAN MD PROV | $30,742 | $30,742 |
| **Grand Total** | | **$450,213** | **$450,213** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II.  Withdrawals: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$110 | -$36 | -$2,753 | -$3,576 | -$94 | -$6,570 |
| BANK FEE | -$113,294 | -$106,350 | -$103,367 | -$102,101 | -$40,236 | -$465,348 |
| CHRGBK | -$36,569 | -$18,408 | -$22,083 | -$2,269 | | -$79,329 |
| DEBIT | | -$58 | | | | -$58 |
| PAYMENT | | | | | -$33,141 | -$33,141 |
| TRANSFER OUT | | | | -$3,335,700 | -$4,368,727 | -$7,704,427 |
| WIRE OUT | -$17,055,076 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$66,773,310 |
| Grand Total | -$17,205,049 | -$23,669,272 | -$12,082,363 | -$17,663,299 | -$4,442,198 | -$75,062,182 |

**II.A.  Transfers out of account: STMNT Processed_5772**

| GCS Acct | 5572 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | 1646 | | | | | -$770,136 | -$2,081,398 | -$2,851,533 |
| TRANSFER OUT | 7324 | | | | | | -$32,600 | -$32,600 |
| TRANSFER OUT | 7329 | | | | | | -$32,000 | -$32,000 |
| TRANSFER OUT | 7343 | | | | | -$30,000 | -$209,040 | -$239,040 |
| TRANSFER OUT | 9152 | | | | | -$2,535,564 | -$2,013,690 | -$4,549,254 |
| WIRE OUT | | ALECTO | -$5,574,197 | -$23,544,420 | -$11,954,161 | -$14,219,653 | | -$55,292,431 |
| WIRE OUT | | WHITE OAK | -$11,480,878 | | | | | -$11,480,878 |
| Grand Total | | | -$17,055,076 | -$23,544,420 | -$11,954,161 | -$17,555,353 | -$4,368,727 | -$74,477,737 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_8191**

| GCS Acct | 8191 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH CREDIT | $679 | | | | | $679 |
| (1) TRANSFER IN | | | | | $68,000 | $68,000 |
| HC CLAIM CR | $20,371,879 | $27,551,834 | $11,409,893 | $7,309,797 | $2,566,333 | $69,209,736 |
| Grand Total | $20,372,559 | $27,551,834 | $11,409,893 | $7,309,797 | $2,634,333 | $69,278,415 |

| (1) | 02/27/2023 Book transfer credit FROM ...8205 | | 68,000.00 |
|---|---|---|---|

**II. Withdrawals: STMNT Processed_8191**

| GCS Acct | 8191 |
|---|---|
| Debit | (Multiple Items) |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| Acct *8205 | TRANSFER OUT | -$20,372,559 | -$27,551,834 | -$11,409,893 | -$6,159,797 | -$2,023,538 | -$67,517,621 |
| | WIRE OUT | | | | | -$25,635 | -$25,635 |
| | WIRE TRFR WDRWL | | | | -$1,150,000 | -$585,159 | -$1,735,159 |
| | Grand Total | -$20,372,559 | -$27,551,834 | -$11,409,893 | -$7,309,797 | -$2,634,333 | -$69,278,415 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I.  Deposits: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | ACH CREDIT | $24,611,984 | $20,557,577 | $19,757,600 | $21,343,331 | $8,878,194 | $95,148,686 |
| | DEPOSIT | $12,087 | $6,374 | $18,185 | $371 | | $37,017 |
| Acct* 8191 | FUNDING | $18,702,627 | $27,551,834 | $11,409,893 | $6,159,797 | $1,448,083 | $65,272,234 |
| | LOCKBOX IN | $201,963 | $175,218 | $176,337 | $8,162 | $1,936 | $563,616 |
| | TRANSFER IN | | | | | $921,994 | $921,994 |
| | **Grand Total** | **$43,528,662** | **$48,291,003** | **$31,362,015** | **$27,511,660** | **$11,250,207** | **$161,943,548** |

**I.A.  Transfers received into account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| **TRANSFER IN** | 8191 | $575,455 | $575,455 |
| **TRANSFER IN** | 8248 | $128,786 | $128,786 |
| **TRANSFER IN** | 8264 | $113,676 | $113,676 |
| **TRANSFER IN** | 9202 | $78,865 | $78,865 |
| **TRANSFER IN** | 9210 | $25,211 | $25,211 |
| **TRANSFER IN Total** | | **$921,994** | **$921,994** |
| **Grand Total** | | **$921,994** | **$921,994** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II.  Withdrawals: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | -$74 | | | | -$74 |
| BANK FEE | -$54,601 | -$60,616 | -$58,968 | -$56,576 | -$25,597 | -$256,358 |
| CHRGBK | | -$1,319 | -$10 | -$50 | | -$1,404 |
| PMT WILSON | | | | -$1,908 | | -$1,908 |
| TRANSFER CNH | -$18,375,921 | -$48,410,802 | -$31,312,380 | -$20,509,455 | | -$118,608,557 |
| TRANSFER OUT | -$24,996,412 | | | | -$68,000 | -$25,064,412 |
| WIRE TRFR WDRWL | | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| Grand Total | -$43,428,254 | -$48,471,502 | -$31,371,397 | -$27,483,816 | -$11,140,991 | -$161,895,960 |

**II.A.  Transfers out of account: STMNT Processed_8205**

| GCS Acct | 8205 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | | Yr | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | Acct | 2019 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | ALECTO HEALTHCA | | -$24,996,412 | | | -$24,996,412 |
| TRANSFER OUT | | 8191 | | | -$68,000 | -$68,000 |
| WIRE TRFR WDRW | (blank) | | | -$6,915,852 | -$11,047,394 | -$17,963,246 |
| Grand Total | | | -$24,996,412 | -$6,915,852 | -$11,115,394 | -$43,027,659 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CLAIM DEPOSIT | | $14,234 | | | | $14,234 |
| CREDIT MEMO | | | $500 | | | $500 |
| DEPOSIT | $1,665,630 | $1,638,073 | $1,822,459 | $6,931,887 | $516,686 | $12,574,735 |
| GOVT INS DEPOSIT | | | | $97,313 | $51,359 | $148,672 |
| INS DEPOSIT | | | $953 | $1,739 | | $2,692 |
| LEASOR DEPOSIT | | | | | $453,803 | $453,803 |
| LOAN DEPOSIT | | | $5,953,722 | | | $5,953,722 |
| LOCKBOX IN | | | | | $1,530 | $1,530 |
| PMT WILSON | $69,727 | $4,750 | $6,913 | $6,006 | $2,528 | $89,924 |
| RETURNED CK | $1,348,341 | $266,704 | | | | $1,615,045 |
| SQUARE DEP | $70,472 | $48,977 | $52,607 | $73,065 | $40,529 | $285,651 |
| TRANSFER IN | $268,625 | $375,916 | $427,983 | $2,550,564 | $2,284,165 | $5,907,253 |
| UMR | $2,646 | $23,621 | $452 | | | $26,719 |
| WIRE IN | $73,180,791 | $60,354,957 | $56,566,678 | $51,744,011 | $9,622,949 | $251,469,387 |
| Grand Total | $76,606,232 | $62,727,231 | $64,832,268 | $61,404,585 | $12,973,550 | $278,543,867 |

**I.A. Transfers received into account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER IN | 1646 | $2,000 | $375,916 | $427,983 | | | $805,898 |
| TRANSFER IN | 5572 | | | | $2,535,564 | $1,943,690 | $4,479,254 |
| TRANSFER IN | 7324 | | | | $15,000 | $340,475 | $355,475 |
| TRANSFER IN | 7329 | $89,300 | | | | | $89,300 |
| TRANSFER IN | 7343 | $177,325 | | | | | $177,325 |
| TRANSFER IN Total | | $268,625 | $375,916 | $427,983 | $2,550,564 | $2,284,165 | $5,907,253 |
| Grand Total | | $268,625 | $375,916 | $427,983 | $2,550,564 | $2,284,165 | $5,907,253 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**
(1) "Summarized Debit", no detail

**II.  Withdrawals: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$1 | -$713 | -$19,673 | -$63 | | -$20,449 |
| CHECK | -$385,989 | -$714,468 | -$372,475 | -$283,182 | -$126,888 | -$1,883,002 |
| CHRGBK | -$1,566 | | -$9,036 | | | -$10,602 |
| (1) DEBIT | -$25,476,656 | -$17,437,042 | -$27,045,184 | -$24,485,397 | -$6,560,080 | -$101,004,359 |
| INS PMT | | | -$5,826 | -$28,952 | -$43,910 | -$78,689 |
| PAYMENT | -$25,348 | -$63,963 | -$102,603 | -$48,603 | -$330,438 | -$570,956 |
| PMT WILSON | -$29,580 | -$29,906 | -$22,814 | -$43,165 | -$28,209 | -$153,674 |
| SQUARE DEBIT | $0 | | | | | $0 |
| TAX | -$145,454 | -$116,520 | -$183,000 | -$151 | | -$445,125 |
| TRANSFER OUT | -$33,787,044 | -$23,528,297 | -$22,420,755 | -$24,498,384 | -$2,964,544 | -$107,199,023 |
| UMR | -$5,839,804 | -$1,930,128 | -$500 | | | -$7,770,432 |
| WIRE OUT | -$11,558,808 | -$18,121,158 | -$14,508,799 | -$12,218,516 | -$3,674,334 | -$60,081,616 |
| WIRE OUT - INTL | | | -$6,000 | | | -$6,000 |
| **Grand Total** | **-$77,250,250** | **-$61,951,231** | **-$64,687,629** | **-$61,606,413** | **-$13,728,404** | **$(279,223,926)** |

**II.A.  Transfers out of account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | -$26,695,910 | -$19,781,252 | -$21,168,391 | -$18,062,753 | -$2,839,444 | -$88,547,750 |
| **TRANSFER OUT** | 5572 | | | | -$5,353,551 | | -$5,353,551 |
| **TRANSFER OUT** | 7329 | -$2,192,167 | -$561,323 | -$159,595 | -$109,000 | -$21,100 | -$3,043,184 |
| **TRANSFER OUT** | 7343 | -$4,898,968 | -$3,185,721 | -$1,092,769 | -$973,080 | -$104,000 | -$10,254,537 |
| **Grand Total** | | **-$33,787,044** | **-$23,528,297** | **-$22,420,755** | **-$24,498,384** | **-$2,964,544** | **-$107,199,023** |

