# EXHIBIT E

| Fill in this information to identify the case: |
| --- |

Debtor 1    Alecto Healthcare Services, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: District of Delaware

Case number    23-10787

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

LHP Hospital Group, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Mark Minuti, Saul Ewing, LLP
Name

1201 N. Market St., Suite 2300
Number    Street

Wilmington    DE    19801
City    State    ZIP Code

Contact phone 301 421 6840

Contact email mark.minuti@saul.com

Where should payments to the creditor be sent? (if different)

Ardent Health Services -Glynda McDaniel
Name

340 Seven Springs Way, Suite 100
Number    Street

Brentwood    Tn    37027
City    State    ZIP Code

Contact phone 615 513 6871

Contact email Glynda.McDaniel@ardenthealth.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

___ ___ ___ ___ ___ — ___ ___ ___ ___ ___ — ___ ___ ___ ___ ___ — ___ ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____
                                                     MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**  $ _____ 3,739,635.77 . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

contract - _____

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                    Proof of Claim                    page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one: **Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).                    $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).                    $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).                    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).                    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).                    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.                    $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   08/14/2023
                   MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

| | | | |
|---|---|---|---|
| Name | Ashley | M. | Crabtree |
| | First name | Middle name | Last name |

Title        authorized signatory

Company    LHP Hospital Group, Inc.
             Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     340 Seven Springs Way, Suite 100
             Number        Street

             Brentwood                          Tn            37027
             City                               State         ZIP Code

Contact phone _____          Email _____

## SUMMARY OF CLAIM

Alecto Healthcare Services Sherman, LLC ("Alecto Sherman") entered into a Purchase Agreement pursuant to which it acquired all of the membership interests in certain entities that owned and operated a medical facility in Sherman, Texas. Under the terms of the Purchase Agreement, Alecto Sherman agreed to indemnify and hold harmless LHP Hospital Group, Inc. ("LHP") for any damages that it suffered in connection with a variety of circumstances described in the Purchase Agreement, including certain obligations associated with the Medical Office Building. Alecto Healthcare Services, LLC ("Debtor") executed a guarantee in favor of LHP pursuant to which it guaranteed Alecto Sherman's obligations under the Purchase Agreement, including the indemnification provisions of it.

**PURCHASE AGREEMENT**

**by and among**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

**and**

**ALECTO HEALTHCARE SERVICES SHERMAN LLC**

**and**

**with respect to Section 6.12 and Article IX only,**

**LHP HOSPITAL GROUP, INC.,**

**and**

**TEXAS HEALTH RESOURCES**

**Dated as of September 23, 2014**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ..............................................................................................................1

    1.1    Defined Terms ...........................................................................................................1
    1.2    Interpretation ..........................................................................................................11

ARTICLE II PURCHASE AND SALE; CLOSING ....................................................................12

    2.1    Sale of the Interests ...............................................................................................12
    2.2    Pre-Closing Statement ...........................................................................................12
    2.3    Purchase Price ........................................................................................................13
    2.4    Post-Closing Purchase Price Adjustment ..............................................................13
    2.5    Closing ...................................................................................................................15
    2.6    Closing Deliveries .................................................................................................15
    2.7    Allocation of Purchase Price. ................................................................................16

ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLER.........................17

    3.1    Organization and Capitalization of the Target Companies and Sherman MD Provider .................17
    3.2    Authorization .........................................................................................................18
    3.3    No Conflicting Agreements; Consents ..................................................................19
    3.4    Financial Statements .............................................................................................19
    3.5    Absence of Undisclosed Liabilities.......................................................................19
    3.6    Absence of Changes..............................................................................................20
    3.7    Contracts ................................................................................................................21
    3.8    Real Property .........................................................................................................22
    3.9    Personal Property ...................................................................................................22
    3.10    Employees; Labor Matters; Employee Benefit Plans; ERISA ...........................23
    3.11    Government Program Participation/Accreditation .............................................24
    3.12    Taxes ...................................................................................................................25
    3.13    Intellectual Property ...........................................................................................26
    3.14    Permits ................................................................................................................26
    3.15    Environmental Conditions ..................................................................................27
    3.16    Legal Proceedings, Court Orders .......................................................................28
    3.17    Insurance.............................................................................................................28
    3.18    Compliance with Laws.......................................................................................28
    3.19    Medical Staff ......................................................................................................28
    3.20    Brokers................................................................................................................29
    3.21    Affiliate Transactions.........................................................................................29
    3.22    No Prior Operations ............................................................................................29

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE PURCHASER ..............29

    4.1    Organization..........................................................................................................29
    4.2    Authorization ........................................................................................................30
    4.3    No Conflicting Agreements; Consents ..................................................................30
    4.4    Legal Proceedings .................................................................................................31
    4.5    Brokers...................................................................................................................31
    4.6    Sufficient Resources ..............................................................................................31
    4.7    Investment Representations ...................................................................................31
    4.8    Non-Reliance .........................................................................................................31

ARTICLE V COVENANTS OF THE SELLER ...........................................................................32

    5.1    Regulatory Approvals ...........................................................................................32

5.2     Conduct Prior to the Closing ......................................................................32
5.3     Employee Matters ........................................................................................33
5.4     Investigation by the Purchaser ....................................................................34
5.5     Closing Conditions ......................................................................................34
5.6     Consultative Process ....................................................................................34
5.7     INTENTIONALLY OMITTED ...................................................................35
5.8     Transition Services ......................................................................................35

ARTICLE VI COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL  COVENANTS OF
THE PARTIES ............................................................................................................................36

6.1     Confidentiality .............................................................................................36
6.2     Regulatory Approvals ..................................................................................36
6.3     Post-Closing Access .....................................................................................37
6.4     Treatment of Seller and Seller-Affiliate Intellectual Property ...................37
6.5     Employee Matters ........................................................................................38
6.6     Tax Matters ..................................................................................................39
6.7     Maintenance of Services ..............................................................................41
6.8     Transfer of Certain Assets ...........................................................................41
6.9     MOB Obligations .........................................................................................41
6.10    Meaningful Use Payments ...........................................................................41
6.11    Closing Conditions ......................................................................................41
6.12    Covenant Not to Compete; Non-Solicitation ..............................................41
6.13    Additional 501(a) Matters ...........................................................................43

ARTICLE VII CONDITIONS TO OBLIGATIONS OF THE PURCHASER ........................43

7.1     Representations and Warranties ...................................................................43
7.2     Compliance with Agreement .......................................................................43
7.3     Closing Certificates .....................................................................................43
7.4     Consents and Authorizations .......................................................................43
7.5     No Action or Proceeding ..............................................................................44
7.6     Good Standing Certificates ..........................................................................44
7.7     Title to Real Property ...................................................................................44
7.8     Excluded Obligations Release ......................................................................44
7.9     Adverse Change ...........................................................................................44
7.10    Waiver of Conditions ..................................................................................44

ARTICLE VIII CONDITIONS TO OBLIGATIONS OF THE SELLER ................................44

8.1     Representations and Warranties ...................................................................44
8.2     Compliance with Agreement .......................................................................45
8.3     Closing Certificates .....................................................................................45
8.4     Consents and Authorizations .......................................................................45
8.5     No Action or Proceeding ..............................................................................45
8.6     Waiver of Conditions ..................................................................................45

ARTICLE IX INDEMNIFICATION ........................................................................................45

9.1     Survival .......................................................................................................45
9.2     Indemnification by the Seller ......................................................................46
9.3     Indemnification by the Purchaser ................................................................46
9.4     Limitations on Claims ..................................................................................47
9.5     Claims Procedures .......................................................................................48
9.6     Subrogation ..................................................................................................49
9.7     Guarantee .....................................................................................................49
9.8     Limitation on Damages ................................................................................49
9.9     Exclusive Remedy .......................................................................................49

ARTICLE X TERMINATION ..................................................................................................................50

    10.1    Termination Events ...........................................................................................................50
    10.2    Effect of Termination .......................................................................................................50

ARTICLE XI NOTICES ........................................................................................................................51

    11.1    Notices ..............................................................................................................................51

ARTICLE XII MISCELLANEOUS ......................................................................................................52

    12.1    Fees and Expenses ............................................................................................................52
    12.2    Entire Agreement ..............................................................................................................52
    12.3    Waiver ...............................................................................................................................52
    12.4    Amendment .......................................................................................................................52
    12.5    Counterparts; Facsimile Signatures; Reproductions ........................................................53
    12.6    No Third Party Beneficiary ..............................................................................................53
    12.7    GOVERNING LAW, CONSTRUCTION ........................................................................53
    12.8    Binding Effect ...................................................................................................................53
    12.9    No Assignment ..................................................................................................................53
    12.10    Headings, Gender, Etc .....................................................................................................54
    12.11    Public Announcement .......................................................................................................54
    12.12    Severability; Invalid Provisions .......................................................................................54
    12.13    Venue ................................................................................................................................54
    12.14    WAIVERS OF TRIAL BY JURY ...................................................................................54
    12.15    No Inferences ....................................................................................................................55
    12.16    Tax and Government Program Advice and Reliance ........................................................55
    12.17    Further Assurance Clause .................................................................................................55
    12.18    Specific Performance .......................................................................................................55

**List of Exhibits:**

| | |
|---|---|
| Exhibit A | Form of Excluded Obligations Release |
| Exhibit B | Knowledge Parties |
| Exhibit C | Net Working Capital Methodology |
| Exhibit D | Target Company Ownership Interests |
| Exhibit E | Required Activities |

**List of Schedules:**

| | |
|---|---|
| Schedule 1.1 | Permitted Encumbrances |
| Schedule 1.2 | Space Leases |
| Schedule 5.1 | Seller Governmental Approvals |
| Schedule 5.2 | Operations During the Executory Period |
| Schedule 5.8(b) | Transition Services |
| Schedule 5.8(c) | Service Contracts |
| Schedule 6.2 | Purchaser Governmental Approvals |
| Schedule 6.4 | Certain Intellectual Property |
| Schedule 6.8 | Certain Assets |
| Schedule 6.13 | 501(a) Assigned Agreements |
| Schedule 7.4(a) | Seller Required Consents |
| Schedule 8.4(a) | Purchaser Required Consents |

## **PURCHASE AGREEMENT**

**THIS PURCHASE AGREEMENT** (the "Agreement") is made and entered into as of September 23, 2014, by and among Sherman/Grayson Health System, LLC, a Texas limited liability company (the "Seller"), and Alecto Healthcare Services Sherman LLC, a Delaware limited liability company (the "Purchaser"), and with respect to Section 6.12 and Article IX only, LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR" and, together with LHP, the "Seller Guarantors"). The Seller and the Purchaser are sometimes referred to herein individually as a "Party" and together as the "Parties."

R E C I T A L S :

A.     The Seller is the sole member and owner of all of the issued and outstanding membership interests of (i) (a) Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Sherman Hospital"), which owns and operates Texas Health Presbyterian Hospital - WNJ (the "Facility") and (b) Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Sherman Services") (the membership interests of Sherman Hospital and Sherman Services, together, the "Hospital Interests") and (ii) Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sherman Sponsor" and, together with the Sherman Hospital and Sherman Services, the "Target Companies") (the membership interests of Sherman Sponsor, the "Sponsor Interests" and, together with the Hospital Interests, the "Interests").

B.     Upon the terms and subject to the conditions set forth herein, the Purchaser desires to purchase from the Seller, and the Seller desires to sell to the Purchaser, all of the Interests.

**NOW, THEREFORE**, in consideration of the foregoing premises, the mutual covenants and other agreements set forth herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

## **ARTICLE I**
## **DEFINITIONS**

1.1     Defined Terms.

As used in this Agreement, the following defined terms shall have the meanings indicated below:

"501(a) Assigned Agreements" has the meaning set forth in Section 6.13.

"501(a) Certification Date" means the date two Business Days following the date upon which Seller receives notice that Sherman MD Provider has been certified by the Texas Medical Board as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code.

"501(a) Certification Time" means 11:59 p.m., Central Time, on the 501(a) Certification Date.

"Accountant" has the meaning set forth in Section 2.4(c).

"Actionable Breach" means, subject to the satisfaction or waiver (by the Party for whom such condition may be waived) of the conditions set forth in Article VII and Article VIII (other than those items that by their terms are to be satisfied at Closing), the failure of either of the Parties to promptly close in accordance with Section 2.5.

"Actual Fraud" means, with respect to a Party, the actual fraud of such Party, with the actual intent to deceive, and, for the avoidance of doubt, shall not include constructive fraud.

"Adjustment Amount" means the net amount (which may be positive or negative) of all increases or decreases to the Closing Date Consideration pursuant to Section 2.4(d).

"Administrative Personnel" has the meaning set forth in Section 6.5(a).

"Affiliate" means any Person that, directly or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For the purposes of this definition, "control", when used with respect to any specified Person, means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Affiliation Agreement" means that certain Affiliation Agreement by and between LHP Texas MD Services, Inc., and Sherman/Grayson Hospital, LLC dated September 1, 2014.

"Agreement" has the meaning set forth in the preamble.

"Allocation Dispute Notice" has the meaning set forth in Section 2.7(b).

"Allocation Statement" has the meaning set forth in Section 2.7(b).

"Balance Sheet Date" has the meaning set forth in Section 3.4.

"Base Purchase Price" means $32,500,000.

"Books and Records" means all existing patient, medical staff, employee, accounting, business, marketing, corporate, limited liability company and other files, documents, instruments, papers, books and records, including without limitation, financial statements, budgets, ledgers, journals, deeds, titles, policies, manuals, minute books, stock certificates and books, equity transfer ledgers, contracts, franchises, permits, supplier lists, reports, computer files and data, retrieval programs and operating data or plans.

"Business" means the business and operations conducted by the Target Companies, including the business and operations of the Facility.

"Business Day" means a day other than Saturday, Sunday, or any day on which the principal commercial banks located in the State of Texas are authorized or obligated to close under the Laws of such states.

"<u>Cash and Cash Equivalents</u>" means the sum of (a) without duplication, all of the Target Companies' cash, bank deposits, marketable securities, certificates of deposit, time deposits, bankers' acceptances, commercial paper, government securities and other cash equivalents, plus (b) the aggregate amount of all checks, drafts and other bank deposits received by the Target Companies but not yet credited to the bank accounts of the Target Companies, minus (c) any outstanding checks or transfers at such time.

"<u>Claim</u>" has the meaning set forth in <u>Section 9.5</u>.

"<u>Closing</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 2.5</u>.

"<u>Closing Date Consideration</u>" has the meaning set forth in <u>Section 2.3</u>.

"<u>Closing Date Net Indebtedness</u>" means the Cash and Cash Equivalents of the Target Companies <u>minus</u> the Indebtedness of the Target Companies, in each case measured as of 11:59 pm CT on the day prior to Closing.  For the avoidance of doubt, the resultant amount may be a positive or negative number.

"<u>Closing Statement</u>" has the meaning set forth in <u>Section 2.4(a)</u>.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"<u>Confidentiality Agreement</u>" means that certain Confidentiality Agreement between LHP Hospital Group, Inc. and Alecto Healthcare Services LLC, an affiliate of Purchaser, dated June 20, 2014.

"<u>Constituent Documents</u>" means, for any corporation, partnership, limited partnership, limited liability company or other organization, its charter, articles of incorporation, certificate of incorporation, bylaws, partnership agreement, operating agreement, certificate of limited partnership, certificate of formation or other similar formation and governance documents, as applicable, each as amended to the relevant date.

"<u>Contract</u>" means any agreement, Lease, license, sublicense, promissory note, evidence of Indebtedness, or other contract to which any of the Target Companies is a party, or by which the Target Companies or the assets of either of the Target Companies are bound.

"<u>Counterparty</u>" has the meaning set forth in <u>Section 5.8(c)</u>.

"<u>Court Order</u>" means any judgment, order, award or decree of any federal, state, local or other court or judicial or quasi-judicial tribunal and any award in any binding arbitration proceeding.

"<u>Damages</u>" means any and all losses, damages, claims, costs, fines, fees, penalties, interest obligations and deficiencies (including, without limitation, reasonable attorney's fees and other expenses of litigation).

"Effective Time" has the meaning set forth in Section 2.5.

"EHR Incentive Program" has the meaning set forth in Section 6.10.

"Employee Benefit Plans" has the meaning set forth in Section 3.10(c).

"Employee Lease Agreement" means that certain Employee Lease Agreement by and between LHP Sherman/Grayson, LLC and Sherman/Grayson Hospital, LLC dated May 1, 2010.

"Employees" has the meaning set forth in Section 3.10(i).

"Encumbrance" means any mortgage, pledge, assessment, security interest, lease, sublease, lien, adverse claim, levy, right of way, easement, covenant, charge or other encumbrance of any kind, or any conditional sale contract, title retention contract, or other contract to give or to refrain from giving any of the foregoing.

"Environmental Claim" means any claim, action, suit, order, cause of action, investigation, written notice or other legal proceeding by any Person alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries or penalties) arising out of, based on or resulting from the violation of any Environmental Law or any obligation arising under any Environmental Law.

"Environmental Laws" means the federal, state, regional, county or local environmental laws, regulations, ordinances, rules and policies and common law in effect on the date hereof and as of the Effective Time relating to the use, refinement, handling, treatment, removal, storage, production, manufacture, transportation or disposal, emission, discharge, release or threatened release of Hazardous Substances, or otherwise relating to protection of human health or safety or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata), as the same may be amended or modified to the date hereof and as of the Effective Time.

"ERISA" has the meaning set forth in Section 3.10(c).

"ERISA Controlled Group" has the meaning set forth in Section 3.10(d).

"Estimated Closing Date Net Indebtedness" has the meaning set forth in Section 2.2.

"Estimated Net Working Capital" has the meaning set forth in Section 2.2.

"Estimated Unpaid Transaction Expenses" has the meaning set forth in Section 2.2.

"Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Obligations" means (i) the liabilities of the Target Companies for any management fees due Seller, the Seller Guarantors, and any Affiliates of Seller and the Seller Guarantors; (ii) the liabilities of the Target Companies for any administrative and royalty fees

due THR or its Affiliates; and (iii) the liabilities of the Target Companies for any intercompany advances, loans, or other amounts due to LHP or its subsidiaries; provided, however, (i) none of the obligations of the Parties or the Seller Guarantors set forth herein shall be deemed "Excluded Obligations", including, without limitation, the obligations of Purchaser pursuant to Section 6.13 and (ii) none of the obligations arising under the Affiliation Agreement or the Employee Lease Agreement, other than obligations for fees for services provided or reimbursement of expenses and losses incurred prior to the Effective Time, shall be deemed "Excluded Obligations."

"Excluded Obligations Release" means the release, substantially in the form attached hereto as Exhibit A, duly executed by Seller and/or the Seller Guarantors (on behalf of itself and its Affiliates), as applicable, that release the Target Companies from the Excluded Obligations.

"Facility" has the meaning set forth in Recital A.

"Final Net Indebtedness" has the meaning set forth in Section 2.4(d).

"Final Net Working Capital" has the meaning set forth in Section 2.4(d).

"Final Purchase Price" has the meaning set forth in Section 2.3.

"Final Unpaid Transaction Expenses" has the meaning set forth in Section 2.4(d).

"Financial Statements" has the meaning set forth in Section 3.4.

"Fundamental Reps Survival Period" has the meaning set forth in Section 9.1.

"Fundamental Representations" means the representations and warranties contained in Sections 3.1, 3.2 and 3.20 of this Agreement.

"GAAP" means generally accepted accounting principles in the United States, as consistently applied by the Target Companies.

"Governmental Authority" means any national, state or local government, any political subdivision thereof or any other governmental, quasi-governmental, judicial, public or statutory instrumentality, authority, body, agency, department, bureau, commission or entity, or any arbitrator with authority to bind a party at law.

"Government Programs" has the meaning set forth in Section 3.11(a).

"Ground Lease" means that certain Ground Lease Agreement (300 N. Highland Dr., Sherman, TX), effective as of August 21, 2012, by and between Sherman/Grayson Hospital, LLC and Altera Highland LLC.

"Guarantee" means that certain Guarantee, dated as of the date hereof, by and between Guarantor, the Seller and LHP.

"Guarantor" means Alecto Healthcare Services LLC.

"Hazardous Substances" means any toxic, radioactive, infectious or hazardous waste, pollutants or substances, including, without limitations, friable asbestos, polychlorinated biphenyls, petroleum products, byproducts, or other hydrocarbon substances, substances defined or listed as a "hazardous substance," "extremely hazardous substance," "toxic substance," "toxic pollutant," "medical waste," "special waste," "hazardous waste," "contaminant," or similarly identified substance or mixture, in or pursuant to any Environmental Law.

"Hired Employees" has the meaning set forth in Section 6.5(a)(ii).

"Hospital Interests" has the meaning set forth in Recital A.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Indebtedness" shall mean, with respect to the Target Companies, the aggregate amount (including the current portions thereof) of (i) indebtedness for borrowed money or indebtedness issued in substitution or exchange for borrowed money or for the deferred purchase price of property or services (other than trade payables and accrued expenses arising in the ordinary course of business); (ii) indebtedness of the type described in clause (i) above guaranteed in any manner or in effect guaranteed, directly or indirectly, through an agreement, contingent or otherwise, to supply funds to, or in any other manner invest in, the debtor, or to purchase indebtedness, or to purchase and pay for property if not delivered or pay for services if not performed, primarily or exclusively, for the purpose of enabling the debtor to make payment of the indebtedness or to insure the owners of the indebtedness against loss; (iii) all indebtedness of the type described in clauses (i) and (ii) above secured by any Encumbrances upon property and assets owned by a Target Company, even if such Target Company has not in any manner become liable for the payment of such indebtedness; and (iv) obligations of a Target Company to pay rent or other amounts under any lease of (or other arrangement covering the right to use) real or personal property, but only if such obligations are classified and accounted for as capital leases on a balance sheet as of the Balance Sheet Date of such Target Company.  For the avoidance of doubt, no liability associated with the MOB, whether in respect of the Ground Lease, the Space Leases, or otherwise, shall be treated as Indebtedness.

"Indemnifying Party" has the meaning set forth in Section 9.5.

"Indemnitee" has the meaning set forth in Section 9.5.

"Intellectual Property" has the meaning set forth in Section 3.13.

"Interests" has the meaning set forth in Recital A.

"Knowledge of the Seller" (and any similar expression, including, the expression the "Seller's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Seller on Exhibit B.

"Knowledge of the Purchaser" (and any similar expression, including the expression the "Purchaser's Knowledge") means, as to a particular matter, the actual knowledge of any Person specified with respect to the Purchaser on Exhibit B.

- 6 -

"Laws" means all statutes, laws, ordinances, regulations and other pronouncements of any Governmental Authority having the effect of law of the United States, any state or commonwealth of the United States, or any city, county, municipality, department, commission, board, bureau, agency or instrumentality thereof.

