# EXHIBIT I

1

<pre>
1                    UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF DELAWARE
2

3   IN RE:                       .  Chapter 11 (Subchapter V)
                                 .  Case No 23-10787 (JKS)
4   ALECTO HEALTHCARE,           .
    SERVICES, LLC,               .  Room 3209
5                                .  844 King Street
                    Debtor.      .  Wilmington, Delaware 19801
6                                .
                                 .  Friday, October 17, 2023
7   . . . . . . . . . . . . . .  .  12:00 p.m.

8

9              TRANSCRIPT OF CONTINUED TELEPHONIC
               SECTION 341 MEETING OF CREDITORS

10  APPEARANCES:

11  For the Chapter 11
    Trustee:                 Linda J. Casey, Esquire
12                           UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
13                           J. Caleb Boggs Federal Building
                             844 King Street
14                           Suite 2207, Lockbox 35
                             Wilmington, Delaware 19801

15

16  For the Debtor :         Jeffrey R. Waxman, Esquire
                             MORRIS JAMES, LLP
17                           500 Delaware Avenue
                             Suite 1500
18                           Wilmington, Delaware 19801

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Electronic recording

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
</pre>

```
1   APPEARANCES (CONTINUED):

2   For the Subchapter V
    Trustee:                    Jami Nimeroff, Esquire
3                               BROWN MCGARRY NIMEROFF, LLC
                                Two Penn Center
4                               John F. Kennedy Boulevard
                                Suite 1030, 1500
5                               Philadelphia, Pennsylvania 19102

6   For the Reed Action
    Judgment Creditors:         William D. Sullivan, Esquire
7                               SULLIVAN HAZELTINE ALLINSON, LLC
                                919 North Market Street
8                               Suite 420
                                Wilmington, Delaware 19801
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                INDEX

2

3    MOTIONS:                                                PAGE

4    341 Creditors' Meeting                                     4

5
     CONTINUED EXAMINATION OF LEX REDDY AND MICHAEL SARRAO
6

7         Examination by Ms. Casey                              6

8         Examination by Ms. Nimeroff                           8

9         Examination by Mr. Sullivan                          11

10

11   Transcriptionist's Certificate                           25

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 12:00 p.m.)

2          MS. CASEY:  Good afternoon, this is Linda Casey.

3  I am the trial attorney assigned to the Alecto bankruptcy

4  case, Number 23-10787 (JKS).

5          It is October 17th, 2013, at 12:00 p.m.  This is

6  the date and time for the continued 341 meeting.

7          A few initial announcements.  This meeting will be

8  recorded by my office.  No other recording is permitted.  I

9  do request that all parties keep their phone on mute unless

10 they are speaking.  This will prevent me from having to

11 force-mute all parties.

12          Does debtor's counsel, would you please make your

13 appearance.

14          MR. WAXMAN:  This is Jeff Waxman of Morris James,

15 on behalf of the debtor.  I'm not sure whether or not my

16 colleague Brya is on (indiscernible).

17          MS. CASEY:  Okay.  Excellent.

18          And who are our witness or witnesses today?

19          MR. WAXMAN:  I believe that Mr. Reddy, Mr. Lex

20 Reddy is on, as well as Mike Sarrao, but I'll ask them to

21 jump on.

22          MR. SARRAO:  That's correct, Ms. Casey.

23          Go ahead, Lex.  I'll follow-up to you.

24          MR. REDDY:  And this is Lex Reddy, and I'm on the

25 line.

1           MS. CASEY:  Excellent.

2           MR. SARRAO:  And this is Mike Sarrao and I'm on

3 the line.

4           MS. CASEY:  Fantastic.

5           When I called in there was only five people on the

6 line.  We have five or less on the line, so is there anyone

7 else on the line currently, besides the two witnesses and the

8 two debtor's counsel?

9           MS. NIMEROFF:  Jami Nimeroff is on the line for

10 the Subchapter V Trustee.

11           MS. CASEY:  Thank you.

12           MR. SULLIVAN:  Bill Sullivan is on the line, also,

13 for the Reed Action Judgment Creditors.

