**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS COMBINED DISCLOSURE STATEMENT AND PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| IN RE: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC., | Case No. 23-10787 (JKS) |
| Debtor.[1] | |

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION**
**PROPOSED BY THE DEBTOR**

You are encouraged to carefully review the full text of this document, including all exhibits and attachments. To assist you in your review, please note that a list of definitions and a section of frequently asked questions appear at the end of this document.

**THE DEBTOR IS NOT SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN, HOWEVER IF YOU WISH TO OBJECT TO CONFIRMATION OF THE PLAN, YOU MUST DO SO BY JANUARY 24, 2024 AT 4:00 P.M. (EASTERN TIME) ("Plan Objection Deadline").**

**A HEARING ON THE CONFIRMATION OF THE PLAN IS SCHEDULED FOR FEBRUARY 6, 2024 AT 10:00 A.M. IN COURTROOM NO. 6 AT THE U.S. BANKRUPTCY COURT, DISTRICT OF DELAWARE, 824 N. MARKET STREET, WILMINGTON, DELAWARE 19801.**

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

**YOUR RIGHTS MAY BE AFFECTED BY THIS PLAN. YOU SHOULD CONSIDER DISCUSSING THIS DOCUMENT WITH AN ATTORNEY.**

Dated: December 19, 2023

**MORRIS JAMES LLP**

*/s/ Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

# TABLE OF CONTENTS

Page

**SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION** ..........................................1

**ARTICLE I - DEFINITIONS** ............................................................................................1

**ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS** .....5

**ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR** ..........6

   1.   Nature of the Debtor's Business. .............................................................................6

   2.   History of Business Operations of the Debtor. .......................................................6

   3.   Filing of the Debtor's Chapter 11 Case. .................................................................7

   4.   Legal Structure and Ownership. .............................................................................8

   5.   Events Leading to the Filing of the Bankruptcy Case. ...........................................8

   6.   The Debtor's Assets and Liabilities. .......................................................................9

   7.   Current and Historical Financial Conditions. .......................................................11

   8.   Significant Events During the Bankruptcy Case. .................................................11

   9.   Projected Recovery of Avoidable Transfers Against Insiders. ..............................15

**ARTICLE IV - THE PLAN** ..............................................................................................17

   1.   Unclassified Claims. ............................................................................................18

        a.  Administrative Expenses .............................................................................18

        b.  Post-Confirmation Professional Fee Claims ...............................................19

        c.  Priority Tax Claims. ...................................................................................20

   2.   Classes of Claims and Equity Interests. ...............................................................20

        a.  Classes of Other Priority Claims. ...............................................................20

        b.  Class of Priority Non-Tax Claims. ..............................................................20

        c.  Class of Secured Claims. ............................................................................21

        d.  Class of General Unsecured Claims. ...........................................................21

        e.  Class of Equity Interest Holders. ................................................................22

   3.   Treatment of Claims and Claims Objections. ......................................................22

        a.  Allowance of Claims. .................................................................................22

        b.  Claims Administration Responsibilities .......................................................23

        c.  Estimation of Claims. .................................................................................23

        d.  Adjustment to Claims .................................................................................23

        e.  Disallowance of Claims ..............................................................................23

16452692/2

      f. Amendments to Claims.................................................................................24

      g. De Minimis Distributions ..........................................................................24

      h. No Distributions Pending Allowance.........................................................24

      i. Duplicative Claims ....................................................................................24

  4. Treatment of Executory Contracts and Unexpired Leases. ...............................24

  5. Means for Implementation and Funding of the Plan.........................................26

  6. Payments. ...........................................................................................................26

      a. Responsibility for Making Payments.........................................................26

      b. Disputed Claims. .......................................................................................27

      c. Unclaimed Payments. ................................................................................27

      d. Payment Dates and Locations....................................................................27

      e. Undeliverable Distribution Reserve...........................................................28

      f. Tax Requirements. .....................................................................................28

  7. Post-Confirmation Management and Insiders Retained by the Debtor...............28

  8. Preservation of Causes of Action. .....................................................................29

  9. Tax Consequences of the Plan...........................................................................29

**ARTICLE V - FEASIBILITY OF PLAN** ............................................................**30**

  1. Ability to Initially Fund Plan.............................................................................30

  2. Ability to Make Plan Payments And Operate Without Further Reorganization. ...............30

**ARTICLE VI  - LIQUIDATION ANALYSIS**.......................................................**31**

**ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS** ....................**31**

  1. Discharge............................................................................................................31

  2. Debtor Releases..................................................................................................31

  3. Exculpation and Limitation of Liability.............................................................31

  4. Injunction...........................................................................................................32

  5. Remedies Upon Default. ....................................................................................32

**ARTICLE VIII - GENERAL PROVISIONS** ........................................................**33**

  1. Title to Assets. ...................................................................................................33

  2. Binding Effect....................................................................................................33

  3. Severability........................................................................................................33

  4. Retention of Jurisdiction by the Bankruptcy Court. ..........................................33

  5. Headings.............................................................................................................34

  6. Successors and Assigns. .....................................................................................34

  7. No Fourteen Day Stay. .......................................................................................34

16452692/2

8.  Incorporation of Agreements Entered Into by the Debtor....................................................34

9.  Modification  of  Plan. ................................................................................34

10. Reservation of Rights. ..................................................................................35

11. Filing of Notice of Substantial Consummation ....................................................35

12. Post-Effective Date Service List ......................................................................35

13. Changes in Rates Not Subject to Regulatory Commission Approval. ...............................35

14. Final Decree.............................................................................................35

**ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE.............36**

1.  Conditions Precedent to Confirmation. .................................................................36

2.  Conditions Precedent to the Effective Date. ......................................................36

3.  Waiver of Conditions. ...................................................................................37

4.  Effect of Failure of Conditions..........................................................................37

5.  Filing of Notice of the Effective Date. ................................................................37

**ARTICLE X - EXHIBITS ........................................................................................37**

1.  Rules of Interpretation...................................................................................37

2.  Computation of Time. ...................................................................................38

3.  Governing Law...........................................................................................38

4.  Reference to Monetary Figures. ......................................................................39

5.  Controlling Document...................................................................................39

16452692/2

## ARTICLE I - DEFINITIONS

The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in the Plan. The definitions that follow that are found in the Bankruptcy Code are for convenience of reference only, and are superseded by the definitions found in the Bankruptcy Code.

1.  **Administrative Expense**: Any cost or expense of administration of the Chapter 11 case entitled to priority under Section 507(a)(2) of the Bankruptcy Code and allowed under § 503(b) of the Code, including without limitation, any actual and necessary expenses of preserving the Debtor's estate, any actual and necessary expenses incurred following the filing of the bankruptcy petition by the Debtor-in-Possession, allowances of compensation or reimbursement of expenses to the extent owed by the Bankruptcy Court under the Bankruptcy Code, the allowed claim of the Trustee for fees and/or reimbursements, and any fees or charges assessed against any of the Debtor's estates under Chapter 123, Title 28, United States Code.

2.  **Administrative Tax Claim**: Any tax incurred pursuant to § 503(b)(1)(B) of the Code.

3.  **Allowed:** With respect to any Claim, except as otherwise provided herein: (a) a Claim that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a proof of claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely filed; or (c) a Claim Allowed pursuant to the Plan, any stipulation approved by the Bankruptcy Court, any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or a Final Order of the Bankruptcy Court; provided that, with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection is so interposed, such Claim shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim or Equity Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtor and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. "Allow" and "Allowing" shall have correlative meanings.

4.  **Allowed Priority Tax Claim**: A Priority Tax Claim to the extent that it is or has become an Allowed Claim, which in any event shall be reduced by the amount of any offsets, credits, or refunds to which the Debtor shall be entitled on the

1

Confirmation Date.

5.    **Allowed Secured Claim**: Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code.

6.    **Avoidance Actions**: Any and all avoidance, recovery, subordination, or other claims, actions, or remedies which any of the Debtor, the Estate, or other appropriate parties in interest have asserted or may assert under sections 502, 510, 542, 544, 545, or 547 through 553 of the Bankruptcy Code or under similar or related state or federal statutes and common law.

7.    **Bankruptcy Code**: The Bankruptcy Reform Act of 1978, as amendedand codified as Title 11 of the United States Code.

8.    **Bankruptcy Court**: The United States Bankruptcy Court for the District of Delaware.

9.    **Bankruptcy Rules**: The Federal Rules of Bankruptcy Procedure.

10.    **Bar Date:** August 15, 2023, the date by which Proofs of Claim are required to be filed by Creditors.

11.    **Business Day**: Any day of the year, other than a Saturday or Sunday, on which national banking institutions in Wilmington, Delaware are open to the public for conducting business and are not required or authorized by Law to close.

12.    **Cash**: Cash, cash equivalents and other readily marketable securities orinstruments issued by a person other than the Debtor, including, without limitation, readily marketable direct obligations of the United States of America, certificates of deposit issuedby banks and commercial paper of any entity, including interest accrued or earned thereon.

13.    **Causes of Action**: All Claims, actions, causes of action, choses in action, Avoidance Actions, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims of the Debtor and/or the Estate that are or may be pending on the Effective Date or instituted by the Reorganized Debtor after the Effective Date against any entity, based in law or equity, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date with respect to matters arising on or before the Effective Date.  For the avoidance of doubt, Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; and (d)

any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

14. **Chapter 11 Case**: This case under chapter 11 of the Bankruptcy Code in which Alecto Healthcare Services LLC is the debtor in possession, Case No. 23-10787.

15. **Claim**: Any "right to payment from the Debtor whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or any right to an equitable remedy for future performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." 11 U.S.C. § 101(5).

16. **Claims Objection Bar Date:** The last day for objecting to a Claim, which shall be the later of (a) 180 days after the Effective Date and (b) such other period of limitation as may be specifically fixed or extended by the Court, the Debtor or the Reorganized Debtor, or by an order of the Bankruptcy Court for objecting to Claims.

