**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: ) | |
| ) | |
| ALECTO HEALTHCARE SERVICES LLC,[1] ) | Case No. 23-10787 (JKS) |
| ) | Chapter 11 (Subchapter V) |
| Debtor. ) | |
| ) | |
| _____ ) | |

**THE UNITED STATES OF AMERICA'S AMENDED OBJECTION TO THE SMALL
BUSINESS DEBTOR'S PLAN OF REORGANIZATION**

The United States of America ("United States") hereby objects[2] to the Small Business Debtor's Plan of Reorganization Proposed by the Debtor (the "Plan"), Dkt. 262, filed by the debtor Alecto Healthcare Services LLC (the "Debtor," or "Alecto"), and in support thereof states as follows:

**INTRODUCTION**

The Plan proposed here is deficient, failing to include all of the Debtor's disposable income, providing an unreasonable salary to the chief executive, and failing to preserve creditors' rights, all while allowing the Debtor's equity holders to retain their equity and continue operating the Debtor to their advantage. The Plan attempts to thwart the Bankruptcy Code by including provisions that violate creditors' rights, including improper claim disallowance procedures, a lack of setoff and recoupment preservation, overly broad injunctions, and inappropriate burdens placed on creditors to keep track of post-confirmation payments and

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] The United States believes it and the Debtor have resolved the objections in Sections A and C herein; the United States files this amended objection out of an abundance of caution, as no final confirmation order is yet available.

1

notices. These deficiencies, and particularly the Debtor's prepetition conduct, make it inequitable for the Plan to be confirmed. Thus, the Court should deny confirmation.

      Debtor, as the parent and alter ego of Olympia Health Care LLC ("Olympia"), a hospital long insolvent and now closed, owes the United States' Medicare program $29 million. Led by CEO Laxman Reddy ("Reddy"), Alecto controlled Olympia's financial decisions – including not repaying its debts to CMS. Additionally, Alecto has avoided repaying Olympia's Medicare debts while fraudulently transferring over fifty million dollars to pay creditors of Alecto's four other hospitals while those hospitals were insolvent or already closed. 28 U.S.C. § 3304(a)(1), (b)(1)(B) and § 3307.[3] Many millions – if not most – of those dollars went to creditors of these hospitals after they had been sold or closed. Now, the Plan (Article IV.7) gives Reddy a $750,000 annual salary to run the single hospital, St. Rose, that Alecto ran but did not own. St. Rose was run by a different (now former) Alecto employee from mid-2016 to early 2022.[4] Reddy took the St. Rose CEO-president position after Alecto had sold or closed four of its five owned hospitals, and the fifth – Sherman/Grayson – was heading for bankruptcy. Reddy's proposed salary over three years is 22.5 percent – $2.25 million – of Alecto's total projected revenue ($10 million) in that time period, solely to manage St. Rose hospital. Alecto's creditors, of which the United States is by far the largest, will split as little as $635,549, less than one year of Reddy's proposed salary and only six percent of Alecto's projected revenue.

---

[3] *See generally* 28 U.S.C. §§ 3301-3308 (regarding fraudulent transfers under the Federal Debt Collection Procedures Act).

[4] When Alecto began managing St. Rose in 2012, Reddy took over as president and CEO. East Bay Times, *New firm to manage struggling St. Rose Hospital in Hayward with an option to buy it* (Jan. 11, 2013) https://www.eastbaytimes.com/2013/01/11/new-firm-to-manage-struggling-st-rose-hospital-in-hayward-with-an-option-to-buy-it/. But Aman Dhuper was St. Rose president and CEO from July 2016 until February 2022. Aman Dhuper, LinkedIn profile (Jan. 19, 2024); St. Rose Hospital website, Leadership webpage (downloaded Sep. 2, 2021); East Bay Times, *St. Rose Hospital could get $8 million from Alameda County* (Dec. 30, 2016).

Alecto sought bankruptcy protection in June 2023. Less than three months earlier, the United States sued Alecto to recover $11 million in Medicare overpayments made to Olympia in 2005 by the Centers for Medicare & Medicaid Services ("CMS"), part of the U.S. Department of Health and Human Services. *United States v. Olympia Health Care LLC*, No. 2:23-1783-ODW-PVC (C.D. Cal.) (the "District Court Case"); Complaint (Mar. 9, 2023, ECF 1) ("Complaint") (Exhibit C to Proof of Claim 21-1 (Dec. 13, 2013)). The United States sued Alecto for this debt, both as Olympia's alter ego and because of the fraudulent transfers, described above, to pay creditors of Alecto's four other hospitals. Since then, CMS has identified more debts for which Alecto is liable. *See* Proof of Claim 21.

