**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 (Subchapter V) |
| | ) | |
| Alecto Healthcare Services LLC,[1] | ) | Case No. 23-10787 (JKS) |
| | ) | |
| Debtors | ) | **Related Docket No. 261** |

**OBJECTION OF THE REED ACTION JUDGMENT CREDITORS**
**TO CONFIRMATION OF THE SMALL BUSINESS DEBTOR'S**
**PLAN OF REORGANIZATION PROPOSED BY THE DEBTOR**

The Reed Action Judgment Creditors (the "Reed Creditors"), by and through undersigned counsel, hereby object to confirmation of the *Small Business Debtor's Plan of Reorganization Proposed by f the Debtor* [Docket No. 261] (the "Plan"). In support of their Objection, the Reed Creditors respectfully state as follows:

**PRELIMINARY STATEMENT**

1. The primary infirmity with the Plan is the Debtor's proposal to release certain of its insiders from all claims for a payment of $25,000. Plan §VII.2. The Reed Creditors have expressed concern about the Debtor pursuing causes of action against its insiders in various filings with the Court beginning with the *Motion of the Reed Action Judgment Creditors for Entry of an Order Appointing an Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 1102(a)(3)* [D.I. 100] (the "Committee Motion").[2] The Debtor's objection to the Committee Motion made clear that Steve Balasiano, the Debtor's newly-appointed independent director "is specifically charged

---

[1] The last four digits of the Debtor's federal tax identification number is 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

[2] *See* Committee Motion ¶¶ 3 and 19; *Reply of the Reed Action Judgment Creditors in Support of their Committee Motion for Entry of an Order Appointing an Official Committee of Unsecured Creditors Pursuant to 11 U.S.C. § 1102(a)(3)* [D.I. 134] ¶¶ 4 and 8; *Objection of the Reed Action Judgment Creditors Motion of the Debtor for an Order (i) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (ii) Approving the Solicitation, Notice and Tabulation Procedures and the Forms Related Thereto* [D.I. 169] ¶¶ 9, 10 and 12.

with sole and absolute discretion … to investigate potential claims against the Company's affiliates and insiders, and to bring any such action as he believes in his sole discretion are valid. [D.I. 127, ¶ 15].

2. The Debtor retained Gould Consulting Services (GCS") to investigate potential estate causes of action. GCS submitted the Report of Gould Consulting Services (the "GCS Report") to Alecto on or about September 28, 2023. The purpose of the GCS Report was "to describe [GCS's] findings, procedures employed, and data and transactions analyzed in the forensic investigation of transactions by and between Alecto Healthcare Services, LLC … and its Affiliates and/or any current or former officers, directors, or equity holders …."[3] Alecto publicly filed the GCS Report as Exhibit D to the *Small Business Debtor's Chapter 11 Plan of Reorganization* dated September 14, 2023 [D.I. 154]. The Debtor states in the Plan that "GCS presented its report to Mr. Balasiano and conferred with Mr. Balasiano in order to provide Mr. Balasiano an opportunity to ask any questions or raise any issues with respect to the estate's potential claims against the Insiders. At the conclusion of the conference, Mr. Balasiano determined that the estate does not have any valid claims against the Insiders for avoidable transfers". Plan § III.9.

3. Based on their review of the GCS Report and the relevant case documents, the Reed Creditors have identified at least two potential causes of action against the Alecto Members and its officers and directors.[4] The first potential cause of action is a fraudulent transfer claim involving the Debtor's transfer of Sunrise Real Estate Holdings, LLC ("Sunrise REH) to the Debtor's

---

[3] *See* first paragraph of GCS Report.

[4] The Reed Creditors served document requests on the Debtor requesting the production of documents necessary for the Reed Creditors to test the conclusions reached by GCS in the GCS Report and Mr. Balasiano's determination that the estate does not have any valid claims against insiders for avoidable transfers. To date, the Debtor has produced 26,608 pages of documents purportedly responsive to the document requests and the Reed Creditors are in the process of reviewing those documents.

2

members (the "Alecto Members"). At the time of the transfer, Plaza Medical Office Building, LLC ("Plaza MOB"), a wholly owned subsidiary of Sunrise REH, was appraised at $50,700,000. In exchange for the transfer of Sunrise REH, the Debtor received consideration in the amount of $28,416,827, which consisted of (i) the payoff of $19,472,350 of the Debtor's secured debt and (ii) capital contributions from the Alecto Members totaling $8,944,477. The $28,416,827 consideration the Debtor received was more than $22 million less than the appraised value of Plaza MOB. The GCS Report acknowledges, as it must, that reasonably equivalent value was received in that transaction. Other transactions purporting to return value to the Debtor have no bearing on this fraudulent transfer claim.

