**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| ALECTO HEALTHCARE SERVICES LLC, | Case No. 23-10787 (JKS) |
| Debtor.[1] | **Re: Docket No. 261** |

**DECLARATION OF MICHAEL SARRAO, EXECUTIVE VICE PRESIDENT, GENERAL COUNSEL, AND SECRETARY OF ALECTO HEALTHCARE SERVICES LLC, IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S SMALL BUSINESS SUBCHAPTER V PLAN OF REORGANIZATION DATED DECEMBER 19, 2023**

I, Michael Sarrao, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.      Since January 1, 2013, I have served as the Executive Vice President, General Counsel, and Secretary for Alecto Healthcare Services LLC, a Delaware limited liability company (the "Debtor" or "Alecto").  I also serve on the Debtor's board of managers (the "Board of Managers").

2.      Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (ii) the Debtor's records made by employees or agents of the Debtor who report to me and who have a business duty to enter the records of the Debtor accurately and at or near the time of the event which they record, (iii) information supplied to me by other members of the Debtor's management or the Debtor's professionals that I believe in good faith to be reliable; (iv) my review of relevant documents; or (v) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. Further, I am familiar with the facts and circumstances relating to the Debtor's pending bankruptcy case (the "Chapter 11 Case"), which are incorporated by reference herein.

---

[1] The last four digits of the Debtor's federal tax identification number are 9723. The Debtor's address is 101 N Brand Boulevard, Suite 1920, Glendale, CA 91203.

3.      I submit this Declaration in support of confirmation of the Debtor's *Small Business Debtor's Plan of Reorganization* dated December 19, 2023 [Docket No. 261] (as may be further modified, amended, or supplemented from time to time, the "Plan").

4.      I am authorized to submit this declaration (the "Declaration") on behalf of the Debtor, and if I were called upon to testify, I would testify competently to the facts set forth herein.

## BACKGROUND

5.      The Debtor is a Delaware limited liability company with its headquarters in Glendale, California.  The Debtor was formed in 2012 to serve as a holding company for healthcare- related entities.  Since its inception, the Debtor has formed various subsidiaries for the purposes of (a) acquiring distressed acute care hospitals; (b) operating acute care hospitals; (c) providing management services to acute care hospitals that are not owned by the Debtor or its subsidiaries; and (d) owning and operating businesses affiliated with acute care hospitals operated by the Debtor's subsidiaries.

6.      Between August 22, 2016 and August 26, 2022, the Debtor and its subsidiaries and affiliates (the "Borrowers"[2] were borrowers under an accounts receivable credit facility (the "AR Credit Facility"), first with White Oak Healthcare Finance, LLC ("White Oak") and then with CNH Finance Fund I, LP ("CNH Finance").[3]

---

[2] The Borrowers were Alecto Healthcare Services LLC, Alecto Healthcare Services Los Angeles LLC, Olympia Health Care, LLC, Horizon Real Estate Holdings, LLC, Alecto Healthcare Services Fairmont LLC, FRMC Physicians, Inc., Alecto Healthcare Services Sherman LLC, Sherman/Grayson Hospital, LLC ("Sherman/Grayson"), Sherman/Grayson Health Services, LLC, Sherman/Grayson Sponsor, LLC, Sherman MD Provider, Inc., and Alecto Healthcare Services Hayward LLC.  Alecto Healthcare Services Ohio Valley LLC, Alecto Healthcare Services Wheeling LLC, Alecto Healthcare Services Martin's Ferry LLC, and Alecto East Ohio Physicians, Inc., became borrowers as of June 2, 2017.

[3] CNH Finance purchased the facility from White Oak on July 8, 2019.

A.      **Terms of the AR Credit Facility**

7.      Under the terms of the AR Credit Facility, the collections received by each subsidiary were swept on a daily basis to the lender and applied to the balance of the AR Credit Facility.  On a daily or weekly basis, the Debtor, as agent for all Borrowers, would, subject to availability, request advances under the AR Credit Facility, and the lender would make the advances to Alecto, as the agent for all Borrowers via a wire transfer to the account established by Alecto for receiving such advances (City National Bank Account No. x3784).  Once the advances were received, Alecto would allocate the advance among the borrowers based on immediate cash needs and retain such funds as were necessary to pay for necessary expenses that were allocated among the subsidiaries such as insurance.  In other words, Alecto was not advancing its own funds, but instead was allocating the funds received by the borrowers under the AR Credit Line among the borrowers.

8.      So that the various advances were accounted for, Alecto developed a system whereby each subsidiary would record an intercompany balance on a monthly basis based on the credit facility activity.  If the advances received by the subsidiary exceeded the collections swept from the subsidiary then the difference would be recorded as an intercompany receivable due by the subsidiary to Alecto.  If the collections swept from the subsidiary exceeded the advances received by the subsidiary, the subsidiary would record an intercompany receivable due by Alecto to the subsidiary which would be offset on the books by the intercompany receivables owed to Alecto by other subsidiaries.  As an example, while Alecto recorded a receivable due from Sherman/Grayson it also recorded a receivable due to Olympia Health Care, LLC.

9.      The Line of Credit was terminated in August 2022, after which, the Debtor served as the de facto conduit for the flow of funds among the affiliated entities.

**B.    Sale of Certain Assets of Alecto's Affiliates and Other Advances**

10.    The majority of the advances made by the Debtor after the AR Credit Line was terminated in August 2022 were the result of advances from two non-debtor subsidiaries that did not have any non-contingent liabilities or debt when they provided such advances.  First, Horizon Real Estate Holdings, LLC ("Horizon"), the former owner of the real estate on which Olympia Medical Center was located, sold the real estate to UCLA Health in January 2021, and Horizon received net proceeds from the sale.  These funds were transferred to Alecto to provide advances to a number of Horizon's affiliates and Alecto's subsidiaries and were used to pay a number of priority claims for the affiliates including payroll taxes.  Since its mortgage debt was paid off through escrow when the sale to UCLA Health closed in January 2021, Horizon did not have any debt or other non-contingent liabilities after January 2021.  Horizon does not have currently have any non-contingent liabilities.[4]

11.    Second, Plaza Medical Office Building, LLC ("Plaza MOB"), the former owner of a medical office building and parking garage adjacent to Olympia Medical Center, sold the office building and parking garage to UCLA Health on August 31, 2021 and received net proceeds from the sale.  The net proceeds received by Plaza MOB provided the funding for the advances made to certain of its affiliates and Alecto's subsidiaries.  Plaza MOB transferred funds to Alecto for purposes of making the advances to the affiliates.  After the transaction was completed on August 31, 2021, Plaza MOB did not have any debt or non-contingent liabilities.[5]

---

[4] Based upon Alecto's ownership interest in Alecto Healthcare Services Ohio Valley LLC and Alecto Healthcare Services Fairmont LLC (and therefore Alecto's indirect ownership interest), Horizon is considered to be part of the control group with respect to the Alecto Healthcare Services Ohio Valley LLC Pension Plan and with respect to Alecto Healthcare Services Fairmont LLC's withdrawal liability with respect to a multi-employer pension plan. Horizon could possibly have liability with respect to both matters.

