**Exhibit C**

16573753/2

ALECTO HEALTHCARE SERVICES LLC

A Delaware Limited Liability Company

AMENDED AND RESTATED

OPERATING AGREEMENT

CONFIDENTIAL

ALECTO_00028648

## ALECTO HEALTHCARE SERVICES LLC

## AMENDED AND RESTATED

## OPERATING AGREEMENT

This Operating Agreement (this "Agreement") is entered into this first day of December 2012 and is to be effective with the opening of business on the first day of January 2013, by and among the Persons identified as Members (each a "Member" and collectively the "Members") in Exhibit A which is incorporated herein by reference. Except as otherwise provided, the capitalized terms used in this Agreement shall have the meanings set forth in Article I hereof.

**WHEREAS**, Alecto Healthcare Services LLC, formerly known as Alecto Healthcare LLC (the "Company"), was formed as a limited liability company under the laws of the State of Delaware by the filing of the Certificate of Formation with the Delaware Secretary of State on August 13, 2012 (the "Effective Date"), as amended by Certificate of Amendment filed with the Delaware Secretary of State on August 15, 2012; and

**WHEREAS**, the Company was formed to manage, purchase and/or operate acute care hospitals throughout the United States (the "Business"); and

**WHEREAS**, Lex Reddy, as the then sole member, entered into an Operating Agreement dated August 22, 2012 (the "Original Agreement") providing for the organization and operation of the Company; and

**WHEREAS**, Lex Reddy desires to admit additional members, subject to their execution of this Agreement and upon payment of the Capital Contributions hereinafter provided; and

**WHEREAS**, the Members desire to enter into this Agreement to create two classes of Membership, to provide for their respective rights, obligations and duties, and to set forth the provisions for the management and governance of the Company; and

**NOW, THEREFORE**, in consideration of the mutual covenants herein expressed, and for other valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

### ARTICLE I
### Definitions

The following defined terms used in this Agreement shall have the meanings specified below:

"Act" shall mean the Delaware Limited Liability Company Act, in effect at the time of the initial filing of the Articles, and as thereafter amended from time to time.

"Adjusted Capital Account Deficit" shall mean, with respect to any Member, the deficit balance, if any, in such Member's aggregate Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

1

(a)     Credit to such Capital Account any amounts which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)     Debit to such Capital Account the items described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Affiliated Person" or "Affiliate" shall mean, with reference to a specified Person, (a) any member of such Person's Immediate Family, (b) any Person who owns directly or indirectly ten percent (10%) or more of the beneficial ownership in such Person, (c) any one or more Legal Representatives of such Person and/or any Persons referred to in the preceding clauses (a) or (b); and (d) any entity in which any one or more of such Person and/or the Persons referred to in the preceding clauses (a), (b) or (c) owns directly or indirectly ten percent (10%) or more of the beneficial ownership.

"Agreement" shall mean this Amended and Restated Operating Agreement as it may be amended, supplemented, or restated from time to time.

"Applicable Federal Rate" shall mean the Applicable Federal Rate as that term is defined in Code Section 1274(d)(1), whether the short-term, mid-term or long-term rate, as the case may be, as published from time to time by the Secretary of the Treasury.

"Approval of the Board" or "Board Acting by Approval" and any grammatical variation thereof, shall mean consent, approval or vote of a majority of the Managers then in office.

"Articles" shall mean the Certificate of Formation creating the Company, and as may, from time to time, be amended in accordance with the Act.

"Bankruptcy" shall mean any of the following:

(a)     If any Member shall file a voluntary petition in bankruptcy, or shall file any petition or answer seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors, or shall file any answer or other pleading admitting or failing to contest the material allegations of any petition in bankruptcy or any petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief filed against such Member, or shall seek or consent to or acquiesce in the appointment of any trustee, receiver, conservator, or liquidator of such Member or of all or any substantial part of his or her properties or his or her interest in the Company (the term "acquiesce" as used herein includes but is not limited to the failure to file a petition or motion to vacate or discharge any order, judgment, or decree within thirty days after such order, judgment or decree);

2

(b)     If a court of competent jurisdiction shall enter in an order, judgment or decree approving a petition filed against any Member seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under the present or any future federal bankruptcy act or any other present or future applicable federal, state, or other statute or law relating to bankruptcy, insolvency, or other relief for debtors and such Member shall acquiesce in the entry of such order, judgment, or decree, or if any Member shall suffer the entry of an order for relief under Title 11 of the United States Code and such order, judgment, or decree shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive) from the date of entry thereof, or if any trustee, receiver, conservator, or liquidator of any Member or of all or any substantial part of his or her properties or his or her interest in the Company shall be appointed without the consent or acquiescence of such Member and such appointment shall remain unvacated and unstayed for an aggregate of sixty (60) days (whether or not consecutive); or

(c)     If any Member shall make an assignment for the benefit of creditors or take any other similar action for the protection or benefit of creditors.

"Board" or "Board of Managers" shall refer collectively to the Persons named to be the Managers in this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity on the Board of Managers of the Company.

"Book Value" shall mean, with respect to any asset of the Company, such asset's adjusted basis for federal income tax purposes, except that:

(a)     The initial Book Value of any asset contributed by a Member of the Company shall be the gross fair market value of such asset (reduced for any liabilities to which it is subject or which the Company assumes), as such value is determined by Approval of the Board, and for which credit is given to the contributing Member under this Agreement;

(b)     The Book Values of all assets of the Company shall be adjusted to equal their respective gross fair market values, as determined by Approval of the Board, at and as of the following times:

(i)     The acquisition of an additional or new interest in the Company by a new or existing Member in exchange for other than a de minimis Capital Contribution by such Member, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members;

(ii)     The distribution by the Company to a Member of more than a de minimis amount of any asset of the Company (including cash or cash equivalents) as consideration for all or any portion of an interest in the Company, if the Board, acting by Approval, reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members; and

(iii)     The liquidation of the Company within the meaning of Regulations Section 1.704 1(b)(2)(ii)(g).

3

(c)     The Book Value of the assets of the Company shall be increased (or decreased) to reflect any adjustment to the adjusted basis of such assets pursuant to Section 734(b) or Section 743(b) of the Code, but only to the extent such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704 1(b)(2)(iv)(m); provided, however, that Book Value shall not be adjusted pursuant to this clause (c) to the extent that the Managers, acting by Approval, determines that an adjustment pursuant to the immediately preceding clause (b) is necessary or appropriate in connection with the transaction that would otherwise result in an adjustment pursuant to this clause (c).

If the Book Value of an asset has been determined or adjusted pursuant to the preceding clauses (a), (b) or (c), such Book Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits or Losses.

"Capital Account" shall mean a capital account maintained and adjusted in accordance with the Code and the Regulations, including the Regulations under Section 704(b) and (c) of the Code. The Capital Account of each Member shall be:

(a)     Credited with all payments made to the Company by such Member on account of Capital Contributions (and as to any property other than cash or a promissory note of the contributing Member, the agreed (as indicated by the Approval of the Board) fair market value of such property, net of liabilities secured by such property and assumed by the Company or subject to which such contributed property is taken) and by such Member's allocable share of Profits and items in the nature of income and gain of the Company;

(b)     Charged with the amount of any distributions to such Member (and as to any distributions of property other than cash or a promissory note of a Member or the Company, by the agreed fair market value of such property, net of liabilities secured by such property and assumed by such Member or subject to which such distributed property is taken), and by such Member's allocable share of Losses and items in the nature of Losses and deductions of the Company;

(c)     Adjusted simultaneously with the making of any adjustment to the Book Value of the Company's assets pursuant to the definition thereof, to reflect the aggregate net adjustments to such Book Value as if the Company recognized Profit or Loss equal to the respective amount of such aggregate net adjustments immediately before the event causing such adjustments; and

(d)     Otherwise appropriately adjusted to reflect transactions of the Company and the Members.

"Capital Contribution" shall mean the amount of cash and the value of any other property contributed to the Company by a Member.

"Class A Member" shall mean any Member holding Class A Units in the Company, in each such Member's capacity as a holder of Class A Units.

"Class B Member" shall mean initially Lex Reddy, and shall include any Member subsequently holding Class B Units in the Company.

4

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent of the Class B Members" shall mean the written consent or approval of the Class B Members.

"Depreciation" shall mean, for each year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same relationship to the Book Value of such asset as the depreciation, amortization or other cost recovery deduction computed for tax purposes with respect to such asset for such period bears to the adjusted tax basis for such asset, or if such asset has a zero adjusted tax basis, Depreciation shall be determined with reference to the initial Book Value of such asset using any reasonable method selected by Approval of the Board, but not less than depreciation allowable for tax purposes for such year.

"Disability" shall mean the inability of a Class A Member by reason of mental or physical illness, disease or injury, to perform services for the Business on a substantially full time basis for a minimum period of six (6) consecutive months or six (6) months cumulatively in any twelve (12) month period as determined by the Approval of the Board.

"Formula Amount" shall mean the deemed value of the Company for purposes of redemption of a Member's ownership interest in the Company pursuant to Section 4.3 hereof. The Formula Amount shall be determined as follows: (i) if the Company has been in operation for less than one (1) calendar year, the Formula Amount shall equal the actual amount of cash equity invested in the Company by all Members; or (ii) if the Company has been in operation for more than one (1) calendar year, but less than five (5) calendar years, the Formula Amount shall be equal to the product of a multiple (which initially shall be three (3)) (the "Multiple") times the Company's net operating income (in accordance with generally accepted accounting principles), excluding extraordinary gains and losses, calculated before deduction of interest, taxes, depreciation and amortization ("EBITDA"), then minus all of the Company's outstanding long-term debt and long-term liabilities (including equipment lease financing obligations) as of the date of the Terminating Event determined in accordance with generally accepted accounting principles. For this purpose, the annual net operating income of the Company and its EBITDA shall be based on the calendar year immediately prior to the year in which the Terminating Event occurs. For example, if the Terminating Event occurs in 2014 the Formula Amount shall be calculated by multiplying the Multiple by EBITDA for the calendar year 2013, then subtracting all of the Company's outstanding long-term debt and long-term liabilities (including equipment lease financing obligations) as of the date of the Terminating Event determined in accordance with generally accepted accounting principles. If the Company has been in operation for at least five (5) full calendar years, the Formula Amount shall be equal to the Multiple times the average of the Company's EBITDA for the most recent two (2) fully completed prior calendar years, then minus all of the Company's outstanding long-term debt and long-term liabilities (including equipment lease financing obligations) as of the date of the Terminating Event determined in accordance with generally accepted accounting principles.

5

ALECTO_00028653

"Immediate Family" with respect to any individual, shall mean his or her ancestors, spouse, issue, spouses of issue, any trust principally for the benefit of any one or more of such individuals, his or her estate, and any entity beneficially owned by such individuals or trusts for their principal benefit.

