

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

J. KATE STICKLES
JUDGE

824 N. MARKET STREET
WILMINGTON, DELAWARE
(302) 252-3820

March 20, 2024

RE:    *In re Alecto Healthcare Services, LLC*, Case No. 23-10787
       **Confirmation Ruling**

Dear Counsel:

This is the Court's ruling following the March 4, 5, and 13, 2024 hearing[1] (the "Confirmation Hearing") on confirmation of the *Small Business Debtor's Plan of Reorganization* (the "Plan").[2] The Court is writing for the benefit of the parties and assumes familiarity with the facts as well as the bankruptcy case.

The Debtor commenced this bankruptcy case under subchapter V of Title 11 on June 16, 2023 (the "Petition Date").[3]  On September 14, 2023, the Debtor filed its Plan,[3] which was subsequently modified.[4]  The Plan provides that Classes 1 (Priority Non-Tax Claims), 2 (Secured Claims), and 4 (Equity Interests) are unimpaired, and Class 3 (General Unsecured Claims) is impaired.  The Debtor forwent solicitation of votes on the Plan and seeks confirmation pursuant to 11 U.S.C. § 1191(b).

**A.   Record and Evidence Presented**

In preparation for the Confirmation Hearing, the Court reviewed and considered, among other things, the Plan, including the exhibits, the reservation of rights filed by the Subchapter V Trustee and the United States Trustee (the "U.S. Trustee"),[5] the objection and amended objection filed by the United States of America,[6] and the objection and supplemental objection filed by the

---

[1] The Transcripts of the March 4, 5, and 13, 2024 proceedings are docketed at D.I. 330, 331, and 342, respectively. The Transcripts are cited herein as "Date Tr. page:line (witness)."

[2] D.I. 261 (the "Plan").

[3] D.I. 154.

[4] D.I. 261.

[5] D.I. 295 and 298.

[6] D.I. 279 and 297.

Reed Action Judgment Creditors (the "Reed Creditors").[7]  The Court also reviewed the declarations of Michael Sarrao and Steven Balasiano in support of the confirmation of the Plan,[8] as well as the Debtor's memorandum in support of confirmation.[9]

At the Confirmation Hearing, the Court listened to the witnesses, who were subject to cross-examination, and reviewed the documents admitted into evidence.[10]  Witnesses in support of confirmation of the Plan included: (i) Jeff McCutcheon, Debtor's executive compensation expert; (ii) Leanne Gould, Gould Consulting Services ("GCS"), Debtor's forensic investigation consultant; (iii) Steven Balasiano, Debtor's independent director/manager,[11] and (iv) Michael Sarrao, Debtor's Vice President, General Counsel, and Secretary.

Following the close of evidence, on March 13, 2024, the Court heard arguments presented by counsel for the Debtor, the Reed Creditors, the U.S. Trustee, and the United States of America, as well as the recommendation of the Subchapter V Trustee.[12]

## B.  **The Confirmation Standards**

The Plan is non-consensual and does not satisfy sections 1129(a)(8) and (10) of the Bankruptcy Code.  Section 1191(b) of the Bankruptcy Code, however, allows a plan to be confirmed on a non-consensual basis, provided that, the requirements of section 1129(a), other than subsections (8), (10), and (15), are satisfied, and the plan does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.

Under section 1191(c), the fair and equitable requirement imposes a projected disposable income requirement, a feasibility finding, and appropriate remedies if payments are not made.  Here, as discussed below, the Plan satisfies those requirements.

---

[7] D.I. 299 and 315.

[8] D.I. 307 and 308, respectively.  The Balasiano Declaration was not admitted into evidence.  *See* D.I. 329.

[9] D.I. 310.

[10] D.I. 329.

[11] 03/04/2024 Tr. 70:10-73:4 (Balasiano); 03/04/2024 Tr. 73:15-16 (Balasiano) ("I was initially retained to perform an analysis of a settlement between Sherman/Grayson and Alecto."); 03/04/2024 Tr. 74:16-22 (Balasiano) ("Later in August, it might be a week or two weeks later . . . my charge expanded to review the Alecto bankruptcy and in particular look at potential fraudulent conveyance actions and director and officer or any type of breach of fiduciary duties that the directors or officers may have acted with during the course prior to the bankruptcy."); 03/04/2024 Tr. 74:25-75:4 (Balasiano) ("I have been charged with the duty of investigation or have the investigation performed as well as to the extent there are findings of malfeasance in any way, shape or form that I would commence that litigation.").

[12] The Subchapter V Trustee supports confirmation under section 1191(b), however, does not take a position with respect to the proposed Debtor Releases or the best interests of creditors.  The Court views the Subchapter V Trustee's recommendation as neutral.

The Debtor bears the burden of establishing the Plan's compliance with 11 U.S.C. §§ 1129(a) and 1191 by a preponderance of the evidence, whereas the objectors to the Plan bear the burden of producing evidence to support their objections.[13]

### 1. Projected Disposable Income

The projected disposable income requirement in section 1191(c)(2) requires that the Plan provide that all of the projected disposable income of the debtor to be received in the three-year period after the first payment under the plan is due, or such longer period not to exceed 5 years as the Court may fix, will be applied to make payments under the plan. Alternatively, the plan may provide that the value of property to be distributed under the plan within the plan period is not less than the projected disposable income of the debtor.

The Plan, including the revised Income Statement[14] at Exhibit C (the "Income Statement"), satisfies the projected disposable income requirement. The Plan provides that all of the Debtor's disposable income in the three-year period following the Effective Date of the Plan will be applied to make payments under the Plan in accordance with section 1191(c)(2).[15] Mr. Sarrao also testified that payments will include any excess disposable income beyond projections[16] and the Debtor is prepared to file post-confirmation reports reflecting the Debtor's income and expenses.[17]

### 2. Feasibility

Section 1191(c)(3) of Bankruptcy Code sets forth the subchapter V feasibility requirement that "(A) [t]he debtor will be able to make all payments under the plan; or (B)(i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan . . . ."[18]

The feasibility requirement of section 1191(c)(3) "fortifies the more relaxed feasibility test that section 1129(a)(11) contains."[19] The feasibility test set forth in section 1129(a)(11) requires only

---

[13] *See In re Exide Techs.*, 303 B.R. 48, 58 (Bankr. D. Del. 2003).