**II.B.  Wire Transfers out of account: STMNT Processed_9152**

| GCS Acct | 9152 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Ty | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | MANAGEMENT HEALTH SYSTEM | | | | -$314,206 | -$150,653 | -$464,859 |
| WIRE OUT | ABBOTT LABS | -$600,848 | -$239,833 | -$984,889 | | -$39,011 | -$1,864,581 |
| WIRE OUT | AIRGAS USA, LLC | | -$11,094 | | | | -$11,094 |
| WIRE OUT | ALECTO | -$1,328,000 | | | | -$154,000 | -$1,482,000 |
| WIRE OUT | ALTERA HIGHLAND LLC | | -$576,930 | | | | -$576,930 |
| WIRE OUT | AMERICAN BARCOD | | | -$2,236 | | | -$2,236 |
| WIRE OUT | APEX PROSPERITY BANK | -$2,154,026 | -$1,619,075 | -$640,239 | -$651,865 | -$404,389 | -$5,469,594 |
| WIRE OUT | APPLIED MEDICAL | | | -$2,057 | | | -$2,057 |
| WIRE OUT | ARTHREX INC | | | -$576 | | | -$576 |
| WIRE OUT | ARTHREX INC | | | -$874 | | | -$874 |
| WIRE OUT | BECKMAN COULTER | -$47,999 | -$153,796 | -$9,341 | | | -$211,136 |
| WIRE OUT | BHG HEALTH, LLC | | -$40,000 | | | -$4,000 | -$44,000 |
| WIRE OUT | BRACCO DIAGNOST | | | | | -$2,159 | -$2,159 |
| WIRE OUT | BREEZY HR | | | | -$5,400 | | -$5,400 |
| WIRE OUT | CANON COPIER LEASE | | -$95,936 | | | | -$95,936 |
| WIRE OUT | CARDINAL HEALTH | -$2,181,333 | -$1,775,923 | -$1,671,000 | -$1,310,794 | -$305,000 | -$7,244,050 |
| WIRE OUT | CARDIOVASCULAR | | | | | -$11,548 | -$11,548 |
| WIRE OUT | CROTHALL HC | | -$143,338 | -$75,000 | | | -$218,338 |
| WIRE OUT | CROWN STAPLE | | | -$17,500 | | | -$17,500 |
| WIRE OUT | CURBELL INC | | | -$1,807 | | | -$1,807 |
| WIRE OUT | DAVIS AND JONES | -$22,023 | | | | | -$22,023 |
| WIRE OUT | DELAWARE ADR | | | | -$15,525 | | -$15,525 |
| WIRE OUT | ERBE USA | | | | -$5,118 | | -$5,118 |
| WIRE OUT | FISHER SCIENTIFIC | | | | -$125,000 | | -$125,000 |
| WIRE OUT | FORVIS, LLP ID: | | | | -$69,497 | -$45,370 | -$114,867 |
| WIRE OUT | FRANK A VITELLO SOLE PROP | | | -$332,000 | -$142,000 | | -$474,000 |
| WIRE OUT | FRY CONSTRUCTION | | | -$148,247 | | | -$148,247 |
| WIRE OUT | FS COMM INC | | | -$875 | | | -$875 |
| WIRE OUT | FUTURE HEALTH C | -$20,000 | | | | | -$20,000 |
| WIRE OUT | GETINGE | | | | -$433 | | -$433 |
| WIRE OUT | GRAYSON CTY TREAS | -$1,973,318 | | -$3,058,111 | -$1,019,370 | | -$6,050,799 |
| WIRE OUT | GREENBERG GRANT RICHARDS | | -$176,238 | -$4,222 | | | -$180,461 |
| WIRE OUT | HEALTH CARE LOG | | | -$734 | | | -$734 |
| WIRE OUT | HEARST COMM | | | | -$25,057 | | -$25,057 |
| WIRE OUT | HHS 1 LLC | | -$2,562,500 | -$3,375,000 | -$3,240,000 | -$945,000 | -$10,122,500 |
| WIRE OUT | HNI HEALTHCARE | | -$50,000 | | | | -$50,000 |
| WIRE OUT | HODGES-MACE LLC | | | -$61,611 | | | -$61,611 |
| WIRE OUT | HOSPITAL HOUSEK | | -$25,000 | | | | -$25,000 |
| WIRE OUT | INFINITT NORTH | | -$58,455 | | | | -$58,455 |
| WIRE OUT | JOHNSON & JOHNSON | -$21,186 | -$208,091 | -$263,630 | -$24,400 | | -$517,307 |
| WIRE OUT | JSD MANAGEMENT, | | -$9,015 | | | | -$9,015 |
| WIRE OUT | KUSTOM KOATINGS | | -$24,072 | | | | -$24,072 |
| WIRE OUT | LHP MGT SVCS | | | | -$625,000 | | -$625,000 |
| WIRE OUT | LIFENET HEALTH | -$2,415 | | | | | -$2,415 |
| WIRE OUT | LIFESAVERS PREV | | -$953 | -$35,565 | | | -$36,518 |
| WIRE OUT | LIGHTFLOWER, LT | | -$40,000 | | | | -$40,000 |
| WIRE OUT | LIQUIDATION SOL | | | -$14,038 | | | -$14,038 |
| WIRE OUT | LUMINANT ENERGY | | -$7,154 | | -$75,174 | -$32,475 | -$114,803 |
| WIRE OUT | MASIMO AMERICAS | -$6,495 | | | | | -$6,495 |
| WIRE OUT | MATHIS LEGAL | | -$10,402 | | | | -$10,402 |
| WIRE OUT | MAURICIO MURCIA | | | -$4,500 | | | -$4,500 |
| WIRE OUT | MEDAILLIANCE PTNRS | -$294,799 | -$99,967 | | | | -$394,766 |
| WIRE OUT | MEDELY INC | | | -$344,892 | -$320,501 | | -$665,393 |
| WIRE OUT | MEDLINE IND | -$450,040 | | | -$180,000 | -$515,000 | -$1,145,040 |
| WIRE OUT | MEDTRONIC CA | | | | -$1,483 | | -$1,483 |
| WIRE OUT | MEDTRONIC CASH POOL LLC | | -$12,000 | -$3,476 | -$1,049 | | -$16,525 |
| WIRE OUT | MELLON FNCL BoNY | -$225,003 | -$5,386,728 | -$336,397 | -$50,000 | | -$5,998,128 |
| WIRE OUT | MPT OPERATING PSHIP | | | | -$2,143,492 | -$289,699 | -$2,433,191 |
| WIRE OUT | MUNTERS CORPORA | | | -$3,800 | | | -$3,800 |
| WIRE OUT | MUTUAL OF OMAHA | | | | | -$68,630 | -$68,630 |
| WIRE OUT | MXR IMAGING | | | | -$10,825 | | -$10,825 |
| WIRE OUT | NES SOUTHWEST MED SVC | | | | | -$20,381 | -$20,381 |
| WIRE OUT | NTHRIVE, INC. I | -$22,378 | -$40,000 | | | | -$62,378 |
| WIRE OUT | OM PERFORMANCE | | | | -$4,000 | | -$4,000 |

| Type | Name | | | | | | Total |
|---|---|---|---|---|---|---|---|
| **WIRE OUT** | PEDI CALL CARE | | -$133 | | | | -$133 |
| **WIRE OUT** | PERRY BAROMEDICAL | | | | -$26,387 | | -$26,387 |
| **WIRE OUT** | PPS OPERATING I | | | -$31,305 | | | -$31,305 |
| **WIRE OUT** | PRECISION HC | | | -$183,178 | | | -$183,178 |
| **WIRE OUT** | RAUCH-MILLIKEN | | -$200,000 | | | | -$200,000 |
| **WIRE OUT** | RESTORIX HEALTH | -$347,227 | -$124,531 | | | | -$471,758 |
| **WIRE OUT** | REVINT SOLUTION | | | -$30,000 | | | -$30,000 |
| **WIRE OUT** | RICHMAR CONSULTING | -$104,000 | | | | | -$104,000 |
| **WIRE OUT** | RS FUNDING INC | | -$22,770 | | | | -$22,770 |
| **WIRE OUT** | SAGE SERVICES G | | | -$3,480 | | | -$3,480 |
| **WIRE OUT** | Sanders, Motley, Young Gallardo IOLTA | | -$55,343 | | | | -$55,343 |
| **WIRE OUT** | SCHEEF AND STON | -$12,000 | | | | | -$12,000 |
| **WIRE OUT** | SHARP ELECTRONI | | | -$6,203 | | | -$6,203 |
| **WIRE OUT** | SHERMAN GRAYSON HOSP | | -$1,229 | | | | -$1,229 |
| **WIRE OUT** | SHI INTERNATION | | | | -$1,559 | | -$1,559 |
| **WIRE OUT** | SHULMAN BASTIAN FRIEDMAN | | | | | -$200,000 | -$200,000 |
| **WIRE OUT** | SIEMENS HC | -$9,159 | | -$1,985 | | | -$11,144 |
| **WIRE OUT** | SIESTA SOLUTIONS | -$1,617,556 | -$1,439,092 | -$1,386,583 | -$1,386,583 | -$351,646 | -$6,181,460 |
| **WIRE OUT** | SIGNET HEALTH | | -$328,710 | | | | -$328,710 |
| **WIRE OUT** | SMITHS MEDICAL | | | -$927 | -$778 | | -$1,705 |
| **WIRE OUT** | SPBS, INC | | | | -$5,954 | | -$5,954 |
| **WIRE OUT** | SSD ALARM | | | | -$1,574 | | -$1,574 |
| **WIRE OUT** | ███████ | | | | -$23,547 | | -$23,547 |
| **WIRE OUT** | STRYKER | | -$83,943 | -$460,083 | -$411,947 | -$67,566 | -$1,023,538 |
| **WIRE OUT** | SURGICAL PRODUC | | -$4,036 | | | | -$4,036 |
| **WIRE OUT** | TEAM NORTH TEXAS | | | -$453,869 | | | -$453,869 |
| **WIRE OUT** | TELEFLEX FUNDIN | | | -$3,922 | | | -$3,922 |
| **WIRE OUT** | THE BRANDT COMP | | -$33,200 | | | | -$33,200 |
| **WIRE OUT** | TK ELEVATOR CORP | | | -$403,803 | | | -$403,803 |
| **WIRE OUT** | UHS RECEIVABLES CORP | | -$800,000 | | | | -$800,000 |
| **WIRE OUT** | UMR INC | | -$1,634,946 | -$4,535 | | | -$1,639,481 |
| **WIRE OUT** | US FOODS INC ID | | | | | -$61,757 | -$61,757 |
| **WIRE OUT** | VERATHON, INC I | | -$1,158 | -$1,665 | | | -$2,823 |
| **WIRE OUT** | WAGNER FALCONER AND JUDD | | | -$141,362 | | | -$141,362 |
| **WIRE OUT** | WESTCMR | | | | | -$6,049 | -$6,049 |
| **WIRE OUT** | WORKTERRA | -$22,879 | | | | | -$22,879 |
| **WIRE OUT** | ZIMMER INC | -$96,125 | -$25,571 | -$3,280 | | | -$124,976 |
| **WIRE OUT - I** | POP PMT OF SETTLEMENT | | | -$6,000 | | | -$6,000 |
| **Grand Total** | | -$11,558,808 | -$18,121,158 | -$14,514,799 | -$12,218,516 | -$3,674,334 | -$60,087,616 |