"Lease Indemnities" has the meaning set forth in Section 6.9.

"Leased Real Property" has the meaning set forth in Section 3.8(b).

"Leases" mean (a) all of those leases, subleases and occupancy agreements to which any of the Target Companies is a party as the lessee/tenant or sublessee/subtenant of any portion of the Real Property, and (b) all the following agreements to which any of the Target Companies is a party as the landlord/lessor or sublandlord/sublessor of any portion of the Real Property:  (i) leases of land to third-party developers or owners in connection with the development, construction or ownership of health care related projects at the Facility; (ii) medical office leases, subleases and occupancy agreements; (iii) leases, subleases and occupancy agreements for other medical uses, services or facilities or other uses related to the Business; and (iv)  leases, subleases and occupancy agreements for food services and other ancillary services at the Facility, including as examples and not as limitations, wireless communication services, gift shops, pharmacies or florist shops.

"LHP" has the meaning set forth in the preamble.

"LHP MD Provider" has the meaning set forth in Section 6.5(a).

"Material Adverse Effect" means any event, change, effect, development, state of facts, condition, circumstance or occurrence (collectively, a "Change") that (a) has or would be reasonably expected to have a material adverse effect upon the financial condition, business, or results of operations of the Target Companies, taken as a whole; provided, however, that any adverse Change arising from or related to the following (by itself or when aggregated or taken together with any and all other Changes) shall not be deemed to be or constitute a Material Adverse Effect and shall not be taken into account in determining whether a Material Adverse Effect has occurred (i) Changes affecting the economy generally or affecting the healthcare industry generally, (ii) any Changes to national or international political conditions, including the engagement or escalation by the United States or any other country in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or escalation of any military or terrorist attack upon the United States or any other country, or any of their respective territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States or any other country, (iii) Changes in weather, meteorological conditions or climate, pandemics, or natural disasters (including hurricanes, storms, tornados, flooding, earthquakes, volcanic eruptions or similar occurrences) affecting the Business of the Target Companies, (iv) Changes in GAAP, (v) Changes in any laws, rules, regulations, orders, or other binding directives issued by any Governmental Authority or any action required to be taken under any law, rule, regulation, order (actual or proposed) applicable to the Target Companies, (vi) the public announcement or pendency of the transactions contemplated by this Agreement (including the public announcement of the identity of Purchaser or its Affiliates), (vii) any failure, in and of itself, by the Target Companies to meet any internal

or published projections, forecasts, predictions or guidance relating to revenues, income, cash position, cash-flow or other financial measure (<u>provided</u> that the exception in this clause (vii) shall not prevent or otherwise affect a determination that any Change underlying such failure not otherwise excluded from the definition of "Material Adverse Effect" has resulted in or contributed to a Material Adverse Effect), (viii) seasonal fluctuations in the Business consistent with prior fiscal years, (ix) any Changes to requirements, reimbursement rates, policies or procedures of third party payors (including Government Programs) or accreditation commissions or organizations that are generally applicable to hospitals or health care facilities, or (x) the taking of any action or omission required by this Agreement and/or the other agreements contemplated hereby or requested or authorized by Purchaser, including the completion of the transactions contemplated hereby and thereby (including the impact thereof on relations (contractual or otherwise) with, or actual, potential or threatened loss or impairment of, physicians, employees, patients, customers, suppliers, distributors or others having relationships with the Target Companies), except to the extent such Change arising from or related to the matters described in clauses (i), (ii) or (iv) disproportionately affects the Target Companies, taken as a whole, as compared to other companies operating in the healthcare industry (but only to the extent of the incremental disproportionate effect on the Target Companies compared to other companies operating in the healthcare industry), or (b) would prevent or materially impede, interfere with, hinder or delay the consummation by the Seller of this Agreement and the other transactions contemplated hereby.

"<u>Material Contracts</u>" has the meaning set forth in <u>Section 3.7(a)</u>.

"<u>Meaningful Use Payments</u>" has the meaning set forth in <u>Section 6.10.</u>

"<u>Medicaid</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>Medical Personnel</u>" has the meaning set forth in <u>Section 6.5(a)</u>.

"<u>Medicare</u>" has the meaning set forth in <u>Section 3.11(a)</u>.

"<u>MOB</u>" means that certain medical office building located at 300 N. Highland Drive, Sherman, Texas.

"<u>Multi-Site Services Contract</u>" has the meaning set forth in <u>Section 5.8(c)</u>.

"<u>Net Working Capital</u>" means the excess of the Target Companies' current assets (excluding (x) Cash and Cash Equivalents, (y) Tax assets and (z) Meaningful Use Payments) over the Target Companies' current liabilities (excluding (v) Indebtedness, (x) Tax liabilities, (y) any Unpaid Transaction Expenses and (z) any Excluded Obligations), each as determined in accordance with the methodology set forth on <u>Exhibit C</u> as of 11:59 pm CT on the date prior to Closing.

"<u>Net Working Capital Adjustment Amount</u>" shall mean Estimated Net Working Capital <u>minus</u> the Target Net Working Capital. For the avoidance of doubt, the resultant amount may be a positive or negative number.

"<u>Objection Notice</u>" has the meaning set forth in <u>Section 2.4(c)</u>.

"Optional Termination Date" means November 30, 2014.

"Owned Real Property" has the meaning set forth in Section 3.8(a).

"Party" and "Parties" have the meaning set forth in the preamble.

"Percentage Obligations" means, with respect to LHP, 68%, and with respect to THR, 32%.

"Permits" means all licenses, permits, franchises, rights, registrations, approvals, authorizations, consents, waivers, exemptions, releases, variances or orders of, or filings with, or otherwise issued by, any Governmental Authority.

"Permitted Encumbrance" means any of the following: (i) statutory Encumbrances for Taxes, assessments and governmental charges or levies either not yet due and delinquent or which are being contested in good faith; (ii) statutory mechanics, carriers', workmen's, warehouseman's, repairmen's, materialmen's or other similar Encumbrances or security interests for obligations not yet past due and that do not materially detract from the value or materially interfere with the present use of the property or assets subject thereto or affected thereby; (iii) Encumbrances to secure obligations to landlords, lessors or renters under leases or rental agreements or underlying leased property; (iv) easements and rights of way; (v) any conditions that would be disclosed by a survey or physical inspection of the Real Property; (vi) Encumbrances imposed by Law; (vii) Encumbrances that, individually or in the aggregate, do not, and would not reasonably be expected to materially detract from the value or materially interfere with the present use of the property or asset subject thereto or affected thereby; (viii); and (ix) Encumbrances set forth on Schedule 1.1 of the Schedule of Exceptions.

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, union, association, court, agency, government, tribunal, instrumentality, commission, arbitrator, board, bureau or other entity or authority.

"Personnel" has the meaning set forth in Section 6.5(a).

"Personnel Providers" has the meaning set forth in Section 6.5(a).

"Post-Closing Covenants Survival Period" has the meaning set forth in Section 9.1.

"Pre-Closing Period" has the meaning set forth in Section 6.6(a)(i).

"Pre-Closing Statement" has the meaning set forth in Section 2.2.

"Proceeding" has the meaning set forth in Section 6.6(d).

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Indemnitee" has the meaning set forth in Section 9.2.

"Real Property" means all real property held by any of the Target Companies that is used in the operation of the Business.

"Returns" means all reports, estimates, declarations, schedules, disclosures, information statements, claims for refunds and returns relating to, or required to be filed in connection with, any Taxes, including any amendments thereto.

"Revised Statements" has the meaning set forth in Section 2.7(b).

"Schedule of Exceptions" means the Schedule of Exceptions accompanying this Agreement.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Seller Indemnitee" has the meaning set forth in Section 9.3.

"Seller" has the meaning set forth in the preamble.

"Seller Guarantors" has the meaning set forth in the preamble.

"Service Providers" has the meaning set forth in Section 5.8(b).

"Services" has the meaning set forth in Section 5.8(b).

"Services Assignor" has the meaning set forth in Section 5.8(c).

"Services Contracts" has the meaning set forth in Section 5.8(c).

"Services Date" has the meaning set forth in Section 6.7.

"Sherman Hospital" has the meaning set forth in Recital A.

"Sherman MD Provider" means Sherman MD Provider, Inc., a Texas corporation.

"Sherman Services" has the meaning set forth in Recital A.

"Sherman Sponsor" has the meaning set forth in Recital A.

"Space Leases" means those certain leases set forth on Schedule 1.2 by and between Sherman/Grayson Health System, LLC and Altera Highland LLC.

"Sponsor Interests" has the meaning set forth in Recital A.

"Staff Providers" has the meaning set forth in Section 3.10(a).

"Straddle Period" means any taxable period that includes but does not end on the Closing Date.

"Survival Period" has the meaning set forth in Section 9.1.

"Target Companies" has the meaning set forth in Recital A.

"Target Net Working Capital" means $5,565,000.

"Tax" or "Taxes" means any net income, alternative or add-on minimum tax, gross income, gross receipts, sales, use, ad valorem, franchise, capital, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, custom duty, transfer, documentary or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or any penalty, addition to tax or additional amount imposed by any Taxing Authority.

"Tax Return" means any return, report, declaration, form, claim for refund, or information return or statement required to be filed with any Governmental Authority relating to Taxes, including estimated tax returns, income tax returns, information returns, withholding returns, employment tax returns, and any schedule or attachment thereto or any amendment thereto.

"Taxing Authority" means any applicable Governmental Authority responsible for the imposition of Taxes.

"Title Policy" has the meaning set forth in Section 7.7.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other Closing documents entered into or delivered by any Party on or after the date hereof pursuant to the terms of this Agreement.

"Unpaid Transaction Expenses" means, to the extent not paid prior to the Closing, any unpaid costs and expenses (including legal, accounting and investment banking fees and expenses) incurred by or on behalf of the Target Companies in connection with the negotiation, execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions contemplated hereby and thereby. For the avoidance of doubt, amounts payable by the Seller for which the Target Companies are not liable shall not constitute Unpaid Transaction Expenses.

"WARN Act" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Section 2101 et. seq.

"Willful Breach" means an action or failure to act by one of the parties hereto that constitutes a breach of this Agreement, and such action was taken or such failure occurred with such party's knowledge or intention that such action or failure to act would reasonably be expected to constitute a breach of this Agreement.

1.2    Interpretation. The words "hereof," "herein" and "herewith" and words of similar import shall, unless otherwise stated, be construed to refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, paragraph, exhibit and schedule references are to the articles, sections, paragraphs, exhibits and schedules of this

Agreement unless otherwise specified. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." All terms defined in this Agreement shall have the defined meanings contained herein when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms. Any reference to this Agreement includes the Agreement, as well as any exhibits or schedules hereto. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, qualified or supplemented, including (in the case of agreements and instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors and assigns.

## ARTICLE II
## PURCHASE AND SALE; CLOSING

2.1     Sale of the Interests.

(a)     On and subject to the terms and conditions set forth in this Agreement, at the Closing, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Hospital Interests. At the Closing, title to the Hospital Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser. The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Hospital Interests.

(b)     On and subject to the terms and conditions set forth in this Agreement, on the 501(a) Certification Date, the Seller shall sell, assign, transfer and deliver to the Purchaser, free and clear of any Encumbrances  (other than applicable securities Laws), and the Purchaser shall purchase from the Seller, the Sponsor Interests. On the 501(a) Certification Date, title to the Sponsor Interests shall pass free and clear of any Encumbrances (other than applicable securities Laws) to the Purchaser. The Purchaser shall then be entitled to all rights, including, without limitation, voting rights, as the sole owner of the Sponsor Interests.

2.2     Pre-Closing Statement. Not more than five (5) Business Days but in no event less than two (2) Business Days prior to the Closing, the Seller shall deliver to the Purchaser a written statement (the "Pre-Closing Statement"), based upon the books and records of the Target Companies, which shall set forth the Seller's good faith estimate of (i) Net Working Capital (as may be further adjusted pursuant to Section 2.4(a), "Estimated Net Working Capital"), (ii) the Closing Date Net Indebtedness ("Estimated Closing Date Net Indebtedness"), together with pay-off letters for any Indebtedness to be repaid at Closing ("Pay-Off Letters"), (iii) the Unpaid Transaction Expenses ("Estimated Unpaid Transaction Expenses") (and wire instructions for the payment thereof) and (iv) the Closing Date Consideration, in each case in accordance with the definition thereof.

2.3     Purchase Price.  The consideration to be paid by the Purchaser to Seller at Closing shall be an amount equal to (i) the Base Purchase Price, plus (ii) the Estimated Closing Date Net Indebtedness, plus (iii) the Net Working Capital Adjustment Amount minus (iii) the Unpaid Transaction Expenses (such amount, the "Closing Date Consideration").   The Closing Date Consideration shall be subject to adjustment after the Closing Date pursuant to Section 2.4, and the aggregate amount, as so adjusted (or not adjusted) after application of the provisions of Section 2.4, is referred to herein as the "Final Purchase Price".

2.4     Post-Closing Purchase Price Adjustment.

(a)     As promptly as practicable, but in no event later than forty-five (45) days following the Closing, Purchaser shall in good faith prepare and deliver to the Seller a written statement (the "Closing Statement"), based upon the books and records of the Target Companies, which shall set forth Purchaser's calculation of (i) Net Working Capital (it being understood and agreed that Net Working Capital shall be used to measure changes in Net Working Capital and not as a form of indemnification and in furtherance of the foregoing, to the extent Purchaser asserts there is a current liability under this Section 2.4 that was not reflected in the calculation of the Target Net Working Capital, the Target Net Working Capital shall be recalculated in accordance with the definitions of Net Working Capital and Target Net Working Capital and the methodology set forth on Exhibit C to reflect such current liability to the extent such current liability is included in the calculation of Final Net Working Capital), (ii) the adjustments to the Target Net Working Capital pursuant to clause (i) above and the resultant adjustments to Estimated Net Working Capital (which shall be recalculated to reflect such adjustments), (iii) Closing Date Net Indebtedness, (iv) Unpaid Transaction Expenses, and (v) the Final Purchase Price based upon such items.  No actions taken by Purchaser on its own behalf or on behalf of the Target Companies, at or following the Closing, shall be given effect for purposes of determining the Final Net Working Capital.  Purchaser shall not add items or increase any amounts on the Closing Statement after it is delivered to Seller.

(b)     If Purchaser's calculation of the Adjustment Amount is positive, Purchaser shall immediately pay to the Seller such positive Adjustment Amount.

(c)     After receipt of the Closing Statement, the Seller and its representatives shall have reasonable access to all relevant books and records (including accountant work papers), accountants and employees of the Target Companies solely for the purpose of reviewing the Closing Statement in accordance with this Agreement and to the extent reasonably necessary to complete its review of the Closing Statement in a manner not to interfere unreasonably with the conduct of Purchaser's or the Target Companies' business.  If, within forty-five (45) days following the delivery of the Closing Statement, the Seller has not given Purchaser notice of its objection to any item in the Closing Statement reasonably detailing the basis of such objection (an "Objection Notice"), then the Closing Statement shall be deemed final and binding on Purchaser and Seller.  If the Seller delivers an Objection Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Objection Notice and, if any disputed items have not been resolved within thirty (30) days following delivery of such notice, from and after such time either the Seller or Purchaser may submit the remaining disputed items to the Dallas, Texas office of Grant Thornton LLP or, if such firm is unable to serve in such capacity, to such other nationally recognized independent accounting firm that is mutually

- 13 -

agreeable to the Seller and Purchaser (the "<u>Accountant</u>") or, if no such agreement can be reached, the Seller and Purchaser each shall, within ten (10) days thereof, select a candidate for the Accountant and the two candidates so selected shall promptly select a third nationally recognized independent accounting firm which shall be appointed as the Accountant. The scope of the disputes to be resolved by the Accountant shall be limited to fixing mathematical errors and determining whether the items in dispute were determined in accordance with the definitions of Cash and Cash Equivalents, Indebtedness, Net Working Capital and Target Net Working Capital and the methodology set forth on <u>Exhibit C</u> without regard to materiality, and the Accountant is not to make any other determination and shall act as an arbitrator and not as an expert.  If any items in dispute are submitted to the Accountant for resolution: (x) Seller and Purchaser shall use their respective reasonable efforts to cause the Accountant to resolve all remaining disagreements with respect to the Closing Statement as soon as practicable but in any event shall direct the Accountant to render a determination within ninety (90) days after its retention; (y) Seller and Purchaser shall furnish to the Accountant and each other such work papers and other documents and information relating solely to the disputed issues as the Accountant may request and are available to that party (including, in the case of Purchaser, the Target Companies or their accountants), and shall be afforded the opportunity to present to the Accountant any materials relating to the determination and to discuss the determination with the Accountant, <u>provided</u> that copies of all such materials are concurrently provided to the other party and that such discussions may only occur in the presence (including by telephone) of the other party, <u>provided</u> <u>further</u> that the Accountant shall consider only those items and amounts which are identified as being in dispute; and (z) the determination by the Accountant of the disputed items in the Closing Statement, as shall be set forth in a notice delivered to both parties by the Accountant, shall be binding and conclusive on the parties.  In resolving any disputed item, the Accountant may not assign a value to any item greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either party. The fees of the Accountant for such determination shall be borne by Purchaser, on the one hand, and the Seller, on the other hand, in proportion to the portion of the aggregate amount in dispute that is finally resolved by the Accountant in a manner adverse to such party.  For example, if Purchaser claims the appropriate adjustments are $1,000, and the Seller contests $500 of the amount claimed by Purchaser, and if the Accountant ultimately resolves the dispute by awarding Purchaser $300 of the $500 contested, then the costs and expenses of the Accountant will be allocated 60% (i.e., 300/500) to the Seller and 40% (i.e., 200/500) to Purchaser.

(d)    The Closing Date Consideration shall be adjusted as follows (without duplication): (i)(A) increased by the amount, if any, by which the Net Working Capital, as finally determined ("<u>Final Net Working Capital</u>"), is greater than 110% of the Estimated Working Capital or (B) reduced by the amount, if any, by which the Final Net Working Capital is less than 90% of the Estimated Working Capital; (ii)(A) reduced by the amount, if any, by which the Closing Date Net Indebtedness, as finally determined ("<u>Final Net Indebtedness</u>") is less than the Estimated Closing Date Net Indebtedness or (B) increased by the amount, if any, by which the Final Net Indebtedness is greater than the Estimated Closing Date Net Indebtedness (for purposes of clarity and the avoidance of doubt, if Final Net Indebtedness is equal to -$500 and Estimated Closing Date Net Indebtedness is -$400, then Closing Date Consideration shall be decreased by $100, and if the Final Net Indebtedness is -$400 and Estimated Close Date Net Indebtedness is -$500, then Closing Date Consideration shall be increased by $100); and/or (iii)(A) reduced by the amount, if any, by which the Unpaid Transaction Expenses, as finally

determined ("<u>Final Unpaid Transaction Expenses</u>") are greater than the Estimated Unpaid Transaction Expenses or (B) increased by the amount, if any, by which the Final Unpaid Transaction Expenses are less than the Estimated Unpaid Transaction Expenses.

(e)     No later than the second Business Day following the final determination of the Adjustment Amount:

(i)     if the Adjustment Amount is greater than the amount (if any) actually paid by the Purchaser pursuant to <u>Section 2.4(b)</u>, Purchaser shall pay such difference to Seller; or

(ii)     if the Adjustment Amount is negative, Seller shall pay such negative amount to Purchaser.

For the avoidance of doubt, if the Adjustment Amount is zero then no payment shall be made by either Party pursuant to this <u>Section 2.4</u> (except as may be required by the penultimate sentence of <u>Section 2.4(c)</u>).

(f)     The Adjustment Amount shall be treated as an adjustment to the Closing Date Consideration for income tax purposes.

2.5     <u>Closing</u>. The closing of the sale of the Hospital Interests (the "<u>Closing</u>") will take place at the offices of Weil, Gotshal & Manges LLP in Dallas, Texas, or such other place as shall be mutually agreed upon by the parties hereto, at 10:00 a.m., Central Time, on the later of (i) the earliest practicable Business Day following the satisfaction (or due waiver) of the conditions set forth in <u>Articles VII</u> and <u>VIII</u> and (ii) October 31, 2014, or such other date as may be mutually agreed upon by the parties hereto.  The date on which the Closing takes place is referred to herein as the "<u>Closing Date</u>."  The Closing shall be deemed to occur at 11:59 p.m., Central Time, on the Closing Date or at such other time as shall be mutually agreed upon in writing by the parties hereto.  The time at which the transactions contemplated hereby are deemed to become effective is referred to herein as the "<u>Effective Time</u>".

2.6     <u>Closing Deliveries</u>.  At the Closing, the following events will occur:

(a)     The Purchaser shall pay, or cause to be paid, the following amounts:

(i)     The Indebtedness evidenced by Pay-Off Letters to the applicable recipients thereof as set forth on the Pre-Closing Statement;

(ii)     the Estimated Unpaid Transaction Expenses to the applicable recipients thereof as set forth on the Pre-Closing Statement; and

(iii)     the Closing Date Consideration shall be delivered in immediately available funds by wire transfer to the Seller, in accordance with written instructions provided by the Seller to the Purchaser at least two (2) Business Days prior to the Closing Date.

(b)     <u>Closing Certificates and Documents</u>.

(i)     The Seller shall deliver the other certificates and documents required to be delivered by the Seller pursuant to <u>Article VII</u>;

(ii)    The Seller shall deliver an affidavit, in customary form, confirming that the Seller is not a "foreign person" under Section 1445 of the Code; and

(iii)   The Purchaser shall deliver the other certificates and documents required to be delivered by the Purchaser pursuant to <u>Article VIII</u>.

2.7    <u>Allocation of Purchase Price.</u>

(a)     Purchaser and the Seller agree that, for federal income tax purposes, the transactions contemplated by this Agreement shall be treated as a sale by Seller to Purchaser of the assets owned by the Target Companies, and shall report the purchase and sale on all federal income Tax Returns consistent with such treatment.