14           MS. CASEY:  Okay.  Is that all of us?  Is there

15 anyone else?

16      (No verbal response)

17           MS. CASEY:  Excellent.

18           Okay.  Mr. Reddy, I'm going to go with you first.

19           Would you please raise your right hand.

20             LEX REDDY, DEBTOR'S WITNESS, SWORN

21           MR. REDDY:  Yes, I do.

22           MS. CASEY:  I have a few questions for you and

23 then I'll swear in Mr. Sarrao.

24 //

25 //

1                           EXAMINATION

2  BY MS. CASEY:

3  Q     Mr. Reddy, were you the person who signed the schedules

4  and the statement of financial affairs for this debtor?

5  A     Yes, I did.

6  Q     Would you please describe your role in preparing and

7  reviewing the schedules and statements?

8  A     I sought the help of Mike Sarrao and the rest of the

9  team at Alecto Healthcare and after they were finalized and I

10 reviewed them, I signed the documents.

11 Q     At the time that you signed the documents, were they

12 true and correct to the best of your knowledge, information,

13 and belief?

14 A     Yes, they are.

15 Q     Do they remain true and correct to the best of your

16 knowledge, information, and belief as of today?

17 A     Yes.

18        MR. WAXMAN:  And that includes the revisions that

19 were subsequently filed?

20        MS. CASEY:  Yes, that does.

21        MR. WAXMAN:  This is Jeff Waxman.

22 BY MS. CASEY:

23 Q     Mr. Reddy, including --

24 A     (Indiscernible.)

25 Q     -- the revisions --

1  A      Okay.

2  Q      -- that were recently filed, do the schedules and

3  statements remain true and correct to the best of your

4  knowledge, information, and belief as of today?

5  A      Yes, they do.

6  Q      Okay.  The amendments that were recently filed included

7  a schedule listing payments made to insiders in the year

8  preceding the bankruptcy case.

9        Does that include all payments made to any statutory

10 insiders, which includes affiliates of the debtors?

11 A      Yes, they were included.

12         MS. CASEY:  Okay.  Mr. Sarrao, would you please

13 unmute your line, raise your right hand.

14         MICHAEL SARRAO, DEBTOR'S WITNESS, SWORN

15         MR. SARRAO:  Yes, I do.

16         MS. CASEY:  Okay.  Because we do have two

17 witnesses, I would ask -- I don't have any further questions

18 at this time.  I'm going to open it up to Ms. Nimeroff and

19 Mr. Sullivan.  I may come back and ask questions, but between

20 the two witnesses, I would ask that you designate the primary

21 witness and then the secondary witness would have to

22 introduce himself each time he answers a question so that the

23 record is complete.

24         Mr. Sarrao or Mr. Reddy, who's going to be the

25 primary witness?

1          MR. SARRAO:  This is Mr. Sarrao.  I will be the

2   primary witness.

3          MS. CASEY:  Okay.  Mr. Reddy, if you do answer one

4   of the questions that follow, please introduce yourself each

5   time so that the record is clear.

6          Ms. Nimeroff, would you like -- do you have any

7   questions for the witnesses?

8          MS. NIMEROFF:  Just a couple.

9                         EXAMINATION

10  BY MS. NIMEROFF:

11  Q    Good morning, gentlemen.  My name is Jami Nimeroff.

12  I'm the Subchapter V Trustee.

13      The -- I really was mostly curious, and Mr. Sarrao,

14  maybe you're the right person, what the status of the

15  Sherman/Grayson sale is at this point and if there's any, you

16  know, update that you have in terms of closing or anticipated

17  closing?

18  A    As of right now, the anticipated closing is

19  October 31st.  That is our plan.  We've been having weekly

20  calls between the buyer, seller, Sherman/Grayson, and NPC,

21  because there's a lease amendment involved with the sales.