17. **Claims Register**: The register of Claims maintained by the Bankruptcy Court.

18. **Class**: A category of holders of claims or interests which are substantially similar to the other claims or interests in such class.

19. **Confirmation**: The entry by the Bankruptcy Court of an order confirming this Plan.

20. **Confirmation Date**: The Date upon which the Bankruptcy Court shall enter the Confirmation Order; provided however, that if on motion the Confirmation Order or consummation of the Plan is stayed pending appeal, then the Confirmation Date shall be theentry of the Final Order vacating such stay or the date on which such stay expires and is nolonger in effect.

21. **Confirmation Hearing**: The hearing to be held on November 15, 2023 at 11:00 a.m. (ET) to consider confirmation of the Plan.

22. **Confirmation Order**: An order of the Bankruptcy Court or any amendmentthereto confirming the Plan in accordance with the provisions of chapter 11 of the Bankruptcy Code.

23. **Creditor**: Any person who has a Claim against the Debtor that arose on or before the Petition Date.

24. **Debtor** and **Debtor-in-Possession**: Alecto Healthcare Services LLC, the debtor in possession in this Chapter 11 Case.

25. **Disputed Claim:** Any claim against the Debtor pursuant to § 502 of the Bankruptcy Code that is not yet Allowed.

3

26.   **Distribution**: The property required by the Plan to be distributed to the holders of Allowed Claims.

27.   **Effective Date**: The first Business Day following the date upon which (a) the Confirmation Date has occurred, or (b) the Confirmation Order is a Final Order, unless, at the Debtor's option, the Debtor desires the Plan go effective regardless of any pending appeal, so long as no stay pending appeal has been granted.

28.   **Entity** has the meaning set forth in section 101(15) of the Bankruptcy Code.

29.   **Equity Interest**: An ownership interest in the Debtor.

30.   **Estate:** The estate of the Debtor created on the Petition Date by Section 541 of the Bankruptcy Code.

31.   **Executory Contracts**: All unexpired leases and executory contracts as described in Section 365 of the Bankruptcy Code.

32.   **File, Filed** or **Filing**: File, filed, or filing in the Chapter 11 Case with the Bankruptcy Court, including with respect to the filing of a Proof of Claim or proof of Equity Interest.

33.   **Final Order**: An order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which (a) any appeal that has been taken has been finally determined or dismissed, or (b) the time for appeal has expired and no notice of appeal has been filed.

34.   **General Unsecured Claim:** any Claim other than: (a) an Administrative Claim; (b) a Professional Fee Claim; (c) a Secured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; or (f) an Equity Interest.

35.   **Governmental Unit**: As defined by 11 U.S.C. § 101(27), the term "governmental unit" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

36.   **Holder**: an Entity holding a Claim or Equity Interest, as applicable.

37.   **Other Priority Claim:** Any Claim entitled to priority in payment under Sections 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code.

38.   **Petition Date**: June 16, 2023, the date the chapter 11 petition for relief was filed.

39.   **Plan**: This Plan, either in its present form or as it may be altered, amended, or modified from time to time.

4

40.     **Priority Tax Claim**: Any Claim entitled to priority in payment under Section 507(a)(8) of the Bankruptcy Code.

41.     **Professional**: A person or Entity employed pursuant to a Final Order in accordance with Sections 327, 328, or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to and including the Effective Date pursuant to Sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

42.     **Professional Fee Claims**: A Claim of a Professional for professional services rendered or costs incurred on or after the Petition Date through the Effective Date.

43.     **Proof of Claim**: A proof of Claim Filed in the Chapter 11 Case.

44.     **Released Parties:** All of the following, and in each case in its capacity as such: (a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date.

45.     **Reorganized Debtor**: The Debtor after the Effective Date.

46.     **Schedules**: Schedules and Statement of Financial Affairs, as amended, filed by the Debtor with the Bankruptcy Court listing liabilities and assets [Docket Nos. 48 and 49].

47.     **Secured Creditor**: Any creditor that holds a Claim that is secured by property of the Debtor.

48.     **Subchapter v Trustee**: Jami Nimeroff, the Subchapter V trustee appointed pursuant to 11 U.S.C. § 1183(a) and whose duties are prescribed under 11 U.S.C. § 1183(b), the Plan, or the order confirming the Plan.

49.     **United States Trustee Fees**: All fees due under 28 U.S.C. § 1930.

## ARTICLE II - SUMMARY OF THE PLAN AND DISTRIBUTIONS TO CREDITORS

The Plan is a reorganization Plan. The Plan will be funded with available Cash on hand on the Effective Date and the Debtor's projected disposable income generated by the ongoing operations of the Debtor. For a period of three (3) years, the Debtor will contribute (i) its entire projected disposable income, in an aggregate amount of no less than $635,549, (ii) any residual value received by the Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement proceeds received on account of such claims. Such amounts will be used to fund Distributions provided under the Plan on an annual basis.

The chart below reflects the proposed treatment of Allowed Claims and Equity Interests

under the Plan:

- o Allowed Administrative Claims will be paid on a monthly pro rata basis, until such claims are paid in full or, alternatively, upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

- o Allowed Priority Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Tax Claims owed.

- o Allowed Priority Non-Tax Claims, if any, will be paid in full on the Effective Date. It is anticipated that that there will be no Priority Non-Tax Claims owed.

- o Allowed Secured Claims, if any, will be paid in accordance with the existing loan documents or other agreements with the Debtor that existed prior to the Petition Date which govern the payment of Debtor's obligations to the holder of the Allowed Secured Claim. Each holder of an Allowed Secured Claim shall retain its lien on its collateral in the same validity and priority as it held prior to the Petition Date until the Allowed Secured Claim amount has been paid. Alternatively, the Allowed Secured Claim amount shall be paid in full through a sale of the collateral or other means, withouts penalty or premium.

- o Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis, after payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, if any, Allowed Priority Non-Tax Claims, if any, and Allowed Secured Claims. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

- o Upon entry of the Confirmation Order, all existing Equity Interests in the Debtor shall be retained.

## ARTICLE III - HISTORY OF THE BUSINESS OPERATIONS OF THE DEBTOR

### 1.    Nature of the Debtor's Business.

The Debtor was formed in 2012 to serve as a holding company for healthcare-related entities.

In the ordinary course of business, the Debtor's employees provide management services through the Debtor's subsidiaries and are engaged in the winddown of hospitals formerly operated by the Debtor's subsidiaries. The winddown of such hospitals consists of responding to requests for patient records and services provided, completing various regulatory requirements, and assisting in the defense of certain litigation matters. An organizational chart of the Debtor and its subsidiaries is attached hereto as **Exhibit A**.

### 2.    History of Business Operations of the Debtor.

Historically, the Debtor formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

6

16452692/2

At its peak, the Debtor's subsidiaries operated five (5) acute care hospitals across the country, the Debtor provided management services to an acute care hospital owned by an unrelated third-party, and one of the Debtor's subsidiaries provided management services to an acute care hospital owned by an unrelated third-party.

As of the Petition Date, the Debtor had an ownership interest in two operating subsidiaries, Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and Alecto Healthcare Services Hayward LLC ("Alecto Hayward")

As of the Petition Date, however, the Debtor's primary source of income relates to the services it provides through its Employees to its subsidiary Alecto Hayward. Alecto Hayward is a party to an Amended Management Services Agreement with Hayward Sisters Hospital dba St. Rose Hospital ("St. Rose") pursuant to which Alecto Hayward provides management services to St. Rose in exchange for a management services fee equal to 3.75% of St. Rose's net revenue with the net revenue being subject to certain adjustments (the "Management Services Fee"). Such management services include the provision of qualified individuals to serve as the Chief Executive Officer and Chief Financial Officer of St. Rose. Alecto Hayward's contract with St. Rose currently runs through May 2025, subject to renewal for an additional period of 2 years. The contract can be terminated without cause on 365 days advance written notice.

To facilitate Alecto Hayward's provision of management services, the Debtor provides its Employees to Alecto Hayward to fulfill Alecto Hayward's responsibilities under the management services agreement including having two of its Employees serve as the Chief Executive Officer and Chief Financial Officer of St. Rose. In return, Alecto Hayward pays a portion of the Management Services Fee each month to the Debtor. The Debtor also receives reimbursement from St. Rose for certain expenses primarily related to the Debtor's Employees other than those who serve as the CEO and CFO that provide services at St. Rose.

Sherman/Grayson is the operator of Wilson N. Jones Regional Medical Center ("WNJ"), a 207-bed acute care hospital located in Sherman, Texas. Sherman has a population of around 45,000 people and is located within Grayson County, Texas which is approximately 75 miles from Dallas, Texas. Among other things, WNJ contains an emergency department, medical surgical units, an intensive care unit, and a behavioral health unit. As discussed below, Sherman/Grayson filed for Chapter 11 relief in Case No. 23-10810 and the Sherman Sale Order (defined below) provides for the sale of substantially all of Sherman/Grayson's assets.

Sherman/Grayson has faced significant financial challenges both during and after the COVID-19 pandemic. As a result of such challenges, during the year prior to filing, Sherman/Grayson was operating at a loss of over $1 million per month.

### 3.    Filing of the Debtor's Chapter 11 Case.

On June 16, 2023, the Debtor filed a voluntary petition for relief under Chapter 11, Subchapter V of the Bankruptcy Code, thereby commencing the above-captioned bankruptcy case. On the Petition Date, the Debtor filed the Declaration of Michael Sarrao, Executive Vice President General Counsel, and Secretary of the Debtor, in Support of First Day Motions [Docket No. 3] (the "Sarrao Declaration"). A copy of the Sarrao Declaration is incorporated as if fully set forth

7

herein.[2]

On June 20, 2023, the Jami Nimeroff was appointed as the Subchapter v Trustee in the Chapter 11 Case.

### 4.    Legal Structure and Ownership.

The Debtor is a Delaware limited liability company.