Olympia, and thus Alecto, owe a $29 million debt to CMS. Neither Alecto nor Olympia dispute any of this debt owed to the United States. The debt includes: (1) $11.05 million in principal still owed on a 2005 overpayment, as sought in the District Court Case; (2) $2.46 million in overpayments for 2017 through 2021; (3) $13.69 million in CARES Act Covid-19 accelerated or advance payments ("CAAP") received in April 2020 and intended to ease hospitals' financial strains from the pandemic; and (4) $2.39 million in pre-petition interest. Proof of Claim 21, Exhibit A, at 4-6 (CMS Declaration). Under the terms of CAAP, Olympia was required to repay the $13.69 million by late 2022. Alecto, however, transferred the $13.69 million from Olympia to Alecto, and neither Olympia nor Alecto repaid any of the CAAP money to CMS. Moreover, after Alecto sold Olympia and its real estate for $125 million at the end of 2020, it used none of those proceeds to pay the CMS debt.

Alecto, by paying other creditors instead of paying the CMS debt, violated the Federal Priority Statute, 31 U.S.C. § 3713, which (a) requires an entity in Olympia's insolvent financial condition to pay federal debts first and (b) makes the persons responsible for violation of the

statute personally liable for the unpaid debts. The United States' pending suit seeks recovery from Reddy – as well as from Alecto's chief financial officer and Olympia's CEO – for violating this statute because they have controlled Alecto since creating the company in 2012, and Olympia since Alecto bought it in 2013, and they paid other creditors ahead of the United States.

In addition to violating the Federal Priority Statute, Reddy, while personally benefiting financially as Alecto's CEO throughout its existence, has:

(1) controlled all significant financial transactions and personnel decisions of debtor's affiliates throughout their existence;

(2) overseen and managed Debtor while all five hospitals it acquired and controlled have failed; and

(3) used almost $50 million of Olympia's money and $125 million of Olympia's sale proceeds to benefit Alecto and pay debts of the other four Debtor-owned hospitals, while claiming Olympia could not afford to pay its debts to CMS.

In sum, a $750,000 salary for Reddy is too high, given the equities: the Debtor's Plan would pay far more to Reddy than to the Debtor's creditors; with Reddy as Debtor's CEO, the Debtor misrepresented Olympia's ability to pay its debts to CMS while using Olympia's money to pay other creditors of the Debtor's failed or failing hospitals; with Reddy as Debtor's CEO, the Debtor's five owned hospitals all closed or were sold while each was insolvent; Reddy and the Debtor have failed to explain why $750,000 is an appropriate salary. In short, Reddy's track record as Debtor's CEO is one of failure. His salary should be substantially reduced for the duration of the Plan so that creditors can receive more in distributions.

## BACKGROUND

On June 23, 2023 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware.

Prior to the Petition Date, the United States sued the Debtor in the District Court Case under the Federal Debt Collections Procedure Act for fraudulent transfers and as Olympia's alter ego.

On December 19, 2023, the Debtor filed the Plan, which is constructed as nonconsensual. The confirmation hearing is set for February 8, 2024.

The United States has proposed certain language to the Debtor that will resolve some of the United States' objections; but, as of the filing of this objection, the Debtor has not yet confirmed that the proposed language will be included in the Plan.

## ARGUMENT

The Plan is objectionable because it (1) fails to include all of its disposable income as part of distributions to creditors, (2) contains an unreasonably high salary for the Debtor's CEO Reddy, and (3) fails to preserve rights of the United States.

**A. The Plan Fails to Include All Disposable Income of the Debtor**

Section 1190(2) of the Bankruptcy Code requires a debtor's plan to "provide for the submission of all or such portion of the future earnings or other future income of the debtor to the supervision and control of the trustee as is necessary for the execution of the plan." A nonconsensual plan cannot be confirmed unless it is "fair and equitable." 11 U.S.C. § 1191(b). In order to be considered "fair and equitable," a plan must

> provide[] that all of the projected disposable income of the debtor
> to be received in the 3-year period, or such longer period not to

5

>exceed 5 years as the court may fix, beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1191(c)(2)(A). Disposable income is defined as "the income that is received by the debtor and that is not reasonably necessary to be expended . . . for . . . the payment of expenditures necessary for the continuation, preservation, or operation of the business of the debtor." 11 U.S.C. § 1191(d)(2).

Article V.2 of the Plan, however, fails to provide all disposable income to making payments under the Plan because it fails to include all future earnings or future income of the Debtor.[5] The Plan proposes to pay $635,549 over three years, as well as any income from subsidiaries and recoveries from causes of action. The $635,549 is the projected income after expenditures. But the Debtor may earn more revenue or incur lower expenses than currently projected, and the Plan should ensure that any excess goes towards the Plan funding.