4. The second potential cause of action is a breach of fiduciary duty claim against Alecto's officers and directors arising from Alecto's advancement of funds to affiliates while it was insolvent or in the zone of insolvency instead of making payment to its creditors. By authorizing transfers to affiliates, well in excess of the amounts owed to its creditors, the Debtor's officers and directors breached their fiduciary duty to Alecto and its residual claimants.

5. The Reed Creditors also object to Section VII.4 of the Plan. Although this section is captioned "Injunction", it is really a non-consensual third-party release because it enjoins creditors from pursuing the Released Parties. There is no basis in law or fact why the Released Parties are entitled to nonconsensual third-party releases.

6. In addition, the Reed Creditors object to the compensation the Debtor proposes to pay to the Debtor's officers. Pursuant to the Plan, the Debtor proposes to pay (i) $750,000 to Laxman Reddy, the Debtor's President and CEO and (ii) $300,000 to Matt Williams, the Debtor's

CFO. Plan § IV.7.[5] This is more than the Debtor's three-year projected income of $848,049 for distribution to creditors. *See* Plan § 4.5.[6]

## BACKGROUND

7. The Reed Creditors hold a liquidated, non-contingent and undisputed claim against the Debtor in the amount of $3,274,861.58, which is the largest liquidated and undisputed claim listed on the Debtor's schedules, other than intercompany claims.

8. Alecto Healthcare Services, LLC ("Alecto" or the "Debtor") filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code on June 16, 2023, and elected to proceed under Subchapter V of chapter 11 of the Bankruptcy Code pursuant to the Small Business Debtor Reorganization Act, as amended. The Debtor filed the Plan on December 19, 2023. On December 21, 2023, the Court entered its *Order (i) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (ii) Approving the Notice and the Forms Related Thereto* [Docket No. 267] (the "Plan Order"). In the Plan Order, the Court scheduled February 6, 2024 as the date for the hearing on confirmation of the Plan. The confirmation hearing has since been rescheduled for March 4, 2024, at 10:00 a.m.

9. According to the Debtor's *Schedules of Assets and Liabilities* [Docket No. 48], the Debtor has nonpriority unsecured claims in the amount of approximately $16 million, including the claims of governmental entities but not including the claims of affiliated entities. The Plan provides the following treatment for Class 3 Allowed General Unsecured Claims:

> After payment in full of all Allowed Administrative Claims, all Allowed Priority Claims in full, and Allowed Secured Claims (if any), Allowed General Unsecured Claims will be paid the Debtor's projected disposable income on a pro rata basis. Pro rata Distributions will be made to Holders of Allowed General Unsecured

---

[5] While it is not clear from the Plan, the Reed Creditors believe that these amounts represent yearly salaries.

[6] The Plan also states that the Debtor's projected disposal income is $635,549 (Plan § IV.5) and $1,362,258 (Liquidation Analysis).

4

>Claims on an annual basis with the first Distribution to be made twelve months after the Effective Date.

Plan § IV.2.d. The Debtor estimates that (i) the total amount of allowed general unsecured claims will be approximately $11,000,000 and (ii) holders of allowed general unsecured claims will receive a distribution of from 3% to 10% on account of their general unsecured claims. *Id.* But based on the passage of time and the continued accrual of obligations, it is not clear what funds, if any, will be made available to unsecured creditors.

10. Section IV.5 of the Plan provides that

>The Plan will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties. The Debtor expects to have approximately $170,000 in combined cash on hand and accounts receivable on the Effective Date, however the cash and accounts receivable will not be available for distribution to creditors under the Chapter 11 Plan as these amounts are necessary for payment of incurred and ongoing expenses (and which would otherwise be administrative expenses) and are already included in the calculus of disposable income in Year 1. The Debtor or the Reorganized Debtor, as applicable, will have all the rights and duties to implement the provisions of the Plan, including the right to make Distributions to Creditors provided for under this Plan.

Plan Section IV.5. The Reed Action Judgment Creditors understand that the $848,049 projected disposable income is the aggregate amount for the proposed three-year distribution period. This amount is net of the costs to fund its operations, including the payment of (i) $750,000 per year to Laxman Reddy, the Debtor's President and CEO, (ii) $300,000 per year to Matt Williams, the Debtor's CFO, and (iii) the cost of medical, dental and vision insurance for Michael Sarrao, the Debtor's EVP and General Counsel. Plan § IV.7.