[5]      Similar to that of Horizon, Plaza MOB could have could possibly have liability with respect to the Alecto Healthcare Services Ohio Valley LLC Pension Plan and withdrawal liability of a multi-employer pension.

C.    **Other Obligations of Alecto and Its Affiliates**[6]

12.    In addition to the joint obligations under the AR Credit Line, Alecto and its Affiliates had a significant number of obligations to other parties, which necessitated that Alecto transfer funds on account of its affiliates.

13.    First, Alecto was a guarantor under the MPT Sherman Lease.  The terms of the MPT Sherman Lease provided among other things, that Sherman/Grayson was obligated to maintain various forms of insurance and meet other obligations to MPT of Sherman/Grayson.  If Sherman/Grayson failed to meet its obligations under the MPT Sherman Lease, Alecto would have an obligation to meet these obligations under the MPT Lease Guaranty or reimburse MPT of Sherman for the costs associated with securing replacement coverage.  Significantly, Alecto decided that it was necessary to pay the portion of insurance premiums due on Alecto's master insurance policies that were allocated to Sherman/Grayson in order to avoid (i) this liability which would be a breach under the MPT Sherman Lease and (ii) the potentially calamitous effect of havjng no insurance for an operating hospital.

14.    Altera Highland, LLC, an unrelated third party, owns an office building located at 300 N. Highland Avenue, Sherman, Texas 75092 immediately adjacent to Wilson N. Jones Regional Medical Center (the "POB") subject to a ground lease with MPT of Sherman, LLC as assignee of Sherman/Grayson.  The Ground Lease provides, among other things, that the Ground

---

[6] Before outlining the nature of the advances and resulting obligations among the Debtor and other Borrowers and their affiliates- both in the year prior and after the to the termination of the AR Credit Facility - it is important to consider the timeframe, particularly as it relates to the COVID-19 pandemic.  The first deaths in the United States were attributed to COVID occurred in January 2020, and the United States declared COVID to be a "public health emergency" on January 31, 2020.  The pandemic had immediate and direct effects upon the Debtor and its affiliates. Among other things, hospitals and other healthcare related entities, were required to incur significant expenses in connection with the purchase of new equipment and other medical necessities.  Further, and particularly after the initial wave of infections, hospitals also incurred significant costs with respect to medical personnel.  While much – but not all - of the cost was borne by the federal and state governments, the pandemic put economic pressure on hospitals and other healthcare entities, particularly as healthcare providers needed to increase the salaries of healthcare workers.

Lessor (currently, MPT of Sherman) has an obligation to purchase the POB if a healthcare facility is not operated at the site of Wilson N. Jones Regional Medical Center for a period of 12 consecutive months.  The purchase price demanded by Altera Highland, LLC would likely be in excess of $13 million.  In other words, MPT of Sherman could be forced to acquire the POB for a price in excess of $13 million if no healthcare facility was operated for 12 consecutive months.  Under the terms of the MPT Sherman Lease, Sherman/Grayson agreed to indemnify MPT of Sherman with respect to this obligation and Alecto guaranteed Sherman/Grayson's obligations to MPT.  As a result, Alecto would face liabilities in excess of $13 million if Wilson N. Jones Regional Medical Center was to close for 12 consecutive months.  To avoid this potential liability, Alecto decided it was necessary to provide funding to Sherman/Grayson so it could continue to operate.

15.    Additionally, Alecto also faced contingent liabilities to as a member of the control group with respect to (a) the Alecto Healthcare Services Ohio Valley LLC Pension Plan (the "OV Pension Plan") and (2) Alecto Healthcare Services Fairmont LLC's liability with respect to its withdrawal from a multi-employer pension plan (the "Fairmont Withdrawal Liability").  Under applicable law, Alecto, as the 80% or 100% owner of Alecto Healthcare Services Ohio Valley[7]("Alecto Ohio Valley") and the 80% or 100% owner of Alecto Healthcare Services Fairmont LLC,[8] is considered to be part of the "control group" with respect to the OV Pension Plan and the Fairmont Withdrawal Liability.  Absent making quarterly payments, the Fairmont Withdrawal Liability could be as much as $10 million and the liabilities associated with the OV Pension Plan would have been in excess of $4 million before the recent spike in interest rates.

---

[7] Alecto owned 80% of Alecto Healthcare Services Ohio Valley LLC prior to January 1, 2022, and has owned 100% of Alecto Healthcare Services Ohio Valley LLC since January 1, 2022.

[8] Alecto owned 80% of Alecto Healthcare Services Fairmont LLC prior to January 1, 2022, and has owned 100% of Alecto Healthcare Services Ohio Valley LLC since January 1, 2022.

To avoid much significantly greater liabilities, Alecto provided funding to meet certain quarterly or other funding obligations of Alecto Ohio Valley and Alecto Fairmont.

**D.      Decisions by the Debtor's Officers and Board of Managers to Continue Funding Its Subsidiaries**

16.      As Alecto experienced after the closure of Ohio Valley Medical Center by Alecto Healthcare Services Wheeling LLC and East Ohio Regional Hospital by Alecto Healthcare Services Martin's Ferry LLC in 2019, and the closure of Fairmont Regional Medical Center by Alecto Healthcare Services Fairmont LLC in 2020, the closure of a hospital without a buyer in place results in a number of obligations that simply cannot be left unsatisfied including: (1) securing and taking custody of the medical records generated by the hospital and making these records available to the patients; (2) securing and taking custody of employee and other records and making them available to employees; (3) securing and taking custody of computer systems which include confidential and sensitive information regarding employees and patients; (4) securing and properly disposing of pharmaceuticals and other regulated materials; (5) securing and properly disposing of medical waste including radiological materials; (6) preparing and filing all necessary reports including Medicare and Medicaid cost reports and responding to audits of the same; (7) responding to governmental inquiries; (8) addressing lawsuits by vendors and others against Alecto even though such lawsuits would likely lack merit; (8) otherwise orderly winding up the operations of the hospital.[9]  These obligations imposed and impose a significant burden on Alecto with respect to the hospitals identified above and Alecto's officers and Board of Managers reasonably believed that they would impose a significant obligation on Alecto if Sherman/Grayson was to close without a buyer.  To avoid these obligations and costs

---

[9] Also, importantly, closing a healthcare facility without a purchaser caused a loss of value by sale without a going concern.

associated therewith, decisions were made to provide funding to Sherman/Grayson while it sought to implement a turnaround plan and locate a buyer.

17.     Although Sherman/Grayson was losing money, Alecto's Managers did not believe that it was a foregone conclusion that Sherman/Grayson would continue to lose money. Like many hospitals and other healthcare facilities, Sherman/Grayson faced significant financial challenges during and after the pandemic, and as a result, Sherman/Grayson was operating at a loss of over $1,000,000.00 per month.  By continuing to operate Sherman/Grayson, Alecto maintained the possibility that Sherman/Grayson would be able to achieve profitability.  Further, Alecto believed that there was an opportunity for Sherman/Grayson's financial performance to improve based on new growth initiatives, including the re-opening of the behavioral health unit and an expansion of occupational health services, cost savings initiatives, and the potential for increases in supplemental funding related to the high percentage of uninsured and underinsured patients that are treated by Sherman/Grayson.