"Legal Representative" shall mean, with respect to any individual, a duly appointed executor, administrator, guardian, conservator, trustee, personal representative or other legal representative appointed as a result of the death, minority or incompetency of such individual.

"Losses" shall have the meaning provided below under the heading "Profits and Losses."

"Manager" shall refer to each Person named as a Manager by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company. "Managers" or "Board" shall refer collectively to the Persons named as Managers by the Members pursuant to this Agreement and any Person who becomes an additional, substitute or replacement Manager as permitted by this Agreement, in each such Person's capacity as a Manager of the Company.

"Member" shall mean any Person named as a Member in this Agreement and any Person who becomes an additional, substitute or replacement Member as permitted by this Agreement, in each such Person's capacity as a Member of the Company.

"Member Minimum Gain" shall mean "partner nonrecourse debt minimum gain" as that term is defined in Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Debt" shall mean "partner nonrecourse debt" or "partner nonrecourse liability" as those terms are defined in Regulations Section 1.704-2(b)(4).

"Member Nonrecourse Deductions" shall mean "partner nonrecourse deductions" as that term is defined in Regulations Section 1.704 2(i)(1).

"Minimum Gain" shall have the meaning given in Regulations Section 1.704-2(d).

"Multiple" shall have the meaning used in the calculation of the Formula Amount.

"Non-Adverse Terminating Event" shall have the meaning set forth in Section 4.3.

"Nonrecourse Deductions" shall have the meaning given in Regulations Section 1.704-2(b)(1).

"Person" or "Party" shall mean any natural person, partnership (whether general or limited), limited liability company, trust, estate, association or corporation.

"Profits and Losses" shall mean, for each year or other period, an amount equal to the Company's taxable income or loss for such year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be

6

stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

      (a)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this provision shall be added to such taxable income or loss;

      (b)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this provision, shall be subtracted from such taxable income or added to such loss;

      (c)     Gain or loss from a disposition of property of the Company with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of such property, rather than its adjusted tax basis;

      (d)     In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account the Depreciation on the assets for such fiscal year or other period; and

      (e)     Any items which are separately allocated pursuant to Sections 6.5 and/or 6.6 which otherwise would have been taken into account in calculating Profits and Losses pursuant to the above provisions shall not be taken into account and, as the case may be, shall be added to or deducted from such amounts so as to be not part of the calculation of the Profits or Losses.

If the Company's taxable income or loss for such year, as adjusted in the manner provided above, is a positive amount, such amount shall be the Company's Profits for such year; and if negative, such amount shall be the Company's Losses for such year.

"Reasonable Reserves" shall mean such amount as the Board acting by Approval, shall deem reasonably necessary to meet the foreseeable liabilities or obligations of the Company taking into consideration historic costs as well as reasonably projected cash flow, and including, but not limited to, (i) the normal expenses of the operation and management of its activities, as such liabilities and obligations become due and payable, and (ii) the expenses of any redemptions pursuant to the provisions of this Agreement.

"Regulations" shall mean the Regulations promulgated under the Code, and any successor provisions to such Regulations, as such Regulations may be amended from time to time.

"Retirement" shall mean when a Class A Member ceases to provide services for the Company on a substantially full-time basis as the Board of Managers, acting by Approval, shall have determined.

"Supermajority Approval" shall mean the written consent or approval of the Members holding a majority of the Class A Units then issued and outstanding and the Consent of the Class B Members.

7

 **ALECTO_00028655**

"Terminating Capital Transaction" shall mean a sale or other disposition of all or substantially all of the assets of the Company.

"Transfer" and any grammatical variation thereof shall refer to any sale, exchange, issuance, redemption, assignment, distribution, encumbrance, hypothecation, gift, pledge, retirement, resignation, transfer or other withdrawal, disposition or alienation in any way as to any interest of a Member. Transfer shall specifically, without limitation of the above, include assignments and distributions resulting from death, incompetency, Bankruptcy, liquidation and dissolution.

"Unit" shall mean a unit or share of interest in the Company. The interest of each Unit in the Company shall be equal to one (1) divided by the total number of Units then authorized and outstanding (including, but not limited to, Class A Units and Class B Units).

"Unit Proportion" shall mean the number of Units held by a Member divided by all Units then issued and outstanding.

The definitions set forth in the Act shall be applicable, to the extent not inconsistent herewith, to define terms not defined herein and to supplement definitions contained herein.

## ARTICLE II
## Organizational Powers and Membership

2.1     Organization. The Board of Managers shall file such articles, certificates and documents as appropriate to comply with the applicable requirements for the operation of a limited liability company in accordance with the laws of any jurisdictions in which the Company shall conduct business and shall continue to do so as long as the Company conducts business therein. By Approval of the Board, the Company may establish places of business within and without the State of Delaware, as and when required by its business and in furtherance of its purposes set forth in Section 2.2 hereof, and may appoint agents for service of process in all jurisdictions in which the Company shall conduct business.

2.2     Purposes and Powers of the Company. The Company is organized for the general purposes of (i) operating the Business, (ii) engaging in other activities in connection therewith which are necessary or beneficial to the Business, and (iii) engaging in any other lawful business activity permitted under the Act consistent with the foregoing. To that end, the Company, subject to the terms of this Agreement, may enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to the accomplishment of, the purposes of the Company, so long as said activities and contracts may be lawfully carried on or performed by a limited liability company under the laws of the State of Delaware.

2.3     Regulatory Regulations. The Members understand that the Company's and the Business operations may subject to various state and federal laws regulating permissible relationships with entities such as the Company. It is the intent of the parties that the Company operate in a manner consistent with all applicable laws. Accordingly, each Member represents and warrants and covenants as of the date hereof and while the Member is a Member, that such Member has not been barred or suspended from participation in any state or federal

8

ALECTO_00028656

governmental healthcare program, including, but not limited to, the Medicare or Medicaid programs.

2.4    Membership.

(a)    There shall be two (2) authorized classes of Members of the Company: Class A Members and Class B Members. All Members shall have (based on Units held) the same economic rights. The Members, acting as Members, shall have no right to act for or bind the Company. The initial Class A Members and the initial Class B Member are identified in Exhibit A hereto.

(b)    No Person shall be eligible to become a Class A Member (or remain a Class A Member, as applicable) unless such Class A Member is a Person who is an Eligible Employee. For the purposes of this Agreement, an "Eligible Employee" is a Person who provides services to the Company or an Affilialte of the Company on a substantially full time basis either as an employee or an independent contractor, unless such requirement is waived by the Managers. The requirements of this Section 2.4(b) shall not apply to the Class B Members.

2.5    Investment Through Asset Protection Vehicle. Notwithstanding anything herein to the contrary, a Class A Member ("Entity Owner") may invest through a pension plan, trust, limited liability company or other similar entity ("Entity Investor") as long as the following conditions are met: (i) the Entity Investor is owned by an Eligible Employee and/or his or her Immediate Family; (ii) any breach of this Agreement by the Entity Investor or the Entity Owner, or the occurrence of a Terminating Event related to the Entity Owner or the Entity Investor, shall be treated as a Terminating Event under this Agreement; (iii) if a Terminating Event occurs with respect to the Entity Owner, the Entity Investor's Units will be redeemed in accordance with Section 4.3 of this Agreement; (iv) the Entity Owner agrees to be bound by each of the covenants contained in this Agreement, including, without limitation, all confidentiality and non-competition covenants, and agrees to abide by the requirements of an eligible Class A Member in this Section 2.3 and Section 2.4(b) hereof, as if such Entity Owner were a direct owner of the Company; and (v) the Entity Owner agrees to sign a counterpart signature page to this Agreement, as such other documents as the Company may reasonably require.

## ARTICLE III
### Capital Contributions and Liability of Members

3.1    Capital Accounts. A separate Capital Account shall be maintained for each Member, including any Member who shall hereafter acquire an interest in the Company.

3.2    Capital Contributions.

(a)    Capital Contributions. The Members have made or shall make the Capital Contributions in the amounts set forth in Exhibit A. The Class A Members shall initially own forty nine thousand (49,000) Units and shall collectively at all times hold forty nine percent (49%) interest in the Company, and the Class B Members shall initially own fifty one thousand Units and shall collectively at all times hold fifty one percent (51%) interest in the Company. Additional issuances of Units to Eligible Employees shall be solely of Class A Units, with the resulting dilution of their percentage interests in the Company, it being expressly understood that

9

                                        ALECTO_00028657

no additional Class B Units are to be issued without the approval of all Class B Members. No Member shall have preemptive rights to acquire any Units to be issued by the Company after the date of this Agreement.

(b)    Loans.    Except as set forth in this Article III, and except with Supermajority Approval pursuant to Section 7.4 hereof, no Member or Manager shall be entitled, obligated or required to make any loan to or guarantee a loan for the Company or make any Capital Contribution to the Company in addition to such Member's Capital Contribution made pursuant to Section 3.2(a) hereof. No loan made to the Company by any Member or Manager shall constitute a Capital Contribution to the Company for any purpose.

(c)    Additional Capital Contributions.    Additional Capital Contributions may be required only with the Supermajority Approval pursuant to Section 7.4 hereof and otherwise in accordance with Article V below.

3.3    No Withdrawal of or Interest on Capital.    Except as otherwise provided in this Agreement, (i) no Member shall have any right to demand and receive property of the Company in exchange for all or any portion of such Member's Capital Contribution or Capital Account, and (ii) no interest or preferred return shall accrue or be paid on any Capital Contribution or Capital Account.

3.4    Liability of Members.    No Member, in his, her or its capacity as a Member, shall have any liability to restore any negative balance of such Member's Capital Account or to contribute to, or in respect of, the liabilities or the obligations of the Company, or to restore any amounts distributed from the Company, except as may be required specifically under this Agreement, the Act or other applicable law. Except to the extent otherwise provided in this Agreement or otherwise agreed to, or as required by law, in no event shall any Member, in such Member's capacity as a Member, be personally liable for any liabilities or obligations of the Company or any of its Members.

3.5    Managers as Members.    No Manager is required to hold any Units in the Company in order to serve as a Manager.

3.6    Additional Members.    Additional Members may be admitted to the Company only upon Supermajority Approval, including the terms of admission, and the Approval of the Board of Managers in accordance with the terms of Article VII hereof and upon execution and delivery by the new Member of a counterpart of this Agreement, delivery of the required Capital Contribution (as determined by the Board of Managers) and execution and delivery of such other documents, instruments and items as the Managers may require. Issuance of Units to new Members shall be subject to compliance with Section 3.2 hereof. All such issuances shall be structured such that the amount paid for Units is not less than fair market value, payments are made in cash or such other consideration as is approved by the Board of Managers.

CONFIDENTIAL    ALECTO_00028658

## ARTICLE IV
### Members And Units

4.1    Classification of Members.   There shall be two (2) classes of Members of the Company: a Class A Member Class and Class B Member Class. All Members shall have (based on Units held) the same economic rights.