[14] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[15] 03/05/2024 Tr. 22:22-25 (Sarrao) (the Plan provides for "all of the debtor's disposable income.").

[16] 03/05/2024 Tr. 22:22-25 (Sarrao) ("[I]t's all of the debtor's disposable income. … [I]n the case of this, if we didn't have to pay, the disposable income would increase, it would be more. … [I]t's whatever the disposal income is.").

[17] 03/05/2024 Tr. 74:24-75:1 (Sarrao) (Q: "Is the debtor prepared to file reports with the company's income and expenses after confirmation?" A: "Yes.").

[18] 11 U.S.C. § 1191(c)(3)(A-B(i)) (emphasis added).

[19] *In re Samurai Martial Sports, Inc.*, 644 B.R. 667, 698 (Bankr. S.D. Tex. 2022) (footnote omitted); *see also In re Pearl Res. LLC*, 622 B.R. 236, 269 (Bankr. S.D. Tex. 2020) (footnotes and citations omitted) ("Section 1191(c)(3) adds two additional factors to the "fair and equitable" analysis. First, § 1191(c)(3)(A) requires that the debtor be able to make all payments under the plan, or that there is a reasonable likelihood that the debtor will be able to make all payments under the plan. The new requirement fortifies the more relaxed feasibility test that § 1129(a)(11) contains.) Section 1129(a)(11) requires only that confirmation is not likely to be followed by liquidation or the need

that the Bankruptcy Court determine that the Plan may be implemented and has a "reasonable assurance of success."[20] "[I]t is not necessary for plan success to be guaranteed, nor is the feasibility requirement generally viewed as rigorous."[21]

The Debtor's Income Statement[22] projects Debtor's net income in years 1, 2 and 3 of the Plan, in the amount of $463,913, $748,514, and $704,083, respectively. Mr. Sarrao testified the vast majority of Debtor's revenue comes from the management contract with St. Rose Hospital that runs through May 31, 2025, subject to a two-year renewal through May 31, 2027.[23] He believes the contract will be extended through 2027.[24]

Mr. Sarrao also explained that the Income Statement reflects more available income than initially projected as a result of certain reduced operating expenses, including: Dr. Reddy's reduced salary;[25] reduced payroll taxes, salary, and PTO due to the termination and/or retirement of employees; reduced tax preparation fees due to eliminated entities; and reduced insurance expenses due to the closing of the sale of the Wilson N. Jones Hospital ("WNJ") operated by Sherman/Grayson Hospital, LLC, an affiliate of the Debtor.[26]

In addition, Mr. Sarrao testified that the Income Statement reflects an increase in bankruptcy professional fees and the addition of a control group reserve, a contingent liability, related to a pension plan that is sponsored by Alecto Healthcare Services Ohio Valley.[27] He explained that any contingent liability not paid becomes disposable income to be distributed under the Plan.[28]

The Court finds, based on the Plan, Income Statement, and Mr. Sarrao's testimony, the Debtor has, by a preponderance of the evidence, carried its burden of demonstrating that there is a

---

for further reorganization unless the plan proposes it. … The feasibility requirement for confirmation requires a showing that the debtor can realistically carry out its plan. Though a guarantee of success is not required, the bankruptcy court should be satisfied that the reorganized debtor can stand on its own two feet.")

[20] *In re Indianapolis Downs LLC*, 486 B.R. 286, 298 (Bankr. D. Del. 2013) (citing *Kane v. Johns-Manville Corp.* (*In re Johns–Manville Corp.*), 843 F.2d 636, 649 (2d Cir. 1988)),

[21] *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D. Pa. 1996) (citations omitted).

[22] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization Proposed by the Debtor) at Exs. 1 (Clean) and 2 (Blackline).

[23] JX12 (Amended Management Services Agreement St. Rose Hospital, Hayward, CA); 03/05/2024 Tr. 18:6-8 (Sarrao).

[24] 03/05/2024 Tr. 17:7-22 (Sarrao).

[25] The Reed Creditors and the U.S. Trustee objected to the proposed compensation of the Debtor's post-confirmation officers, as set forth in Art. VIII.7 of the Plan. At the commencement of the Confirmation Hearing, the Debtor announced that the CEO's proposed salary had been reduced from $750,000 to $550,000 per year and that Messrs. Reddy and Williams would not receive any salary increase in the next 3 years.

[26] 03/05/2024 Tr. 19:11-21:2 (Sarrao). Sherman/Grayson Hospital, LLC ("Sherman/Grayson") is also in bankruptcy in this Court. Case No. 23-10810. In that case, the sale of WNJ closed on January 1, 2024; however, prior to closing, the purchaser operated WNJ. *See* Del. Bankr. Case No. 23-10810, D.I. 60, 161, and 314.

[27] 03/05/2024 Tr. 20:9-13; 21:3-22:16 (Sarrao).

[28] 03/05/2024 Tr. 22:20-25 (Sarrao).

reasonable likelihood that the Debtor will be able to make all payments under the Plan.  Thus, the
Plan meets the feasibility requirements of sections 1129(a)(11) and 1191(c)(3)(A).

### 3.  Remedies

Section 1191(c)(3)(B) requires that the plan provide appropriate remedies if the debtor does not
make required payments under a plan.  Article VII.5 of the Plan provides remedies upon default
in satisfaction of section 1191(c)(3)(B).

### 4.  Unfair Discrimination

Under the Plan, Class 1 (Allowed Priority Non-Tax Claims) and Class 2 (Allowed Secured
Claims) will receive a 100% recovery; Class 3 (Allowed General Unsecured Claims) will receive
a pro rata share of the Debtor's projected disposable income, an approximate 3–10% recovery of
the total general unsecured claims; and Class 4 (Equity Interest Holders) will retain their equity
ownership interest in the Debtor.  The Plan's treatment of Claims and Equity Interests is proper
because all similarly situated holders of Claims and Equity Interests will receive substantially
similar treatment.  No party has challenged the proposed classification and/or treatment under the
Plan.  The Court finds that the Plan does not discriminate unfairly and meets the requirements of
11 U.S.C. §§ 1191(b) and 1129(b)(1).