GOULD Consulting Services

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**I. Deposits: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Credit | (All) |
| Debit | (blank) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH CREDIT | | | $31,436 | | | $31,436 |
| ACH RETURNS SETT EXCEPTIONS | $11,271 | $5,440 | $5,975 | $8,547 | $1,689 | $32,923 |
| DEPOSIT | | | | | $28,276 | $28,276 |
| PAYROLL CR | | | $448 | | | $448 |
| TRANSFER IN | $28,413,148 | $20,618,072 | $21,168,391 | $18,832,889 | $5,116,177 | $94,148,677 |
| TRNX REVERSAL | | $541,770 | $9,293 | $1,041 | | $552,104 |
| WIRE IN | | $1,229 | | $2,622,852 | $5,734,601 | $8,358,682 |
| **Grand Total** | **$28,424,419** | **$21,166,511** | **$21,215,544** | **$21,465,329** | **$10,880,743** | **$103,152,545** |

**I.A. Wire transfers into account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2020 | 2022 | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | | $50,000 | $17,800 | $67,800 |
| **WIRE IN** | SHERMAN GRAYSON | $1,229 | $2,572,852 | $5,716,801 | $8,290,882 |
| **Grand Total** | | **$1,229** | **$2,622,852** | **$5,734,601** | **$8,358,682** |

**I.B. Wire transfers into account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER IN** | 5572 | | | | $770,136 | $2,081,398 | $2,851,533 |
| **TRANSFER IN** | 7324 | | | | | $142,943 | $142,943 |
| **TRANSFER IN** | 7329 | $71,119 | | | | $3,637 | $74,756 |
| **TRANSFER IN** | 7343 | $1,646,119 | $836,819 | | | $48,757 | $2,531,695 |
| **TRANSFER IN** | 9152 | $26,695,910 | $19,781,252 | $21,168,391 | $18,062,753 | $2,839,444 | $88,547,750 |
| **Grand Total** | | **$28,413,148** | **$20,618,072** | **$21,168,391** | **$18,832,889** | **$5,116,177** | **$94,148,677** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman/Grayson Hospital**

**II. Withdrawals: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURNS SETT EXCEPTIONS | | -$17,829 | -$1,785 | | | -$19,614 |
| CHECK | -$64,325 | -$55,505 | -$74,496 | -$97,274 | -$28,494 | -$320,094 |
| CHILD SUPP | -$75,531 | -$55,660 | -$25,130 | -$18,095 | -$8,686 | -$183,102 |
| DEBIT | -$70,986 | -$32,433 | -$42,884 | -$30,506 | -$53,832 | -$230,642 |
| PAYMENT | | | -$325,353 | -$623,840 | -$277,750 | -$1,226,943 |
| PAYROLL | -$23,545,348 | -$16,619,022 | -$15,228,281 | -$15,361,145 | -$8,129,460 | -$78,883,256 |
| TAX | -$4,680,701 | -$4,010,415 | -$5,046,475 | -$5,384,149 | -$2,386,049 | -$21,507,788 |
| TRANSFER OUT | -$8,000 | -$378,800 | -$427,983 | | | -$814,783 |
| WIRE OUT | -$1,672 | | | | | -$1,672 |
| **Grand Total** | **-$28,446,563** | **-$21,169,663** | **-$21,172,387** | **-$21,515,009** | **-$10,884,270** | **-$103,187,893** |

**II.A. Transfers out of account: STMNT Processed_1646**

| GCS Acct | 1646 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | Grand Total |
| **TRANSFER OUT** | 7329 | -$6,000 | -$2,093 | | -$8,093 |
| **TRANSFER OUT** | 7343 | | -$792 | | -$792 |
| **TRANSFER OUT** | 9152 | -$2,000 | -$375,916 | -$427,983 | -$805,898 |
| **TRANSFER OUT Total** | | **-$8,000** | **-$378,800** | **-$427,983** | **-$814,783** |
| **Grand Total** | | **-$8,000** | **-$378,800** | **-$427,983** | **-$814,783** |

# Schedules A.2.3.1 – A.2.3.4
# Sherman MD Bank Account Summaries

**Schedule A.2.3.1 – Account *7324**
**Schedule A.2.3.2 – Account *7329**
**Schedule A.2.3.3 – Account *7343**
**Schedule A.2.3.4 – Account *8248**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I.  Deposits: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | $16 | $25 | | | $41 |
| DEPOSIT | $1,381,504 | $752,689 | $189,758 | $256,608 | $146,284 | $2,726,843 |
| GOVT INS | $15,327 | $11,708 | $7,672 | $1,639 | | $36,346 |
| HC CLAIM | $1,147,686 | $788,323 | $336,428 | $272,577 | $120,826 | $2,665,840 |
| INS PMT RCVD | | | | | $3,559 | $6,471 | $10,030 |
| MPS RECON DEPOSIT | $141,852 | $198,340 | $35,727 | $36,830 | $15,344 | $428,094 |
| (1) TRANSFER IN | | | | | $32,600 | $32,600 |
| WIRE IN | | | | $9,500 | $237,072 | $246,572 |
| Grand Total | $2,686,370 | $1,751,075 | $569,610 | $580,713 | $558,598 | $6,146,365 |

**I.A.  Wire transfers received into account: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | |
|---|---|---|---|---|
| Transaction Type | Name | 2022 | 2023 | Grand Total |
| **WIRE IN** | SHERMAN ANESTHE | | $3,000 | $3,000 |
| **WIRE IN** | SHERMAN GRAYSON | | $212,000 | $212,000 |
| **WIRE IN** | SHERMAN MD PROV | $9,500 | $22,072 | $31,572 |
| **Grand Total** | | **$9,500** | **$237,072** | **$246,572** |

(1)    01/04/2023    10,000.00    ██████ 5965 10,000.00 AUTOMATIC TRANSFER CREDITS ██████ 1612 ACCOUNT TRANSFER TRSF FROM ██████ 5572
          03/01/2023    22,600.00    AUTOMATIC TRANSFER CREDITS ██████ 1801 ACCOUNT TRANSFER TRSF FROM

**II.  Withdrawals: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | -$514 | | -$25 | -$102 | | -$640 |
| BANK CHRG | -$45,836 | -$43,067 | -$35,855 | -$26,549 | -$2,978 | -$154,285 |
| CHRGBK | -$1,875 | | -$468 | -$60 | | -$2,403 |
| TRANSFER OUT | | | | -$173,500 | -$536,178 | -$709,678 |
| WIRE OUT | -$2,643,590 | -$1,712,929 | -$538,501 | -$376,725 | -$18,538 | -$5,290,283 |
| Grand Total | -$2,691,814 | -$1,756,463 | -$574,441 | -$576,876 | -$557,694 | -$6,157,288 |

**II.A.  Transfers out of account: STMNT Processed_7324**

| GCS Acct | 7324 |
|---|---|
| Break | DR |

| Sum of Amount | | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction Type | Acct Transfer T | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | | | | | | -$142,943 | -$142,943 |
| **TRANSFER OUT** | 7329 | | | | | -$52,000 | -$34,500 | -$86,500 |
| **TRANSFER OUT** | 7343 | | | | | -$106,500 | -$88,260 | -$194,760 |
| **TRANSFER OUT** | 9152 | | | | | -$15,000 | -$270,475 | -$285,475 |
| **WIRE OUT** | | APEX | | | | | -$18,538 | -$18,538 |
| **WIRE OUT** | | CNH FINANCE | -$1,039,982 | -$1,712,929 | -$538,501 | -$376,725 | | -$3,668,137 |
| **WIRE OUT** | | WHITE OAK HEALT | -$1,603,608 | | | | | -$1,603,608 |
| **Grand Total** | | | -$2,643,590 | -$1,712,929 | -$538,501 | -$550,225 | -$554,715 | -$5,999,961 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I.  Deposits: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | $2,000 | | | | | $2,000 |
| DEPOSIT | $60,852 | $40,125 | $20,249 | $25,244 | $93,203 | $239,673 |
| MERCH FEES | $1 | | | | | $1 |
| TRANSFER IN | $2,198,167 | $791,131 | $164,595 | $161,000 | $87,600 | $3,402,492 |
| WIRE IN | $992,000 | $50,000 | | $25,000 | $170,000 | $1,237,000 |
| CHECK REVRSL | $1,332 | | | | | $1,332 |
| Grand Total | $3,254,352 | $881,256 | $184,844 | $211,244 | $350,803 | $4,882,498 |

**I.A.  Wire transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| WIRE IN | ALECTO HE/ | $992,000 | $50,000 | | | $1,042,000 |
| WIRE IN | SHERMAN GRAYSON | | | | $170,000 | $170,000 |
| WIRE IN | SHERMAN MD PROV | | | $25,000 | | $25,000 |
| Grand Total | | $992,000 | $50,000 | $25,000 | $170,000 | $1,237,000 |

**I.B. Transfers received into account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | CR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct Transf | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER IN | 1646 | $6,000 | $2,093 | | | | $8,093 |
| TRANSFER IN | 5572 | | | | $32,000 | | $32,000 |
| TRANSFER IN | 7324 | | | | $52,000 | $34,500 | $86,500 |
| TRANSFER IN | 7343 | | $75,847 | $5,000 | | | $80,847 |
| TRANSFER IN | 9152 | $2,192,167 | $713,191 | $159,595 | $109,000 | $21,100 | $3,195,052 |
| Grand Total | | $2,198,167 | $791,131 | $164,595 | $161,000 | $87,600 | $3,402,492 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**II.  Withdrawals: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHECK | -$2,174,260 | -$674,322 | -$178,470 | -$166,067 | -$189,825 | -$3,382,943 |
| DEBIT | -$94 | | | | | -$94 |
| MERCH FEES | -$476 | | | | | -$476 |
| PAYMENT | -$26,670 | -$20,799 | -$17,982 | -$17,594 | -$36,138 | -$119,182 |
| TRANSFER OUT | -$1,125,646 | -$7,614 | -$37,848 | | -$35,637 | -$1,206,745 |
| WIRE OUT | -$80,595 | -$123,984 | | -$20,608 | -$100,000 | -$325,187 |
| WITHDRAWAL | -$1,467 | | | | | -$1,467 |
| Grand Total | -$3,409,208 | -$826,719 | -$234,300 | -$204,268 | -$361,599 | -$5,036,094 |

**II.A. Transfers out of account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2023 |
| TRANSFER OUT | 1646 | -$71,119 | | | -$3,637 |
| TRANSFER OUT | 7343 | -$965,227 | -$1,433 | -$37,848 | -$32,000 |
| TRANSFER OUT | 9152 | -$89,300 | -$6,181 | | |
| Grand Total | | -$1,125,646 | -$7,614 | -$37,848 | -$35,637 |