(b)     Not later than ninety (90) days after the Closing Date, the Seller shall prepare or cause to be prepared and delivered to Purchaser for its review a schedule allocating the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes, among the assets of the Target Companies, prepared in accordance with the provisions of Section 1060 of the Code (the "<u>Allocation Statement</u>").  The Allocation Statement shall be modified to reflect any adjustment to the Closing Date Consideration, as reasonably determined by the Seller and Purchaser.  If, within thirty (30) days following the delivery of the Allocation Statement, Purchaser has not given Seller notice of its objection to any item in the Allocation Statement reasonably detailing the basis of such objection (an "<u>Allocation Dispute Notice</u>"), then the Allocation Statement shall be deemed final and binding on Purchaser and the Seller.   If Purchaser delivers an Allocation Dispute Notice, then Purchaser and Seller shall consult in good faith to resolve the disputed items set forth in the Allocation Dispute Notice, and if any disputed items have not been resolved within thirty (30) days following delivery of such notice, then the parties shall resolve their dispute in accordance with the procedures set forth in <u>Section 2.4(c)</u>.  Seller shall provide to Purchaser, from time to time, revised copies of the Allocation Statement (the "<u>Revised Statements</u>") so as to report any matters on the Allocation Statement that need updating (including purchase price adjustments pursuant to <u>Section 2.4</u>, if any).  Notwithstanding anything to the contrary in this Section 2.7, the parties agree that $32,500,000 of the Closing Date Consideration, and any liabilities of the Target Companies to the extent such liabilities are required to be treated as part of the purchase price for federal income tax purposes shall be allocated to real property and improvements, subject to any adjustments which may be required by applicable tax regulations.   The parties agree that they will report the transactions contemplated by this Agreement for federal (and applicable state and local) income tax purposes (including, without limitation, the filing of Internal Revenue Service Form 8594) in accordance with the Allocation Statement (or, if applicable, the last Revised Statement), and that no party will take a position inconsistent with the Allocation Statement (or such Revised Statement) on any Tax Return unless otherwise required by applicable law or a good faith settlement of a Tax audit.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller represents and warrants to the Purchaser that except as set forth in the Schedule of Exceptions the following statements are true and correct as of the date hereof. The section numbers of the Schedule of Exceptions correspond to the section numbers in this <u>Article III</u>; <u>provided</u>, <u>however</u>, that any information disclosed in the Schedule of Exceptions under any such section shall be deemed to be disclosed with respect to and incorporated in any other section of this Agreement to the extent it is readily apparent from a reading of the disclosure that such disclosure is applicable to such other section. The Schedule of Exceptions and the information and disclosures contained therein are intended only to qualify and limit the representations, warranties or covenants contained in this Agreement, and do not, except as expressly set forth in the representations and warranties which they qualify, constitute representations and warranties as to the matters described therein. The listing of any matter in the Schedule of Exceptions shall not constitute an acknowledgement regarding the materiality of such disclosure or undisclosed matters of similar scope or materiality or whether the subject matter of such disclosure or undisclosed matter of similar scope or materiality may have a Material Adverse Effect or whether the subject matter is in the ordinary course of the Business. The Seller shall not be prejudiced in any manner whatsoever, and no presumptions shall be created, by virtue of the disclosure of any matter in the Schedule of Exceptions which otherwise is not required to be disclosed by this Agreement. The inclusion of any item in the Schedule of Exceptions shall not be deemed to be an admission to any third party against the interests of any party to this Agreement.

3.1    <u>Organization and Capitalization of the Target Companies and Sherman MD Provider</u>.

(a)    Each Target Company (i) is a limited liability company duly organized, validly existing and in good standing under the Laws of the state indicated as the state of its organization, as identified on <u>Exhibit D</u>, (ii) has limited liability company power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a limited liability company in the jurisdictions specified in <u>Exhibit D</u> and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(b)    Seller is the sole legal and beneficial owner of the Interests. As of the Effective Time, (i) the Purchaser will have good and marketable title to, and will own, the Hospital Interests, beneficially and of record, (ii) the Hospital Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Hospital Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Hospital Interests. As of the 501(a) Certification Time, (i) the Purchaser will have good and marketable title to, and will own, the Sponsor Interests, beneficially and of record, (ii) the Sponsor Interests will be free and clear of all Encumbrances (other than those arising under applicable securities Laws), and (iii) the Purchaser will have full voting power over the Sponsor Interests, subject to no proxy, voting trust or other agreement relating to the voting of any of the Sponsor Interests. The Interests have been duly authorized for issuance and validly issued in compliance with all Laws.

(c)     Except for the Interests, there are no outstanding equity securities of the Target Companies, including (i) securities which are convertible into or exchangeable for any membership interest in the Target Companies, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of equity securities of the Target Companies, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by the Target Companies governing the issuance of units of their membership interests.

(d)     Sherman Sponsor is the sole legal and beneficial owner of all of the outstanding membership interests in Sherman MD Provider.  The membership interests of Sherman MD Provider have been duly authorized for issuance and validly issued in compliance with all Laws.

(e)     Sherman MD Provider (i) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Texas, (ii) has corporate power and authority to own or lease and to operate its assets and to conduct business as currently conducted, and (iii) is qualified to transact business as a corporation in the State of Texas and is not required to be so qualified by any Laws in any other jurisdiction in which it has material operations or assets.

(f)     Except for the membership interests owned by Sherman Sponsor, there are no outstanding membership interests of Sherman MD Provider, including (i) interests which are convertible into or exchangeable for any shares in Sherman MD Provider, (ii) contracts, arrangements, commitments or restrictions relating to the issuance, sale, transfer, purchase or obtaining of membership interests of Sherman MD Provider, or (iii) options, warrants, rights, calls or commitments of any character granted or issued by Sherman MD Provider governing the issuance of membership interests.

3.2     Authorization.

(a)     The consummation by the Seller of the transactions contemplated hereby and by the Transaction Documents is within the powers of the Seller and has been duly authorized and approved by all necessary organizational action of the Seller.  No other organizational proceedings on the part of the Seller are necessary to authorize the performance of this Agreement or the other Transaction Documents.

(b)     This Agreement has been (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will be) duly and validly executed and delivered by the Seller.  This Agreement constitutes (and upon their execution and delivery, the other Transaction Documents by which the Seller is bound, will constitute) the legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with its terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

3.3    <u>No Conflicting Agreements; Consents</u>.  Neither the execution and delivery of this Agreement nor any of the other Transaction Documents nor the consummation of any of the transactions contemplated hereby or thereby will:

(a)    violate, conflict with, result in a breach or termination of the terms, conditions or provisions of, constitute a default under, or entitle any party to terminate or accelerate (i) the respective Constituent Documents of the Target Companies, (ii) any Material Contract, (iii) any Court Order to which the Target Companies or the Seller is a party or by which the Target Companies or the Seller is bound, or (iv) any material requirements of Law affecting the Target Companies or the Seller;

(b)    result in the creation or imposition of any Encumbrance upon any of the assets of any of the Target Companies (except for Permitted Encumbrances); or

(c)    require a permit, approval, consent or authorization from, or the making by the Target Companies or the Seller of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Seller to perform its obligations hereunder or under the other agreements contemplated hereby to be entered into by Seller or prevent the consummation of the transactions contemplated hereby or thereby.

3.4    <u>Financial Statements</u>.

(a)    <u>Schedule 3.4(a)</u> contains copies of the following financial statements (collectively, the "<u>Financial Statements</u>"):  (a) audited balance sheets and statements of income and cash flows as of and for the year ended December 31 of 2012 and 2013 of the Seller, (b) unaudited balance sheet and statements of income as of and for the 6-month period ended June 30, 2014 (the "<u>Balance Sheet Date</u>") of the Seller, (c) unaudited, pro forma combined balance sheet and statement of income as of and for the year ended December 31 of 2013 of Sherman Hospital and Sherman Services and (d) unaudited, pro forma combined balance sheet and statement of income as of and for the 6-month period ended June 30, 2014 of Sherman Hospital and Sherman Services.

(b)    The Financial Statements:  (i) were prepared in all material respects in accordance with GAAP, except, in the case of unaudited Financial Statements, for the absence of notes thereto, in the case of interim Financial Statements, normal year-end adjustments, or as described on <u>Schedule 3.4(b)</u>; and (ii) present fairly, in all material respects, the financial position and results of operations and cash flows (when presented) of the applicable companies at the dates and for the periods indicated therein.

3.5    <u>Absence of Undisclosed Liabilities</u>.

(a)    The Business does not have any liabilities of any nature (whether accrued, absolute, contingent or otherwise) that are of a nature or type required to be disclosed or reflected in financial statements in accordance with GAAP, except for (i) liabilities reflected or reserved against in the Financial Statements (including the notes thereto), (ii) liabilities incurred

- 19 -

in the ordinary course of the Target Companies since the Balance Sheet Date and (iii) liabilities set forth in the Schedule of Exceptions.

(b)     Except for liabilities set forth in the Schedule of Exceptions, no Target Company is a party to, or has any commitment to become a party to, any joint venture, off-balance sheet partnership or any similar Contract (including any Contract relating to any transaction or relationship between or among the Target Companies, on the one hand, and any unconsolidated Affiliate, including any structured finance, special purpose or limited purpose entity or person, on the other hand), where the intended effect of such Contract is to avoid disclosure of any material transaction involving, or material liabilities of, the Target Companies in the Financial Statements.

3.6     <u>Absence of Changes</u>.  Between the Balance Sheet Date and the date hereof, there has not been any transaction or occurrence in which any of the Target Companies, has:

(a)     suffered any material damage, destruction or loss with respect to or affecting the Facility;

(b)     made any capital expenditure or commitment outside of the ordinary course for additions to property, plant, equipment, intangible or capital assets for any purpose, other than as required by Law or for urgent repairs;

(c)     sold, transferred or otherwise disposed of any assets of the Business except in the ordinary course of business;

(d)     granted or incurred any obligation for any increase in the compensation of any employee who is employed at the Facility (including any increase pursuant to any bonus, pension, profit-sharing, retirement, or other plan or commitment) except increases in compensation granted generally to all employees in a designed pay grade that are in the ordinary course of business in accordance with Seller's customary personnel practices;

(e)     except as required by GAAP, made any change in any method of accounting or accounting principle, practice, or policy;

(f)     agreed, so as to legally bind the Purchaser or the Target Companies, whether in writing or otherwise, to take any of the actions set forth in this <u>Section 3.6</u> and not otherwise permitted by this Agreement;

(g)     taken any action or omission that would be prohibited by <u>Section 5.2</u> if such action or omission occurred on or after the date hereof and prior to Closing; or

(h)     experienced any event, occurrence, or circumstance having a Material Adverse Effect on the condition, financial or otherwise, of the assets of the Target Companies or in the business or the results of operations of the Facility.

3.7    <u>Contracts</u>.

(a)    Except as set forth in Schedule <u>3.7(a)</u>, none of the Target Companies is a party to or bound by the following (collectively, "<u>Material Contracts</u>"):

(i)    any agreement for the lease of personal property to or from any third party providing for lease payments in excess of $100,000 per annum;

(ii)    any agreement concerning a partnership or joint venture;

(iii)    any agreement under which it has created, incurred, assumed or guaranteed any Indebtedness;

(iv)    any agreement restricting the Target Companies concerning non-competition or non-solicitation (other than agreements with placement or staffing firms for the placement of Personnel);

(v)    any profit sharing, stock option, stock purchase, deferred compensation, severance or other material plan or arrangement for the benefit of its current or former directors, officers and employees;

(vi)    any local collective bargaining agreement;

(vii)    any agreement for the employment of any individual on a full-time or part-time basis providing annual compensation in excess of $100,000;

(viii)    any Contract relating to cleanup, abatement or other actions in connection with environmental liabilities;

(ix)    any other Contract involving or reasonably likely to involve payment or receipt after the date hereof of more than $100,000 in the aggregate in the current or next succeeding fiscal year of any of the Target Companies that is a party to such Contract and not terminable without penalty by any such Target Company on thirty (30) days' or less notice; and

(x)    all contracts with physicians who are actual or potential referral sources or other health care providers or with any immediate family members of any such physician or any entity in which any of the foregoing are equity owners regardless of dollar value and term.

(b)    Each Material Contract is valid and existing, and the applicable Target Company has duly performed in all material respects its obligations under each Material Contract to which it is a party (to the extent that such obligations to perform have accrued).

(c)    None of the Target Companies is in default (nor would they be in default with notice or lapse of time or both as a result of events that have occurred) under any Material Contract.

3.8    Real Property.

(a)    Schedule 3.8(a) sets forth a complete and correct list of all of the Real Property owned by any Target Company and used in the operation of the Business (the "Owned Real Property").  With respect to their physical condition, to the Knowledge of the Seller the Owned Real Property and structures located thereon owned by any Target Company are in all material respects in functional operating condition and repair, suitable for the purpose for which they are intended and there are no material defects, structural or otherwise, in any of the Owned Real Property and structures located thereon owned by any Target Company.

(b)    Schedule 3.8(b) sets forth a complete and correct list of all of the Real Property leased by any Target Company (the "Leased Real Property").

(c)    Schedule 3.8(c) sets forth a complete and correct list of real property used in the operation of the Business that is owned or leased by Seller, the Seller Guarantors or their Affiliates (other than the Target Companies).

(d)    Schedule 3.8(d) sets forth a complete and correct list of real property that is owned by Seller or the Seller Guarantors that is located within a 15 mile radius of the Facility.

(e)    The Owned Real Property, the Leased Real Property, the Space Leases and the lease agreements identified on Schedule 3.8(c) constitute all of the real property used by the Target Companies, Seller, the Seller Guarantor and their Affiliates in the operation of the Business.

(f)    The Target Companies own good and marketable fee simple title to all Owned Real Property, together with all buildings, improvements, and component parts thereon and all appurtenances and rights thereto, free and clear of all Encumbrances (other than Permitted Encumbrances).

(g)    To the Knowledge of the Seller, the plants, structures and equipment owned by the Target Companies are in conformity with prevailing industry standards in the region where located, are in functional operating condition and repair (ordinary wear and tear excepted), are adequate for the uses to which they are being put and are in compliance in all material respects with all building, life safety, zoning and land use regulations, and have complied in all material respects with all requirements and obligations imposed by Governmental Authority with regard to zoning variances, conditional uses, and non-conforming use requirements.  To the extent applicable and to the Knowledge of the Seller, the improvements on the Real Property are in compliance in all material respects with all federal, state, and local legal requirements, including, without limitation, the Americans with Disabilities Act, relative to architectural barriers or accommodations of disabled persons.

3.9    Personal Property.

(a)    The Target Companies have good and valid title to, free and clear of any Encumbrances (other than Permitted Encumbrances), or have valid leasehold interests in or valid rights under contract to use, all of the personal property used by Target Companies in the conduct of the Business, including all personal property reflected on the Financial Statements

and all of the personal property purchased or otherwise acquired for use at or by the Facility since the Balance Sheet Date, other than personal property disposed of since the Balance Sheet Date in the ordinary course of business consistent with past practice.  Such personal property in the possession of the Target Companies as of the Effective Time constitutes all necessary personal property for the operation of the Facility as presently conducted.

(b)    There are no outstanding rights (including purchase options, rights of first refusal, rights of first offers, agreements or other commitments made by the Seller or any of its Affiliates) that give any Person a current or future right to require the Target Companies to sell or transfer to a third party any material interests in the personal property owned by them.

(c)    To the Knowledge of the Seller, all of the material personal property is in functional operating condition and repair, suitable, in all material respects, for the purposes for which it is intended, subject to ordinary wear and tear.

3.10    Employees; Labor Matters; Employee Benefit Plans; ERISA.

(a)    Except as provided by Section 3.19 or as described or contemplated by Section 6.5(a), the employees who work at the Facility are leased or provided to the Target Companies by LHP Sherman/Grayson, LLC, LHP IT Services, LLC and LHP Management Services, LLC (the "Staff Providers"), which are Affiliates of LHP.  No changes in the basis for remuneration of such employees have been made, promised or authorized since the Balance Sheet Date, except in the ordinary course of business.  No Target Company has written employment contracts (other than offer letters creating an at-will employment relationship) nor does any agreement of any nature exist that provides for employment for any particular period of time or that provides any restrictions upon the right to terminate employment without any post-termination payment obligation with any Person whomsoever.  No binding agreements have been made or entered into with any employees regarding changes in compensation, promotion or any other change in status.

(b)    There is no pending or, to the Seller's Knowledge, threatened employee strike, work stoppage or labor dispute.  To the Seller's Knowledge, no union representation question exists respecting any employees who work at any Target Company, no demand has been made for recognition by a labor organization by or with respect to any employees who work at the Target Companies, no union organizing activities by or with respect to any employees who work at any Target Company are taking place, and none of the employees who work at any of the Target Companies is represented by any labor union or organization.  No collective bargaining agreement exists or is currently being negotiated by any Target Company.  There is no unfair practice claim against any Target Company before the National Labor Relations Board, or any strike, dispute, slowdown, or stoppage pending or, to the Seller's Knowledge, threatened against or involving the Business or any of the Target Companies.  To the Knowledge of the Seller, the Target Companies are in compliance in all material respects with all Laws and contracts respecting employment and employment practices, labor relations, terms and conditions of employment, and wages and hours.  There are no pending or, to the Seller's Knowledge, threatened complaints or charges before any Governmental Authority regarding employment discrimination, safety or other employment-related charges or complaints, wage and hour claims, unemployment compensation claims, workers' compensation claims or the like.

(c)     Schedule 3.10(c) contains a true and complete list of all the following agreements, plans or other arrangements, covering any employee who works at any Target Company, which are presently in effect:  (i) employee benefit plans within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and (ii) any other written employee benefit plan, program, policy, or arrangement that the Seller or the Target Companies currently sponsor, or to which they have any outstanding present obligations to contribute or other liability (collectively, the "Employee Benefit Plans").

(d)     None of the assets used or owned by the Target Companies are, and the Seller does not reasonably expect them to become, subject to a lien imposed under the Code or under Title I or Title IV of ERISA including liens arising by virtue of any Target Company being considered to be aggregated with another entity pursuant to Section 414 of the Code ("ERISA Controlled Group").

(e)     Neither the Seller nor any member of the Seller's ERISA Controlled Group has sponsored, contributed to or had an "obligation to contribute" (as defined in ERISA Section 4212) to a "multiemployer plan" (as defined in ERISA Sections 4001(a)(3) or 3(37)(A)) on or after September 26, 1980 on behalf of any employee who works at any of the Target Companies.

(f)     Neither the Seller nor any member of the Seller's ERISA Controlled Group have at any time sponsored or contributed to a "single employer plan" (as defined in ERISA Section 4001(a)(14)) to which at least two or more of the "contributing sponsors" (as defined in ERISA Section 4001(a)(13)) are not part of the same ERISA Controlled Group.

(g)     There are no actions, audits or claims pending or, to the Seller's Knowledge, threatened against any of the Target Companies with respect to maintenance of the Employee Benefit Plans, other than routine claims for benefits and other claims that are not material.

(h)     The LHP Hospital Group, Inc. Welfare Benefits Plan has complied with all of the continuation coverage requirements of Code Section 4980B, as amended, and ERISA Sections 601 through 608, as amended.

(i)     Schedule 3.10(i) contains a list, as of the date hereof, of all of the officers and employees who perform substantially all of their services at the Facility (the "Employees"), their current salary or wage rates, and the department and job title of such employees.  Schedule 3.10(i) also indicates whether such employees are part-time or full-time.

(j)     No employees who work at any of Target Companies have suffered an "employment loss" in the previous twelve (12) months (as such quoted term is defined in the WARN Act).

3.11    Government Program Participation/Accreditation.

(a)     The Facility is eligible to receive payment under Title XVIII of the Social Security Act ("Medicare") and Title XIX of the Social Security Act ("Medicaid") and is a "provider" with valid and current provider agreements and with one or more provider numbers

- 24 -

with the federal Medicare, all applicable state Medicaid and successor programs (the "<u>Government Programs</u>") through intermediaries. A true and correct copy of each of such agreements has been previously provided to the Purchaser by the Seller. The Facility is in compliance with the conditions of participation for the Government Programs in all material respects. There is not pending or, to the Seller's Knowledge, threatened any proceeding or investigation involving the Business or any of the Target Companies that could adversely affect the Target Companies' rights to participate in any Government Program.

(b)      To the Knowledge of the Seller, all cost reports and all other reports with respect to the Facility or any of the Target Companies that are required by Law to have been filed or made with respect to the purchase of services of the Facility by Government Programs have been timely filed and are complete and correct in all material respects. To the Knowledge of the Seller, such cost reports do not claim, and the Facility has not received, payment or reimbursement in excess of the amount permitted by applicable Law, except where excess reimbursement was noted on the cost report and except for normal course claims adjustments. True and correct copies of all such reports for the three (3) most recent fiscal years of the Facility have been provided to the Purchaser. <u>Schedule 3.11(b)</u> indicates which of such cost reports have been audited by the fiscal intermediary and finally settled, and contains a brief description of any and all notices of program reimbursement, proposed or pending audit adjustments, disallowances, appeals of disallowances, and any and all other unresolved claims or disputes, in connection with any audit, review or inquiry with respect to such cost reports.

(c)      To the Knowledge of the Seller, all of the billing practices of each of the Target Companies with respect to the Business to the Government Programs have been and are in compliance in all material respects with all applicable Laws.

(d)      The Facility is duly accredited with no material contingencies by The Joint Commission. The Seller has provided the Purchaser copies of the most recent Joint Commission accreditation survey report and deficiency list for the Facility, if any, together with the Facility's most recent statement of deficiencies and plan of correction. To the Knowledge of the Seller, there are no pending Joint Commission investigations involving the Facility.

(e)      Neither the Facility, nor any of the Target Companies' current officers, directors, governing board members, agents or managing employees (as such term is defined in 42 U.S.C. §1320a-5(b)), has been excluded from Medicare or any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)) or been subject to sanction pursuant to 42 U.S.C. §1320a-7a or 1320a-8 or been convicted of a crime described at 42 U.S.C. §1320a-7b. To the Seller's Knowledge, no other employee who currently works at any of the Target Companies is excluded from participating in any federal health care program (as defined in 42 U.S.C. §1320a-7b(f)).

3.12    <u>Taxes</u>.

(a)      All Tax Returns required to be filed with any Taxing Authority by or on behalf of any of the Target Companies have been filed when due (taking into account applicable extensions). All amounts of Taxes required to be paid by or with respect to the Target Companies have been timely paid.

(b)    As of the date of this Agreement, (i) there is no audit or examination relating to Taxes by any Taxing Authority now pending or threatened in writing against or with respect to any Target Company in respect of any material amount of Tax of such Target Company, (ii) no adjustment has been made, proposed or threatened in writing by a Taxing Authority with respect to any material Tax Return of the Target Companies, which adjustment remains pending, (iii) none of the Target Companies has requested any extension of time within which to file any material Tax Returns of the Target Companies and has not yet filed such Tax Returns, and (iv) none of the Target Companies has granted any extension or waiver of the statute of limitations period applicable to any material Tax Returns of the Target Companies, which period (after giving effect to any such extension or waiver) has not yet expired.

(c)    For U.S. federal income tax purposes, the Target Companies are and always have been treated as entities that are disregarded as separate from the Seller for federal income tax purposes.

(d)    There are no liens for Taxes (other than Permitted Encumbrances) existing upon the Target Companies.