22      So the plan is October 31st (indiscernible), one way or

23  the other, probably, but we're doing everything we can to

24  have it close on October 31st.

25  Q    Okay.  Thank you.

1        And in terms of the insurance issues that, you know,

2   have permeated this case, particularly as it relates to

3   Sherman/Grayson, are they, at this point, sort of largely

4   resolved in terms of that the buyer is being, you know, or

5   Sherman/Grayson is being billed and that, you know, to the

6   extent that there's a shortfall, that the buyer is being

7   taken care of, making reimbursement to the Alecto debtor for

8   remaining insurance amounts until closing?

9   A    Yeah, they are largely --

10            MR. REDDY:  This is likely (indiscernible).

11            MR. WAXMAN:  This is Jeff Waxman.

12            Jamie, I'm not going to tell Mr. Sarrao not to

13   answer.  I would just point out that this really isn't the

14   forum for that.  This is 341.  But I understand your

15   question.

16            I'm not disputing, you know, your desire for that

17   information.  I'm not going to ask Mr. Sarrao not to -- or

18   instruct Mr. Sarrao not to answer; I would just point out

19   this is far afield for the 341.

20            MS. NIMEROFF:  Well, and let me -- hang on -- and

21   let me respond that this is as to the assets and liabilities

22   and the financial condition of this debtor, so I would

23   disagree with you.  I have a few questions, Jeff, and it

24   would just be a lot easier and quicker if Mr. Sarrao would

25   just answer.

1          THE WITNESS:  Ms. Nimeroff, to largely address,

2    there's a little bit of an accounting issue because there's

3    an necessity order and there's the Sherman/Grayson case, as I

4    think you're aware of, that is kind of prepetition period and

5    that some of that overlaps with the payment they already made

6    through June.  So we need to figure out that accounting

7    issue.

8          And then (indiscernible) I'm told the 31st date is

9    we're working with our insurance broker to terminate those

10   policies that are specific to Texas that we would no longer

11   need and then to change the D&O policy, which would produce a

12   much lower premium, because we wouldn't need to include those

13   Texas entities.  So they're largely resolved.  I need to

14   follow-up with Matt Williams on the last invoice to make sure

15   that's been paid, but they're largely resolved.

16         Other than that, it's kind of an accounting issue,

17   more than anything because the necessity order is a little

18   bit different than what the initial invoice was for June.  So

19   it's kind of just addressing and accounting for that and

20   making sure that we're all set to drop off those policies

21   that Alecto would no longer need and no longer need to pay

22   for, or modify them like the auto policy that currently

23   insures five vehicles, four being in Texas, that we would

24   cancel that, get a refund, and then only have one car

25   insured.

1          So, we're -- all that stuff is in process to save

2   money for Alecto.

3          MS. NIMEROFF:  Great.  Thank you.

4          Ms. Casey, those are the only questions that I

5   have at this time.  Thank you.

6          MS. CASEY:  Thank you.

7          Mr. Sullivan, do you have any questions for the

8   witness today?

9          MR. SULLIVAN:  Yes, I do.

10                         EXAMINATION

11  BY MR. SULLIVAN:

12  Q    Mr. Sarrao, this is Bill Sullivan on behalf of the Reed

13  Action Judgment Creditors.

14       With respect to the amended statement of financial

15  affairs, did the only amendment to the one-year list of

16  payments to insiders, include any affiliates?

17  A    Well, there -- yeah.

18       So there's that amendment because, to reflect the

19  correct time period, and as Ms. Casey pointed out in the

20  initial 341, oversight on my part, I hadn't thought about the

21  entities being insiders, which they clearly are.

22       And I just want to check one thing, Mr. Sullivan.  I

23  think the only other -- because we were filing it, I just --

24  just give me one second to scroll down.

25       (Pause)

1          THE WITNESS:  So if you look at, I think it's

2    page 48 of 48, the wages and health benefits paid, that was

3    updated, I believe, to include that last pay date on 6/15.