The following entities and individuals hold ownership interests in the Debtor:

| Name of Entity/Individual | % of Ownership |
|---|---|
| The Reddy Investment Trust | 60.08% |
| The Krissman Family Trust | 10.60% |
| The Sarrao Family Trust | 7.42% |
| The Jeyakumar Inter-Vivos Trust | 3.5% |
| The Hayes Irrevocable Trust | 3.80% |
| Steven Kay | 5.3% |
| Matthew Williams | 5.30% |
| Aman Dhuper | 2.50% |
| Comstock Investment Trust | 1.50% |

### 5.    Events Leading to the Filing of the Bankruptcy Case.

The hospitals acquired by the Debtor's subsidiaries were independent community hospitals that were in some form of financial distress when they were acquired by the Debtor's subsidiaries and faced stiff competition (and in some cases, unfair competition) from nearby hospitals. Despite the best efforts of the Debtor and its subsidiaries, the hospitals acquired by the Debtor's subsidiaries continued to suffer from financial distress which ultimately resulted in two (2) of the hospitals closing in 2019 and one (1) hospital closing in March 2020.

After the closure of the three (3) hospitals described above, the remaining hospitals were faced with significant financial challenges associated with the COVID-19 pandemic including decreased revenue and out of control costs. The significant adverse effect of the pandemic forced one of the Debtor's subsidiaries to sell the real estate associated with an acute care hospital in 2021 to pay off secured lenders and satisfy other priority claims.

The closure of each of these hospitals placed a significant financial burden on the Debtor as the Debtor has been forced to spend time and resources on the winddown of the operations of each of these hospitals and litigate claims by parties seeking to hold the Debtor liable for the debts

---

[2]    A copy of all pleadings in the Chapter 11 Case are available for a fee on the Bankruptcy Court's website, https://ecf.deb.uscourts.gov/.

16452692/2

of its subsidiaries.

As of the Petition Date, the Debtor's subsidiaries continued to operate only one hospital, which has subsequently filed for bankruptcy. However, this hospital has faced, and continues to face, significant financial challenges as a result of the pandemic and has not been able to recover financially. In the two years immediately prior to the Petition Date, the Debtor made significant investments in the form of advances to and the payment of expenses on behalf of Sherman/Grayson in an effort to ensure that this hospital could continue operating as a going concern thereby maximizing the value of the subsidiary while meeting the healthcare needs of the community and avoiding additional costs and expense to Debtor if the hospital was to close. Additionally, the Debtor was a guarantor on Sherman/Grayson's lease with MPT of Sherman-Alecto, LLC, which required that (a) Sherman/Grayson maintain its insurance, and in the event that Sherman/Grayson's insurance lapsed, such lapse would be an event of default for which the Debtor would be liable for under the guaranty as obligations under the lease, and (b) that Sherman/Grayson indemnify MPT of Sherman-Alecto, LLC was required to purchase an office building for more than $10 Million pursuant to the terms of a ground lease which may require MPT of Sherman-Alecto, LLC as the ground lessor, to purchase the office building if a healthcare facility is not operated at the location of Wilson N. Jones Regional Medical Center for twelve (12) consecutive months and Sherman/Grayson's failure to perform would constitute an event of default for which the Debtor would be liable for under the guaranty. Accordingly, the Debtor provided significant advances to Sherman/Grayson's during the two (2) years immediately prior to the Petition Date which placed a financial burden on the Debtor and has resulted in a significant decrease in the Debtor's liquidity.

The pandemic further affected patient volumes and revenue at St. Rose which resulted in decreases in the Management Services Fee paid to Alecto Hayward since the fee is based on a percentage of net revenue.

While the Debtor has been able to maintain the business operations outlined above, on May 11, 2023, a judgment was entered against the Debtor in the amount of $2,686,357.11 in plus interest and fees in the legal action *Reed, et. al. v. Alecto Healthcare Services LLC, et. al.* in United States District Court for Northern District of West Virginia, Civil Action No. 5:19-cv-263 (the "Reed Judgment"). On June 1, 2023, the plaintiffs (the "Reed Creditors") in this action obtained a writ of execution against the Debtor in the total amount of $3,242,498.77.

Enforcement of the Reed Judgment against the Debtor would cause a liquidity crisis whereby the Debtor will no longer be able to pay the expenses necessary to continue to operate

6.    **The Debtor's Assets and Liabilities.**

The Debtor's assets and liabilities are detailed in the Schedules filed on June 30, 2022 [Docket Nos. 48 and 49] (the "Schedules").

By operation of General Order of the Delaware Bankruptcy Court dated September 14, 2020, the deadline for all parties other than governmental entities to the file a proof of claims was August 15, 2023, and the deadline for governmental entities to the file a proof of claims was set for December 13, 2013. A copy of the claims register maintained by the Bankruptcy Court and

9

the Schedules  are attached hereto as **Exhibit B.**

Additionally, on March 9, 2023, the United States commenced a civil suit against the Debtor, seven of its direct or indirect subsidiaries and three individuals to recover approximately $14,211,115 in alleged overpayments made to Defendant Olympia Health Care, LLC by the Centers for Medicare and Medicaid Services, part of the Department of Health and Human Services, in 2005 (Civil Action No. 2:23-cv-01783).  The Debtor was named as a defendant because it allegedly controlled Olympia during the relevant period.  The Debtor does not believe that it (or any of the defendants) has any liability to the United States for the alleged overpayments.

On the Petition Date, the Debtor had two operating subsidiaries:  (i) Sherman/Grayson which, as discussed below, filed its own voluntary Chapter 11 bankruptcy during which its assets were sold and the Debtor may realize some value on account of its claim, and (ii) Alecto Hayward. The projected income and expenses of the Debtor for the next three years is attached hereto as **Exhibit C**.

The Debtor also some miscellaneous assets, including a vehicle and office furniture and equipment.  The Debtor does not expect that, if the Chapter 11 case were to convert to Chapter 7 that these miscellaneous assets would generate much money, if any.

In addition to those two entities, the Debtor may realize some value from other direct and indirect subsidiaries but which may have some remnant value.

Alecto Healthcare Services Fairmont LLC ("Alecto Fairmont"), may have residual income due from West Virginia Medicaid of as much as $3 million[3] and from Medicare of as much as $2.8 Million if Alecto Fairmont's appeals related to Medicare's denial of Alecto Fairmont's requests for a Volume Decrease Adjustment of $1,406,332 for 2016 and $1,408,524 for 2017 are successful. The Debtor cannot predict the likelihood or timing for recovery related to these appeals.  Before the any payment can be upstreamed to the Debtor, Alecto Fairmont will need to pay all of the liabilities to its own creditors, which include certain outstanding trade claims, payroll taxes, and the payment of certain liabilities related to Alecto Fairmont's withdrawal from a multi-employer pension plan sponsored by the Retail, Wholesale and Department Store International Union and Industry Benefit and Pension Funds, which may be as much as $20 million and Alecto Fairmont's contingent liability as a member of the control group with respect to a defined benefit pension plan sponsored by Alecto Healthcare Services Ohio Valley LLC (the "Alecto Ohio Valley Pension Plan").  The Debtor anticipates that that the liabilities of Alecto Fairmount will significantly exceed any of its residual assets.

Alecto Healthcare Services Wheeling, LLC, an indirect subsidiary of the Debtor, may have some residual income due from West Virginia Medicaid of as much as $900,000, but it also has significant liabilities, including the Reed Creditor's judgment and other judgments entered against it.  Those liabilities include payroll taxes, judgments, and contingent liabilities associated with the Alecto Ohio Valley Pension Plan .  The Debtor anticipates that that the liabilities of Alecto

---

[3]     This money due to Alecto Fairmount has been outstanding for more than two years and it is unclear how much or when such amounts will be paid.

Wheeling will significant exceed any of its residual assets.

Sunrise MOB Holdings, LLC ("Sunrise MOB"), a direct subsidiary, is also an indirect parent of Plaza Medical Office Building, LLC ("Plaza"). Plaza recently received $3 million from an indemnity reserve from a sale of certain of its real estate assets. Even though Plaza received these funds, it has contingent liabilities as a member of the control group with respect to the withdrawal liability of Alecto Fairmont, which may be as much as $20 million, and as a member of the control group with respect to the Alecto Ohio Valley Pension Plan. Accordingly, the Debtor does not anticipate that its interest in either Sunrise MOB or Plaza will have any value for the benefit of the Debtor's creditors

### 7.    Current and Historical Financial Conditions.

In 2021, gross revenues were approximately $3,426,000 with net loss of approximately $810,000; and in 2022, gross revenues were approximately $3,559,929 with net profit of approximately $135,767.

In 2023, through May 31, 2023, gross revenues were $1,559,149.56 with net income of $84,474.62.

Since the Petition Date, the Debtor has filed monthly operating reports reflecting the Debtor's ongoing finances [Docket Nos 83 and 122].

### 8.    Significant Events During the Bankruptcy Case.

A.    First Day Motions and Orders

On or about the Petition Date, the Debtor filed certain motions and applications seeking relief from the Bankruptcy Court designed to minimize the potential disruption of the Chapter 11 filing on the Debtor's business affairs and facilitate the orderly administration of the Chapter 11 Case. On, or shortly after the Petition Date, the Bankruptcy Court entered various orders. The final hearing on the below motions is set for July 14, 2023. These include:

(a)    Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Employee Claims, Including Wages and Salaries, (II) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue Employee Benefits on Postpetition Basis, (III) Authorizing Payment of Reimbursement to Employees for Prepetition Expenses, (IV) Authorizing Payment of Withholding and Payroll-Related Taxes, (V) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party Providers, and (VI) Allowing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments [Docket No. 4]. On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 26].

(b)    Motion Pursuant to Sections 105 and 366 of the Bankruptcy Code for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services to, or Discriminating Against, the Debtor, (II) Determining that the Utility Companies are Adequately Assured of Postpetition Payment and (III) Establishing Procedures for Resolving Requests for Additional Adequate Assurance [Docket No. 5]. On June 20, 2023, the

Bankruptcy Court entered an Interim Order granting the motion [Docket No. 27].