Similarly, the Plan's projections are based on the Debtor's management of St. Rose hospital under a contract that will end by the third year of the Plan. Because the Debtor has managed St. Rose since 2012, the Debtor may extend that contract, or potentially find more hospitals to manage. Any such new revenue streams that create disposable income must also be included in the plan funding. Denying the creditors the benefit of such future or excess income is inequitable and creates a windfall for the Debtor.

Whatever income the Debtor earns over-and-above its current projections, subtracting any attendant necessary expenditures, would be disposable income as defined by the Bankruptcy

---

[5] The Plan similarly fails to include all disposable income by paying a $750,000 salary to Reddy that is far in excess of a "necessary" expenditure, as discussed below.

Code, and must be included in the Plan's funding and distributions to creditors; otherwise, the Plan is not fair and equitable, and the Court must deny confirmation.

### B. The Plan Contains an Unreasonable Executive Salary

The Plan's salary for CEO Reddy is unreasonably high, and thus violates section 1191(b)'s requirement that the Plan be fair and equitable. As stated above, section 1191(d) defines disposable income as income "not reasonably necessary" for operating expenses. When a debtor includes unnecessary expenditures in a plan, that debtor has failed to allocate all disposable income to creditors. Thus, business expenses, such as salaries and benefits, must be reasonably necessary. Here, Reddy is to receive $750,000 a year for the management of a single hospital. *See* Article IV.7. Courts have considered a variety of facts in determining whether executive salaries are reasonable, such as whether the salary is tied to the business' success and the past conduct of the executive. *See In re Hal Luftig Co., Inc.*, 655 B.R. 508, 544 (Bankr. S.D.N.Y. 2023) (finding a CEO's salary of $210,000 to be reasonable because of the CEO's substantial contribution to the debtor, the fact that the CEO's salary had fluctuated with the debtor's commercial success, and because the CEO did not draw a salary during the pandemic).

Here, the facts do not support such a large, three-quarters-of-a-million-dollar salary, which is far more than the Debtor's Plan would pay to the Debtor's creditors. The Plan is devoid of details that could support the necessity of the salary. And Reddy's past conduct and the Debtor's track record do not justify such a salary. With Reddy as the Debtor's CEO, for several years the Debtor repeatedly misrepresented to CMS that Olympia could not repay its 2005 Medicare overpayment debt while the Debtor used $49 million of Olympia's money to pay other creditors of the Debtor's failed or failing hospitals. Further, according to documents provided by

Debtor,[6] Reddy's proposed salary to manage a single hospital is the same as when he was managing Alecto's five owned hospitals plus St. Rose – an incongruity that goes unexplained.

Given section 1191(d)'s restriction on unnecessary expenditures and the equities, Reddy's salary should be reduced significantly for the duration of the Plan so that creditors can receive greater distributions. Reddy should not receive a $750,000 salary given his failure to accomplish – in every case – Alecto's stated mission to buy financially distressed hospitals and make them profitable. Instead, all the hospitals ended up closing or bankrupt, and, in Olympia's case, owing the United States $29 million.

In short, this unreasonable executive salary violates section 1191(b)'s requirement that the Plan be fair and equitable. The Plan cannot be confirmed.

### C. The Plan Fails to Preserve the United States' Rights

The Plan contains several provisions that impede on the rights of the United States under the Bankruptcy Code and common law and are unfair and inequitable. Confirmation must be denied unless the Debtor corrects these deficiencies.

First, Article IV.3.f states that any claim amended or filed after the Effective Date without court authorization is deemed disallowed in full and expunged. This provision is not supported by the Bankruptcy Code and it is inequitable for the entire claim to be disallowed if the claim is being amended. *See generally* 11 U.S.C. § 502. The onus should be on the Debtor or Reorganized Debtor to object to any untimely claim, rather than the creditor needing to seek court approval.

---

[6] In response to the United States' request, the Debtor provided documents related to Reddy's salary, including Reddy's Form W-2 Wage and Tax Statements for 2012-2023 and the Debtor's tax returns for 2013-2022.

Second, Article IV.3.h. discusses a reserve fund for disputed claims. But the Plan does not describe the mechanism for calculating the reserves. The reserve funds for each disputed claim should be calculated as the pro rata share the creditor would be paid if the claim is ultimately allowed in full. Reserve funds should be carried to future years if the disputed claim is not yet resolved. The Plan needs to be clearer that such protections will be effectuated, stating that any disputed claim's pro-rata distribution shall be calculated assuming the claim is not disputed and be held in reserve until the disputed claim is resolved. *See In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020) (approving plan that reserved distributions for disputed claims based on pro-rated share of disposable income if claims were allowed).