11. At the time of the Plan's filing the Debtor projected that administrative expense claims will total $752,500 as of the effective date of the Plan. Plan, § IV.1.a. The Debtor has since hired an additional expert. Allowed administrative expense claims will be paid in full under the

5

Plan, as they must. It is not clear what the source of funding for payment of allowed administrative claims will be. The Debtors will also have to pay post-effective date legal fees. *Id.*

12. The Plan proposes that the Debtors will release certain Released Parties from all claims the Debtor may have against them in exchange for payment of $25,000. Plan §VII.2. The Released Parties include "(a) the officers and managers of the Debtor; (b) the Debtor's Professionals, and (d) with respect to each of the foregoing Persons in clauses (a) through (b), such Entities' respective predecessors, successors and assigns, provided, however, that notwithstanding the foregoing, and for the avoidance of doubt, nothing herein shall release any Causes of Action of the Debtor or the Estate against any of the Debtor's representatives that did not serve in such capacity on or after the Petition Date." Plan § I.44.

## OBJECTION

### I. Release of Insiders.

13. The Reed Creditors object to the release of the Debtor's insiders in consideration for payment of $25,000, a paltry sum that will yield no benefit to creditors. As noted above, the Reed Creditors have identified at least two significant causes of action that should be pursued against (i) the Alecto Members related to Alecto's transfer of Sunrise REH to the Alecto Members and (ii) Alecto's officers and directors, for their breach of their fiduciary duties to Creditors.[7]

    A. <u>Fraudulent Transfer of Alecto's equity interest in Sunrise Real Estate Holdings, LLC to Alecto's Members.</u>

14. On June 19, 2019, Alecto transferred its 100% equity interest in Sunrise Real Estate Holdings to the Alecto members, who apparently formed a new entity named Sunrise MOB to receive the Sunrise REH equity (the "Sunrise REH Transaction")[8]. The Sunrise REH equity was

---

[7] The Reed Creditors reserve the right to supplement this Objection following completion of its review.
[8] GSC Report, Discussion Section A (p. 7).

a valuable acquisition for the Alecto Members because Sunrise REH was the 100% owner of Plaza MOB, which owned a medical office building appraised at $50,700,000.[9]

15. Based on the Gould report, the Reed Creditors understand that Alecto received value from the Sunrise REH Transaction as a result of the re-financing loan which Sunrise MOB obtained on the medical office building in the amount of $30 million, from which (i) the existing loan on the building was satisfied, in the amount of $19,472,350,[10] and (ii) Alecto received a capital contribution from the members in the amount of $8,444,477.81.[11] As such, through the loan payoff and capital contributions, the GCS Report states that Alecto received approximately $28 million for its transfer of the ultimate ownership interest in the medical office building.[12] The GCS Report acknowledges that Alecto did not receive reasonably equivalent value in the transaction.[13]

16. Eighteen months later, in a separate transaction, the interests in Sunrise MOB were assigned to Alecto to be included as part of a larger, two-part transaction with UCLA, for no consideration to Sunrise MOB (the "Sunrise MOB Transaction").[14] UCLA entered into a transaction to acquire (i) the Olympia Medical Center, (ii) the real estate that the hospital occupied, and (iii) the medical office building owned by Plaza MOB, for a total of $128,500,000.[15] In the first part of the transaction, UCLA acquired the Olympia Medical Center and the real estate the hospital occupied on January 1, 2021. On August 31, 2021, Sunrise MOB sold the Plaza medical office building to UCLA in the second part of the transaction for $58,500,000.[16] The Gould Report states that proceeds from the sale of the medical office building were used to pay off loan

---

[9] *Id.*, Discussion Section A. 4, FN 12 (p. 6).
[10] GCS Report, Summary of Observations Section A (p. 3).
[11] *Id.*, Discussion Section A. 6 (p. 6).
[12] *See id.*, Findings and Observations Section A (p. 2).
[13] *See id.*
[14] *Id.*, Discussion Section C (p. 10).
[15] *Id.*
[16] *Id.* (pp. 10-11).

obligations of Alecto and certain Affiliates to MPT Operating Partnership, LP., and the remaining $15,769,770.21 was deposited into a Plaza MOB bank account.[17]

17. The Gould report attempts to document numerous other transfers relating to the Plaza MOB transactions for the benefit of Alecto, under the mistaken assumption that the Alecto Members can set off the 2019 Sunrise REH Transaction against claims the Alecto Members may have arising from the 2021 Sunrise MOB Transaction in order to determine whether Alecto received reasonably equivalent value for the Plaza MOB assets.[18] In such effort, the Gould report appears to state that a total of $29,687,817 was deposited into Alecto's bank accounts through June 30, 2023. It doesn't indicate whether that money was subsequently transferred back out to other affiliates or insiders, as Alecto appeared to freely do. But more importantly, an analysis of these transfers for the benefit of Alecto is not even necessary.