18.     As Alecto's subsidiaries faced financial challenges and required funding, Alecto's Managers evaluated the funding needs with a number of considerations in mind and certain of Alecto's subsidiaries made advances to the other subsidiaries through Alecto.  This process occurred on a daily basis as the members of the Debtors' Board of Managers considered the financial needs of Alecto's subsidiaries.  The most significant of these were Alecto's liabilities related to MPT of Sherman and ongoing expenses of Sherman/Grayson.

19.     Through this process, Alecto's Managers believed that there were parties who were interested in purchasing the assets of Sherman/Grayson and that an agreement could be reached with an interested party that would eliminate future liabilities and avoid the burden associated with closing the hospital without a buyer, while realizing a sale of Sherman/Grayson

as a going concern, rather than at liquidation value.  As more fully set forth in the (i) Declaration of Michael Sarrao, Executive Vice President of Sherman/Grayson Hospital, LLC, in Support of First Day Motion [Sherman/Grayson, Docket No. 3],[10] (ii) Motion of the Debtor for Entry of an Order (I) Authorizing the Private Sale of Substantially All Assets Free And Clear of All Liens, Claims, Encumbrances and Other Interests, (II) Authorizing the Assumption and Assignment Of Executory Contracts and Unexpired Leases, and (III) Granting Other Related Relief [Sherman Docket No. 60] (the "Sherman Sale Motion"), (iii) Declaration of Michael J. Sarrao in Support of the Sherman Sale Motion [Sherman Docket No. 60], and  (iv) Declaration of Michael Sarian in Support of the Sherman Sale Motion [Sherman Docket No. 63], Sherman/Grayson began the process of marketing Sherman/Grayson in 2019.

20.    Specifically, in 2019, Sherman/Grayson engaged Bank of America Merrill Lynch develop a confidential information memorandum and identify parties who may be interested in acquiring or investing in WNJ.  Had Alecto ceased its support of Sherman/Grayson, Sherman/Grayson's operations would have necessarily ceased and Alecto would not have realized any value on account of its interest in Sherman/Grayson.

21.    The impact on the community and employees if Sherman was to close Wilson N. Jones Regional Medical Center and the likelihood that Alecto would be facing lawsuits from vendors and others which Alecto would have to defend.  Even though the lawsuits would likely be meritless, Alecto would still have to defend the lawsuits.

22.    Ultimately, by June 2023, Alecto was owed approximately: (i) $60.1 million by Sherman, (ii) $4,653,799 by Alecto Fairmont, (iii) $30,657,574 by Alecto Healthcare Services Wheeling, and (iv) $885,862 by Alecto Martin's Ferry LLC.

---

[10] References to "Sherman Docket Nos" refer to Case No. 23-10810-JKS, pending in the United States Bankruptcy Court for the District of Delaware.

23.     Without Alecto's ability to continue funding Sherman/Grayson's operations, Sherman/Grayson filed its own Chapter 11 case on June 23, 2023.  Shortly after filing for bankruptcy relief, Sherman/Grayson filed a motion to approve the sale of substantially all of its assets.    In Sherman/Grayson's bankruptcy case, the Court ultimately approved the sale, on account of which, the Sherman/Grayson estate will receive a total of approximately $250,000 the assumption of certain liabilities, and the payment of all of Sherman/Grayson's ongoing administrative expenses.

### E.     The Debtor's Bankruptcy Filing

24.     On June 16, 2023 (the "Petition Date"), the Debtor filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

25.     On the Petition Date, the Debtor filed the Declaration of Michael Sarrao in Support of First Day Motions (the "First Day Declaration") [Docket No 3].  The statements in the First Day Declaration, including the Debtor's business, corporate structure and its recent financial performance and its prepetition indebtedness, and the circumstances surrounding the commencement of this Chapter 11 case were true and correct, and I incorporate the facts as set forth in First Day Declaration as if fully set forth herein.

26.     On June 20, 2023, Jami Nimeroff of Brown McGarry Nimeroff LLC was appointed as the Subchapter V Trustee (the "Subchapter V Trustee").

27.     The Debtor has continued in possession of its property and has continued to operate and manage its business as debtor in possession pursuant to sections 1107(a) and 1108 of the United States Bankruptcy Code (the "Bankruptcy Code").

28.     As noted above, Sherman/Grayson filed its own voluntary Chapter 11 bankruptcy in the Delaware Bankruptcy Court on June 23, 2023.  After Sherman/Grayson filed its petition, the Office of the United States Trustee, certain creditors, and the Bankruptcy Court each raised issues with respect to whether the Debtor's current managers and members were conflicted from addressing certain issues in connection with claims and liabilities among the Debtor and Sherman/Grayson.  Additionally, certain parties raised issues with respect to potential claims against the Debtor's insiders as a result of fraudulent conveyances allegedly received by Sherman/Grayson, other affiliates, and insiders.

**F.     Appointment and Retention of the Independent Director and Forensic Accountant**

29.     On August 4, 2023, the Board of Managers appointed Steven Balasiano as the Debtor's independent director/manager.  Mr. Balasiano was selected by the Board of Managers because he has over 30 years of experience as a business leader, advisor and practicing attorney. In his role at MHR Advisory Group, Mr. Balasiano served as a fiduciary capacity as a liquidating trustee, plan administrator, and other similar roles for approximately ten years. Further, Mr. Balasiano has significant experience as an interim officer or director, including served in many executive positions through his career including the Senior Vice President and Chief Administrative Officer of The Children's Place Retail Stores, at the time, a multi-billion dollar children's apparel retailer. Subsequent to that, Mr. Balasiano acted as the President to many national and international consumer goods and manufacturing companies. When the Board of Managers retained Mr.  Balasiano, it believed that Mr. Balasiano had sufficient education, training, and experience to make independent decisions on behalf of the Debtor and its estate.

30.     On August 7, 2023, the Board of Managers executed a written consent that provided, among other things, that Mr. Balasiano's responsibilities specifically included

investigating, evaluating, and settling certain claims of the Debtor as against Sherman/Grayson Hospital, LLC ("Sherman/Grayson") and disputes between Alecto and the official committee of unsecured creditors appointed in the Sherman/Grayson bankruptcy case, and such other issues as may arise in the Chapter 11 Case. Further, the August 7, 2023 written consent specifically provided that the Board of Managers, officers, and employees would provide Mr. Balasiano with such information and documents as he may request from time to time, and shall not interfere or impede the performance of Mr. Balasiano's duties as an independent director/manager. Further, the August 7, 2023 written consent authorized Mr. Balasiano to retain his own counsel, and Mr. Balasiano availed himself of the opportunity to retain his own counsel.

31.     An application to retain Mr. Balasiano as Independent Director/Manager of the Debtor was filed with the Bankruptcy Court on August 9, 2023, seeking approval of his retention nunc pro tunc to August 4, 2023 [Docket No. 93] (the "Application"), and the Application was approved by the Bankruptcy Court on August 16, 2023 [Docket No. 118].