4.2    Withdrawal of a Class A Member.   No Class A Member has the right to withdraw or resign from the Company at any time, except upon Supermajority Approval.  If a Class A Member withdraws or resigns as a Member in violation of this Section 4.2, or through such Member's action causes such Member to fail to satisfy the conditions of Membership (such as failing to qualify as an Eligible Employee), such Member hereby agrees that such withdrawal, resignation or action will constitute a breach of this Agreement.  The Company may offset any damages due to such a breach against any amounts otherwise distributable to such Member.  In the event that the Act or a final court ruling entitles the Class A Member to receive a distribution upon withdrawal in violation of this Section 4.2, such distribution shall be equal to the Member's Capital Account.  The foregoing represents the parties' reasonable best efforts to determine the damages that would stem from a Class A Member's breach of this Section 4.2.

4.3    Redemption of a Member.

(a)    Terminating Events are categorized as either Adverse Terminating Events or Non-Adverse Terminating Events for purposes of differentiating the Company's redemption obligations to the Member to whom or which an event occurs.

(b)    For purposes of this Section, an "Adverse Terminating Event" means:

(i)    with respect to any Member:

A.    the improper Transfer (or attempt to Transfer) of Units;

B.    the exclusion, suspension or debarment of a Member from participation in the Medicare or Medicaid programs;

C.    the exclusion, suspension or debarment of a Member by any State health care licensing authority;

D.    the conviction of any felony;

E.    any uncured material breach of a provision of this Agreement;

F.    any event of Bankruptcy; or

G.    the failure to make guaranties or any capital contribution required pursuant to Section 5.1.

11

    ALECTO_00028659

        (ii) with respect to a Class A Member, in addition to Section 4.3(b)(i) above:

            A. the failure by the Class A Member to meet the Eligible Employee requirements set forth in Section 2.4.

    (c) For purposes of this Section, a "Non-Adverse Terminating Event" means:

        (i) With respect to a Class A Member:

            A. death;

            B. the adjudication of incompetence;

            C. Disability; or

            D. Retirement.

    (d) Each Terminating Event, if subject to cure within thirty (30) days, shall trigger termination only after written notice is provided and if a cure has not been made of the Terminating Event within such thirty (30) day period.

    (e) If a Terminating Event (whether Adverse or Non-Adverse) shall occur with respect to any Member, the Company may elect, at the Company's sole option and upon written notice to such Member within six (6) months after the Company has received actual knowledge of the Terminating Event (meaning knowledge of a majority of the Board of Managers without knowledge being imputed from one Manager to another), to purchase the Member's Units and the Member must sell such Units to the Company at a price as determined as follows:

        (i) Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of an Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Formula Amount determined as of the date of the Terminating Event multiplied by the Member's Unit Proportion, discounted by forty percent (40%) (the "Adverse Purchase Price").

        (ii) Subject to Section 4.3(f), if any Member's Units are purchased by the Company because of the occurrence of a Non-Adverse Terminating Event, the amount the Company shall pay for the Units owned by such Member shall be the Formula Amount multiplied by the Member's Unit Proportion (the "Non-Adverse Purchase Price"). The "Adverse Purchase Price," and the "Non-Adverse Purchase Price" may be referred to collectively as the "Valuation Price."

    (f) For purposes of this Section 4.3, the Formula Amount (as defined in Article I) is intended as a means of approximating fair market value while minimizing disputes and appraisal-related costs and expenses regarding valuation of Units for purposes of redemption.

12

(i)    All calculations used to determine the Formula Amount shall be performed by the Company's regularly retained accountants and such calculations shall be final and binding upon all parties to this Agreement. All Members acknowledge and agree that the Formula Amount may be an inexact approximation of fair market value, and all Members waive any and all rights to contest the use of the Formula Amount for any and all purposes in lieu of an appraisal or other method.

(ii)    The Board of Managers, in its sole discretion, with Supermajority Approval, shall have the ability to adjust the Multiple used to arrive at the Formula Amount (as defined in Article I) based on its assessment of the operations, expansion opportunities, market conditions and other factors the Board of Managers deems appropriate for the Company on an annual basis or whenever determined; provided, once adjusted, the Multiple may not be adjusted for the next twelve (12) months; and provided further, a Multiple adjustment taking effect after the occurrence of a Terminating Event will not affect the Formula Amount with respect to the Member for whom the Terminating Event had occurred. Rather, in that case, the Multiple shall remain the Multiple in effect on the effective date of such Member's Terminating Event.

Payments for Units hereunder shall be made as follows: twenty percent (20%) on the initial payment date, which shall be within ninety (90) days after the determination of the Valuation Price (the "Purchase Date") (which in no event shall be more than six (6) months after the Terminating Event, and twenty percent (20%) of the Valuation Price on each of the anniversaries of the Purchase Date with interest on the outstanding principal balance accruing at the Prime Rate shown in the Money Rates Section of the Wall Street Journal on the Purchase Date until the principal is paid in full. Notwithstanding any delay in the payment of amounts due, a Member's rights as a Member shall cease on the Purchase Date. Aggregate payments to be made in connection with all redemptions shall not exceed seven and one-half percent (7.5%) of the Company's collected revenues in any year. If payments are so restricted, payments shall be made in proportion to amounts owed to all Members being redeemed. In sum, notwithstanding the provisions of this Article, the Company shall not be required to make payments to former Members pursuant to this Section 4.3 which, in the aggregate, would exceed seven and one-half percent (7.5%) of the aggregate collections of the Company for any such period. If the aggregate amount of payments otherwise due to former Members pursuant to this Section would reasonably be expected to exceed this limitation in any calendar year or portion thereof, the Company, with the Approval of the Board, shall pay such former Members, on a pro rata basis, based on the amount still owed such Members, quarterly payments totaling seven and one-half percent (7.5%) of the Company's anticipated aggregate collections for such period, and the balance of that period's payment obligations to such former Members shall be deferred to the following calendar year or years, until such amounts can be paid without violating such limitation with respect to any such year or years. Within sixty (60) days following the end of each calendar year, the Company shall make a pro rata adjusted payment to the former Members if and to the extent that actual aggregate collections during the prior year (or relevant portion thereof) have exceeded the anticipated amount.

CONFIDENTIAL                                                                                    ALECTO_00028661

## ARTICLE V
### Additional Capital

5.1    Funding Capital Requirements.

(a)    In the event that the Company requires additional funds to carry out its purposes, to conduct its business, or to meet its obligations, the Company may borrow funds from such lender(s), including Members and Managers, on such terms and conditions as are Approved by the Board of Managers, all on such terms as reflect fair market value.  It is specifically provided that (except as set forth in Section 3.2 and 5.1(c)) no such terms or conditions shall impose any personal liability on any Member without the prior written consent of such Member.

(b)    No Member or Manager shall be obligated to make any Capital Contributions or loans to the Company (except as provided in Sections 3.2 and 7.4 of this Agreement), or otherwise supply or make available any funds to the Company, even if the failure to do so would result in a default of any of the Company's obligations or the loss or termination of all or any part of the Company's assets or business.

(c)    The Company may require that additional Capital Contributions be made by the Members upon Supermajority Approval pursuant to Section 7.4 hereof.  If a Member fails to deliver to the Company such an additional requested Capital Contribution within ten (10) business days of a request by the Board to do so, the Company, after giving thirty (30) days notice of such failure, may elect (i) to subordinate such Member's Unit Proportion to that of all non-defaulting Members for the amount of the additional Capital Contribution, plus interest of 12% per annum, compounded annually, or, if lower, the highest rate allowed by law (the "Applicable Interest Rate"); (ii) to borrow on behalf of such Member that amount necessary to meet such Member's commitment and the charging of interest thereon of up to the Applicable Interest Rate, with repayments of such indebtedness made from the first distributions related to such Member's Membership interest; (iii) allow the remaining Members to make contributions in excess of their proportionate shares, on a pro rata basis, to the extent such Members desire to make such contributions, with a corresponding adjustment to such contributing Members' Unit Proportion in the Company to reflect their relative Capital Contributions; or (iv) dilute such Member's Unit Proportion by issuing to those Members that have made the required additional Capital Contribution a number of Units equal to the Diluted Issuance Amount.   The "*Diluted Issuance Amount*" for each contributing Member shall mean a number of Units equal to: (1) the total amount of the additional Capital Contribution made by the particular Member with respect to the specific additional Capital Contribution required, *divided by* (2) the Deemed Unit Value.  The "*Deemed Unit Value*" shall mean an amount equal to: (I) the Formula Amount as of the time of the additional Capital Contribution *divided by* (II) the total number of Units outstanding in the Company prior to the additional Capital Contribution, then discounted by forty percent (40%).  Any Member who fails to make the required additional Capital Contribution shall not be issued any additional Units under this subsection 5.1(c)(iv).

5.2    Third Party Liabilities.  The provisions of this Article and of Section 3.2 hereof are not intended to be for the benefit of any creditor or other Person (other than a Member in his, her or its capacity as a Member) to whom any debts, liabilities or obligations are owed by (or

14

who otherwise has any claim against) the Company or any of the Members. Moreover, notwithstanding anything contained in this Agreement, including specifically but without limitation this Article, no such creditor or other Person shall obtain any rights under this Agreement or shall, by reason of this Agreement, make any claim in respect of any debt, liability or obligation (or otherwise) against the Company or any Member.

## ARTICLE VI
### Distributions; Profits and Losses

6.1     Distribution of Company Funds - In General. Except as necessary to comply with the Sections of this Article VI, distribution of Company funds to the Members shall be subject to Approval of the Board, taking into account future cash needs of the Conpany, Reasonable Reserves and such other factors as are considered by the Board of Managers, within their sole and absolute discretion.    All distributions approved by the Board of Managers shall be distributed among the Members on a pro rata basis based on each Member's Unit Proportion.

6.2     Distribution Upon Dissolution. Proceeds from a Terminating Capital Transaction and/or other amounts or assets available upon dissolution, and after payment of, or adequate provision for, the debts and obligations of the Company, shall be distributed and applied in the following priority:

(a)     First, to fund reserves for liabilities not then due and owing and for contingent liabilities to the extent deemed reasonable by Approval of the Board, provided that, upon the expiration of such period of time as the Board, acting by Approval, shall deem advisable, the balance of such reserves remaining after payment of such contingencies shall be distributed in the manner hereinafter set forth in this Section; and

(b)     Second, to the Members, an amount sufficient to reduce the Members' Capital Accounts to zero, in proportion to the positive balances in such Capital Accounts after reflecting in such Capital Accounts all adjustments thereto necessitated by (i) all other Company transactions (distributions and allocations of Profits and Losses and items of income, gain, deduction and loss) and (ii) such Terminating Capital Transaction; and

(c)     Finally, to the extent funds remain, to the Members of the Company on a pro rata basis based on eadch Member's Unit Proportion.