## C.  Best Interests of Creditors - 11 U.S.C. § 1129(a)(7)

A plan satisfies the best interest of creditors when, "with respect to each impaired class of claims
or interests . . . each holder of a claim or interest of such class . . . will receive or retain under the
plan on account of such claim or interest property of a value, as of the effective date of the plan,
that is not less than the amount that such holder would so receive or retain if the debtor were
liquidated under chapter 7 . . . ."[29]

Exhibit G to the Plan, the Revised Liquidation Analysis,[30] dated March 3, 2023 (the "Liquidation
Analysis"), projects that $265,338 will be available for payment of claims in chapter 7, while
$2,079,010 will be available for payment of claims under the Plan.[31]  No evidence has been
presented to refute the Debtor's projections.  Mr. Sarrao testified creditors would receive more in
a chapter 11 than chapter 7, stating: "I think very little, if anything, would be distributed to the
creditors if there was a Chapter 7."[32]  Moreover, no credible evidence validates a finding that
conversion to chapter 7 would be in the best interests of creditors.

---

[29] 11 U.S.C. § 1129(a)(7)(A)(ii).

[30] D.I. 316 (Notice of Filing of Amended Exhibits C and G to Small Business Debtor's Plan of Reorganization
Proposed by the Debtor) at Exs. 3 (Clean) and 4 (Blackline).

[31] *Id.*

[32] 3/5/2024 Tr. 24:6-9; 25:12-21 (Sarrao).

## D. Confirmation Objections

Numerous Plan objections have been resolved and those resolutions are included in a revised proposed confirmation order (the "Proposed Confirmation Order")[33] or noted on the record at the Confirmation Hearing.  Below is the Court's ruling with respect to each pending objection.

### 1. U.S. Trustee Objection to the Process Regarding Amended Proofs of Claim

The U.S. Trustee objects to Article IV.3.f. of the Plan and paragraph 50 of the Proposed Confirmation Order that prohibit amendments to claims and automatically disallows post-Effective Date amendments to claims.  Paragraph 50 of the Proposed Confirmation Order[34] provides, in part: "Any amendment to a proof of Claim filed after the Effective Date shall be ineffective unless approved by the Bankruptcy Court after notice and an opportunity for hearing."

The U.S. Trustee argues that the proposed language violates 11 U.S.C. § 502 because a claim is deemed allowed until objected to and it is a debtor's responsibility to object to late-filed amended claims.  The U.S. Trustee contends that replacing the phrase "disallowed in full and expunged" with the term "ineffective," does not resolve the procedural deficiency.

The Debtor argues against an unlimited right to file and/or amend a claim and maintains that finality is required in the claims administration process.  The Debtor further contends that while the issue is procedural; it could have a substantive impact because "real money" is spent to defend claims and late filed claims could increase the claims pool and cause disgorgement of claims already paid.  The Debtor cites various cases in support of its position.

The cases cited in support of the Debtor's position, which bar the filing of an amended claim post-Effective Date, are inapposite.  In *Holstein v. Brill*[35] and *IRT Partners, L.P. v. Winn-Dixie Stores, Inc.*,[36] the Seventh and Eleventh Circuits, respectively, held that *res judicata* should preclude post-confirmation amendment of claims absent some compelling reason.  Likewise, in *Kaiser Group International*,[37] the debtor sought to estimate a claim and cited to the *Holstein* holding in a footnote.  None of those cases involved a procedure or addressed a plan provision that automatically expunged, disallowed, or deemed "ineffective" an amended claim filed after the Effective Date.

A properly filed proof of claim is deemed allowed unless a party in interest objects, at which point the court must determine the amount of the claim to be allowed.[38]  Section 502(b) requires

---

[33] D.I. 334.

[34] *Id.*

[35] *Holstein v. Brill*, 987 F.2d 1268 (7th Cir.1993).

[36] *IRT Partners, L.P. v. Winn-Dixies Stores, Inc. (In re Winn-Dixie Stores, Inc.)*, 639 F.3d 1053, 1056 (11th Cir. 2011).

[37] *In re Kaiser Grp. Int'l, Inc.*, 289 B.R. 597 (Bankr. D. Del. 2003).

[38] 11 U.S.C.A. § 502(a), (b).

"notice and a hearing" prior to the disallowance of a claim. The language at issue in paragraph 50 is inconsistent with the Bankruptcy Code. For these reasons, the Court sustains the U.S. Trustee's objection.

### 2. Reed Creditors

The Reed Creditors object to the proposed Debtor Releases and Injunction provisions in the Plan and assert that the Plan was not filed in good faith. Each issue will be addressed.

### a. Debtor Releases

The Reed Creditors object to the proposed Debtor Releases, Plan Art. VII.2, that release Debtor's insiders in consideration for payment of $25,000 (the "Settlement Consideration"), a sum they argue will yield no benefit to creditors. They argue that they have identified at least two potential causes of action against the members of Alecto Healthcare Services, LLC (the "Alecto Members"): (1) a $22 million fraudulent conveyance claim involving the Debtor's transfer of Sunrise Real Estate Holdings, LLC to the Alecto Members while the Debtor was insolvent, for which GCS acknowledges in its report (the "GCS Report") that reasonably equivalent value was not received in that transaction; and (2) breach of fiduciary duty claims against Alecto Members arising from Alecto's advancement of funds to affiliates while it was insolvent or in the zone of insolvency instead of making payment to Alecto's creditors.