**II.B. Wire transfers out of account: STMNT Processed_7329**

| GCS Acct | 7329 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2022 | 2023 | Grand Total |
| WIRE OUT | APEX | -$77,180 | -$74,902 | -$20,608 | | -$172,690 |
| WIRE OUT | CARDINAL HEALTH | | -$49,082 | | | -$49,082 |
| WIRE OUT | MEDELY INC | | | | -$100,000 | -$100,000 |
| WIRE OUT | QUALITY MED, IN | -$3,415 | | | | -$3,415 |
| WIRE OUT Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |
| Grand Total | | -$80,595 | -$123,984 | -$20,608 | -$100,000 | -$325,187 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I.  Deposits: STMNT Processed_7343**

| GCS Acct | 7343 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| DEPOSIT | $47,076 | | | | | $47,076 |
| EXPERTPAY DEBIT | $0 | | | | | $0 |
| TRANSFER IN | $5,864,195 | $3,740,147 | $1,130,616 | $1,109,580 | $422,540 | $12,267,078 |
| TRANSFER OUT | | | | | $10,760 | $10,760 |
| WIRE IN | | $1,062,227 | | $146,087 | $431,600 | $1,639,914 |
| **Grand Total** | **$5,911,271** | **$4,802,374** | **$1,130,616** | **$1,255,667** | **$864,900** | **$13,964,828** |

**I.A.  Wire transfers received into account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2020 | 2022 | 2023 | Grand Total |
| **WIRE IN** | ALECTO HEALTHCA | $1,062,227 | | | $1,062,227 |
| **WIRE IN** | SHERMAN GRAYSON | | | $356,500 | $356,500 |
| **WIRE IN** | SHERMAN MD PROV | | $146,087 | $75,100 | $221,187 |
| **Grand Total** | | **$1,062,227** | **$146,087** | **$431,600** | **$1,639,914** |

**II.  Withdrawals: STMNT Processed_7343**

| GCS Acct | 7343 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHILD SUPP | -$46,767 | | | | | -$46,767 |
| DEBIT | -$657 | | -$706 | -$191 | -$156 | -$1,710 |
| EXPERTPAY DEBIT | -$6,523 | -$45,646 | | | | -$52,169 |
| PAYROLL | -$2,805,538 | -$2,574,609 | -$781,141 | -$874,144 | -$530,113 | -$7,565,545 |
| TAX | -$1,228,497 | -$1,147,503 | -$357,441 | -$383,317 | -$284,697 | -$3,401,454 |
| TRANSFER OUT | -$1,823,444 | -$955,138 | -$5,000 | | -$48,757 | -$2,832,339 |
| REVERSE WIRE | | -$61,227 | | | | -$61,227 |
| **Grand Total** | **-$5,911,426** | **-$4,784,122** | **-$1,144,288** | **-$1,257,652** | **-$863,723** | **-$13,961,211** |

Alecto Wire (label next to REVERSE WIRE row)

**II.A. Transfers out of account: STMNT Processed_7343**

| Sum of Amount | | Yr | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2023 | Grand Total |
| **TRANSFER OUT** | 1646 | -$1,646,119 | -$836,819 | | -$48,757 | -$2,531,695 |
| **TRANSFER OUT** | 7329 | | -$75,847 | -$5,000 | | -$80,847 |
| **TRANSFER OUT** | 9152 | -$177,325 | -$42,472 | | | -$219,797 |
| **Grand Total** | | **-$1,823,444** | **-$955,138** | **-$5,000** | **-$48,757** | **-$2,832,339** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman MD Provider, Inc.**

**I. Deposits: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $9,323 | $2,008 | $4,036 | $1,325 | $596 | $17,289 |
| DEPOSIT | $194,272 | $527 | $1,330 | $7,034 | $3,261 | $206,424 |
| HC CLAIM | $2,056,623 | $1,669,391 | $653,128 | $503,410 | $221,951 | $5,104,503 |
| (1) TRANSFER IN | | | | | $7,574 | $7,574 |
| **Grand Total** | **$2,260,219** | **$1,671,926** | **$658,494** | **$511,769** | **$233,382** | **$5,335,791** |

| (1) | 06/28/2023 | Book transfer credit FROM ...8264 | 5,396.54 |
|---|---|---|---|
| | 06/28/2023 | Book transfer credit FROM ...9202 | 1,416.04 |
| | 06/28/2023 | Book transfer credit FROM ...9210 | 761.76 |

**II. Withdrawals: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| TRANSFER OUT | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$211,592 | -$5,289,001 |
| (1) WIRE OUT | | | | -$25,000 | -$20,737 | -$45,737 |
| **Grand Total** | **-$2,260,219** | **-$1,671,926** | **-$658,494** | **-$511,769** | **-$232,329** | **-$5,334,738** |

| (1) | 10/06/2022 | Wire transfer withdrawal Sherman MD Provi der Inc 100622 ███9704 | 25,000.00 |
|---|---|---|---|
| | 02/15/2023 | Wire transfer withdrawal Sherman Grayson Hospital L 021523 ███3947 | 2,665.00 |
| | 02/17/2023 | Wire transfer withdrawal Sherman Grayson Hospital L 021723 ███6738 | 5,000.00 |
| | 06/28/2023 | Wire transfer withdrawal Sherman MD  Provi der INC 062823 ███5294 | 13,072.16 |

**II.A. Transfers out of account: STMNT Processed_8248**

| GCS Acct | 8248 |
|---|---|
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Acct | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **TRANSFER OUT** | 8205 | | | | | -$128,786 | -$128,786 |
| **TRANSFER OUT** | 8264 | -$2,260,219 | -$1,671,926 | -$658,494 | -$486,769 | -$82,806 | -$5,160,215 |
| **Grand Total** | | **-$2,260,219** | **-$1,671,926** | **-$658,494** | **-$486,769** | **-$211,592** | **-$5,289,001** |

# Schedule A.2.4
# Sherman Anesthetics Bank Account Summaries

## Schedule A.2.4 – Accounts *9202 and *9210

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

**I.  Deposits: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $733,113 | $486,885 | $300,149 | $324,561 | $129,316 | $1,974,024 |
| DEPOSIT | $8,609 | $14,129 | $3,680 | $2,803 | | $29,221 |
| LOCKBOX DEPOSIT | $149,862 | $62,205 | $38,844 | $41,490 | $7,513 | $299,913 |
| Grand Total | $891,584 | $563,219 | $342,672 | $368,854 | $136,829 | $2,303,158 |

**II.  Withdrawals: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK CHRG | -$36,727 | -$35,593 | -$34,717 | -$31,063 | -$4,034 | -$142,134 |
| CHRGBK | | -$2,028 | | -$186 | | -$2,214 |
| TRANSFER OUT | | | | | -$80,481 | -$80,481 |
| WIRE OUT | -$852,801 | -$528,554 | -$307,931 | -$334,309 | -$55,281 | -$2,078,875 |
| Grand Total | -$891,556 | -$564,147 | -$342,648 | -$365,558 | -$139,797 | -$2,303,705 |

**II.A.  Wire transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | SHERMAN ANESTH | -$852,801 | -$528,554 | -$307,931 | -$320,209 | | -$2,009,494 |
| WIRE OUT | SHERMAN GRAYSON | | | | -$14,100 | -$55,281 | -$69,381 |
| WIRE OUT Total | | -$852,801 | -$528,554 | -$307,931 | -$334,309 | -$55,281 | -$2,078,875 |
| Grand Total | | -$852,801 | -$528,554 | -$307,931 | -$334,309 | -$55,281 | -$2,078,875 |

**II.B.  Transfers out of account: STMNT Processed_9202**

| GCS Acct | 9202 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| TRANSFER OUT | 8205 | -$78,865 | -$78,865 |
| TRANSFER OUT | 8248 | -$1,416 | -$1,416 |
| TRANSFER OUT | 9210 | -$200 | -$200 |
| TRANSFER OUT Total | | -$80,481 | -$80,481 |
| Grand Total | | -$80,481 | -$80,481 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Sherman Anesthetics, Inc.**

**I. Deposits: STMNT Processed_9210**

| GCS Acct | 9210 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $97,694 | $69,326 | $61,556 | $84,878 | $30,881 | $344,335 |
| DEPOSIT | $902,434 | $540,219 | $315,488 | $320,537 | $66 | $2,078,743 |
| LOCKBOX DEPOSIT | | | | $448 | $7,130 | $7,578 |
| TRANSFER IN | | | | | $200 | $200 |
| **Grand Total** | **$1,000,128** | **$609,544** | **$377,044** | **$405,863** | **$38,276** | **$2,430,855** |

**II. Withdrawals: STMNT Processed_9210**

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | | | | | -$556 | -$556 |
| ACH WITHDRAWAL | -$4,796 | -$4,286 | -$4,172 | -$5,025 | -$1,256 | -$19,534 |
| ADJ | | | | | -$417 | -$417 |
| TRANSFER OUT | | | | | -$25,973 | -$25,973 |
| WIRE OUT | -$996,030 | -$605,396 | -$372,939 | -$402,626 | -$10,100 | -$2,387,091 |
| **Grand Total** | **-$1,000,826** | **-$609,682** | **-$377,112** | **-$407,650** | **-$38,302** | **-$2,433,571** |

**II.A. Wire transfers out of account: STMNT Processed_9210**

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| **WIRE OUT** | CNH FINANCE | -$400,809 | -$605,396 | -$372,939 | -$305,626 | | -$1,684,770 |
| **WIRE OUT** | SHERMAN GRAYSON | | | | -$97,000 | -$10,100 | -$107,100 |
| **WIRE OUT** | WHITE OAK | -$595,221 | | | | | -$595,221 |
| **WIRE OUT Total** | | **-$996,030** | **-$605,396** | **-$372,939** | **-$402,626** | **-$10,100** | **-$2,387,091** |
| **Grand Total** | | **-$996,030** | **-$605,396** | **-$372,939** | **-$402,626** | **-$10,100** | **-$2,387,091** |

**II.B. Transfers out of account: STMNT Processed_9210**

| GCS Acct | 9210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Acct | 2023 | Grand Total |
| **TRANSFER OUT** | 8205 | -$25,211 | -$25,211 |
| **TRANSFER OUT** | 8248 | -$762 | -$762 |
| **TRANSFER OUT Total** | | **-$25,973** | **-$25,973** |
| **Grand Total** | | **-$25,973** | **-$25,973** |

# Schedules A.3.1.1 – A.3.1.4
# Olympia HC Bank Account Statement Summaries

**Schedule A.3.1.1 – Account *7573**
**Schedule A.3.1.2 – Account *7780**
**Schedule A.3.1.3 – Account *7798**
**Schedule A.3.1.4 – Account *9017**

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | | | $5,225 | | | $5,225 |
| ADJ | $192 | | $176 | | | $368 |
| COVER 401K CONTRIB | | | | | $5,547 | $5,547 |
| DEPOSIT | $6,743,475 | $3,093,074 | $2,050,042 | $180,566 | $34,632 | $12,101,788 |
| MERCH DEPOSIT | $3,216,164 | $3,319,355 | $1,282,645 | $17,906 | $78 | $7,836,149 |
| WIRE IN | $60,464,280 | $78,299,121 | $22,003,042 | $1,336,111 | $204,906 | $162,307,459 |
| Acct *2995 ZBA FUNDING IN | $516,779 | $90,474 | | | | $607,252 |
| Grand Total | $70,940,889 | $84,802,024 | $25,341,130 | $1,534,583 | $245,163 | $182,863,788 |