(e)    The Target Companies have complied in all material respects with all applicable Laws relating to the withholding of Taxes.

3.13    <u>Intellectual Property</u>.  Each Target Company owns or has the right to use (or as of the Closing will own or have the right to use) all trademarks, trade names, service marks, trade secrets, copyrights and other intellectual property rights and licenses as are necessary or otherwise are used to conduct its Business as currently conducted (the "<u>Intellectual Property</u>"). To the Knowledge of the Seller, (a) no infringement exists by any of the Target Companies on the intellectual property rights of any other Person, and (b) there is no infringing use of any of the Intellectual Property owned by any Target Company by any other Person.  No Court Orders or proceedings are pending, or to the Knowledge of the Seller, threatened, against any of the Target Companies that challenge the validity of, or such Target Company's ownership of or right to use, any of the Intellectual Property.  No Target Company has any patents, trademarks, service marks or copyrights related to the Business.  No Target Company has been served with process in any suit, action or proceeding which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party related to the business and operation of the Facility.<u>Permits</u>.

(a)    True and complete copies of all material Permits issued or granted by a Governmental Authority and owned or held by or issued to any Target Company in connection with the current operation of the Business have been provided or made available to the Purchaser.  Such Permits constitute all material Permits necessary for the conduct of the Business and the operation of the Facility as currently conducted.  Each Target Company is the duly authorized holder of such Permits.  The Facility's pharmacies, laboratories and all other material ancillary departments located at the Facility or operated for the benefit of the Facility (and which are owned or operated by any Target Company), which are required to be specially licensed, are licensed by the appropriate Governmental Authority.

(b)    To the Knowledge of the Seller, the Facility is in compliance in all material respects with all Permits required by Law.  There are no provisions in, or agreements relating to, any such Permits which preclude or limit in any material respect any Target Company from operating the Facility as it is currently operated.  There is not now pending or, to the Knowledge of the Seller, threatened, any action by or before any Governmental Authority to revoke, cancel, rescind, modify or refuse to renew any of the Permits, and all of the material Permits are and shall be in good standing now and as of the Closing.

3.15    <u>Environmental Conditions</u>.

(a)    To the Knowledge of the Seller, each of Target Companies has materially complied and is and has been at all relevant times in material compliance with all Environmental Laws and the Real Property and all improvements on the Real Property are in material compliance with all Environmental Laws;

(b)    To the Knowledge of the Seller, no Target Company has stored any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(c)    To the Knowledge of the Seller, no Target Company has disposed of or released any Hazardous Substances on any of the Real Property, except in material compliance with applicable Environmental Laws;

(d)    No Target Company has received any written communication from a Governmental Authority or any other Person that alleges that such Target Company is not in material compliance with Environmental Laws or is otherwise subject to material liability relating to Environmental Laws; and

(e)    There is no Environmental Claim which is reasonably likely to result in liability in excess of $200,000 pending or, to the Seller's Knowledge, threatened against any Target Company.

(f)    To the Knowledge of the Seller, none of the Target Companies has any liability under any Environmental Law with respect to the Facility or the Real Property, nor are any of them responsible for any liability of any other Person under any Environmental Law with respect to the Facility or the Real Property.  To the Knowledge of the Seller, there are no threatened actions, suits, orders, claims, legal proceedings or other proceedings based on, and the Target Companies have not received any formal or informal written notice of any complaint, order, directive, citation, notice of responsibility, notice of potential responsibility, or information request from any Governmental Authority or any other Person or knows or suspects any fact(s) which would reasonably be expected to form the basis for any such actions or notices arising out of or attributable to any Environmental Laws.

(g)    The Real Property contains no underground improvements, including treatment or storage tanks, or underground piping associated with such tanks, used currently or in the past for the management of Hazardous Materials, and neither the Target Companies nor any of their Affiliates has used any portion of the Real Property as a dump or landfill.

3.16    Legal Proceedings, Court Orders.

(a)     Schedule 3.16 sets forth an accurate written list and summary description of all material litigation with respect to the Facility, the Business and the Target Companies to which any of the Target Companies is a party.  Other than as set forth in Schedule 3.16, there are no material actions, suits, proceedings, audits or investigations pending, or to the Seller's Knowledge, threatened against any of the Target Companies with respect to the Facility or the Business.

(b)     Neither the Seller nor any Target Company is subject to any Court Order with respect to the Facility or the Business.

3.17    Insurance.  Schedule 3.17 includes a list of all insurance policies maintained by or for the benefit of the Facility or any Target Company, including fire and extended coverage and casualty, professional liability, general liability and other forms of insurance, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).  All of such policies are now and will be until the Effective Time in full force and effect on an occurrence basis with no premium arrearages.  (i) There is no outstanding written requirement or recommendation by any insurance company that issued any such policy or by any board of fire underwriters or other similar body (including any Governmental Authority) exercising similar functions which requires or recommends any repairs or other work to be done or with respect to any of the assets of the Target Companies, (ii) the holder of each such policy has given to its insurer in a timely manner all notices required to be given under its insurance policies with respect to all  claims and actions covered by insurance with respect to the assets of the Target Companies, and no insurer has denied coverage of any such claims or actions or reserved its rights with respect to or rejected any such claims and (iii) no holder of any such policy has, as of the date of this Agreement (a) received any notice or other written communication from any such insurance company canceling or materially amending any of said insurance policies with respect to the assets of the Target Companies or relating to the reservation of rights on any existing claims under any such insurance policies, and to the Knowledge of the Seller no such cancellation or amendment is threatened, or (b) failed to give any required notice or present any claim which is still outstanding under any of said policies with respect to the assets of the Target Companies.

3.18    Compliance with Laws.  To the Knowledge of the Seller, the Facility at all times since its acquisition by Sherman Hospital and the Target Companies have been in compliance, in all material respects, with all Laws applicable to the Facility and the Target Companies, including, but not limited to, the false claims, false representations, anti-kickback and all other provisions of the Medicare/Medicaid fraud and abuse laws (42 U.S.C. Section 1320a-7 et seq.) and the physician self-referral provisions of the Stark Law (42 U.S.C. Section 1395nn).

3.19    Medical Staff.  As of the date hereof, the Seller has provided to the Purchaser (i) true and correct copies of the blank forms used with respect to medical staff membership and clinical privileges application or delineation of clinical privileges, and (ii) all current medical staff bylaws, rules, and regulations and amendments thereto respecting the Facility.  With regard to the medical staff of the Facility, except as disclosed in Schedule 3.19, which disclosure shall be made on an anonymous basis, to the Knowledge of the Seller, there are no pending or

threatened disciplinary or corrective actions or appeals therefrom involving physician applicants or medical staff members and to the Knowledge of the Seller, there are no disputes, suits, actions, arbitration proceedings, or investigations pending or threatened with applicants, medical staff members, or health professional affiliates.  As of the date hereof, Schedule 3.19 sets forth a true, correct and complete list of description of (a) the name of each member of the medical staff of the Facility, and (b) the specialty, if any, of each medical staff member.  All members of the organized medical staff of the Facility and all other persons providing clinical services to patients have been credentialed in substantial compliance with the applicable bylaws, policies, standards, and procedures of the Facility and the medical staff, and are providing services within the permitted scope of their privileges.  The Facility has operated in material compliance with such by-laws, rules and regulations.  To the Knowledge of the Seller, no member of the medical staff of the Facility has tendered a resignation that would be effective after the date hereof.

3.20    Brokers.  Neither the Seller nor any of its Affiliates has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.  All amounts due and owing with respect to the matters set forth in Schedule 3.20 shall be the sole responsibility of the Seller.

3.21    Affiliate Transactions.  Except for the payment of salaries and benefits to employees in the ordinary course of business or as set forth in Schedule 3.21, (a) none of the Target Companies is, nor have they been during the previous two (2) years, a party to any Contract or arrangement with, or indebted, either directly or indirectly, to any of its officers, directors, managers, members or stockholders, or any of their respective relatives or Affiliates and (b) none of such Persons is (nor have they been during the previous two (2) years) indebted to any of the Target Companies or has at any time during the previous two (2) years any direct or indirect ownership interest in, or any contractual or business relationship with, any Person with which any of the Target Companies has a business relationship or any Person which, directly or indirectly, competes with any of the Target Companies, excluding ownership of securities having no more than two percent (2%) of the outstanding voting power of any company that is listed on any national securities exchange so long as the Person owning such securities has no other connection or relationship with such company.

3.22    No Prior Operations.  Except as contemplated by Section 6.5(a)(i), neither Sherman Sponsor nor Sherman MD Provider has incurred any liabilities or obligations or engaged in any business activities of any type or kind whatsoever, or entered into any agreements or arrangements with any Person, or become subject to or bound by any obligation or undertaking.

# ARTICLE IV
# REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller that the following statements are true and correct as of the date hereof as follows:

4.1    Organization.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of Delaware.

4.2    <u>Authorization</u>.

(a)    The execution, delivery and performance by the Purchaser of this Agreement and the other Transaction Documents to which the Purchaser is a party or is bound, and the consummation by the Purchaser of the transactions contemplated hereby and thereby are within the Purchaser's powers, are not in contravention of the terms of the Purchaser's Constituent Documents, and have been duly authorized and approved by the governing body of the Purchaser.  No other organizational proceeding on the part of the Purchaser is necessary to authorize the execution, delivery and performance of this Agreement or the other Transaction Documents by the Purchaser.

(b)    This Agreement has been duly and validly executed and delivered by the Purchaser, and as of the Closing, the other Transaction Documents to be entered into by the Purchaser will have been duly and validly executed and delivered by the Purchaser.  This Agreement constitutes, and upon their execution and delivery, such other Transaction Documents will constitute, the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms (assuming the valid authorization, execution and delivery hereof and thereof by the other parties thereto), subject, in each case, to bankruptcy, insolvency, reorganization, moratorium and similar Laws of general application relating to or affecting creditors' rights and to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing.

4.3    <u>No Conflicting Agreements; Consents</u>.  Neither the execution and delivery of this Agreement or any of the other Transaction Documents to be entered into by the Purchaser nor the consummation of any of the transactions contemplated hereby or thereby will:

(a)    violate, conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default under (i) the Constituent Documents of the Purchaser, (ii) any material agreement, lease, sublease, license, sublicense, promissory note, evidence of indebtedness or other contract (whether written or oral) to which assets of the Purchaser is a party or by which the Purchaser is bound, except such violations, conflicts, breaches or defaults which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or would not prevent the consummation of the transactions contemplated hereby or thereby, (iii) any Court Order to which the Purchaser is a party or by which the Purchaser is bound, or (iv) any material requirements of Law affecting the Purchaser, except such violations, conflicts, breaches or defaults of such requirements of Laws which would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or which would not prevent the consummation of the transactions contemplated hereby or thereby; or

(b)    require a material Permit, approval, consent or authorization from, or the making by the Purchaser of any material declaration, filing or registration with, any Governmental Authority, except as provided in <u>Section 5.1</u> or <u>Section 6.2</u> and except for such Permits, approvals, consents, authorizations, declarations, filings or registrations, the failure of which to be obtained or made would not materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or prevent the consummation of the transactions contemplated hereby or thereby.

4.4    <u>Legal Proceedings</u>.  There are no material actions, suits or proceedings pending or, to the Knowledge of the Purchaser, threatened against the Purchaser which would materially impair the ability of the Purchaser to perform its obligations hereunder or under the other Transaction Documents or could reasonably be expected to delay or prevent the consummation of the transactions contemplated hereby or thereby.

4.5    <u>Brokers</u>.  The Purchaser has not paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

4.6    <u>Sufficient Resources</u>.  The Purchaser has sufficient financial resources (either internally or externally), and at the Closing, the Purchaser will possess sufficient funds, to permit the Purchaser to deliver the all amounts in accordance with <u>Section 2.6(a)</u>, subject to satisfaction of the conditions precedent to its obligations to close the transactions contemplated by this Agreement.

4.7    <u>Investment Representations</u>.

(a)    The Purchaser is acquiring the respective Interests to be acquired by the Purchaser for its own account and not with a view to the distribution thereof within the meaning of the Securities Act.

(b)    The Purchaser is not relying upon any representation or warranty of Seller or any of its Affiliates or any of the officers, directors, employees, agents or representatives thereof, other than those representations and warranties contained in this Agreement.

(c)    The Purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of purchasing the Interests to be acquired by the Purchaser and to understand the risks of, and other considerations relating to, its purchase of the Interests to be acquired by the Purchaser.

(d)    The Purchaser is aware that as of the Closing Date and the 501(a) Certification Date, as applicable, (i) the Interests will not have been registered under the Securities Act or any state's securities laws, and (ii) no securities issued by any of the Target Companies will be subject to the reporting requirements of the Exchange Act.

4.8    <u>Non-Reliance</u>.  Except for the specific representations and warranties expressly made by the Seller in <u>Article III</u> (as modified by the Schedule of Exceptions), (a) Purchaser represents and warrants that (i) Seller is not making and has not made any representation or warranty, expressed or implied, at law or in equity, in respect of the Target Companies, or any of the Target Companies' respective businesses, assets, liabilities, operations, prospects, or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the business, the effectiveness or the success of any operations, or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Target Companies furnished to Purchaser or its representatives or made available to Purchaser and its representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in

connection with, the transactions, or in respect of any other matter or thing whatsoever, and (ii) none of the Seller or the members, officers, managers, agents, representatives or employees of the Seller, the Target Companies or their respective Affiliates has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement and subject to the limited remedies herein provided, (b) Purchaser specifically disclaims that it is relying upon or has relied upon any such other representations or warranties that may have been made by any Person, and acknowledges and agrees that the Seller and its Affiliates have specifically disclaimed and do hereby specifically disclaim any such other representation or warranty made by any Person, (c) Purchaser specifically disclaims any obligation or duty by the Seller or any of its Affiliates to make any disclosures of fact not required to be disclosed pursuant to the specific representations and warranties set forth in Article III, and (d) Purchaser is entering into the transactions and acquiring the Interests subject only to the specific representations and warranties set forth in Article III as further limited by the specifically bargained for exclusive remedies as set forth in Article IX.

## ARTICLE V
## COVENANTS OF THE SELLER

5.1    Regulatory Approvals.    The Seller will cause the Target Companies to use commercially reasonable efforts to (i) obtain, as promptly as practicable, each of the Permits, approvals, authorizations and clearances of Governmental Authorities listed in Schedule 5.1 hereto, and to make the filings and declarations with Governmental Authorities listed in Schedule 5.1 hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Purchaser's obtaining any Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with Section 6.2 as such Governmental Authorities or the Purchaser may reasonably request, and (iii) cooperate with the Purchaser in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Purchaser is required to obtain pursuant to Section 6.2.

5.2    Conduct Prior to the Closing.    On or after the date hereof and prior to the Closing, except as set forth on Schedule 5.2, as consented to or approved in writing by the Purchaser, or as contemplated by this Agreement (including, without limitation, Sections 6.5 and 6.8), the Seller shall not act or omit to act, and shall cause the Target Companies not to act or omit to act, otherwise than in accordance with the following:

(a)    None of the Target Companies shall amend its respective Constituent Documents;

(b)    No change shall be made in the number or amount of authorized or issued membership interests of the Target Companies; nor shall any other equity security of any kind be granted or issued by the Target Companies; nor shall Seller enter into or permit any of the Target Companies to enter into any other agreement with respect to any equity security of the Target Companies;

(c)     The Seller will not make or enter into any commitment to make any capital expenditure at the Facility or otherwise on behalf of either Target Company, other than in the ordinary course of business, consistent with past practices, or as required by Law or for urgent repairs;

(d)     The Seller will not change or permit any change to be made in any accounting policy, practice or method of the Target Companies except any such changes as are required to conform to modifications in GAAP;

(e)     The Seller shall not, and shall not permit the Target Companies to, (a) make, change or revoke any election in respect of Taxes, (b) change any accounting method in respect of Taxes, (c) prepare any Tax Return in a manner which is not consistent with the past practice of the Target Companies, (d) file any amendment to a material Tax Return, (e) incur any liability for a material amount of Taxes other than in the ordinary course of business, or (f) settle any claim or assessment in respect of material Taxes;

(f)     The Target Companies will not (A) assume, guaranty, endorse or otherwise become liable or responsible for the obligations of any Person (other than another Target Company); (B) make any loans, advances or capital contributions to, or investments in, any Person, other than loans to other Target Companies; or (C) make any commitments to do any of the foregoing;

(g)     The operations, activities and practices of the Business shall be conducted consistent with the ordinary course of business and in conformity with past practice;

(h)     The Seller and the Target Companies will use commercially reasonable efforts to ensure that the services of the present employees, agents and representatives of the Business will be kept available for the Purchaser (except with respect to those employees or relationships terminated for cause or in the ordinary course of business consistent with past practices); <u>provided</u> in no event shall Seller or the Target Companies be required to offer or provide any inducements, financial or otherwise, to cause any such Persons to continue to work or provide services for the benefit of the Business;

(i)     The insurance maintained with respect to the Facility and the Business, or comparable insurance, shall be maintained in full force and effect until the Effective Time; and

(j)     The Target Companies will not sell, transfer or otherwise dispose of any properties or assets, except for inventory purchased or sold in the ordinary course of business consistent with past practice; <u>provided</u>, that the foregoing shall in no event preclude the distribution of cash by any of the Target Companies to their respective equity or debt holders so long as at all times prior to the Closing the Target Companies retain sufficient cash as is reasonably necessary to conduct the Business in the ordinary course of business.

5.3     <u>Employee Matters</u>.  Between the date of this Agreement and the Closing, except as otherwise consented to or approved in writing by the Purchaser, the Seller will cause its Affiliates not to (a) make any general increase in the rate of compensation payable to any employees who work in the Business, other than normal and customary increases consistent with past practice or increases that otherwise may be required by obligations pursuant to Contracts or

- 33 -

applicable Law, or (b) increase severance or termination obligations to any employees who work in the Business (except increases that are the result of increases to an employee's underlying compensation that are permitted under this <u>Section 5.3</u>.)

5.4    <u>Investigation by the Purchaser</u>.    Between the date of this Agreement and the Closing Date, to the extent permitted by Law, the Seller will provide the Purchaser and its counsel, accountants and other representatives with reasonable access during normal business hours, to all of the assets, properties, facilities, employees, agents, accountants and Books and Records of the Business and will furnish or make available to the Purchaser and such representatives during such period all such information and data (including, without limitation, copies of Contracts) concerning the Business in the possession of the Seller or its Affiliates as Purchaser or such representatives reasonably may request; <u>provided</u>, <u>however</u>, such investigation shall be coordinated through such persons as may be designated in writing by the Seller for such purpose.    The Purchaser's right of access and inspection shall be made in such a manner as not to interfere with the operation of the Business or the Target Companies. Notwithstanding the foregoing, the Purchaser understands that (x) with respect to documents and information deemed by the Seller in good faith to be market sensitive, competitive or otherwise confidential in nature, (1) the Seller will identify such documents and information to the Purchaser, (2) if such documents and information are requested by the Purchaser, the Seller will provide such documents and information to the Purchaser's outside attorneys and accountants (who will be bound by confidentiality agreements) for their review, and (3) any report by such attorneys and accountants to the Purchaser with respect to such documents and information will be in writing and subject to prior review and reasonable approval by the Seller to confirm that any specific market sensitive, competitive or otherwise confidential information is not made available to the Purchaser, and (y) litigation and other materials (including internal/external legal audit letters or reviews, patient records and similar patient information, Professional Review Organization information, National Data Bank reports, peer and quality review information and other physician-specific confidential information) that are deemed privileged or confidential by the Seller and materials which the Seller or its Affiliates may not disclose without violating confidentiality agreements with third parties will be made available to the Purchaser only without identifying information.

5.5    <u>Closing Conditions</u>.  The Seller will use commercially reasonable efforts to cause each of the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) to be satisfied on or prior to October 31, 2014; <u>provided</u>, if the conditions set forth in <u>Article VII</u> (other than <u>Section 7.7</u>) shall not have been satisfied on or prior to October 31, 2014, Seller shall continue to use its commercially reasonable efforts to satisfy its obligations under this <u>Section 5.5</u> as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date; <u>provided further</u>, in no event shall the Seller be obligated to expend any funds in connection with the solicitation or receipt of any consents or approvals from any non-Governmental Authority.  Seller shall reasonably cooperate with Purchaser in connection with Purchaser's efforts to obtain the Title Policy.

5.6    <u>Consultative Process</u>.  From and after the date hereof and until the Closing, the Purchaser shall designate an individual or individuals whom the Seller's representatives may contact during normal business hours for the purpose of approving actions or transactions for which the consent of the Purchaser is required under this Agreement.  The written approval of a

designated individual as contemplated in this <u>Section 5.6</u> shall constitute the consent of the Purchaser to the transaction or action so approved.  Unless and until the Purchaser gives written notice to the Seller to the contrary, such designated individuals shall be Lex Reddy and Roger Krissman.

5.7    <u>INTENTIONALLY OMITTED</u>.

5.8    <u>Transition Services</u>.  At or prior to Closing:

(a)    Seller shall deliver to Purchaser a schedule of its vendor relationships related to the operation of the Business.

(b)    LHP and/or one of more of its subsidiaries (the "<u>Service Providers</u>") shall provide the services listed on <u>Schedule 5.8(b)</u> (the "<u>Services</u>") to Purchaser or its designee for a period of six (6) months following the Effective Time.  Purchaser shall promptly pay LHP for such Services in the amounts set forth on <u>Schedule 5.8(b)</u> at the end of each calendar month following the Closing Date (prorated based on days elapsed for any partial month of service).  In no event shall the Service Providers have any obligation to provide such Services after the date that is six (6) months after the Closing Date.  The Service Providers shall use their commercially reasonable efforts to provide the Services at consistent levels and with a degree of care as such Services were provided to the Target Companies in the three (3) month period prior to the Closing.  Except in the case of a Willful Breach by a Service Provider, no Service Provider shall have liability to Purchaser or its Affiliates in connection with the provision of the Services.  Purchaser agrees and acknowledges that (i) the Service Providers are not in the business of providing the Services on a commercial arm's-length basis to independent third parties and (ii) the Services are only required in connection with the transactions contemplated by this Agreement for specific business circumstances on a transitional basis only.