4          The original statement of financial affairs that

5    had pay date on 6/02, but that includes that last pay date

6    on -- that was paid on 6/15.  So the wages paid and then the

7    health benefits paid to include.  That's the other update;

8    that's the only other change.

9    BY MR. SULLIVAN:

10   Q    Okay.  So sticking with that page for a minute, when

11   you say 6/15, that's the last entry on page 48 of 48, before

12   were you get to the insurance?

13   A    Correct.

14        Yeah, that line entry that says, "pay period starting

15   5/28/23; pay period ends 6/10/23" and then "pay date

16   6/15/23."  Correct.

17   Q    Gotcha.  Okay.

18        So other than that, then you have that six-page chart

19   that is at from 36 of 48 to 41 of 48 and that's new, right,

20   or updated?

21   A    Yeah.  Well, I think that it actually -- you said -- I

22   think it actually starts on page 28 of 48, which is the

23   Item 4, I think, starts on page 28 and then it goes

24   through 35 of 48 and then there's that intercompany activity,

25   which is what the page reference that you referenced.  So,

1  both of those were updated, because the initial page numbers,

2  that Attachment 4, like I said, Ms. Casey correctly point out

3  that we had not included -- we just included the transfers to

4  the individuals initially, an oversight on our part.  This

5  includes all the transfers to any of the affiliates.  So

6  those are the two updates.

7  Q    I'm sorry, you're right; there are two charts, not one

8  chart.

9  A    Yeah, correct.

10       They kind of go together but they're -- yeah, I

11  think 28 through 46 or whatever -- you have the correct page

12  number for the last one.

13  Q    Okay.  Now, with respect to the second chart, and I'm

14  specifically on page 41 of 48, you have a total at the bottom

15  of the intercompany activity.  And so the last two columns of

16  this six-page chart are identified as due from Alecto and due

17  to Alecto, correct?

18  A    Correct, yeah.

19       There's the far-right column is due to Alecto and then

20  due from Alecto, correct.

21  Q    Okay.  And so the totals there that are basically

22  twenty-seven nine million [sic] are due there Alecto and

23  twenty-seven seven million [sic] are due to Alecto, those --

24  that represents the entire year regarding these entities,

25  correct?

1  A      Correct.

2  Q      Okay.  Now that information is all information that was

3  from the debtor's records and so nothing has changed, with

4  respect to the debtor's records, OSHA just, you know,

5  provided the one-year lookback, as opposed to the 90 days,

6  correct?

7  A      Yeah, correct.

8         But that's -- I said nothing has changed, with respect

9  to the debtor's records.  It would just be we had it -- well,

10 the intercompany activity wasn't in the first one and then

11 like you said, the date, period and then making sure all the

12 affiliates were included.

13 Q      Okay.  But -- and so my real question is, you know, the

14 2022 tax returns for the debtor showed a net -- showed an

15 operating loss of negative $36 million.

16        Nothing has changed with respect to that, correct?

17 A      Correct.

18        Nothing has changed, with respect to the tax return.

19 No amendments to the tax returns have been filed or anything

20 like that, no.

21 Q      Okay.  So then, I want to refer you back to the

22 schedules, because there's a question I have on a couple of

23 the scheduled claims --

24 A      Okay.

25 Q      -- now that there have been proofs of claim filed, I

1 | wanted to file up on.

2 |     So, do you have the schedules in front of you?

3 | A    I do have the schedules in front of me, yes.

4 | Q    Okay.  So there's a schedule claim for LHP Hospital

5 | Group which is listed as contingent, unliquidated, and

6 | disputed at 3.13 on page 32.

7 |     Do you see that?

8 | A    Let me just get to it.  Give me one sec.

9 | Q    Okay.

10 | A    I have it up now.

11 | Q    Are you familiar with the documents giving rise to that

12 | potential claim?

13 | A    I am.

14 | Q    Are you familiar with the claim that LHP has filed?

15 | A    I'm familiar with the claim they filed and then also

16 | the potential claims that we've identified on our schedules,

17 | so yes.