(c)     Debtor's Motion for Interim and Final Orders Authorizing: (I) Maintenance of Existing Bank Accounts, (II) Continued Use of Existing Cash Management System, and (III) Continued Use of Business Forms Pursuant to 11 U.S.C. §§ 105, 345, 363, 364, 503, 1107 and 1108 of the Bankruptcy Code [Docket No. 6].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 28].

(d)     Motion of the Debtor for an Order Under Sections §§105(a), 363(b), 363(c), and 503(b) of the Bankruptcy Code and Federal Rule Of Bankruptcy Procedure 6003 Authorizing Debtor to (A) Maintain Existing Insurance Policies; and (B) Pay All Obligations in Respect Thereof [Docket No. 7].  On June 20, 2023, the Bankruptcy Court entered an Interim Order granting the motion [Docket No. 29].

B.     Retention of Professionals

During the Chapter 11 Case, the Bankruptcy Court entered various orders authorizing the employment of various professionals to assist with the conduct and administration of the Chapter 11 Case and reorganization efforts, including but not limited to the following:

a.     On July 7, 2023, the Debtor filed (i) an application for entry of an order authorizing the retention and employment of Shulman Bastian Friedman & Bui LLP as bankruptcy counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 67], and (ii) an Application for Entry of an Order Authorizing the Retention and Employment of The Rosner Law Group LLC as Delaware counsel to the Debtor *nunc pro tunc* to the Petition Date [Docket No. 68] (collectively, the "Shulman/Rosner Applications").  On August 7, 2023, the United States Trustee filed an objection to the Shulman/Rosner Applications [Docket No. 89] (the "UST Objection"), and based upon the UST Objection as well as comments made by the Court at the July 13, 2023 hearing to consider the Shulman/Rosner Applications, the Debtor and Sherman/Grayson elected to have substitute counsel for the Debtor.

On August 16, 2023, the Court held a hearing on the Application at which the Court requested additional evidentiary support.  On August 23, 2023, the Debtor filed the First Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No. 133], and on August 24, 2023, the Debtor filed the Second Supplemental Declaration of Michael Sarrao in support of the Shulman/Rosner Applications [Docket No 136].  On August 28, 2023, the Court held a hearing on the Application.. Based on the record at the Hearing, the Court approved the Application subject to certain revisions, and on August 31, 2023, this Court entered an Orders approving the Shulman/Rosner Applications *nunc pro tunc* to the Petition Date through and including August 2, 2023 [Docket Nos.  146 and 147].

b.     Due to the possibility of a perceived conflict due to potential claims against the Debtors' insiders, on August 9, 2023, the Debtor filed an application to employ Steven Balasiano as independent director/manager to the Debtor *nunc pro tunc*, to August 4, 2023 [Docket No. 93] (the "Balasiano Application").  The purpose of Mr. Balasiano's retention was to make decisions on behalf of the Debtor related to: (i) the Claim of Alecto against Sherman/Grayson arising from intercompany advances made by the Debtor to Sherman/Grayson and certain expenses paid by the

16452692/2

Debtor on behalf of Sherman/Grayson, including any settlement of the Alecto Claim; and (ii) potential estate claims against the Debtor's insiders, and (iii) any other conflict that may arise as and between the Debtor and Sherman/Grayson/ On August 16, 2023, the Bankruptcy Court entered an Order approving the Balasiano Application [Docket No. 118].

       c.      On August 16, 2023, the Debtor filed an Application to Employ Morris James as counsel to the Debtor *nunc pro tunc*, to August 11, 2023  [Docket No. 115] (the "<u>Morris James Application</u>").  On September 1, 2023, the Bankruptcy Court entered an Order approving the Morris James Application [Docket No. 149].

       d.      On August 27, 2023, the Debtor filed an Application to Employ Gould Consulting Services as Forensic Investigation Consultant to the Debtor, *nunc pro tunc*, to August 25, 2023 [Docket No. 138].

       C.     <u>Filing of the Sherman/Grayson Bankruptcy Case</u>

On June 23, 2023, Sherman/Grayson, one of the Debtor's remaining two operating subsidiaries, filed for Chapter 11 relief in the United States Bankruptcy Court for the District of Delaware at Case No. 23-10810 (the "<u>Sherman Bankruptcy Case</u>"). When Sherman/Grayson filed its bankruptcy petition, the Debtor was the largest creditor of Sherman/Grayson, with a general claim of approximately $60.1 million.

On July 5, 2023, Sherman/Grayson filed a Motion for Entry of an Order (I) Authorizing the Private Sale of Substantially All Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment Of Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief [Docket No. 60] (the "<u>Sherman Sale Motion</u>").  By and through the Sherman Sale Motion, the Debtor sought to sell its substantially all of its assets to AHS Sherman, LLC (the "<u>Purchaser</u>") for $100,000 in cash, plus the assumption of certain liabilities.  Significantly, the Purchaser also agreed to fund all of the Debtor's operations and other administrative obligations of the hospital and its bankruptcy case, including estate professional fees irrespective of whether the closing is ultimately consummated.  Prior to the hearing to consider the Sherman Sale Motion, the Official Committee of Unsecured Creditors of Sherman/Grayson (the "Sherman Committee") entered into a term sheet with the Purchaser by and through which the Purchaser agreed to fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors (the "<u>Sherman GUC Fund</u>").  Additionally, the term sheet between the Purchaser and the Sherman Committee provided that the Debtor would release all claims against the Sherman/Grayson estate and the Debtor would not participate in any distribution from the Sherman GUC Fund.  On August 15, 2023, the Debtor filed a limited objection and reservation of rights with respect to the Sale Motion to address the Debtor's right to participate in the Sherman GUC Fund.  At the hearing to consider the Sherman Sale Motion, the Debtor again expressly reserved its rights with respect to the proceeds of the sale and the waiver of any right of the Debtor.  The Sherman Committee announced that it would file a motion under Bankruptcy Rule 9019 for approval of the term sheet, including the waiver of the Debtor's right to a distribution from the Sherman GUC Fund.  The Committee has not yet filed the motion for approval of the settlement.  On August 31, 2023, the Bankruptcy Court entered an Order approving the Sale Motion [Docket No. 167] (the "<u>Sherman Sale Order</u>").  The sale has not closed as Sherman/Grayson and the Purchaser attempt to address the regulatory issues.

16452692/2

Significantly, the Debtor has been paying certain expenses of Sherman/Grayson, including its insurance. By virtue of the Sherman Sale Order, the Debtor has received repayment on account of the costs of insurance on behalf of Sherman/Grayson for the prorated month of June and for July that were paid by the Debtor. The Debtor expects that the Purchaser will continue to provide funds to Sherman/Grayson so that it will continue to remit payment to the Debtor until the sale closes.

Additionally, at a hearing on August 16, 2023, the Bankruptcy Court orally granted a request by Sherman/Grayson to remit payment to the Debtor on account of certain insurance obligations for the benefit of Sherman/Grayson under the doctrine of necessity. An Order granting the request has not yet been entered.

As set forth above, as part of the sale to the Purchaser, the Sherman Committee negotiated to provide that the Purchaser would fund $250,000 to be placed into an escrow account to be held solely for the benefit of general unsecured creditors. Based solely upon the schedules filed by Sherman/Grayson, the Debtor's unsecured claim is approximately 75% of all unsecured claims. Notably, the Sherman Committee has asserted that the Debtor has liability to Sherman/Grayson on account of avoidable transfers in an amount up to $150,000, and therefore the Debtor is not entitled to a distribution by operation of 11 U.S.C. § 502(d). The Debtor does not agree with the Sherman Committee's analysis, and barring settlement, the Debtor will likely object to any motion filed by Sherman/Grayson or the Sherman Committee which would deny the Debtor's right to any distribution from the Sherman GUC Fund..

      D.      <u>Motion for Appointment of an Official Committee of Unsecured Creditors</u>

On August 11, 2023, the Reed Creditors filed a motion to Appoint Creditors' Committee [Docket No. 100] (the "<u>Committee Appointment Motion</u>"). Another creditor, Snyder Brothers, Inc., filed a joinder to the Committee Appointment Motion [Docket No. 111]. On August 22, 2023, the Debtor filed an objection to the Committee Appointment Motion [Docket No. 127], and the United States Trustee filed a statement in response to the Committee Appointment Motion [Docket No. 128].

On August 28, 2023, the Court conducted an evidentiary hearing to consider the Committee Appointment Motion and objection thereto. At the conclusion of the hearing, the Court denied the Committee Appointment Motion, and ruled that the Debtor did not have to provide work product to creditors or the Subchapter v Trustee. On September 11, 2023, the Court entered an Order denying the Committee Appointment Motion [Docket No. 152].

      E.      Reed Creditors' Motion for Revoke Designation of the Bankruptcy Case under <u>Subchapter V</u>

On November 2, 2023, the Reed Action Judgment Creditors filed a pleading titled "Objection of the Reed Action Judgment Creditors to Debtor's Designation of This Case as a Subchapter V Case and Motion to Revoke Debtor's Designation as a Subchapter V Debtor" (the "<u>Designation Motion</u>") [Docket No. 204]. By and through the Designation Motion, the Reed Creditors sought to revoke the Debtor's designation as a subchapter v debtor based upon the amount of noncontingent and liquidated claims against the Debtor as of the Petition Date. On

16452692/2

November 22, 2023, the Debtor filed a response in opposition to the Designation Motion [Docket No. 226], and on November 27, 2023, the Reed Creditors filed a reply in support of the Designation Motion [Docket No. 227].

On November 29, 2023, the Court conducted an evidentiary hearing to consider the Designation Motion and objection thereto, and on December 1, 2023, the Court issued its bench decision in which it denied the Designation Motion.