Third, Article IV.6.b states that no claim of a creditor will be paid until a disputed claim is resolved. Again, section 502 does not support such a provision, and it should be removed from the Plan. This provision unfairly harms the United States because it has multiple agency claims, and there is no equitable reason why a claim of the Department of Labor, for example, should not be paid if the Debtor disputes the claim of another, unrelated agency. Further, this provision is not necessary to preserve the Debtor's setoff rights because the United States does not and will not owe the Debtor any money.

Fourth, the Plan preserves setoff rights for the Debtor, but not for any other creditor, in violation of law. The Third Circuit preserves setoff and recoupment rights for the United States. *In re Continental Airlines*, 134 F.3d 536, 542 (3d Cir. 1998) (holding that confirmation of a plan does not extinguish setoff claims when timely asserted); *Megafoods Stores, Inc. v. Flagstaff Realty Assocs. (In re Flagstaff Realty Assocs.)*, 60 F.3d 1031, 1035-36 (3d Cir. 1995) (holding that recoupment survives discharge following confirmation and implementation of chapter 11

plan even if creditor did not object to plan or seek a stay pending appeal). Thus, the Plan must be amended to preserve the United States' rights or confirmation must be denied.

Fifth, Article IV.6.c states that unclaimed payments are forfeited after 180 days after the first distribution is made. The Plan does not provide any specific dates when Plan payments will be made. Thus, Article IV.6.c's provision is inequitable for several reasons: (1) if creditors do not know when to expect a payment, they will not know that it was missed; and (2) creditors will receive at least six payments throughout the distribution years of the Plan, and any forfeiture period should only apply to the specific unclaimed Plan payment. It is inequitable for a creditor who does not receive the first payment to then be barred from receiving any of the remaining payments. United States' agencies, in particular, may experience delay in is claiming a payment depending on how and where the agency receives notice.

Sixth, Article VII.4 contains an overly broad injunction because it includes the Released Parties, which include numerous non-debtors. Among the non-debtors would be insiders, including the Debtor's CEO Reddy, among other officers and directors. And claims against Reddy, such as those the United States has brought in federal district court under the Federal Priority Statute, appear to be enjoined. As such, the injunction acts as a nonconsensual third-party release. This Court has previously held that a non-debtor release over a creditor's objection "would not pass muster" because the court "does not have the power to grant a third-party release of a non-debtor." *In re Wash. Mut., Inc.*, 442 B.R. 314, 351-52 (Bankr. D. Del. 2011); *see also In re Coram Healthcare Corp.*, 315 B.R. 321, 335 (Bankr. D. Del. 2004) (holding that the "Trustee (and the Court) do not have the power to grant a release of the Noteholders on behalf of third parties," and that such release must be based on consent of the releasing party); *In re Exide Technologies*, 303 B.R. 48, 74 (Bankr. D. Del. 2003) (approving releases which were binding only on those creditors and equity holders who accepted the terms of the plan); *In re Zenith*

*Electronics Corp.*, 241 B.R. 92, 111 (Bankr. D. Del. 1999) (release provision had to be modified to permit third-party releases of non-debtors only for those creditors who voted in favor of the plan). There are no extraordinary circumstances to warrant third party releases in the form of an overly broad injunction.

Finally, Article VIII.12 states that creditors must request continued notices of docket activity within 30 days after the Effective Date. It is not clear if ECF notice will continue; if not, this provision puts an unnecessary burden on the creditors. The Reorganized Debtor should file a notice on the docket prior to that date with instructions on how to request continued notices to ensure all creditors can request renewed service of docket notices. Placing the burden on creditors may lead many to unknowingly forego further notices, which is not equitable and fair as required by the Bankruptcy Code.

The Plan's failure to preserve these rights makes it objectionable and unconfirmable.

## CONCLUSION

For the foregoing reasons, the Plan is not fair and equitable and cannot be confirmed pursuant to section 1191(b). Unless the Plan's deficiencies are fully addressed by the Debtor, confirmation must be denied.

Dated: February 22, 2024

        Respectfully submitted,

        BRIAN M. BOYNTON
        Principal Assistant Attorney General

        /s/ *John R. Kresse*
        KIRK T. MANHARDT
        MARCUS SACKS
        LEAH V. LERMAN (Fed. Bar No. 28669)
        JOHN R. KRESSE
        Civil Division

U. S. Department of Justice
P. O. Box 875
Ben Franklin Station
Washington, D.C.  20044-0875
(202) 598-3811 (telephone)
(202) 514-9163 (facsimile)
Email: John.Kresse@usdoj.gov

*ATTORNEYS FOR THE UNITED STATES*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 22, 2024, I electronically filed the foregoing UNITED STATES OF AMERICA'S AMENDED OBJECTION TO THE SMALL BUSINESS DEBTOR'S PLAN OF REORGANIZATION with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.


*/s/ John R. Kresse*
JOHN R. KRESSE
Commercial Litigation Branch
Civil Division
United States Department of Justice