18. The fraudulent transfers by Alecto to its members (through the Sunrise REH Transaction) cannot be set off against any claims the Alecto members may have against Alecto arising from the Sunrise MOB transaction or otherwise, as a matter of law. Bankruptcy courts have repeatedly held that prepetition claims cannot be set off against fraudulent transfer claims. *See, e.g.*, *Security Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC (In*

---

[17] *Id.,* Summary of Observations Section C (p. 3).

[18] As stated in the GCS Report—

"Although the June 2019 transfer of Sunrise REH and Plaza MOB was completed without receiving reasonably equivalent value in exchange (appraised value of over $50 million was greater than the loan payoff and capital contribution received of over $28 million), the assets were transferred back by assignment to Alecto by the Alecto Members in January 2021 for no consideration and those assets were sold later that year for over $58 million, an increase in value of approximately $8 million. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million."

*Id.,* Findings and Observations Section A (p. 2).

*re Madoff)*, 654 B.R. 224, 234-35 (S.D.N.Y 2023) (holding that defendant could not set off a prepetition debt against a fraudulent transfer claim because there was no mutuality); *Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010) (same); *In re McConnell*, 934 F.2d 662 (5th Cir. 1991) (holding that "[s]ection 553(a) setoffs … do not apply to actions by [a trustee] to recover fraudulent transfers: 'It would defeat the purpose of the Bankruptcy Act's provisions relating to fraudulent transfers to allow [creditors] to offset the value of the property thus transferred to them by the amount of their unsecured claim against [the debtor]. '" (quoting *Mack v. Newton,* 737 F.2d 1343, 1366 (5th Cir. 1984))); *Pereira v. Urthbox Inc. (In re: Try the World, Inc.)*, No. 18-11764 (JLG), 2023 WL 5537564, at *13 (Bankr. S.D.N.Y. Aug. 28, 2023) (holding that defendant could not set off funds he gave or loaned to debtor after the transfer at issue against his fraudulent transfer liability to the debtor's estate); *In re Brooke Corp.,* 485 B.R. 650, 664 (Bankr. D. Kan. 2013) (recognizing that "[c]ourts generally hold that a prepetition claim against the debtor may not be set off against a trustee's preferential transfer or fraudulent transfer claim….").

19. While Bankruptcy Code Section 553 preserves any rights of setoff available under applicable non-bankruptcy law, to be eligible for setoff (i) the amounts owed by the debtor must be a prepetition debt, (ii) the debtor's claim against the creditor must be a prepetition claim, and (iii) and the debts and claims must be mutual. *Id.* at 234.

> [D]ebts are mutual only if "they are due to and from the same persons in the same capacity." It is also widely accepted that "mutuality is strictly construed against the party seeking setoff." The effect of this narrow construction is that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."

*In re Am. Home Mortg., Holdings, Inc.*, 501 B.R. 44, 56 (Bankr. D. Del. 2013) (quoting *In re SemCrude*, 399 B.R. at 393 (Bankr. D. Del 2009) *aff'd,* 428 B.R. 590 (D. Del. 2010).

> It is well established that a party will be unable to assert a setoff where the party is being sued for fraudulent transfers. This is because where the party seeking to set off is being sued for fraudulent transfer, there is no mutuality of obligations, which is required under Code Section 553(a).

*Kramer v. Sooklall (In re Singh)*, 434 B.R. 298, 308 (Bankr. E.D.N.Y. 2010).

20. There is no mutuality when the defendant attempts to set off its fraudulent-transfer liability with a prepetition claim "because they are not in the same right and between the same parties, standing in the same capacity." *Try the World*, 2023 WL 5537564, at *13. The "claims are not in the same right and between the same parties, standing in the same capacity" where the claims underlying the purported right to setoff accrued prepetition and the "liability for the fraudulent-transfer claim is held by the Trustee as a post-petition obligation…. Therefore, the claims are not in the same right and between the same parties, standing in the same capacity." *Id.*

21. Here, under the Bankruptcy Code, Alecto has a $22 million fraudulent transfer claim against its members for the transfer of the ownership of Sunrise REH equity in 2019 to Sunrise MOB. Sunrise MOB's claim against Alecto for the transfer of Plaza MOB back to Alecto in 2021, for no consideration, entitles Sunrise MOB to a prepetition claim in such amount as may be determinable from the analysis of the Alecto books and records. Any prepetition claims, to the extent allowable, would be payable in the same percentage as other unsecured claims against Alecto.