32.     On August 19, 2023, the Board of Managers executed a second written consent that specifically expanded Mr. Balasiano's duties and responsibilities to include that, to the extent not already provided, his appointment as an independent director of the Debtor includes authority to investigate potential claims against Alecto's affiliates and insiders, and to bring any such actions as he believed in his sole discretion are valid. Further, the August 7, 2023 written consent provided that the Board of Managers, officers, and employees would provide Mr. Balasiano with such information and documents as he may request from time to time and shall not interfere or impede the performance of his duties as an independent director/manager.

33.     Additionally and separately, due to concerns about conflicts of interest between the Debtor and Sherman/Grayson, on August 11, 2023, the Debtor retained Morris James LLP as

replacement counsel for the Debtor.  Further, on August 25, 2023, after hearing the concerns of

the United States Trustee, the Reed Creditors, and other parties about potential fraudulent

conveyances and those parties expression of doubts as to the impartiality and ability of the

Debtor to remain disinterested with respect to claims, the Debtor retained Gould Consulting

Services ("GCS") to perform forensic accounting services that would be necessary and

appropriate during this Chapter 11 Case.

34.     An application to retain GCS was filed on August 27, 2023 [Docket No. 138] (the

"GCS Application"), and the GCS Application was approved by this Court on October 18, 2023

[Docket No. 184]. Among other things, GCS was tasked with:

• examining the Debtor's financial records and related documents and data for four years prior to its bankruptcy filing, to analyze transactions with insiders, related, and/or affiliated companies and identify potential causes of action, if any;

• examining the Debtor's accounting records and bank statements and those of related entities Sherman/Grayson, Alecto Healthcare Services Hayward LCC, Alecto Healthcare Services Sherman LLC, Alecto Healthcare Services Los Angeles LLC, Alecto Healthcare Services Ohio Valley, LLC, Alecto Healthcare Services Real Estate Holding LLC, and Alecto Healthcare Services Fairmont LLC, in order to determine if there are any potential claims against any of the affiliates and/or current or former officers and directors;

• providing all findings in a written report prior to September 11, 2023;[11]

• reporting directly to Morris James LLP with all reports, communications, and work product; and

• performing all services in accordance with the Standards for Forensic Services established by the American Institute of Certified Public Accountants.

Since its appointment, GCS' reviewed the Debtor's financial records, including all available

bank statements, tax returns for 2019, 2020, 2021, and 2022, and certain of the Debtor's other

financial records, to determine, among other things, whether the Debtor received reasonably

---

[11]  This date was subsequently extended to September 29, 2023, to allow GCS to continue its review and evaluation of potential claims.

equivalent value on account of transfers made during the four years immediately prior to the Petition Date.

### G.    The Gould Report and the Sunrise Transfer

35.    On September 28, 2023, GCS issued its report, which was included as Exhibit D to the Plan (the "Gould Report").  As set forth in the Gould Report, there was a transfer (the "Sunrise Transfer") made by the Debtor to insiders during the four years immediately prior to the Petition Date, for which GCS concluded that the Debtor did not receive reasonably equivalent value.

36.    On June 19, 2019 (the "Sunrise Transfer Date"), Alecto caused the transfer of the its membership interests in Sunrise Real Estate Holdings LLC[12] to the members of Alecto, who then transferred the membership interests to Sunrise MOB Holdings, LLC, an entity owned by those members (the "Sunrise Transfer") on June 19, 2019 (the "Sunrise Transfer Date") as part of the refinancing of the debt of Plaza Medical Office Building, LLC ("Plaza MOB"), the owner of a medical office building and parking garage in Los Angeles, California.[13]  Upon completion of the refinancing, the net proceeds of the refinancing, which were in excess of $9 million, were contributed to Alecto.

37.    In January 2021, the members of Sunrise MOB Holdings transferred their interests in Sunrise MOB Holdings to Alecto for no consideration.  As a result of this transfer, Alecto owned 100% of Plaza MOB through Sunrise MOB Holdings and its subsidiaries.  Plaza

---

[12] Sunrise Real Estate Holdings, LLC directly and indirectly holds 100% of the membership interests of Plaza Medical Office Building, LLC.

[13] Prior to the Debtor acquiring an interest in Sunrise Real Estate Holdings, the property owned by Plaza MOB was encumbered by a securitized mortgage.  After efforts to improve the tenant base for the office building and parking garage, efforts were made to refinance the mortgage in 2019.  As part of this refinancing, the lender (Wells Fargo) required that the borrower, Plaza MOB, remain a special purpose entity with no connection to hospital operations and required that the ownership of Sunrise Real Estate Holdings be spun out from Alecto.  The Sunrise Transfer was effectuated to meet this requirement and the net proceeds from the refinancing were contributed back into the Debtor.

MOB's assets were sold later that year for $58.5 million, an increase in value of approximately $8.5 million June 2019. No consideration was given to the Alecto Members for the transfer and Alecto received proceeds from the sale of over $15 million.

38.    On the Sunrise Transfer Date, Alecto was solvent.  According to the Debtor's balance sheet maintained by the Debtor in the ordinary course of business, at the end of June 2019, Alecto's equity was valued at more than $9.5 million.  In fact, at no time during 2019 was the equity in Alecto less than $9.4 million.   A copy of the Debtor's balance sheet for 2019 is attached hereto as **Exhibit A**.  This is consistent with the Debtor's 2019 tax return which stated that the Debtor's capital accounts at the beginning of 2019 had a value of $10,095,179, and at the conclusion of 2019, the value of the Debtor's capital accounts had a value of $18,671,358.   A true and correct (but redacted) copy of the Debtor's 2019 tax return is attached hereto as **Exhibit B**.

39.    Further, throughout 2019, the Debtor was paying its obligations as they came due.

**H.    The Debtor's Small Business Plan**

40.    On December 19, 2023, the Debtor filed the Plan, which was premised upon maximizing the value of the Debtor's assets through the continuation of the Debtor's operating business and providing creditors with all of the Debtor's disposable income for three years after the effective date of the Plan, including money received from the Debtor's affiliates, which is more than creditors would receive on account of their claims if the case was converted to Chapter 7.

41.    As more fully set forth in the Plan, the Plan is comprised of the following six classes of claims and interests: (a) Class 1: Priority Non-Tax Claims; (b) Class 2: Secured Claims; (c) Class 3: General Unsecured Claims; and (d) Class 4: Equity Interest Holders.

42.    Class 4 is unimpaired under the Plan, and holders of such claims were not entitled to vote. Classes 1, 2, and 3 were each impaired under the Plan, and holders of such claims were deemed to reject and, thus, not entitled to vote. The Debtor elected to proceed without soliciting votes of creditors, and will rather seek approval of the Plan pursuant to section 1191(b) of the Bankruptcy Code.