6.3     Distribution of Assets in Kind. No Member shall have the right to require any distribution of any assets of the Company in kind. If any assets of the Company are distributed in kind, such assets shall be distributed on the basis of their respective fair market values as determined by the Approval of the Board. Any Member entitled to any interest in such assets shall, unless otherwise determined by the Approval of the Board, receive separate assets of the Company and not an interest as tenant-in-common, with other Members so entitled, in each asset being distributed.

6.4     Allocation of Profits and Losses. After giving effect to the allocations set forth in Sections 6.5 and 6.6 which affect the Members' distributive shares, Profits and Losses shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding.

15

6.5    Required Regulatory Allocations.

(a)    Limitation on and Reallocation of Losses. At no time shall any allocations of Losses, or any item of loss or deduction, be made to a Member if and to the extent such allocation would cause such Member to have, or would increase the deficit in, any Adjusted Capital Account Deficit of such Member at the end of any fiscal year. To the extent any Losses or items are not allocated to one or more Members pursuant to the preceding sentence, such Losses shall be allocated to the Members to which such losses or items may be allocated without violation of this Section 6.5(a).

(b)    Minimum Gain Chargeback. If there is a net decrease in the Minimum Gain of the Company during any fiscal year, then items of income or gain of the Company for such fiscal year (and, if necessary, subsequent fiscal years) shall be allocated to each Member in an amount equal to such Member's share of the net decrease in the Minimum Gain, determined in accordance with Regulations Section 1.704-2(d)(1). A Member's share of the net decrease in the Minimum Gain of the Company shall be determined in accordance with Regulations Section 1.704-2(g). The items of income and gain to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(2)(i).

(c)    Nonrecourse Deductions. Nonrecourse Deductions for any fiscal year or other period (not including any Member Nonrecourse Deductions allocated pursuant to Section 6.5(d)) shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding. Solely for purposes of determining each Member's proportionate share of the "excess nonrecourse liabilities" of the Company, within the meaning of Regulations Section 1.752-3(a)(3), the Company Profits shall be allocated among the Members on a pro rata basis, based on the proportion of Units then held by each such Member to the total number of Units then issued and outstanding. The items of losses, deductions and Code Section 705(a)(2)(B) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(d)    Member Nonrecourse Deductions. Any Member Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Member who bears the economic risk of loss with respect to the nonrecourse liability, as determined and defined under Regulations Section 1.704-2(b)(4), to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1). The items of losses, deductions and Code Section 705(a)(2)(b) expenditures to be so allocated shall be determined in accordance with Regulations Section 1.704-2(j)(1)(ii).

(e)    Member Minimum Gain Chargeback. Notwithstanding any contrary provisions of this Article VI, other than Section 6.5(b) above, if there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during any fiscal year, then each Member who has a share of such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i), shall be allocated items of income and gain of the Company, determined in accordance with Regulations Section 1.704-2(j)(2)(ii), for such fiscal year (and, if necessary, subsequent fiscal years) in an amount equal to each such Member's share of the net decrease in such Member Minimum Gain, determined in accordance with Regulations Section 1.704-2(i)(3) and 2(i)(5).

16

(f)     Qualified Income Offset. If any Member unexpectedly receives an item described in Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to each such Member in an amount and manner sufficient to eliminate, as quickly as possible and to the extent required by Regulations Section 1.704-1(b)(2)(ii)(d), the Adjusted Capital Account Deficit of such Member, provided that an allocation pursuant to this Section 6.5(f) shall only be made if and to the extent that such Member would have an Adjusted Capital Account Deficit after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(f).

(g)     Basis Adjustment. To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to either of Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to said Section of the Regulations.

(h)     Gross Income Allocation. If at the end of any Company fiscal year any Member has a Capital Account deficit which is in excess of the sum of the items to be credited to a Member's Capital Account under clause (a) of the definition of Adjusted Capital Account Deficit, then each such Member shall be allocated items of income and gain in the amount of such excess as quickly as possible provided that an allocation pursuant to this Section 6.5(h) shall only be made if and to the extent that such Member would have a Capital Account deficit in excess of such sum after accounting for all other allocations provided for in this Article VI other than that described in this Section 6.5(h). As among Members having such excess, if there are not sufficient items of income and gain to eliminate all such excess, such allocations shall be made in proportion to the amount of each Member's respective excess.

(i)     Curative Allocations. The allocations set forth in this Section 6.5 are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted consistently therewith. Such allocations may not be consistent with the manner in which the Members intend to divide Company distributions and to make Profit and Loss allocations. Accordingly, by the Approval of the Board, after effecting the allocations required pursuant to this Section 6.5, other allocations of Profits, Losses and items thereof shall be divided among the Members so as to prevent the allocations in this Section 6.5 from distorting the manner in which Company distributions will be divided among the Members pursuant to Sections 6.1 and 6.2 hereof. In general, the Members anticipate that this will be accomplished by specifically allocating other Profits, Losses and items of income, gain, loss and deduction among the Members so that the net amount of allocations under this Section 6.5 and allocations under this Section 6.6 to each such Member is zero. However, the Board shall have discretion to accomplish this result in any reasonable manner.

6.6     Tax Allocations and Book Allocations.

(a)     Except as otherwise provided in this Section 6.6, for federal income tax purposes, each item of income, gain, loss and deduction shall, to the extent appropriate, be

17

     ALECTO_00028665

allocated among the Members in the same manner as its correlative item of "book" income, gain, loss or deduction has been allocated pursuant to the other provisions of this Article VI.

(b)    In accordance with Code Section 704(c) and the Regulations thereunder, depreciation, amortization, gain and loss, as determined for tax purposes, with respect to any property whose Book Value differs from its adjusted basis for federal income tax purposes shall, for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value, such allocation to be made by the Approval of the Managers in any manner which is permissible under said Code Section 704(c) and the Regulations thereunder and the Regulations under Code Section 704(b).

(c)    In the event the Book Value of any property of the Company is subsequently adjusted, subsequent allocations of income, gain, loss and deduction with respect to any such property shall take into account any variation between the adjusted basis of such asset for federal income tax purposes and its respective Book Value in the manner provided under Section 704(c) of the Code and the Regulations thereunder.

(d)    Allocations pursuant to this Section 6.6 are solely for federal, state, and local income tax purposes, and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

6.7    General Allocation and Distribution Rules.

(a)    For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Approval of the Board of Managers using any permissible method under Code Section 706 and the Regulations thereunder. Except as otherwise provided in this Agreement, all items of income, gain, loss, and deduction shall be allocated among the Members in the same proportions as the allocations of Profits or Losses for the fiscal year in which such items are to be allocated.

(b)    Upon the admission of a new Member or the Transfer of an interest, the new and old Members or the transferor and transferee shall be allocated shares of Profits and Losses and other allocations and shall receive distributions, if any, based on the portion of the fiscal year that the new or transferred Company interest was held by the new and old Members, or the transferor and transferee, respectively. For the purpose of allocating Profits and Losses and other allocations and distributions, (i) such admission or Transfer shall be deemed to have occurred on the first day of the month in which it occurs, or if such date shall not be permitted for allocation purposes under the Code or the Regulations, on the nearest date otherwise permitted under the Code or the Regulations, and (ii) if required by the Code or the Regulations, the Company shall close its books on an interim basis on the last day of the previous calendar month.

6.8    Tax Withholding. If the Company incurs a withholding tax obligation with respect to the share of income allocated to any Member, (a) any amount which is (i) actually

18

withheld from a distribution that would otherwise have been made to such Member and (ii) paid over in satisfaction of such withholding tax obligation shall be treated for all purposes under this Agreement as if such amount had been distributed to such Member, and (b) any amount which is so paid over by the Company, but which exceeds the amount, if any, actually withheld from a distribution which would otherwise have been made to such Member, shall be treated as an interest-free advance to such Member. Amounts treated as advanced to any Member pursuant to this Section shall be repaid by such Member to the Company within thirty (30) days after the Board, acting by Approval of the Board of Managers, give notice to such Member making demand therefore. Any amounts so advanced and not timely repaid by such Member shall bear interest, commencing on the expiration of said 30-day period, compounded monthly on unpaid balances, at an annual rate equal to the lowest Applicable Federal Rate as of such expiration date. The Company shall collect any unpaid amounts so advanced from any Company distributions that would otherwise be made to such Member.

6.9     Tax Matters Partner.   The Class B Member, and if more than one Class B Member the one holding the largest number of Unit, shall be the "Tax Matters Partner" (as defined in Code Section 6231) of the Company.  The Tax Matters Partner is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings (collectively, "Audits"), and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do or refrain from doing any and all things reasonably required to conduct such proceedings.  The Company shall indemnify and hold harmless the Tax Matters Partner and if applicable the Tax Matters Partner's directors, officers, employees and agents from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of his, hers or its activities on behalf of the Company as Tax Matters Partner absent the gross negligence of the Tax Matter Partner.  The Members specifically acknowledge that the Tax Matters Partner shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member with respect to any action taken by the Tax Matters Partner with respect to an Audit absent the gross negligence of the Tax Matter Partner.  The Tax Matters Partner shall take such action as may be necessary to cause each Member to be entitled to notice as set forth in Code Section 6223.  The Tax Matters Partner shall not take any action contemplated by Code Section 6224 through 6230 without the prior authorization of the Members.

## ARTICLE VII
## Management

7.1     Management of the Company.   The overall management and control of the business and affairs of the Company shall be vested in the Board of Managers, acting by Approval of the Board of Managers, but subject to the Member protections as set forth in Section 7.4 hereof or as otherwise provided in this Agreement.   All management and other responsibilities not specifically reserved to the Members in this Agreement, or specifically requiring Class A Member and/or Class B Member Consent, shall be vested in the Board of Managers, and the Members shall have no voting rights except as specifically provided in this Agreement. Each Manager shall devote such time to the affairs of the Company as is reasonably necessary for performance by such Manager of his, her or its duties, provided such Manager

19

shall not be required to devote full time to such affairs. Moreover, each Manager shall act in good faith with the care an ordinary, prudent person in a like position would exercise under similar circumstances and in the best interest of the Company.

7.2     Board of Managers. The business and affairs of the Company shall be managed by the Board of Managers.

(a)     Number, Term, Election, and Qualifications. The Company shall have a panel of three (3) Managers, comprised initially of the following: Lex Reddy, Roger A. Krissman and Panch Jeyakumar, M.D. The number of Managers comprising the panel of Managers of the Company may be changed from time to time by the Supermajority Approval, provided that in no instance shall there be less than three (3) Managers. The Managers shall be elected and hold office until such time as a new slate of Managers are elected at a meeting of the Members held pursuant to a written request for such meeting by Members holding a majority of the Units then outstanding. At the meeting for the election of Managers "cumulative voting" shall apply. Cumulative voting shall permit each Member to cast a number of votes for Managers equal to such Member's number of Units multiplied by the number of Managers to be elected at such time. Each Member shall be entitled to cast one or more and up to all of such Member's votes for one candidate for Manager, or may allocate votes among the various candidates for Manager in whatever manner the Member so chooses. For example, if three Managers are to be elected, and if a Member has 10,000 Units, the Member shall be entitled to vote 30,000 votes (10,000, which is the number of votes respecting the election of a single Manager, times 3, which is the number of Managers to be elected), and may allocate his, her or its 30,000 votes to one Manager candidate or allocate such votes equally or unequally among all the Manager candidates, as the Member so chooses. A Manager need not be a Member, an individual, a resident of any particular State, or a citizen of the United States. The powers of the Board shall be exercised subject to the Member protections set forth in Section 7.4 hereof.