Section 1123(b)(3)(A) of the Bankruptcy Code provides that a chapter 11 plan may provide for the "settlement or adjustment of any claim or interest belonging to the debtor or to the estate."[39] Further, a debtor may release claims under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[40]

The Court determines if the released claims fall into the lowest point of reasonableness for a settlement.[41] "When determining whether to approve a settlement, the bankruptcy court should consider: (1) the probability of success in the litigation; (2) the complexity, expense, and delay of the litigation involved; (3) the possible difficulties in collection; and (4) the paramount interests of creditors."[42] "The court does not have to be convinced that the settlement is the best possible

---

[39] *In re Coram Healthcare Corp.*, 315 B.R. 321, 334-35 (Bankr. D. Del. 2004).

[40] *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010) (footnote and citation omitted).

[41] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted).

> Where a compromise is part of a plan of reorganization, however, the court has the duty "to determine that a proposed compromise forming part of a reorganization plan is fair and equitable." The standards for approval of a settlement under section 1123 are generally the same as those under Rule 9019, though the court should consider all factors relevant to a "full and fair assessment of the wisdom of the proposed compromise."

*Id.* at 334–35 (citations omitted).

[42] *Coram Healthcare Corp.*, 315 B.R. at 330 (citations omitted); *Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996)).

compromise, but only that the settlement falls within a reasonable range of litigation possibilities."[43]  Courts generally defer to a trustee's business judgment when there is a legitimate business justification for the trustee's decision.[44]

In determining the reasonableness of the settlement, the Court reviews the underlying claims alleged by the Reed Creditors that were investigated by the independent director.

### 1) Fraudulent Conveyance Action[45]

The Reed Creditors assert that the June 2019 transfer of Sunrise REH and Plaza MOB (the "Sunrise Transfer") was a fraudulent conveyance.  The GCS Report concludes that the Sunrise Transfer was completed "without receiving reasonably equivalent value in exchange."[46]

The Debtor responds that *even if* there was not reasonably equivalent value for the Sunrise Transfer, it does not matter because the Debtor was not insolvent in June 2019, as required by California law.

The California Fraudulent Transfer Act contains two possible applications in determining whether the Sunrise Transfer was a fraudulent conveyance.  California Civil Code section 3439.04 applies to present and future creditors and section 3439.05 applies only to present creditors.  The parties did not distinguish between the two statutes in their papers or arguments. The Court reviews both.

Section 3439.04, provides that "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . .[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[47]  No evidence was presented indicating that the Debtor intended or, in fact, would become insolvent as a result of the Sunrise Transfer.[48]

Section 3439.05 states a fraudulent transfer is "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without

---

[43] *In re Wash. Mut, Inc.*, 442 B.R. 314, 338 (Bankr. D. Del. 2011) (citations omitted).

[44] *Martin*, 91 F.3d at 3953.

[45] The Debtor argued that only the California Uniform Fraudulent Transfer Act could be applicable to the Reed Creditors' assertion, and the Reed Creditors argue solvency under the Uniform Fraudulent Transfer Act applies. California Civil Code 3439.05 and the Uniform Fraudulent Transfer Act, for the purposes of the Court's analysis are substantially similar.  As validity of the claim hinges on solvency, under either statute, the result would be the same.

[46] JX96.003.

[47] Cal. Civ. Code § 3439.04.

[48] 03/04/2024 Tr. 29:3-31:34 (Sarrao).

receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."[49]   Under California law:

> (a) A debtor is insolvent if, at a fair valuation, the sum of the debtor's debts is greater than the sum of the debtor's assets.
> ...
> (c) Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.
> (d) Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.[50]

Mr. Balasiano, the Debtor's independent director responsible for examining the transaction, testified that he conducted an investigation as to potential fraudulent conveyance claims, including discussions with Ms. Gould (who had performed an analysis of the transactions going back four years prior to the bankruptcy filing),[51] his counsel, and Debtor's counsel.[52] He also reviewed the GCS Report, P&L balance sheet, cash flow, and tax returns.[53] Mr. Balasiano relied upon the Debtor's 2019 balance sheet, which reflects the Debtor had an equity value of at least $9.4 million;[54] and the Debtor's 2019 tax returns, which show assets in excess of $18 million.[55] He concluded the Debtor had a positive balance sheet for 2019 (and 2020) and was able to pay its debts as they became due.[56]  Both the balance sheet reflecting assets in excess of liabilities and the payment of debts as they become due are acceptable methods for calculating solvency under the California fraudulent conveyance statute.[57]

Based on his investigation, Mr. Balasiano concluded that "there was no actionable cause of action that could be brought as a result of that transaction [Sunrise Transfer]" because "[t]he company was solvent."[58] He reasoned that: "In order to bring a fraudulent conveyance action

---

[49] Cal. Civ. Code § 3439.05(a).

[50] Cal. Civ. Code § 3439.02. *See also In re Beverly*, 374 B.R. 221, 238 n. 18 (B.A.P. 9th Cir. 2007), *aff'd in part, dismissed in part*, 551 F.3d 1092 (9th Cir. 2008) (applying this statute to a fraudulent transfer analysis).

[51] JX96.002 (GCS Report).

[52] 03/04/2024 Tr. 76:25-77:20 (Balasiano).

[53] 03/04/2024 Tr. 78:4-14 (Balasiano).

[54] 03/04/2024 Tr. 89:11-24 (Balasiano); 03/05/2024 Tr. 33:22-35:5; 44:17-46:21 (Sarrao); JX2 (Alecto Healthcare Services, LLC Income Statement FY19).

[55] JX1.010 (2019 Tax Return for Alecto Healthcare Services LLC prepared by MossAdams) and JX41 (Alecto Healthcare Services Balance Sheet Summary (in millions), dated 12/31/2019).

[56] 03/04/2024 Tr. 80:11 (Balasiano).

[57] Cal. Civ. Code § 3439.02. *See also In re Beverly*, 374 B.R. at 238.

[58] 03/04/2024 Tr. 80:3-16 (Balasiano).

there are two factors. One is there has to be a transfer for lack of reasonably equivalent value and, number two, the company has to be insolvent at the time of that transfer. Clearly, the second fact[or] of the test was not satisfied her[e]."[59]

The burden of proving insolvency is on the creditor by a preponderance of the evidence.[60] "As a general rule 'solvency and not insolvency is presumed.'"[61] Here, the Reed Creditors did not carry their burden to prove by a preponderance of the evidence that the Debtor was insolvent at the time of the Sunrise Transfer.