**I.A. Wire transfers received into account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | Alecto Healthcare | $48,418,000 | $45,049,251 | | $15,000 | | $93,482,251 |
| WIRE IN | CNB Alecto Healthcare | $11,756,280 | $32,230,000 | $20,312,000 | $611,000 | | $64,909,280 |
| WIRE IN | Deanco Healthcare | | | $524,520 | | | $524,520 |
| WIRE IN | Global Financia | | | $54,465 | | | $54,465 |
| WIRE IN | Key Health Medical | | $127,662 | $77,655 | | | $205,317 |
| WIRE IN | Medical Debt Resolution | | | $247,302 | | | $247,302 |
| WIRE IN | Medlegal Solutions | | $767,208 | $772,427 | | | $1,539,635 |
| WIRE IN | Olympia Health | | | | $41,237 | $16,500 | $57,737 |
| WIRE IN | Plaza MOB | $290,000 | $125,000 | $14,673 | $668,874 | $188,406 | $1,286,953 |
| Grand Total | | $60,464,280 | $78,299,121 | $22,003,042 | $1,336,111 | $204,906 | $162,307,459 |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.  Withdrawals: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| | ADJ | | | -$30 | | | -$30 |
| | B TO B ACH DEBIT | | -$11,579,251 | | | | -$11,579,251 |
| | CASH OUT | -$21,406 | -$27,469 | -$4,890 | | | -$53,765 |
| Acct *2995 | DEPOSIT UNPAID | -$282 | -$965 | -$105,955 | -$45 | | -$107,247 |
| | LEGAL ORDER | -$1,046 | | -$38,072 | | | -$39,119 |
| | MERCH DEPOSIT | -$109,984 | -$108,062 | -$55,047 | -$2,025 | | -$275,118 |
| | MERCH FEES | | | | -$79 | -$651 | -$730 |
| | PAYMENT | -$252 | -$385 | -$29 | | | -$666 |
| | TRANSFER OUT | -$66,018,487 | -$69,376,984 | -$28,671,761 | -$1,051,814 | -$282,755 | -$165,401,801 |
| | WIRE OUT | -$4,811,770 | -$109,032 | -$390,188 | -$492,221 | -$1,000 | -$5,804,210 |
| | **Grand Total** | **-$70,963,227** | **-$81,202,147** | **-$29,265,972** | **-$1,546,184** | **-$284,406** | **$  (183,261,936)** |

**II.A. Wire transfers out of account: STMNT Processed_7573**

| GCS Acct | 7573 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Transaction Type** | **Acct** | **2019** | **2020** | **2021** | **2022** | **2023** | **Grand Total** |
| | **TRANSFER OUT** | 4538 | -$239 | -$40 | | | | -$279 |
| | **TRANSFER OUT** | 7798 | -$34,954,436 | -$35,951,443 | -$14,769,303 | -$41,377 | -$5,547 | -$85,722,106 |
| | **TRANSFER OUT** | 9017 | -$31,063,811 | -$33,425,501 | -$13,902,458 | -$1,010,437 | -$277,208 | -$79,679,416 |
| | **Grand Total** | | **-$66,018,487** | **-$69,376,984** | **-$28,671,761** | **-$1,051,814** | **-$282,755** | **$  (165,401,801)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.B. Wire transfers out of account: STMNT Processed_7573**

| GCS Acct | 7573 |
|----------|------|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Typ | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | Aitken Aitken and Cohn | | | | -$447,708 | | -$447,708 |
| WIRE OUT | Alecto Healthca | -$1,000,000 | | -$35,000 | | | -$1,035,000 |
| WIRE OUT | Anthem Blue Cro | | | -$11,138 | | | -$11,138 |
| WIRE OUT | Global Financia | | | -$51,275 | | | -$51,275 |
| WIRE OUT | Medical Debt Re | | | -$20,015 | | | -$20,015 |
| WIRE OUT | Meditech | | | -$2,850 | | | -$2,850 |
| WIRE OUT | Medline Industr | -$543,498 | | | | | -$543,498 |
| WIRE OUT | Mpt Development | -$2,817,747 | | | | | -$2,817,747 |
| WIRE OUT | Ntt Data Servic | | | -$223,415 | | | -$223,415 |
| WIRE OUT | Olympia Health | | | | -$5,164 | -$1,000 | -$6,164 |
| WIRE OUT | Olympia Lockbox | | | | -$3,199 | | -$3,199 |
| WIRE OUT | Plaza MOB | -$245,000 | | | -$35,560 | | -$280,560 |
| WIRE OUT | United Physicia | -$205,525 | -$109,032 | -$46,495 | | | -$361,052 |
| WIRE OUT | Wells Fargo | | | | -$590 | | -$590 |
| **WIRE OUT Total** | | **-$4,811,770** | **-$109,032** | **-$390,188** | **-$492,221** | **-$1,000** | **-$5,804,210** |
| **Grand Total** | | **-$4,811,770** | **-$109,032** | **-$390,188** | **-$492,221** | **-$1,000** | **$ (5,804,210)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_7780**

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT | $22,033 | $1,546 | $2,497 | | | $26,076 |
| CARES ACT STIMULUS | | $7,989,883 | | | | $7,989,883 |
| CLAIM DEPOSIT | $21,881,113 | $20,873,936 | $9,815,507 | $1,881,642 | | $54,452,199 |
| DEPOSIT | $1,522,971 | $920,380 | $903,184 | $104,359 | | $3,450,894 |
| GOVT INS | $214,244 | $95,097 | $1,360 | $59 | | $310,761 |
| LOCKBOX IN | $13,592,769 | $9,608,488 | $3,503,139 | $64,975 | $3,078 | $26,772,449 |
| WIRE IN | $869,262 | $782,700 | $514,901 | $85,100 | $18,131 | $2,270,093 |
| ZBA FUNDING IN | $30,754,690 | $55,305,520 | $3,397,966 | | | $89,458,176 |
| **Grand Total** | **$68,857,082** | **$95,577,550** | **$18,138,555** | **$2,136,135** | **$21,209** | **$184,730,530** |

Acct *2995 (row label for ZBA FUNDING IN)

**I.A. Wire transfers received into account: STMNT Processed_7780**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | California Business Bureau | $869,262 | $782,700 | $514,901 | $76,146 | $17,131 | $2,260,140 |
| WIRE IN | Olympia Health | | | | $8,954 | $1,000 | $9,954 |
| **Grand Total** | | | **$869,262** | **$782,700** | **$514,901** | **$85,100** | **$18,131** | **$2,270,093** |

**II. Withdrawals: STMNT Processed_7780**

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| BANK CHRG | -$21,825 | -$21,232 | -$15,862 | -$7,690 | -$1,551 | -$68,160 |
| CASH OUT | | -$570 | | | | -$570 |
| DEPOSIT UNPAID | -$26,425 | -$14,271 | -$20,000 | -$82 | | -$60,779 |
| TRANSFER OUT | | -$792 | -$11,738 | -$10,345 | -$3,687 | -$26,562 |
| WIRE OUT | -$68,508,763 | -$95,626,802 | -$18,516,802 | -$2,119,220 | -$16,500 | -$184,788,086 |
| **Grand Total** | **-$68,557,013** | **-$95,663,668** | **-$18,564,402** | **-$2,137,336** | **-$21,738** | **-$184,944,157** |

Acct *2995 (row label for TRANSFER OUT)

**II. Wire Transfers out of account: STMNT Processed_7780**

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | CNH Finance Fund | -$26,590,799 | -$95,626,802 | -$18,516,802 | -$1,008,714 | | -$141,743,116 |
| WIRE OUT | Ecapital Healthcare | | | | -$7,026 | | -$7,026 |
| WIRE OUT | Olympia Health | | | | | -$5,000 | -$5,000 |
| WIRE OUT | OMC CMA Acct | | | | -$41,237 | -$11,500 | -$52,737 |
| WIRE OUT | Plaza MOB | | | | -$1,062,243 | | -$1,062,243 |
| WIRE OUT | WO HEALTHCO | -$41,917,964 | | | | | -$41,917,964 |
| **WIRE OUT Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **-$184,788,086** |
| **Grand Total** | | **-$68,508,763** | **-$95,626,802** | **-$18,516,802** | **-$2,119,220** | **-$16,500** | **$ (184,788,086)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH ADJ | $1,760 | $2,593 | | | | $4,353 |
| PAYROLL | | $1,727 | | | | $1,727 |
| RETURNED CK | $9,482 | $14,726 | | | | $24,208 |
| TAX | $382,352 | | | | | $382,352 |
| Acct *2995 ZBA BAL TRNSFR IN | $34,954,436 | $35,951,443 | $14,769,303 | $45,203 | $5,547 | $85,725,932 |
| **Grand Total** | **$35,348,030** | **$35,970,489** | **$14,769,303** | **$45,203** | **$5,547** | **$86,138,572** |

**II. Withdrawals: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH BATCH OUT | -$24,594,140 | -$24,494,213 | -$5,768,278 | -$1,633 | | -$54,858,263 |
| B TO B ACH DEBIT | | | -$1,977,577 | -$791 | -$5,547 | -$1,983,915 |
| CHECK | -$1,844,243 | -$1,609,656 | -$1,514,667 | -$818 | | -$4,969,384 |
| Acct *2995 LEGAL ORDER | -$558,985 | | | | | -$558,985 |
| PAYMENT | | | -$286,820 | | | -$286,820 |
| PAYROLL | -$1,648,646 | -$1,588,811 | -$585,160 | | | -$3,822,617 |
| TAX | -$6,323,488 | -$8,277,810 | -$4,276,117 | -$41,961 | | -$18,919,376 |
| Acct *7573 TRANSFER OUT | -$315,084 | | | | | -$315,084 |
| WIRE OUT | -$63,445 | | -$360,684 | | | -$424,129 |
| **Grand Total** | **-$35,348,030** | **-$35,970,489** | **-$14,769,303** | **-$45,203** | **-$5,547** | **-$86,138,572** |