(c)    Set forth on <u>Schedule 5.8(c)</u> are certain contracts (collectively, the "<u>Service Contracts</u>") to which the Seller, the Seller Guarantors and/or their Affiliates, as applicable (a "<u>Services Assignor</u>") are a party and the Business receives the benefit of all or a portion of such Services Contract from a counterparty (the "<u>Counterparty</u>") providing services thereunder. The Services Assignors shall endeavor to (i) assign (to the extent assignable) the Service Contracts to the extent such contact is applicable solely to the Business or (ii) with respect to any Services Contract that involves services provided to the Business and other facilities or businesses owned and/or operated by any Services Assignor or its Affiliates (a "<u>Multi-Site Services Contract</u>"), attempt to arrange for the Counterparty to divide the Services Contract into two contracts, one that relates solely to the Business (which contract shall be reasonably acceptable to the Purchaser) and one that relates to the remaining portions of such Service Contract (which contract shall be reasonably acceptable to the applicable Services Assignor). If any Services Contract cannot be assigned or divided (as described above), the applicable Services Assignor, shall, to the extent permitted under the applicable Services Contract, permit the Purchaser and/or the Target Companies, as applicable, to receive the benefit of the services to be provided thereunder (but only to the extent applicable to the Business), and Purchaser shall promptly pay to the applicable Services Assignor, upon written request, all amounts due under such Services Contract for the provision of the services provided thereunder applicable to the Business and shall indemnify, defend and hold harmless the applicable Services

Assignor in connection with Purchaser's and/or the Target Companies' receipt of such services. With respect to a Multi-Site Services Contract, Purchaser shall pay (i) for services billed based on actual usage, the fees owed in respect of such usage by the Business and (ii) for services billed other than for actual usage, based on the historical allocation of fees between the Business and the other service recipients thereunder, as reasonably determined by the applicable Services Assignor.  Purchaser agrees that it shall, or it shall cause the applicable Target Company, to receive all services to be provided pursuant to the immediately preceding sentence for the term of the applicable Services Contract; <u>provided</u>, Purchaser may cause (to the extent permitted by the applicable Services Contract and upon the notice period required) the earlier termination of that portion of any Services Contract applicable to the Business, in which case Purchaser shall pay any early termination or similar penalty or fee and shall indemnify, defend and hold harmless the applicable Services Assignor in connection with such early termination and/or assignment; <u>provide</u>, <u>further</u>, the early termination right above shall only apply to a Multi-Site Services Contract if  such contract (or the applicable Counterparty) permits a partial termination of only that portion of  such contract that relates to the Business.

**ARTICLE VI**
**COVENANTS OF THE PURCHASER; CERTAIN ADDITIONAL COVENANTS OF THE PARTIES**

6.1    <u>Confidentiality</u>.  The Purchaser acknowledges and agrees that the Confidentiality Agreement shall survive the execution and delivery of this Agreement by the parties hereto and that all information provided to the Purchaser or its "Representatives" or "Other Recipients" (as such terms are defined in the Confidentiality Agreement) in accordance with this Agreement shall be considered "Evaluation Material" (as such term is defined in the Confidentiality Agreement).

6.2    <u>Regulatory Approvals</u>.

(a)    The Purchaser will use best efforts to (i) obtain, as promptly as practicable, all Permits, approvals, authorizations and clearances of Governmental Authorities listed in <u>Schedule 6.2</u> hereto and to make the filings and declarations with Governmental Authorities listed in <u>Schedule 6.2</u> hereto, (ii) provide such information and communications to applicable Governmental Authorities as are necessary in connection with the foregoing or in connection with the Seller or its Affiliates' obtaining any of the Permits, approvals, authorizations and clearances of Governmental Authorities or making any filings or declarations with Governmental Authorities in accordance with <u>Section 5.1</u>, and (iii) cooperate with the Seller and its Affiliates in obtaining or making, as soon as practicable, any Permits, approvals, authorizations, clearances, filings and declarations of or with Governmental Authorities that the Seller or its Affiliates are required to obtain or make pursuant to <u>Section 5.1</u>.

(b)    In furtherance and not in limitation of the terms of <u>Section 5.1</u> and <u>Section 6.1</u>, if required by applicable Law, the Seller and the Purchaser will promptly (but in no event later than twenty (20) Business Days) after the execution and delivery of this Agreement by all of the parties hereto file a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement.  The Seller and the Purchaser agree to supply promptly any additional information and documentary material that may be requested by any

Governmental Authority (including the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission) pursuant to the HSR Act, and shall cooperate in connection with any filing under applicable antitrust Laws and in connection with resolving any investigation or other inquiry concerning the transactions contemplated by this Agreement commenced by any Governmental Authority, including the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, or the office of any state attorney general. The filing fee with respect to the Notification and Report Form pursuant to the HSR Act, if any, shall be borne fifty percent (50%) by the Seller and fifty percent (50%) by the Purchaser.

(c)    If any state takeover statute or similar statute becomes applicable to this Agreement or any of the transactions contemplated by this Agreement, the parties will use commercially reasonable efforts to ensure that the transactions contemplated by this Agreement may be consummated as promptly as practicable on the terms contemplated by this Agreement and otherwise to minimize the effect of such statute or regulation on this Agreement and the transactions contemplated by this Agreement.

6.3    Post-Closing Access.

(a)    The Purchaser acknowledges that, subsequent to the Closing, the Seller may need access to information, documents or computer data in the control or possession of Purchaser (or its Affiliates), and the Seller may need access to the Facility or other assets of the Target Companies for purposes of concluding the transactions contemplated herein and for the prosecution or defense of third party claims. The Purchaser agrees that, at the sole cost and expense of the Seller, it will, subject to applicable Law, make available to the Seller and its representatives, agents and independent auditors such documents and information as may be in the possession of the Purchaser and its Affiliates relating to periods prior to the Effective Time and will permit the Seller and its representatives, agents and independent auditors to make copies of such documents and information at Seller's sole cost and expense.

(b)    Until six (6) months after the later to occur of (i) the expiration of the period during which any of the Tax Returns of the Target Companies for any Pre-Closing Period are subject to audit by any Governmental Authority or the final adjudication of any dispute or investigation involving Taxes arising out of the business, operations or affairs of the Target Companies before the Effective Time, (ii) the final adjudication of any matter for which the Seller may be required to indemnify or hold harmless any Purchaser Indemnitee pursuant to the terms of this Agreement, or (iii) the running of applicable statutes of limitations, the Purchaser will maintain in their original form all medical and other records (including all documents, electronic data and other compilations of information in any form) of the Target Companies existing as of the Effective Time that relate to the pre-Closing business, operations, assets and properties of the Business, and will give the Seller and its representatives reasonable access to all such Books and Records to the fullest extent reasonably required to enable the Seller and its Affiliates to satisfy their respective obligations hereunder or under applicable Law.

6.4    Treatment of Seller and Seller-Affiliate Intellectual Property. Purchaser agrees and acknowledges that Purchaser shall have no right to use, and shall not use, any of the Intellectual Property set forth on Schedule 6.4, all of which shall remain the sole and exclusive

property of the Person owning such Intellectual Property as reflected on <u>Schedule 6.4</u>.  For the avoidance of doubt, from and after the Effective Time, Purchaser shall, and shall cause the Target Companies and Sherman MD Provider to, cease using any of the Intellectual Property set forth on <u>Schedule 6.4</u>.

      6.5   <u>Employee Matters</u>.

      (a)    Certain physicians engaged in the Business (the "<u>Medical Personnel</u>") are currently employed by LHP Texas MD Services, Inc. ("<u>LHP MD Provider</u>"), an Affiliate of LHP, and certain non-medical staff engaged in the Business (the "<u>Administrative Personnel</u>" and, together with the Medical Personnel, the "<u>Personnel</u>") are currently employed by the Staff Providers (the Staff Providers, together with the LHP MD Provider, being referred to herein as the "<u>Personnel Providers</u>").

      (i)    Seller shall use its commercially reasonable efforts to cause (x) Sherman Sponsor to sponsor Sherman MD Provider as a "501(a)" entity organized pursuant to Section 162.001(b) of the Texas Occupations Code, (y) LHP MD Provider to transfer all Medical Personnel, including assigning all Contracts governing the provision of services by the Medical Personnel, to Sherman MD Provider, and (z) Sherman MD Provider to accept all Medical Personnel, including all Contracts governing the provision of services by the Medical Personnel, and to indemnify LHP MD Provider for any claims by the Medical Personnel based on or arising out of any pre-501(a) Certification Time actions; <u>provided</u>, <u>however</u>, the Parties agree and acknowledge that the 501(a) Certification Date is likely to occur after the Closing Date.

      (ii)    Except as otherwise provided by <u>Section 6.5(a)(i)</u>, effective as of the Effective Time, Seller shall cause the Personnel Providers to terminate the Personnel, and Purchaser shall, or shall cause the Target Companies or one of its Affiliates to, offer to employ all of the Personnel as of the Closing Date, including Personnel on military or other types of leave in positions and at compensation levels consistent with those being provided by the Personnel Providers immediately prior to Closing.  All such Personnel who accept the Purchaser's offer of employment, or who are transferred to Sherman MD Provider in accordance with <u>Section 6.5(a)(i)</u>, shall be referred to herein as the "<u>Hired Employees</u>".  At the Effective Time, and without further action of any party thereto, the term of the Employee Lease Agreement shall expire.

      (b)    For the period beginning on the Closing Date (or, with respect to Medical Personnel transferred to Sherman MD Provider, the 501(a) Certification Date) and ending on the first anniversary of the Closing Date, Purchaser agrees to maintain benefit levels, including nonqualified deferred compensation opportunities, retirement benefits, and health and welfare benefits, for the Hired Employees which are comparable to those that were in effect for the Hired Employees immediately prior to the Closing Date.  Purchaser will treat, and cause the appropriate benefit plans to treat, the service of the Hired Employees with LHP and its Affiliates attributable to any period before the Closing Date as service rendered to Purchaser or any Affiliate of Purchaser for purposes of eligibility and vesting under paid time off programs of Purchaser (or its Affiliates), for purposes of the health and welfare plan(s) and cafeteria plan(s) maintained by Purchaser (or its Affiliates) and for purposes of the defined contribution plan(s) of Purchaser (or its Affiliates), except where such credit would result in duplication of benefits.

Without limiting the foregoing, to the extent that any Hired Employee participates in any health or other group welfare benefit plan of Purchaser or its Affiliate following the Closing, (i) Purchaser shall cause any pre-existing conditions or limitations, eligibility waiting periods and required physical examinations under any health or similar welfare plan of Purchaser (or its Affiliates) to be waived with respect to the Hired Employees and their eligible dependents, to the extent waived under the corresponding plan in which the Hired Employee participated immediately prior to the Closing, and (ii) any deductibles paid and flexible spending account balances accumulated by a Hired Employee under any of LHP's (or its Affiliates') health or cafeteria plans in the plan year in which the Closing Date occurs shall be credited towards deductibles and flexible spending account balances under the health plan(s) or cafeteria plan(s), as appropriate, of Purchaser (or its Affiliates).  LHP and the Purchaser shall cooperate to effectuate any rollovers to the Purchaser's 401(k) plan by the Hired Employees, to the extent the Hired Employees elect to rollover any such assets into the Purchaser's 401(k) plan. Notwithstanding any provision in this Agreement to the contrary, nothing in this <u>Section 6.5(b)</u> shall (i) be deemed or construed to be an amendment or other modification of any Employee Benefit Plan or of any of Purchaser's employee benefit plans, or (ii) create any third party rights in any current or former employee, director or other service provider of Purchaser, LHP, the Seller or any of their respective Affiliates (or any beneficiaries or dependents thereof).

(c)     Pursuant to the "Alternate Procedure" provided in section 5 of Revenue Procedure 2004-53, 2004-34 I.R.B. 320 (i) Purchaser and the Personnel Providers shall report on a predecessor/successor basis as set forth therein, (ii) the Personnel Providers shall be relieved from filing a Form W-2 with respect to the Hired Employees and (iii) Purchaser shall undertake to file (or cause to be filed) a Form W-2 for each such Hired Employee for the year that includes the Closing Date (including the portion of such year that such Hired Employee was employed by a Personnel Provider).

(d)     Purchaser will continue to employ a sufficient number of then-current employees at each Target Company and Sherman MD Provider for the period commencing on the Closing Date and ending ninety (90) days after the 501(a) Certification Date so as not to result in the imposition of liability on the Seller or its Affiliates under the WARN Act due to a "plant closing" or "mass layoff" or otherwise under the provisions of the WARN Act, or any similar state or local laws relating to plant closings, with respect to the Target Companies and Sherman MD Provider.  All quoted terms used in this <u>Section 6.5(d)</u> and not defined herein shall have the meanings ascribed to such terms under the WARN Act.

6.6     <u>Tax Matters</u>.

(a)     <u>Filing of Tax Returns</u>.

(i)     The Seller shall prepare and file, or cause to be prepared and filed, all Tax Returns, if any, of the Target Companies (including any amendments thereto) for any taxable period ending at or prior to the Closing Date (a "<u>Pre-Closing Period</u>").  The Purchaser agrees to assist the Seller without any charge in the determination of such Taxes and the preparation of such Tax Returns.

(ii)    The Purchaser shall prepare and file, or cause to be prepared and filed, all Tax Returns of the Target Companies for all taxable periods other than a Pre-Closing Period.

(b)    Straddle Period Tax Allocation.    Any liability for Taxes of a Target Company attributable to a Straddle Period shall be apportioned between the portion of such period ending on or prior to the Closing Date and the portion beginning after the Closing Date (i) in the case of real property, personal property and ad valorem Taxes, by apportioning such Taxes on a per diem basis and (ii) in the case of all other Taxes, on a closing of the books basis, as if the taxable year of such Target Company ended on the Closing Date, provided that exemptions, allowances or deductions that are calculated on an annual basis (including, but not limited to, depreciation and amortization deductions) shall be apportioned on a per diem basis.

(c)    Cooperation.    The Seller, on the one hand, and the Purchaser and the Target Companies, on the other hand, agree to furnish or cause to be furnished to each other or their respective representatives, upon request, as promptly as practicable, such information and assistance (including access to Books and Records) relating to the Target Companies as is reasonably necessary for the preparation of any Return, claim for refund, audit or similar matter, or the prosecution or defense of any claim, suit or proceeding relating to any proposed adjustment of Taxes.

(d)    Post-Closing Audits and Other Proceedings.    In the case of any audit, examination or other proceeding ("Proceeding") with respect to Taxes for which a Seller is or may be liable pursuant to this Agreement, the Purchaser shall promptly notify the Seller in writing of any such Proceeding, and the Purchaser shall timely execute or cause to be executed powers of attorney or other documents necessary to enable the Seller to take all actions desired by the Seller with respect to such Proceeding to the extent such Proceeding may affect the amount of Taxes for which the Seller is liable with respect to the Target Companies.  The Seller shall have the sole right to control any such Proceedings, including the right to initiate any claim for refund or credit, file any amended Tax Return or take any other action that it deems appropriate with respect to such Taxes (or refunds or credits).  If any Proceeding would affect the Tax liability of the Purchaser or an Affiliate (including a Target Company) in any material respect for a taxable period ending after the Closing Date, the Seller will not settle such Proceeding without the Purchaser's prior written consent, such consent not to be unreasonably withheld, conditioned, or delayed.  In the event that the Purchaser's consent is withheld, the Purchaser will assume the control, costs and expenses of the Proceeding.  If such Proceeding is ultimately resolved by payment of an amount in excess of the amount in the original settlement proposal (or receipt of a refund in an amount less than the amount in the original settlement proposal), the Purchaser will pay the amount of such excess (or shall pay the Seller the amount of such refund shortfall).  If such Proceeding is ultimately resolved by payment of an amount less than the amount of the original settlement proposal (or a refund or credit in an amount greater than the original settlement proposal), the Seller will reimburse the Purchaser for their respective costs and expenses to the extent of such difference.

(e)    Refunds for Pre-Closing Periods.  The amount of any refund of or credits against Taxes relating to a Target Company (including any interest paid or credited with respect thereto) in respect of the Pre-Closing Period or the pre-Closing portion of any Straddle Period

shall be promptly paid by Purchaser to Seller, without set-off or application therefor against any Taxes owed for any period after the Effective Time.

6.7    <u>Maintenance of Services</u>.  Purchaser shall continue to provide the material clinical services and programs currently being provided by the Facility that are described on <u>Exhibit E</u> and shall not discontinue the provision of any such material clinical services and programs prior to April 16, 2015 (the "<u>Services Date</u>"), so long as appropriate levels of clinical quality and patient safety can be maintained with respect to each of such services throughout such period. Any deletion of such services and programs prior to the Services Date shall be based upon the clinical quality and patient safety factors and shall require the prior written approval of Seller. Seller shall have the right to specific performance of Purchaser's obligation set forth in this <u>Section 6.7</u>.

6.8    <u>Transfer of Certain Assets</u>.  Prior to the Closing, Seller shall use its commercially reasonable efforts to transfer and assign, and the Target Companies shall accept and assume, the assets and liabilities set forth on <u>Schedule 6.8</u>.

6.9    <u>MOB Obligations</u>.  Purchaser, Guarantor and Seller shall use their commercially reasonable efforts to cause Seller and LHP to be fully and finally released from any obligations under the Ground Lease and Space Leases.

6.10    <u>Meaningful Use Payments</u>.  The Facility is an acute care inpatient hospital that is a participant in the Medicare and Medicaid Electronic Health Record Incentive Program (the "<u>EHR Incentive Program</u>") and is eligible for incentive payments under the EHR Incentive Program as a meaningful user of certified electronic health record technology (the "<u>Meaningful Use Payments</u>").  Purchaser covenants and agrees to remit promptly to Seller (and in any event within five (5) days following the receipt thereof) any Meaningful Use Payments received by Purchaser, the Target Companies or their Affiliates following the Closing Date (which, for the avoidance of doubt, may be received after December 31, 2014) that relate to the Facility's participation in the EHR Incentive Program during periods ending on or before December 31, 2014.

6.11    <u>Closing Conditions</u>.  The Purchaser will use its commercially reasonable efforts to (i) cause the conditions set forth in <u>Article VIII</u> hereof to be satisfied and (ii) obtain the Title Policy, in each case on or prior to October 31, 2014; <u>provided</u>, if the conditions set forth in <u>Article VIII</u> shall not have been satisfied, or if Purchaser shall have failed to secure the Title Policy, on or prior to October 31, 2014, Purchaser shall continue to use its commercially reasonable efforts to satisfy its obligations under this <u>Section 6.11</u> as soon as reasonably practicable thereafter, but in all circumstances prior to the Optional Termination Date.

6.12    <u>Covenant Not to Compete; Non-Solicitation</u>.

(a)    For a one (1) year period immediately following the Closing Date (the "<u>Restricted Period</u>"), Seller and the Seller Guarantors  shall not, directly or indirectly, except as a consultant or contractor to or of Purchaser (or any Affiliate of Purchaser), own, lease, manage, operate, control, or participate in any manner with the ownership, leasing, management, operation or control of any business which offers services in competition with the Business,

including but not limited to any acute care hospital, specialty hospital, long-term acute care hospital, rehabilitation facility, diagnostic imaging center, inpatient or outpatient psychiatric or substance abuse facility, ambulatory or other type of surgery center, skilled nursing facility, or home health or hospice agency (any of such uses being referred to herein as a "Competing Business"), within a 25-mile radius of the Facility (the "Restricted Area"), without Purchaser's prior written consent; provided, however, that Seller and the Seller Guarantors will not be precluded from participating in activities which they were engaged in as of the September 1, 2014.

(b)     Each of Seller and the Seller Guarantors further agrees that, during the Restricted Period, Seller and the Sellers Guarantors shall not directly or indirectly, in any capacity, either separately, jointly or in association with others, directly or indirectly do any of the following: (i) employ or seek to employ any Hired Employee; or (ii) solicit, induce, or influence any proprietor, partner, stockholder, lender, director, officer, employee, joint venturer, investor, consultant, agent, lessor, supplier, customer or other Person having a business relationship with the Purchaser or its Affiliates primarily with respect to the Business, at any time during the Restricted Period, to discontinue or reduce or modify the extent of such relationship with the Purchaser or its Affiliates with respect to the Business; provided, however, with respect to clause (i), such prohibition shall not apply to any solicitation (or hiring as a result thereof) conducted by means of a general solicitations or through the use of hiring firms not directed to target any Hired Employee.

(c)     Seller and the Seller Guarantors agree and acknowledge that Purchaser has legitimate business interests justifying the non-competition and non-solicitation covenants included herein.  Purchaser's legitimate business interests include, without limitation, valuable confidential business and professional information, substantial relationships with specific prospective and existing customers, patients, clients and payors, and also patient and client goodwill associated with Purchaser's specific geographic location and specific marketing area. Seller and the Seller Guarantors acknowledge and agree that the non-competition and non-solicitation covenants included herein are reasonably necessary to protect the legitimate business interests of the Purchaser.

(d)     Seller and the Seller Guarantors acknowledge that satisfaction of the covenants and agreements set forth in this Section 6.12 is necessary to protect the business, goodwill, and other proprietary interests of Purchaser and that a breach of such covenants and agreements will result in irreparable and continuing damage to Purchaser for which there will be no adequate remedy at law, and further agree that this Section 6.12 may be enforced by temporary restraining order, temporary injunction, or permanent injunction restraining violation thereof, or by any another other remedy whether at law or in equity (including, without limitation, monetary damages), pending or following trial on the merits without the necessity of the posting of a bond or other security.  Seller and the Seller Guarantors hereby waive the claim or defense that an adequate remedy at law for such a breach exists. Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth herein are unreasonable, then it is the intention of the parties that such restrictions be enforced to the maximum scope, duration and territory that the court deems reasonable, and this Agreement shall thereby be reformed.

(e)    All of the provisions of this Section 6.12 shall inure to any successor or assign of Purchaser with respect to the Business.  Notwithstanding anything to the contrary herein, the Restricted Period shall immediately terminate with respect to LHP in the event that a Person or group of Persons who are not currently Affiliates of LHP acquire, directly or indirectly, (i) a majority of the voting securities of LHP (whether pursuant to stock purchase, merger, consolidation or otherwise) or (ii) all or substantially all of the assets of LHP and/or its subsidiaries.

6.13    Additional 501(a) Matters.  On the 501(a) Certification Date, LHP MD Provider shall assign, and Sherman MD Provider shall assume, the agreements set forth on Schedule 6.13 (the "501(a) Assigned Agreements"); provided, such assignment shall not relieve Sherman Hospital from any obligations to LHP MD Provider under the 501(a) Assigned Agreements arising out of any events prior to the 501(a) Certification Time.  If the Closing Date occurs prior to the 501(a) Certification Date, Purchaser shall cause Sherman Hospital to perform all of its obligations under the Affiliation Agreement from the Closing Date through the 501(a) Certification Time.  Upon the 501(a) Certification Time, and without further action of any party thereto, the term of the Affiliation Agreement shall expire.  LHP MD Provider shall be an express third party beneficiary of this Section 6.13.