18 | Q    Okay.  So with respect to the claim that they filed,

19 | they indicated that it arises from a purchase agreement from

20 | 2014, because they attached that agreement to the proof of

21 | claim, correct?

22 | A    I agree, they have --

23 |     MR. WAXMAN:  Do you have the document in front of

24 | you?  If you don't have the document, I don't think you can

25 | testify as to what is or is not (indiscernible).

1           THE WITNESS:  I'm familiar with the purchase

2   agreement.  I'm familiar with their claim, so go ahead.

3   BY MR. SULLIVAN:

4   Q    Okay.  So they have a three-sentence summary of their

5   claim.  I'm going to read one of the sentences.  It says:

6           "Under the terms of the purchase agreement, Alecto

7   Sherman agreed to indemnify and hold harmless LHP Hospital

8   Group for any damages that it suffered in connection with a

9   variety of circumstances described in the purchase agreement,

10  including certain obligations associated with the medical

11  office building."

12      Okay.  So that's what LHP said and then they also say

13  that, in the next sentence, that the debtor executed the

14  guaranty in favor of LHP, guaranteeing the obligations that

15  Alecto Sherman was indemnifying for.

16      So are those statements accurate?

17  A    Yes, there is a purchase agreement.  When Alecto

18  Sherman acquired a hundred percent of the membership

19  interests of Sherman/Grayson Hospital, LLC in 2014, Alecto

20  Sherman agreed to indemnify LHP Hospital Group from certain

21  obligations that they had, including, I call just "POB"

22  versus the "NOB," but some office space leases and a ground

23  lease.  And then Alecto Healthcare Services, LLC, the debtor,

24  guarantied Alecto Healthcare Services Sherman, obligations

25  under the purchase agreement.

1      So those two statements are correct.  Some are actual.

2  Some are potential.  Some (indiscernible) claims because they

3  haven't come into fruition.

4  Q    Okay.  So I just want to focus on the actual

5  (indiscernible).  And the description there in 3.13 only

6  says, "potential claims related to the guaranty."

7      Can you tell me about the actual claims?

8  A    So, my understanding of LHP's claim (indiscernible).

9      So there are five office-space leases in what I call

10  the "POB."  They reference the "NOB," which is an office

11  building owned by a third party, Altera Highland LLC.

12      There's two leases that run through 2024 and there are

13  three leases that run through 2027, that when LHP owned the

14  hospital, or their subsidiaries owned the hospital, they

15  entered into a (indiscernible) transaction where they sold

16  the office building to Altera Highland and they ground leased

17  the land back to Altera Highland.  So right now, MPT owns

18  that land and is party to that ground lease.

19      My understanding of their claim -- I haven't seen their

20  breakdown, their numbers -- is they have continued -- I know

21  they have continued to pay rent on those office leases

22  because they guaranteed those office leases and those numbers

23  they include in their claim are the amount of rent they've

24  paid for a period of time post the settlement that was

25  reached with them.  So that's their, what I refer to as their

1  "potential claim."

2       The other reference to the potential claim is part of

3  that ground lease.  The ground lease provides that if there's

4  no healthcare facility at the site for a period of 12

5  consecutive months, Altera Highland can re-acquire the ground

6  lessor to purchase the office building from them for, I think

7  it's called "fair market value."  There's some specific term

8  in the ground lease.  So there's the potential

9  (indiscernible) if the hospital were to close for 12 months

10  and nothing was there (indiscernible).  They have to --

11  someone would have to buy that building and LHP could get out

12  for that.

13       It's my understanding that their claim is based on the

14  rent they have paid over a certain period of time.  I haven't

15  seen the specific -- I haven't looked at their claim, other

16  than read the first couple of pages, and I haven't seen their

17  specific computation of numbers.  There may be disputes about

18  those numbers, as well.