On December 18, 2023, the Reed Creditors filed a notice of appeal of the Court's decision to deny the Designation Motion.

### 9. Projected Recovery of Avoidable Transfers Against Insiders

A forensic investigation is defined by the scope of the engagement and/or issues in question and may include the analysis of entire sets of data based on the focus of the investigation.[4]   The Debtor requested that Gould Consulting Services ("GCS") conduct a forensic analysis of cash transactions into and out of the Debtor's bank accounts to identify a) cash payments and loans to, or for the benefit of, officers, director, shareholders, and related-parties ("Insiders"), and b) potentially voidable transfers to Insiders, if any.   Since its retention on August 25, 2023, GCS received approximately 1,950 documents during the course of our examination has performed the following analyses:[5]

1.    Reviewed certain filings with the Bankruptcy Court.

2.    Conducted interviews with Michael Sarrao, Alecto's Executive Vice President,

---

[4]    Forensic investigations are iterative, meaning that the analytical techniques used are not performed in isolation since observations made using one technique generally provide insight into other areas of the investigation.

[5]    The scope of work performed by GCS did not include, among others, a) verification of trade accounts receivable or payable, b) examination of deposits into Alecto bank accounts and the source of such deposits unless discussed herein, c) analysis of vendor invoices and related payments, d) analysis of copies of checks, e) identification of payees by ACH or check described in the bank statements as preauthorized debits, identification of payees by ACH or check where no name was identified, or the transaction listed as, or included in, a journal entry, f) detailed examination of invoices and funding request packages used to allocate funds to Affiliates, nor g) examination of email and other internal data/documents unless discussed herein.

While GCS examined transfers into and out of the Alecto bank accounts to CNH Finance and Affiliates and traced the recording of such transfers into Alecto's general ledger, GCS did not reconcile the Affiliates' intercompany accounts.

GCS did not perform an audit, review or compilation as those terms are defined in the AICPA's Statements on Standards for Accounting and Review Services or generally accepted auditing standards.

15

16452692/2

General Counsel and Secretary and Matt Williams, Alecto's Chief Financial Officer.

3.    Analyzed cash sources and uses based on the analysis, categorization, and summarization of 1,296 bank statements containing 116,850 transactions included in 26 bank accounts held by Alecto and certain of its Affiliates for the four (4) year Examination Period June 17, 2019, through June 30, 2023, as discussed below.

    a.    Bank statements were received for the Examination Period for the following entities:

        i.    Alecto Healthcare Services LLC (3 accounts)

        ii.    Alecto Healthcare Services Hayward LLC (1 account)

        iii.    Sherman/Grayson Hospital LLC (7 accounts)

        iv.    Sherman MD Provider, Inc., a subsidiary of Alecto Sherman (5 accounts)

        v.    Sherman Anesthesia, Inc., a subsidiary of Alecto Sherman (2 accounts)

        vi.    Olympia Health Care LLC (6 accounts)

        vii.    Plaza Medical Office Building LLC (2 accounts)

    b.    Identified deposits, payments made by check, direct debit, internal transfer, or wire transfer, and categorized the data by transaction category and payee, if identified in the bank statements.

    c.    Electronically tied Alecto payments by check and ACH Transfer (Bill Payment) to Alecto's general ledger to identify payees.

    d.    Traced advances from the CNH Revolving Facility per electronic statements into Alecto's primary disbursement account *3874 and subsequent transfers from Alecto's account *3874 to bank accounts held by Affiliates.

    e.    Tied advances to Affiliates per bank statements to the LOC Reconciliations, calculated estimated over/under advances to Affiliates, and sampled the recording of such transactions in Alecto's general ledger.

    f.    Calculated total advances retained by Alecto for operating expenses and other purposes and tied to Alecto bank statements.

    g.    Analyzed transfers to/from accounts not included in lists of Alecto and/or Affiliate held accounts.

4.    Examined Alecto's general ledger, including 1,208 separate disbursements by

check, ACH, or wire transfer to identify payments to, or for the benefit of, Insiders, of $10,000 or more, if any.

5.       Examined Alecto's year end payroll records for the years 2020 – 2022 and the 6-month period ended June 16, 2023, to identify payments to Insiders.

6.       Analyzed cash flows into/out of the credit facility utilized under the 2018 Promissory Note and payoff by Plaza MOB.

7.       Examined supporting documentation for interest payments related to the Plaza MOB Loan.

8.       Analyzed cash flows and certain closing documents, including settlement and funds flow statements, related to the June 20, 2019 Plaza MOB Refinance and the 2021 UCLA Asset Sale.

After conducting its forensic analysis, GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. A copy of GCS report is attached hereto as **Exhibit D**. At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers.

## <u>ARTICLE IV - THE PLAN</u>

The Plan must describe how Creditors will be paid. Certain Claims are entitled to specific treatment under the Bankruptcy Code and are not placed in a class for purpose of payment.  For example, Administrative Expenses and Priority Tax Claims are not classified.

As required by the Bankruptcy Code, the Plan places Claims and Equity Interests in various classes and describes the treatment each class will receive.  The Plan also states whether each class of Claims or Equity Interests is impaired or unimpaired.  A Claim or Equity Interest can be impaired if the Plan alters the legal, equitable or contractual rights to which the Creditors are otherwise entitled.  If the Plan is confirmed, each Creditor's recovery is limited to the amount provided in the Plan.

Pursuant to section 1191(b) of the Bankruptcy Code, the Bankruptcy Court may confirm the Plan even if no impaired Class of Claims votes to accept the Plan.  Specifically, section 1191(b) of the Bankruptcy Code provides that the Plan may be confirmed if the applicable requirements of section 1129(a) are satisfied, other than sections 1129(a)(8), (10), and (15), if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan. Thus, the Plan may be confirmed even if no impaired Class votes to accept the Plan.

17

Based upon the foregoing, and based upon the statements of counsel for the Reed Creditors stating that they will object to confirmation and indicating that the Reed Creditors will not vote to support the Plan, the Debtor has elected to proceed without soliciting votes of creditors, and will seek approval of the Plan pursuant to Section 1191 of the Bankruptcy Code.

## 1.    Unclassified Claims.

Certain types of Claims are automatically entitled to specific treatment under the Bankruptcy Code.  For example, Administrative Expenses and Priority Tax Claims are not classified.  They are not considered impaired, however they may, however, object if, in their view, their treatment under the Plan does not comply withthat required by the Bankruptcy Code.  As such, the Plan does not place the following Claims in any class:

### a.    Administrative Expenses

The Debtor must pay all Administrative Expenses in full.  If an Administrative Expense is disputed, the Bankruptcy Court must determine the validity and amount of the Administrative Expense, or in other words, "allow" the Administrative Expense.  Any Administrative Expense that is undisputed and is due and owing on the Effective Date will be paid in accordance with this Plan, or upon such other terms as agreed upon by the Debtor and the Administrative Creditor or Bankruptcy Court order. If the Administrative Expense is disputed, payment will be made after the Administrative Expense is allowed by the Bankruptcy Court.

There are several types of Administrative Expenses, including the following:

- If the Debtor continues to operate in the ordinary course of business following its filing of the Chapter 11 Case, Creditors are entitled to be paid in full for the goods or services provided.  This ordinary trade debt incurred by the Debtor after the Petition Date will be paid on an ongoing basis in accordance with the ordinary business practices and terms between the Debtor and its trade Creditors.

- Administrative Expenses also include any post-petition fees and expenses allowed to Professionals, including the allowed claim of the Trustee for fees and/or reimbursements, and for attorneys and accountants employed  upon Bankruptcy Court authority to render services to the Debtor during the course of the Chapter 11 Case.  These fees and expenses must be noticed to Creditors and approved by the Bankruptcy Court prior to payment.

The following chart lists the Debtor's estimated Administrative Expenses, andtheir proposed treatment under the Plan:

16452692/2

| Type | Estimated Amount Owed | Proposed Treatment |
|---|---|---|
| Expenses arising in the ordinary course of business after the Petition Date | $0.00 (All amounts paid on ongoing basis) | Payment through the Plan as follows:  Payment in full on the Effective Date. |
| Administrative Tax Claims | $0.00 | The Debtor does not expect any but if there are any Administrative Tax Claims, payment through the Plan as follows: Payment in full on the Effective Date, except to the extent otherwise agreed to by the Debtor and the Claimant. |
| United States Trustee fees | $2,500 | Payment through the Plan as follows: Payment in full on the Effective Date. |
| Professional Fee Claims, including the fees of the Independent Director as approved by the Bankruptcy Court | $700,000 | After Bankruptcy Court approval, Payment through the Plan as follows: Payment in full. |
| Subchapter V Trustee | $50,000 | Upon application under § 330 and after Bankruptcy Court approval, payment through the Plan as follows: Payment in full. |
| **TOTAL** | **$752,500** | |

### b.    Post-Confirmation Professional Fee Claims

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtor shall, in the ordinary course of business and without any further notice to, or action, order, or approval of, the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Professionals.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtor may employ and pay any Professional in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court.

19

16452692/2

c.      **Priority Tax Claims.**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Bankruptcy Code. Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agrees to a less favorable treatment, pursuant to section 1129(a)(9) of the Bankruptcy Code, each Holder of such Allowed Priority Tax Claim shall receive the full unpaid amount of such Allowed Priority Tax Claim in Cash on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Priority Tax Claim is due or as soon as reasonably practicable thereafter).

The Debtor anticipates that there will be no Priority Tax Claims.

2.      **Classes of Claims and Equity Interests.**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

a.      **Classes of Other Priority Claims**

Certain priority Claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Bankruptcy Code are required to be placed in classes. The Bankruptcy Code requires that each holder of such a Claim receive cash on the Effective Date of the Plan equal to the allowed amount of such Claim.