22. The claims are not mutual because they are not in the same right and between the same parties, standing in the same capacity. The Alecto Members' claims, if any, are against Alecto. In contrast, Alecto's fraudulent transfer claims are claims that Alecto can bring only as a debtor-in-possession. As a result, the Alecto Members cannot set off any claims they may have as a result of the Sunrise MOB Transaction, or otherwise, against Alecto's fraudulent transfer claim against the Alecto Members arising from the Sunrise REH Transaction.

23. Moreover, the Debtor's fraudulent transfer claim against the Alecto Members arising from the Sunrise REH Transaction is not barred by the applicable statute of limitations. The statute of limitations for fraudulent transfer claims under both California[19] and Delaware[20] law is four years.[21] The fraudulent transfer occurred on June 19, 2019, the date of the Sunrise REH transaction. The statute of limitations would have expired on June 18, 2023 if Alecto had not filed its bankruptcy petition by that date. But Alecto filed its bankruptcy petition on June 13, 2023. As a result, Bankruptcy Code Section 108 extended the time within which Alecto may commence its fraudulent transfer claim through June 12, 2025. *See* 11 U.S.C. § 108(a).[22] Accordingly, the Debtor's fraudulent transfer claim against the Alecto Members is not time-barred.

B. <u>Breach of Fiduciary Duty Claim against Officers and Directors</u>.

24. The Debtor's Statement of Financial Affairs (SOFA) identifies substantial intercompany transfers to Debtor affiliates in the year prior to the Petition Date [D.I. 175, pp. 28-35], including advances of $19,303,563.37 to affiliate Sherman/Grayson Hospital, LLC ("Sherman/Grayson"), an insolvent entity which relied on such transfers to sustain operations. [See Ex. A, attached]. During this time period, Alecto advanced funds to other affiliates as well. Meanwhile, Alecto was also insolvent or in the zone of insolvency and was not timely paying its

---

[19] Alecto's headquarters and primary place of business is in California and the Sunrise REH Transaction involved real property located in California.
[20] Alecto, Sunrise REH, Plaza MOB and Sunrise MOB are all entities formed under the laws of the State of Delaware.
[21] *See* Cal. Civ. Code § 3439.09; 6 Del. C. § 1309.
[22] Section 108(a) provides as follows:
(a) If applicable nonbankruptcy law, an order entered in a nonbankruptcy proceeding, or an agreement fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
(1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
(2) two years after the order for relief.

debts due to creditors. Alecto's 2022 U.S. Tax Return reported a net loss of $36.4 million. [D.I. 1, page 20].

25. The Debtor has a breach of fiduciary duty claim against its officers, directors and/or other persons in control of Alecto who authorized and directed Alecto to make these advances to affiliates instead of paying its creditors. Persons in control of a Delaware limited liability company owe fiduciary duties to maximize the value of the company for the benefit of all residual claimants, including creditors, when the company is in the zone of insolvency. *See Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited*, 2021 WL 3184591 *18 (Del. Ch. July 28, 2021); *see also Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155, 172 (Del. Ch. 2014) ("When a corporation is insolvent, its creditors become the beneficiaries of any initial increase in the corporation's value."); see also *In re Scott Acquistion Corp.*, 344 B.R. 283 (Del. Bankr. 2006)(rejecting motion to dismiss Chapter 7 trustee's breach of fiduciary duty claims against insiders, holding that fiduciary duties owed to creditors of an insolvent corporation similarly apply to any wholly owned subsidiary).

26. Here, Alecto's officers, directors and/or control persons breached their fiduciary duties to Alecto and its residual claimants by advancing more than $19 million to Sherman/Grayson during the year prior to the Petition Date when Alecto was insolvent or in the zone of insolvency, rather than paying its creditors. Of this amount, more than $5 million was advanced to Sherman/Grayson after the Reed Creditors obtained their approximately $3.2 million judgment against Alecto on November 28, 2022, and before the Petition Date. The Court should not grant releases to the Released Parties because a liquidating trustee should have the opportunity to evaluate and pursue such breach of fiduciary claims against the Released Parties. The Debtor

maintained D&O Insurance which provides a further source of recovery for such breach of fiduciary duty claims.