43.    On January 25, 2024, the Court entered the *Amended Order (I) Scheduling a Hearing on Plan Confirmation and Deadlines Related Thereto; and (II) Approving the Notice and the Forms Related Thereto* [Docket No. 284] (the "Procedures Order"), which among other things, set the hearing to consider the confirmation of the Plan ("Confirmation") for March 4, 2024 at 1:00 p.m. (ET) (the "Confirmation Hearing").

44.    Debtor's counsel caused notice of the deadline for objecting to confirmation of the Plan, and related notice to be distributed on January 1, 2024, and continuing thereafter (the "Notice Deadlines"), as evidenced by, among other things, the Certificate of Counsel. [Docket No. 283].

45.    The Plan was provided to the Debtor's creditors and other parties in interest, provides holders of claims and interests with adequate information with respect to the treatment of such claims and interest, and satisfies the requirements of section 1191(b) of the Bankruptcy Code.

46.    The Plan provides holders of claims and interests in this Chapter 11 Case with information about, among other things: (i) the circumstances that gave rise to the filing of the Debtor's bankruptcy petitions; (ii) an estimate of the Estate assets and liabilities; (iii) the Debtor's actions and conditions during these Chapter 11 Case; (iv) the proposed treatment of Claims and Interests under the Plan and likely distributions to be received on account of each

Class of Claims and Interests under the Plan; (v) an analysis as to the distributions creditors would receive from the Debtor's Estate if it were liquidated under Chapter 7 of the Bankruptcy Code; (vi) the relevant sources of information contained in the Plan; (vii) conspicuous language containing releases, exculpation and limitation of liabilities and the injunction to be entered by and in connection with the Plan; and (viii) such other and further information that informs Holders of Claims and Interests of their rights arising from and relating to the Plan.

47.     Based upon the disclosure of information set forth therein, I believe that the Plan provides Holders of Claims and Interests with adequate information with respect to the treatment of such Claims and Interest and satisfies the requirements of section 1191(b) of the Bankruptcy Code.

## COMPLIANCE WITH THE BANKRUPTCY CODE

48.     A court must confirm a plan under Section 1192(b), if all of the applicable requirements of section 1129(a) of this title, other than paragraphs (8), (10), and (15) of that section, are met with respect to a plan, if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

49.     Based on my review of the Plan and my understanding with respect to the requirements to confirm the Plan, I believe that the Plan complies with the applicable provisions of the Bankruptcy Code, including Sections 1112, 1123, 1129(a) and 1191(b) of the Bankruptcy Code.

### A.     Compliance with Sections 1122 and 1123 of the Bankruptcy Code

a.     Proper Classification (Sections 1122, 1123(a)(1)). Article IV of the Plan designates four (4) separate classes of claims and interests. I am familiar with the classification

of Claims and Interests in the Plan and believe that such classification system is based upon the legal and/or factual nature, or other relevant criteria, and relative rights of the Claims and Interests and is not proposed for any improper purposes. Each Class contains only Claims or Interests that are substantially similar to other Claims and Interests therein. Specifically, Priority Non-Tax Claims (Class 1), Secured Claims (Class 2), General Unsecured Claims (Class 3), and Equity Interest Holders (Class 4). Each of the four classes are dissimilar and, therefore, are properly classified separately under the Plan.

      b.   <u>Specified Treatment of Unimpaired Claims (Sections 1123(a)(2))</u>. The Plan specifies whether each Class of Claims and Interests is unimpaired under the Plan and sets forth the treatment of such classes of Claims and Interests. Article IV of the Plan identifies the Equity Interest Holders (Class 4) as unimpaired.

      c.   <u>Specified Treatment of Impaired Classes (Section 1123(a)(3))</u>. The Plan specifies whether each Class of Claims and Interests is impaired under the Plan and sets forth the treatment of such classes of Claims and Interests. Article IV of the Plan details the treatment of Priority Non-Tax Claims (Class 1), Secured Claims (Class 2) and General Unsecured Claims (Class 3) as the impaired classes under the Plan.

      d.   <u>No Discrimination (Section 1123(a)(4))</u>. Pursuant to the Plan, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, unless the holder of a particular Claim or Interest has agreed to a less favorable treatment of such particular Claim or Interest. Article IV of the Plan provides that each claim or interest that is classified in a particular Class under the Plan will receive the same treatment as the other claims and interests included in such Class.

e.   <u>Implementation of the Plan (Section 1123(a)(5))</u>. Article IV.5 of the Plan, provides adequate and proper means for implementation of the Plan. Specifically, the Plan dictates it will be funded by: (1) the Debtor's projected disposable income ($848,049) generated by the Debtor's post-confirmation operations, and (2) $25,000 provided by certain of the Released Parties.

f.   <u>Nonvoting Equity Securities (Section 1123(a)(6))</u>. The Plan does not provide for issuance of non-voting equity securities and so this section of the Bankruptcy Code is inapplicable.

g.   <u>Continuation of Existing Corporate Officers and Directors (Section 1123(a)(7))</u>. Here, the Plan provides the Equity Interest Holders will retain their equity ownership positions. The identities of the Directors and their compensation are set forth in the Plan.

h.   <u>Debtor is an Individual (Section 1123(a)(8))</u>. The Debtor is not an individual and so this section of the Bankruptcy Code is inapplicable.

i.   <u>Impairment of Classes (Section 1123(b)(1))</u>. Article IV of the Plan impairs or leaves unimpaired, as the case may be, each Class of Claims or Interests under the Plan.

j.   <u>Treatment of Executory Contracts and Unexpired Leases Section 1123(b)(2))</u>. Article IV.4 of the Plan, provides that any Executory Contract not previously assumed, assigned and sold or rejected by the Debtor may be assumed, assigned and sold, or rejected by the Debtor. Such treatment satisfies Section 1123(b)(2) of the Bankruptcy Code.

k.   <u>Releases and Exculpation Pursuant to Section 1123(b)(6)</u>. Pursuant to section 1123(b)(6) of the Bankruptcy Code, the Plan may include any other appropriate provision that is not inconsistent with any applicable provisions of the Bankruptcy Code. Pursuant to this section, the Plan contains release and exculpation provisions that are integral components of the Plan. As more fully set forth hereinbelow, the release and exculpation provisions and injunction

provisions set forth in Article VII of the Plan, are fair and reasonable, supported by consideration, and necessary to the realization of the Plan and the value realized thereunder. As more fully set forth hereinbelow, it is my understanding that such provisions are not inconsistent with any applicable provision of the Bankruptcy Code and should be approved.