(b)     Meetings of the Board of Managers and the Members may be called and scheduled by the President of the Company, the Class B Member and/or by two (2) Managers. At least four (4) days prior written notice of the time, place and purpose of the Board of Manager meetings shall be provided to all Managers, and at least ten (10) days prior written notice of the time, place and purpose of the Member meetings shall be provided to all Members.

(c)     Special meetings of the Members also may be called at the written request of any two (2) Members delivered to the President. Upon receipt of such written request the President shall schedule a meeting of the Members within no later than thirty (30) days, and shall send advance written notice to the Members at least ten (10) days prior to the date of the meeting. The time, place and purpose or purposes for such special meeting shall be stated in the notice of such meeting.

(d)     Managers representing a majority of Units shall constitute a quorum at any meeting of the Board of Managers. Members representing a majority of Units shall constitute a quorum at any meeting of the Members.

(e)     Regarding Board meetings, Managers may provide a proxy to attend a Board meeting who shall have powers to vote as a Manager. For Class A Members, such proxy

20

                                                    ALECTO_00028668

to attend a meeting of the Members must be a Member. Members and Managers may also attend their respective Member and Board meetings by phone or video conference.

(f)     A Manager may resign from, retire from, abandon or otherwise terminate his, her or its status as a Manager upon ten (10) days prior written notice to the Board, unless the Board otherwise consents in writing.

7.3     Manner of Exercise of Board's Authority.   All responsibilities granted to the Board under this Agreement shall be exercised by the Board as a body, and no Manager, acting alone and without prior Approval of the Board, shall have the authority to act on behalf of the Board.  Unless otherwise expressly provided in this Agreement, all actions of the Board of Managers shall act by Approval of the Board.  None of the following actions shall be taken by the Company except upon Approval of the Board of Managers, subject to the requirements of Section 7.4 hereof:

(a)     Borrow money and otherwise obtain credit and other financial accommodations in the ordinary course of the business of the Company;

(b)     Enter into management agreements, leases, asset purchase agreements, financing agreements and loans in any amounts, and any other agreements wherein the financial obligations of the Company exceed on an annual basis the sum of One Hundred Thousand Dollars ($100,000.00);

(c)     Employ, engage, retain or deal with any Persons to act as agents, brokers, accountants or lawyers or outside professionals in such other capacity as may be necessary or desirable;

(d)     Appoint individuals to act as officers of the Company and delegate to such individuals such authority to act on behalf of the Company and such duties and functions as would normally be delegated to officers of a corporation holding similar offices;

(e)     Adjust, compromise, settle or refer to arbitration any claim in favor of or against the Company or any of its assets;

(f)     Make elections in connection with the preparation of any federal, state and local tax returns of the Company and to institute, prosecute, and defend any legal action or any arbitration proceeding;

(g)     Acquire and enter into any contract of insurance necessary or proper for the protection of the Company and/or any Member and/or any Manager, including without limitation to provide the indemnity described in Section 7.8 or any portion thereof;

(h)     Approve technical amendments to this Agreement or the Articles;

(i)     Approve the Transfer of Class A Units to another Class A Member or Eligible Employee;

(j)     Establish a record date for any distribution to be made under Article VI;

21

(k)    Enter into, renew, amend or terminate any arrangement or agreement with any Company executive or employee who is also a Manager or Member; and

(l)    Perform any other act which the Managers may deem necessary or desirable for the Company as well as the Business.

7.4    <u>Restrictions</u>.    Notwithstanding any other provision in this Agreement to the contrary, the Company shall not take any of the following actions without Supermajority Approval:

(a)    Authorize, create, designate, determine or issue any new class of Units or issue new Units, or securities convertible into Units or issue options or warrants to purchase Units or authorize the merger, consolidation or similar combination with any other entity, or authorize the sale of all or substantially all the assets of the Company or the dissolution or liquidation of the Company;

(b)    Except as contemplated by Article IV hereof, authorize, or set aside any sums for, the purchase, repurchase, redemption or other acquisition by the Company of any Member's Units of any class or make loans or distributions to Members;

(c)    Effect any Bankruptcy event with regard to the Company;

(d)    Require a Member to make an additional Capital Contribution or guarantee an obligation of the Company; provided, the aggregate debt to which such personal liabilities relate may not exceed One Million Five Hundred Thousand Dollars ($1,000,000);

(e)    Approve any decision to not enforce the Company's rights set forth in Article X; and

(f)    Except for technical amendments, amend this Agreement or the Articles.

7.5    <u>Binding the Company</u>.    Subject to the provisions of Sections 7.3 and 7.4 hereof, any action taken by a Manager, with Approval of the Board or, where so required, with Supermajority Approval, shall bind the Company and any other Managers and shall be deemed to be the action of the Company.

7.6    <u>Compensation of Managers and Members</u>.    No direct or indirect payment shall be made by the Company to any Manager, Member, or officer of the Company or to any Affiliate of any Manager, Member, or officer of the Company, for such Manager's, Member's, or officer's services as a Manager, Member, or officer, except by Approval of the Board.  Each Manager and officer shall be entitled to reimbursement from the Company for all reasonable expenses incurred by such Manager or officer in managing and conducting the business and affairs of the Company.

7.7    <u>Contracts with Affiliated Persons</u>.    Subject to Section 7.4 hereof, the Company may enter into one or more agreements, leases, contracts or other arrangements for the furnishing to or by the Company of goods, services or space with any Member, Manager or Affiliated Person, and may pay compensation thereunder for such goods, services or space, provided in

22

each case the amounts payable thereunder are reasonably comparable to those which would be payable to unaffiliated Persons under similar agreements, and if the determination of such amounts is made in good faith it shall be conclusive absent manifest error.

7.8    Indemnification.

(a)    Notwithstanding any provision of this Agreement, common law or the Act, no member of the Board, principal officer of the Company or the Tax Matters Member (the "Covered Persons") shall be liable to the Members or to the Company for any loss suffered which arises out of an act or omission of such person, if, in good faith, it was determined by such persons that such act or omission was in the best interests of the Company and such act or omission did not constitute gross negligence or fraud. The Covered Persons shall be indemnified by the Company against any and all claims, demands and losses whatsoever if: (i) the indemnitee conducted himself in good faith; (ii) the indemnitee was not grossly negligent and the loss was not caused by the indemnitee's willful misconduct; (iii) reasonably believed (x) in the case of conduct in his, her or its official capacity with the Company, that the conduct was in its best interests and (y) in all other cases, that the conduct was at least not opposed to its best interests; and (iv) in the case of any criminal proceeding, the Covered Person had no reasonable cause to believe the conduct was unlawful. The payment of any amounts for indemnification shall be made before any distribution are made by the Company. No Member shall have any obligation to provide funds for any indemnification obligation hereunder.

(b)    The right to indemnification and the payment of expenses incurred in defending a proceeding in advance of its final disposition conferred in this Article VII shall not be exclusive of any other right which any person may have or hereafter acquire under any statute, provision of the Articles, provision of this Agreement, vote of Members or otherwise.

(c)    The Company may maintain insurance, at its expense, to protect itself and any Member, the Board, Board committees, officer, employee or agent of the Company against any expense, liability or loss, whether or not the Company would have the power to indemnify such person against such expense, liability or loss under Delaware law.

(d)    Any amendment, repeal or modification of any provision of this Section 7.8 shall not adversely affect any right or protection of a Member, the Board, Board committee, officer, employee or agent of the Company existing at the time of such amendment, repeal or modification.

7.9    Other Activities.  Subject to any other restrictions set forth in this Agreement, the Members, Managers and any Affiliates of any of them may engage in and possess interests in other investment opportunities of every kind and description other than those that are similar to the Business of the Company, independently or with others as long as they do not violate Article X hereof.

7.10    Financial Statements.  The Board shall authorize and cause to be prepared reviewed, but not audited, financial statements on an annual basis within ninety (90) days after the end of each fiscal year of the Company.

23

ALECTO_00028671

## ARTICLE VIII
### Officers

8.1　　Number; Election; Resignation.  The Company shall have a President (who may also be referred to as the CEO), a Chief Financial Officer, a Secretary, and such other officers as the Board may in its discretion create.  All officers shall be elected by the Board, acting by Approval, at any duly convened meeting of the Board or by written consent in lieu of a meeting. In selecting officers, the Board shall consider the skill, qualifications, dedication, and loyalty of officer candidates, and with respect to such officers, the Board shall select only those individuals who, in the Board's sole opinion, shall best promote and advance the interests of the Company. Each officer shall hold office until his or her successor is chosen and qualified, unless terminated earlier and except as otherwise provided at the meetings respectively at which he or she is elected or appointed.  Any officer may resign by delivering written resignation to the Company at its office, or to the Board, and such resignation shall be effective upon receipt, unless it is specified to be effective at some other time or upon the happening of some other event.

8.2　　Same Person Holding Two or More Offices.  To the extent permitted by the Act, any two or more of the offices referred to in this Section may be filled by the same person.

8.3　　Officers Need Not Be Members or Managers.  Except as otherwise provided by the Act, any person shall be eligible for election to be an officer of the Company without the necessity of being a Member or Manager.

8.4　　Removal of Officers.  Any officer may be removed by the Board, acting by Approval, with or without cause.

8.5　　Vacancies.  In case a vacancy in any office shall occur due to any cause, the Board of Managers, acting by Approval, may elect a person to fill such vacancy who shall hold office until the date on which the office would ordinarily be filled, and until a successor is chosen and qualified.

8.6　　President.  The President shall be the chief executive officer of the Company and shall, subject to the provisions set forth hereinafter, have the authority to oversee such administrative activities and to take such administrative actions as shall be customary for a chief executive officer.  The President shall perform such additional duties as may be delegated to the President by the Board or as may be imposed by law.  It shall be the duty of the President, and the President shall have the power to see to it, that all orders and resolutions of the Board are carried into effect.  The President shall, from time to time, report to the Board all matters within his or her knowledge which the interests of the Company may require to be brought to its notice.