The Court finds that Mr. Balasiano's determination that there is "no actionable cause of action that could be brought" for fraudulent conveyance is a reasonable basis for the settlement.[62]

### 2) **Breach of Fiduciary Duties**

Next, the Reed Creditors assert that the Debtor is releasing viable claims against the Alecto Members for Breach of Fiduciary Duties arising from Alecto's advancement of funds to its affiliates while Alecto was allegedly insolvent or in the zone of insolvency instead of making payment to its creditors. The crux of this allegation is that more than $5 million was advanced to Sherman/Grayson after the Reed Creditors obtained their approximately $3.2 million judgment against Alecto in November 2022, and before the Petition Date. Essentially, the Reed Creditors allege that the Debtor favored propping-up Sherman/Grayson, it's affiliate, over the Reed Creditors, it's creditor.

In Delaware, "limited liability company managers owe fiduciary duties akin to those owed by directors of a corporation."[63] "Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty."[64]

"The fiduciary duty of due care requires that directors of a Delaware corporation both: (1) use that amount of care which ordinarily careful and prudent men would use in similar

---

[59] 03/04/2024 Tr. 80:11-16 (Balasiano). The Debtor asserted that *even if* the Sunrise Transfer was a fraudulent conveyance, the property was transferred back to the Debtor in 2021. And, as the 2021 transfer resulted in more equity for the Debtor than the 2019 Sunrise Transfer, such transfer should be "set off" against the 2021 transfer back to the Debtor. The Court is *not* assessing the merits of the Sunrise Transfer (nor the 2021 return transfer). Here, the Court is determining whether the settlement of the causes of action in the Releases (in exchange for the Settlement Consideration) is in "the lowest point in the range of reasonableness." *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted). As a result, the Court need not address the "set off" argument.

[60] *See Stearns v. Los Angeles City Sch. Dist.*, 53 Cal. Rptr. 482, 509 (Cal. Ct. App. 1966) (citations omitted); *Whitehouse v. Six Corp.*, 48 Cal. Rptr. 2d 600, 606 (Cal. Ct. App. 1995), *as modified* (Nov. 29, 1995), *as modified on denial of reh'g* (Dec. 19, 1995).

[61] *Stearns*, 53 Cal. Rptr. at 509 (citing *Hasenjeager v. Voth*, 267 P. 146, 147 (Cal. Ct. App. 1928)).

[62] 03/04/2024 Tr. 80:3-9 (Balasiano); *Wash. Mut., Inc.*, 442 B.R. at 328 (citations omitted).

[63] *Mehra v. Teller*, No. CV 2019-0812-KSJM, 2021 WL 300352, at *28 (Del. Ch. Jan. 29, 2021) (footnote omitted).

[64] *77 Charters, Inc. v. Gould*, No. CV 2019-0127-JRS, 2020 WL 2520272, at *9 (Del. Ch. May 18, 2020) (citations omitted).

circumstances; and (2) consider all material information reasonably available."[65] The business judgment standard is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[66] A court will not disturb the business decisions of loyal and informed directors "if they can be attributed to any rational business purpose."[67]

The fiduciary duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."[68] A director is "being independent only when the director's decision is based entirely on the corporate merits of the transaction and is not influenced by personal or extraneous considerations."[69]

Mr. Balasiano also investigated the breach of fiduciary duty claims[70] and concluded:

> [there were] no breach of fiduciary duties, no breach of duty -- no
> breach of loyalty, and no breach of duty of care by the directors
> and the officers in this case. All of the activities that were done, all
> the funds that were allocated to the different subsidiaries,
> especially to the Sherman/Grayson, which I believe is the biggest
> issue in the case right here, right now, especially to
> Sherman/Grayson were allocated in a fashion with the appropriate
> judicious business judgment. The actions that the business
> members took were daily conversations, daily decisions that were
> undertaken in order to keep Sherman/Grayson Hospital afloat to
> enable to sell it as a going concern.[71]

After speaking with his counsel, the Debtor's counsel, and officers and employees of the Debtor; examining documents, including those related to Sherman/Grayson;[72] and reviewing the decisions made by the Alecto Members, Mr. Balasiano determined that the Alecto Members acted within their business judgment.[73] He reasoned that a going concern sale is typically better for a company than a liquidation or closure, and in this case, the Alecto Members were cognizant of approximately $30 million in collateral liabilities (such "Springing Liabilities" are discussed

---

[65] *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer (In re Bridgeport Holdings, Inc.)*, 388 B.R. 548, 568 (Bankr. D. Del. 2008) (citation omitted).

[66] *Gantler v. Stephens*, 965 A.2d 695, 705–06 (Del. 2009) (footnote omitted).

[67] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971).

[68] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) (citations omitted).

[69] *Id.* at 364 (citations omitted).

[70] 03/04/2024 Tr. 74:14-75:3 (Balasiano).

[71] 03/04/2024 Tr. 83:4-16 (Balasiano).

[72] 03/04/2024 Tr. 80:20-82:1 (Balasiano).

[73] 03/04/2024 Tr. 83:2-16 (Balasiano).

below) from the potential closure of WNJ.[74]  The Alecto Member's determined that supporting
WNJ would allow a purchaser to assume many, if not all, of these Springing Liabilities.[75]  Based
on his investigation, Mr. Balasiano concluded that the Alecto Members acted within their
fiduciary duties and pursuant to their business judgment.  Mr. Balasiano concluded that there was
no valid cause of action for breach of fiduciary duties and the release of such claims
appropriate.[76]

In addition, Mr. Balasiano testified about the costs of potential litigation.  He said litigation could
give rise to indemnification under the Operating Agreement which would further deplete assets
of Alecto.[77]  Although there is insurance, the insurer would be entitled to review for coverage.[78]
Mr. Balasiano concluded the financial resources of the Debtor could be drained.[79]

Mr. Balasiano's reasoning is supported by Mr. Sarrao who testified that Alecto Managers spoke
nearly every business day regarding the oversight and management of the business[80] and were
aware of the potential harm to Alecto if it stopped funding the affiliates.[81]  He explained the
following Springing Liabilities were considered in the Alecto Members' decision-making
process:

- Alecto guaranteed the real estate lease at the WNJ facility.  This lease obligation would
  be an approximate $7.2 million liability of Alecto.[82]

- Alecto, as guarantor, would be liable under a "put option" for the hypothetical fair market
  value of a facility adjacent to WNJ if it did not operate for 12 months.[83]  Mr. Sarrao
  estimates this liability between $13-15 million.[84]

---

[74] 03/04/2024 Tr. 83:17-84:14 (Balasiano).