**II.A. Wire transfers out of account: STMNT Processed_7798**

| GCS Acct | 7798 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2019 | 2021 |
| **WIRE OUT** | ▮ | -$3,640 | |
| **WIRE OUT** | ▮ | -$2,816 | |
| **WIRE OUT** | ▮ | -$2,105 | |
| **WIRE OUT** | ▮ | -$2,929 | |
| **WIRE OUT** | Dcg&T AS Truste | | -$360,684 |
| **WIRE OUT** | ▮ | -$3,025 | |
| **WIRE OUT** | ▮ | -$2,771 | |
| **WIRE OUT** | ▮ | -$1,982 | |
| **WIRE OUT** | ▮ | -$3,551 | |
| **WIRE OUT** | ▮ | -$2,756 | |
| **WIRE OUT** | Matthew William | -$6,197 | |
| **WIRE OUT** | ▮ | -$3,522 | |
| **WIRE OUT** | ▮ | -$3,001 | |
| **WIRE OUT** | ▮ | -$3,805 | |
| **WIRE OUT** | ▮ | -$3,063 | |
| **WIRE OUT** | ▮ | -$2,373 | |
| **WIRE OUT** | ▮ | -$3,142 | |
| **WIRE OUT** | ▮ | -$3,009 | |
| **WIRE OUT** | ▮ | -$4,562 | |
| **WIRE OUT** | ▮ | -$3,178 | |
| **WIRE OUT** | ▮ | -$2,020 | |
| **WIRE OUT Total** | | **-$63,445** | **-$360,684** |
| **Grand Total** | | **-$63,445** | **-$360,684** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Credit | (All) |
| Break | CR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| | CHRGBK | | $5,200 | | | | $5,200 |
| | NSF CHRGBK | $527,183 | | | | | $527,183 |
| | RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| | TAX | $5,895 | | $349 | | | $6,243 |
| Acct *7573 | ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| | **Grand Total** | **$31,614,099** | **$33,734,298** | **$13,979,387** | **$1,274,717** | **$277,312** | **$80,879,811** |

**II. Withdrawals: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| | Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| | ACH RETURN | -$1,892 | | | | | -$1,892 |
| | B TO B ACH DEBIT | | | -$1,000 | | | -$1,000 |
| | BANK CHRG | | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| | CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| | GCS RESEARCH | -$25 | | | | | -$25 |
| | PAYMENT | -$13,046 | | | | | -$13,046 |
| | TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| Acct *7573 | TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| | WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| | **Grand Total** | **-$31,614,099** | **-$33,734,298** | **-$13,979,387** | **-$1,274,717** | **-$277,312** | **$ (80,879,811)** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**II.A. Wire transfers out of account: STMNT Processed_9017**

| GCS Acct | 9017 |
|----------|------|
| Debit | (All) |
| Break | DR |

| Sum of Amount | | Yr | | | |
|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | Grand Total |
| WIRE OUT | ███████4658 | -$124,615 | | | -$124,615 |
| WIRE OUT | AIG | -$127,320 | | | -$127,320 |
| WIRE OUT | Almazan & Finneman | | | -$31,500 | -$31,500 |
| WIRE OUT | AMA | -$123 | | | -$123 |
| WIRE OUT | Bridgeport Capi | | -$126,084 | | -$126,084 |
| WIRE OUT | California Stra | | -$20,000 | | -$20,000 |
| WIRE OUT | Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| WIRE OUT | Centinel Spine, | | | -$11,500 | -$11,500 |
| WIRE OUT | Change Healthca | | | -$26,211 | -$26,211 |
| WIRE OUT | Cnc Contractrs | -$183,775 | | | -$183,775 |
| WIRE OUT | Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| WIRE OUT | Emerald Los Ang | | | -$40,000 | -$40,000 |
| WIRE OUT | Hss Inc | -$45,000 | | | -$45,000 |
| WIRE OUT | ████████ | -$306,845 | | | -$306,845 |
| WIRE OUT | Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| WIRE OUT | Medtronic USA, | -$75,692 | | | -$75,692 |
| WIRE OUT | Metlife | -$68,214 | | | -$68,214 |
| WIRE OUT | Pipeline Health | | | -$48,000 | -$48,000 |
| WIRE OUT | Plaza MOB | -$60,000 | | | -$60,000 |
| WIRE OUT | Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| WIRE OUT | Stryker Corpora | | | -$107,345 | -$107,345 |
| WIRE OUT | U.S. Bank Equip | -$13,500 | | | -$13,500 |
| WIRE OUT | Vitello Consult | | | -$25,000 | -$25,000 |
| WIRE OUT | Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| WIRE OUT | Windham Profess | | | -$42,031 | -$42,031 |
| WIRE OUT | Woodruff-Sawyer | | | -$14,673 | -$14,673 |
| WIRE OUT | Workterra | -$15,531 | | | -$15,531 |
| WIRE OUT | Zimmer US, Inc | -$142,601 | -$59,962 | | -$202,563 |
| Grand Total | | -$5,585,489 | -$7,112,448 | -$531,259 | $ (13,229,195) |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Olympia Health Care LLC**

**I. Deposits: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Credit | (All) |
| Break | CR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH DEPOSIT/RETURN | $8,809 | $2,192 | $181 | | | $11,182 |
| CHRGBK | | $5,200 | | | | $5,200 |
| NSF CHRGBK | $527,183 | | | | | $527,183 |
| RETURNED CK | $8,401 | $301,405 | $76,399 | $2,488 | $104 | $388,796 |
| TAX | $5,895 | | $349 | | | $6,243 |
| Acct *7573 ZBA BAL TRNSFR IN | $31,063,811 | $33,425,501 | $13,902,458 | $1,272,229 | $277,208 | $79,941,207 |
| **Grand Total** | **$31,614,099** | **$33,734,298** | **$13,979,387** | **$1,274,717** | **$277,312** | **$80,879,811** |

**II. Withdrawals: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ACH RETURN | -$1,892 | | | | | -$1,892 |
| B TO A BACH DEBIT | | | -$1,000 | | | -$1,000 |
| BANK CHRG | -$82,911 | -$63,301 | -$53,980 | -$24,666 | -$12,107 | -$236,965 |
| CHECK | -$25,710,545 | -$26,455,396 | -$13,387,143 | -$1,247,451 | -$264,609 | -$67,065,144 |
| GCS RESEARCH | -$25 | | | | | -$25 |
| PAYMENT | -$13,046 | | | | | -$13,046 |
| TAX | -$21,342 | -$14,312 | -$6,005 | -$2,599 | -$595 | -$44,853 |
| Acct *7573 TRANSFER OUT | -$198,849 | -$88,842 | | | | -$287,691 |
| WIRE OUT | -$5,585,489 | -$7,112,448 | -$531,259 | | | -$13,229,195 |
| **Grand Total** | **-$31,614,099** | **-$33,734,298** | **-$13,979,387** | **-$1,274,717** | **-$277,312** | **$ (80,879,811)** |

**II.A. Wire transfers out of account: STMNT Processed_9017**

| GCS Acct | 9017 |
|---|---|
| Debit | (All) |
| Break | DR |

| | Sum of Amount | Yr | | | |
|---|---|---|---|---|---|
| | Transaction Type | Name | 2019 | 2020 | 2021 | Grand Total |
| 12/16/2019 | WIRE OUT | 2000045334658 | -$124,615 | | | -$124,615 |
| | WIRE OUT | AIG | -$127,320 | | | -$127,320 |
| | WIRE OUT | Almazan & Finneman | | | -$31,500 | -$31,500 |
| | WIRE OUT | AMA | -$123 | | | -$123 |
| | WIRE OUT | Bridgeport Capi | | -$126,084 | | -$126,084 |
| | WIRE OUT | California Stra | | -$20,000 | | -$20,000 |
| | WIRE OUT | Cardinal Health | -$1,540,156 | -$1,540,223 | -$185,000 | -$3,265,379 |
| | WIRE OUT | Centinel Spine, | | | -$11,500 | -$11,500 |
| | WIRE OUT | Change Healthca | | -$26,211 | | -$26,211 |
| | WIRE OUT | Cnc Contractrs | -$183,775 | | | -$183,775 |
| | WIRE OUT | Cse-Capro,LLC S | -$28,750 | | | -$28,750 |
| | WIRE OUT | Emerald Los Ang | | | -$40,000 | -$40,000 |
| | WIRE OUT | Hss Inc | -$45,000 | | | -$45,000 |
| | WIRE OUT | Lewis Brisbois | -$306,845 | | | -$306,845 |
| | WIRE OUT | Medline Industr | -$2,487,478 | -$5,010,908 | | -$7,498,386 |
| | WIRE OUT | Medtronic USA, | -$75,692 | | | -$75,692 |
| | WIRE OUT | Metlife | -$68,214 | | | -$68,214 |
| | WIRE OUT | Pipeline Health | | | -$48,000 | -$48,000 |
| | WIRE OUT | Plaza MOB | -$60,000 | | | -$60,000 |
| | WIRE OUT | Restorixhealth, | -$328,389 | -$355,270 | | -$683,659 |
| | WIRE OUT | Stryker Corpora | | | -$107,345 | -$107,345 |
| | WIRE OUT | U.S. Bank Equip | -$13,500 | | | -$13,500 |
| | WIRE OUT | Vitello Consult | | -$25,000 | | -$25,000 |
| | WIRE OUT | Wells Fargo Comm Mortg | -$37,500 | | | -$37,500 |
| | WIRE OUT | Windham Profess | | | -$42,031 | -$42,031 |
| | WIRE OUT | Woodruff-Sawyer | | -$14,673 | | -$14,673 |
| | WIRE OUT | Workterra | -$15,531 | | | -$15,531 |
| | WIRE OUT | Zimmer US, Inc | -$142,601 | -$59,962 | | -$202,563 |
| | **Grand Total** | | **-$5,585,489** | **-$7,112,448** | **-$531,259** | **$ (13,229,195)** |

# Schedules A.7.3.1 – A.7.3.2
# Plaza MOB Bank Account
# Summaries

### Schedule A.7.3.1 – Account *2120
### Schedule A.7.3.2 – Account *2210

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I.  Deposits: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| ADJ | | | $272 | | | $272 |
| DEPOSIT | $3,883,566 | $3,124,420 | $2,169,454 | $16,790 | $239,779 | $9,434,010 |
| INV PYMT RCVD | | $196,664 | $190,268 | | | $386,932 |
| LOAN 9223 PMT REVRS | $143,676 | | | | | $143,676 |
| NSF CHRGBK | | | | $1,521,467 | $1,593,175 | $3,114,642 |
| RENT PYMNT RCVD | | $74,553 | $76,218 | | | $150,770 |
| RETURNED CK | $1,516 | | $300 | | | $1,816 |
| WIRE IN | $3,133,683 | $472,897 | $918,583 | $3,573,687 | $233,565 | $8,332,414 |
| (1) WIRE IN - 2019 REFI | $8,565,154 | | | | | $8,565,154 |
| (2) WIRE IN - 2021 SALE | | | $15,770,214 | | | $15,770,214 |
| **Grand Total** | **$15,727,595** | **$3,868,534** | **$19,125,309** | **$5,111,944** | **$2,066,519** | **$45,899,901** |

(1)

| | |
|---|---|
| 06/20/2019 WT Fed#00884 First American Tru /Org=First American Title Insurance Comp Srf# 20191710274000 Trn#190620077757 Rfb# | $8,444,478 |
| 06/20/2019 WT Fed#01490 First American Tru /Org=First American Title Insurance Comp Srf# 20191710467300 Trn#190620104850 Rfb# | $120,236 |
| 06/21/2019 WT Fed#02501 First American Tru /Org=First American Title Insurance Comp Srf# 20191720774200 Trn#190621128333 Rfb# | $440 |
| | $8,565,154 |