# ARTICLE VII
# CONDITIONS TO OBLIGATIONS OF THE PURCHASER

Except as may be waived by the Purchaser, the obligations of the Purchaser to purchase the Interests, to pay the Closing Date Consideration on the Closing Date, and to consummate the transactions contemplated hereby shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

7.1    Representations and Warranties.  The Fundamental Representations shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), other than de minimis inaccuracies.  All other representations and warranties of the Seller set forth in this Agreement shall be true and correct as of the Closing Date in each case as if made on and as of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date), except to the extent that the occurrences, circumstances or facts giving rise to any such representation or warranty not being true and correct, individually or in the aggregate, have not resulted in a Material Adverse Effect.

7.2    Compliance with Agreement.  On and as of the Closing Date, the Seller shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

7.3    Closing Certificates.  The Seller shall have delivered to the Purchaser a certificate, dated as of the Closing Date and signed on behalf of the Seller, certifying the fulfillment of the conditions specified in Sections 7.1 and 7.2.

7.4    Consents and Authorizations.  The Purchaser shall have obtained documentation or other evidence reasonably satisfactory to the Purchaser that the Seller has:

(a)    received all Permits, consents or approvals set forth on <u>Schedule 7.4(a)</u>; and

(b)    complied with all waiting periods under the HSR Act and any similar state Law.

7.5    <u>No Action or Proceeding</u>.  On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

7.6    <u>Good Standing Certificates</u>.  At the Closing, the Seller shall have delivered to the Purchaser good standing certificates issued with respect to each of the Target Companies by the Secretary of State of the relevant entity's state of organization.  Each such good standing certificate shall be dated as of a date that is not more than sixty (60) days prior to the Closing Date.

7.7    <u>Title to Real Property</u>.  First American Title Insurance Company (or another title company reasonably acceptable to Purchaser) shall have committed to issue to Purchaser (at Purchaser's sole cost and expense) a customary title policy with respect to the Owned Real Property, subject only to the Permitted Encumbrances (the "<u>Title Policy</u>").

7.8    <u>Excluded Obligations Release</u>.  Seller shall have delivered the duly executed Excluded Obligations Release.

7.9    <u>Adverse Change</u>.  No act, change, event, or occurrence shall have occurred that has had a Material Adverse Effect with respect to the Target Companies.

7.10    <u>Waiver of Conditions</u>.  The Purchaser may waive any condition of this <u>Article VII</u> to the extent permitted by applicable law.  Except as otherwise provided herein or agreed to by the parties prior to the Closing, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Purchaser to refuse to close the transactions contemplated by this Agreement, and (b) the release of Target and Target Companies from any claim by the Purchaser for any resulting injuries and Damages with respect to that waived condition.

## ARTICLE VIII
## CONDITIONS TO OBLIGATIONS OF THE SELLER

Except as may be waived in writing by the Seller, the obligations of the Seller to consummate the sale of the Hospital Interests on the Closing Date and the Sponsor Interests on the 501(a) Certification Date shall be subject to the satisfaction on or prior to the Closing Date of the following conditions:

8.1    <u>Representations and Warranties</u>.    All representations and warranties of the Purchaser set forth in this Agreement shall be true and correct in all material respects (except to the extent that any such representation or warranty is qualified by materiality, in which case it must be true and correct in all respects) as of the Closing Date in each case as if made on and as

of the Closing Date (except to the extent such representations and warranties speak as of an earlier date, in which case as of such date).

8.2    <u>Compliance with Agreement</u>.  On and as of the Closing Date, the Purchaser shall have performed and complied in all material respects with each covenant and agreement required by this Agreement to be performed and complied with by it on or before the Closing Date.

8.3    <u>Closing Certificates</u>.  The Purchaser shall have delivered to the Seller a certificate, dated as of the Closing Date and signed on behalf of the Purchaser, certifying the fulfillment of the conditions specified in <u>Sections 8.1</u> and <u>8.2</u>.

8.4    <u>Consents and Authorizations</u>.  The Seller shall have obtained documentation or other evidence reasonably satisfactory to the Seller that the Purchaser and Target Companies have:

(a)    received all Permits, consents or approvals set forth on <u>Schedule 8.4(a)</u>; and

(b)    complied with all waiting periods under the HSR Act and any similar state Law.

8.5    <u>No Action or Proceeding</u>.  On the Closing Date, no valid judgment, order or decree of any court or other Governmental Authority restraining, enjoining or otherwise preventing the consummation of this Agreement or the transactions contemplated hereby shall be in effect.

8.6    <u>Waiver of Conditions</u>.  The Seller may waive any conditions of this <u>Article VIII</u> to the extent permitted by applicable law.  Except as otherwise provided herein, the consequences of any knowing waiver shall be (a) the elimination of the waived condition as a valid basis for the Seller to refuse to close the transactions contemplated by this Agreement, and (b) the release of the Purchaser from any claim for resulting injuries and Damages with respect to that waived condition.

## ARTICLE IX
## INDEMNIFICATION

9.1    <u>Survival</u>.  Except for (i) the Fundamental Representations and the representations and warranties of Purchaser contained in <u>Article IV</u>, which representations and warranties shall survive until five (5) years after the Closing Date ("<u>Fundamental Reps Survival Period</u>") and (ii) <u>Section 3.5</u>, which shall survive until one (1) year after the Closing Date (the "<u>Section 3.5 Survival Period</u>"), the representations and warranties set forth in this Agreement shall terminate and be extinguished at the Closing and the covenants and agreements contemplated by this Agreement to be performed at or prior to Closing shall terminate and be extinguished at the Closing, and no party shall have any liability or obligation in connection with any such representation, warranty, covenant or agreement following the Closing (and the parties hereto acknowledge and agree that, in the event that Closing occurs, no party may bring any claim for indemnification against the other party hereunder based upon or arising out of a breach of any such representations, warranties, covenants or agreements).  The respective covenants and

agreements of the parties contained in or made pursuant to this Agreement that by their terms are to be performed after the Closing shall survive such Closing in accordance with their terms (the "Post-Closing Covenants Survival Period" and, together with the Fundamental Reps Survival Period and the Section 3.5 Survival Period, each a "Survival Period").  The Parties agree and acknowledge that the Survival Periods set forth herein, to the extent expressly longer than the three (3) year survival period permitted by Title 10, Section 8106(a) of the Delaware Code, are expressly intended to survive for such longer periods as permitted by Title 10, Section 8106(c) of the Delaware Code.

9.2     Indemnification by the Seller.  Subject to the provisions of this Article IX, the Seller shall indemnify and hold harmless the Purchaser, any Affiliate of the Purchaser, and the respective officers, directors, shareholders, employees, agents and representatives of the Purchaser and its Affiliates (each, a "Purchaser Indemnitee") from and after the Effective Time, from and against any Damages actually incurred by the Purchaser Indemnitee as a result of:

(a)     any inaccuracy in any of the Fundamental Representations made herein by the Seller;

(b)     any inaccuracy in Section 3.5;

(c)     any breach of any of the covenants or agreements made herein by the Seller; and

(d)     any Taxes for any Pre-Closing Period (including the pre-Closing portion of any Straddle Period, determined in accordance with Section 6.6(b)).

9.3     Indemnification by the Purchaser.  The Purchaser shall indemnify and hold harmless the Seller, the Seller Guarantors or any Affiliate of the Seller Guarantors, and their respective officers, directors, shareholders, employees, agents and representatives (each a "Seller Indemnitee") from and after the Effective Time from and against any Damages actually incurred by such Seller Indemnitee as a result of:

(a)     any inaccuracy in any of the representations and warranties made herein by the Purchaser;

(b)     any breach of any of the covenants or agreements made herein by the Purchaser;

(c)     (i) any claim by any current or former employee of a Personnel Provider related to such Person's work in the Business or (ii) any claim by a third party against a Seller Indemnitee that relates to any Target Company or the Business, including any claim related to any services provided to any Target Company or the Business by any Seller Indemnitee; provided, no Seller Indemnitee shall be entitled to indemnification pursuant to this Section 9.3(c)(ii) with respect to any services provided to any Target Company or the Business if it is finally determined by a court of competent jurisdiction that such claim principally arose out of such Seller Indemnitee's gross negligence or willful misconduct;

(d)    any Claims, actions, suits, or other proceedings relating to the operations of the Target Companies after the Effective Time; provided, that nothing herein shall relieve the Seller of its indemnification obligations pursuant to Section 9.2; and

(e)    any liabilities related to the MOB in respect of (i) Seller's post-Closing lease obligations under the Space Leases or (ii) LHP's guarantees of the Ground Lease and Space Leases.

9.4    Limitations on Claims.

(a)    Notwithstanding anything in this Article IX to the contrary, the rights of the parties to be indemnified and held harmless under this Article IX shall be limited as follows:

(i)    in no event shall the Purchaser Indemnitees be entitled to recover any Damages with respect to any matter relating to the Target Companies' assets, liabilities or reserves that were included in the calculation of the Final Net Working Capital, to the extent such Damages are reflected therein;

(ii)    Seller will have no obligation to indemnify a Purchaser Indemnitee pursuant to Section 9.2(a) in respect of damages arising from any inaccuracy in any of the Fundamental Representations or Section 3.5 unless and until the aggregate amount of such damages incurred or suffered by all Purchaser Indemnitees exceeds $250,000 (the "Threshold"), and thereafter Seller shall only indemnify a Purchaser Indemnitee in respect of any damages in excess of the Threshold;

(iii)    Purchaser will have no obligation to indemnify a Seller Indemnitee pursuant to Section 9.3(a) in respect of damages arising from any inaccuracy in any of the representations and warranties made herein by Purchaser unless and until the aggregate amount of such damages incurred or suffered by all Seller Indemnitees exceeds the Threshold, and thereafter Purchaser shall only indemnify a Seller Indemnitee in respect of any damages in excess of the Threshold; and

(iv)    the Seller shall not be liable for any Damages pursuant to Section 9.2 in excess of the aggregate dollar amounts paid to the Seller pursuant to any of the provisions of this Agreement; provided, Seller's liability for any Damages pursuant to Section 9.2(b) shall not exceed $1,137,500.

(b)    The liability of a party with respect to any claim for indemnity by an Indemnitee pursuant to this Article IX shall be offset dollar for dollar by (i) any insurance proceeds received by such Indemnitee after the Effective Time in respect of the Damages involved, (ii) any other recovery made by such Indemnitee from any third party on account of the Damages involved, but, in each case, only after Indemnitee first recovers all Damages, including the aggregate amount of all costs and expenses incurred by such Indemnitee in connection with the recovery of such proceeds (including payment of deductibles and self-insured retention amounts) and less the present value of all insurance policy premium increases reasonably anticipated to result therefrom, and (iii) any Tax benefit realized by the Purchaser or an Affiliate in respect of the indemnified matter.

(c)    The right to indemnification with respect to any claim for which notice has been properly and timely given in accordance with Sections 9.1 and 9.5 shall expire on the day after the expiration of the applicable Survival Period, unless an action or suit has been brought with respect to such Claim.

9.5    Claims Procedures.

(a)    If a party seeks indemnification for Damages hereunder, the party seeking indemnification (the "Indemnitee") shall promptly notify the party from whom indemnification is sought (the "Indemnifying Party") in writing of the existence and nature of such Damages (a "Claim"), and shall include in the Claim a reasonably detailed description of all related claims, demands, actions or proceedings, if any, out of which the Damages arise; provided, however, that so long as a Claim is delivered within the applicable Survival Period, failure or delay by the Indemnitee to deliver a Claim in compliance with this provision shall only reduce the obligation of the Indemnifying Party to the extent that such failure impairs the Indemnifying Party's ability to defend the claim or mitigate Damages, in which case the Indemnifying Party shall have no obligation to indemnify the Indemnitee to the extent of Damages caused by such failure.

(b)    In the event of a Claim related to a claim by a third party, the Indemnifying Party may elect to retain counsel of its choice to represent the Indemnitee in connection with such Claim and shall pay the fees, charges and disbursements of such counsel. The Indemnitee may participate, at its own expense and through legal counsel of its choice, provided that (i) the Indemnifying Party may elect to control the defense of the Indemnitee in connection with such Claim and (ii) the Indemnitee and their counsel shall cooperate with the Indemnifying Party and its counsel in connection with such Claim. The Indemnifying Party shall not settle any such Proceeding without the relevant Indemnitees' prior written consent (which shall not be unreasonably withheld). Notwithstanding the foregoing, if the Indemnifying Party elects not to retain counsel and assume control of such defense or if both the Indemnifying Party and any Indemnified Party are parties to or subjects of such proceeding and conflicts of interests exist between the Indemnifying Party and such Indemnitee, then the Indemnitee shall retain counsel reasonably acceptable to the Indemnifying Party in connection with such proceeding and assume control of the defense in connection therewith, and the fees, charges and disbursements of no more than one such counsel per jurisdiction selected by the Indemnitee shall be reimbursed by the Indemnifying Party.

(c)    If the Indemnifying Party shall, within a reasonable time after said notice, fail to defend, the Indemnitee shall have the right, but not the obligation, and without waiving any rights against the Indemnifying Party, to undertake the defense of, and with the consent of the Indemnifying Party (such consent not to be withheld unreasonably), to compromise or settle the Claim on behalf, for the account, and at the risk and expense, of the Indemnifying Party and shall be entitled to collect the amount of any settlement or judgment or decree and all costs and expenses (including, without limitation, reasonable attorney's fees) in connection therewith from the Indemnifying Party. Under no circumstances will the Indemnifying Party have any liability in connection with any settlement of any Proceeding that is entered into without its prior written consent (which shall not be unreasonably withheld). Except as provided in this Section 9.5(c), the Indemnitee shall not compromise or settle any Claim.

(d)     From and after the delivery of a Claim, at the reasonable request of the Indemnifying Party, each Indemnitee shall grant the Indemnifying Party and its counsel, experts and representatives full access, during normal business hours, to the books, records, personnel and properties of the Indemnitee to the extent reasonably related to the Claim at no cost to the Indemnifying Party.

(e)     An Indemnitee shall use commercially reasonable efforts to pursue insurance claims or claims against third parties that may reduce or eliminate any Damages.

9.6     <u>Subrogation</u>.  After any indemnification is made to any Indemnitee pursuant to this <u>Article IX</u>, the Indemnifying Party shall, to the extent of such payment, be subrogated to all rights (if any) of the Indemnitee against any third party in connection with the Damages to which such payment relates (which rights of subrogation shall be junior to any rights of the Indemnitee for any such Damages as to which it did not receive indemnification pursuant to this <u>Article IX</u> as a result of the limitations set forth in <u>Section 9.4</u> or otherwise).

9.7     <u>Guarantee</u>.  The Seller Guarantors, severally to the extent of their Percentage Obligations and not jointly, hereby irrevocably guarantee the prompt performance of all obligations of the Seller arising under <u>Section 2.4(e)(ii)</u> and this <u>Article IX</u>.  The Seller Guarantors, Seller and Purchaser acknowledge that but for these guarantees, Purchaser would not enter into this Agreement and the transactions contemplated herein.

9.8     <u>Limitation on Damages</u>.  NOTWITHSTANDING ANYTHING TO THE CONTRARY ELSEWHERE IN THIS AGREEMENT, NEITHER PARTY (OR ANY OF ITS AFFILIATES) SHALL BE LIABLE TO THE OTHER PARTY (OR ANY OF ITS AFFILIATES) FOR ANY SPECIAL, CONSEQUENTIAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, COSTS, EXPENSES, CHARGES OR CLAIMS.

9.9     <u>Exclusive Remedy</u>.  From and after the Closing, the remedies provided for in this <u>Article IX</u> and in the Guarantee shall be exclusive and shall preclude assertion by any Indemnitee of any other rights or the seeking of any and all other remedies against any Indemnitor for claims based on this Agreement, the negotiation thereof or otherwise, other than for (a) actions for specific performance, (b) Damages arising out of or relating to Actual Fraud by any Indemnitor and (c) adjustments to the Closing Date Consideration contemplated by <u>Section 2.4</u>.  Each party hereby waives any provision of applicable Law to the extent that it would limit or restrict the agreement contained in this <u>Section 9.9</u>, and Seller and Purchaser each hereby expressly waives for periods following the Closing any and all other rights or causes of action it or its Affiliates or representatives may have against the other Party or its Affiliates or representatives now or in the future under any applicable Law with respect to any breach of any representation, warranty, covenant or other agreement herein or the subject matter of such indemnification provisions.

# ARTICLE X
# TERMINATION

10.1    <u>Termination Events</u>.  This Agreement may be terminated at any time prior to Closing upon prior written notice by the party electing to terminate this Agreement to the other party:

(a)    by written agreement executed by the Seller and the Purchaser;

(b)    by either the Seller or the Purchaser if any permanent injunction, Court Order or other order, decree or ruling of any court or other Governmental Authority of competent jurisdiction permanently restraining, enjoining or otherwise preventing the consummation of the transactions contemplated hereby shall have been issued and become final and non-appealable;

(c)    by either the Seller or the Purchaser if the Closing shall not have occurred by the Optional Termination Date; <u>provided</u>, <u>however</u>, that this <u>Section 10.1(c)</u> shall not be available to any Party (A) whose Willful Breach of any provision of this Agreement results in the failure of the Closing to be consummated on or before the Optional Termination Date, <u>provided</u> that from and after the Optional Termination Date, the non-Willful Breaching party shall have sixty (60) days to commence a legal proceeding for specific performance of this Agreement and (x) if such legal proceeding is not commenced by the end of such sixty (60) day period or (y) there is a final and nonappealable judgment by a Governmental Authority of competent jurisdiction denying a claim for specific performance by the non-Willful Breaching party, the Willful Breaching party shall have the right to terminate this Agreement pursuant to the terms and conditions of this <u>Section 10.1(c)</u> notwithstanding this clause (A)) or (B) during the pendency of any legal proceeding by the other Party for specific performance of this Agreement;

(d)    by the Seller upon a breach in any material respect of any covenant or agreement on the part of the Purchaser set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Purchaser shall have been breached or shall have become untrue in any such case that the conditions set forth in <u>Sections 8.1</u> and <u>8.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties); or

(e)    by the Purchaser upon a breach in any material respect of any covenant or agreement on the part of the Seller set forth in this Agreement, and such breach is not cured within thirty (30) days of notice thereof, or if any representation or warranty of the Seller shall have been breached or shall have become untrue in any such case such that the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> would be incapable of being satisfied by the Optional Termination Date (or any later date as such date may be otherwise extended by mutual agreement of the parties).

10.2    <u>Effect of Termination</u>.  In the event of termination of this Agreement pursuant to <u>Section 10.1</u>, all obligations of the parties hereto shall terminate, except the obligations of the parties pursuant to <u>Sections 6.1</u>, <u>10.2</u>, <u>11.1</u>, and <u>Article XII</u> (other than <u>Section 12.18</u>); <u>provided</u>, <u>however</u>, that the foregoing shall in no way release or waive any rights which any party may

have on account of a Willful Breach of any covenant or agreement or Actionable Breach pursuant to this Agreement which occurred prior to such termination.

## ARTICLE XI
## NOTICES

      11.1   <u>Notices</u>.  All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or received by telegraphic or other electronic means (including facsimile, telecopy and telex), when delivered by reputable overnight courier, or if mailed, five days after being deposited in the United States mail, certified or registered mail, first-class postage prepaid, return receipt requested, to the parties at the following addresses or facsimile numbers:

If to the Seller, to:

Sherman/Grayson Health System, LLC
c/o LHP Hospital Group, Inc.
2400 Dallas Parkway, Suite 450
Plano, Texas  75093
Attention: General Counsel
Fax:  (972) 312-9750

with a copy (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Harvey Eisenberg, Esq.
Facsimile:  212-310-8007

If to the Purchaser, to:

Alecto Healthcare Services Sherman LLC
c/o Alecto Healthcare Services LLC
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: CEO
Facsimile: (949) 878-9458

with a copy (which shall not constitute notice) to:

Law Offices of Michael J. Sarrao
16310 Bake Parkway, Suite 200
Irvine, California 92618
Attention: Michael J. Sarrao, Esq.
Facsimile: (949) 878-9458

Any Party from time to time may change its address or facsimile number for the purpose of receipt of notices to that Party by giving a similar notice specifying a new address or facsimile number to the other notice Parties listed above in accordance with the provisions of this <u>Section 11.1</u>.

**ARTICLE XII**
**MISCELLANEOUS**

12.1    <u>Fees and Expenses</u>.  Except as otherwise provided in this Agreement, the Seller shall pay its own expenses (including, without limitation, the fees and expenses of Weil, Gotshal & Manges LLP and of the parties reflected in <u>Schedule 3.20</u> in connection with this Agreement and also including those expenses of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred prior to the Effective Time) and the Purchaser shall pay its own expenses (including, without limitation, the fees and expenses of attorneys, accountants and other representatives in connection with this Agreement, and also including those of the Target Companies in connection with this Agreement and the transactions contemplated hereby incurred after the Effective Time) in connection with this Agreement and the transactions contemplated hereby.  Purchaser shall pay all recording fees, transfer fees, transfer taxes, and documentary or stamp taxes, if any, relating to the sale and the transactions provided for herein.  Except as set forth in the following sentence and in <u>Section 6.2(b)</u>, each party shall pay its own fees and expenses, including for purposes of this <u>Section 12.1</u>, attorney fees, with respect to the preparation of pre-merger report forms under the HSR Act, if applicable.  Further, and notwithstanding the foregoing, the Purchaser will bear all fees and expenses of all parties, resulting from or relating to any investigation or challenge of the transactions contemplated hereby initiated by the United States Federal Trade Commission, the United States Department of Justice or the Attorney General of any state on, prior to or after the Closing under antitrust or similar Laws, including costs and expenses resulting from or relating to any "second request" issued in connection with the parties' HSR Act filings, if any, made in connection with the transactions contemplated hereby.

12.2    <u>Entire Agreement</u>.  Except for documents and agreements executed pursuant hereto, and except for the provisions of the Confidentiality Agreement (which Confidentiality Agreement shall survive the parties' execution and delivery of this Agreement), this Agreement supersedes all prior oral discussions and written agreements between the parties with respect to the subject matter of this Agreement (including any term sheet or similar agreement or document relating to the transactions contemplated hereby).  Except for the Confidentiality Agreement, this Agreement, including the exhibits and schedules hereto and other documents delivered in connection herewith, contains the sole and entire agreement between the parties hereto with respect to the subject matter hereof.

12.3    <u>Waiver</u>.  Any term or condition of this Agreement may be waived at any time by the party which is entitled to the benefit thereof.  Any such waiver must be in writing and must be duly executed by such party.  A waiver on one occasion shall not be deemed to be a waiver of the same or any other breach, provision or requirement on any other occasion.

12.4    <u>Amendment</u>.  This Agreement may be modified or amended only by a written instrument duly executed by the Seller and the Purchaser.