19  Q    Okay.  And putting aside the potential requirement for

20  acquiring, I want to go to the actual part of the claim.  I

21  think you said that it was amounts that have been paid or so

22  not including anything that was included in the prior

23  settlement, right?

24  A    Correct, that's my understanding of the claim.

25       Again, I don't think their claim -- I'd have to go back

1  and look at it -- has a breakdown of, okay, these are the

2  amounts, this and that, and I think there's some argument and

3  stuff about the amount of the claim and (indiscernible)

4  litigation and stuff like that.  But that's my understanding

5  is the basis of their claim.

6  Q     (Indiscernible.)

7              MR. WAXMAN:  Excuse me.

8              Just to be clear, Mike, you don't have the

9  documents in front of you, correct?

10             THE WITNESS:  I don't have their claim in front of

11  me; correct, Jeff.

12             MR. WAXMAN:  Okay.  And you don't have the

13  underlying documents in front of you, correct?

14             THE WITNESS:  I don't.

15             MR. WAXMAN:  This is just through the best of your

16  recollection?

17             THE WITNESS:  Correct.

18             MR. WAXMAN:  This is just to the best of your

19  recollection, is my point.

20             THE WITNESS:  That's correct.

21  BY MR. SULLIVAN:

22  Q     Okay.  So, Mr. Sarrao, has the debtor received a demand

23  from LHP for payment of these amounts since the settlement?

24  A     I don't believe the debtor has.  I believe the May

25  (indiscernible) something went to Alecto Sherman.  I don't

1  believe the debtor, post-petition, post-filing, they may have

2  sent something to Alecto Sherman.  But no, like, we didn't

3  get, like, a monthly statement from them or a monthly demand

4  letter or anything like that from LHP.

5  Q    Okay.

6  A    Not that I'm aware of.

7  Q    And just to be clear on the time frame, I'm talking

8  about pre-filing.  So anytime from -- do you recall when the

9  settlement was?

10 A    I don't off the top of my head.  It was probably the

11 year 2020 to 2021.  I don't believe we got -- I don't recall

12 receiving any official demands from them saying:  You owe

13 this amount.  You owe this amount.

14      I remember post-petition, Alecto Sherman received

15 something, but not -- there wasn't -- it specifically was not

16 directed to Alecto, obviously, because of the stay and all

17 that kind of stuff.

18 Q    Gotcha.  Okay.

19      So then, there's another entity at 3.23.  It's Sherman/

20 Grayson Health Systems LLC, care of Ardent Health Services.

21 (Indiscernible) same set of transactions, that claim at 3.23?

22 A    Partially and partially not.

23      So Sherman/Grayson Health Systems LLC was the seller in

24 that membership interest purchase agreement in 2014.  It was

25 the parent company of Sherman/Grayson Hospital LLC and it

1  sold its interest in Sherman/Grayson Hospital LLC to Alecto

2  Healthcare Services Sherman.

3       So, in theory, some of those lease claims that, really,

4  what that related to is, there's indemnification obligations

5  under the purchase agreement.  I don't think there's any

6  indemnity claims, it's been so long now.  But that's what

7  that would relate to.

8       But they're both -- LHP Hospital -- as I understand

9  their corporate structure, LHP Hospital Group owns Sherman/

10 Grayson Health Systems LLC.  So they're related, but I don't

11 believe Sherman/Grayson Health Systems has filed any claim,

12 that they have any claims for indemnity or anything like

13 that.

14 Q    Okay.  So -- and just to be clear, they're not an

15 affiliate of the debtor.  It's the former parent of the

16 hospital, I guess, is what I understand?

17 A    Yeah, that's correct.

18      When they, LHP, acquired this hospital, they formed all

19 these entities, Sherman/Grayson this, Sherman/Grayson that.

20 That Sherman/Grayson Health Systems LLC was a different LHP

21 entity that wasn't an affiliate of the debtor or of the

22 Sherman/Grayson Hospital LLC debtor, none of that

23 (indiscernible) so, we have no control or interest or

24 anything with them, with that entity.