It is anticipated that there will be no Other Priority Claims owed. In the event that there are Other Priority Claims owed, such claims will be paid in full on the Effective Date.

b.      **Class of Priority Non-Tax Claims**

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|-------|----------------|------------------------------------------|
| 1 | Priority Non-Tax Claims. Each Holder of an Allowed Priority Non-Tax Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed Class 1 Claim: (A) Cash equal to the amount of such Allowed Priority Non-Tax Claim; or (B) such other treatment which the Reorganized Debtor and the Holder of such Allowed Priority Non-Tax Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

c.      **Class of Secured Claims.**

Allowed Secured Claims are Claims secured by property of the Estate (or that are subject to setoff) to the extent allowed as secured Claimsunder § 506 of the Bankruptcy Code. If the value of the collateral or setoffs securing the Creditor's Claim is less than the amount of the Creditor's Allowed Claim, the deficiency will be classified as a general unsecured Claim.

The Debtor does not believe that there are any secured Claims as the Debtor does not have any assets that are currently encumbered by security interests, and any party that previously had a security interest in the Debtor's assets is entitled to a general Unsecured Claim due have unsecured deficiency Claim, however in the event that a Holder of an Allowed secured Claim has a valid security interest such Holder of an Allowed secured Claim at the option of the Reorganized Debtor shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing.

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 2 | Secured Claims.  Each Holder of an Allowed secured Claim, shall receive in full and final satisfaction, settlement, and release of and in exchange for such Allowed secured Claim: (A) return of the collateral securing such Allowed Secured Claim; or (B) Cash equal to the amount of such Allowed Secured Claim; or (C) such other treatment which the Reorganized Debtor and the Holder of such secured Claim have agreed upon in writing. | Approx. $0<br><br>Recovery: 100% |

d.      **Class of General Unsecured Claims.**

General Unsecured Claims are not secured by property of the Estate and are not entitled to priority under § 507(a) of the Bankruptcy Code.

16452692/2

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 3 | After payment in full of all Allowed Administrative Claims, all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date. | Approx. **$11,000,000** Recovery: 3% - 10% |

### e.    Class of Equity Interest Holders.

Equity Interest holders are parties who hold an ownership interest (*i.e.*, equity interest)in the Debtor.  The following chart sets forth the Plan's proposed treatment of the class of Equity Interest holders:

| Class | Plan Treatment | Estimated Claim Pool /Projected Recovery |
|---|---|---|
| 4 | Equity Interest Holders in Class 4 will retain their equity ownership interest in the Debtor. | Unimpaired |

### 3.    Treatment of Claims and Claims Objections.

The Debtor or the Reorganized Debtor, as applicable, and the Subchapter v Trustee may object to the amount or validity of any Claim by the Claims Objection Bar Date by filing an objection with the Bankruptcy Court and serving a copy of the objection on the holder of the Claim. The Claim objected to will be treated as a Disputed Claim under the Plan.  If and when a Disputed Claim is finally resolved by the allowance of the Claim in whole or in part, the Debtor will pay the Allowed Claim in accordance with the Plan.  Nothing in this Section shall in any way limit the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### a.    Allowance of Claims

After the Effective Date, the Reorganized Debtor shall have and retain any and all rights and defenses the Debtor had with respect to any Claim immediately before the Effective Date.  Further, the Reorganized Debtor shall succeed to the right to any objection to a Claim pending on the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Case allowing such Claim.

22

16452692/2

### b. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor shall have the sole authority to File and prosecute objections to Claims, and the Reorganized Debtor shall have the sole authority to: (1) settle, compromise, withdraw, litigate to judgment, or otherwise resolve objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; and (2) from and after the Effective Date, all objections with respect to Disputed Claims shall be litigated to a Final Order except to the extent the Reorganized Debtor elects to withdraw any such objection, or the Debtor and the Creditor elect to compromise, settle, or otherwise resolve any such objection, in which event they may settle, compromise, or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court. For the avoidance of doubt, nothing set forth herein shall limit in any way the Trustee's rights to object to Claims as provided for in the Bankruptcy Code.

### c. Estimation of Claims

Before, on, or after the Effective Date, the Debtor or the Reorganized Debtor may (but is not required to) at any time request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim, and the Bankruptcy Court shall retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection. Notwithstanding any provision to the contrary in the Plan, a Claim that has been disallowed, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any Claim, such estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtor, or the Reorganized Debtor, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim, unless otherwise ordered by the Bankruptcy Court. Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### d. Adjustment to Claims

Any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register after the Debtor or the Reorganized Debtor, as applicable, files a notice of satisfaction with the Bankruptcy Court and serves such notice of satisfaction on the affected Claimant on ten (10) days' negative notice if no objection having been filed. If an objection is filed to the notice of satisfaction, an evidentiary hearing will be scheduled before the Bankruptcy Court.

### e. Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to

section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtor by that Entity have been turned over or paid to the Debtor or the Reorganized Debtor. All Proofs of Claim Filed on account of an indemnification obligation shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to, or action, order, or approval of, the Bankruptcy Court.

### f.    Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtor. Unless such prior authorization is granted, any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further notice to, or action, order, or approval of, the Bankruptcy Court to the maximum extent provided by applicable law.

### g.    De Minimis Distributions

If any Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may withhold such distribution until a final distribution is made to such Holder. If any final Distribution under the Plan to the Holder of an Allowed Claim would be less than $25.00, the Reorganized Debtor may cancel such distribution. Any unclaimed Distributions pursuant to this Section shall be treated as unclaimed property under Article IV(6)(f) of the Plan.

### h.    No Distributions Pending Allowance

If an objection to a Claim or portion thereof is Filed, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim, unless otherwise determined by the Reorganized Debtor. Any distribution to be made on account of such Claim shall be reserved by the Reorganized Debtor, pending Allowance or Disallowance of the Claim that is the subject of an objection. In the event that a Claim is Disallowed in whole or in part, the Debtor will make Distributions to the Holder of the Claim on account of the Allowed portion of the Claim, and the balance will be distributed on a pro rata basis to Holders of Allowed Claims

### i.    Duplicative Claims

If a Class 3 Creditor filed duplicate Proofs of Claim, the earlier filed Proof of Claim will be deemed Disallowed without the need for any further motion, objection or Bankruptcy Court order, such that the Class 3 Creditor receives only one payment under the Plan based on the later filed Proof of Claim.

### 4.    Treatment of Executory Contracts and Unexpired Leases.

Executory Contracts are contracts where significant performance of the contract remains for both the Debtor and another party to the contract. The Debtor has the right to reject, assume

(i.e. accept), or assume and assign these types of contracts to another party, subject to the Bankruptcy Court's approval. The paragraphs below explain the Debtor's intentions regarding its Executory Contracts (which includes its unexpired leases) and the impact such intentions would have on the other parties to the contracts.

Check all that apply:

☒ Assumption of Executory Contracts.

The Executory Contracts shown on **Exhibit E** shall be assumed by the Debtor.  Assumption means that the Debtor has elected to continue to perform the obligations undersuch contracts and unexpired leases, and to cure defaults of the type that must be cured under the Bankruptcy Code, if any.

The Debtor shall give any party to an Executory Contract that the Debtor seeks to assume fourteen (14) days' notice of the Debtor's intent to assume such Executory Contract along with a proposed cure of any defaults.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of future performance, you must file and serve your objection to the assumption within the deadline for objecting to the confirmation of the Plan, unless the Bankruptcy Court has set an earlier time.

Unless otherwise provided in the Plan, each Executory Contract that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and Executory Contracts related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

☒ Rejection of Executory Contracts.

The Executory Contracts shown on **Exhibit F** shall be rejected by the Debtor.

Except for the Executory Contracts and Unexpired Leases being assumed in Exhibit E, the Debtor rejects the remaining Executory Contracts and Unexpired Leases listed in the Debtor's Schedule G on file with the Court, including but not limited to those listed in Exhibit F.

Rejection means that the Debtor has elected not to continue to perform the obligations under such contracts or leases. If the Debtor has elected to reject a contract or lease, the other party to the contract or lease will be treated as a General Unsecured Creditor holding a Claim that arose before the bankruptcy was filed.

16452692/2

Neither the exclusion nor inclusion of any Executory Contract on Exhibits E or F, nor anything contained in the Plan, shall constitute an admission by the Debtor that any such contract or lease is in fact an Executory Contract or that the Debtor or Reorganized Debtor has any liability thereunder.

Further, it is important to note that contracts between the Debtor and non-debtor parties that are included on Exhibits E or F may not be executory. The inclusion of contracts is premised upon the inclusion of those contracts in the Debtor's Schedules. **In the event, and to the extent, that any party objects to the inclusion and proposed treatment of a contract as proposed herein, the party must timely file an objection to such treatment. Absent such any objection, all contracts listed on Exhibits E and F will be treated as set forth herein.**

5.    <u>**Means for Implementation and Funding of the Plan.**</u>

The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties. The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

On the Effective Date of the Plan, all property of the Debtor, tangible and intangible, including, without limitation, licenses, furniture, fixtures and equipment, will revert, free and clear of all Claims and Equity Interests except as provided in the Plan, to the Reorganized Debtor and all funds not expressly provided for in Plan will remain property of the Estate. The Debtor expects to have sufficient Cash on hand to make the payments required on the Effective Date.

6.    <u>**Payments.**</u>

a.    <u>**Responsibility for Making Payments.**</u>

Prior to the Effective date, the Debtor shall remit all payments due for United States Trustee Fees. Upon the Effective Date, the Reorganized Debtor shall make all Plan Distributions to Creditors in accordance with the terms of the Plan.

The Reorganized Debtor shall only be required to act and make Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, the Reorganized Debtor shall have no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Distributions under the Plan to any party who does not hold a Claim against the Debtor on any date on which a Distribution is made or who does not otherwise comply with the terms of the Plan.