27.     The Reed Creditors review of transactions identified in the Gould Report and documents produced by the Debtor relating to such transactions is ongoing.  The Reed Creditors reserve their right to supplement the record with respect to additional potential fraudulent transfer claims at the confirmation hearing.

28.     Based on the foregoing, this Court should prohibit the Debtor from granting a release to the Released Parties.

## II. Excessive Compensation for Officers

29.     As noted above, the Debtor proposes to pay a total of $1,050,000 in annual compensation to its officers, which consists of (i) $750,000 to Laxman Reddy, the Debtor's President and CEO and (ii) $300,000 to Matt Williams, the Debtor's CFO. Plan § IV.7.  This proposed compensation is unreasonably excessive given that the Debtor proposes to make distributions to creditors from its three-year projected disposable income in the total amount of $848,049. *See* Plan § 4.5.  This is especially so given that holders of general unsecured claims will receive an estimated distribution of from 3% to 10% on account of their claims.  The Court should not permit the Debtor to pay a total of $3,150,000 to its two officers over three years while it distributes less than 25% of that amount to its creditors over that same time period.

## III. Nonconsensual Third-Party Releases

30.     Section VII.4 of the Plan provides in pertinent part that

> all Entities that held, hold, or may hold claims or interests that have been discharged, released or exculpated pursuant to the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or

13

recovering by any manner or means any judgment, award, decree, or order against the Released Parties on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any lien or encumbrance of any kind against the Released Parties or the property of the Released Parties on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from the Released Parties or against the property of the Released Parties on account of or in connection with or with respect to any such claims or interests unless the Released Parties has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that the Released Parties asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

Plan § VII.4. While this section is captioned "Injunction," it is in effect a third-party release in favor of the Released Parties because it enjoins creditors from pursuing any claims against the Released Parties related to claims dealt with by the Plan. Moreover, the release is nonconsensual because it does not provide creditors with the opportunity to opt-out of the releases.

31. The hallmarks of permissible non-consensual releases are fairness, necessity to the reorganization, and specific factual findings to support these conclusions. *In re Continental Airlines, Inc.,* 203 F.3d 203, 214 (3d Cir. 2000), None of these hallmarks are present here. The Debtor will not be able to present specific factual findings to support an argument that the nonconsensual third-party releases are either fair or necessary to the Debtor's reorganization. Accordingly, the Court should not permit nonconsensual third-party releases in favor of the Released Parties.

### IV. Disclosure Issues

32. The Reed Creditors also objects to the Plan because it contains inconsistent information. First, as noted above, the Plan states three different amounts as its projected three-year disposable income; (i) $635,549 (Plan Art. II and §V.2), (ii) $848,049 (Plan § IV.5) and

$1,362,258 (Liquidation Analysis). The Court should require the Debtor to clarify this discrepancy.

33. Second, the Liquidation Analysis provides that the projected disposable income will be $339,163 in year one, $533,763 in year two, and $489,332, but does not address why these amounts vary significantly. The Court should require the Debtor to explain how it calculated in projected disposable income.

34. Third, the Plan provides for the payment of $752,500 of administrative expense claims but does identify the source of the payments. The Court should require the Debtor to state whether holders of administrative expense claims will be paid from the Debtor's projected disposable income or from some other source.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Reed Action Judgment Creditors respectfully request that this Honorable Court enter an order denying confirmation of the Plan and granting such other and further relief as is just and proper.

Date: February 22, 2024  
Wilmington, DE

**SULLIVAN · HAZELTINE · ALLINSON LLC**

 /s/ William D. Sullivan  
William D. Sullivan (No. 2820)  
William A. Hazeltine (No. 3294)  
919 North Market Street, Suite 420  
Wilmington, DE 19801  
Tel: (302) 428-8191  
Email: bsullivan@sha-llc.com  
         whazeltine@sha-llc.com  

-and-  
Colten L. Fleu, Esq.  
Mountain State Justice, Inc.  
1217 Quarrier St.  
Charleston, WV 25301  
Tel: (304) 326-0188  
Email:  colten@msjlaw.org

15

-and-

John Stember, Esq.
Maureen Davidson-Welling, Esq.
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
Tel: 412-338-1445
Email: jstember@stembercohn.com
       mdavidsonwelling@stembercohn.com

*Attorneys for the Reed Action Judgment Creditors*