**B.    Satisfaction of the Requirements of Section 1129 of the Bankruptcy Code, other than Sections (a) (8), (10), and (15)**

a.    <u>Compliance with the applicable provisions of Title 11 (The Plan 1129(a)(1))</u>

50.    I believe that the Plan complies with the requirements of the Bankruptcy Code, including sections 1122, 1123, 1125, 1126, and 1129 of the Bankruptcy Code.

b.    <u>The Debtor, as Plan Proponent complies with the applicable provisions of this title. (Section 1129(a)(3))</u>

51.    To the best of my knowledge, the Debtor has complied with all applicable provisions of the Bankruptcy Code with respect to the Plan.  In particular, the Plan complies with the disclosure requirements of sections 1125 as set forth in the affidavits of service filed by the Debtor's service agent.

c.    <u>Plan Proposed in Good Faith (Section 1129(a)(3))</u>

52.    The Debtor proposed the Plan in good faith and not by any means forbidden by law. The Debtor, as proponent of the Plan, has acted in good faith in the negotiation and formulation of the Plan. The Plan and the proposed Confirmation Order is the product of arms-length negotiations with key stakeholders, the United States Trustee and the Subchapter V Trustee. Thus, there is substantial support for the Court determining that the Plan has been proposed in good faith.

d.    Payments for Services or Costs and Expenses (Section 1129(a)(4))

53.    Any payment made or to be made by the Debtor for services or for costs and expenses in or in connection with the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, outside the ordinary course of business, has been approved by, or is subject to the approval of, the Court as reasonable. In other words, to the best of my knowledge, the Debtor has only paid expenses outside the ordinary course of business after Court approval.

e.    Directors, Officers, and Insiders (Section 1129(a)(5))

54.    Pursuant to Article IV.7 of the Plan, as of the Effective Date, the Debtor has disclosed the identity and affiliations of any person proposed to serve as officers of the Reorganized Debtor. To the extent any such director or officer is an "insider" under the Bankruptcy Code, the nature of any compensation to be paid to such director or officer was also disclosed.  Specifically, the Plan states that Mr. Reddy's, the President and CEO, annual salary will be $750,000 and Mr. William's, the CFO, annual salary will be $300,000.

f.    No Rate Changes (Section 1129(a)(6))

55.    The Plan does not provide for rate changes subject to the jurisdiction of any governmental regulatory agency.

g.    Best Interests of Creditors Test (Section 1129(a)(7))

56.    With respect to each impaired Class each has been deemed to reject the Plan. However, as described in the Plan, the Debtor has put forth affirmative evidence showing that creditors will fare better under the Plan than in a chapter 7 liquidation. The Liquidation Analysis, attached as Exhibit G to the Plan, demonstrates that all Holders of Claims and Interests are projected to receive under the Plan more than the estimated distribution they would expect to

receive in a hypothetical chapter 7 liquidation, with General Unsecured Creditors receiving more in a chapter 11 case.

### h.   Section 1129(a)(8) is Inapplicable

57.    Because the Debtor seeks to confirm the Plan pursuant to section 1191(b), this section is inapplicable.

### i.    Treatment of Administrative and Tax Claims (Section 1129(a)(9))

58.    The Plan provides that Administrative Expenses will be paid in full on the Effective Date or upon Court approval, unless otherwise agreed by the claimant.  In this case, the Debtor will not pay Administrative Expenses on the Effective Date, but the Debtor will pay all Allowed Administrative Expenses through the Plan pursuant to Section 1191(e) of the Bankruptcy Code.

### j.   Section 1129(a)(10) is Inapplicable

59.    Because the Debtor seeks to confirm the Plan pursuant to section 1191(b), this section is inapplicable.

### k.   Feasibility (Section 1129(a)(11))

60.    I understand that in order for the Plan to be confirmed, the Debtor must show that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. Here, all of the Debtor's obligations under the Plan will be funded by the Debtor's projected disposable income generated by cash on hand on the Effective Date, the Debtor post-confirmation operations, income realized from the Debtor's subsidiaries, and $25,000 provided by certain Released Parties and as such, is feasible. Therefore, I believe that Confirmation of the Plan is not likely to be followed by the need for further financial reorganization.

l.   Payment of Fees (Section 1129(a)(12))

61.     The Debtor elected to proceed under Subchapter V of the chapter 11 where the fees referenced in section 1129(a)(12) are not due.

m.   Retiree Benefits (Section 1129(a)(13))

62.     The Debtor does not have any present obligations to pay retiree benefits within the meaning of sections 1114.

n.   Domestic Support Obligation (Section 1129(a)(14))

63.     The Debtor is not an individual and, as such, is not required to pay any domestic support obligations.

o.   Individual Debtor Requirements (Section 1129(a)(15))

64.     The Debtor is attempting to confirm the Plan pursuant to section 1191(b) of the Bankruptcy Code, thus this section is inapplicable.

p.   Fair and Equitable; No Unfair Discrimination (Sections 1191(b) and (c))

65.     The Plan satisfies all of the applicable requirements of section 1191(b) and (c). Classes 1 (Priority Non-Tax Claims), 2 (Secured Claims), and 3 (General Unsecured Claims) are impaired and deemed to have rejected the Plan. However, the Plan does not unfairly discriminate, and it is fair and equitable with respect to Classes 1, 2, and 3. The Plan satisfies section 1191(c) because: (i) no Secured Claims have been identified and the Debtor does not predicate any will; (ii) the Debtor will apply cash on hand and projected disposable income to make payments under the Plan; (iii) the Debtor's immediate cash on hand and projected income of the Reorganized Debtor heightens the likelihood that the Debtor will be able to make all payments under the Plan. 1191(b) is satisfied because, presently, there are no Classes with similarly situated claims that are receiving different treatment under the Plan. Specifically,

Classes 1, 2, and 3 do not have similarly situated claims that are receiving different treatment under the Plan. Accordingly, it is my understanding that the Plan is fair and equitable with respect to such Classes and does not unfairly discriminate against such Classes.

### Injunction, Exculpation and Releases

66.     I understand that the proposed injunction and exculpation provisions in Article VII of the Plan are customary in bankruptcy cases, such as these.  Further, with respect to the proposed releases, nothing in the Plan releases any Released Parties from any claims of third parties.  The Plan only seeks releases in connection with claims of the Debtor and its estate, including claims that could be brought derivatively.  But no direct claims of third parties are to be released under the Plan.

67.     Article VII also exculpates parties critical to the formulation of the Plan for any acts or omissions in connection with the Plan, the restructuring efforts, and the Chapter 11 Case (the "<u>Exculpation</u>"). As discussed above, the Plan is the result of extensive arms' length negotiations and compromise. It is my belief that such negotiations could not have occurred without protection from liability for the Released Parties related to their efforts in connection with the Plan and the Chapter 11 Case. It is my understanding that the Exculpation and is narrowly tailored to achieve that purpose.  Under such circumstances, I am advised that the exculpation is appropriate.

68.     Article VII provides an injunction that permanently enjoins all Entities that held, hold or may hold claims or interests that have been discharged, released or exculpated under the Plan from asserting or bringing any actions on any such claims or interests against the Debtor or its estate, other than those distributions to be received under the Plan.

69.     With respect to the proposed releases of Released Parties under Article VII.2 of the Plan, I understand that such releases are customary and appropriate.  Further, in exchange for the proposed releases, the Released Parties have agreed to provide an aggregate amount of $25,000 to the Debtor, which shall go toward the disposable income for distribution to creditors under the Plan, and the agreement not to increase their compensation from the amounts set forth the Article IV.7 of the Plan for three (3) years immediately following the Effective Date.

70.     I have reviewed the objection of the Reed Judgment Creditors, including the allegation that the estate has claims for fraudulent conveyances and breaches of fiduciary duty against the Debtor's members and managers and I am familiar with the facts regarding both alleged claims.