8.7　　Chief Financial Officer.  The Chief Financial Officer shall, subject to the supervision and control of the Board, have custody of the funds and of all the valuable papers of the Company.  The Chief Financial Officer shall keep the accounts of the Company in a clear manner, and shall, at all times, when requested by the Board, exhibit a true statement of the affairs of the Company.  The Chief Financial Officer shall, if required by the Board, give a bond for the faithful discharge of his or her duties, at the expense of the Company, with satisfactory sureties in such penal sum as the Board may determine, if so required by the Board.  Except as

24

 ALECTO_00028672

the Board may otherwise order, the Chief Financial Officer shall sign and/or endorse all promissory notes, bills, checks, drafts, trade acceptances, and bankers' acceptances, and may execute all deeds, mortgages, reports, contracts, agreements, and other legal documents of the Company, but the Board may authorize any other officer or officers, or agent or agents, to sign any obligations, instruments, or papers on behalf of the Company, and/or may limit the authority of the Chief Financial Officer in any of said matters. The Chief Financial Officer shall perform such other duties as may be delegated to him or her by the Board or as may be imposed by law.

When the Chief Financial Officer shall be absent or for any other reason unable to perform his or her duties, the Chief Financial Officer may appoint any other officer of the Company to act as Treasurer, and said Treasurer shall have all the duties herein delegated to the Chief Financial Officer during the term of his or her appointment.

8.8     Secretary. The Secretary shall keep the records of the Company, of its Members, and of the Board, and shall perform such duties and have such powers additional to the foregoing as the Board shall designate.

## ARTICLE IX
## Fiscal Matters

9.1     Books and Records. The Chief Financial Officer shall oversee the day to day bookkeeping for the Company and all of its operations and  facilities and shall keep complete and accurate records of the same. The Company shall keep reviewed, but not audited financial statements that are prepared on an annual basis. Upon Approval of the Board, the Company may engage the services of a certified public accounting firm ("Accounting Firm") to audit the Company's books and records using the same methods of accounting which are used in preparing the federal income tax returns of the Company to the extent applicable and otherwise in accordance with generally accepted accounting principles consistently applied.    The Company's books and records shall be maintained and updated monthly, and shall be available, in addition to any documents and information required to be furnished to the Members under the Act, at an office of the Company or the Accounting Firm (as applicable) for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such books, records, documents and information shall be sent by the Company to any Member, or the Member's duly authorized representative, upon reasonable request therefore and at the expense of such Member. The Company shall keep at its principal office all items required pursuant to the Act. Within ninety (90) days after the end of each fiscal year of the Company, each Member shall be furnished with financial statements which shall contain a balance sheet as of the end of the fiscal year and statements of income and cash flows for such fiscal year. Any Member may, at any time, at the Member's own expense, cause an audit or review of the Company books to be made by a certified public accountant of the Member's own selection.

9.2     Bank Accounts. Bank accounts and/or other accounts of the Company shall be maintained in such banking and/or other financial institution(s) as shall be selected by Approval of the Board, and withdrawals shall be made and other activity conducted on such signature or signatures as determined by Approval of the Board. Any and all records with respect to such bank accounts and/or other accounts, including, but not limited to, copies of any checks written

25

on such account or records or other withdrawal activity, shall be available at an office of the Company or the Accounting Firm for examination and copying by any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member. Alternately, copies of such records shall be sent by the Company to any Member, or the Member's duly authorized representative, upon reasonable request therefor and at the expense of such Member.

9.3    Fiscal Year. The fiscal year of the Company shall end on December 31 of each year, unless otherwise Approved by the Board.

## ARTICLE X
### Transfer of Interests and Admission of Transferees

10.1    Restriction on Transfers.

(a)    Except as indicated below, no Class A Member may sell, Transfer, pledge, hypothecate, gift or otherwise dispose of or encumber all or any portion of his, her or its Units without Approval of the Board. Any Transfer in violation hereof shall be treated as an Adverse Terminating Event. The Units of a Member and any interest of such Member's spouse in such Units, shall remain subject to this Agreement regardless of the termination, for any reason, of the marital relationship of any Member and the Member's spouse. During the marriage of the Member and such Member's spouse, such Member's obligations to sell or offer to sell Units pursuant to this Agreement shall include any interest of such Member's spouse in the Units. Any Units transferred in contravention of this Section shall be void of all voting, inspection and other rights with respect to the pledgee/transferee and any such transfer shall be null and void ab initio and shall be subject to purchase by the Company as an Adverse Terminating Event. Each spouse of a Member shall sign a Consent of Spouse form, substantially in the form of Exhibit B, agreeing to be bound by the terms hereof including, without limitation, the term providing that ownership by a spouse is not permitted. Any transferee must sign a counterpart to this Agreement agreeing to be bound by all terms hereof prior to such Transfer being deemed effective.

(b)    Notwithstanding anything else to the contrary in this Agreement, a Class B Member may Transfer his, her or its Units to an Affiliate or to such other Person as is approved by the affirmative vote of the holders of a majority of the outstanding Class B Units, so long as the transferor and the transferee agree to remain bound by all of the terms hereof.

(c)    No Member may pledge his, her or its Units to a bank, financial institution, creditor or other lender.

(d)    Notwithstanding the foregoing, a Member may transfer his or her interest to an Entity Investor in accordance with Section 2.5 hereof.

10.2    Irreparable Harm. Each Member specifically acknowledges that a breach of Section 10.1 would cause the Company and the Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of the provisions of Section 10.1, the Company or other Members shall be entitled to injunctive relief to prevent or end such breach, without the

26

ALECTO_00028674

requirement to post bond or prove damages. Nothing herein shall be construed to prevent the Company or other Members from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages, reasonable attorneys' fees and expenses.

10.3    Assignee of a Member's Units. If, notwithstanding the prohibitions in Section 10.1, a Member Transfers all or any portion of his, her or its Units and a Person acquires such Units, (but is not admitted as a substituted Member pursuant to the terms of this Agreement) such Person shall:

(a)    be treated as an assignee of a Member's Units, as provided in the Act, and not as a Member of the Company;

(b)    have no right to participate in the business and affairs of the Company or to exercise any rights of a Member under this Agreement or the Act;

(c)    share in distributions from the Company with respect to the transferred Units on the same basis as the transferring Member previously had; and

(d)    be required to transfer the Units to the Company in accordance with the redemption provisions hereof relating to Adverse Terminating Events.

10.4    Obligations of Permitted Transferees. In the case of any approved Transfer or disposition of Units, the transferee shall execute and deliver an appropriate instrument agreeing to be bound by this Agreement as a Member and such additional agreements or instruments as the Board may require. Any permitted transferee of Units shall receive and hold such Units subject to this Agreement and all of the restrictions, obligations and rights created hereunder, and the Members and each transferee shall be bound by their obligations under this Agreement with respect to each subsequent transferee.

10.5    Preemptive Rights. No Member shall have any preemptive rights to purchase or otherwise acquire New Units proposed to be issued by the Company, it being expressly understood that additional Units are contemplated to be issued to Eligible Employees hired by the Company after the date of this Agreement, the terms and conditions of such subsequent issuances being subject to Approval of the Board. For purposes of applying this Section, "New Units" shall mean any Units (irrespective of class) which the Company proposes to issue on or after the date hereof, any rights or options which the Company proposes to grant for the purchase of any Units (irrespective of class), any bonds, securities or obligations of the Company which are convertible into or exchangeable for, or which carry any rights, to acquire Units (irrespective of class), whether now or hereafter authorized or created, whether issued or unissued, and whether the proposed issue, transfer or grant is for cash, property, services or any other lawful consideration, and including any issuance otherwise provided for in this Agreement.

10.6    Noncompetition. During the term of a Member's membership in the Company, and for a period of five (5) years thereafter, other than through the Company, no Member, nor any of their Affiliates, except as provided below, shall, without the prior written Approval of the Board and the Class B Members, directly or indirectly own, manage, operate, control or participate in any manner in the ownership, management, operation or control of, or serve as a

27

ALECTO_00028675

partner, employee, principal, agent, consultant or otherwise contract with, or have any financial interest in, or aid or assist any other person or entity that operates a business that is similar to or competitive with the Business of the Company, whether or not the Company is then doing business in the same State. The preceding sentence shall not be construed to prevent a Member or any of their Affiliates from owning stock of one percent (1%) or less of any publicly traded company that engages in any of the restricted activities set forth herein so long as the Member does not actively participate in any aspect of the operations and business of such publicly traded company.

Each party understands and acknowledges that the provisions of this Section 10.6 are designed to preserve the goodwill of the parties and that the Multiple used in the Formula Amount set forth in Section 4.3 takes into consideration some allocation of such goodwill. Accordingly, each party hereby acknowledges and agrees that any breach or threatened breach of the provisions of this Section 10.6 hereof binding on a party will result in irreparable harm and injury to the other party and that monetary damages will not provide an adequate remedy to a party. Accordingly, each Member hereby agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the non-breaching party shall be entitled to: (a) a temporary restraining order, preliminary injunction and permanent injunction to enjoin such breach or threatened breach without the requirement of the posting of a bond; (b) an accounting for any and all monies, earnings, profits and other benefits that the breaching party has derived or received, directly or indirectly, as a result of such breach or threatened breach; (c) recover from the breaching party the reasonable attorneys' fees and costs incurred by the non-breaching party in enforcing the provisions of this Section 10.6; and (d) all deferred payments due to the Member shall be suspended until final resolution of the dispute. The breaching party further agrees that in the event of a breach or threatened breach of the provisions of this Section 10.6, the restrictions set forth in this Section 10.6 shall be extended during the period of any breach or threatened breach by the breaching party. The rights and remedies set forth herein are cumulative and shall be in addition to any other rights or remedies to which a party may be entitled.

Each party hereby acknowledges that the restrictions set forth in this Section 10.6 are minimal, reasonable in scope and duration and are necessary to protect the legitimate interests of the parties and that any breach or threatened breach of these restrictions will result in irreparable harm to the non-breaching party. In the event that any of the restrictions are found by a court of competent jurisdiction to be too broad to permit enforcement to its full extent, then such restrictions shall be enforced to the maximum extent allowable by law and the parties hereby consent to and authorize the court to modify the restrictions in a manner to permit their enforcement. Notwithstanding any other provision of this Agreement, the Class B Members shall have the right to enforce, on behalf of the Company and at the Company's expense, the provisions of this Section 10.6 against any Member without relying on the Approval of the Board therefore.

10.7    Confidential Information.  Each Member acknowledges that the Confidential Information is valuable property of the Company and undertakes that for so long as he, she or it is a Member, and thereafter until such information otherwise becomes publicly available other than through breach of this Section 10.7, he, she or it shall:

(a)    treat the Confidential Information as secret and confidential;

28

ALECTO_00028676

(b)      not disclose (directly or indirectly, in whole or in part) the Confidential Information to any third Party except with the prior written consent of Company;

(c)      not use (or in any way appropriate) the Confidential Information for any purpose other than the performance of the business of the Company and otherwise in accordance with the provisions of this Agreement;

(d)      recognize and acknowledge that the Company's trade secrets and other confidential or proprietary information, as they may exist from time to time, are valuable, special and unique assets of the Company's business. Accordingly, during the term of the Company, each Member shall hold in strict confidence and shall not, directly or indirectly, disclose or reveal to any person, or use for its own personal benefit or for the benefit of anyone else, any trade secrets, confidential dealings or other confidential or proprietary information of any kind, nature or description (whether or not acquired, learned, obtained or developed by a Member alone or in conjunction with others) belonging to or concerning the Company, or any of its customers or clients or others with whom they now or hereafter have a business relationship, except: (i) with the prior written consent of all the other Members; (ii) in the course of the proper performance of the Member's duties hereunder; or (iii) as required by applicable law or legal process. Each Member confirms that all such information constitutes the exclusive property of the Company.