[75] 03/05/2024 Tr. 52:20-53:2 (Sarrao).

[76] 03/04/2024 Tr. 83:2-84:4 (Balasiano).

[77] 03/04/2024 Tr. 107:12-16 (Balasiano).

[78] 03/04/2024 Tr. 107:22-108:17 (Balasiano).

[79] 03/04/2024 Tr. 85:3-9 (Balasiano).

[80] 03/05/2024 Tr. 15:17-16:5 (Sarrao).

[81] *See, e.g.,* 03/05/2024 Tr. 52:20-53:17 (Sarrao) (describing obligations from Sherman/Grayson that the Debtor
would become liable for without providing funding to Sherman/Grayson); *see also Asmussen v. Quaker City Corp.*,
156 A. 180, 181 (Del. Ch. 1931) (holding that directors of insolvent corporations may appropriately prefer particular
creditors); *Pennsylvania Co. for Insurances on Lives and Granting Annuities v. South Broad St. Theatre Co.*, 174 A.
112, 115-16 (Del. Ch.1934) (finding that the board's preference of one creditor over another could be a breach of
fiduciary duty if motivated by self-interest). *See also Nelson v. Emerson*, No. CIV.A. 2937-VCS, 2008 WL
1961150, at *9 n. 59 (Del. Ch. May 6, 2008).

[82] 03/05/2024 Tr. 53:8-17 (Sarrao). JX18 (Lease Agreement between MPT of Sherman Alecto Hospital, LLC and
Sherman/Grayson Hospital, LLC dated Oct. 31, 2014).

[83] 03/05/2024 Tr. 55:13-22 (Sarrao).

[84] 03/05/2024 Tr. 55:3-22; 58:2-15 (Sarrao). 03/04/2024 Tr. 84:7-12 (Balasiano).  JX10 (Ground Lease Agreement
for 300 N. Highland Dr., Sherman, TX); JX19 (Assumption and Assignment of MOB Ground Lease); JX20
(Guaranty).

- During the COVID-19 pandemic, WNJ was a recipient of Medicare advance payments under the CAAP program from CMS.[85] Mr. Sarrao believes CMS would pursue Alecto for return of these advance payments if WNJ did not pay them.[86] Mr. Sarrao estimates this liability to be over $5 million if WNJ closed.[87]

- Mr. Sarrao testified that, at any given time, there is approximately $800,000 of accrued payroll at WNJ and that such payroll would become the responsibility of Alecto if WNJ did not pay the accrued payroll.[88]

- Mr. Sarrao believes that there is approximately $1 million of accrued pay roll taxes that would become the responsibility of Alecto.[89]

- Mr. Sarrao testified that WNJ accrued approximately $775,000 in PTO (paid time off) for its employees that would become the responsibility of Alecto if WNJ closed.[90]

- Mr. Sarrao testified that Alecto would be liable for up to $500,000 in accrued real estate taxes if WNJ closed and did not pay its taxes.[91]

- Mr. Sarrao testified if WNJ closed (i) there would be wind-down costs associated with the computer systems and paper records at WNJ which contain protected health records; (ii) pharmaceuticals, including radioactive materials, would have to be handled in accordance with applicable law; (iii) WNJ patients would have to be transferred to other facilities; and (iv) WNJ's facility secured and equipment disposed of during closure. Mr. Sarrao estimates these expenses would be approximately $3 million.[92]

- Mr. Sarrao testified approximately $1 million of personal property taxes would be due and owning and would become the responsibility of Alecto.[93]

- Mr. Sarrao testified Alecto would face approximately $3-3.2 million of possible WARN Act claims if WNJ closed without any advance notice to employees.[94]

---

[85] 03/05/2024 Tr. 58:16-22 (Sarrao). Referring to the "COVID-19 Accelerated and Advance Payment" from the Centers for Medicare & Medicaid Services. *See* https://www.cms.gov/medicare/payment/covid-19/covid-19-accelerated-and-advance-payments/covid-19-accelerated-and-advance-payment-caap-and-repayment-reporting.

[86] 03/05/2024 Tr. 59:3-5 (Sarrao).

[87] 03/05/2024 Tr. 58:18-59:12 (Sarrao).

[88] 03/05/2024 Tr. 59:15-21 (Sarrao).

[89] 03/05/2024 Tr. 61:5-8 (Sarrao).

[90] 03/05/2024 Tr. 59:18-21 (Sarrao).

[91] 03/05/2024 Tr. 59:25-60:7 (Sarrao).

[92] 03/05/2024 Tr. 60:8-24 (Sarrao).

[93] 03/05/2024 Tr. 60:25-61:5 (Sarrao).

[94] 03/05/2024 Tr. 61:10-62:3 (Sarrao).

Mr. Sarrao testified that in his business judgment, and the business judgment of the board of managers, when Alecto found a buyer for WNJ, the sale would absorb many of the Springing Liabilities[95] (which indeed occurred in the Sherman/Grayson bankruptcy case).