(2)

| | |
|---|---|
| 08/31/2021 WT Fed#05028 First American Tru /Org=First American Title Insurance Comp Srf# 20212431446700 Trn#210831194681 Rfb# | $15,769,770 |
| 09/02/2021 WT Fed#02074 First American Tru /Org=First American Title Insurance Comp Srf# 20212450620800 Trn#210902124089 Rfb# | $444 |
| | $15,770,214 |

**I.A.  Wire transfers received into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE IN | ALECTO HEALTHCA | $160,000 | $227,000 | | $2,475,884 | $233,565 | $3,096,449 |
| WIRE IN | OLYMPIA MEDICAL | $305,000 | | | $1,097,803 | | $1,402,803 |
| WIRE IN | PLAZA MOB 2210 | $2,026,578 | | | | | $2,026,578 |
| WIRE IN | Richmar Consult | $28,000 | | | | | $28,000 |
| WIRE IN | WELLS FARGO BANK | $614,105 | $245,897 | $918,335 | | | $1,778,337 |
| WIRE IN | Woodruff-Sawyer | | | $248 | | | $248 |
| **WIRE IN Total** | | **$3,133,683** | **$472,897** | **$918,583** | **$3,573,687** | **$233,565** | **$8,332,414** |
| **Grand Total** | | **$3,133,683** | **$472,897** | **$918,583** | **$3,573,687** | **$233,565** | **$8,332,414** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

### II. Withdrawals: STMNT Processed_2120

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | | | | | |
|---|---|---|---|---|---|---|
| Transaction Type | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| CHECK | -$1,111,256 | -$1,192,111 | -$874,797 | | | -$3,178,163 |
| LOAN 9223 PAYMENT | -$1,025,732 | | | | | -$1,025,732 |
| PAYMENT | -$103 | | | | | -$103 |
| UNPAID DEPOSIT | -$3,889 | | | | | -$3,889 |
| (1) WIRE OUT | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |
| (2) WIRE OUT - 2019 REFI | -$9,565,154 | | | | | -$9,565,154 |
| Grand Total | -$15,691,238 | -$3,579,946 | -$2,152,993 | -$19,637,298 | -$4,975,820 | -$46,037,295 |

(2)

| 06/20/2019 WT Fed#04645 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc., Client Trus Srf# Gw00000025652401 Trn#190620114876 Rfb# 4030 | ($8,444,478) |
|---|---|
| 07/31/2019 WT FED#04959 CITY NATIONAL BANK /FTR/BNF=RICHARD A. HAYES, INC., SRF# GW00000026630089 TRN#190731148701 RFB# 4049 | ($620,676) |
| 09/26/2019 WT Fed#04787 City National Bank /Ftr/Bnf=Richard A. Hayes, Inc Srf# Gw00000027989004 Trn#190926149692 Rfb# 4072 | ($500,000) |
| | ($9,565,154) |

### II.A. Wire transfers out of account: STMNT Processed_2120

| GCS Acct | 2120 | | =Transfers during "Plaza MOB Gap Period" |
|---|---|---|---|
| Debit | (Multiple Items) | | |

| Sum of Amount | | Yr | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction Type | Name | 2019 | 2020 | 2021 | 2022 | 2023 | Grand Total |
| WIRE OUT | ALECTO HEALTHCA | -$2,731,226 | -$280,000 | | -$9,245,189 | -$4,672,414 | -$16,928,829 |
| WIRE OUT | Davis-Dyer-Max, | | | -$32,559 | | | -$32,559 |
| WIRE OUT | Dilworth Paxson | -$20,000 | | | | | -$20,000 |
| WIRE OUT | FIRST CLEARING, | | | | -$3,892,499 | | -$3,892,499 |
| WIRE OUT | HOLTZ, SLAVETT | | | | -$5,795,236 | | -$5,795,236 |
| WIRE OUT | MUFG Union Bank 2932 | -$155,830 | | | | | -$155,830 |
| WIRE OUT | OLYMPIA CMA | | | | -$548,025 | | -$548,025 |
| WIRE OUT | OLYMPIA MEDICAL | -$290,000 | -$125,000 | -$14,673 | -$120,848 | -$188,406 | -$738,927 |
| WIRE OUT | Ream, Trustee for Various Invest | -$755,150 | -$1,812,369 | -$1,222,447 | | | -$3,789,966 |
| WIRE OUT | Richmar Consult | -$28,000 | | | | | -$28,000 |
| WIRE OUT | Shulman Bastian | | | | | -$115,000 | -$115,000 |
| WIRE OUT | Vitello Consult | | | | -$35,500 | | -$35,500 |
| WIRE OUT | Woodruff-Sawyer | | -$170,466 | -$8,517 | | | -$178,983 |
| WIRE OUT | Commercial Due Diligence | -$4,900 | | | | | -$4,900 |
| WIRE OUT Total | | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |
| Grand Total | | -$3,985,106 | -$2,387,835 | -$1,278,196 | -$19,637,298 | -$4,975,820 | -$32,264,255 |

Net wire transfers to Alecto "Post-Assignment"                    Net wire transfers to Affiliates "Post-Assignment"

| $2,709,449 | from Alecto | | $1,097,803 | from Olympia HC/OMC |
|---|---|---|---|---|
| ($13,917,603) | to Alecto | | ($871,953) | to Olympia HC/OMC |
| ($11,208,155) | Net wire transfers to Alecto | | $225,850 | Net wire transfers to Olympia HC/OMC |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I.A.2019 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (blank) |

| Sum of Amount | | Yr | Mo | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Grand Total |
| Transaction Type | Name | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE IN | ALECTO HEALTHCA | | | | | | | $160,000 | $160,000 |
| WIRE IN | PLAZA MOB 2210 | $210,454 | $310,025 | $350,087 | | | | | $870,566 |
| WIRE IN | Richmar Consult | | | | | | $28,000 | | $28,000 |
| WIRE IN | WELLS FARGO BANK | | $500,000 | $25,330 | $24,263 | $46,249 | $18,263 | | $614,105 |
| WIRE IN - 2019 REFI | First American | $8,565,154 | | | | | | | $8,565,154 |
| Grand Total | | $8,775,608 | $810,025 | $375,417 | $24,263 | $46,249 | $46,263 | $160,000 | $10,237,824 |

**I.A.2020 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 Grand Total |
| Transaction Type | Name | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| WIRE IN | ALECTO HEALTHCA | | $227,000 | | | | | | $227,000 |
| WIRE IN | WELLS FARGO BANK | $48,918 | $38,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $245,897 |
| Grand Total | | $48,918 | $265,017 | $32,800 | $35,699 | $43,233 | $20,000 | $12,500 | $14,730 | $472,897 |

**I.A.2021 Wire transfers into account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (All) |

| Sum of Amount | | Yr | Mo | | |
|---|---|---|---|---|---|
| | | 2021 | 2021 | 2021 | Grand Total |
| Transaction Type | Name | 5 | 8 | 9 | |
| WIRE IN | WELLS FARGO BANK | | | $918,335 | $918,335 |
| WIRE IN | Woodruff-Sawyer | $248 | | | $248 |
| WIRE IN - 2021 SALE | First American | | $15,769,770 | $444 | $15,770,214 |
| Grand Total | | $248 | $15,769,770 | $918,779 | $16,688,797 |

| Net wire transfers to Alecto in "Plaza MOB Gap Period" | | Net wire transfers to Affiliates in "Plaza MOB Gap Period" | |
|---|---|---|---|
| $160,000 | from Alecto 2019 | ($125,000) | to Olympia Medical |
| $227,000 | from Alecto 2020 | | |
| ($2,731,226) | to Alecto 2019 | | |
| ($280,000) | to Alecto 2020 | | |
| ($2,624,226) | Net wire transfers to Alecto | | |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**II.A.2019 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | Mo | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 Grand Total |
| Transaction 1 Name | | | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE OUT | ALECTO HEALTHCA | | -$2,571,226 | | | | | -$160,000 | -$2,731,226 |
| WIRE OUT | MUFG Union Bank 2932 | | | -$155,830 | | | | | -$155,830 |
| WIRE OUT | Ream, Trustee for Various Invest | | | -$152,680 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$755,150 |
| WIRE OUT | Richmar Consult | | | | | | -$28,000 | | -$28,000 |
| **WIRE OUT Total** | | | **-$2,571,226** | **-$308,510** | **-$152,680** | **-$148,555** | **-$180,680** | **-$308,555** | **-$3,670,206** |
| **Grand Total** | | | **-$2,571,226** | **-$308,510** | **-$152,680** | **-$148,555** | **-$180,680** | **-$308,555** | **-$3,670,206** |

**II.A.2020 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 Grand Total |
| Transaction 1 Name | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
| WIRE OUT ALECTO HEALTHCA | | -$280,000 | | | | | | | | | | | | -$280,000 |
| WIRE OUT OLYMPIA MEDICAL | | | -$125,000 | | | | | | | | | | | -$125,000 |
| WIRE OUT Ream, Trustee for Various Invest | | -$152,680 | -$160,314 | -$144,430 | -$152,680 | -$148,555 | -$152,680 | -$148,555 | -$152,145 | -$152,145 | -$148,020 | -$152,145 | -$148,020 | -$1,812,369 |
| WIRE OUT Woodruff-Sawyer | | | | | | | | -$170,466 | | | | | | -$170,466 |
| **WIRE OUT Total** | | **-$432,680** | **-$285,314** | **-$144,430** | **-$152,680** | **-$148,555** | **-$152,680** | **-$319,021** | **-$152,145** | **-$152,145** | **-$148,020** | **-$152,145** | **-$148,020** | **-$2,387,835** |
| **Grand Total** | | **-$432,680** | **-$285,314** | **-$144,430** | **-$152,680** | **-$148,555** | **-$152,680** | **-$319,021** | **-$152,145** | **-$152,145** | **-$148,020** | **-$152,145** | **-$148,020** | **-$2,387,835** |

**II.A. 2021 Wire transfers out of account: STMNT Processed_2120**

| GCS Acct | 2120 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | Yr | Mo | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 | 2021 Grand Total |
| Transaction 1 Name | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | |
| WIRE OUT Davis-Dyer-Max, | | | | | | | | | -$32,559 | -$32,559 |
| WIRE OUT OLYMPIA MEDICAL | | | | | | | | -$14,673 | | -$14,673 |
| WIRE OUT Ream, Trustee for Various Invest | | -$152,145 | -$152,145 | -$139,770 | -$152,145 | -$173,020 | -$152,145 | -$148,020 | -$153,058 | -$1,222,447 |
| WIRE OUT Woodruff-Sawyer | | | | | | | -$8,517 | | | -$8,517 |
| **WIRE OUT Total** | | **-$152,145** | **-$152,145** | **-$139,770** | **-$152,145** | **-$173,020** | **-$160,662** | **-$162,693** | **-$185,617** | **-$1,278,196** |
| **Grand Total** | | **-$152,145** | **-$152,145** | **-$139,770** | **-$152,145** | **-$173,020** | **-$160,662** | **-$162,693** | **-$185,617** | **-$1,278,196** |