12.5    Counterparts; Facsimile Signatures; Reproductions.    This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.  Facsimile signatures on this Agreement shall be deemed to be original signatures for all purposes.  This Agreement and all documents relating hereto, including (i) consents, waivers and modifications which may hereafter be executed, (ii) the documents delivered at the Closing, and (iii) financial statements, certificates and other information previously or hereafter furnished to the Seller or to the Purchaser, may be reproduced by the Seller and by the Purchaser by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process and, unless otherwise required by Law, the Seller and the Purchaser may destroy any original documents so reproduced.  The Seller and the Purchaser agree and stipulate that any such reproduction shall be admissible in evidence as the original itself in any judicial, arbitral or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by the Seller or the Purchaser in the regular course of business) and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

12.6    No Third Party Beneficiary.    The terms and provisions of this Agreement are intended solely for the benefit of the Seller, the Purchaser and their respective successors or assigns, and it is not the intention of the parties to confer third party beneficiary rights upon any other Person, other than with respect to the provisions of Sections 5.8, 6.4, 6.5, 6.9 and 6.13 and Article IX, which shall inure to the benefit of the Persons who are intended to be third-party beneficiaries thereof.

12.7    GOVERNING LAW, CONSTRUCTION.    THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  The parties hereto agree that no provisions of this Agreement or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

12.8    Binding Effect.    This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns, including successors by merger or otherwise.

12.9    No Assignment.    Neither this Agreement nor any right hereunder or part hereof may be assigned by any party hereto without the prior written consent of the other parties hereto; provided, however, that (a) the Seller, on the one hand, and the Purchaser, on the other hand, may assign their respective rights and obligations under this Agreement to other Persons who (i) are Affiliates of the Seller or the Purchaser, respectively, and (ii) agree to be bound by the terms and conditions of this Agreement; and (b) Purchaser may assign its rights under this Agreement to a real estate investment trust and/or its Affiliates in connection with a sale/leaseback transaction and true operating lease which is used to provide Purchaser with capital   to consummate this Agreement.  Notwithstanding the assignment of this Agreement or any rights or

obligations hereunder, the assignor shall be jointly and severally liable with its assignee with respect to any obligations assigned hereunder.

12.10  <u>Headings, Gender, Etc.</u>  The headings used in this Agreement have been inserted for convenience and do not constitute provisions to be construed or interpreted in connection with this Agreement.  Unless the context of this Agreement otherwise requires, (a) words of any gender will be deemed to include each other gender, (b) words using the singular or plural number also will include the plural or singular number, respectively, (c) the terms "hereof", "herein", "hereby" and derivative or similar words will refer to this entire Agreement, and (d) the terms "Article," "Section," "Schedule" and "Exhibit" will refer to the specified Article or Section of this Agreement or the specified Schedule or Exhibit to this Agreement.

12.11  <u>Public Announcement.</u>  Prior to the Closing, the Parties shall not, and shall cause their respective Affiliates not to, make or issue any public statements or announcements with respect to this Agreement or the transactions contemplated hereby.  In connection with the Closing, the Parties will use good faith efforts to agree on the text of a joint public statement or announcement and/or will use good faith efforts to obtain the other Party's approval of the text of any public statement or announcement to be made solely on behalf of a Party; <u>provided</u> that the foregoing shall not preclude any Party from making such disclosure as may be required by applicable Law.

12.12  <u>Severability; Invalid Provisions.</u>  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

12.13  <u>Venue.</u>  To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Agreement or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Agreement or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

12.14  <u>WAIVERS OF TRIAL BY JURY.</u>  EACH OF THE SELLER AND THE PURCHASER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY

JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS
AGREEMENT OR ANY OF THE TRANSACTION DOCUMENTS, AND CONSENTS TO
THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED
APPROPRIATE BY THE COURT.

12.15   <u>No Inferences</u>.  Inasmuch as this Agreement is the result of negotiations between
sophisticated parties of equal bargaining power represented by counsel, no inference in favor of,
or against, either party shall be drawn from the fact that any portion of this Agreement has been
drafted by or on behalf of such party.

12.16   <u>Tax and Government Program Advice and Reliance</u>.  Except as expressly
provided in this Agreement, none of the Parties (nor any of the Parties' respective counsel,
accountants or other representatives) has made or is making any representations to any other
Party (or to any other Party's counsel, accountants or other representatives) concerning the
consequences of the transactions contemplated hereby under applicable Tax Laws or under the
Laws governing any Government Program.  Each Party has relied solely upon the Tax any
Government Program advice of its own employees or of representatives engaged by such Party
and not on any such advice provided by any other Party hereto.

12.17   <u>Further Assurance Clause</u>.  On and after the Closing Date, the Seller and the
Purchaser will take all appropriate action and execute all documents, instruments or conveyances
of any kind which may be reasonably necessary or advisable to carry out any of the provisions
hereof, including, without limitation, putting the Purchaser in possession and operational control
of the Business and the Facility.

12.18   <u>Specific Performance</u>.  The Parties agree that irreparable damage would occur in
the event that any of the obligations, undertakings, covenants or agreements of the Parties hereto
were not performed in accordance with their specific terms or were otherwise breached and that
monetary damages, even if available, would not be an adequate remedy.  It is accordingly agreed
that the Seller, on the one hand, and, Purchaser, on the other hand, shall be entitled to an
injunction or injunctions to prevent breaches of this Agreement by the other Party, and to enforce
specifically the terms and provisions of this Agreement by a decree of specific performance,
without the necessity of proving actual harm or posting a bond or other security therefor, this
being in addition to any other remedy to which such Party is entitled at law or in equity, and each
Party hereto agrees that it will not oppose the granting of an injunction, specific performance or
other equitable relief on the basis that any other Party hereto has an adequate remedy at law or
that any award of specific performance or other equitable remedy is not an appropriate remedy
for any reason at law or in equity.  Without limitation of the foregoing, the Parties hereby further
acknowledge and agree that prior to the Closing, the Seller shall be entitled to seek specific
performance to enforce specifically the terms and provisions of, and to prevent or cure breaches
of the covenants required to be performed by Purchaser under this Agreement (including to cause
Purchaser to consummate the Closing and to make the payments contemplated by this
Agreement, including <u>Section 2.6(a)</u>) in addition to any other remedy to which the Seller is
entitled at law or in equity, including the Seller's right to terminate this Agreement pursuant to
<u>Article X</u> and seek money damages (including damages based on loss of the economic benefits
of the transactions contemplated hereby to the Seller).  In the event that the Seller, on the one
hand, or Purchaser, on the other hand, brings a legal proceeding for specific performance

pursuant to this <u>Section 12.18</u>, and a court rules that the Seller or Purchaser, as applicable, breached any provision of this Agreement, then the breaching Party shall also pay the non-breaching Party's reasonable costs and expenses (including reasonable attorneys' fees and expenses) in connection with all such legal proceedings to seek specific performance of the Seller's or Purchaser's, as applicable, obligations under this Agreement and all legal proceedings to collect such costs and expenses.  Each of the Parties further agrees that it shall not take any position in any legal proceeding concerning this Agreement that is contrary to the terms of this <u>Section 12.18</u>.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                        **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**          **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                              **SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By: _Rebecca Hurley_                         By:_____
Name: _REBECCA HURLEY_                  Name:_____
Its: _EVP_                                       Its:_____


**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By: _Rebecca Hurley_
Name: _REBECCA HURLEY_
Its: _EVP_


**TEXAS HEALTH RESOURCES**

By:_____
Name:_____
Its:_____


[Signature Page to Purchase Agreement]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                    **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**          **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                        **SHERMAN LLC**

                                       By: Alecto Healthcare Services LLC, its sole member

By:_____          By:_____
Name:_____          Name:_____
Its:_____         Its:_____

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By:_____
Name:_____
Its:_____

**TEXAS HEALTH RESOURCES**

By:_____
Name:_____*STANLEY E. TEMAN*_____
Its:_____*CEO*_____

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**SELLER:**                                    **PURCHASER:**

**SHERMAN/GRAYSON HEALTH**          **ALECTO HEALTHCARE SERVICES**
**SYSTEM, LLC**                              **SHERMAN LLC**

By: Alecto Healthcare Services LLC, its sole member

By:_____    By:_____
Name:_____    Name:_____ _Roger Krissman____
Its:_____    Its:_____ _CFO_____

**SELLER GUARANTORS:**

**LHP HOSPITAL GROUP, INC.**

By:_____
Name:_____
Its:_____

**TEXAS HEALTH RESOURCES**

By:_____
Name:_____
Its:_____

[Signature Page to Purchase Agreement]

**Exhibit A**

**Form of Excluded Obligations Release**

# RELEASE

THIS RELEASE (the "Release") is entered into as of the [•] day of [•], 2014, by and among Sherman/Grayson Hospital, LLC, a Texas limited liability company ("Hospital"), Sherman/Grayson Health Services, LLC, a Texas limited liability company ("Services") and Sherman/Grayson Sponsor, LLC, a Texas limited liability company ("Sponsor" and, together with Hospital and Services, the "Released Parties"), on the one hand, and Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), LHP Hospital Group, Inc., a Delaware corporation ("LHP"), and Texas Health Resources, a Texas non-profit corporation ("THR", together with Seller and LHP, the "Releasing Parties"), on the other hand.  Capitalized terms not defined herein shall have the meanings ascribed to them in the Purchase Agreement, as defined below.

WHEREAS, Sherman/Grayson Health System, LLC ("Seller"), Alecto Healthcare Services Sherman LLC ("Buyer"), LHP Hospital Group, Inc. and Texas Health Resources entered into that certain Purchase Agreement, dated as of September 23, 2014 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), pursuant to which Seller agreed to sell to Buyer all of the outstanding membership interests in the Released Parties; and

WHEREAS, Section 7.8 of the Purchase Agreement provides that the Seller shall deliver at the Closing to the Buyer this Release.

NOW, THEREFORE, in consideration of the foregoing premises and the covenants and agreements set forth herein and in the Purchase Agreement, the parties hereto agree as follows:

1.    Termination.    Except for the Purchase Agreement and the Transaction Documents and the obligations set forth therein, and with effect immediately following consummation of the transactions contemplated by the Purchase Agreement and delivery of all of the Transaction Documents, each of the Releasing Parties for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever terminates any agreements or obligations of any kind between and among any of the Released Parties to the extent any such agreement or obligation is an Excluded Obligation, in each case without any liability to the Released Parties.

2.    Release.  Each of the Releasing Parties, for itself, and each of LHP and THR on behalf of its respective Affiliates, fully, finally and forever releases the Released Parties from any and all actions, obligations, costs, expenses, Damages, debts, claims, liabilities, causes of action and demands, known or unknown, actual or contingent, of whatever character, at law or in equity, in each case, relating to the Excluded Obligations (collectively "Claims") which such Releasing Party ever had, now has, or hereafter can, shall or may have based upon actions, omissions, events or circumstances occurring up to the time of the execution of this Release (collectively "Released Claims"); provided, however that Released Claims do not include Claims arising under the Purchase Agreement or the Transaction Documents.

3.    Governing Law.    THIS RELEASE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE

1

APPLICABLE TO A CONTRACT EXECUTED AND PERFORMED IN SUCH STATE IN ANY EVENT WITHOUT REGARD TO ANY CHOICE OF LAW PRINCIPLE THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION. The parties hereto agree that no provisions of this Release or any related document shall be construed for or against or interpreted to the advantage or disadvantage of any party hereto by any court or other Governmental Authority by reason of any party's having or being deemed to have structured or drafted such provision, each party having participated equally in the structuring and drafting hereof.

4.      Submission to Jurisdiction.   To the fullest extent permitted by applicable law, each party hereto (a) agrees that any claim, action or proceeding by such party seeking any relief whatsoever arising out of, or in connection with, this Release or the transactions contemplated hereby shall be brought only in any State or Federal court located in Delaware and not in any other State or Federal court in the United States of America or any court in any other country, (ii) agrees to submit to the exclusive jurisdiction of such courts located in Delaware for purposes of all legal proceedings arising out of, or in connection with, this Release or the transactions contemplated hereby, (iii) waives and agrees not to assert any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court or any claim that any such proceeding brought in such a court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

5.      Assignment; Successors.   Neither this Release nor any of the rights, interests or obligations under this Release may be assigned or delegated, in whole or in part, by operation of law or otherwise, without the prior written consent of the Releasing Parties and the Released Parties, and any such assignment without such prior written consent shall be null and void.

**[SIGNATURES APPEAR ON THE FOLLOWING PAGE]**

   IN WITNESS WHEREOF, the parties hereto have executed this Release as of the date first above written.

**RELEASING**      **SHERMAN/GRAYSON HEALTH SYSTEM, LLC**
**PARTIES:**

By:_____
  Name:_____
  Title:_____

**LHP HOSPITAL GROUP, INC.**

By:_____
  Name:_____
  Title:_____

**TEXAS HEALTH RESOURCES**

By:_____
  Name:_____
  Title:_____

**RELEASED**
**PARTIES:**

**SHERMAN/GRAYSON HOSPITAL, LLC,**

By:_____
   Name:_____
   Title:_____

**SHERMAN/GRAYSON HEALTH SERVICES, LLC,**

By:_____
   Name:_____
   Title:_____

**SHERMAN/GRAYSON SPONSOR, LLC,**

By:_____
   Name:_____
   Title:_____

**<u>Exhibit B</u>**

**<u>Knowledge Parties</u>**

<u>Target Companies</u>

John Holland

John Ehrie

<u>Purchaser</u>

Lex Reddy

Roger Krissman

## **Exhibit C**

## **Net Working Capital Methodology**

# Net Working Capital Methodology

**Texas Health Presbyterian Hospital - WNJ**

**Net Working Capital Calculation**

**As of July 2014**

*Amounts in $000s*

| | Seller Unaudited Balance Sheet July 2014 | Adjustments to Eliminate Seller | Target Companies' Combined B/S | NWC per Purchase Agreement | Notes |
|---|---|---|---|---|---|
| **Current Assets:** | | | | | |
| Cash | 5 | (5) | - | - | Remove Cash |
| Restricted Cash | - | - | - | - | |
| Accounts Receivable, less allowance for doubtful accounts | 13,930 | (313) | 13,617 | 13,617 | Remove Meaningful Use Receivable |
| Inventories | 2,608 | - | 2,608 | 2,608 | |
| Other receivables | 296 | - | 296 | 296 | |
| Other / Prepaids | 466 | - | 466 | 466 | |
| **Total Current Assets** | 17,305 | (318) | 16,987 | 16,987 | |
| **Property and equipment, at cost:** | | | | | |
| Land | - | - | - | - | |
| Buildings and improvements | 10,056 | - | 10,056 | - | |
| Furniture and equipment | 20,590 | - | 20,590 | - | |
| Construction in progress | 1,484 | - | 1,484 | - | |
| Accumulated Depreciation | (24,470) | - | (24,470) | - | |
| **Property and equipment, net** | 7,659 | - | 7,659 | - | |
| Investments in and advances to affiliate | 87 | - | 87 | - | |
| Notes Receivable | 2 | - | 2 | - | |
| Other assets | 468 | (405) | 63 | - | |
| **Total Assets** | 25,521 | (723) | 24,798 | - | |
| **Liabilities and Members' Equity** | | | | | |
| **Current liabilities:** | | | | | |
| Accounts Payable | 6,894 | - | 6,894 | 6,894 | |
| Accrued salaries, wages and benefits | 2,755 | - | 2,755 | 2,755 | |
| Other accrued expenses | 12,038 | (10,625) | 1,413 | 1,413 | Remove management fees |
| Interest payable | 448 | (88) | 360 | 360 | Remove interest payable on debt |
| Current portion of long term debt | 2,664 | (2,664) | - | - | Remove current portion of debt |
| Due to corporate | 24,753 | (24,753) | - | - | Remove intercompany due to LHP |
| **Total current liabilities** | 49,552 | (38,130) | 11,422 | 11,422 | |
| **Long term liabilities:** | | | | | |
| Long term debt | 45,337 | (45,337) | - | - | |
| Other | 369 | - | 369 | 369 | |
| **Total long term debt** | 45,705 | (45,337) | 369 | - | |
| Long term obligations | 10,925 | - | 10,925 | - | |
| **Total long term liabilities** | 56,630 | (45,337) | 11,294 | - | |
| **Total liabilities** | 106,182 | (83,466) | 22,716 | - | |
| Total Members equity & retained deficit | (80,660) | 82,743 | 2,083 | - | |
| **Total liabilities and equity** | 25,521 | (723) | 24,798 | - | |
| **Target Net Working Capital** | | | | 5,565 | |

*The line items above consist only of the aggregated GL line items attached to this Exhibit*

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000000) Non-desig Payer Type -system account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000005) Revenue Accrual Gross AR | 722,129 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000010) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000100) Other Patient AR 1417 Clinic | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000101) Other Patient AR Reserve 1417 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000102) Other Patient AR CRNA | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000103) Other Patient AR Reserves CRNA's | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000104) Other Patient AR #3 | (150,955) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000105) Other Patient AR Reserve #3 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000106) Other Patient AR #4 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000300) AR û Credit Balances | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000400) AR û Industrial | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000520) Agency 1 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000860) Return Check Clearing | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000930) Unapplied Cash û Ins (hosp designated) | (221,590) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000980) Refund Clearing | (128) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000981) Refund Clearing #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11000990) Late charge suspense account | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001000) 1 - MEDICARE IP Gross AR | 8,325,043 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001010) 1 - MEDICARE IP CA | (6,405,410) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001500) 1 - MEDICARE OP Gross AR | 2,589,351 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001510) 1 - MEDICARE OP CA | (1,423,770) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001580) MC bad debt receivable/payable | 33,553 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001590) Bad Debt Pass Through Pmts | (186,197) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001600) MC DSH receivable/payable | 84,265 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001840) MPPS accrued contractual adjustments | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11001870) MC Outpatient  Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002000) 2 - MEDICAID IP Gross AR | 777,044 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002010) 2 - MEDICAID IP CA | (3,843,239) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002500) 2 - MEDICAID OP Gross AR | 173,073 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002510) 2 - MEDICAID OP CA | (976,046) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002810) MA Allowance for OP fee-based rec | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11002840) Allowance for MA Inpatient | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003000) 8 - WORKMANS COMP IP Gross AR | 144,689 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003010) 8 - WORKMANS COMP IP CA | 52,106 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003500) 8 - WORKMANS COMP OP Gross AR | 188,029 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11003510) 8 - WORKMANS COMP OP CA | (112,896) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004000) 4 - COMMERCIAL IP Gross AR | 482,438 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004010) 4 - COMMERCIAL IP CA | (363,613) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004500) 4 - COMMERCIAL OP Gross AR | 876,907 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11004510) 4 - COMMERCIAL OP CA | (558,030) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005000) 7 - MNGED CARE - MEDICAID IP Gross AR | 1,337,813 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005010) 7 - MNGED CARE - MEDICAID IP CA | (878,963) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005500) 7 - MNGED CARE-MEDICAID OP Gross AR | 910,782 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11005510) 7 - MNGED CARE - MEDICAID OP CA | (466,699) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006000) 3 - OTHER FED/COUNTY/STATE IP Gross AR | 671,040 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006010) 3 - OTHER FED/COUNTY/STATE IP CA | (300,985) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006500) 3 - OTHER FED/COUNTY/STATE OP Gross AR | 353,058 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11006510) 3 - OTHER FED/COUNTY/STATE OP CA | (205,681) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007000) 5 - MNGED CARE-COMMERCIAL IP Gross AR | 4,074,477 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007010) 5 - MNGED CARE-COMMERCIAL IP CA | (1,306,581) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007500) 5 - MNGED CARE-COMMERCIAL OP Gross AR | 3,154,650 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11007510) 5 - MNGED CARE-COMMERCIAL OP CA | (1,132,165) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008000) 6 - MNGED CARE - MEDICARE IP Gross AR | 1,380,536 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008010) 6 - MNGED CARE - MEDICARE IP CA | (352,249) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008050) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008060) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008500) 6 - MNGED CARE - MEDICARE OP Gross AR | 679,544 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008510) 6 - MNGED CARE - MEDICARE OP CA | (359,882) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11008710) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11009000) 9 - SELF PAY IP Gross AR | 14,217,539 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11009020) Industrial Account û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11009100) Charity Discount Program û Allowance | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11009500) 9 - SELF PAY OP Gross AR | 9,157,166 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202000) Allow for Uncollectible Patient Accts | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202020) For future use | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202050) Allowance for Industrial A/R | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202100) Allowance for other patient AR | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202102) Other Patient BD Reserve #2 | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202200) Pure Self Pay AFDA | (14,203,875) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202210) Self Pay After Insurance AFDA | (2,469,477) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202220) Insured Aged < 365 days AFDA | (971,915) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11202230) Insured Aged >= 365 days AFDA | (620,023) | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203000) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203010) Year to be determined | 256,223 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203020) Year to be determined | - | - |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | Accounts Receivable, Net | | Accounts Payable | | |
| | | Inventories | | Accrued salaries, wages and benefits | | |
| | | Other / Prepaids | | Other accrued expenses | | |
| | | Other Receivables | | Interest payable | | |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203030) Year to be determined | 194,517 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203040) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11203070) Medicare due to/from 2013 | 222,792 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204000) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204070) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204080) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204090) Year to be determined | - | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11204130) Medicaid due to/from 2013 | 11,515 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206000) Year to be determined | 13,167 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11206130) Champus due to/from 2013 | 43,844 | - |
| BS - Accounts Receivable, Net | BS | Accounts Receivable, less allowance for doubtful accounts | D | (11207000) MC MU/HIT 2012 | 312,651 | 312,651 |
| | | | | **Accounts Receivable, Net:** $ 13,929,571 | | $ 13,616,921 |
| BS - Inventory | BS | Inventories | D | (11306120) Inventory-Medical and Surgical Unit | - | - |
| BS - Inventory | BS | Inventories | D | (11307010) Inventory-Surgery Unit | 1,067,976 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | 733,191 | - |
| BS - Inventory | BS | Inventories | D | (11307120) Inventory-Pharmacy-#1 | - | - |
| BS - Inventory | BS | Inventories | D | (11307180) Inventory-Materials Management | 423,264 | - |
| BS - Inventory | BS | Inventories | D | (11307200) Inventory-Non-Published | - | - |
| BS - Inventory | BS | Inventories | D | (11307360) Inventory-Microbiology lab | 160,244 | - |
| BS - Inventory | BS | Inventories | D | (11307380) Inventory-Non-Published | 2,735 | - |
| BS - Inventory | BS | Inventories | D | (11307460) Inventory-Cardiac Cath Lab | 206,657 | - |
| BS - Inventory | BS | Inventories | D | (11307620) Inventory-Physical Therapy | - | - |
| BS - Inventory | BS | Inventories | D | (11307820) Inventory-Industrial Medicine | - | - |
| BS - Inventory | BS | Inventories | D | (11308000) Inventory-Dietary/Cafeteria#1 | 14,118 | - |
| | | | | **Inventories:** $ 2,608,184 | | $ 2,608,184 |
| BS - Other | BS | Other | D | (11400000) General prepaids | 367,783 | - |
| BS - Other | BS | Other | D | (11400000) General prepaids | - | - |
| BS - Other | BS | Other | D | (11400010) Prepaid General Liability | - | - |
| BS - Other | BS | Other | D | (11400020) Insure | 98,473 | - |
| BS - Other | BS | Other | D | (11400020) Insure | - | - |
| BS - Other | BS | Other | D | (11400510) Taxes | - | - |
| | | | | **Other / Prepaids:** $ 466,256 | | $ 466,256 |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | 2,281 | - |
| BS - Other receivables | BS | Other receivables | D | (11500200) Current Non-Patient Receivable FDN | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500210) Current Non-Patient A/R - ASC | 14,852 | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500220) Current Non-Patient Receivable #3 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500230) Current Non-Patient Receivable #4 | 100 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | 10,508 | - |
| BS - Other receivables | BS | Other receivables | D | (11500240) Current Non-Patient Receivable #5 | - | - |
| BS - Other receivables | BS | Other receivables | D | (11500250) Vendor Credits Receivable | 10,184 | - |
| BS - Other receivables | BS | Other receivables | D | (11500260) Current Non-Patient AR | 13,475 | - |
| BS - Other receivables | BS | Other receivables | D | (11500270) Current Non-Patient AR | 68,552 | - |
| BS - Other receivables | BS | Other receivables | D | (11501000) Mgmt Fee Receivable PWNJ | - | - |
| BS - Other receivables | BS | Other receivables | D | (11501010) To be determined by facility | 47,672 | - |
| BS - Other receivables | BS | Other receivables | D | (11502010) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502050) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502070) To be determined by facility | 116,668 | - |
| BS - Other receivables | BS | Other receivables | D | (11502080) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502090) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11502100) To be determined by facility | 11,536 | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503020) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503030) To be determined by facility | - | - |
| BS - Other receivables | BS | Other receivables | D | (11503040) To be determined by facility | - | - |
| | | | | **Other Receivables:** $ 295,828 | | $ 295,828 |