25 Q    Okay.  But you don't believe that those claims would be

1  overlapping with the LHP claims and you don't believe they

2  filed a proof of claim anyway, right?

3  A    I don't believe they filed a proof of claim.  I don't

4  think they have any claims.

5       Part of that was more precautionary to put them in

6  there, because there is --

7  Q    Okay.

8  A    -- in theory, but it's been, what, nine years?  So it

9  would be hard-pressed if they could have some indemnity claim

10 out there related to some cost-report settlement or

11 something.  I just don't think there is any.

12 Q    Okay.  And then the last item I wanted to ask you about

13 is 3.26, which is the government lawsuit that has $12.84

14 million.

15      Is there any update on that and where that stands?

16 A    All right.  I'm no --

17           MR. WAXMAN:  Hold on there for one second.

18           THE WITNESS:  All right.

19           MR. WAXMAN:  Before you answer, (indiscernible)

20 specific question as focused.  I just want everybody to bear

21 in mind this is ongoing litigation and so Mr. Sarrao, I have

22 no issue with you addressing an update.  I do not want to

23 address the specifics of the underlying claim.  Thank you.

24           THE WITNESS:  Sure.

25           So the update, Mr. Sullivan, would be after the

1 filings, we obviously filed notice of, you know, bankruptcy

2 filings for the debtor Alecto Healthcare Services LLC and

3 Sherman/Grayson Hospital LLC.  So they were stayed and the

4 parties entered into a stipulation then that effectively

5 stayed the case and, like, the discovery and obligations and

6 stuff.

7          I believe the next hearing before the Court is the

8 end of November to try to figure out whether there's a

9 possibility of settlement and how the whole bankruptcy stuff

10 shakes out kind of, so to speak.  So there hasn't really been

11 any activity with respect to the litigation because once the

12 notice of stay or notice of bankruptcy is filed, the parties

13 agreed to kind of stay and (indiscernible), give them time to

14 figure those things out and then we would deal with insurance

15 coverage on that issue, as well, so...

16 BY MR. SULLIVAN:

17 Q    Okay.  And so --

18 A    (Indiscernible) updates on the case.

19 Q    -- when you say, "stay everything," you mean stay the

20 litigation as to all parties, not just the parties that have

21 filed?

22 A    Correct, yeah, to all parties.

23       Because there's a number of other nondebtor parties,

24 including some MPT parties.  So it's been stayed as to all

25 parties and I think the last update was from the judge was,

 1  this is the last kind of continuance and there's a hearing

 2  (indiscernible) where they come back and report to the judge

 3  what's going on, what are the next steps, as to all entities.

 4  So there's been no activity in the case.  That's been stayed.

 5       I don't know if "stayed" is the right word, but

 6  everything has been stopped while the parties figure out

 7  what's going on, because there hasn't been any exchange of

 8  discovery, a case management conference, anything like that.

 9       It's all been stayed and (indiscernible) report back

10  (indiscernible).

11  Q    Okay.  Thank you for that.

12            MR. SULLIVAN:  I don't have any other questions.

13            THE WITNESS:  Sure.

14            MS. CASEY:  Jamie, did that raise any questions

15  for you?

16            MS. NIMEROFF:  No, I'm good.  Thank you.

17            MS. CASEY:  Okay.  Thank you, everybody.

18            That concludes the 341.

19            MR. WAXMAN:  Before we go off, once we're off the

20  record --

21            MS. CASEY:  Okay.  Wait.  Wait.  Wait.

22            Do you want me to --

23            MR. WAXMAN:  Are we off the record now?

24       (Proceedings concluded at 12:28 p.m.)

25

1                        CERTIFICATION

2            I certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of my

5   knowledge and ability.

6

7

8   /s/ William J. Garling                    October 24, 2023

9   William J. Garling, CET-543

10  Certified Court Transcriptionist

11  For Reliable

12

13

14

15

16

17

18

19

20

21

22

23

24

25