16452692/2

Any required payments to the Holders of Allowed Claims or Equity Interests shall be made by the Reorganized Debtor: (a) in U.S. dollars by check, draft or warrant, drawn on a domestic bank by first-class mail (or by other equivalent or superior means as determined by the Reorganized Debtor), or (b) by wire transfer from a domestic bank.

b.    **Disputed Claims.**

Notwithstanding anything herein to the contrary: (a) no Distribution shall be made with respect to any Disputed Claim until such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Reorganized Debtor, no Distribution shall be made to any Entity that holds both an Allowed Claim and a Disputed Claim until such Entity's Disputed Claims have been resolved by settlement or Final Order.

c.    **Unclaimed Payments.**

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an undeliverable or unclaimed distribution within 180 days after the first distribution is made to such Holder shall be deemed to have forfeited its claim for such undeliverable or unclaimed distribution and shall be forever barred and enjoined from asserting any such claim for the undeliverable or unclaimed distribution against the Debtor, the Estate, the Reorganized Debtor, or its properties or assets.  In such cases, any Cash or other property held by the Reorganized Debtor in the Undeliverable Distribution Reserve for distribution on account of such claims for undeliverable or unclaimed distributions, including the interest that has accrued on such undeliverable or unclaimed distribution while in the Undeliverable Distribution Reserve, shall become the property of the Reorganized Debtor, notwithstanding any federal or state escheat laws to the contrary, and shall promptly be transferred to the Reorganized Debtor to be distributed according to the priority set forth in the Plan without any further action or order of the Bankruptcy Court.

d.    **Payment Dates and Locations.**

Distributions shall be made by the Reorganized Debtor twice a year, and such Distributions shall be on a pro rata basis to Holders of Allowed Claims based upon their priority.  Accordingly, the first Distributions shall be remitted on a pro rata basis to Holders of Allowed Administrative Expenses (including United States Trustee Fees) until all Allowed Administrative Expenses are paid in full. Once Allowed Administrative Expenses have been paid in full, the Reorganized Debtor shall remit payments on a pro rata basis to Holders of Allowed Priority Claims until all Allowed Priority Claims are paid in full, including interest to the extent applicable.  Once Allowed Priority Expenses have been paid in full, the Reorganized Debtor shall remit payment on a pro rata basis to Holders of general unsecured claims.  After each Distribution, the Reorganized Debtor shall provide the Subchapter v Trustee a list of parties to whom payments were remitted.

Except as otherwise provided in the Plan, Distributions to Holders of Allowed Claims shall be made as set forth on the latest date of the following documents: (a) to the address of payment set forth on any of the Proofs of Claim Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim is Filed; (b) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date

27

of any related Proof of Claim and prior to the Effective Date; and (c) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Debtor and Reorganized Debtor have not received a written notice of a change of address prior to the Effective Date.

The Reorganized Debtor shall make one attempt to make the Distributions contemplated hereunder in accordance with the procedures set forth herein. The Reorganized Debtor, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable distributions. Any Distributions returned to the Reorganized Debtor as undeliverable or otherwise shall remain in the possession of the Reorganized Debtor until such time as a Distribution becomes deliverable, and no further Distributions shall be made to such Holder unless such Holder notifies the Reorganized Debtor of its then current address.

Nothing contained in this Plan shall constitute a waiver or release by the Reorganized Debtor of any rights in respect of legal and equitable objections, defenses, setoffs, or recoupment. To the extent permitted by applicable law, the Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other Distributions to be made under the Plan in respect of such Claim, claims of any nature whatsoever that arose before the Petition Date that the Estate, or the Reorganized Debtor may have against the Holder of such Claim or Equity Interest.

        e.        **Undeliverable Distribution Reserve.**

If a Distribution to any Holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable or is otherwise unclaimed, such Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such Holder until such time as such distribution becomes deliverable or is claimed or is deemed to have been forfeited.

        f.        **Tax Requirements.**

Notwithstanding any other provision of the Plan, each Holder of an Allowed Claim that has received a Distribution under the Plan shall have responsibility for the satisfaction or payment of any tax obligation imposed by any Governmental Unit, including income, withholding and other tax obligation, on account of such Distribution. The Reorganized Debtor reserves the right to allocate and distribute all Distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens and similar encumbrances.

        7.        **Post-Confirmation Management and Insiders Retained by the Debtor.**

The managers and officers of the Debtor immediately prior to the Effective Date shall serve as the initial managers and officers of the Debtor on and after the Effective Date. Each off the managers and officers being retained are insiders of the Debtor. The post-confirmation officers and managers of the Debtor, and their compensation, shall be as follows:

| Name | Position | Compensation |
|---|---|---|
| **Laxman Reddy** | **President & CEO** | **$750,000** |
| **Matt Williams** | **CFO** | **$300,000** |
| **Michael Sarrao** | **EVP & General Counsel** | **$0**[6] |

## 8.    Preservation of Causes of Action.

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, including the Claims and Causes of Action specifically discussed in Article 5 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtor may pursue such Causes of Action, as appropriate, in the Reorganized Debtor's sole discretion.  No Entity may rely on the absence of a specific reference in the Plan to any Cause of Action against it as any indication that the Debtor or the Reorganized Debtor will not pursue any and all available Causes of Action against it.  The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or pursuant to a Bankruptcy Court order, the Debtor or Reorganized Debtor, as applicable, expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation.  In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtor.  The Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to, or action, order, or approval of, the Bankruptcy Court.

## 9.    Tax Consequences of the Plan.

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their***

---

[6] Mr. Sarrao is not paid compensation other than: (1) medical, dental and vision insurance (approximate value of $33,000); and (2) certain expense reimbursements.

16452692/2

*Tax Liability Should Consult with Their Own Accountants, Attorneys, And/Or Advisors.*

There may be a number of material income tax considerations, risks and uncertainties associated with the implementation of the Plan. The Debtor does not offer an opinion as to any federal, state, local or other tax consequences to Holders of Claims and Equity Interests as a result of the confirmation of the Plan.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. NOTHING HEREIN SHALL CONSTITUTE TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OR OTHER PLAN RECIPIENTS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

## ARTICLE V - FEASIBILITY OF PLAN

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

### 1.    Ability to Initially Fund Plan.

The Debtor believes that it will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses that are entitled to be paid on that date.

### 2.    Ability to Make Plan Payments And Operate Without Further Reorganization.

For a period of three (3) years, the Debtor will contribute its entire projected disposable income, in an aggregate amount of $635,549, plus (ii) any residual value received by the Reorganized Debtor on account of the Debtor's direct and indirect subsidiaries including the claim filed in the bankruptcy case of Sherman/Grayson Hospital, LLC, and (iii) the proceeds of any Cause of Action, including any settlement of such claims, to fund distributions under the Plan on an annual basis. Once a year, the Debtor shall file a certified statement about money received by the Debtor on account of its interest from direct and indirect affiliates.[7] Further, to the extent that the Independent Director determines that there are any valid Causes of Action, the Debtor may create a liquidating trust with an independent third party to pursue such claims with all costs of pursuing such claim(s) coming from the Debtor's projected disposable income that would otherwise be distributions on account of Allowed Claims.

---

[7]    In accordance with applicable non-bankruptcy law, any amounts received by the Debtor's direct or indirect subsidiaries must first be paid to those subsidiaries' creditors and Debtor's direct and indirect subsidiaries must maintain adequate reserves to address contingent liabilities before such money can be transferred to the Debtor as a distribution on account of the Debtor's equity interest.

16452692/2

The Debtor will have sufficient operating income to make such payments as indicated in the projections attached hereto as **Exhibit A.**

## ARTICLE VI  - LIQUIDATION ANALYSIS

To confirm the Plan, the Bankruptcy Court must find that all Creditors and Equity Interest holders who do not accept the Plan will receive at least as much under the Plan as such Creditors and Equity Interest holders would receive in a Chapter 7 liquidation. A liquidation analysis is attached hereto as **Exhibit G.**

## ARTICLE VII - DISCHARGE, RELEASES AND INJUNCTIONS

1. **Discharge.**

Assuming the Plan is consensual, pursuant to section 1191(a) of the Bankruptcy Code, on the Effective Date, the Debtor will be discharged from any debt that arose before confirmation of this Plan, to the extent specified in section 1141(d)(1)(A) of the Bankruptcy Code, except that the Debtor will not be discharged of any debt imposed by this Plan or to the extent provided in section 1141(d)(6) of the Bankruptcy Code.

If the Plan is confirmed under section 1191(b), as soon as practicable after completion by the Debtor of all payments due under the Plan, unless the Court approves a written waiver of discharge executed by the Debtor after the order for relief under the Bankruptcy Code, the Court shall grant the Debtor a discharge of all debts provided in section 1141(d)(1)(A) of the Bankruptcy Code, and all other debt allowed under section 503 of the Bankruptcy Code and provided for in this Plan, except any debt – (1) on which the last payment is due after the first 3 years of the Plan, or such other time not to exceed 5 years fixed by the Court; or (2) if applicable, of the kind specified in section 523(a) of the Bankruptcy Code.

2. **Debtor Releases.**

Subject to the occurrence of the Effective Date, and in consideration of the services provided and a total of $25,000 to be remitted by certain of the Debtor's insiders, on the Effective Date, the Debtor and its Estate shall release, waive, and discharge unconditionally the Released Parties from any and all claims, causes of action, and liabilities whatsoever (including those arising under the Bankruptcy Code), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising in law, equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence: in connection with or arising from the Debtor's Chapter 11 Case, the pursuit of confirmation of the Plan, the Consummation thereof, the administration thereof or the property to be distributed thereunder; provided, that the foregoing shall not operate as a waiver of or release from any causes of action resulting from the willful misconduct, actual fraud, or gross negligence

3. **Exculpation and Limitation of Liability.**

Except as otherwise specifically provided in the Plan, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from any Cause of Action arising

31

between the Petition Date and the Effective Date related to any act or omission in connection with, relating to, or arising out of: (i) the Chapter 11 Case, (ii) the Plan, or any contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Plan, (iii) the pursuit of Confirmation, (iv) the administration and implementation of the Plan, or (v) the distribution of property under the Plan or any other related agreement.  The Released Parties have, and upon closing of the Chapter 11 Case or the Effective Date shall be deemed to have, with respect to all actions arising on or after the Petition Date, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan; provided that in no event shall anything in this Article 5.3 be construed as a release of any person's gross negligence, fraud, or willful misconduct, each as determined by a Final Order.