### a.       Potential Claim for Avoidance of the Sunrise Transfer

71.     First and foremost, GCS extensively reviewed all of the Debtor's financial transactions during the four years immediately prior to the Petition Date and concluded that one transfer, the Sunrise Transfer, was not for reasonably equivalent value.

72.     Although the Debtor may not have received reasonably equivalent value on the Sunrise Transfer Date, Alecto was not insolvent when the Sunrise Transfer occurred. [14] Further, the transfer of the Plaza MOB did not render Alecto insolvent, and in June 2019, Alecto was paying its debts as they came due.

73.     As noted above, the Debtor's balance sheet was maintained in the ordinary course of business.  As set forth in the Debtor's balance sheet for 2019, which attached is hereto as **Exhibit A**, the end of June 2019, Alecto's equity was valued at more than $9.5 million.  Further, as set forth in the Debtor's 2019 tax return, the Debtor's capital accounts at the beginning of

---

[14] Further, Alecto's books and records reflect that the Debtor was still solvent at the conclusion of 2020 and into 2021.

2019 had a value of $10,095,179, and at the conclusion of 2019, the value of the Debtor's capital accounts had a value of $18,671,358.

74.    At the end of June 2019, Alecto's equity was valued at more than $9.5 million.  In fact, at no time during 2019 was the equity in Alecto less than $9.4 million.  This is consistent with the Debtor's 2019 tax return which stated that the Debtor's capital accounts at the beginning of 2019 had a value of $10,095,179, and at the conclusion of 2019, the value of the Debtor's capital accounts had a value of $18,671,358.

75.    Beyond the objective numbers set forth in the Debtor's tax records and balance sheets, common sense evidences that the Debtor was on sound financial footing.  On or about July 8, 2019, approximately one month after the Sunrise Transfer, Alecto was able to refinance its line of credit at a lower interest rate with a lender (CNH Finance Fund I, LP) that provided additional borrowing capacity while increasing the available borrowing under the facility.  Alecto would not have been able to do so if it had been insolvent.

76.     In fact, prior to March 2021,[15] Alecto was profitable.  That continued, even during the first year of the pandemic, as state and federal governments provided funds for hospitals and other healthcare organizations to address the immediate needs of COVID.  Even as certain areas of hospitals, such as elective surgeries, decreased, the volume of patients at hospitals grew significantly.  The financial issue that Alecto had, which is similar to those of other hospitals:  As the pandemic continued, the amount of money received from the states and federal governments decreased, and the volume of patients decreased, while the costs of labor increased significantly as hospitals were required to pay higher rates for "travelling workers,"

---

[15] On March 11, 2020, the World Health Organization first declared COVID-19 to be a pandemic.

who were independent contractors earning a higher amount than the amounts due to the hospitals' own employees.

77.     Also significantly, the Gould Report also determined that, in January 2021, the interests in Sunrise Real Estate Holdings, the entity that owned Plaza MOB was transferred back to Alecto for no consideration and Plaza MOB's assets were sold later that year for $58.5 million, an increase in value of approximately $8.5 million. No consideration was given to the Alecto Members for the transfer and Plaza MOB received proceeds from the sale of over $15 million. Based upon the return of the interests in Plaza MOB to Alecto, the transfer was already effectively voided as of January 1, 2021, and the Debtor suffered no damages.  In fact, the Debtor received additional funds from Plaza MOB.  I understand that, as a matter of applicable nonbankruptcy law upon which such a fraudulent conveyance would be brought, the Alecto's lack of damages would be fatal to any such claim for avoidance of the Sunrise Transfer.

**b.     Potential Claim for Breach of Fiduciary Duty**

78.     In its objection the Reed Judgment Creditors alleged that the Debtor and its estate have claims against the Debtor's insiders for fiduciary duty.  In particular, the Reed Creditors have asserted that Alecto's insiders breached their fiduciary duties to Alecto and its residual claimants by advancing more than $19 million to Sherman/Grayson during the year prior to the Petition Date when Alecto was insolvent or in the zone of insolvency, rather than paying its creditors, including more than $5 million to Sherman/Grayson after the Reed Creditors obtained their judgment against Alecto on November 28, 2022, and before the Petition Date.

79.     Throughout the period mentioned, Alecto's Board of Managers had rational reasons for continuing to fund Sherman/Grayson, and its decisions to do so were the product of at least that amount of care that an ordinarily careful and prudent men would use in similar

circumstances, and were decided after considering all of the material information readily available.

80.    As Alecto experienced after the closure of Ohio Valley Medical Center by Alecto Healthcare Services Wheeling LLC and East Ohio Regional Hospital by Alecto Healthcare Services Martin's Ferry LLC in 2019, and the closure of Fairmont Regional Medical Center by Alecto Healthcare Services Fairmont LLC in 2020, the closure of a hospital without a buyer in place results in a number of obligations that simply cannot be left unsatisfied including: (1) securing and taking custody of the medical records generated by the hospital and making these records available to the patients; (2) securing and taking custody of employee and other records and making them available to employees; (3) securing and taking custody of computer systems which include confidential and sensitive information regarding employees and patients; (4) securing and properly disposing of pharmaceuticals and other regulated materials; (5) securing and properly disposing of medical waste including radiological materials; (6) preparing and filing all necessary reports including Medicare and Medicaid cost reports and responding to audits of the same; (7) responding to governmental inquiries; (8) addressing lawsuits by vendors and others against Alecto even though such lawsuits would likely lack merit; (8) otherwise orderly winding up the operations of the hospital.[16]  These obligations imposed and impose a significant burden on Alecto with respect to the hospitals identified above and Alecto's officers and Board of Managers reasonably believed that they would impose a significant obligation on Alecto if Sherman/Grayson was to close without a buyer.  To avoid these obligations and costs associated therewith, decisions were made to provide funding to Sherman/Grayson while it sought to implement a turnaround plan and locate a buyer.

---

[16] Also, importantly, closing a healthcare facility without a purchaser caused a loss of value by sale without a going concern.

81.    Additionally, Alecto was a guarantor under the MPT Sherman Lease.  The terms of the MPT Sherman Lease provided among other things, that Sherman/Grayson was obligated to maintain various forms of insurance and meet other obligations to MPT of Sherman Alecto, LLC ("MPT of Sherman").  If Sherman/Grayson failed to meet its obligations under the MPT Sherman Lease, Alecto would have an obligation to meet these obligations under the MPT Lease Guaranty or reimburse MPT of Sherman for the costs associated with securing replacement coverage.  Significantly, Alecto decided that it was necessary to pay the portion of insurance premiums (at a cost of approximately $140,000 a month) due on Alecto's master insurance policies that were allocated to Sherman/Grayson in order to avoid (i) a liability that would be a breach under the MPT Sherman Lease and (ii) the potentially calamitous effect of having no insurance for an operating hospital.