(e)      Given the secretive and competitive environment in which the Company does business and the fiduciary relationship that the Members have with the Company, each Member agrees to promptly deliver to the Company, at any time when the Company so requests, all memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) in any way relating to the business or affairs of the Company or any of its customers and clients, whether made or compiled by such Member or furnished to it by the Company or any of its employees, customers, clients, consultants or agents, which such Member may then possess or have under its control. Each Member confirms that all such memoranda, notes, records, drawings, manuals and other documents (and all copies thereof and therefrom) constitute the exclusive property of the Company. Notwithstanding the foregoing paragraph or any other provision of this Agreement, each Member shall be entitled to retain any written materials received by such Member in its capacity as a Member, and limit the dissemination of and access to the Confidential Information to such of the Company's and the Member's officers, directors, managers, employees, agents, attorneys, consultants, professional advisors or representatives as may reasonably require such information for the performance of Company business and ensure that any and all such persons observe all the obligations of confidentiality contained in this Section.

(f)      "Confidential Information" means any and all policies, procedures, quality assurance techniques, plans, projections, pro formas, financial, statistical and other information of the Company, including (but not limited to) information embodied on magnetic tape, computer software or any other medium for the storage of information, together with all notes, analyses, compilations, studies or other documents prepared by the Company or others on behalf of the Company containing or reflecting such information. Confidential Information does not include information which:

29

          (i)     was lawfully made available to or known by third person on a non-confidential basis prior to disclosure by a Member;

          (ii)    is or becomes publicly known through no wrongful act of a Member; or

          (iii)   is received by a Member from a third party other than in breach of confidence.

    10.8   <u>Additional Covenants</u>.

          (a)    If a court of competent jurisdiction should declare this Article X, or any provision hereof, unenforceable because of any unreasonable restriction of duration, activity and/or geographical area, then the Parties hereby acknowledge and agree that such court shall have the express authority to reform this Agreement to provide for reasonable restrictions and/or grant the Company such other relief at law or in equity, reasonably necessary to protect the interests of the Company.

          (b)    Each Member specifically acknowledges that a breach of this Article X would cause the Company and other Members to suffer immediate and irreparable harm, which could not be remedied by the payment of money. In the event of a breach or threatened breach by a Member of any of the provisions of this Article X, the Company and other Members shall be entitled to injunctive relief to prevent or end such breach, without the requirement to post bond, and shall be entitled to recover reasonable attorneys' fees and expenses. Nothing herein shall be construed as prohibiting the Company from pursuing any other remedies available to it for such breach or such threatened breach, including the recovery of damages.

          (c)    Each Member warrants and represents that he, she or it:

          (i)     Is familiar with the confidentiality and non competition agreements contained herein.

          (ii)    Is acquiring such Units solely for investment and not resale, is an accredited investor, has experience and sophistication in financial matters sufficient to evaluate the merits and risks of the investment, and can afford to lose his, her or its entire investment and has not learned of this investment through any general solicitation or advertising. The Company has relied upon the fact that the Units in the Company are to be held by the Members solely for investment and on each of the representations made hereby.

          (iii)   Has concluded that his, her or its obligations and the Company's rights and remedies described herein, including, without limitation, the right to equitable relief contained herein, are reasonable.

          (iv)   Is fully aware of the duties, responsibilities, obligations and liabilities imposed upon him, her or it by this Article.

          (v)    Acknowledges that the covenants contained herein are fair, reasonable and just, under the circumstances, and are not a penalty.

CONFIDENTIAL        ALECTO_00028678

(vi)    Acknowledges that no registration statement is now on file with the Securities and Exchange Commission with respect to any Units in the Company, and the Company has no obligation or current intention to register such Units under the Federal Securities Act 1933 ("33 Act").

(vii)    Acknowledges that the Units have not been registered under the 33 Act because the Company is issuing such Units in the belief that such Units are being issued in reliance upon the exceptions from registration requirements of the 33 Act providing for issuance of securities not involving a public offering, together with any corresponding exemptions of the Delaware Securities Act.

(viii)    Acknowledges that the exemptions from registration under the 33 Act would be unavailable if the Units in the Company were acquired by a Member with a view to distribution.

(ix)    Acknowledges that this Agreement does not conflict with or violate any other agreement to which the Member is party.

(x)    Agrees to be substantially involved in the operation of the Company and does not expect a return on his, her or its investment due to the efforts of others.

(xi)    Is aware that there are numerous risk factors associated with the holding of the Units, all of which each Member is aware exists and has expressly agreed to assume.

**ARTICLE XI**
**Dissolution and Termination**

11.1    <u>Events Causing Dissolution</u>.  The Company shall be dissolved and its affairs wound up upon the first to occur of the following events:

(a)    The sale or other disposition of all or substantially all of the assets of the Company, unless the disposition is a transfer of assets of the Company in return for consideration other than cash and, by Approval of the Board, a determination is made not to distribute any such non-cash items to the Members;

(b)    The election for any reason to dissolve the Company made by Supermajority Approval;

(c)    When there are no remaining Members, unless the holders of all of the financial rights in the Company agree in writing, within ninety (90) days after the cessation of membership of the last Member, to continue the legal existence and business of the Company and to appoint one or more new Members;

(d)    Any consolidation or merger of the Company with or into any entity unless the Company is the resulting or surviving entity; or

(e)    Entry of a decree of judicial dissolution.

31

11.2 <u>Procedures on Dissolution</u>. Dissolution of the Company shall be effective on the day on which the event occurs giving rise to the dissolution, but the Company shall not terminate until the Articles shall be canceled in the manner set forth in the Act. Notwithstanding the dissolution of the Company, prior to the termination of the Company, as aforesaid, the business and the affairs of the Company shall be conducted so as to maintain the continuous operation of the Company pursuant to the terms of this Agreement. Upon dissolution of the Company and subject to the Supermajority Approval required by Section 7.4 hereof, the Board, acting by Approval, or, if none, a liquidator elected by Supermajority Approval, shall liquidate the assets of the Company, apply and distribute the proceeds thereof under Article VI, and cause the termination of this Agreement.

**ARTICLE XII**
**General Provisions**

12.1 <u>Notices</u>. Any and all notices under this Agreement shall be effective (a) on the fifth (5th) business day after being sent by registered or certified mail, return receipt requested, postage prepaid, or (b) on the first business day after being sent by express mail, telecopy, or commercial expedited delivery service providing a receipt for delivery. All such notices in order to be effective shall be addressed, if to the Company at its principal office, if to a Member at the last address of record on the Company books, and copies of such notices shall also be sent to the last address for the recipient which is known to the sender, if different from the address so specified. A Member may change its address for purposes of this Agreement by giving the Board notice of such change in the manner heretofore provided for the giving of notices.

12.2 <u>Word Meanings</u>. The words "herein," "hereinafter," "hereinbefore," "hereof" and "hereunder" as used in this Agreement refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. All section references, except as otherwise provided herein, are to sections of this Agreement.

12.3 <u>Binding Provisions</u>. Subject to the restrictions on transfers set forth herein, the covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, Legal Representatives, successors and assigns.

12.4 <u>Applicable Law</u>. This Agreement shall be construed and enforced in accordance with the laws of the State of Delaware, including the Act, as interpreted by the courts of the State of Delaware, notwithstanding any rules regarding choice of law to the contrary.

12.5 <u>Counterparts</u>. This Agreement may be executed in several counterparts and as so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all of the parties have not signed the original or the same counterpart.

12.6 <u>Separability of Provisions</u>. Each provision of this Agreement shall be considered separable. If for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, and if for any reason any provision or

32

 ALECTO_00028680

provisions herein would cause the Members to be liable for or bound by the obligations of the Company, such provision or provisions shall be deemed void and of no effect.

12.7    Section Titles.    Section titles are for descriptive purposes only and shall not control or alter the meaning of this Agreement as set forth in the text.

12.8    Amendments.    This Agreement may be amended or modified only in accordance with Sections 7.3 and 7.4 hereof.

12.9    Entire Agreement.    This Agreement embodies the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings relating to such subject matter.

12.10    Waiver of Partition.    Each Member agrees that irreparable damage would be done to the Company if any Member brought an action in court to dissolve the Company. Accordingly, each Member agrees that he or she shall not, either directly or indirectly, take any action to require partition or appraisement of the Company or of any of the assets or properties of the Company, and notwithstanding any provisions of this Agreement to the contrary, each Member (and his or her successors and assigns) accepts the provisions of this Agreement as his or her sole entitlement on termination, dissolution and/or liquidation of the Company and hereby irrevocably waives any and all rights to maintain any action for partition or to compel any sale or other liquidation with respect to his or her interest, in or with respect to, any assets or properties of the Company. Each Member further agrees that he or she or it will not petition a court for the dissolution, termination or liquidation of the Company.

12.11    Survival of Certain Provisions.    The Members acknowledge and agree that this Agreement contains certain terms and conditions which are intended to survive the dissolution and termination of the Company, including, but without limitation, the provisions of Sections 10.6 and 10.7. The Members agree that such provisions of this Agreement which by their terms require, given their context, that they survive the dissolution and termination of the Company so as to effectuate the intended purposes and agreements of the Members hereunder shall survive notwithstanding that such provisions had not been specifically identified as surviving and notwithstanding the dissolution and termination of the Company or the execution of any document terminating this Agreement, unless such document specifically provides for nonsurvival by reference to this Section 12.11 and to the specific provisions hereof which are intended not to survive.

12.12    No Impairment.    Except as expressly contemplated by this Agreement, the Company shall not amend, modify or repeal any provision of the Articles or this Agreement in any manner which would alter or change the rights, preferences, privileges or powers of, or the restrictions provided for the benefit of, the Members, without the express prior written consent of the holders of a majority of the Units of the class so impacted in each and every such instance; nor shall the Company, through any reorganization, transfer of assets, merger, dissolution, issue, sale or distribution of Units or any other voluntary action, avoid or seek to avoid the observance or performance of any terms of this Agreement for the benefit of the Members, without the express prior written consent of the majority of the holders of the majority of the Class so impacted in each and every such instance, as limited by Section 7.4.    The Company shall in

33

                                                                                                    ALECTO_00028681

good faith take any and all actions which are necessary or appropriate in order to protect the rights of the Members.