Mr. Sarrao further testified about the negative impact of the COVID-19 pandemic on hospital operations and profits, including (i) increased labor and supply costs (particularly, traveling nurses and respiratory therapist); (ii) static reimbursement rates from insurance and Medicare; (iii) decreased patients; (iv) closure of more profitable hospital departments, such as the psychiatric in-patient ward and elective surgeries.[96] These COVID-related pressures, and resulting decline in profits, were considered and impacted the Alecto Managers' exercise of their business judgment in determining how to expend limited financial resources.[97]

There is no evidence that the Alecto Managers did not consider all information reasonably available to them, or that they were negligent in determining whether to make transfers to Sherman/Grayson. Similarly, no evidence was presented that the managers acted in their own self-interests rather than the interests of Debtor.

### 3) *Zenith* Factors

In addition to analyzing the Debtor Releases under the business judgment standard, some courts within the Third Circuit assess the propriety of a debtor release under the five *Zenith* factors:

> (1) an identity of interest between the debtor and non-debtor such that a suit against the non-debtor will deplete the estate's resources; (2) a substantial contribution to the plan by the non-debtor; (3) the necessity of the release to the reorganization; (4) the overwhelming acceptance of the plan and release by creditors and interest holders; and (5) the payment of all or substantially all of the claims of the creditors and interest holders under the plan.[98]

No one *Zenith* factor is dispositive, nor is a plan proponent required to establish each factor for the release to be approved.[99] Applying *Zenith*, two factors are neutral. Factor 1, whether there is an identity of interest between the Debtor and non-debtors, is neutral because it is subject to debate[100] and the parties have not provided sufficient evidence on the issue. Similarly, factor 4 is neutral because no creditors voted to accept or reject the Plan.

---

[95] 03/05/2024 Tr. 64:16-23 (Sarrao). The Sherman/Grayson sale of the WNJ hospital closed on January 1, 2024. Del. Bankr. Case No. 23-19810, D.I. 314.

[96] 03/05/2024 Tr. 178:15-81:12 (Sarrao).

[97] 03/05/2024 Tr. 178:6-183:4 (Sarrao).

[98] *Coram Healthcare Corp.*, 315 B.R. at 335 (*citing In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)).

[99] *In re Wash. Mut. Inc.*, 442 B.R. at 346.

[100] JX13 (Alecto Healthcare Services LLC Amended and Restated Operating Agreement, § 7.8) (specifying certain indemnification obligations that the Debtor has in relation to the Released Parties).

Two factors weigh in favor of releases. Factor 2, the substantial contribution factor, weighs in favor because the "Released Parties" are contributing the Settlement Consideration for distribution to the creditors under the Plan.[101] Mr. Balasiano, the independent director tasked with reviewing claims, determined in his business judgment that the alleged claims were not actionable;[102] under the circumstances, the Court finds the contribution to be substantial. Factor 3, the uncontroverted testimony established that, absent the releases, the Debtor would not proceed with the Plan.[103] If this case is converted to Chapter 7, the Liquidation Analysis reflects no recovery for unsecured creditors.[104]

Factor 5 weighs against releases. All claim holders will be paid in full except those in Class 3 who will receive a pro rata recovery over a three-year plan period.[105]

On balance, the *Zenith* factors favor approval of the Debtor Releases.

### 4) Conclusion Regarding Debtor Releases

In sum, Mr. Balasiano, the Debtor's independent director, determined in his business judgment and based on his independent investigation, that there was not an actionable claim for fraudulent conveyance or breach of fiduciary duties, and that the release of such claims was appropriate. No contrary evidence was presented.

Based on the evidence, and considering the *Zenith* standard, the Court finds that the proposed settlement falls within a reasonable range of litigation possibility. Under the *Martin* factors, the claims have very little probability of success on the merits, if any.[106] Absent the settlement, the Debtor would face increased expense, inconvenience and delay attending to litigation.[107] These are complex claims that could cause delay in the distribution of any assets to the creditors. Additionally, the creditors will receive the Settlement Consideration as part of the disposable income of the Debtor. There was no evidence regarding the possibility of collection on any

---

[101] Plan (D.I. 261) at Art. IV.5; Sarrao Declaration (D.I. 307) at ¶ 69; 03/04/2024 Tr. 80:3-9, 83:2-7 (Balasiano); 03/05/2024 Tr. 176:2-4 (Sarrao).

[102] 03/04/2024 Tr. 80:3-9; 83:2-7.

[103] 03/05/2024 Tr. 73:18-74:1 (Sarrao) ("Q. Are the releases in conjunction and exculpation each an (indiscernible) part of the debtor[']s plan? A. From my view, yes. Q. And has the board considered whether to proceed with the plan if each of those provisions is not approved? A. It has. Q. And what would the [board] do if these were not approved? A. It would likely not proceed with the plan as it's structured right now.").

[104] Plan (D.I. 261) at Art. IV.5; *see also* 03/05/2024 Tr. 22:20-25 (Sarrao).

[105] Plan (D.I. 261) at Art. IV.1-2.

[106] *See* generally *In re World Health Alts., Inc.*, 344 B.R. 291, 302 (Bankr. D. Del. 2006) ("Factor one favors settlement because there is a low probability of litigation success. A sufficient degree of uncertainty exists as to whether the Committee, or a chapter 7 trustee, could prevail on any of the potential causes of action against CapSource. Moreover, the Court finds that the probability of successfully challenging CapSource's liens is low.")

[107] *Id.* ("Substantial expenditure of money may not be warranted in light of the low probability of success and the estate's limited resources.")

judgment, so this factor is neutral. The other three *Martin* factors weigh in favor of approving the settlement.

The Settlement Consideration is a substantial contribution because there are no actionable causes of action that could be brought based on these purported claims. As a result, the Debtor Releases are a valid exercise of the Debtor's business judgment, are fair, reasonable, and in the best interest of the Debtor's estate. The sole remaining objection to the Debtor Releases is overruled.