**Alecto Healthcare Services LLC**
**Bank Statement Analysis**
**Plaza Medical Office Building LLC**

**I. Deposits: STMNT Processed_2210**

| GCS Acct | 2210 |
|---|---|
| Credit | (Multiple Items) |

| Sum of Amount | Yr | |
|---|---|---|
| Transaction Type | 2019 | Grand Total |
| DEPOSIT | $2,017,168 | $2,017,168 |
| Grand Total | $2,017,168 | $2,017,168 |

**II. Withdrawals: STMNT Processed_2210**

| GCS Acct | 2210 |
|---|---|
| Debit | (Multiple Items) |

| Sum of Amount | | Yr | |
|---|---|---|---|
| Transaction Type | Name | 2019 | Grand Total |
| PAYMENT | | -$93 | -$93 |
| WIRE OUT | PLAZA MOB 2120 | -$2,031,578 | -$2,031,578 |
| Grand Total | | -$2,031,671 | -$2,031,671 |

**Exhibit ~~D~~E**
Contracts to be Assumed

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x0380) for Policy No. x8117 - Property Insurance | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. x2606) for Policy No. x1701 – Extending Reporting Professional Liability Policy | Bank Direct Capital Finance 150 North Field Drive, Suite 190 Lake Forest, IL 60045 |
| Commercial Insurance Premium Finance and Security Agreement (Quote No. 45720646 for Policy No. 02-462-55-24, 02-462-55-22, NHS703822 | Stetson Insurance Funding, LLC 6450 Transit Road Depeur, NY 14043 |
| Medical Insurance Benefits | Anthem Blue Cross PO Box 51011 Los Angeles, CA 90051 |
| Dental and Vision Insurance Benefits | Met Life 811 Main Street, 7th Floor Kansas City, MO 64105 |
| Life Insurance Benefits | Unum 655 N. Central, Suite 900 Glendale, CA 91203 |
| Insurance Directors & Officers Employment Practices Fiduciary & Crime - Primary Layer Term: 1/31/2023 - 1/31/2024 Policy No.: 02-462-55-16 | National Union Fire Insurance Co 28 Liberty Street New York, NY 10005 |
| Insurance Excess Directors & Officers Employment Practices Term: 1/31/2023 - 1/31/2024 Policy No. NHS 703822 | RSUI Indemnity Company 945 East Paces Ferry Road Suite 1800 Atlanta, GA 30376 |
| Insurance Excess Directors & Officers Employment Practices Term: 1/31/2023 - 1/31/2024 Policy No. 02-462-55-24 | National Union Fire Insurance Co 28 Liberty Street New York, NY 10005 |
| Insurance Comprehensive Employer Indemnity Term: 3/1/2023 - 3/31/2024 Policy No. ORNSOL000039-01 | Old Republic Union Insurance Co 307 N Michigan Avenue Chicago, IL 60601 |

1

| | |
|---|---|
| Insurance<br>Workers Compensation Term: 4/1/2023 -<br>41/2024 Policy No. BNUWC0153849 | StarNet Insurance Company<br>9301 Innovation Drive Suite 200<br>Manassa, VA 20110 |
| InsuranceAutomobile<br>Term: 6/1/2023 - 6/1/2024 Policy No.<br>5087-0849-02 | Vantapro Specialty Insurance Co<br>199 Water Street<br>New York, NY 10038 |
| Insurance<br>"All Risks" Property incl Boiler & Machinery<br>& Flood, excluding CA EM<br>Term: 7/1/2022 – 7/1/2023 Policy No.<br>018258117 | American Home Assurance Co<br>175 Water Street<br>New York, NY 10038 |
| Insurance<br>Excess Medical Professional<br>General Liability for TX<br>(WNJ) Exposure Only<br>Term: 8//1/2022 -<br>8/1/2023<br>Policy No. HUL 09114235 | Magmutual Professional Security Ins Co<br>PO Box 52979<br>Atlanta, GA 30355 |
| InsuranceEnvironmental Pollution<br>Storage Tank Liability - WNJ Term:<br>8/1/2022 - 8/1/2023 Policy No.<br>PSPIUSCBM76002 | Ironshore Specialty Insurance Co<br>175 Berkeley Street<br>Boston, MA 02116 |
| InsuranceCyber Liability<br>Term: 8/1/42022 - 8/14/2023<br>Policy No. C-4LPY-047551-CYBER-2002 | Coalition Insurance Solutions Arch Specialty -<br>45% Fireman's Fund - 25% Ascot Specialty -<br>25%<br>North American Capacity - 5% |
| Insurance<br>3 Year Extended Reporting Period Excess<br>Medical Professional General Liability<br>Coverage for Non TX Exposures<br>Term: 8/1/2022 - 8/1/2025 Policy No. x1701 | Endurance American Specialty Ins Co<br>16052 Swingley Ridge Road Suite 130<br>St Louis, MO 63017 |
| Sublease dated 1/31/2023<br>Approximately 2,862 square feet of office<br>space located at 101 N. Brand Boulevard,<br>Suite 1920, Glendale, CA 91203 | Pacific Global<br>Investment<br>Management Group<br>Attn: SVP<br>101 N. Brand Blvd., Suite 1950<br>Glendale, CA 91203 |
| Record Storage and Data Agreement dated<br>2/1/2023 | GRM Information Management of San Francisco,<br>LLC 40199 Boyce Road<br>Fremont, CA 94538 |

16305343/2

**Exhibit ~~E~~ F**

Contracts to be Rejected[1]

| List All Contracts and Unexpired Leases | Name and Mailing Address of All Other Parties with Whom the Debtor Has an Executory Contract or Unexpired Lease |
|---|---|
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 110, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Master Agreement with Alecto Healthcare Services LLC. Pharmaceuticals and Supplies provided to subsidiary hospitals | Cardinal Health 200, LLC c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Prime Vendor Agreement - Distribution Agreement for Pharmaceuticals dated 6/1/2016 First Amendment dated 12/5/2016 Second Amendment dated 3/7/2017 Third Amendment dated 6/20/2017 | Cardinal Health 110, LLC and Cardinal Health, Inc. c/o Porter Wright Morris & Arthur LLC 41 South High Street, Suite 2900 Columbus, Ohio 43215 |
| Guaranty dated 10/31/2014 Guarantee re Sherman/Grayson Hospital, LLC obligations to MPT of Sherman-Alecto, LLC for Capital Reserve Deposits | MPT of Sherman-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 9/19/2014 Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Fairmont LLC | MPT of Fairmont-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 6/1/2017 Guarantee re past due rent under Master Lease Agreement with Alecto Healthcare Services Wheeling LLC and Alecto Healthcare Services Martin's Ferry LLC | MPT of Wheeling-Alecto Hospital, LLC MPT of Martins Ferry-Alecto Hospital, LLC Attn Larry Portal, SVP Attn Legal Department 1000 Urban Center Drive, Suite 501 Birmingham, AL 35242 |
| Guaranty dated 9/23/2014 | Sherman/Grayson Health System, LLC LHP Hospital Group, Inc. c/o Ardent Health Services Attn Legal Department One Burton Hills Boulevard Suite 250 Nashville, TN 37215 |

---

[1] Certain contracts listed herein may not be executory contracts, as defined by Section 365 of the Bankruptcy Code, but have been included because they were included on Schedule G of the Debtor's schedules are included herein solely for the purposes of ensuring notice to the non-debtor parties to such contracts that such contracts are being terminated on the effective date.

# EXHIBIT ~~F~~G

Liquidation Analysis
~~(TO BE FILED)~~

**Alecto Healthcare**
**LIQUIDATION ANALYSIS**
**as of October 4, 2023**

| | CHAPTER 11 | CHAPTER 7 |
|---|---|---|
| Cash and Accounts Receivable [1] | | $ 170,000 |
| Year 1 disposable income [2] | $ 242,214.00 | $ - |
| Year 2 disposable income [2] | $ 228,937.00 | $ - |
| Year 3 disposable income [2] | $ 164,398.00 | $ - |
| Other assets [3] | | |
| Distributions from subsidiaries [4] | $ 187,500.00 | $ 187,500.00 |
| Furniture and Equipment [5] | $ - | $29,838.36 |
| Vehicles [6] | | $21,000.00 |
| Causes of Action [7] | $ 25,000 | $ - |
| **Total Assets** | **$ 848,049** | **$ 408,338** |
| | | |
| Postconfirmation attorneys fees [8] | $40,000.00 | |
| Chapter 7 Trustee Fee [9] | | $16,000.00 |
| Chapter 7 Trustee Counsel [10] | | $75,000.00 |
| **Total Fees** | **$ 40,000** | **$ 91,000** |
| | | |
| **Available for Payment of Claims** | **$ 808,049** | **$ 317,338** |

NOTES

(1) - The Debtor estimates that as of the Effective Date, the estate will have $170,000 of cash and accounts receivable.  Note that th
amounts depends upon the timing of payments made/received, and is the estimate is premised upon an Effective Date of
December 7, 2023.  Note that this amount is not available for distribution to creditors under the Chapter 11 Plan as these amou
are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and
are already included in the calculus of disposable income in Year 1.

(2) - See Projected Income and Expenses attached as Exhibit C to Plan.  In the event of liquidation, the Debtor's estate would

not receive any income received from the Debtor's subsdiary, Alecto Healthcare Services Hayward LLC, on account of service provided to St. Rose Hospital.

(3) - This is intended to include all other assets of the Debtor available for distribution to creditors.

(4) - This includes distributions expected to be received from the estate of Sherman/Grayson Hospital, LLC on account of the Debtc claim,  which may be the subject of a compromise.   As more fully set forth in the Plan, the Debtor does not believe, based upon the assets and liabilities of other direct and indirect subsidiaries of the Debtor, that there will be any value to be received by the Debtor on account of its interests in those entities.

(5) - See Schedule A.39 and A.41.

(6) - See Schedule A.47.

(7) - See the report attached as Exhibit D to the Plan.  As more fully set forth therein, as determined by the Independent Director, th insiders have no liability for avoidable transfers.  Notwithstanding the foregoing, the insiders have agreed to provide the estate $25,000 for the benefit of creditors in order to get releases from the estate.  The insiders have not agreed to remit any payment the estate in the event that the case converts to Chapter 7

(8) - The Debtor does not believe that there will be signficant matters left to address after confirmation, although the Debtor may object to certain claims, and other matters necessary to administer the estate prior to closing the bankruptcy case.

(9) - See 11 U.S.C. S 326.

(10) - The primarily differences between the professional fees of the reorganized debtors and those of a Chapter 7 trustee include the following:  (i) the need for the Chapter 7 Trustee and its counsel to become familiar with the underlying facts of the case, (ii) the need to prepare for and attend a 341 meeting, (iii) the preparation and filing of retention application(s) for the Chapter 7 Trustee's professionals, and (iv) other costs which would not be necessary for a confirmed Chapter 11 case.