| FS Line | Statement | CIM Description | DR CR | (SubAcct) Description | GL2014.A7 | Adjustments |
|---|---|---|---|---|---|---|
| | | | | Accounts Receivable, Net | | |
| | | | | Inventories | | |
| | | | | Other / Prepaids | | |
| | | | | Other Receivables | | |
| | | | | Accounts Payable | | |
| | | | | Accrued salaries, wages and benefits | | |
| | | | | Other accrued expenses | | |
| | | | | Interest payable | | |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100100) Accts Payable System Interface | 3,331,748 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | 786,034 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100750) Accts Payable Accrual | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,759,253 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | 1,950 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20100760) Manual A/P Accruals | - | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20101770) Misc Accruals | 548,171 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102010) Medical Fees Payable | 466,857 | - |
| BS - Accounts Payable | BS | Accounts Payable | C | (20102020) Medical Fees Payable | | |
| | | | | **Accounts Payable:** $ | 6,894,013 | $ 6,894,013 |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | 1,116,542 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200010) Accrued Payroll | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200020) Accrued PTO | 1,230,284 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200025) Accrued PTO - Officers | 60,139 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200030) Vision Plan accrual | - | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200050) Payroll Clearing Account | 94,117 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200060) Accrued Incentive Comp-Admin | 112,312 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200070) Accrued Incentive Comp-Dept Directors | 141,358 | - |
| BS - Accrued salaries, wages and benefits | BS | Accrued salaries, wages and benefits | C | (20200100) For future use | | |
| | | | | **Accrued salaries, wages and benefits:** $ | 2,754,753 | $ 2,754,753 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302010) FICA taxes payable employee | 178,547 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302020) Federal withholding taxes payable | 116,978 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302030) State Withholding Taxes Payable | 1,217 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302050) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302060) Other payroll deductions | 1,530 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302080) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302090) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302110) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302120) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302140) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302150) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302160) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302165) Other payroll deductions | 1,291 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302170) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302175) Other payroll deductions | 1,535 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302180) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302185) Other payroll deductions | 1,215 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302190) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302200) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302210) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302220) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302230) Other payroll deductions | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20323440) 401(k) deduction payable | 63,417 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20323450) Withholding for 401(k) personal loan | 3,541 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20324450) Day care spending account deduction | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20324460) Health care spending account deduction | 7,557 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20324490) Dependent Life Insure deduction | 3,168 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20325000) Federal unemployment tax payable | 883 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20325010) Life Insure Employee Paid | 10,130 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20325040) Voluntary ADD | 1,960 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20302600) Short Term Disability | 9,115 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20304430) SUTA Liab-Texas | 6,233 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502000) Audit accrual | 96,221 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502001) Audit Fees Odd Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502002) Audit Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502003) Internal Audit fees off years | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502020) Tax Prep Fees Even Year | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20502021) Tax Prep Fees Odd Year | 20,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504120) Franchise tax (accrued) | 93,188 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504150) City sales tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504160) State sales tax (accrued) | 2,888 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | 526,695 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504170) Property tax (accrued) | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504280) Healthplan Reserve-PMC | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504520) For future use | 14,000 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504530) Other accrued expenses | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20504530) Other accrued expenses | 7,073,855 | 7,073,855 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20505990) Dental Plan Benefit Plan Fees | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508000) Other accrued expenses | 3,550,798 | 3,550,798 |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508210) W/C -IBNR-PMC (02/09-01/10) | 903,715 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (20508220) W/C -Claims Paid-PMC (02/09-01/10) | (791,943) | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700000) Commitment Fees payable | 140,262 | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700010) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21700020) For future use | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701050) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701070) Phy Recruitment Agreement Liabilities | - | - |
| BS - Other accrued expenses | BS | Other accrued expenses | C | (21701090) Phy Recruitment Agreement Liabilities | | |
| | | | | **Accrued salaries, wages and benefits:** $ | 12,037,995 | $ 1,413,342 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | 88,122 | 88,122 |
| BS - Interest payable | BS | Interest payable | C | (21004000) Interest payable | - | - |
| BS - Interest payable | BS | Interest payable | C | (21004010) Interest payable | 360,219 | - |
| | | | | **Accrued salaries, wages and benefits:** $ | 448,341 | $ 360,219 |

**Exhibit D**

**Target Company Ownership Interests**

| Target Company | Interests Authorized | Interests Issued | Jurisdiction of Incorporation | Business Qualifications |
|---|---|---|---|---|
| Sherman/Grayson Hospital, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Health Services, LLC | N/A | | Texas | Texas |
| Sherman/Grayson Sponsor, LLC | N/A | | Texas | Texas |

**Exhibit E**

**Required Activities**

*Medical Services*

- Anesthesiology
- Emergency Services
- General Surgery (inpatient and outpatient)
- Nephrology
- Oncology
- Otolaryngology
- Rehabilitation Medicine
- Radiology
- Cardiology (non-invasive and invasive)
- Family Practice

- Gynecology/Oncology
- Neurology
- Ophthalmology
- Pathology
- Hospitalist
- Medical Office and Clinics
- Gastroenterology
- Internal Medicine
- Obstetrics/Gynecology
- Orthopedics
- Pediatrics
- Urology

*Ancillary and Support Services*

- Audiology/Speech Therapy (inpatient and outpatient)
- Cardiac Catheterization
- Cardiac Rehab
- Cardiopulmonology
- Clinical Laboratory
- Community Education Classes
- Computerized Tomography
- Critical Care Unit
- Diabetes Education
- Dialysis (inpatient)
- Electrocardiology
- Electroencephalography
- Emergency Department/Clinical Decision Unit
- Hematology/Oncology
- Hyperbarics/Enterostomal Therapy/Wound Care
- Interventional Radiology
- Lithotripsy
- Mammography/Bone Density
- MRI
- Nuclear Medicine
- Neuro Diagnostics

- Nursery (Level II)
- Obstetrics/Maternity/Lactation Consults
- Occupational Therapy (inpatient and outpatient)
- Open Heart Surgery
- Pathology
- Physical Therapy (inpatient and outpatient)
- Post-Anesthesia Care Unit
- Pulmonary Function
- Pharmacy
- Radiology
- Rehabilitation Services (outpatient)
- Respiratory Therapy
- Rural Health Clinic
- Same-Day Surgery
- Sleep Lab
- Stress Lab
- Stroke Center
- Transesophageal Echocardiography
- Ultrasound
- WorkMed Occupational Medicine
- X-ray/Fluoroscopy

# GUARANTEE

This Guarantee, dated as of September 23, 2014 (this "Guarantee"), is made by Alecto Healthcare Services LLC, a Delaware limited liability company (the "Guarantor"), in favor of the Seller Indemnitees (each a "Guaranteed Party" and together the "Guaranteed Parties"). Sherman/Grayson Health System, LLC, a Texas limited liability company ("Seller"), and LHP Hospital Group, Inc., a Delaware corporation ("LHP"), are signatories hereto in their capacity as representatives of themselves and the other Seller Indemnitees. Capitalized terms used but not otherwise defined herein shall have the respective meanings given to them in the Purchase Agreement (as defined below).

1.    Guarantee. To induce Seller and LHP to enter into that certain Purchase Agreement, dated as of the date hereof, by and among Alecto Healthcare Services Sherman LLC, a Delaware limited liability company ("Purchaser"), Seller, LHP, and Texas Health Resources, a Texas not-for-profit corporation (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Purchase Agreement"), whereby Purchaser shall acquire 100% of the issued and outstanding membership interests of Sherman/Grayson Hospital, LLC, Sherman/Grayson Health Services, LLC and Sherman/Grayson Sponsor, LLC, the Guarantor hereby absolutely, unconditionally and irrevocably guarantees to the Guaranteed Parties the due and punctual payment, performance and discharge of each and every of Purchaser's obligations under the Purchase Agreement (together with any reasonable and documented out-of-pocket fees and expenses, including attorney fees and costs, which the Guaranteed Parties shall incur in enforcing or preserving any rights under this Guarantee if the obligations hereunder are not paid by the Guarantor when due as required herein or if this Guarantee is enforced by suit or through bankruptcy court or other judicial proceedings whatsoever, the "Obligations").

2.    Nature of Guarantee; Changes in Obligations; Certain Waivers.

(a)    This Guarantee is an unconditional guarantee of payment and performance and not of collection. The Guaranteed Parties shall not be obligated to file any claim relating to the Obligations in the event that Purchaser becomes subject to a bankruptcy, reorganization or similar proceeding, and the failure of the Guaranteed Parties to so file shall not affect the Guarantor's Obligations hereunder.

(b)    The Guarantor agrees that the Guaranteed Parties may at any time and from time to time, without notice to or further consent of the Guarantor, extend the time of payment of any of the Obligations, and may also enter into any agreement with Purchaser for the extension, renewal, payment, compromise, discharge or release thereof, in whole or in part, or for any modification of the Purchase Agreement or of any agreement between the Guaranteed Parties and Purchaser without in any way impairing or affecting the Guarantor's Obligations under this Guarantee. The Guarantor agrees that the Obligations of the Guarantor hereunder shall not be released or discharged, in whole or in part, or otherwise affected by (i) the failure of the Guaranteed Parties to assert any claim or demand or to enforce any right or remedy against, or to join Purchaser to any suit arising under this Guarantee or the Obligations of, Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (ii) any change in

the time, place or manner of payment of any of the Obligations or any rescission, waiver, compromise, consolidation or other amendment or modification of any of the terms or provisions of the Purchase Agreement made in accordance with the terms thereof; (iii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement; (iv) the existence of any claim, set-off or other right which the Guarantor may have at any time against Purchaser or the Guaranteed Parties, whether in connection with the Obligations or otherwise; (v) the invalidity, illegality or unenforceability of all or any part of the Obligations or any document or agreement executed in connection with the Obligations, for any reason related to actions by the Purchaser, the Guarantor or their respective Affiliates, including without limitation the fact that the act of creating the Obligations or any part thereof is *ultra vires*, the officers or representatives executing the documentation or otherwise creating the Obligations acted in excess of their authority, or Purchaser or the Guarantor has valid defenses, claims or offsets (other than those expressly provided in the Purchase Agreement) which render the Obligations wholly or partially uncollectible from Purchaser or the Guarantor; or (vi) the adequacy of any other means the Guaranteed Parties may have of obtaining repayment of any of the Obligations.  To the fullest extent permitted by applicable Laws, the Guarantor hereby expressly waives any and all rights or defenses arising by reason of any applicable Law which would otherwise require any election of remedies by the Guaranteed Parties.  The Guarantor waives promptness, diligence, notice of the acceptance of this Guarantee and of the Obligations, presentment, demand for payment, notice of non-performance, default, dishonor and protest, notice of any Obligations incurred and all other notices of any kind (except for notices to be provided pursuant to this Guarantee or to Purchaser and its counsel in accordance with the Purchase Agreement), all defenses which may be available by virtue of any valuation, stay, moratorium law or other similar applicable Law now or hereafter in effect, any right to require the marshalling of assets of Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement, and all suretyship defenses generally.  The Guarantor acknowledges that it will receive substantial direct and indirect benefits from the transactions contemplated by the Purchase Agreement and that the waivers set forth in this Guarantee are knowingly made in contemplation of such benefits.

(c)    Guarantor hereby unconditionally and irrevocably agrees not to exercise any rights that it may now have or hereafter acquire against Purchaser or any other Person interested in the transactions contemplated by the Purchase Agreement that arise from the existence, payment, performance, or enforcement of a Guarantor's Obligations under or in respect of this Guarantee, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Guaranteed Parties against Purchaser or such other Person, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from Purchaser or such other Person, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security on account of such claim, remedy or right, unless and until the Obligations have been satisfied in full; provided, that the Guarantor shall have the right to cause any other Person to satisfy its Obligations to the Guaranteed Parties hereunder.  If any amount shall be paid to any Guarantor in violation

2

of the immediately preceding sentence at any time prior to the performance of and payment in full in cash of the Obligations and all other amounts payable under this Guarantee, an amount equal to the lesser of (i) the amount paid to the Guarantor in violation of the immediately preceding sentence, and (ii) all amounts payable under this Guarantee, shall be received and held in trust for the benefit of the Guaranteed Parties, shall be segregated from other property and funds of the Guarantor and shall forthwith be paid or delivered by the Guarantor to the Guaranteed Parties in the same form as so received (with any necessary endorsement or assignment) to be credited and applied to the Obligations and all other amounts payable under this Guarantee, whether matured or unmatured, or to be held as collateral for any Obligations or other amounts payable under this Guarantee thereafter arising.

3.  <u>Effect on Certain Rights</u>.  No failure on the part of the Guaranteed Parties to exercise, and no delay in exercising, any right, remedy or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by the Guaranteed Parties of any right, remedy or power hereunder preclude any other or future exercise of any right, remedy or power hereunder except as explicitly set forth herein or in the Purchase Agreement.  Subject to the terms hereof and of the Purchase Agreement, except as stated therein, each and every right, remedy and power hereby granted to the Guaranteed Parties or allowed to it by applicable Law shall be cumulative and not exclusive of any other, and may be exercised by the Guaranteed Parties at any time or from time to time.

4.  <u>Representations and Warranties</u>.  The Guarantor hereby represents and warrants that:

(a)  the execution, delivery and performance of this Guarantee have been duly authorized by all necessary action and do not and will not contravene any provision of the Guarantor's charter, partnership agreement, operating agreement or similar organizational documents or any applicable Law or material contract binding on the Guarantor or its assets;

(b)  all consents, approvals, authorizations, permits of, filings with and notifications to, any Governmental Authority necessary for the due execution, delivery and performance of this Guarantee by the Guarantor have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Governmental Authority is required in connection with the execution, delivery or performance of this Guarantee;

(c)  this Guarantee constitutes a legal, valid and binding obligation of the Guarantor enforceable against the Guarantor in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar applicable Laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law); and

(d)  the Guarantor has the financial capacity to pay and perform its obligations under this Guarantee, and all funds necessary for the Guarantor to fulfill its Obligations

under this Guarantee for so long as this Guarantee shall remain in effect in accordance
with <u>Section 7</u>.

     5.    <u>Assignment</u>.  The Guarantor shall not assign its rights, interests or obligations
hereunder to any other Person (except by operation of law) without the prior written consent of
Seller and LHP; <u>provided</u>, that any such permitted assignment shall not relieve the Guarantor of
its Obligations hereunder.

     6.    <u>Notices</u>.  All notices and other communications hereunder shall be in writing and
shall be deemed given (a) when delivered personally by hand (with written confirmation of
receipt), (b) when sent by facsimile (with written confirmation of transmission) or (c) one (1)
Business Day following the day sent by reputable, national overnight courier (with written
confirmation of receipt), in each case at the following addresses, e-mail addresses or facsimile
numbers (or to such other address, e-mail address or facsimile number as a party hereto may
have specified by notice given to the all other parties hereto pursuant to this provision):

     If to the Guarantor, to:

     c/o Alecto Healthcare Services LLC
     16310 Bake Parkway, Suite 200
     Irvine, California 92618
     Attention: CEO
     Facsimile: (949) 878-9458

     with a copy (which shall not constitute notice) to:

     Law Offices of Michael J. Sarrao
     16310 Bake Parkway, Suite 200
     Irvine, California 92618
     Attention: Michael J. Sarrao, Esq.
     Facsimile: (949) 878-9458

     If to the Guaranteed Parties, to:

     c/o LHP Hospital Group, Inc.
     2400 Dallas Parkway, Suite 450
     Plano, Texas  75093
     Attention: General Counsel
     Facsimile:  (972) 312-9750

     with a copy (which shall not constitute notice) to:

     Weil, Gotshal & Manges LLP
     767 Fifth Avenue
     New York, New York 10153
     Attention: Harvey Eisenberg
     Facsimile: (212) 310-8007

7.    <u>Continuing Guarantee</u>. Unless terminated pursuant to this <u>Section 8</u>, this Guarantee shall remain in full force and effect and shall be binding on the Guarantor, its successors and permitted assigns until the Obligations have been indefeasibly paid, observed, performed or satisfied in full.

8.    <u>Governing Law; Jurisdiction and Forum</u>.   This Guarantee (including, without limitation, the validity, construction, effect or performance hereof and any remedies hereunder or related hereto), and all claims or causes of action of any kind (whether at law, in contract or in tort or otherwise) that may be based upon, arise out of or relate to this Guarantee, or the negotiation, execution or performance hereof (including, without limitation, any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Guarantee or as an inducement to enter into this Guarantee), shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.   Each of the parties hereto irrevocably agrees that any action or proceeding arising out of or relating to this Guarantee and the rights and obligations arising hereunder, and the rights and obligations arising hereunder brought by any other party hereto or its successors or assigns, shall be brought and determined exclusively in the state or federal courts of the State of Delaware; <u>provided</u>, that a judgment rendered by such Delaware courts may be enforced in any court having competent jurisdiction.   Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of such courts in any such action, agrees to take any and all future action necessary to submit to the jurisdiction of such courts, waives, and agrees not assert, by way of motion, as a defense, counterclaim or otherwise, any objection it may now or hereafter have to venue or to convenience of forum (including (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise); and (c) to the fullest extent permitted by law, any claim that: (i) the action in such court is brought in an inconvenient forum; (ii) the venue of such action is improper; or (iii) this Guarantee, or the subject matter hereof, may not be enforced in or by such courts), agrees that all claims in respect of the action shall be heard and determined only in any such court and agrees not to bring any action arising out of or relating to this Guarantee or any transaction contemplated hereby in any other court.   The parties hereto agree that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained agreement between the parties hereto irrevocably to waive any objections to venue or to convenience of forum.   Each of the parties hereto irrevocably consents to the service of process out of the state and federal courts within the State of Delaware in any such action by the mailing of copies thereof by registered mail, postage prepaid, to it at its address set forth herein, such service of process to be effective upon acknowledgment of receipt of such registered mail.  Nothing herein shall affect the right of any party hereto to serve process in any other manner permitted by applicable law.

9.    <u>Waiver of Jury Trial</u>.   EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS GUARANTEE OR THE

TRANSACTIONS CONTEMPLATED HEREBY OR THE ACTIONS OF THE PARTIES HERETO IN THE NEGOTIATION, EXECUTION, PERFORMANCE AND ENFORCEMENT OF THIS GUARANTEE.

10. <u>Entire Agreement</u>. This Guarantee constitutes the entire agreement with respect to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, among the parties hereto.

11. <u>Amendments and Waivers</u>. No amendment, waiver, supplement or modification of any provision of this Guarantee will be valid and binding unless it is in writing and signed, in the case of an amendment, supplement or modification, by the Guarantor, Seller and LHP or, in the case of waiver, by the party or parties against whom the waiver is to be effective. No waiver by any party hereto of any breach or violation of, or default under, this Guarantee, whether intentional or not, will be deemed to extend to any prior or subsequent breach, violation or default hereunder or affect in any way any rights arising by virtue of any prior or subsequent such occurrence. No delay or omission on the part of any party hereto in exercising any right, power or remedy under this Guarantee will operate as a waiver thereof.

12. <u>Severability</u>. If any provision of this Guarantee is held to be illegal, invalid or unenforceable under any present or future Law, (a) such provisions will be fully severable; (b) this Guarantee will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; (c) the remaining provisions of this Guarantee will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom; and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Guarantee a legal, valid and enforceable provision as similar in terms and effect to such illegal, invalid or unenforceable provision as may be possible.

13. <u>Counterparts</u>. This Guarantee may be executed and delivered (including by facsimile transmission or via portable document format (.pdf)) in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same instrument.

14. <u>No Third Party Beneficiaries</u>. The parties hereto hereby agree that their respective representations, warranties, agreements and covenants set forth herein are solely for the benefit of the other parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns, in accordance with and subject to the terms of this Guarantee, and this Guarantee is not intended to, and does not, confer upon any person other than the parties hereto (and any Guaranteed Parties not signatories hereto) and their respective successors and permitted assigns any rights or remedies hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK – SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the parties have duly executed and delivered this Guarantee as of the date first written above.

**GUARANTOR**:

**ALECTO HEALTHCARE SERVICES LLC**

By:_____

Name:_____

Its:_____

**GUARANTEED PARTIES:**


**REPRESENTED BY:**

**SHERMAN/GRAYSON HEALTH SYSTEM, LLC**

By:

Name: Rebecca Hurley

Its: EVP



**LHP HOSPITAL GROUP, INC.**

By:

Name: Rebecca Hurley

Its: EVP