4.    **Injunction.**

Except with respect to the obligations arising under the Plan or the Confirmation Order, and except as otherwise expressly provided in the Plan or the Confirmation Order, all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

ALL ENTITIES SHALL BE PRECLUDED FROM ASSERTING AGAINST THE PROPERTY TO BE DISTRIBUTED PURSUANT TO THIS PLAN ANY OTHER CLAIMS OR EQUITY INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

5.    **Remedies Upon Default.**

32

The Debtor expects to be able to make all payments under the Plan. In the event of a default, however, pursuant to § 1191(c)(3) of the Bankruptcy Code, if the Reorganized Debtor defaults in payments under the Plan, the affected creditor shall notify the Reorganized Debtor, who shall have fifteen (15) days to cure the default. If the Reorganized Debtor does not cure within the 15 days, the creditor may file a notice of the default with the Bankruptcy Court and request a hearing to consider appropriate remedies.

<u>**ARTICLE VIII - GENERAL PROVISIONS**</u>

**1.**    <u>**Title to Assets**</u>

If a plan is confirmed under § 1191(a), except as otherwise provided in the Plan or in the order confirming the Plan, (i) confirmation of the Plan vests all of the property of the Estate in the Debtor, and (ii) after confirmation of the Plan, the property dealt with by the Plan is free and clear of all Claims and Equity Interests of Creditors, equity security holders, and of general partners in the Debtor.

If a plan is confirmed under § 1191(b), property of the Estate includes, in addition to the property specified in § 541, all property of the kind specified in that section that the Debtor acquires, as well as earnings from services performed by the Debtor, after the date of commencement of the case but before the case is closed, dismissed, or converted to a case in § 1185 of the Bankruptcy Code, the Plan, or the order confirming the Plan, the Debtor shall remain in possession of all property of the Estate.

**2.**    <u>**Binding Effect**</u>

If the Plan is confirmed, the provisions of the Plan will bind the Debtor and all Creditors, whether or not they accept the Plan. The rights and obligations of any entity named or referred to in this Plan will be binding upon and will inure to the benefit of the successors or assigns of such entity.

**3.**    <u>**Severability**</u>

If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan.

**4.**    <u>**Retention of Jurisdiction by the Bankruptcy Court**</u>

The Bankruptcy Court shall retain jurisdiction of this case with regard to all matters to the fullest extent allowed pursuant to applicable law, including the following: (i) to make such orders as are necessary or appropriate to implement the provisions of this Plan and to resolve any disputes arising from implementation of the Plan and to remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order; (ii) to rule on any modification of the Plan proposed under § 1193; (iii) to hear and allow all applications for compensation to Professionals and other Administrative Expenses; (iv) to allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Claim or Equity Interest; (v) to ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan; (vi) to determine any and all

16452692/2

applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract; (vii) to determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any entity's obligations in connection with the Plan, or to defend any of the rights, benefits, Estate property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof; (viii) to consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor and the Estate; (ix) to decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, or the Estate that may be pending on the Effective Date or that may be brought by the Debtor or the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing; (x) to decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation of the Plan, including but not limited to the issuance of Form 1099s (or similar forms); (xi) to interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; (xii) to enforce the release, exculpation and injunction provisions contained in Article 5 herein; and (xiii) to enter an order closing the Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

5.      **Headings**

The headings contained in this Plan are for convenience of reference only and do not affect the meaning or interpretation of this Plan.

6.      **Successors and Assigns**

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

7.      **No Fourteen Day Stay**

Notwithstanding the requirements set forth by Federal Rules of Bankruptcy Procedure, Rules 3020(e), 6004(h), and 6006(d), the Debtor has the right to elect for the Plan to go effective upon entry of the Confirmation Order so long as no stay is in place.

8.      **Incorporation of Agreements Entered Into by the Debtor**

The Debtor may enter into certain agreements or stipulations with certain Creditors regarding the treatment of their Claim so long as such agreements or stipulations do not violate the Bankruptcy Code. The Plan may be amended to reflect such agreements or stipulations. Such amendments shall not reopen any notice or objection periods regarding the Plan.

9.      **Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan pursuant to § 1193(a).

16452692/2

If the Plan is confirmed under § 1191(a), the Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated *and* (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

If the Plan is confirmed under § 1191(b), the Debtor may seek to modify the Plan at any time only if (1) it is within 3 years of the Effective Date, or such longer time not to exceed 5 years as fixed by the Bankruptcy Court and (2) the Bankruptcy Court authorizes the proposed modifications after notice and a hearing.

### 10.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) the Debtor with respect to the holders of Claims or Equity Interests or other parties-in-interest; or (2) any holder of a Claim or other party-in-interest prior to the Effective Date.

### 11.    Filing of Notice of Substantial Consummation

Not later than fourteen (14) days after the Plan of is substantially consummated, the Debtor shall file with the Bankruptcy Court and serve upon the Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

### 12.    Post-Effective Date Service List

Pursuant to Bankruptcy Rule 2002 and any applicable Local Rule, notice of all post-Confirmation matters for which notice is required to be given shall be deemed sufficient if served upon counsel for the U.S. Trustee, counsel to the Debtors, counsel for the Liquidating Trustee, and all persons on the Bankruptcy Rule 2002 service list.  With the exception of the Debtors, Cerberus, and the U.S. Trustee, any Person desiring to remain on the Bankruptcy Rule 2002 service list shall be required to file a request for continued service and to serve such request upon counsel to the Liquidating Trustee within thirty (30) days subsequent to the Effective Date.  Persons shall be notified of such continued notice requirements in the notice of entry of the Confirmation Order. **Persons who do not file a request for continued service within thirty (30) days subsequent to the Effective Date shall be removed from the Bankruptcy Rule 2002 service list.**

### 13.    Changes in Rates Not Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory approval of rate. The Debtor is not regulated by a governmental commission.

### 14.    Final Decree

Unless otherwise ordered by the Bankruptcy Court, once the Estate has been fully administered, as provided in Rule 3022 of the Federal Rules of Bankruptcy Procedure, the Reorganized Debtor or other party in interest shall file a motion with the Bankruptcy Court to obtain

a final decree to close the case.

## ARTICLE IX - CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

1.     **Conditions Precedent to Confirmation.**

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)     The Plan and the Confirmation Order shall be in a form and substance reasonably acceptable to the Debtor.

2.     **Conditions Precedent to the Effective Date.**

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to Article 7.3:

(a)     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance reasonably acceptable to the Debtor.

(b)     The Bankruptcy Court shall have entered a Final Order, in form and substance reasonably acceptable to the Debtor confirming the Plan pursuant to section 1191 of the Bankruptcy Code.

(c)     All authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained.

(d)     No order of a court shall have been entered and remain in effect restraining the Debtor from consummating the Plan and the transactions contemplated therein, and the Confirmation Order shall be in full force and effect.

(e)     All actions, documents, certificates and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws, and are in form and substance acceptable to the Debtors.

16452692/2

3.      **Waiver of Conditions.**

The conditions to Confirmation of the Plan and to the occurrence of the Effective Date set forth in this Article 7 may be waived at any time by the Debtor.

4.      **Effect of Failure of Conditions.**

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall: (i) constitute a waiver or release of any claims by or Claims against the Debtor or any of the Released Parties; (ii) prejudice in any manner the rights of the Debtor, any Holders of a Claim or Equity Interest or any other entity; or (iii) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any Creditors or Equity Interest Holders or any other entity in any respect. In addition, the Debtor and all Holders of Claims against or Equity Interests in the Debtor shall be restored to the status quo as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred.

5.      **Filing of Notice of the Effective Date.**

On the Effective Date or as shortly thereafter as reasonably practicable, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court.

## ARTICLE X - EXHIBITS

The following documents accompany the Plan:

| Attached | Description | Exhibit |
|---|---|---|
| X | Organizational Chart | A |
| X | Claims Register and Schedules | B |
| X | Projected Income and Expenses | C |
| X | Report of Gould Consulting Services | D |
| X | Executory Contracts and Unexpired Leases to be Assumed | E |
| X | Executory Contracts and Unexpired Leases to be Rejected | F |
| X | Liquidation Analysis | G |

## ARTICLE XI - RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

1.      **Rules of Interpretation.**

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular

37

16452692/2

or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit as it may thereafter be amended, modified, or supplemented; (4) any reference to an Entity as a holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (10) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (11) all references to docket numbers of documents Filed in the Chapter 11 Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Case, unless otherwise stated; (13) any immaterial effectuating provisions may be interpreted by the Debtor, the Reorganized Debtor, or the Trustee in such a manner that is consistent with the overall purpose and intent of the Plan, all without further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity; and (14) except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtor or to the Reorganized Debtor shall mean the Debtor and the Reorganized Debtor, as applicable, to the extent the context requires.

**2.**     **Computation of Time.**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

**3.**     **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of California, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that corporate governance matters relating to the Debtor or the Reorganized Debtor, as

16452692/2

applicable, shall be governed by the laws of the state of incorporation or formation of the Debtor or Reorganized Debtor, as applicable.

**4.**      **Reference to Monetary Figures.**

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

**5.**      **Controlling Document.**

In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

Dated: December 19, 2023

**MORRIS JAMES LLP**

/s/ *Jeffrey R. Waxman*
Jeffrey R. Waxman (DE Bar No. 4159)
Brya M. Keilson (DE Bar No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Tel: (302) 888-6800
Fax: (302) 571-1750
E-mail: jwaxman@morrisjames.com
E-mail: bkeilson@morrisjames.com

*Counsel to the Debtor and Debtor in Possession*

39