82.    Altera Highland, LLC, an unrelated third party, owns an office building located at 300 N. Highland Avenue, Sherman, Texas 75092 immediately adjacent to Wilson N. Jones Regional Medical Center (the "POB") subject to a ground lease with MPT of Sherman as assignee of Sherman/Grayson.  The Ground Lease provides, among other things, that the Ground Lessor (currently, MPT of Sherman) has an obligation to purchase the POB if a healthcare facility is not operated at the site of Wilson N. Jones Regional Medical Center for a period of 12 consecutive months.  The purchase price demanded by Altera Highland, LLC would likely have been in excess of $13 million.  In other words, MPT of Sherman could be forced to acquire the POB for a price in excess of $13 million if no healthcare facility was operated for 12 consecutive months.  Under the terms of the MPT Sherman Lease, Sherman/Grayson agreed to indemnify MPT of Sherman/Grayson with respect to this obligation and Alecto guaranteed Sherman/Grayson's obligations to MPT.  As a result, Alecto would face liabilities in excess of

$13 million if Wilson N. Jones Regional Medical Center was to close for 12 consecutive months. To avoid this potential liability, Alecto decided it was necessary to provide funding to Sherman/Grayson so it could continue to operate until a buyer could be found.

83.    Additionally, Alecto also faced contingent liabilities as a member of the control group with respect to (a) the Alecto Healthcare Services Ohio Valley LLC Pension Plan (the "OV Pension Plan") and (2) Alecto Healthcare Services Fairmont LLC's liability with respect to its withdrawal from a multi-employer pension plan (the "Fairmont Withdrawal Liability").  Under applicable law, Alecto, as at least the 80%[17] owner of Alecto Healthcare Services Ohio Valley LLC ("Alecto Ohio Valley") and at least the 80%[18] owner of Alecto Healthcare Services Fairmont LLC, is considered to be part of the "control group" with respect to the OV Pension Plan and the Fairmont Withdrawal Liability.  Absent making quarterly payments, the Fairmont Withdrawal Liability could be as much as $10,836,358 and the liabilities associated with the OV Pension Plan would have been in excess of $4 million before the recent spike in interest rates. To avoid much significantly greater liabilities, Alecto provided funding to meet certain quarterly or other funding obligations of Alecto Ohio Valley and Alecto Fairmont.

84.    Alecto's continued funding was necessary in order to preserve the affiliates' value while looking for a purchaser for its subsidiary.[19] There do not appear to be any facts suggesting that the managers received a benefit that was at variance with Alecto or its members, thus the

---

[17] MPT of Wheeling-Alecto Hospital, LLC owned 20% of the membership interests of Alecto Healthcare Services Ohio Valley LLC from June 1, 2017 to December 31, 2021.  Since January 1, 2022, the Debtor has owned 100% of Alecto Healthcare Services Ohio Valley LLC.

[18] MPT of Fairmont-Alecto Hospital, LLC owned 20% of the membership interests of Alecto Healthcare Services Fairmont LLC from September 20, 2014 to December 31, 2021.  Since January 1, 2022, the Debtor has owned 100% of Alecto Healthcare Services Fairmont LLC.

[19] In fact, and as more fully set forth in the pleadings filed in Sherman/Grayson's bankruptcy case which is presently before this Court. The Debtor had been marketing Sherman/Grayson since 2019, and Sherman/Grayson was ultimately able to find a purchaser, and the sale closed during its bankruptcy case.  By continuing to fund Sherman/Grayson through the sale process, Alecto was saved from at least $10 million (and likely significantly more) of liability on account of obligations under leases to which it was a guarantor.

transaction does not appear to be self-interested. That the managers' decisions ultimately resulted in Alecto seeking bankruptcy protection does not by itself establish a claim of breach of fiduciary duty.

85.    Meanwhile, although certain of Alecto's subsidiaries were losing money, particularly during the second half of the pandemic, the managers believed that there was a reasonable possibility that with certain changes, the affiliates could revert to economic neutrality, if not begin to become profitable.  Thus, the Debtor had legitimate reasons to continue funding its affiliates, even as they were continuing to lose money.

86.    The decision to continue funding was not made all at once, but was an ongoing decision by the Board of Managers.  At all times, the Board of Managers were informed with respect to the decisions to continue funding.  Among other things, the Debtor's managers spoke with each other and other employees of the Debtor virtually every day regarding business decisions, including funding of the subsidiaries, and the Board of Managers' decisions were made for valid business reasons, including (i) avoiding additional, significant claims against Alecto, and preserving the going concern value of the subsidiaries and affiliates.

87.    Although I do not believe that there are any valid claims against the Debtor's insiders for breach of fiduciary duty, I believe that the consideration provided for the proposed releases under the Plan is an appropriate, good faith compromise and settlements of the potential claims of the estate against the Released Parties, and such that the proposed releases are fair, equitable, reasonable, and are integral elements of the resolution of this Chapter 11 Case in accordance with the Plan.

88.    In exchange for the releases, the Debtor will receive consideration, including (i) $25,000 in cash, and (ii) the Debtor's management has agreed that they will not increase their

compensation for three years immediately following the Effective Date.  Additionally, were a claim to be brought on behalf of the estate, the costs of such an action would reduce the amount of disposable income available to be distributed to creditors.  And even if the claim were brought on a contingency basis, it would still reduce (and possibly significantly reduce) the disposable income available to be distributed to creditors as the Reorganized Debtor would be responsible for indemnification of Alecto's members or officers pursuant to Section 7.8 of Alecto's Amended and Restated Operating Agreement, a copy of which is attached hereto as **<u>Exhibit C</u>**.  So although the consideration to be received on account of the releases does not seem significant, it is more than the Debtor's estate would receive were there no releases, particularly since the pursuit of such claims would trigger indemnification obligations.  While I do was not party to his deliberations and considerations, the independent director charged with investigation of claims apparently agreed.

89.     As more fully set forth herein, the estate's potential claims against insiders were investigated by the Mr. Balasiano, the Debtor's independent manager/director.  I have provided information to counsel for the Debtor, some or all of which I understand was forwarded to Mr. Balasiano in connection with his investigation of claims against the Debtor's investigate potential claims against Alecto's affiliates and insiders.  I also personally attended a number of conferences with Mr. Balasiano in order to provide Mr. Balasiano with the opportunity to ask any questions with respect to the underlying facts with respect to the potential claims he was investigating.  Also in attendance during those conferences were Ms. Gould, counsel for the Debtor, and Mr. Balasiano's own counsel.  During those conferences, Mr. Balasiano and/or his counsel asked questions with respect to the potential claims of the estate against the Debtor's affiliates and insiders, and Ms. Gould or I answered those questions.  I also understand that

Debtor's counsel separately spoke with Mr. Balasiano and his counsel throughout without me being present.

90.    At the conclusion of his investigation, Mr. Balasiano determined that there were no valid claims for breach of fiduciary duty or for avoidance of fraudulent conveyances.

## **CONCLUSION**

91.    Based on the foregoing, I believe that the Plan satisfies the requirements of the Bankruptcy Code and should be confirmed.

Dated: February 29, 2024

*/s Michael Sarrao*

Michael Sarrao
Executive Vice President, General Counsel, and Secretary