12.13 <u>Specific Performance or Injunctive Relief</u>.  The Members and the Company hereby declare that it is impossible to measure in money the damages which may accrue to one or more of them by reason of the failure of a Party to perform any of its obligations hereunder. Therefore, if any Party hereto shall institute any action or proceeding to enforce the provisions of this Agreement, any person (including the Company) against whom such action or proceeding is brought hereby waives the claim or defense therein that such Party has or may have an adequate remedy at law and agrees not to urge in any such action or proceeding that such a remedy exists. Furthermore, any Party seeking to enforce the provisions of this Agreement shall have the right to specific performance, injunctive or other equitable relief without the requirement to post bond.

12.14 <u>Dispute Resolution; Limited Renegotiation; Arbitration</u>. Except for disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief and the Arbitrator (as defined below) does not have authority to grant preliminary, temporary and/or permanent injunctive relief, all disputes shall be resolved under the following provisions of this Agreement.

This Agreement shall be construed to be in accordance with any and all federal and state statutes, rules, regulations, principles and interpretations applicable to the Company and the Members, and the relationships among them.  It is the intent of this Section to set forth a procedure so that if certain legal developments occur, a dispute arises, or certain circumstances arise in which the Board of Managers should become internally deadlocked (provided, however, that a deadlock shall not be deemed to occur due to the withholding of Supermajority Approval), a procedure will be in place that will bring the terms of this Agreement back into legal compliance and/or resolve a Board deadlock while preserving, to the extent possible, the economic and governance relationships set forth here.

In the event there is any dispute among the parties or there is any legal development, including without limitation, a change in (or the interpretation of) federal or state statutes, rules, regulations, principles or interpretations, that renders any of the material terms of this Agreement unlawful or unenforceable (including any services rendered or compensation to be paid hereunder), or a definitive judicial or State of Delaware interpretation of Delaware law that substantially affects the business, governance, or economics of the Company in an adverse manner (collectively a "Negative Legal Development"), or any circumstance in which the Board itself is deadlocked in its decision making hereunder and cannot take action (a "Deadlock Event"), any Member affected by such Negative Legal Development or such Deadlock Event shall have the immediate right upon notice to the other Members (the "Notice") to initiate the renegotiation of the affected term or terms of this Agreement, so as to remedy the impacts of the Negative Legal Development or to seek resolution of the Deadlock Event, each in a manner that substantially maintains the then existing economic and governance relationships of the Members, if it is legal to accomplish the change while maintaining substantially such economic and governance relationship.

If the Parties are not able to renegotiate the affected terms of the Agreement or resolve the Deadlock Event or dispute on a mutually satisfactory basis within forty-five (45) days after

34

the Notice, the Parties must submit the issues (the "Dispute") to mediation and arbitration pursuant to the procedure set forth below. The arbitrator selected in accordance with the provisions set forth below (the "Arbitrator") will be asked to determine whether there is a bona fide Negative Legal Development or Deadlock Event, and if so, the Arbitrator will decide the matter as set forth in Section 12.14 C. of this Agreement.

     A.    <u>Right to Mediate or Arbitrate</u>.  Any dispute between the Parties relating to this Agreement must first be submitted to non-binding mediation in accordance with procedures agreed upon by the Parties.  If the dispute is not resolved through mediation within forty-five (45) days of the initial request for mediation or within a time frame mutually agreed upon by the Parties, the dispute must then be submitted for binding arbitration in accordance with procedures set forth by the American Health Lawyers Association.

     B.    <u>Pre-Arbitration Procedure</u>.

     1.    Any dispute shall be submitted to arbitration by notifying the other Party or Parties, as the case may be, hereto in writing of the submission of such dispute to arbitration (the "Arbitration Notice"). The Party delivering the Arbitration Notice shall specify therein, to the fullest extent then possible, its version of the facts surrounding the dispute and the amount of any damages and/or the nature of any injunctive or other relief such Party claims.

     2.    The Party (or Parties, as the case may be) receiving such Arbitration Notice shall respond within sixty (60) days after receipt thereof in writing (the "Arbitration Response"), stating its version of the facts to the fullest extent then possible and, if applicable, its position as to damages or other relief sought by the Party initiating arbitration.

     3.    The Parties shall then endeavor, in good faith, to resolve the dispute outlined in the Arbitration Notice and Arbitration Response. In the event the Parties are unable to resolve such dispute within sixty (60) days after receipt of the Arbitration Response, the Parties shall initiate the arbitration procedure outlined below.

     C.    <u>Arbitration Procedure</u>.

     1.    If the Parties hereto are unable to resolve the dispute within sixty (60) days after receipt of the Arbitration Response as set forth above, then the Parties must submit the dispute to binding arbitration in accordance with the American Health Lawyers arbitration program.  If the Parties are unable to agree on an arbitrator within sixty (60) days after receipt of the Arbitration Response, each of the Parties shall, within sixty (60) days after receipt of the Arbitration Response, choose an arbitrator selector ("Selector").  The Selectors shall then have forty (40) days to select an arbitrator who shall serve as the final arbitrator for the dispute. (The arbitrator chosen by the Parties hereto or by the Selectors, as the case may be, shall hereinafter be as the "Arbitrator").  The Arbitrator shall not be an Affiliate of any of the Parties hereto.

     2.    The arbitration shall be held in Los Angeles County, California.  The Parties shall submit to the Arbitrator the Arbitration Notice and the Arbitration Response and any other facts regarding the dispute of which any Party desires.

CONFIDENTIAL    ALECTO_00028683

3.    The Arbitrator shall apply the arbitration rules set forth below in making his or her decision. After the Arbitrator has heard the case of each Party in accordance with Section 12.14 D., the Arbitrator shall request that each Party submit an Order to resolve all matters in dispute.  The Arbitrator shall then execute one of the Orders submitted by the Parties. The Arbitrator shall not be allowed to modify or amend any Orders submitted by the Parties. The decision of the Arbitrator shall be rendered within sixty (60) days of the close of the hearing record.

D.    Arbitration Rules.

1.    The Arbitrator shall allow reasonable discovery, which he determines is necessary for determination of the issues presented.

2.    The Arbitrator shall be guided by, and shall substantially comply with, the then applicable Federal Rules of Evidence.

3.    Should any Party refuse or neglect to appear or participate in the arbitration proceedings, including the procedures relating to the selection of an Arbitrator, the participating Party may select the Arbitrator and the Arbitrator is empowered to decide the controversy in accordance with whatever evidence is presented.

E.    Arbitrator's Award.  The award of the Arbitrator shall be binding on the Parties and may be entered as a final judgment in a court of competent jurisdiction.

F.    Other Disputes.  All disputes relating to breaches of Sections 10.6 through 10.9 in which the Company is seeking injunctive relief shall be resolved by a court of law with the site of venue in Los Angeles County, California if the Arbitrator does not have authority to grant preliminary, temporary and/or permanent injunctive relief.

12.15  Waiver of Trial by Jury.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES TRIAL BY JURY IN CONNECTION WITH ANY ACTION OR PROCEEDING INSTITUTED UNDER OR RELATING TO THIS AGREEMENT, OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO, OR IN CONNECTION WITH ANY COUNTERCLAIM RESULTING FROM ANY SUCH ACTION OR PROCEEDING.

CONFIDENTIAL                                                                                    ALECTO_00028684

IN WITNESS WHEREOF, the the undersigned have executed this Agreement as of the day and year first above written.

<u>CLASS A MEMBERS</u>:

_____
Lex Reddy

_____
Panch Jeyakumar, M.D.

_____
Roger A. Krissman

<u>CLASS B MEMBER</u>:

_____
Lex Reddy

<u>THE COMPANY</u>:

**ALECTO HEALTHCARE SERVICES LLC**

By: _____
Lex Reddy, CEO

37

**ALECTO_00028685**

## EXHIBIT A

### MEMBERS, CAPTIAL CONTRIBUTIONS AND UNITS

| NAMES AND ADDRESSES MEMBERS | TOTAL CASH CAPITAL CONTRIBUTIONS | TOTAL UNITS |
|---|---|---|
| **CLASS A MEMBERS:** | | |
| Lex Reddy | $150.00 | 21,000 |
| Panch Jeyakumar, M.D. | $100.00 | 14,000 |
| Roger A. Krissman | $100.00 | 14,000 |
| **CLASS A TOTALS** | $350.00 | 49,000 |
| **CLASS B MEMBER:** | | |
| Lex Reddy | $10,000.00 | 51,000 |
| **CLASS B TOTALS** | $10,000.00 | 51,000 |
| **TOTALS** | $10,350.00 | 100,000 |

**CONFIDENTIAL**

**ALECTO_00028686**

## EXHIBIT B

### CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Alecto Healthcare Services LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _____, 2012.

Name of Member: _____

Name of Spouse: _____

Signature of Spouse: _____

ALECTO_00028687

## EXHIBIT B

### CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Alecto Healthcare Services LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _April 29_, 2013.

Name of Member: _Roger Krissman_

Name of Spouse: _Brenda Krissman_

Signature of Spouse: _Brenda Krissman_

ALECTO_00028688

## EXHIBIT B

### CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Agreement and that I understand its contents.  I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Alecto Healthcare Services LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: April 29th, 2013.

Name of Member: Panch Jeyakumar

Name of Spouse: Haridevi Jeyakumar

Signature of Spouse: H. Jak

ALECTO_00028689

## EXHIBIT B

## CONSENT OF SPOUSE

I acknowledge that I have read the foregoing Agreement and that I understand its contents. I am aware that such Agreement contains provisions whereby my spouse agrees to sell all his/her interest, of any form, in Alecto Healthcare Services LLC (the "Company"), including, if any, our community interest in it, upon the occurrence of certain events, and that such Agreement also impose restrictions on the transfer of such ownership interest. I hereby consent to any sale of my spouse's interest in the Company pursuant to the Agreement, approve of the provisions of the Agreement, and agree that our community property interest, if any, is subject to the provisions of the Agreement and that I will take no action at any time to hinder operation of the Agreement in relation to that interest. Further, in the event of dissolution of my marriage or other event which necessitates the division of marital community property, I will assert no right, claim or other entitlement to the interest of my spouse in the Company so that full ownership of the interest therein shall thereafter remain with my spouse as his/her separate property notwithstanding that it may be subject to valuation for the purpose of achieving a fair and equitable division of our community property.

I AM AWARE THAT THE LEGAL, FINANCIAL AND OTHER MATTERS CONTAINED IN THE AGREEMENTS ARE COMPLEX AND I AM FREE TO SEEK ADVICE WITH RESPECT THERETO FROM INDEPENDENT COUNSEL. I HAVE EITHER SOUGHT SUCH ADVICE OR DETERMINED AFTER CAREFULLY REVIEWING THE AGREEMENT THAT I WILL WAIVE SUCH RIGHT.

Dated: _April 28_, 2013.

Name of Member: _L Ex REDDY_

Name of Spouse: _ANURADHA REDDY_

Signature of Spouse: _Anuradha Reddy._

**ALECTO_00028690**