### b. Injunction

The Reed Creditors object to the Injunction in Section VII.4 of the Plan. They argue the Injunction creates the equivalent of non-consensual third-party release because it enjoins creditors from pursuing the Released Parties.[108] Paragraph 69 of the Proposed Confirmation Order, which was revised to resolve certain objections, states: "Nothing in the Plan or herein shall be interpreted to provide any third-party releases, however no party may bring a derivative claim of the Debtor or its estate against any of the Released Parties for any Claim arising prior to the Effective Date."[109]

As a general matter, creditors, such as the Reed Creditors, of an insolvent corporation (or a corporation operating in the zone of insolvency) cannot bring direct causes of action (including fraudulent conveyance and breach of fiduciary duty claims) against such corporation's officers and directors.[110] Such claims must be brought derivatively.[111]

As the Court finds that the Debtor's settlement by release of the above-described claims is appropriate and the only way for the Reed Creditors to bring such claims is derivatively (i.e., standing in the shoes of the Debtor), the objection to the proposed injunction is overruled.

### c. Good Faith - 11 U.S.C. §1129(a)(3)

Section 1129(a)(3) requires a plan to be "proposed in good faith and not by any means forbidden by law." At the Confirmation Hearing, the Reed Creditors argued the Debtor cannot satisfy the good faith requirement.

First, the Reed Creditors argue that this case involves process, evidence, and legal failures in the Debtor's efforts to obtain releases through the Plan in favor of its insiders. They assert that the independent director could not fulfill his role as a fiduciary to creditors because he failed to evaluate the potential causes of action independently, engaged in a "cursory" analysis, and was unable to articulate why he determined those claims were not viable. They also argue that Mr. Sarrao is not an expert on solvency and is conflicted as a potential target of a possible breach of fiduciary duty claim. As detailed above, Mr. Balasiano, an independent director, with fiduciary

---

[108] Plan (D.I. 261) at Art. VII.4.

[109] D.I. 334.

[110] *N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 100–01 (Del. 2007).

[111] *Id.* at 101.

16

duties, investigated and analyzed the potential claims and concluded there were no actionable causes of actions that could be brought.[112]  Likewise, Mr. Sarrao relied upon documents prepared in the ordinary course of business and his experience with the Debtor's business.  The Court found both Messrs. Balasiano's and Sarrao's testimony to be credible.

Second, the Reed Creditors argue the $25,000 consideration for the release of claims will "yield no benefit to creditors."  They argue this recovery is "paltry" compared to a potential $1.9 million recovery if the fraudulent conveyance and breach of fiduciary duty claims were successfully prosecuted.  Again, considering Mr. Balasiano's determination regarding the claims, $25,000 for the release of the purported claims is substantial and yields a recovery to creditors.

Finally, the Reed Creditors argue that preserving causes of action for the Reorganized Debtor amounts to benefitting the insiders.  However, the Reed Creditors never presented any evidence or otherwise explained how the plan fails to satisfy section 1129(a)(3).  In contrast, the evidence shows that the Plan "comports with . . . [the] principal purpose of the Bankruptcy Code," which "is to grant a fresh start to debtors."[113]

For these reasons, the Court finds that the Plan "has been proposed in good faith and not by any means forbidden by law."[114]  The Reed Creditors' objection is overruled.

## E.  Conclusion

Based on the record before the Court, and as explained above, the Court finds that the Plan satisfies the requirements of the Bankruptcy Code.  The Court will confirm the Plan, subject to modification of the Proposed Confirmation Order.  A hearing will be held on **March 25, 2024, at 11:00 am (Prevailing Eastern Time)** to discuss the language of the Proposed Confirmation Order.[115]

Regards,

J. Kate Stickles
United States Bankruptcy Judge

cc: Counsel on attached Service List via E-mail

---

[112]  Mr. Balasiano, an attorney, serves as trustee and independent director in bankruptcy cases, including evaluating potential causes of action.

[113]  *See City of Chicago v. Fulton*, 141 S. Ct. 585, 593 (2021) (citation omitted).

[114]  11 U.S.C. § 1129(a)(3).

[115]  To the extent unresolved, the Court will address the objection of the United States of America and the U.S. Trustee to Article VI.c. of the Plan and paragraph 53 of the Proposed Confirmation Order relating to forfeiture of undeliverable or unclaimed distributions.

## Service List

**Counsel to the Debtor**
Jeffrey R. Waxman, Esquire
Tara C. Pakrouh, Esquire
Christopher M. Donnelly, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
jwaxman@morrisjames.com
tpakrouh@morrisjames.com
cdonnelly@morrisjames.com

**Counsel for Debtor's Independent
Director/Manager**
Justin R. Alberto, Esquire
Cole Schotz P.C.
500 Delaware Ave., Suite 1410
Wilmington, DE 19801
JAlberto@coleschotz.com

**Subchapter V Trustee**
Jami Nimeroff, Esquire
Brown McGarry Nimeroff LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801
JNimeroff@bmnlawyers.com

**United States Trustee**
Linda Casey, Esquire
Office of the United States Trustee
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Linda.Casey@usdoj.gov

**Counsel for the United States of America**
Brian M. Boynton, Esquire
Kirk T. Manhardt, Esquire
Marc S. Sacks, Esquire
Stanton C. Mcmanus, Esquire
U.S. Department of Justice –
   Civil Division Commercial
Litigation Branch
P.O. Box 875, Ben Franklin Station
Washington, DC 20044
stanton.c.mcmanus@usdoj.gov

-and-

Leah V. Lerman, Esquire
U.S. Department of Justice Civil Division
P.O. Box 875 Ben Franklin Station
Washington, DC 20044-0875
Leah.V.Lerman@usdoj.gov

**Counsel for the Reed Action Judgment Creditors**
William D. Sullivan, Esquire
William A. Hazeltine, Esquire
Sullivan Hazeltine Allinson LLC
919 North Market Street, Suite 420
Wilmington, DE 19801
bsullivan@sha-llc.com
whazeltine@sha-llc.com

-and-

Colten L. Fleu, Esquire
Mountain State Justice, Inc.
1217 Quarrier St.
Charleston, WV 25301
colten@msjlaw.org

-and-

John Stember, Esquire
Maureen Davidson-Welling, Esquire
Stember Cohn & Davidson-Welling, LLC
The Harley Rose Building
425 First Avenue, 7th Floor
Pittsburgh, PA 15219
jstember@stembercohn.com
mdavidsonwelling@stembercohn.com